ELECTRONICALLY FILED - 2025 Feb 03 1:45 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| | ) | |
| COUNTY OF FLORENCE | ) | CASE NO: 2024-CP-21-02844 |
| | ) | |
| City of Florence, South Carolina, | ) | |
| | ) | |
| Plaintiff, | ) | **AFFIDAVIT OF SERVICE** |
| | ) | |
| vs. | ) | |
| | ) | |
| Aladdin Manufacturing Corporation; | ) | |
| Americhem, Inc., et. al., | ) | |
| | ) | |
| Defendants. | ) | |

The undersigned, Debbie Brothers being duly sworn, says that she served the foregoing: **COVER LETTER, AMENDED SUMMONS AND AMENDED COMPLAINT** in the above captioned action upon the Defendant **ALADDIN MANUFACTURING CORPORATION** by delivering the same to:

( ) the individual personally

(X) **TRACEY FOREMAN, Paralegal for Corporation Service Company, Registered Agent** person served as authorized/designated to receive service for the defendant and leaving with him/her one (1) copy of the same at **508 Meeting Street, West Columbia, SC** on the **27th day** of **January, 2025,** at **10:34 a.m.**

The Affiant further says, that upon information and belief, she know the person so served to be the defendant mentioned and described in the documents served and that the affiant is not a party to nor interested in the action.

_Debbie Brothers_
Debbie Brothers

SWORN TO before me this ___28___ day
of _January_ ,2025
_McArthur Lewis_
Notary Public for S.C.
My Commission Expires: _3-6-2025_

ELECTRONICALLY FILED - 2025 Feb 03 1:45 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STATE OF SOUTH CAROLINA   )   IN THE COURT OF COMMON PLEAS
   )
COUNTY OF FLORENCE   )   CASE NO: 2024-CP-21-02844
   )
City of Florence, South Carolina,   )
   )
       Plaintiff,   )   **AFFIDAVIT OF SERVICE**
   )
vs.   )
   )
Aladdin Manufacturing Corporation; )
Americhem, Inc., et. al.,   )
   )
       Defendants.   )
   )

The undersigned, Debbie Brothers being duly sworn, says that she served the foregoing: **COVER LETTER, AMENDED SUMMONS AND AMENDED COMPLAINT** in the above captioned action upon the Defendant **MOHAWK INDUSTRIES, INC.,** by delivering the same to:

( ) the individual personally

(X) **TRACEY FOREMAN, Paralegal for Corporation Service Company, Registered Agent** person served as authorized/designated to receive service for the defendant and leaving with him/her one (1) copy of the same at **508 Meeting Street, West Columbia, SC** on the **27th day** of **January, 2025,** at **10:34 a.m.**

The Affiant further says, that upon information and belief, she know the person so served to be the defendant mentioned and described in the documents served and that the affiant is not a party to nor interested in the action.

_____
Debbie Brothers

SWORN TO before me this ____ day
of _____ ,2025
_____
Notary Public for S.C.
My Commission Expires: 3 - 6 - 2025

ELECTRONICALLY FILED - 2025 Feb 03 3:31 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STATE OF SOUTH CAROLINA
COUNTY OF FLORENCE

IN THE COURT OF COMMON PLEAS
FOR THE TWELFTH JUDICIAL CIRCUIT

IN RE:
PFAS LITIGATION COORDINATED DOCKET

City of Florence, South Carolina,

*Plaintiff*,

v.

Aladdin Manufacturing Corporation, et al.,

*Defendants*.

C.A. No. 2024-CP-21-02844

**ORDER APPOINTING A RECEIVER OVER DEFENDANT DELTA MILLS, INC.**

This matter came before the Court on Plaintiff City of Florence, South Carolina's Motion for the Appointment of a Receiver over Defendant Delta Mills, Inc. pursuant to section 15-65-10(4) of the South Carolina Code. This Court—which has exclusive jurisdiction to hear and dispose of all Local PFAS Litigation cases and all pretrial matters arising therefrom[1]—finds that the application is meritorious under the applicable statute because Defendant Delta Mills, Inc. is a dissolved Delaware corporation that has forfeited its corporate rights. Further, Plaintiff has properly served Delta Mills, Inc. with the Amended Summons and Complaint, but Delta Mills, Inc. has failed to answer and is in default. Plaintiff likewise has provided sufficient notice to Defendant Delta Mills, Inc. by serving the Motion for the Appointment of a Receiver on the South Carolina Secretary of State. Therefore, the Court finds that Plaintiff's Motion is appropriate and will be GRANTED.

---

[1] *RE: Local PFAS Litigation*, S.C. Sup. Ct. Order dated Oct. 7, 2024.

ELECTRONICALLY FILED - 2025 Feb 03 3:31 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

This Court hereby appoints Peter D. Protopapas as Receiver over Defendant Delta Mills, Inc. pursuant to section 15-65-10(4) of the South Carolina Code. The Receiver's appointment, including all of his duties and protections, extends to Delta Mills, Inc., as well as its affiliated entities and all of their past, present, and future predecessors, successors, affiliates, parents, subsidiaries, and assigns that may be discovered in the future (collectively, "Delta Mills").

The Receiver has the power and authority to fully administer all assets of Delta Mills, accept service on behalf of Delta Mills, engage counsel on behalf of Delta Mills, and take any and all steps necessary to protect the interests of Delta Mills, whatever they may be. This Order is inclusive of, but is not limited to, the Receiver's right and obligation to administer any insurance assets of Delta Mills, as well as any claims related to the actions and/or omissions of Delta Mills' insurance carriers.

In addition to the powers of the Receiver set forth herein, the Receiver shall have the following rights, authority, and powers with respect to Delta Mills' property: (1) to collect all accounts receivable and all rents due from any tenant; (2) to change locks to all premises where any property is situated; (3) to open any mail addressed to Delta Mills or any business it owned and to redirect the delivery of any such mail to the Receiver; (4) to endorse and cash all checks and negotiable instruments payable to Delta Mills, except paychecks for current wages; (5) to hire a real estate broker to sell any real property and interest belonging to Delta Mills; (6) to hire any person or company to move and store any property of Delta Mills; (7) to insure any property belonging to Delta Mills (but not the obligation); (8) to obtain financial records of or pertaining to Delta Mills from any financial institution, bank, credit union, savings and loan or title company, credit bureau, or any other third party; (9) to obtain copies of any lease, lease application, credit application, payment history, or rent payments of or pertaining to Delta Mills from any landlord,

ELECTRONICALLY FILED - 2025 Feb 03 3:31 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

building owner, or building manager where Delta Mills or any business it owned was a tenant; (10) to hire any person or entity necessary to accomplish any right, authority, or power under this Order; (11) to take all action necessary to gain access to all storage facilities, safety deposit boxes, real property, and leased premises wherein any property of Delta Mills may be situated; and (12) to obtain and review copies of all documents related to Delta Mills or any business it owned.

Additionally, the Court expects the Receiver to investigate the existence of all insurance coverage potentially available to Delta Mills. This includes providing potential insurers with information to facilitate the insurers' search for coverage, including coverage provided to the receivership company and coverage provided to the receivership company as an additional insured under coverage written to another entity. The Court expects all insurers to cooperate with the Receiver's investigation, conduct thorough and diligent searches for potential insurance coverage, and deliver any and all policy documents or other evidence of coverage to the Receiver.

The Court further orders that, as the Court appointing the Receiver, neither the Receiver nor Delta Mills may be sued outside this Court without obtaining the Receiver's consent or an order of this Court prior to doing so.

ELECTRONICALLY FILED - 2025 Feb 03 3:31 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844



Florence Common Pleas

**Case Caption:**    Florence City Of South Carolina VS   Burlington Industries Inc , defendant, et al

**Case Number:**    2024CP2102844

**Type:**    Order/Appointment of Receiver


IT IS SO ORDERED.

S/GRACE GILCHRIST KNIE - 2760


Electronically signed on 2025-02-03 14:21:47    page 4 of 4

ELECTRONICALLY FILED - 2025 Feb 03 3:31 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STATE OF SOUTH CAROLINA
COUNTY OF FLORENCE

IN THE COURT OF COMMON PLEAS
FOR THE TWELFTH JUDICIAL CIRCUIT

IN RE:
PFAS LITIGATION COORDINATED DOCKET

City of Florence, South Carolina,

*Plaintiff*,

v.

Aladdin Manufacturing Corporation, et al.,

*Defendants*.

C.A. No. 2024-CP-21-02844

**ORDER APPOINTING A RECEIVER OVER DEFENDANT J.P. STEVENS & COMPANY, INC.**

This matter came before the Court on Plaintiff City of Florence, South Carolina's Motion for the Appointment of a Receiver over Defendant J.P. Stevens & Company, Inc. pursuant to section 15-65-10(4) of the South Carolina Code. This Court—which has exclusive jurisdiction to hear and dispose of all Local PFAS Litigation cases and all pretrial matters arising therefrom[1]—finds that the application is meritorious under the applicable statute because Defendant J.P. Stevens & Company, Inc. is a dissolved Delaware corporation that has forfeited its corporate rights. Further, Plaintiff has properly served J.P. Stevens & Company, Inc. with the Amended Summons and Complaint, but J.P. Stevens & Company, Inc. has failed to answer and is in default. Plaintiff likewise has provided notice to Defendant J.P. Stevens & Company, Inc. by serving the Motion for the Appointment of a Receiver on the South Carolina Secretary of State. Therefore, the Court finds that Plaintiff's Motion is appropriate and will be GRANTED.

---

[1] *RE: Local PFAS Litigation*, S.C. Sup. Ct. Order dated Oct. 7, 2024.

ELECTRONICALLY FILED - 2025 Feb 03 3:31 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

This Court hereby appoints Peter D. Protopapas as Receiver over Defendant J.P. Stevens & Company, Inc. pursuant to section 15-65-10(4) of the South Carolina Code. The Receiver's appointment, including all of his duties and protections, extends to J.P. Stevens & Company, Inc., as well as its affiliated entities and all of their past, present, and future predecessors, successors, affiliates, parents, subsidiaries, and assigns that may be discovered in the future (collectively, "JPS").

The Receiver has the power and authority to fully administer all assets of JPS, accept service on behalf of JPS, engage counsel on behalf of JPS, and take any and all steps necessary to protect the interests of JPS, whatever they may be. This Order is inclusive of, but is not limited to, the Receiver's right and obligation to administer any insurance assets of JPS, as well as any claims related to the actions and/or omissions of JPS' insurance carriers.

In addition to the powers of the Receiver set forth herein, the Receiver shall have the following rights, authority, and powers with respect to JPS' property: (1) to collect all accounts receivable and all rents due from any tenant; (2) to change locks to all premises where any property is situated; (3) to open any mail addressed to JPS or any business it owned and to redirect the delivery of any such mail to the Receiver; (4) to endorse and cash all checks and negotiable instruments payable to JPS, except paychecks for current wages; (5) to hire a real estate broker to sell any real property and interest belonging to JPS; (6) to hire any person or company to move and store any property of JPS; (7) to insure any property belonging to JPS (but not the obligation); (8) to obtain financial records of or pertaining to JPS from any financial institution, bank, credit union, savings and loan or title company, credit bureau, or any other third party; (9) to obtain copies of any lease, lease application, credit application, payment history, or rent payments of or pertaining to JPS from any landlord, building owner, or building manager where JPS or any

2

ELECTRONICALLY FILED - 2025 Feb 03 3:31 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

business it owned was a tenant; (10) to hire any person or entity necessary to accomplish any right, authority, or power under this Order; (11) to take all action necessary to gain access to all storage facilities, safety deposit boxes, real property, and leased premises wherein any property of JPS may be situated; and (12) to obtain and review copies of all documents related to JPS or any business it owned.

Additionally, the Court expects the Receiver to investigate the existence of all insurance coverage potentially available to JPS. This includes providing potential insurers with information to facilitate the insurers' search for coverage, including coverage provided to the receivership company and coverage provided to the receivership company as an additional insured under coverage written to another entity. The Court expects all insurers to cooperate with the Receiver's investigation, conduct thorough and diligent searches for potential insurance coverage, and deliver any and all policy documents or other evidence of coverage to the Receiver.

The Court further orders that, as the Court appointing the Receiver, neither the Receiver nor JPS may be sued outside this Court without obtaining the Receiver's consent or an order of this Court prior to doing so.



Florence Common Pleas

**Case Caption:**    Florence City Of South Carolina VS   Burlington Industries Inc ,
defendant, et al

**Case Number:**    2024CP2102844

**Type:**    Order/Appointment of Receiver


IT IS SO ORDERED.

S/GRACE GILCHRIST KNIE - 2760


Electronically signed on 2025-02-03 14:22:27    page 4 of 4

ELECTRONICALLY FILED - 2025 Feb 03 3:31 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Feb 07 2:14 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STATE OF SOUTH CAROLINA

COUNTY OF FLORENCE

CITY OF FLORENCE, SOUTH CAROLINA,

      Plaintiff,

v.

ALADDIN MANUFACTURING CORPORATION; AMERICHEM, INC.; AURIA ALBEMARLE, LLC; AURIA SOLUTIONS USA, INC.; BFI WASTE SYSTEMS OF NORTH AMERICA, LLC; BURLINGTON INDUSTRIES, INC.; CARVANA, LLC; CASCADES HOLDING US, LLC; CHEM-TEX LABORATORIES, INC.; DELTA MILLS, INC. its predecessors, successors, assigns, and/or responsible parties; DOMTAR PAPER COMPANY, LLC; ELEVATE TEXTILES, INC.; HEIQ CHEMTEX, INC.; J.P. STEVENS & COMPANY, INC.; its predecessors, successors, assigns, and/or responsible parties; MARCAL CORDOVA LLC; MOHAWK INDUSTRIES, INC.; REPUBLIC SERVICES, INC.; WASTE CONNECTIONS, INC.; and WASTE CONNECTIONS OF NORTH CAROLINA, INC.,

      Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

IN THE COURT OF COMMON PLEAS
TWELFTH JUDICIAL CIRCUIT
C/A No. 2024-CP-21-02844

[PFAS Litigation Coordinated Docket]

**DOMTAR PAPER COMPANY, LLC'S
MOTION TO DISMISS**

NOW COMES Defendant Domtar Paper Company, LLC ("Domtar"), by and through the undersigned counsel, and hereby respectfully submits this Motion to Dismiss (this "Motion") the Amended Complaint pursuant to Rules 8(a), 12(b)(1) and Rule 12(b)(6) of the South Carolina

307848391v1

ELECTRONICALLY FILED - 2025 Feb 07 2:14 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

Rules of Civil Procedure (SCRCP).[1]  Specifically, Domtar seeks dismissal of all causes of action pursuant to Rule 12(b)(1), SCRCP, because the claims are not ripe for adjudication.  Domtar further seeks dismissal of Plaintiffs' causes of action for nuisance, trespass, and negligence because the Amended Complaint fails to state a claim upon which relief can be granted.  This Motion is based on the pleadings of record, a Memorandum in Support to be submitted in accordance with the briefing schedule entered by the Court on January 31, 2025, oral argument at the hearing scheduled for March 12, 2025, and any other materials properly before the Court.

WHEREFORE, Domtar respectfully requests that the Court enter an Order granting this Motion and dismissing the Amended Complaint.  Domtar further seeks any additional relief deemed just and proper.

This the 7th day of February, 2025.

s/ William J. Farley III
William J. Farley III (S.C. Bar No. 101033)
TROUTMAN PEPPER LOCKE LLP
301 S. College Street, Suite 3400
Charlotte, North Carolina 28202
Telephone:  704.998.4099
Facsimile:  704.998.4051
Email:  will.farley@troutman.com

*Counsel for Domtar Paper Company, LLC*

---

[1] In filing this Motion, Domtar notes for the Court and incorporates by reference pending motions to dismiss filed in other matters in this consolidated proceeding (including *Grand Strand Water and Sewer Authority v. Aladdin Manufacturing Corporation, et al.*, C/A No. 2024-CP-26-05523) to the extent such motions seek dismissal of cause(s) of action based on arguments that are equally applicable to the causes of action asserted in this case.

307848391v1

ELECTRONICALLY FILED - 2025 Feb 14 12:24 PM - LAURENS - COMMON PLEAS - CASE#2024CP3000734

| | |
|---|---|
| **STATE OF SOUTH CAROLINA** | **IN THE COURT OF COMMON PLEAS** |
| **COUNTY OF LAURENS** | **EIGHTH JUDICIAL CIRCUIT** |

| | |
|---|---|
| LAURENS COUNTY WATER AND SEWER DIVISION, | C.A. No. 2024-CP-30-00734 |
| *Plaintiff,* | |
| v. | |
| CONE MILLS RECEIVER, LLC; CRYOVAC, INC.; CRYOVAC, LLC; FIRSTSOURCE WORLDWIDE, LLC; FITESA SIMPSONVILLE, INC.; MILLIKEN & COMPANY; OPPERMAN WEBBING, INC.; T&S BRASS AND BRONZE WORKS, INC.; UNICHEM SPECIALTY CHEMICALS, LLC, | **DEFENDANT FITESA SIMPSONVILLE, INC'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR PROTECTIVE ORDER AND STAY OF DISCOVERY** |
| *Defendants.* | |

Defendant Fitesa Simpsonville, Inc. ("Fitesa") respectfully submits this memorandum in support of its Motion for a Protective Order and Stay of Discovery pending this Court's decision on Fitesa's Motion to Dismiss. The Motion is based on the ground that responding to Plaintiff Laurens County Water and Sewer Division ("Plaintiff" or "Laurens") Discovery Requests while Fitesa's Motion to Dismiss is pending would impose an unnecessary burden on Fitesa.

## BACKGROUND

Fitesa is the owner and operator of an industrial facility in Simpsonville, South Carolina. As part of its industrial operations, Fitesa discharges wastewater to a wastewater treatment plant for treatment.

Plaintiff, according to the Amended Complaint, is the duly elected commission authorized to provide potable water and additional public utility services to residents of Laurens County. *See* Amended Complaint ¶ 13.

ELECTRONICALLY FILED - 2025 Feb 14 12:24 PM - LAURENS - COMMON PLEAS - CASE#2024CP3000734

Plaintiff filed its Amended Complaint in the above-captioned action against Defendant Fitesa and others on August 23, 2024, and served Fitesa on October 28, 2024. Plaintiff's Amended Complaint alleges that Plaintiff suffered an injury as a result Fitesa's alleged discharge of wastewater containing certain per- and polyfluoroalkyl substances ("PFAS") that Plaintiff drew into its water treatment plant.

Also on October 28, 2024, Plaintiff served on Fitesa Plaintiff's First Set of Interrogatories, Requests to Produce, and Requests to Admit ("Discovery Requests"). Plaintiff's Discovery Requests are attached hereto as **Exhibit A.** Plaintiff's counsel agreed to an extension of time for Fitesa to respond to the Amended Complaint and Discovery Requests through January 22, 2025. On December 20, 2024, Fitesa filed a Motion to Dismiss Plaintiff's Amended Complaint pursuant to Rule 12(b) in lieu of an Answer, illustrating to the Court that the Plaintiff's claims against Fitesa should be dismissed for several grounds, including (1) the claims are not ripe; (2) Fitesa does not control the wastewater discharge that is the alleged source of the alleged nuisance; (3) the alleged contamination of public waters is not a private nuisance; (4) Fitesa cannot be negligent because it does not owe a duty to Plaintiff; and (5) voluntary acceptance of intangible matter cannot be a trespass.

## STANDARD OF REVIEW

Rule 26(c) of the South Carolina Rules of Civil Procedure provides that "[u]pon motion by a party... and for good cause shown, the court in which the action is pending... may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden by expense, including... that the discovery not be had." As this Court knows, the Court may stay discovery during the pendency of a dispositive motion if there is good cause to do so. *Boudreaux Grp., Inc. v. Clark Nexsen*, *Owen, Barbieri, Gibson, P.C.*, No. 8:18-CV-1498-

2

TMC, 2018 WL 9785308, at *4–5 (D.S.C. Nov. 20, 2018) (finding that defendants demonstrated good cause to stay discovery pending their Motion to Dismiss because the granting of their Motion to Dismiss would dispose of the entire matter as to defendants).

Moreover, this Court has the inherent authority to manage the conduct of proceedings and may also grant a motion seeking the stay of discovery when a dispositive motion has been filed and not yet decided. *See, e.g.*, *Tilley v. United States*, 270 F. Supp. 2d 731, 734 (M.D.N.C. 2003), *aff'd*, 85 F. App'x 333 (4th Cir. 2004) (holding that a protective order under Rule 26(c) to stay discovery pending determination of party's dispositive motion was warranted).

## **ARGUMENT**

A protective order and temporary stay of discovery are warranted in this matter because the granting of Fitesa's pending motion to dismiss will dispose of this entire matter as it relates to Fitesa. As noted above, the Amended Complaint does not allege any viable claims against Fitesa.

Further, the Discovery Requests Plaintiff served on Fitesa generally are not limited in time, overly broad and unduly burdensome. Accordingly, Fitesa should not suffer the further expense of responding to Plaintiff's Discovery Requests prior to the Court's decision on Fitesa's Motion to Dismiss.

Further, even though Fitesa did not believe discovery should be initiated until after the resolution of Fitesa's pending Motion to Dismiss, in the spirit of cooperation, <u>Fitesa did serve responses to Plaintiff's interrogatories and requests to produce</u> on January 21, 2025 (*see* **Exhibit B**), within the extension period granted by Plaintiff.

Fitesa respectfully submits that a protective order should be entered (proposed Order attached as **Exhibit C**), and a temporary stay should be granted so that Fitesa may avoid engaging in the unduly burdensome and expensive process of responding to Plaintiff's Discovery Requests

3

ELECTRONICALLY FILED - 2025 Feb 14 12:24 PM - LAURENS - COMMON PLEAS - CASE#2024CP3000734

until the Court decides if Plaintiff's claims should be dismissed (and they should be dismissed because Plaintiff has failed to state a claim against Fitesa).

Respectfully submitted, this 14th day of February, 2025.

/s/ *Robert H. Jordan*
Kevin A. Dunlap
SC State Bar No. 13081
Parker Poe Adams & Bernstein LLP
110 East Court Street, Suite 200
Greenville, SC 29601
Telephone: (864) 577-6370
Email: kevindunlap@parkerpoe.com

Robert H. Jordan
SC State Bar No. 13612
PARKER POE ADAMS & BERNSTEIN LLP
850 Morrison Drive, Suite 400
Charleston, South Carolina 29403
Phone: 843-727-2650
E-mail: robertjordan@parkerpoe.com

Steven D. Weber
S.C. State Bar No. 16917
PARKER POE ADAMS & BERNSTEIN LLP
620 South Tryon St., Ste. 800
Charlotte, North Carolina 28202
Tel.: (704) 372-9000
Email: steveweber@parkerpoe.com

*Attorneys for Defendant Fitesa Simpsonville, Inc.*

ELECTRONICALLY FILED - 2025 Feb 14 12:24 PM - LAURENS - COMMON PLEAS - CASE#2024CP3000734

# Exhibit C

ELECTRONICALLY FILED - 2025 Feb 14 12:24 PM - LAURENS - COMMON PLEAS - CASE#2024CP3000734

ELECTRONICALLY FILED - 2025 Feb 14 12:24 PM - LAURENS - COMMON PLEAS - CASE#2024CP3000734

| | | |
|---|---|---|
| **STATE OF SOUTH CAROLINA** | ) | **IN THE COURT OF COMMON PLEAS** |
| | ) | |
| **COUNTY OF LAURENS** | ) | **EIGHTH JUDICIAL CIRCUIT** |
| | ) | |
| | ) | |
| **LAURENS COUNTY WATER AND** | ) | C.A. No. 2024-CP-30-00734 |
| **SEWER DIVISION,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FITESA SIMPSONVILLE, INC. *et al.,* | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

## PLAINTIFF'S FIRST INTERROGATORIES AND REQUESTS FOR PRODUCTION TO FITESA SIMPSONVILLE, INC.

### DEFINITIONS

1. **"You"** and **"Your"** mean the Defendant to whom these discovery requests are propounded, as well as all of its partners, directors, officers, employees, servants, agents, attorneys, joint ventures, third-party contractors, or other representatives, including all corporations and entities affiliated with Defendant. "You" and "Your" shall also include all predecessor business entities, as well as any predecessor's partners, directors, officers, employees, servants, agents, attorneys, joint ventures, third-party contractors, or other representatives. "You" or "Your" shall also include all foreign subsidiaries or foreign parent companies, as well as any foreign subsidiaries' or parent companies' partners, directors, officers, employees, servants, agents, attorneys, joint ventures, third-party contractors, or other representatives.

2. **"Documents"** is coextensive with the meanings of "documents" and "tangible things" in Rule 34, SCRCP, and has the broadest possible meaning and interpretation ascribed to those terms under that rule. Consistent with this definition, Documents include, without limitation, any database, written, printed, typed, photostatic, photographed, recorded, computer-generated, computer-stored, or otherwise maintained or reproduced communication or representation, any data compilation in any form, whether comprised of letters, words, numbers, pictures, sounds, bytes, e-mails, electronic signals or impulses, electronic data, active files, deleted files, file fragments, or any combination thereof including, without limitation, all memoranda, notes, records, letters, envelopes, telegrams, messages, studies, analyses, contracts, agreements, projections, estimates, working papers, accounts, analytical records, reports and/or summaries of investigations, opinions or reports of consultants, opinions or reports of experts, opinions or reports of accountants, other reports, trade letters, press releases, comparisons, books, diaries, articles, magazines, newspapers, booklets, brochures, pamphlets, circulars, bulletins, notices, forecasts, drawings, diagrams, instructions, minutes of meetings, correspondence and

ELECTRONICALLY FILED - 2025 Feb 14 12:24 PM - LAURENS - COMMON PLEAS - CASE#2024CP3000734

communications (as defined below) of any type (including but not limited to video files, audio files, and inter- and intra-office communications), questionnaires, surveys, charts, graphs, photographs, phonographs, films, tapes, discs, data cells, drums, printouts, all other compiled data which can be obtained (translated, if necessary, through intermediary or other devices into usable forms), Documents maintained on, stored in or generated on any electronic transfer or storage system, any preliminary versions, drafts or revisions of any of the foregoing, and other writings or Documents of whatever description or kind, whether produced or authorized by or on behalf of You or anyone else, and shall include all non-identical copies and drafts of any of the foregoing now in the possession, custody, or control of You, or the former or present directors, officers, counsel, agents, employees, partners, consultants, principals, and/or persons acting on Your behalf.

3. **"Communications"** and **"Correspondence"** mean any oral, written, spoken, or electronic transmission of information, including but not limited to meetings, discussions, conversations, telephone calls, memoranda, letters, emails, text messages, postings, instructions, conferences, seminars, or any other exchange of information between You and any other person or entity, or between persons, departments, or other subdivisions within Your organization.

4. **"PFAS"** is intended to be broad and inclusive, and means any fluorinated substances that contain at least one fully fluorinated methyl or methylene carbon atom (without any H/Cl/Br/I atom attached to it). That is, a PFAS is any chemical with at least a perfluorinated methyl group ($-CF_3-$) or a perfluorinated methylene group ($-CF_2-$). PFAS includes nonpolymeric and polymeric PFAS. By way of example and not limitation, PFAS includes perfluoroalkyl acids ("PFAAs"), such as PFOA and PFOS; precursors that can degrade or transform to PFAAs, such as perfluoroalkyl iodides and fluorotelomer alcohols; fluoropolymers such as PTFE and PVDF; and side-chain fluorinated polymers.

5. **"Facility"** or **"Facilities"** mean Your facility or facilities that discharge wastewater directly and/or indirectly to the Reedy River, Saluda River, or to a tributary of either waterway. For purposes of these discovery requests, indirect discharge means discharge to a wastewater treatment plant that discharges to any of these waterways or their tributaries.

6. **"Operative Period"** means the time period beginning with Your earliest purchase, sale, manufacture, use, and/or disposal of PFAS through the present and continuing.

## INTERROGATORIES

1. For the Operative Period, identify all products, materials, or substances present at or used at Your Facility(s) that contained or which you reasonably suspect may have contained PFAS, and for each such product, material, or substance, provide at least the following information:

   (a) the name of the product, material, or substance;

   (b) The manufacturer, vendor, intermediary, and/or supplier of the product, material, or substance; and

   (c) the date range for when You used the product, material, or substance at Your Facility(s).

ELECTRONICALLY FILED - 2025 Feb 14 12:24 PM - LAURENS - COMMON PLEAS - CASE#2024CP3000734

## REQUESTS FOR PRODUCTION

1. Produce Documents supporting your identification of the products, materials, or substances; manufacturers, vendors, intermediaries, and/or suppliers; and applicable date ranges identified in response to Interrogatory No. 1.

2. Produce all safety data sheets ("SDS") and technical data sheets ("TDS") in Your possession for products, materials, or substances that contain or which you reasonably suspect may contain PFAS.

3. Produce all Documents and Communications related to any testing for PFAS of Your waste streams or emissions, including Your wastewater discharges or effluent.

4. Produce all Documents and Communications related to any testing by You for PFAS of surface waters, groundwater, soil, plant or animal life, or any other environmental media.

5. Produce all Documents and Communications related to any testing for PFAS of Your workers or employees, such as (by way of example and not limitation) testing to determine levels of PFAS present in Your workers' blood.

6. Produce all Documents and Communications related to any testing for PFAS of any materials, products, substances, components, processes, or other elements of Your manufacturing processes.

7. Produce all Documents and Communications related to any testing for PFAS of any products manufactured, sold, distributed, or otherwise supplied by You.

Respectfully submitted,

/s/ John B. White. Jr._____
John B. White, Jr. (S.C. Bar No. 5996)
Marghretta H. Shisko (S.C. Bar No. 100106)
Christopher R. Jones (S.C. Bar No. 101265)
Griffin L. Lynch (S.C. Bar No. 72518)
John B. White, Jr., P.A.
291 S. Pine Street
P.O. Box 2465 (29304)
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

October 22, 2024                    *Attorneys for Plaintiff*

# Exhibit D

ELECTRONICALLY FILED - 2025 Feb 14 12:24 PM - LAURENS - COMMON PLEAS - CASE#2024CP3000734



ELECTRONICALLY FILED - 2025 Feb 14 12:24 PM - LAURENS - COMMON PLEAS - CASE#2024CP3000734

**Robert H. Jordan**

t: 843.727.2670

f: 843.727.2680

robertjordan@parkerpoe.com

Atlanta, GA
Charleston, SC
Charlotte, NC
Columbia, SC
Greenville, SC
Raleigh, NC
Spartanburg, SC
Washington, DC

January 21, 2025

**Via E-mail**

John B. White, Jr.
Marghretta Shisko
John B. White Jr. P.A. Law Firm
291 South Pine Street
Spartanburg, SC  29304
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com

Re:  ***Laurens County Water and Sewer Commission v. Cone Mills Receiver, LLC et al.*  C.A. No. 2024-CP-30-00734**

Dear Counsel:

Enclosed please find Fitesa Simpsonville, Inc.'s Responses to Plaintiff's First Interrogatories and Requests for Production regarding the above-referenced matter.

Please do not hesitate to contact us if you have any questions.

Sincerely,

Robert H. Jordan

RHJ/cmm
Enclosure

Cc:  All Counsel of Record

Parker Poe Adams & Bernstein LLP   850 Morrison Drive   Suite 400   Charleston, SC   29403
t 843.727.2650    f 843.727.2680    www.parkerpoe.com

ELECTRONICALLY FILED - 2025 Feb 14 12:24 PM - LAURENS - COMMON PLEAS - CASE#2024CP3000734

STATE OF SOUTH CAROLINA

COUNTY OF LAURENS

LAURENS COUNTY WATER AND
SEWER DIVISION,

*Plaintiff,*

**v.**

CONE MILLS RECEIVER, LLC;
CRYOVAC, INC.; CRYOVAC, LLC;
FIRSTSOURCE WORLDWIDE, LLC;
FITESA SIMPSONVILLE, INC.;
MILLIKEN & COMPANY; OPPERMAN
WEBBING, INC.; T&S BRASS AND
BRONZE WORKS, INC.; UNICHEM
SPECIALTY CHEMICALS, LLC,

*Defendants.*

IN THE COURT OF COMMON PLEAS

EIGHTH JUDICIAL CIRCUIT

C.A. No. 2024-CP-30-00734

**DEFENDANT FITESA SIMPSONVILLE,
INC.'S RESPONSES TO PLAINTIFF'S
FIRST INTERROGATORIES AND
REQUESTS FOR PRODUCTION**

Defendant Fitesa Simpsonville, Inc. ("Fitesa"), by and through undersigned counsel, and

pursuant to the South Carolina Rules of Civil Procedure ("SCRCP") 26 and 33, and the South

Carolina Rules of Evidence ("SCRE"), hereby serves its objections and responses to Plaintiff's

First Set of Interrogatories ("Interrogatories") and Requests for Production of Documents

("Requests").

**PRELIMINARY STATEMENT OF OBJECTIONS**

Fitesa has not completed its investigation of the facts or law relating to this litigation and

discovery in this matter is ongoing.  Accordingly, these objections are provided without prejudice

to Fitesa's right to produce evidence of any facts, subsequently discovered facts, or additional

facts, information or documents that may exist whose location, relevance, significance or

applicability has not yet been determined by Fitesa.  These objections are provided in good faith

based on documents and information presently available and known to Fitesa.  In providing these

objections, Fitesa reserves all objections as to competency, relevancy, materiality, authenticity and

ELECTRONICALLY FILED - 2025 Feb 14 12:24 PM - LAURENS - COMMON PLEAS - CASE#2024CP3000734

admissibility of any information or documents. To the extent Fitesa has objections or declines to respond to any specific Interrogatory or Request, Fitesa is willing to meet and confer with Plaintiff's counsel to narrow the scope or otherwise modify the Interrogatory or Request to allow further response. Fitesa will conduct a reasonable search for information requested, subject to and without waiving the objections set forth herein, and pursuant to the terms and in a form consistent with the SCRCP and SCRE.

Each objection below, is provided subject to, and without waiver of, general or specific objections. This preliminary statement is hereby incorporated by reference into each objection to the specific Interrogatories and Requests set forth below.

**OBJECTIONS TO INSTRUCTIONS AND DEFINITIONS**

1.      Fitesa objects to each and every one of the Instructions and Definitions in the Interrogatories and Requests to the extent they attempt to impose obligations on Fitesa other than those imposed or authorized by the SCRCP, including but not limited to, the extent they exceed the permissible scope of discovery under the SCRCP, and/or seek to impose duties of responding and/or supplementation different from or in excess of those imposed by the SCRCP.

2.      Fitesa objects to Plaintiff's definition of the term "Documents" because it is vague, ambiguous, unduly burdensome, overly broad, and beyond the common or reasonable understanding of that term. Fitesa further objects to the extent this definition attempts to impose obligations beyond those set forth in the SCRCP or SCRE. Fitesa further objects to this definition to the extent it calls for the forensic investigation into computing devices or systems to determine or locate information indicating or evidencing documents that were deleted or that are no longer accessible as active data, as such measures are unduly burdensome, and purport to impose obligations greater than those set forth in the applicable rules. Fitesa further objects to this definition on the grounds that the definition is unduly burdensome to the extent that it purports to

2

ELECTRONICALLY FILED - 2025 Feb 14 12:24 PM - LAURENS - COMMON PLEAS - CASE#2024CP3000734

require the production of categories of information that Fitesa does not maintain in the regular course of business or that would be unduly burdensome to identify, collect, and produce.  In responding to the Interrogatories and Requests, Fitesa will comply with its obligations under the SCRCP and SCRE.

3.      Fitesa objects to Plaintiff's definition of the terms "You" and "Your" because they are vague, ambiguous, overly broad, unduly burdensome, and not stated with reasonable particularity.  Fitesa further objects to the extent the terms purport to apply to predecessor, successor and affiliate companies.

4.      Fitesa objects to Plaintiff's definition of the terms "Communications" and "Correspondence" because they are vague, ambiguous, unduly burdensome, and fail to satisfy the Plaintiffs' obligation to describe the items requested with reasonable particularity.  Specifically, the inclusion of such terms as "meetings," "discussions," "conversations," "postings," "instructions," "conferences," "seminars," and "any other exchange of information" in the definitions expands their scope beyond the requirement that production be limited to being already in some form of media, as they are kept in the ordinary course of business.

5.      Fitesa objects to Plaintiff's definition of the term "PFAS" because it is overly broad, vague and ambiguous.

6.      Fitesa objects to Plaintiff's definition of the terms "Facility" or "Facilities" because "Facility" is a defined term under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA").

7.      Fitesa objects to Plaintiff's definition of the term "Operative Period" in that it is overly broad and insofar as it implies Fitesa purchased, sold, manufactured, used or disposed of PFAS.

3

ELECTRONICALLY FILED - 2025 Feb 14 12:24 PM - LAURENS - COMMON PLEAS - CASE#2024CP3000734

8.     Notwithstanding Fitesa's specific objections to Plaintiff's definitions, Fitesa states to its knowledge that other, non-defined terms in Plaintiff's Interrogatories and Requests are vague, ambiguous, overly broad and otherwise objectionable.  Fitesa maintains, and does not waive, any such objections to those terms.

These objections to instructions and definitions, the preliminary statement of objections above, and the general objections and limitations herein are hereby incorporated into each objection to the specific Interrogatories and Requests set forth below, and any repetition or omission of these objections and limitations in each objection below does not waive the incorporation of each and every objection and limitation.

## GENERAL OBJECTIONS TO INTERROGATORIES AND REQUESTS

1.     Fitesa objects to the Interrogatories and Requests on the bases that they are overly broad, impose an undue burden and expense, are not reasonably calculated to lead to the discovery of admissible evidence,  and/or seek information  and/or documents that are  neither relevant  nor proportional to the needs of the case, considering the parties' relative access to the information requested and the fact that the burden and expense of the proposed discovery outweighs any potential benefit.

2.     Fitesa objects to the extent that the Interrogatories and Requests purport to seek information not within Fitesa's possession, custody or control.  Fitesa further objects to the extent the Interrogatories and Requests purport to seek documents that provide duplicative information.

3.     Fitesa objects to the Interrogatories and Requests to the extent that they seek information that is protected by privilege (including, but not limited to, the attorney-client privilege; the attorney work product doctrine and consultant/consulting expert information) or not otherwise discoverable.  Fitesa will meet and confer with Plaintiff regarding providing a log of protected documents, if necessary.  Any inadvertent production of any such privileged or protected documents

4

ELECTRONICALLY FILED - 2025 Feb 14 12:24 PM - LAURENS - COMMON PLEAS - CASE#2024CP3000734

or information shall not constitute a waiver of any privilege or protection applicable thereto, or to any related information or documents, and anyone suspecting such an inadvertent production by Fitesa is requested to return such information or documents immediately and bring it to the attention of the undersigned counsel.  Furthermore, Fitesa reserves the right to demand the return of any documents from Plaintiff that may be inadvertently produced if Fitesa determines that such documents may include or contain information protected by any applicable privilege or protection.

4.	Fitesa objects to the Interrogatories and Requests to the extent that they seek the disclosure of information including Fitesa's confidential, business or proprietary information or the confidential, business or proprietary information of persons or entities in contractual privity with Fitesa and/or to whom Fitesa has an obligation to maintain confidentiality.

5.	Fitesa objects to the Interrogatories and Requests to the extent that they seek information that is reflected in, or is determinable from, publicly available documents or sources and/or is equally or more readily available and/or accessible to Plaintiff.  Among other things, and without limiting the objections above, Fitesa objects on the basis that, in many instances, Plaintiff has failed to disclose the specific documents and/or information on which its Interrogatories and Requests are based, and to the extent the Interrogatories and Requests ask Fitesa to conduct a search of information that is publicly available and/or in the possession of Plaintiff's counsel, on the basis that Plaintiff is equally or better positioned to search for the information it seeks.

6.	Neither the fact that Fitesa has responded to the Interrogatories and Requests, nor the Objections themselves,  constitute  an admission or acknowledgement  that any or all of the Interrogatories or Requests are proper; that the information such Interrogatories and Requests seek is relevant, material, or otherwise within the proper bounds of discovery or admissible at trial; or that other Interrogatories and Requests will be treated in a similar fashion.  A partial response or objection

5

ELECTRONICALLY FILED - 2025 Feb 14 12:24 PM - LAURENS - COMMON PLEAS - CASE#2024CP3000734

to any Interrogatory and Request to which Fitesa has objected, in whole or in part, does not constitute a waiver of any objection.

7.      In addition to specific terms objected to above, Fitesa objects to the descriptions and all terms utilized throughout the Interrogatories and Requests to the extent that they assume or imply allegations or elements of Plaintiff's claims in this case. Fitesa's Objections to the Interrogatories and Requests are not to be deemed an admission of assent or agreement.

8.      Fitesa objects to the Interrogatories and Requests to the extent that they assume facts that do not exist or have not been established.

9.      Fitesa objects to the Interrogatories and Requests to the extent that they seek to impose burdens and/or obligations upon Fitesa that exceed and/or are inconsistent with those set forth in the SCRCP and SCRE.

10.      Fitesa's objections to the Interrogatories and Requests are made subject to, and without waiver of, its rights to: (a) at any hearing or trial, contest the admissibility of any evidence disclosed in these objections, in any production of documents, or in any disclosure of information occurring pursuant to any Interrogatory or Request; (b) object to any other subsequent discovery requests that may or may not relate to these objections; and (c) modify or amend these objections in any manner.

11.      Fitesa reserves the right to use documents or information later discovered, and/or to supplement and/or amend its objections to the Interrogatories and Requests in the event additional responsive material is discovered.

12.      Fitesa objects to these Interrogatories and Requests to the extent they would require Fitesa to make, accept, or interpret legal conclusions.

13.      Fitesa objects to each definition that is unintelligible, vague, or ambiguous, such that an ordinary, literal reading of said language would expand the scope of an Interrogatory and

ELECTRONICALLY FILED - 2025 Feb 14 12:24 PM - LAURENS - COMMON PLEAS - CASE#2024CP3000734

Request to seek material irrelevant to the claims or defenses in this litigation, and thus, imposes an unreasonable burden on Fitesa, disproportionate to the needs of the case.

14.     Fitesa objects to the Interrogatories and Requests to the extent they call for the production of trade secret, proprietary, personal, commercially sensitive, or other confidential, information.  Fitesa will only produce such information that is responsive, relevant, and not otherwise privileged or protected from disclosure, pursuant to the SCRCP and SCRE.

These general objections and limitations are hereby incorporated into each objection to the specific Interrogatories and Requests set forth below, and any repetition or omission of these objections and limitations above, and in each objection below does not waive the incorporation of each and every objection and limitation.  Investigation and discovery are ongoing and Fitesa specifically reserves its right to amend, modify, change and/or supplement its objections to these Interrogatories and Requests as appropriate.  Fitesa is willing to meet and confer, as necessary, to identify ways to conduct a reasonable search for documents and information.  Subject to and without waiving the foregoing objections and limitations, Fitesa responds as follows:

<u>**RESPONSES TO INTERROGATORIES**</u>

1.     For the Operative Period, identify all products, materials, or substances present at or used at Your Facility(s) that contained or which you reasonably suspect may have contained PFAS, and for each such product, material, or substance, provide at least the following information:

  (a)     the name of the product, material, or substance;

  (b)     The manufacturer, vendor, intermediary, and/or supplier of the product, material, or substance; and

  (c)     the date range for when You used the product, material, or substance at Your Facility(s).

ELECTRONICALLY FILED - 2025 Feb 14 12:24 PM - LAURENS - COMMON PLEAS - CASE#2024CP3000734

**RESPONSE:** In addition to its General Objections, Fitesa objects to this Interrogatory because it is not limited in time.  Subject to, and without waiving the foregoing objections, Fitesa responds that, to its knowledge, it has not used and does not use PFAS at its plant.

## RESPONSES TO REQUESTS FOR PRODUCTION

1.     Produce Documents supporting your identification of the products, materials, or substances; manufacturers, vendors, intermediaries, and/or suppliers; and applicable date ranges identified in response to Interrogatory No. 1.

**RESPONSE:**  In addition to its General Objections, Fitesa objects to this Request because it is overly broad and unduly burdensome.  Subject to, and without waiving the foregoing objections, Fitesa responds that, to its knowledge, it has not used and does not use PFAS at its plant and does not possess documents responsive to this Request.  Fitesa continues to investigate whether responsive documents exist and reserves the right to supplement this response.

2.     Produce all safety data sheets ("SDS") and technical data sheets ("TDS") in Your possession for products, materials, or substances that contain or which you reasonably suspect may contain PFAS.

**RESPONSE:**  In addition to its General Objections, Fitesa objects to this Request because it is overly broad and unduly burdensome.  Subject to, and without waiving the foregoing objections, Fitesa responds that, to its knowledge, it has not used and does not use PFAS at its plant and does not possess documents responsive to this Request.  Fitesa continues to investigate whether responsive documents exist and reserves the right to supplement this response.

3.     Produce all Documents and Communications related to any testing for PFAS of Your waste streams or emissions, including Your wastewater discharges or effluent.

**RESPONSE:** In addition to its General Objections, Fitesa objects to this Request because it is overly broad and unduly burdensome.  Fitesa further objects to the extent that any such test

ELECTRONICALLY FILED - 2025 Feb 14 12:24 PM - LAURENS - COMMON PLEAS - CASE#2024CP3000734

results are publicly available.  Subject to, and without waiving the foregoing objections, Fitesa responds that it has not conducted PFAS testing.  Fitesa refers plaintiff to documents Fitesa will produce in response to this Request.

4.      Produce all Documents and Communications related to any testing by You for PFAS of surface waters, groundwater, soil, plant or animal life, or any other environmental media.

**RESPONSE:**  In addition to its General Objections, Fitesa objects to this Request because it is overly broad and unduly burdensome.  Subject to, and without waiving the foregoing objections, Fitesa responds that it has not conducted PFAS testing and does not possess documents responsive to this Request.

5.      Produce all Documents and Communications related to any testing for PFAS of Your workers or employees, such as (by way of example and not limitation) testing to determine levels of PFAS present in Your workers' blood.

**RESPONSE:**  In addition to its General Objections, Fitesa objects to this Request because it is overly broad and unduly burdensome.  Subject to, and without waiving the foregoing objections, Fitesa responds that it has not conducted PFAS testing and does not possess documents responsive to this Request.

6.      Produce all Documents and Communications related to any testing for PFAS of any materials, products, substances, components, processes, or other elements of Your manufacturing processes.

**RESPONSE:**  In addition to its General Objections, Fitesa objects to this Request because it is overly broad and unduly burdensome.  Subject to, and without waiving the foregoing objections, Fitesa responds that it has not conducted PFAS testing and does not possess documents responsive to this Request.

7.      Produce all Documents and Communications related to any testing for PFAS of any products manufactured, sold, distributed, or otherwise supplied by You.

**RESPONSE:**  In addition to its General Objections, Fitesa objects to this Request because it is overly broad and unduly burdensome.   Subject to, and without waiving the foregoing objections, Fitesa responds that it has not conducted PFAS testing and does not possess documents responsive to this Request.

This 21st day of January, 2025.

/s/ *Robert H. Jordan*

Robert H. Jordan
SC State Bar No. 13612
PARKER POE ADAMS & BERNSTEIN LLP
850 Morrison Drive, Suite 400
Charleston, South Carolina 29403
Phone: 843-727-2650
E-mail: robertjordan@parkerpoe.com

Kevin A. Dunlap
SC State Bar No. 13081
Parker Poe Adams & Bernstein LLP
110 East Court Street, Suite 200
Greenville, SC 29601
Telephone: (864) 577-6370
Email: kevindunlap@parkerpoe.com

Steven D. Weber
S.C. State Bar No. 16917
PARKER POE ADAMS & BERNSTEIN LLP
620 South Tryon St., Ste. 800
Charlotte, North Carolina 28202
Tel.: (704) 372-9000
Email: steveweber@parkerpoe.com

*Attorneys for Defendant Fitesa Simpsonville, Inc.*

ELECTRONICALLY FILED - 2025 Feb 14 12:24 PM - LAURENS - COMMON PLEAS - CASE#2024CP3000734

10

ELECTRONICALLY FILED - 2025 Feb 14 12:24 PM - LAURENS - COMMON PLEAS - CASE#2024CP3000734

| | |
|---|---|
| **STATE OF SOUTH CAROLINA** | **IN THE COURT OF COMMON PLEAS** |
| **COUNTY OF LAURENS** | **EIGHTH JUDICIAL CIRCUIT** |
| LAURENS COUNTY WATER AND SEWER DIVISION, | C.A. No. 2024-CP-30-00734 |
| *Plaintiff,* | |
| **v.** | |
| CONE MILLS RECEIVER, LLC; CRYOVAC, INC.; CRYOVAC, LLC; FIRSTSOURCE WORLDWIDE, LLC; FITESA SIMPSONVILLE, INC.; MILLIKEN & COMPANY; OPPERMAN WEBBING, INC.; T&S BRASS AND BRONZE WORKS, INC.; UNICHEM SPECIALTY CHEMICALS, LLC, | **CERTIFICATE OF SERVICE** |
| *Defendants.* | |

I hereby certify that a true and correct copy of **DEFENDANT FITESA SIMPSONVILLE, INC.'S RESPONSES TO PLAINTIFF'S FIRST INTERROGATORIES AND REQUESTS FOR PRODUCTION** was sent via electronic mail only to the counsel of record listed below and to all defense counsel of record on January 21, 2025.

John B. White, Jr.
Marghretta Shisko
John B. White Jr. P.A. Law Firm
291 South Pine Street
Spartanburg, SC 29304
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com

*Attorneys for Plaintiff*

Jennifer Thiem
K&L Gates LLP
134 Meeting Street, Suite 500
Charleston, SC 29401
jennifer.thiem@klgates.com

*Attorneys for Cryovac, Inc. and Cryovac, LLC*

11

ELECTRONICALLY FILED - 2025 Feb 14 12:24 PM - LAURENS - COMMON PLEAS - CASE#2024CP3000734

Paul Harrill
Burr & Forman LLP
PO Box 11390
Columbia, SC 29211
pharrill@burr.com

*Attorneys for FirstSource Worldwide, LLC and Opperman Webbing, Inc.*

Richard Willis
Williams Mullen
1230 Main Street, Suite 330
Columbia, SC 29201
rwillis@williamsmullen.com

*Attorneys for T&S Brass and Bronze Works, Inc.*

Kelly Lowry
P.O. Drawer 750
White Stone, SC 29386
kelly@lowryandassociates.com

*Attorneys for Cone Mills Receiver*

Rita Bolt Barker
Wyche Law Firm
PO Box 728
Greenville, SC 29601
rbarker@wyche.com

*Attorneys for Miliken & Company*

James Weatherholtz
Womble Bond Dickinson LLP
PO Box 999
Charleston, SC 29402
james.weatherholtz@wbd-us.com

*Attorneys for Unichem Specialty Chemicals, LLC*

PARKER POE ADAMS & BERNSTEIN LLP
850 Morrison Drive, Suite 400
Charleston, SC 29403

12

ELECTRONICALLY FILED - 2025 Feb 14 3:38 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| | |
|---|---|
| STATE OF SOUTH CAROLINA | IN THE COURT OF COMMON PLEAS<br>TWELFTH JUDICIAL CIRCUIT |
| COUNTY OF FLORENCE | C/A No. 2024-CP-21-02844 |

CITY OF FLORENCE, SOUTH CAROLINA,  )

     Plaintiff,  )

v.  )

ALADDIN MANUFACTURING CORPORATION; AMERICHEM, INC.; AURIA ALBEMARLE, LLC; AURIA SOLUTIONS USA, INC.; BFI WASTE SYSTEMS OF NORTH AMERICA, LLC; BURLINGTON INDUSTRIES, INC.; CARVANA, LLC; CASCADES HOLDING US, LLC; CHEM-TEX LABORATORIES, INC.; DELTA MILLS, INC. its predecessors, successors, assigns, and/or responsible parties; DOMTAR PAPER COMPANY, LLC; ELEVATE TEXTILES, INC.; HEIQ CHEMTEX, INC.; J.P. STEVENS & COMPANY, INC.; its predecessors, successors, assigns, and/or responsible parties; MARCAL CORDOVA LLC; MOHAWK INDUSTRIES, INC.; REPUBLIC SERVICES, INC.; WASTE CONNECTIONS, INC.; and WASTE CONNECTIONS OF NORTH CAROLINA, INC.,  )

     Defendants.  )

[PFAS Litigation Coordinated Docket]

**DOMTAR PAPER COMPANY, LLC'S MOTION TO DISMISS**

NOW COMES Defendant Domtar Paper Company, LLC ("Domtar"), by and through the undersigned counsel, and submits this Memorandum in Support of its Motion to Dismiss (this "Motion") the Amended Complaint filed by Plaintiff City of Florence, South Carolina ("Plaintiff"). For the reasons stated herein and in similar motions filed in other matters consolidated for pretrial motions pursuant to the Supreme Court of South Carolina's Order styled

1

ELECTRONICALLY FILED - 2025 Feb 14 3:38 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

as "Re: Local PFAS Litigation" dated October 7, 2024, Domtar respectfully requests that the Court dismiss the Amended Complaint.[1]

## BACKGROUND

This lawsuit arises upon Plaintiff's allegation that Defendants contaminated the Great Pee Dee River with certain per- and polyfluoroalkyl substances ("PFAS") and other substances. *See* Am. Compl., ¶ 1.   Plaintiff alleges that Defendants have "discharged and continue to discharge" such substances, resulting in high levels of PFAS that "cannot be removed by conventional wastewater treatment processes." *Id.*, ¶¶ 2, 5.   Plaintiff provides potable water to residents of various Florence County, commenced this action seeking to recover certain alleged damages, as well as equitable and injunctive relief associated with its future acquisition, installation, and operation of "new water treatment technologies to remove, and provide water free from, Defendants' PFAS." *Id.*, ¶¶ 3, 6, 7.

Plaintiff's allegations specific to Domtar are limited.  Plaintiff alleges that Domtar, as "part of its processes" at its Marlboro Mill, "directly discharges industrial wastewater contaminated with products that contain or degrade to these PFAS into the Great Pee Dee River upstream from Plaintiff's water intake," and that these materials "flow downstream from the Great Pee Dee River, and thereby contaminate Plaintiff's properties and its water source." *See* Am. Compl., ¶¶ 25, 90, 93.   Based on these allegations, the Amended Complaint asserts four causes of action against

---

[1] In filing this Motion, Domtar joins in all other pending motions to dismiss and supporting memoranda filed in other matters in this consolidated proceeding (including *Grand Strand Water and Sewer Authority v. Aladdin Manufacturing Corporation, et al.*, C/A No. 2024-CP-26-05523) to the extent such motions seek dismissal of cause(s) of action based on arguments that apply to all defendants.  This memorandum borrows from the well-constructed arguments presented in this other briefing.

ELECTRONICALLY FILED - 2025 Feb 14 3:38 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

Domtar: (1) private nuisance; (2) public nuisance; (3) trespass; and (4) negligence/gross negligence/recklessness.

As further detailed below, the Court should dismiss the Amended Complaint pursuant to Rule 12(b)(1), SCRCP, because none of the causes of action asserted therein are ripe for adjudication. Separately, the Court should also dismiss certain causes of action pursuant to Rule 12(b)(6), SCRCP, on the grounds that they fail to state a claim upon which relief can be granted.

## LEGAL STANDARD

Pursuant to Rule 12(b)(1), SCRCP, a court may dismiss an action for lack of subject matter jurisdiction. Subject matter jurisdiction is a "threshold inquiry for any court," which "requires a determination of justiciability, *i.e.*, whether the litigation presents an active case or controversy." *Holden v. Cribb*, 349 S.C. 132, 137 (2002) (internal citation omitted). Pursuant to Rule 12(b)(6), a "defendant may move to dismiss a complaint based on a failure to state facts sufficient to constitute a cause of action." *Spence v. Spence*, 368 S.C. 106, 116 (2006). A court may also dismiss a complaint based on a failure to state facts sufficient to constitute a cause of action. Rule 12(b)(6), SCRCP. If the facts and inferences drawn from the complaint, viewed in the light most favorable to the plaintiff, would not entitle the plaintiff to relief on any theory, then the grant of a motion to dismiss for failure to state a claim is proper. *Id*. (citing *Baird v. Charleston Cnty.*, 333 S.C. 519, 527 (2006)).

## ARGUMENT

### I.     Plaintiff's claims are not ripe for adjudication

To determine whether litigation constitutes an active case or controversy, a court must assess whether the plaintiff's claims are ripe for adjudication. *See James v. Anne's Inc.*, 390 S.C. 188, 193 (2010). If a claim presents only a "contingent, hypothetical or abstract dispute," the claim

ELECTRONICALLY FILED - 2025 Feb 14 3:38 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

is not ripe for adjudication and must be dismissed. *See Pee Dee Elect. Co-op, Inc. v. Carolina Power & Light Co.*, 279 S.C. 64, 66 (1983); *see also Peoples Fed. Sav. & Loan Ass'n of S.C. v. Res. Plan. Corp.*, 358 S.C. 460, 477 (2004) (holding that a justiciable controversy is a real and substantial controversy which is ripe and appropriate for judicial determination, as distinguished from a contingent, hypothetical, or abstract dispute).

In this matter, the allegations in the Amended Complaint make clear that Plaintiff has not yet suffered—and may never suffer—any legally cognizable injury due to PFAS. Indeed, while the U.S. Environmental Protection Agency's PFAS water drinking standards ("maximum contaminant levels" or "MCLs") became final in April 2024, it has not been determined if or how the rule will impact Plaintiff. *See* Am. Compl., ¶ 49. This is true because the rule does not require that Plaintiff "begin conducting and reporting regular PFAS monitoring" until 2027, and does not require compliance with the MCLs until 2029. *Id.*, ¶ 51.

Moreover, the Amended Complaint offers no factual allegations to suggest that Plaintiff is doing anything other than waiting to see if and when it might have to incur costs or expenses associated with the MCLs scheduled to take effect in 2029. At present, any such costs or expenses cannot be quantified and are subject to a number of variables, all of which highlight the premature nature of this litigation. For example, there is pending litigation across the country challenging the EPA's rule. *See e.g., Am. Water Works Ass'n v. U.S. EPA*, Case No. 24-1188; *Nat'l Assoc. of Manufacturers, et al. v. U.S. EPA*, Case No. 24-1191; *The Chemours Company FC, LLC v. U.S. EPA*, Case No. 24-1192. Similarly, Plaintiff's future testing during the monitoring period may reveal that it is not required to make any capital investments to comply with the MCLs. The Amended Complaint acknowledges these variables insofar as Plaintiff seeks the award of

ELECTRONICALLY FILED - 2025 Feb 14 3:38 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

unspecified and speculative "future costs" it might incur to install water treatment technologies. *See e.g.,* Am. Compl., ¶ 105.

This is precisely the sort of "threat of injury" that is "too contingent or remote to support present adjudication." *Waters v. S.C. Land. Res. Conservation Comm'n*, 321 S.C. 219, 228 (1996) (internal citation omitted). Accordingly, the Court should dismiss the Amended Complaint.

## II.     Plaintiff's claim for private nuisance fails

Plaintiff's claim for private nuisance should be dismissed because any alleged contamination of a public water body cannot form the basis of a claim for private nuisance. In South Carolina, "a private nuisance affects only one person or a determinate number of persons," whereas a "nuisance is public because of the danger to the public which might have been created." *See Baltzeger v. Carolina Midland Ry. Co.*, 54 S.C. 242, 248 (1899); *Homes Sales Inc. v. City of N. Myrtle Beach*, 299 S.C. 70, 81 (Ct. App. 1989). "If the only interest that is invaded is an interest shared equally by members of the public, then the alleged nuisance is public in nature." *Rhodes v. E.I. du Pont de Nemours & Co.*, 636 F.3d 88, 96-97 (4th Cir. 2011) (holding that an alleged interference with the public's access to clean drinking water and the presence of pollutants in the public water supply will not support a private nuisance claim).

Plaintiff's claim for private nuisance is based on alleged contamination of the Great Pee Dee River, a public body of water accessed by many other landowners with riparian rights and the public at large, and relied upon by "over 34,000 water customers in Florence County" for domestic water supply. Am. Compl., ¶ 2. Plaintiff's allegations, therefore, involve alleged harm that is fundamentally public in nature, which "will not support a private nuisance claim." *See Rhodes*, 636 F.3d at 96-97. Accordingly, the Court should dismiss Plaintiff's cause of action for private nuisance.

ELECTRONICALLY FILED - 2025 Feb 14 3:38 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

### III.    Plaintiff's claim for trespass fails

#### A.    Any alleged entry of PFAS onto Plaintiff's property cannot support a trespass claim

Under South Carolina law, trespass is defined as "any intentional invasion of the plaintiff's interest in the exclusive possession of his property." *Hawkins v. City of Greenville*, 358 S.C. 280, 296 (Ct. App. 2004).  To constitute actionable trespass, however, there must be an affirmative act, invasion of land must be intentional, and harm caused must be the direct result of that invasion." *Id.*  "South Carolina adheres to the traditional rule requiring an invasion by a physical, tangible thing for a trespass to exist." *Babb v. Lee Cnty. Landfill S.C.,* 405 S.C. 129, 145 (2013).  In *Babb*, the Supreme Court of South Carolina specifically analyzed and rejected a broader rule recognizing trespass claims based on "intangible invasions" by "microscopic particulates." *Id*. at 150-52 (rejecting a trespass claim based on "microscopic and atomic" particles because such a claim would lead to public uncertainty as to what constitutes a trespass and would "transform trespass into nuisance" whereby a plaintiff could recover for "even the most ephemeral intrusion").

PFAS molecules, measured in the parts-per-trillion, fit squarely within the "microscopic particulate" category, which, in accordance with *Babb*, cannot form the basis of a trespass claim under South Carolina law.  Therefore, Plaintiffs' cause of action for trespass should be dismissed.

#### B.    Plaintiff does not allege an intentional, unauthorized entry onto its property

A trespass under South Carolina law requires an affirmative act that is "intentional" and "unauthorized." *Snow v. City of Columbia*, 305 S.C. 544, 553 (Ct. App. 1991); *Ravan v. Greenville Cnty.*, 315 S.C. 447, 464 (Ct. App. 1993).  Similarly, and pertinent to allegations in this case, multiple courts have recently found that a water treatment facility has no cause of action for trespass where the facility voluntarily draws allegedly contaminated water from a river. *See e.g.*, *Utilities Bd. Of Tuskegee v. 3M Co.*, *Inc.*, No. 2:22-cv-420-WKW, 2023 WL 1870912, at *16

(M.D. Ala. Feb. 9, 2023) (rejecting a trespass claim based on similar allegations because, "unlike other indirect trespasses, Defendants' PFAS did not cross onto [plaintiff's] boundary line by a natural process").

The Amended Complaint is void of any allegation that Domtar, by intentionally discharging water in the Great Pee Dee River, intended to cause PFAS to enter Plaintiff's downstream water source. Notwithstanding this omission, the notion that Domtar acted with such intent strains credulity given that Domtar's Marlboro Mill is located over thirty (30) miles upstream. Moreover, it is impossible to square the concept that Domtar affirmatively, intentionally trespassed on Plaintiff's property with the fact that it is Plaintiff who affirmatively draws water from the public watershed into its facility by activating its pumps. *See* Am. Compl., ¶ 92. Stated differently, but for Plaintiff affirmatively taking water from the public watershed, there would never be an "invasion" of Plaintiff's property. This Court should follow the well-reasoned opinion in *Utilities Bd. Of Tuskegee*, and dismiss Plaintiff's claim for trespass.

> ### C. Plaintiff does not enjoy exclusive possession of the water from the Great Pee Dee River

Finally, the Supreme Court of South Carolina has previously held that trespass claims protect only the "right to exclusive possession" of property, as opposed to protecting against "merely interfer[ing] with the right to use and enjoyment." *Babb*, 405 S.C. at 150-51. It is also well-settled that while a riparian owner has "an equal right to use of the water which follows in the stream adjacent to his lands, … [h]e has no property in the water itself, but a simple usufruct." *White v. Whitney Mfg. Co.*, 60 S.C. 254, 265 (1904).

It follows that, to the extent Plaintiff seeks to recover on a trespass theory based on alleged PFAS contamination of the Great Pee Dee River, such a claim fails because Plaintiff does not possess an exclusion right to the water. Rather, Plaintiff has only a riparian right of reasonable

ELECTRONICALLY FILED - 2025 Feb 14 3:38 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

use. Plaintiff admits as much, and specifically alleges that it "owns riparian land abutting the Great Pee Dee River, and Plaintiff has a property right in the reasonable use of the waters, including for the provision of water to its customers." *See* Am. Compl., ¶ 65. This is not—nor does allege it to be—exclusive possession of the Great Pee Dee River, which is fatal to Plaintiff's trespass claim. Accordingly, the Court should dismiss this cause of action.

## IV.    Plaintiff's claim for negligence fails

To prevail on a negligence cause of action under South Carolina law, it is well-established that a legally cognizable duty of care must flow between the plaintiff and the defendant; otherwise, the claim fails as a matter of law. *See e.g.*, *Huggins v. Citibank, N.A.*, 355 S.C. 329, 333 (2003) (holding that the parties must have a relationship recognized by law as providing the foundation for a duty to prevent an injury and that a court must not extend the concept of a legal duty of care in tort liability beyond reasonable limits); *Madison ex rel. Bryant v. Babcock Ctr., Inc.*, 371 S.C. 123, 136 (2006) (holding that an affirmative legal duty may be created by statute, a contractual relationship, status, property interest, or some other special circumstance).

Here, the Amended Complaint is void of any allegation purporting to establish the existence of a duty of care flowing to Plaintiff from Domtar. Plaintiff does not allege the existence of a legal duty created by statute. Plaintiff does not allege the existence of a contractual relationship between Plaintiff and Domtar. Plaintiff does not allege a property interest involving Plaintiff or Domtar giving rise to a cognizable duty of care. There is likewise no other "status" or "special circumstance" alleged by Plaintiff as applicable to Domtar that might give rise to a cognizable duty of care.

Instead, Plaintiff bases its negligence claim on the general notion that all Defendants "have a duty to use care in the handling, use, and disposal of products containing or degrading to PFOA,

8

ELECTRONICALLY FILED - 2025 Feb 14 3:38 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Feb 14 3:38 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals." *See* Am. Compl., ¶ 98. This broad, conclusory statement runs contrary to South Carolina law, which expressly guards against the extension of tort liability beyond reasonable limits. *See e.g.*, *Huggins*, 355 S.C. at 333; *see also Miller v. City of Camden*, 329 S.C. 310, 314 (1997) (citation omitted) (holding that "one who has no control owes no duty"). Given the absence of a legal duty flowing between Plaintiff and Domtar, the Court should dismiss Plaintiff's cause of action for negligence.

## CONCLUSION

Based on the foregoing, Domtar respectfully requests that the Court enter an Order granting this Motion and dismissing the Amended Complaint. Domtar further seeks any additional relief deemed just and proper.

This the 14th day of February, 2025.

> s/ William J. Farley III
> William J. Farley III (S.C. Bar No. 101033)
> TROUTMAN PEPPER LOCKE LLP
> 301 S. College Street, Suite 3400
> Charlotte, North Carolina 28202
> Telephone: 704.998.4099
> Facsimile: 704.998.4051
> Email: will.farley@troutman.com
>
> *Counsel for Domtar Paper Company, LLC*



# CABARRUS COUNTY SHERIFF'S OFFICE
## Van W. Shaw, Sheriff

*Public Safety through Professionalism and Integrity*

**State of: SOUTH CAROLINA**

DocketNumber:2024CP2102844

**Plft:** CITY OF FLORENCE, SOUTH CAROLINA
**Deft:** ALADDIN MANUFACTURING CORPORATION

PROCESS: AMENDED SUMMONS & COMPLAINT

CHEM-TEX LABORATORIES INC
C/O REGISTERED AGENT
COLLETTE MARTIN
2725 ARMENTROUT DRIVE
CONCORD NC 28025

STATE OF NORTH CAROLINA COUNTY OF CABARRUS

Before me this day personally appeared ___Deputy AW Morgan___

Deputy Sheriff of Cabarrus County who first being sworn and said as follows:

That a Deputy Sheriff, employed by VAN W. SHAW, Sheriff of Cabarrus County, Concord, North Carolina.

That on ___February 11th 2025___, was served.

At: ___2725 armentrout Drive Concord N___

with a copy of the ___SEE ABOVE CAPTION___

○ By delivering a copy to the defendant personally.

○ By leaving a copy at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

_____

☒ As the defendant is a corporation, by leaving copies with ___
___Collette Martin (registered agent)___

The Defendant, _____, was not served for the

following reason: _____

Service returned on ___2-11th___ 20 __25__

By: ___AW Morgan___

Deputy Sheriff of Cabarrus County

VAN W. SHAW
SHERIFF OF CABARRUS COUNTY
Concord, North Carolina

SWORN TO AND SUBSCRIBED BEFORE ME THIS THE __11__ DAY OF ___February___ 20__25__

NOTARY PUBLIC, CABARRUS COUNTY, STATE OF NORTH CAROLINA
MY COMMISSION EXPIRES: ___1/25/21___
Rec: 02/10/2025
300753

(OFFICIAL SEAL)
RACHAE SANTIAGO
Notary Public
Cabarrus County
NORTH CAROLINA

Cabarrus

Van W. Shaw, Sheriff

ELECTRONICALLY FILED - 2025 Feb 17 2:01 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844



# CABARRUS COUNTY SHERIFF'S OFFICE
## Van W. Shaw, Sheriff

*Public Safety through Professionalism and Integrity*

State of: **SOUTH CAROLINA**

DocketNumber:**2024CP2102844**

Plft:  **CITY OF FLORENCE, SOUTH CAROLINA**
Deft:  **ALADDIN MANUFACTURING CORPORATION**

| PROCESS: AMENDED SUMMONS & COMPLAINT |
| --- |

**CHEM-TEX LABORATORIES INC**
**C/O REGISTERED AGENT**
**COLLETTE MARTIN**
**2725 ARMENTROUT DRIVE**
**CONCORD NC 28025**

STATE OF NORTH CAROLINA COUNTY OF CABARRUS

Before me this day personally appeared _____ *Deputy AW Morgan* _____

Deputy Sheriff of Cabarrus County who first being sworn and said as follows:

That a Deputy Sheriff, employed by VAN W. SHAW, Sheriff of Cabarrus County, Concord, North Carolina.

That on _____ *February 11th 2025* _____, was served.

At: _____ *2725 armentrout Drive Concord N* _____

with a copy of the _____ SEE ABOVE CAPTION _____

- ○ By delivering a copy to the defendant personally.

- ○ By leaving a copy at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

  _____

- ☒ As the defendant is a corporation, by leaving copies with _____
  *Collette Martin (registered agent)* _____

The Defendant, _____, was not served for the following reason: _____

Service returned on *2-11th* 20 *25*

By: _____ *AW Morgan* _____
Deputy Sheriff of Cabarrus County

VAN W. SHAW
SHERIFF OF CABARRUS COUNTY
Concord, North Carolina

SWORN TO AND SUBSCRIBED BEFORE ME THIS THE *11* DAY OF _____ *February* 20 *25*
_____
NOTARY PUBLIC, CABARRUS COUNTY, STATE OF NORTH CAROLINA
MY COMMISSION EXPIRES: _____
Rec: 02/10/2025
300753

RACHAEL SANTIAGO
Notary Public
Cabarrus County
NORTH CAROLINA
(OFFICIAL SEAL)

Cabarrus

Van W. Shaw, Sheriff

ELECTRONICALLY FILED - 2025 Feb 17 2:01 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Feb 17 4:30 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| | ) | |
| COUNTY OF FLORENCE | ) | TWELFTH JUDICIAL CIRCUIT |
| | ) | |
| City of Florence, South Carolina, | ) | |
| | ) | CA No.: 2024-CP-21-02844 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **PROOF OF SERVICE** |
| | ) | |
| Aladdin Manufacturing Corporation, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiff City of Florence, South Carolina ("Plaintiff") served Plaintiff's Amended Summons and Amended Complaint on Defendant BFI Waste Systems of North America, LLC ("BFI") via certified mail, restricted delivery, mailed on February 7, 2025, from Spartanburg, SC to BFI's registered agent, CT Corporation System, 2 Office Park Court, Ste. 103, Columbia, SC 29223. The date of delivery was February 10, 2025, as shown on the attached signed USPS Return Receipt Card.

/s/ John B. White, Jr.
John B. White, Jr. (SC Bar No. 05996)
Marghretta H. Shisko (SC Bar No. 100106)
Griffin L. Lynch (SC Bar No. 72518)
Christopher R. Jones (SC Bar No. 101265)
JOHN B. WHITE, JR., PA
PO Box 2465 (29304)
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
glynch@johnbwhitelaw.com
cjones@johnbwhitelaw.com

*Attorneys for Plaintiff*

Spartanburg, SC
February 17, 2025

ELECTRONICALLY FILED - 2025 Feb 17 4:30 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

BFI Waste Systems of North America, LLC
c/o Registered Agent,
CT Corporation System
2 Office Park Court, Ste. 103
Columbia, SC 29223

9590 9402 9034 4122 9040 77

2. Article Number (Transfer from service label)

9589 0710 5270 1603 0076 39

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
Pam Johnson
X *Pam Johnson*
☐ Agent
☐ Addressee

B. Received by (Printed Name)

C. Date of Delivery
2/10/25

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☒ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☒ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053          Domestic Return Receipt

ELECTRONICALLY FILED - 2025 Feb 17 4:30 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| | ) | |
| COUNTY OF FLORENCE | ) | TWELFTH JUDICIAL CIRCUIT |
| | ) | |
| City of Florence, South Carolina, | ) | |
| | ) | CA No.: 2024-CP-21-02844 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **PROOF OF SERVICE** |
| | ) | |
| Aladdin Manufacturing Corporation, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiff City of Florence, South Carolina ("Plaintiff") served Plaintiff's Amended Summons and Amended Complaint on Defendant Carvana, LLC ("Carvana") via certified mail, restricted delivery, mailed on February 7, 2025, from Spartanburg, SC to Carvana's registered agent, Corporation Service Company, 508 Meeting Street, W. Columbia, SC 29169. The date of delivery was February 10, 2025, as shown on the attached signed USPS Return Receipt Card.

/s/ John B. White, Jr.
John B. White, Jr. (SC Bar No. 05996)
Marghretta H. Shisko (SC Bar No. 100106)
Griffin L. Lynch (SC Bar No. 72518)
Christopher R. Jones (SC Bar No. 101265)
JOHN B. WHITE, JR., PA
PO Box 2465 (29304)
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
glynch@johnbwhitelaw.com
cjones@johnbwhitelaw.com

*Attorneys for Plaintiff*

Spartanburg, SC
February 17, 2025

ELECTRONICALLY FILED - 2025 Feb 17 4:30 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Carvana , LLC
c/o Registered Agent,
Corporation Service Company
508 Meeting Street
W. Columbia, SC 29169

9590 9402 9034 4122 9040 60

2  9589 0710 5270 1603 0076 46

PS Form 3811, July 2020 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X  *Daniele Kriz*          ☐ Agent
                            ☐ Addressee

B. Received by (Printed Name)        C. Date of Delivery

Daniele Kriz    10 FEB 2025

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:       ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☒ Signature Confirmation Restricted Delivery

Domestic Return Receipt

ELECTRONICALLY FILED - 2025 Feb 17 4:30 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| | ) | |
| COUNTY OF FLORENCE | ) | TWELFTH JUDICIAL CIRCUIT |
| | ) | |
| City of Florence, South Carolina, | ) | |
| | ) | CA No.: 2024-CP-21-02844 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **PROOF OF SERVICE** |
| | ) | |
| Aladdin Manufacturing Corporation, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiff City of Florence, South Carolina ("Plaintiff") served Plaintiff's Amended Summons and Amended Complaint on Defendant Cascades Holding US, Inc. ("Cascades") via certified mail, restricted delivery, mailed on February 7, 2025, from Spartanburg, SC to Cascade's registered agent, CT Corporation System, 2 Office Park Court, Ste. 103, Columbia, SC 29223. The date of delivery was February 10, 2025, as shown on the attached signed USPS Return Receipt Card.

/s/ John B. White, Jr.
John B. White, Jr. (SC Bar No. 05996)
Marghretta H. Shisko (SC Bar No. 100106)
Griffin L. Lynch (SC Bar No. 72518)
Christopher R. Jones (SC Bar No. 101265)
JOHN B. WHITE, JR., PA
PO Box 2465 (29304)
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
glynch@johnbwhitelaw.com
cjones@johnbwhitelaw.com

*Attorneys for Plaintiff*

Spartanburg, SC
February 17, 2025

ELECTRONICALLY FILED - 2025 Feb 17 4:30 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844



ELECTRONICALLY FILED - 2025 Feb 17 4:30 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| | ) | |
| COUNTY OF FLORENCE | ) | TWELFTH JUDICIAL CIRCUIT |
| | ) | |
| City of Florence, South Carolina, | ) | |
| | ) | CA No.: 2024-CP-21-02844 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **PROOF OF SERVICE** |
| | ) | |
| Aladdin Manufacturing Corporation, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiff City of Florence, South Carolina ("Plaintiff") served Plaintiff's Amended Summons and Amended Complaint on Defendant Elevate Textiles, Inc. ("Elevate") via certified mail, restricted delivery, mailed on February 7, 2025, from Spartanburg, SC to Elevate's registered agent, CT Corporation System, 2 Office Park Court, Ste. 103, Columbia, SC 29223. The date of delivery was February 10, 2025, as shown on the attached signed USPS Return Receipt Card.

/s/ John B. White, Jr.
John B. White, Jr. (SC Bar No. 05996)
Marghretta H. Shisko (SC Bar No. 100106)
Griffin L. Lynch (SC Bar No. 72518)
Christopher R. Jones (SC Bar No. 101265)
JOHN B. WHITE, JR., PA
PO Box 2465 (29304)
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
glynch@johnbwhitelaw.com
cjones@johnbwhitelaw.com

*Attorneys for Plaintiff*

Spartanburg, SC
February 17, 2025



ELECTRONICALLY FILED - 2025 Feb 17 4:30 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Feb 17 4:30 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| | ) | |
| COUNTY OF FLORENCE | ) | TWELFTH JUDICIAL CIRCUIT |
| | ) | |
| City of Florence, South Carolina, | ) | |
| | ) | CA No.: 2024-CP-21-02844 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **PROOF OF SERVICE** |
| | ) | |
| Aladdin Manufacturing Corporation, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiff City of Florence, South Carolina ("Plaintiff") served Plaintiff's Amended Summons and Amended Complaint on Defendant HeiQ ChemTex, Inc. ("HeiQ") via certified mail, restricted delivery, mailed on February 7, 2025, from Spartanburg, SC to HeiQ's registered agent, John Cottrell, 205 Rocky Meadow Drive, Gilbert, SC 29054. The date of delivery was February 10, 2025, as shown on the attached signed USPS Return Receipt Card and USPS Tracking Results.

/s/ John B. White, Jr.
John B. White, Jr. (SC Bar No. 05996)
Marghretta H. Shisko (SC Bar No. 100106)
Griffin L. Lynch (SC Bar No. 72518)
Christopher R. Jones (SC Bar No. 101265)
JOHN B. WHITE, JR., PA
PO Box 2465 (29304)
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
glynch@johnbwhitelaw.com
cjones@johnbwhitelaw.com

*Attorneys for Plaintiff*

Spartanburg, SC
February 17, 2025

ELECTRONICALLY FILED - 2025 Feb 17 4:30 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

HeiQ ChemTex, Inc.
c/o Registered Agent,
John Cottrell
205 Rocky Meadow Drive
Gilbert, SC 29054

9590 9402 9034 4122 9040 39

2. Article Number *(Transfer from service label)*

9589 0710 5270 1603 0079 29

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature

X _____  ☐ Agent
                        ☐ Addressee

B. Received by *(Printed Name)*     C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☒ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ ...Mail
☐ ...Mail Restricted Delivery
   (...)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☒ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053          Domestic Return Receipt

ALERT: WINTER STORMS IN THE MIDWEST THROUGH THE NORTHEAST U.S. MAY DELAY FINAL DELIVERY OF YOUR MAIL AND PACKAGES. READ MORE › (HTTPS://A…

## USPS Tracking®

FAQs ›

Remove ✕

Tracking Number:

## 95890710527016 03007929

Copy     Add to Informed Delivery (https://informeddelivery.usps.com/)

**Latest Update**

Your item was delivered to an individual at the address at 11:24 am on February 10, 2025 in GILBERT, SC 29054.

Get More Out of USPS Tracking:

    USPS Tracking Plus®

**Delivered**
Delivered, Left with Individual
GILBERT, SC 29054
February 10, 2025, 11:24 am

**Out for Delivery**
GILBERT, SC 29054
February 10, 2025, 6:10 am

**Arrived at Hub**
GILBERT, SC 29054
February 9, 2025, 8:17 am

**Arrived at USPS Facility**
GILBERT, SC 29054
February 9, 2025, 7:21 am

**Departed USPS Regional Facility**
COLUMBIA SC PROCESSING CENTER
February 9, 2025, 5:54 am

**Arrived at USPS Regional Facility**
COLUMBIA SC PROCESSING CENTER
February 8, 2025, 7:43 pm

**In Transit to Next Facility**
February 8, 2025, 6:42 pm

**Departed USPS Facility**
GASTONIA, NC 28054
February 8, 2025, 5:23 pm

**Arrived at USPS Regional Facility**
CHARLOTTE NC DISTRIBUTION CENTER
February 8, 2025, 1:01 pm

**Hide Tracking History**

**What Do USPS Tracking Statuses Mean? (https://faq.usps.com/s/article/Where-is-my-package)**

| Text & Email Updates | ⌄ |
|---|---|

| USPS Tracking Plus® | ⌄ |
|---|---|

| Product Information | ⌄ |
|---|---|

See Less ⌃

ELECTRONICALLY FILED - 2025 Feb 17 4:30 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

Feedback

USPS.com® - USPS Tracking® Results

Track Another Package

Enter tracking or barcode numbers

## Need More Help?

Contact USPS Tracking support for further assistance.

FAQs

ELECTRONICALLY FILED - 2025 Feb 17 4:30 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Feb 17 4:30 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| | ) | |
| COUNTY OF FLORENCE | ) | TWELFTH JUDICIAL CIRCUIT |
| | ) | |
| City of Florence, South Carolina, | ) | |
| | ) | CA No.: 2024-CP-21-02844 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **PROOF OF SERVICE** |
| | ) | |
| Aladdin Manufacturing Corporation, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiff City of Florence, South Carolina ("Plaintiff") served Plaintiff's Amended Summons and Amended Complaint on Defendant Republic Services, Inc. ("Republic") via certified mail, restricted delivery, mailed on February 7, 2025, from Spartanburg, SC to Republic's registered agent, CT Corporation System, 2 Office Park Court, Ste. 103, Columbia, SC 29223. The date of delivery was February 10, 2025, as shown on the attached signed USPS Return Receipt Card.

/s/ John B. White, Jr.
John B. White, Jr. (SC Bar No. 05996)
Marghretta H. Shisko (SC Bar No. 100106)
Griffin L. Lynch (SC Bar No. 72518)
Christopher R. Jones (SC Bar No. 101265)
JOHN B. WHITE, JR., PA
PO Box 2465 (29304)
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
glynch@johnbwhitelaw.com
cjones@johnbwhitelaw.com

*Attorneys for Plaintiff*

Spartanburg, SC
February 17, 2025

ELECTRONICALLY FILED - 2025 Feb 17 4:30 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

**SENDER:** *COMPLETE THIS SECTION*

■ Complete items **1**, **2**, and **3**.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Republic Services, Inc.
c/o Registered Agent,
CT Corporation System
2 Office Park Court, Ste. 103
Columbia, SC 29223

9590 9402 9034 4122 8858 57

2. Article Number *(Transfer from service label)*

9589 0710 5270 1603 0079 12

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature

X *Pam Johnson*    ☐ Agent   ☐ Addressee

B. Received by *(Printed Name)*    C. Date of Delivery    2/19/25

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Mail
☐ Mail Restricted Delivery (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form **3811**, July 2020 PSN 7530-02-000-9053    Domestic Return Receipt

ELECTRONICALLY FILED - 2025 Feb 17 4:30 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| | |
|---|---|
| STATE OF SOUTH CAROLINA ) | IN THE COURT OF COMMON PLEAS |
| ) | |
| COUNTY OF FLORENCE ) | TWELFTH JUDICIAL CIRCUIT |
| ) | |
| City of Florence, South Carolina, ) | |
| ) | CA No.: 2024-CP-21-02844 |
| Plaintiff, ) | |
| ) | |
| v. ) | **PROOF OF SERVICE** |
| ) | |
| Aladdin Manufacturing Corporation, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |

Plaintiff City of Florence, South Carolina ("Plaintiff") served Plaintiff's Amended Summons and Amended Complaint on Defendant Waste Connections of North Carolina, Inc. ("Waste Connections NC") via certified mail, restricted delivery, mailed on February 7, 2025, from Spartanburg, SC to Waste Connections NC's registered agent, Corporation Service Company, 508 Meeting Street, W. Columbia, SC 29169. The date of delivery was February 10, 2025, as shown on the attached signed USPS Return Receipt Card.

/s/ John B. White, Jr.
John B. White, Jr. (SC Bar No. 05996)
Marghretta H. Shisko (SC Bar No. 100106)
Griffin L. Lynch (SC Bar No. 72518)
Christopher R. Jones (SC Bar No. 101265)
JOHN B. WHITE, JR., PA
PO Box 2465 (29304)
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
glynch@johnbwhitelaw.com
cjones@johnbwhitelaw.com

*Attorneys for Plaintiff*

Spartanburg, SC
February 17, 2025

ELECTRONICALLY FILED - 2025 Feb 17 4:30 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

**SENDER:** *COMPLETE THIS SECTION*

- Complete items **1, 2,** and **3.**
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Waste Connections of North Carolina, Inc.
c/o Registered Agent,
Corporation Service Company
508 Meeting Street
W. Columbia, SC 29169

||||||||||||||||||||||||||||||||||||||
9590 9402 9034 4122 9040 22

2. Article Number *(Transfer from service label)*

9589 0710 5270 1603 0079 05

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature

X *Daniele Kriz*   ☐ Agent   ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

*iele Kriz*

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:   ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ ...il Restricted Delivery (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form **3811**, July 2020 PSN 7530-02-000-9053          Domestic Return Receipt

STATE OF NORTH CAROLINA
COUNTY OF WAKE



STATE OF SOUTH CAROLINA
COUNTY OF FLORENCE

Plaintiff Name:
CITY OF FLORENCE SOUTH CAROLINA

*Versus*

Defendant Name:
AMERICHEM INC
c/o CORPORATION SERVICE CO.
2626 GLENWOOD AVE., STE 550
RALEIGH, NC 27608

## DEPUTY'S AFFIDAVIT OF SERVICE

Court File No: 2024-CP-21-02844

I, __H.L. MᶜClain, JR__ , being a duly sworn Deputy Sheriff of Wake County, Raleigh, North Carolina, States that in the above referenced matter,  on the __12ᵗʰ__ Day of __Feb__ ,20 __21__ at __12:50__ }AM{ �XPM, HE/SHE ☒ SERVED/ { } WAS UNABLE TO SERVE, AMERICHEM INC, legal service of AMENDED SUMMONS, and  FIRST AMENDED COMPLAINT , on Defendant/Person to serve as follows: (check one):

_____

☐ BY DELIVERING TO DEFENDANT / PERSON TO SERVE A COPY (IES)

☐ BY LEAVING A COPY (IES) AT THE DWELLING HOUSE OR USUAL PLACE OF ABODE OF THE DEFENDANT/ PERSON TO SERVE, WITH A PERSON OF SUITABLE AGE.

☒ AS THE DEFENDANT / PERSON TO SERVE IS A CORPORATION, SERVICE WAS EFFECTED BY DELIVERING A COPY(IES) TO WHO IS AN OFFICER OF THE CORPORATION. *Lilly Frazier - Register Agent*

☐ NOT SERVED: DEFENDANT/PERSON NOT FOUND IN WAKE COUNTY.

☐ OTHER:_____

Service Name:_____

**WILLIE ROWE**
SHERIFF OF WAKE COUNTY

BY: __HPMᶜClain #3689__
*DEPUTY SHERIFF*

SUBSCRIBED AND SWORN TO BEFORE ME THIS THE __14__ DAY OF __February 2025,__

__Carolyn Monroe__
NOTARY PUBLIC WAKE COUNTY, NORTH CAROLINA
MY COMMISSION EXPIRES THE __30__ DAY OF __June 2029__



R_Civi83

ELECTRONICALLY FILED - 2025 Feb 18 7:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STATE OF NORTH CAROLINA
COUNTY OF WAKE

‖‖‖‖‖‖‖‖‖‖‖‖‖‖

STATE OF SOUTH CAROLINA
COUNTY OF FLORENCE

**DEPUTY'S AFFIDAVIT
OF SERVICE**

Court File No: 2024-CP-21-02844

Plaintiff Name:
CITY OF FLORENCE SOUTH CAROLINA

*Versus*

Defendant Name:
AURIA SOLUTIONS USA INC.
c/o CORPORATION SERVICE CO.
2626 GLENWOOD AVE., STE 550
RALEIGH, NC 27608

I, _H. L. McClain, Jr_____, being a duly sworn Deputy Sheriff of Wake County, Raleigh, North Carolina, States that in the above referenced matter, on the _12th_ Day of _Feb_____, 20_25_ at _1050_{ }AM{X}PM, HE/SHE {X}SERVED/ { } WAS UNABLE TO SERVE, AURIA SOLUTIONS USA INC, legal service of AMENDED SUMMONS, and FIRST AMENDED COMPLAINT , on Defendant/Person to serve as follows: (check one):

_____

[ ] BY DELIVERING TO DEFENDANT / PERSON TO SERVE A COPY (IES)

[ ] BY LEAVING A COPY (IES) AT THE DWELLING HOUSE OR USUAL PLACE OF ABODE OF THE DEFENDANT/ PERSON TO SERVE, WITH A PERSON OF SUITABLE AGE.

[X] AS THE DEFENDANT / PERSON TO SERVE IS A CORPORATION, SERVICE WAS EFFECTED BY DELIVERING A COPY(IES) TO WHO IS AN OFFICER OF THE CORPORATION. *Lilly Frazier-Register Agent*

[ ] NOT SERVED: DEFENDANT/PERSON NOT FOUND IN WAKE COUNTY.

[ ] OTHER:_____

Service Name:_____

**WILLIE ROWE**
SHERIFF OF WAKE COUNTY

BY: ___H. L. McClain Jr #3689___
*DEPUTY SHERIFF*

SUBSCRIBED AND SWORN TO BEFORE ME THIS THE _14_ DAY OF _February 2025_.

_Carolyn Monroe_____
NOTARY PUBLIC, WAKE COUNTY, NORTH CAROLINA
MY COMMISSION EXPIRES THE _30_ DAY OF _June 2029_

CAROLYN MONROE
NOTARY PUBLIC
WAKE COUNTY, NC

R_Civi83

ELECTRONICALLY FILED - 2025 Feb 18 7:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Feb 19 10:34 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

**STATE OF SOUTH CAROLINA**
**COUNTY OF FLORENCE**

**IN THE COURT OF COMMON PLEAS**
**TWELFTH JUDICIAL CIRCUIT**

| | |
|---|---|
| CITY OF FLORENCE, SOUTH CAROLINA ) ) ) | |
| ) | C.A. No.: 2024-CP-21-02844 |
| Plaintiff, ) | |
| ) | |
| v. ) | PFAS Litigation Coordinated Docket |
| ) | |
| ALADDIN MANUFACTURING ) CORPORATION, ET AL. ) | |
| ) | |
| Defendants. ) | |

### DEFENDANTS MOHAWK INDUSTRIES, INC. AND ALADDIN MANUFACTURING CORPORATION'S MOTION AND MEMORANDUM IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

Defendants Mohawk Industries, Inc. and Aladdin Manufacturing Corporation (jointly, "Moving Defendants") move pursuant to Rules 8(a), 12(b)(1), and 12(b)(6) of the South Carolina Rules of Civil Procedure to dismiss all claims asserted against them in the Amended Complaint ("Complaint"). Moving Defendants submit this memorandum in support of their motion.

## I.     INTRODUCTION

Plaintiff is a municipal corporation that operates water treatment facilities in Florence County and intakes surface water from the Great Pee Dee River. (*Compl.* ¶ 3, 16.) Plaintiff claims that Moving Defendants owned and operated the Oak River Mill (the "Mill"), a yarn conversion and extrusion facility located on the Great Pee Dee River near Bennettsville, until the Mill closed in 2022. The Complaint asserts that Moving Defendants discharged PFAS chemicals used at the Mill into the River and that PFAS from the Mill flowed more than 30 miles downstream to Plaintiff's treatment facility. (*Id.*)

ELECTRONICALLY FILED - 2025 Feb 19 10:34 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

Based on these factual allegations, Plaintiff asserts causes of action against Moving Defendants for private and public nuisance, trespass, and negligence. Plaintiff contends that the presence of PFAS in its source water will require Plaintiff to upgrade its treatment facilities to comply with new U.S. Environmental Protection Agency ("EPA") regulations, set to take effect in 2029, related to PFAS levels in drinking water. Through this lawsuit, Plaintiff seeks to compel Moving Defendants and their co-Defendants to fund the acquisition, installation, and operation of water treatment technologies designed to remove PFAS from Plaintiff's water intake. (*Id*. at ¶¶ 7, 73, 79, 85, 96.)

The Complaint should be dismissed because the dispute is not ripe for judicial review. The EPA regulations on which Plaintiff's claims are based will not take effect until 2029, if at all. And even if the regulations ultimately take effect in their current form—which remains uncertain given several ongoing federal court challenges—it is unclear what specific actions, if any, Plaintiff must take to comply and whether the federal government will pay for any such action.

Moreover, the Complaint acknowledges that the new EPA rule includes an initial three-year testing period, which has only recently begun, to assess PFAS levels in source water. Plaintiff does not allege that it has thus far incurred costs or taken action to comply with the new regulations. Instead, the Complaint seeks to recover hypothetical future expenses associated with new water treatment system technologies that Plaintiff may never need. As such, Plaintiff's suit is premature and should be dismissed on that basis.

Plaintiff's individual causes of action are also deficient, warranting dismissal on that basis as well. Plaintiff's private nuisance claim fails because the alleged contamination of the Great Pee Dee River affects the public generally, as opposed to Plaintiff in particular, which precludes a claim for private nuisance. Plaintiff's trespass claim likewise fails because PFAS molecules

2

ELECTRONICALLY FILED - 2025 Feb 19 10:34 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

constitute "intangible" matter that will not support a trespass claim and, to the extent any PFAS entered Plaintiff's property from the waterway, it was the result of Plaintiff's own voluntary actions rather than intentional conduct by Moving Defendants. Lastly, Plaintiff's negligence claim fails as well because Mohawk owes no legal duty to Plaintiff and Plaintiff fails to allege that it incurred physical injury or property damage due to Moving Defendants' alleged negligence. For these reasons, set forth in greater detail below, Moving Defendants' motion should be granted.

## II.    LEGAL STANDARD

The court may dismiss a claim where "the defendant demonstrates the plaintiff has failed 'to state facts sufficient to constitute a cause of action' in the pleadings filed with the court." *Williams v. Condon*, 347 S.C. 227, 232-33, 553 S.E.2d 496, 499 (Ct. App. 2001) (quoting Rule 12(b)(6), SCRCP). The court's "ruling on a motion to dismiss under Rule 12(b)(6), SCRCP, must be based solely on the allegations contained in the complaint." *Chewning v. Ford Motor Co.*, 346 S.C. 28, 32, 550 S.E.2d 584, 586 (Ct. App. 2001). However, in making a motion to dismiss, only the "well pleaded facts are admitted, but inferences drawn by the plaintiff from such facts and conclusions of law are not admitted." *Jensen v. S.C. Dep't of Soc. Scrvs.*, 297 S.C. 323, 326, 377 S.E.2d 102, 104 (Ct. App. 1987). The motion to dismiss must be granted if, viewing the evidence in favor of the plaintiff, the "facts alleged in the complaint and inferences reasonably deducible therefrom do not entitle the plaintiff to relief on any theory of the case." *Chewning*, 346 S.C. at 32-33, 550 S.E.2d at 586.

## III.    ARGUMENT

### 1. Plaintiff's claims are not ripe for adjudication.

"A threshold inquiry for any court is a determination of justiciability, i.e., whether the litigation presents an active case or controversy." *Lennon v. S.C. Coastal Council,* 330 S.C. 414,

3

ELECTRONICALLY FILED - 2025 Feb 19 10:34 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

415, 498 S.E.2d 906, 906 (Ct. App. 1998). This includes an assessment of whether the plaintiff's claims are ripe for adjudication. *See James v. Anne's Inc.,* 390 S.C. 188, 193, 701 S.E.2d 730, 732 (2010). A claim is not ripe and should be dismissed when it presents "a contingent, hypothetical or abstract dispute." *Pee Dee Elec. Co-op., Inc. v. Carolina Power & Light Co.,* 279 S.C. 64, 66, 301 S.E.2d 761, 762 (1983).

The Complaint establishes that Plaintiff has not yet suffered the injury for which it seeks recovery. The thrust of this case is that Plaintiff expects to incur costs to comply with recently enacted EPA regulations regarding "maximum contaminant levels" ("MCLs") of PFAS in drinking water. *PFAS National Primary Drinking Water Regulation*, 89 Fed Reg. 32532 (April 26, 2024) (the "Rule"). Although the Rule became final in April 2024 (*Compl.*, ¶¶ 49-51), it remains unclear how, if at all, the Rule will impact Plaintiff. The Rule provides for a three year "initial monitoring" period that runs through 2027. *Id.*; *see also* 89 Fed. Reg. 32532, 32633. Even assuming that initial monitoring determines further action is necessary to satisfy the Rule, Plaintiff will not have to comply with the MCLs until 2029. *Id.* ¶ 51. Plaintiff alleges no facts indicating that it has incurred expenses yet due to alleged PFAS in its source water. In fact, nothing in the Complaint indicates that Plaintiff's operations have changed at all from before the MCLs were finalized in April 2024 or as a result of PFAS in the waterway. Rather, the Complaint makes clear that Plaintiff asks this Court to award unspecified, speculative costs that Plaintiff *may* incur in the future. (*Compl.*, ¶ 79) (requesting "expenses associated with the ***future*** acquisition, installation, and operation of required treatment technologies") (emphasis added).

Several factors indicate Plaintiff may not incur these costs at all. For example, Plaintiff's testing during the initial monitoring period may establish that improvements to Plaintiff's facilities are unnecessary to comply with the Rule. Moreover, the Rule faces numerous legal challenges that

4

remain pending in federal courts.[1] Irrespective of the outcome of these lawsuits, the new administration and leadership at EPA could alter or eliminate the Rule altogether before Plaintiff must comply with the MCLs. Furthermore, the federal government, including the EPA, has made available grants to pay for infrastructure and source water treatment for PFAS and other contaminants, and to conduct water quality testing.[2] Such grants could reduce or eliminate altogether any costs Plaintiff might otherwise incur to comply with the Rule. Because of these numerous contingencies and the consequent uncertainty regarding Plaintiff's obligations under the Rule, the facts alleged by Plaintiff demonstrate, at most, "the mere threat of potential injury," which is "too contingent or remote to support present adjudication." *Waters v. S.C. Land Res. Conservation Comm'n*, 321 S.C. 219, 228, 467 S.E.2d 913, 918 (1996) (quoting *Thrifty Rent-A-Car Sys., Inc. v. Thrifty Auto Sales of Charleston, Inc.*, 849 F. Supp. 1083, 1086 (D.S.C. 1991)). Thus, Plaintiff's claims are not ripe for adjudication and should be dismissed.[3]

2. **Plaintiff's private nuisance claim fails because the alleged contamination of a public body of water cannot form the basis of a claim for private nuisance.**

Plaintiff's claim for private nuisance must be dismissed because the alleged contamination of a public body of water—the Great Pee Dee River—is a public harm that cannot form the basis of a private nuisance claim.

---

[1] See, e.g., *National Association of Manufacturers v. EPA*, D.C. Cir., Case No. 24-01191, *The Chemours Company FC, LLC v. EPA*, D.C. Cir., Case No. 24-01192 and *American Water Works Association, et al v. EPA*, Fed. Cir., Case No. 24-01188, consolidated under Case No. 24-01188.

[2] www.epa.gov/newsreleases/biden-harris-administration-announces-2-billion-bipartisan-infrastructure-law-funding.

[3] Moreover, even if Plaintiff *had already* incurred costs to comply with the Rule, these costs simply are not the type of damages recoverable for trespass and nuisance causes of action under South Carolina law. *See Babb v. Lee Cnty. Landfill SC, LLC*, 405 S.C. 129, 747 S.E.2d 468 (2013) ("The damages recoverable for trespass and nuisance being strictly limited to damages to one's property interests, *the only proper measure of them is the value of the property*.") (emphasis added).

5

ELECTRONICALLY FILED - 2025 Feb 19 10:34 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Feb 19 10:34 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

A private nuisance "affects only one person or a determinate number of persons," whereas "[a] nuisance is public because of the danger to the public which might have been created." *See Baltzeger v. Carolina Midland* Ry. Co., 54 S.C. 242, 248, 32 S.E. 358, 360 (1899); *Home Sales, Inc. v. City of N. Myrtle Beach*, 299 S.C. 70, 81, 382 S.E.2d 463, 469 (Ct. App. 1989) ("A nuisance is public because of the danger to the public which might have been created. It is private only because the individual as distinguished from the public has been or may be injured."); *see also Charleston Dev. Co. v. Alami*, 433 S.C. 533, 547-48, 860 S.E.2d 687, 695 (Ct. App. 2021) ("'A private nuisance is anything done to the hurt or annoyance of the lands, tenements, or hereditaments of another. It produces damage to but one or two persons, and cannot be said to be public.'") (citations omitted); *accord Rhodes v. E.I. du Pont de Nemours & Co.*, 636 F.3d 88, 96-97 (4th Cir. 2011) ("If the only interest that is invaded is an interest shared equally by members of the public, then the alleged nuisance is public in nature. Such a circumstance is precisely the situation presented here, because DuPont's allegedly tortious conduct interfered with the general public's access to clean drinking water. . .. We therefore conclude . . . that when a release of pollutants directly affects a municipal water supply and does not interfere with any private water source, such as a well drilled on private property, the presence of the pollutants in the public water supply will not support a private nuisance claim.") (citations omitted).

Plaintiff's claims against Moving Defendants are based on alleged discharges into the Great Pee Dee River more than 30 miles upstream from Plaintiff. (*Compl.* ¶¶ 3, 16.) This alleged harm would affect the public at large. In fact, Plaintiff admits that the alleged discharges affect the "domestic water supply for over 34,000 water customers in Florence County[.]" (*Compl* ¶ 2.) Plaintiff's allegations therefore involve an alleged harm that is "public in nature," which "will not

6

support a private nuisance claim." *See Rhodes*, 636 F.3d at 96-97. For this reason, Plaintiff's private nuisance claim should be dismissed.

Moreover, courts nationwide have held that a "private nuisance does not exist where water pollution affects only a municipal water supply." *Rhodes v. E.I. du Pont de Nemours & Co.*, 657 F. Supp. 2d 751, 767 (S.D.W. Va. 2009), *judgment entered*, No. 6:06-CV-00530, 2010 WL 11622804 (S.D.W. Va. Jan. 6, 2010), *and aff'd in part, appeal dismissed in part*, 636 F.3d 88 (4th Cir. 2011); *see Anderson v. W.R. Grace & Co.*, 628 F.Supp. 1219, 1233 (D. Mass.1986) ("The right to be free of contamination to the municipal water supply is clearly a 'right common to the general public', thus interference with that right would be a public nuisance."); *see also Adkins v. Thomas Solvent Co.*, 440 Mich. 293, 487 N.W.2d 715, 721 n. 11 (1992) (noting that "the contamination of ground water may give rise to an action for public nuisance"). When pollutants are released and impact the municipal water supply, rather than only a private water source, the harm affects a right shared by the general public and constitutes a public nuisance, not a private one. *Rhodes* 657 F.Supp. 2d at 767; *see Anderson*, 628 F.Supp. at 1233; *see also* Restatement (Second) of Torts § 821B cmt. b (explaining that conduct interfering with the public health constitutes a public nuisance). As in these cases, Plaintiff's private nuisance claim should be dismissed.

### 3. Plaintiff's allegations do not support a claim for trespass.

#### a. An alleged entry onto property by PFAS will not support a trespass claim.

Plaintiff's trespass claim fails because alleged contamination by PFAS is not an invasion by a physical, tangible thing as required by South Carolina law. South Carolina follows the traditional rule that "only recognizes intrusions by physical, tangible things as capable of constituting a trespass." *Babb v. Lee Cnty. Landfill SC, LLC*, 405 S.C. 129, 152, 747 S.E.2d 468, 480 (2013). Intrusions by "microscopic particulates" or similarly intangible "infiltration[s] of

7

ELECTRONICALLY FILED - 2025 Feb 19 10:34 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Feb 19 10:34 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

contaminants onto a plaintiff's property" do not constitute actionable trespass under South Carolina law. *Id*. at 144-52, 476-80.

In adhering to the traditional rule that requires "an invasion by a physical, tangible thing," the Supreme Court recognized it was "an imperfect rule" that may not incorporate the pure scientific definition of matter. *Id.* at 150, 479. Nevertheless, the court held the traditional rule remained "superior" to the alternate rules which require the adoption of an uncertain "substantiality requirement," because it "possesses the virtues of clarity, ease of implementation, and ability to serve as a guide for future conduct" that will "yield a stable rule as to what rises to the level of a trespass." *Id*. at 149-51, 479-80. The Court further explained that the traditional rule preserves "the distinction between trespass and nuisance," whereas "the divergent view would transform trespass into nuisance," thereby "leav[ing] property owners with less, rather than more, protection of their property rights." *Id*. at 151-52, 480.

By retaining the traditional rule, the Supreme Court expressly rejected "divergent" cases in Oregon and Alabama, which held intrusions of "fluoride particles" and "sulfoxide emissions" respectively were sufficient to constitute a trespass despite their "intangible nature." *Id*. at 146-49, 747 S.E.2d at 477-78 (*rejecting Martin v. Reynolds Metals Co*., 342 P.2d 790 (1959) and *Borland v. Sanders Lead Co.,* 369 So. 2d 523 (Ala. 1979)). Instead, the Court followed the Michigan Court of Appeals' decision in *Adams v. Cleveland-Cliffs Iron Co*. that concluded dust is "not actionable in trespass" because "dust, along with other forms of airborne particulate, does not normally present itself as a significant physical intrusion," but instead "become[s] a part of the ambient circumstances of th[e] space" on which it settles. *See Babb*, 405 S.C. at 149-50, 747 S.E.2d at 479; *see also* 237 Mich. App. 51, 67-70, 602 N.W.2d 215, 222-24 (1999).

ELECTRONICALLY FILED - 2025 Feb 19 10:34 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

PFAS molecules, measured in parts-per-trillion, fit squarely within the "microscopic particulates" discussed in *Babb*. Because any alleged PFAS contamination cannot constitute a trespass under South Carolina law, Plaintiff's trespass claim must be dismissed.

### b.  Plaintiff fails to allege an intentional, unauthorized entry onto its property.

A trespass under South Carolina law requires a defendant's "affirmative act [and that] the invasion of the land must be intentional . . .." *Snow v. City of Columbia*, 305 S.C. 544, 553, 409 S.E.2d 797, 802 (Ct. App. 1991). In addition, the entry onto another's property must be unauthorized. *Ravan v. Greenville Cnty.*, 315 S.C. 447, 464, 434 S.E.2d 296, 306 (Ct. App. 1993) ("The essence of trespass is the unauthorized entry onto the land of another.").

Plaintiff fails to allege an intentional unauthorized entry onto its property as required by South Carolina law. Moving Defendants did not enter Plaintiff's property by manufacturing yarn more than 30 miles upstream. Moreover, Plaintiff concedes that, to the extent PFAS enters Plaintiff's property from the public waterway, it does so because Plaintiff *voluntarily* draws water into its facility by activating its pumps. (*Compl.* ¶ 92.) Plaintiff therefore fails to satisfy this required element of a trespass claim.

For similar reasons, multiple courts have recently found that a water treatment facility has no cause of action for trespass where the facility voluntarily draws allegedly contaminated water from a river. *See Utilities Bd. Of Tuskegee v. 3M Co.*, Inc., No. 2:22-cv-420-WKW, 2023 WL 1870912, at *16 (M.D. Ala. Feb. 9, 2023) ("As alleged, the facts here do not sound in trespass because, unlike other indirect trespasses, Defendants' PFAS did not cross onto [plaintiff's] boundary line by a natural process."); *see also W. Morgan-E. Lawrence Water & Sewer Auth. v. 3M Co.*, 208 F. Supp. 3d 1227, 1235 (N.D. Ala. 2016). Because Plaintiff's voluntary intake of allegedly contaminated surface water cannot state a claim for trespass, this claim must be dismissed.

ELECTRONICALLY FILED - 2025 Feb 19 10:34 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

#### c. Plaintiff does not enjoy exclusive possession of the water from the Great Pee Dee River.

The South Carolina Supreme Court has made clear that trespass protects only the "right to *exclusive* possession" of property, as opposed to protection against "merely interfer[ing] with the right to use and enjoyment." *Babb v. Lee Cnty. Landfill SC, LLC*, 405 S.C. 129, 150-151, 747 S.E.2d 468, 479-480 (2013) (emphasis added). And it is a "well-settled rule of law" that while a riparian owner, such as Plaintiff, has "an equal right to the use of the water which flows in the stream adjacent to his lands . . . [h]e has no property in the water itself, but a simple usufruct". *White v. Whitney Mfg. Co.*, 60 S.C. 254, 265, 38 S.E. 456, 460 (1901).

Accordingly, to the extent that Plaintiff seeks to recover on a trespass theory for the alleged pollution *of the waterway*, that claim fails because plaintiff does not hold an exclusive right to the water from the Great Pee Dee River, only a riparian right of reasonable use. Plaintiff admits as much: "Plaintiff owns riparian land abutting the Great Pee Dee River, and ***Plaintiff has a property right in the reasonable use of these waters***, including for the provision of water to its customers." (*Compl.* ¶ 65) (emphasis added). Because Plaintiff does not enjoy exclusive possession of the Great Pee Dee River, Plaintiff cannot recover in trespass for Moving Defendants' alleged discharges.

### 4. Plaintiff's negligence claim fails because Defendant owes no duty to Plaintiff and Plaintiff fails to allege any cognizable damages.

#### a. Defendant owes no duty to plaintiff.

"An essential element in a cause of action for negligence is the existence of a legal duty of care owed by the defendant to the plaintiff." *Huggins v. Citibank, N.A.,* 355 S.C. 329, 332, 585 S.E.2d 275, 276 (2003). There can be no negligence liability unless the parties "have a relationship recognized by law as providing the foundation for a duty to prevent an injury." *McCullough v. Goodrich & Pennington Mortg. Fund, Inc.,* 373 S.C. 43, 47, 644 S.E.2d 43, 46 (2007). Such a duty "may be created by statute, a contractual relationship, status, property interest, or some other

10

ELECTRONICALLY FILED - 2025 Feb 19 10:34 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

special circumstance." *Madison ex rel. Bryant v. Babcock Ctr., Inc.,* 371 S.C. 123, 136, 638 S.E.2d 650, 656-57 (2006). Foreseeability of the alleged injury alone does not give rise to a duty absent such a relationship. *See Charleston Dry Cleaners & Laundry, Inc. v. Zurich Am. Ins. Co.,* 355 S.C. 614, 618, 586 S.E.2d 586, 588 (2003). "Absent a legally recognized duty, the defendant in a negligence action is entitled to a judgment as matter of law." *Wright v. S.C. Dep't of Transportation*, 437 S.C. 184, 191, 877 S.E.2d 788, 791 (Ct. App. 2022), *reh'g denied* (Sept. 23, 2022), *cert. denied* (May 24, 2023) (*citing Cole v. Boy Scouts of Am.*, 397 S.C. 247, 251, 725 S.E.2d 476, 478 (2011).

Plaintiff pleads no facts that could establish a duty of care owed by Moving Defendants to Plaintiff. Plaintiff does not allege Moving Defendants violated any applicable law or regulation. In fact, the only regulation referenced in the Complaint is the Rule, which Plaintiff concedes was enacted 2 years *after* Moving Defendants closed the Mill. Plaintiff's water treatment facility lies more than 30 miles from the Mill, and Plaintiff does not claim that any relationship existed at any time between Plaintiff and Moving Defendants. Plaintiff therefore alleges no duty "created by statute, a contractual relationship, status, property interest, or some other special circumstance." *McCullough,* 373 S.C. at 47, 644 S.E.2d at 46.

Instead, Plaintiff makes only the conclusory allegation that "Defendants have a duty to use due care in the handling, use, and disposal of products containing or degrading to [PFAS] to avoid causing an unreasonable risk of harm to others[.]" (*Compl*. ¶ 98). But Plaintiff fails to allege how the risk of the harm for which Plaintiff seeks recovery—the hypothetical future expense of complying with the Rule—was foreseeable years before the Rule was enacted. In any event, South Carolina law holds that "foreseeability of injury, in and of itself, does **not** give rise to a duty." *Charleston Dry Cleaners* at 618, 586 S.E.2d at 588 (*citing South Carolina State Ports Auth. v.*

11

ELECTRONICALLY FILED - 2025 Feb 19 10:34 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

*Booz-Allen & Hamilton, Inc.*, 289 S.C. at 376, 346 S.E.2d at 325) (emphasis in original). Because no duty exists between Plaintiff and Moving Defendants, Plaintiff's negligence claim must fail.

### b. Plaintiff pleads no cognizable injury.

Damages is a required element of a negligence claim. *Babb*, 405 S.C. at 153, 747 S.E.2d at 481. "Generally, under South Carolina law, the damages element requires a plaintiff to establish physical injury or property damage." *Id.*

As stated in Section III.1. above, Plaintiff fails to allege cognizable damages because Plaintiff has not yet (and may never) incur costs to comply with the Rule. Other than the alleged future expenses to comply with the Rule, the Complaint asserts only conclusory allegations of harm. (*See, e.g., Compl.* ¶¶ 61, 82, 105, 115 (alleging unspecified "past, present, and future injury to property," and unnamed damages and "losses resulting from injury to its property")). These allegations are plainly insufficient to withstand a motion to dismiss. *Jones v. Gilstrap*, 288 S.C. 525, 528, 343 S.E.2d 646, 648 (Ct. App. 1986) (holding that, even under the liberal standard for a motion to dismiss, mere conclusory allegations, unsupported by allegations of fact, are insufficient). Consequently, Plaintiff's negligence claim must be dismissed on this basis as well.

### CONCLUSION

For all of the foregoing reasons, Moving Defendants' Motion to Dismiss should be granted, and Plaintiff's claims against Moving Defendants should be dismissed with prejudice.

### SIGNATURES ON FOLLOWING PAGE

ELECTRONICALLY FILED - 2025 Feb 19 10:34 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

NELSON MULLINS RILEY & SCARBOROUGH LLP


By: s/ MERRITT G. ABNEY

Merritt G. Abney
SC Bar No. 71893
E-Mail: merritt.abney@nelsonmullins.com
Sarah Specter Powell
SC Bar No. 104261
E-Mail: sarah.powell@nelsonmullins.com
151 Meeting Street / Sixth Floor
Post Office Box 1806 (29402-1806)
Charleston, SC  29401-2239
(843) 853-5200

Wesley T. Moran
South Carolina Bar No. 102787
E-Mail: wes.moran@nelsonmullins.com
3751 Robert M. Grissom Parkway / Suite 300
Post Office Box 3939 (29578-3939)
Myrtle Beach, SC 29577-6412
(843) 448-3500

*Attorneys for Defendants Aladdin Manufacturing Corporation and Mohawk Industries, Inc.*

Charleston, South Carolina
February 19, 2025

ELECTRONICALLY FILED - 2025 Feb 19 10:34 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

**STATE OF SOUTH CAROLINA**
**COUNTY OF FLORENCE**

**IN THE COURT OF COMMON PLEAS**
**TWELFTH JUDICIAL CIRCUIT**

CITY OF FLORENCE, SOUTH
CAROLINA )
)
)     C.A. No.: 2024-CP-21-02844
Plaintiff, )
)
v. )     PFAS Litigation Coordinated Docket
)
ALADDIN MANUFACTURING )
CORPORATION, ET AL. )
)
Defendants. )

### DEFENDANTS MOHAWK INDUSTRIES, INC. AND ALADDIN MANUFACTURING CORPORATION'S MOTION AND MEMORANDUM IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

Defendants Mohawk Industries, Inc. and Aladdin Manufacturing Corporation (jointly, "Moving Defendants") move pursuant to Rules 8(a), 12(b)(1), and 12(b)(6) of the South Carolina Rules of Civil Procedure to dismiss all claims asserted against them in the Amended Complaint ("Complaint"). Moving Defendants submit this memorandum in support of their motion.

## I.     INTRODUCTION

Plaintiff is a municipal corporation that operates water treatment facilities in Florence County and intakes surface water from the Great Pee Dee River. (*Compl.* ¶ 3, 16.) Plaintiff claims that Moving Defendants owned and operated the Oak River Mill (the "Mill"), a yarn conversion and extrusion facility located on the Great Pee Dee River near Bennettsville, until the Mill closed in 2022. The Complaint asserts that Moving Defendants discharged PFAS chemicals used at the Mill into the River and that PFAS from the Mill flowed more than 30 miles downstream to Plaintiff's treatment facility. (*Id.*)

ELECTRONICALLY FILED - 2025 Feb 19 10:34 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

Based on these factual allegations, Plaintiff asserts causes of action against Moving Defendants for private and public nuisance, trespass, and negligence. Plaintiff contends that the presence of PFAS in its source water will require Plaintiff to upgrade its treatment facilities to comply with new U.S. Environmental Protection Agency ("EPA") regulations, set to take effect in 2029, related to PFAS levels in drinking water. Through this lawsuit, Plaintiff seeks to compel Moving Defendants and their co-Defendants to fund the acquisition, installation, and operation of water treatment technologies designed to remove PFAS from Plaintiff's water intake. (*Id*. at ¶¶ 7, 73, 79, 85, 96.)

The Complaint should be dismissed because the dispute is not ripe for judicial review. The EPA regulations on which Plaintiff's claims are based will not take effect until 2029, if at all. And even if the regulations ultimately take effect in their current form—which remains uncertain given several ongoing federal court challenges—it is unclear what specific actions, if any, Plaintiff must take to comply and whether the federal government will pay for any such action.

Moreover, the Complaint acknowledges that the new EPA rule includes an initial three-year testing period, which has only recently begun, to assess PFAS levels in source water. Plaintiff does not allege that it has thus far incurred costs or taken action to comply with the new regulations. Instead, the Complaint seeks to recover hypothetical future expenses associated with new water treatment system technologies that Plaintiff may never need. As such, Plaintiff's suit is premature and should be dismissed on that basis.

Plaintiff's individual causes of action are also deficient, warranting dismissal on that basis as well. Plaintiff's private nuisance claim fails because the alleged contamination of the Great Pee Dee River affects the public generally, as opposed to Plaintiff in particular, which precludes a claim for private nuisance. Plaintiff's trespass claim likewise fails because PFAS molecules

ELECTRONICALLY FILED - 2025 Feb 19 10:34 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

constitute "intangible" matter that will not support a trespass claim and, to the extent any PFAS entered Plaintiff's property from the waterway, it was the result of Plaintiff's own voluntary actions rather than intentional conduct by Moving Defendants. Lastly, Plaintiff's negligence claim fails as well because Mohawk owes no legal duty to Plaintiff and Plaintiff fails to allege that it incurred physical injury or property damage due to Moving Defendants' alleged negligence. For these reasons, set forth in greater detail below, Moving Defendants' motion should be granted.

## II.     LEGAL STANDARD

The court may dismiss a claim where "the defendant demonstrates the plaintiff has failed 'to state facts sufficient to constitute a cause of action' in the pleadings filed with the court." *Williams v. Condon*, 347 S.C. 227, 232-33, 553 S.E.2d 496, 499 (Ct. App. 2001) (quoting Rule 12(b)(6), SCRCP). The court's "ruling on a motion to dismiss under Rule 12(b)(6), SCRCP, must be based solely on the allegations contained in the complaint." *Chewning v. Ford Motor Co.*, 346 S.C. 28, 32, 550 S.E.2d 584, 586 (Ct. App. 2001). However, in making a motion to dismiss, only the "well pleaded facts are admitted, but inferences drawn by the plaintiff from such facts and conclusions of law are not admitted." *Jensen v. S.C. Dep't of Soc. Scrvs.*, 297 S.C. 323, 326, 377 S.E.2d 102, 104 (Ct. App. 1987). The motion to dismiss must be granted if, viewing the evidence in favor of the plaintiff, the "facts alleged in the complaint and inferences reasonably deducible therefrom do not entitle the plaintiff to relief on any theory of the case." *Chewning*, 346 S.C. at 32-33, 550 S.E.2d at 586.

## III.     ARGUMENT

### 1.  Plaintiff's claims are not ripe for adjudication.

"A threshold inquiry for any court is a determination of justiciability, i.e., whether the litigation presents an active case or controversy." *Lennon v. S.C. Coastal Council,* 330 S.C. 414,

3

ELECTRONICALLY FILED - 2025 Feb 19 10:34 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

415, 498 S.E.2d 906, 906 (Ct. App. 1998). This includes an assessment of whether the plaintiff's claims are ripe for adjudication. *See James v. Anne's Inc.,* 390 S.C. 188, 193, 701 S.E.2d 730, 732 (2010). A claim is not ripe and should be dismissed when it presents "a contingent, hypothetical or abstract dispute." *Pee Dee Elec. Co-op., Inc. v. Carolina Power & Light Co.,* 279 S.C. 64, 66, 301 S.E.2d 761, 762 (1983).

The Complaint establishes that Plaintiff has not yet suffered the injury for which it seeks recovery. The thrust of this case is that Plaintiff expects to incur costs to comply with recently enacted EPA regulations regarding "maximum contaminant levels" ("MCLs") of PFAS in drinking water. *PFAS National Primary Drinking Water Regulation*, 89 Fed Reg. 32532 (April 26, 2024) (the "Rule"). Although the Rule became final in April 2024 (*Compl.*, ¶¶ 49-51), it remains unclear how, if at all, the Rule will impact Plaintiff. The Rule provides for a three year "initial monitoring" period that runs through 2027. *Id.*; *see also* 89 Fed. Reg. 32532, 32633. Even assuming that initial monitoring determines further action is necessary to satisfy the Rule, Plaintiff will not have to comply with the MCLs until 2029. *Id.* ¶ 51. Plaintiff alleges no facts indicating that it has incurred expenses yet due to alleged PFAS in its source water. In fact, nothing in the Complaint indicates that Plaintiff's operations have changed at all from before the MCLs were finalized in April 2024 or as a result of PFAS in the waterway. Rather, the Complaint makes clear that Plaintiff asks this Court to award unspecified, speculative costs that Plaintiff *may* incur in the future. (*Compl.*, ¶ 79) (requesting "expenses associated with the ***future*** acquisition, installation, and operation of required treatment technologies") (emphasis added).

Several factors indicate Plaintiff may not incur these costs at all. For example, Plaintiff's testing during the initial monitoring period may establish that improvements to Plaintiff's facilities are unnecessary to comply with the Rule. Moreover, the Rule faces numerous legal challenges that

ELECTRONICALLY FILED - 2025 Feb 19 10:34 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

remain pending in federal courts.[1] Irrespective of the outcome of these lawsuits, the new administration and leadership at EPA could alter or eliminate the Rule altogether before Plaintiff must comply with the MCLs. Furthermore, the federal government, including the EPA, has made available grants to pay for infrastructure and source water treatment for PFAS and other contaminants, and to conduct water quality testing.[2] Such grants could reduce or eliminate altogether any costs Plaintiff might otherwise incur to comply with the Rule. Because of these numerous contingencies and the consequent uncertainty regarding Plaintiff's obligations under the Rule, the facts alleged by Plaintiff demonstrate, at most, "the mere threat of potential injury," which is "too contingent or remote to support present adjudication." *Waters v. S.C. Land Res. Conservation Comm'n*, 321 S.C. 219, 228, 467 S.E.2d 913, 918 (1996) (quoting *Thrifty Rent-A-Car Sys., Inc. v. Thrifty Auto Sales of Charleston, Inc.*, 849 F. Supp. 1083, 1086 (D.S.C. 1991)). Thus, Plaintiff's claims are not ripe for adjudication and should be dismissed.[3]

   2. **Plaintiff's private nuisance claim fails because the alleged contamination of a public body of water cannot form the basis of a claim for private nuisance.**

Plaintiff's claim for private nuisance must be dismissed because the alleged contamination of a public body of water—the Great Pee Dee River—is a public harm that cannot form the basis of a private nuisance claim.

---

[1] See, e.g., *National Association of Manufacturers v. EPA*, D.C. Cir., Case No. 24-01191, *The Chemours Company FC, LLC v. EPA*, D.C. Cir., Case No. 24-01192 and *American Water Works Association, et al v. EPA*, Fed. Cir., Case No. 24-01188, consolidated under Case No. 24-01188.

[2] www.epa.gov/newsreleases/biden-harris-administration-announces-2-billion-bipartisan-infrastructure-law-funding.

[3] Moreover, even if Plaintiff *had already* incurred costs to comply with the Rule, these costs simply are not the type of damages recoverable for trespass and nuisance causes of action under South Carolina law. *See Babb v. Lee Cnty. Landfill SC, LLC*, 405 S.C. 129, 747 S.E.2d 468 (2013) ("The damages recoverable for trespass and nuisance being strictly limited to damages to one's property interests, *the only proper measure of them is the value of the property*.") (emphasis added).

5

ELECTRONICALLY FILED - 2025 Feb 19 10:34 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

A private nuisance "affects only one person or a determinate number of persons," whereas "[a] nuisance is public because of the danger to the public which might have been created." *See Baltzeger v. Carolina Midland* Ry. Co., 54 S.C. 242, 248, 32 S.E. 358, 360 (1899); *Home Sales, Inc. v. City of N. Myrtle Beach*, 299 S.C. 70, 81, 382 S.E.2d 463, 469 (Ct. App. 1989) ("A nuisance is public because of the danger to the public which might have been created. It is private only because the individual as distinguished from the public has been or may be injured."); *see also Charleston Dev. Co. v. Alami*, 433 S.C. 533, 547-48, 860 S.E.2d 687, 695 (Ct. App. 2021) ("'A private nuisance is anything done to the hurt or annoyance of the lands, tenements, or hereditaments of another. It produces damage to but one or two persons, and cannot be said to be public.'") (citations omitted); *accord Rhodes v. E.I. du Pont de Nemours & Co.*, 636 F.3d 88, 96-97 (4th Cir. 2011) ("If the only interest that is invaded is an interest shared equally by members of the public, then the alleged nuisance is public in nature. Such a circumstance is precisely the situation presented here, because DuPont's allegedly tortious conduct interfered with the general public's access to clean drinking water. . .. We therefore conclude . . . that when a release of pollutants directly affects a municipal water supply and does not interfere with any private water source, such as a well drilled on private property, the presence of the pollutants in the public water supply will not support a private nuisance claim.") (citations omitted).

Plaintiff's claims against Moving Defendants are based on alleged discharges into the Great Pee Dee River more than 30 miles upstream from Plaintiff. (*Compl.* ¶¶ 3, 16.) This alleged harm would affect the public at large. In fact, Plaintiff admits that the alleged discharges affect the "domestic water supply for over 34,000 water customers in Florence County[.]" (*Compl* ¶ 2.) Plaintiff's allegations therefore involve an alleged harm that is "public in nature," which "will not

ELECTRONICALLY FILED - 2025 Feb 19 10:34 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

support a private nuisance claim." *See Rhodes*, 636 F.3d at 96-97. For this reason, Plaintiff's private nuisance claim should be dismissed.

Moreover, courts nationwide have held that a "private nuisance does not exist where water pollution affects only a municipal water supply." *Rhodes v. E.I. du Pont de Nemours & Co.*, 657 F. Supp. 2d 751, 767 (S.D.W. Va. 2009), *judgment entered*, No. 6:06-CV-00530, 2010 WL 11622804 (S.D.W. Va. Jan. 6, 2010), *and aff'd in part, appeal dismissed in part*, 636 F.3d 88 (4th Cir. 2011); *see Anderson v. W.R. Grace & Co.*, 628 F.Supp. 1219, 1233 (D. Mass.1986) ("The right to be free of contamination to the municipal water supply is clearly a 'right common to the general public', thus interference with that right would be a public nuisance."); *see also Adkins v. Thomas Solvent Co.*, 440 Mich. 293, 487 N.W.2d 715, 721 n. 11 (1992) (noting that "the contamination of ground water may give rise to an action for public nuisance"). When pollutants are released and impact the municipal water supply, rather than only a private water source, the harm affects a right shared by the general public and constitutes a public nuisance, not a private one. *Rhodes* 657 F.Supp. 2d at 767; *see Anderson*, 628 F.Supp. at 1233; *see also* Restatement (Second) of Torts § 821B cmt. b (explaining that conduct interfering with the public health constitutes a public nuisance). As in these cases, Plaintiff's private nuisance claim should be dismissed.

### 3. Plaintiff's allegations do not support a claim for trespass.

#### a. An alleged entry onto property by PFAS will not support a trespass claim.

Plaintiff's trespass claim fails because alleged contamination by PFAS is not an invasion by a physical, tangible thing as required by South Carolina law. South Carolina follows the traditional rule that "only recognizes intrusions by physical, tangible things as capable of constituting a trespass." *Babb v. Lee Cnty. Landfill SC, LLC*, 405 S.C. 129, 152, 747 S.E.2d 468, 480 (2013). Intrusions by "microscopic particulates" or similarly intangible "infiltration[s] of

7

ELECTRONICALLY FILED - 2025 Feb 19 10:34 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

contaminants onto a plaintiff's property" do not constitute actionable trespass under South Carolina law. *Id*. at 144-52, 476-80.

In adhering to the traditional rule that requires "an invasion by a physical, tangible thing," the Supreme Court recognized it was "an imperfect rule" that may not incorporate the pure scientific definition of matter. *Id.* at 150, 479. Nevertheless, the court held the traditional rule remained "superior" to the alternate rules which require the adoption of an uncertain "substantiality requirement," because it "possesses the virtues of clarity, ease of implementation, and ability to serve as a guide for future conduct" that will "yield a stable rule as to what rises to the level of a trespass." *Id*. at 149-51, 479-80. The Court further explained that the traditional rule preserves "the distinction between trespass and nuisance," whereas "the divergent view would transform trespass into nuisance," thereby "leav[ing] property owners with less, rather than more, protection of their property rights." *Id*. at 151-52, 480.

By retaining the traditional rule, the Supreme Court expressly rejected "divergent" cases in Oregon and Alabama, which held intrusions of "fluoride particles" and "sulfoxide emissions" respectively were sufficient to constitute a trespass despite their "intangible nature." *Id*. at 146-49, 747 S.E.2d at 477-78 (*rejecting Martin v. Reynolds Metals Co*., 342 P.2d 790 (1959) and *Borland v. Sanders Lead Co.,* 369 So. 2d 523 (Ala. 1979)). Instead, the Court followed the Michigan Court of Appeals' decision in *Adams v. Cleveland-Cliffs Iron Co*. that concluded dust is "not actionable in trespass" because "dust, along with other forms of airborne particulate, does not normally present itself as a significant physical intrusion," but instead "become[s] a part of the ambient circumstances of th[e] space" on which it settles. *See Babb*, 405 S.C. at 149-50, 747 S.E.2d at 479; *see also* 237 Mich. App. 51, 67-70, 602 N.W.2d 215, 222-24 (1999).

8

PFAS molecules, measured in parts-per-trillion, fit squarely within the "microscopic particulates" discussed in *Babb*. Because any alleged PFAS contamination cannot constitute a trespass under South Carolina law, Plaintiff's trespass claim must be dismissed.

### b. Plaintiff fails to allege an intentional, unauthorized entry onto its property.

A trespass under South Carolina law requires a defendant's "affirmative act [and that] the invasion of the land must be intentional . . .." *Snow v. City of Columbia*, 305 S.C. 544, 553, 409 S.E.2d 797, 802 (Ct. App. 1991). In addition, the entry onto another's property must be unauthorized. *Ravan v. Greenville Cnty.*, 315 S.C. 447, 464, 434 S.E.2d 296, 306 (Ct. App. 1993) ("The essence of trespass is the unauthorized entry onto the land of another.").

Plaintiff fails to allege an intentional unauthorized entry onto its property as required by South Carolina law. Moving Defendants did not enter Plaintiff's property by manufacturing yarn more than 30 miles upstream. Moreover, Plaintiff concedes that, to the extent PFAS enters Plaintiff's property from the public waterway, it does so because Plaintiff *voluntarily* draws water into its facility by activating its pumps. (*Compl.* ¶ 92.) Plaintiff therefore fails to satisfy this required element of a trespass claim.

For similar reasons, multiple courts have recently found that a water treatment facility has no cause of action for trespass where the facility voluntarily draws allegedly contaminated water from a river. *See Utilities Bd. Of Tuskegee v. 3M Co.*, Inc., No. 2:22-cv-420-WKW, 2023 WL 1870912, at *16 (M.D. Ala. Feb. 9, 2023) ("As alleged, the facts here do not sound in trespass because, unlike other indirect trespasses, Defendants' PFAS did not cross onto [plaintiff's] boundary line by a natural process."); *see also W. Morgan-E. Lawrence Water & Sewer Auth. v. 3M Co.*, 208 F. Supp. 3d 1227, 1235 (N.D. Ala. 2016). Because Plaintiff's voluntary intake of allegedly contaminated surface water cannot state a claim for trespass, this claim must be dismissed.

9

ELECTRONICALLY FILED - 2025 Feb 19 10:34 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

### c. Plaintiff does not enjoy exclusive possession of the water from the Great Pee Dee River.

The South Carolina Supreme Court has made clear that trespass protects only the "right to *exclusive* possession" of property, as opposed to protection against "merely interfer[ing] with the right to use and enjoyment." *Babb v. Lee Cnty. Landfill SC, LLC*, 405 S.C. 129, 150-151, 747 S.E.2d 468, 479-480 (2013) (emphasis added). And it is a "well-settled rule of law" that while a riparian owner, such as Plaintiff, has "an equal right to the use of the water which flows in the stream adjacent to his lands . . . [h]e has no property in the water itself, but a simple usufruct". *White v. Whitney Mfg. Co.*, 60 S.C. 254, 265, 38 S.E. 456, 460 (1901).

Accordingly, to the extent that Plaintiff seeks to recover on a trespass theory for the alleged pollution *of the waterway*, that claim fails because plaintiff does not hold an exclusive right to the water from the Great Pee Dee River, only a riparian right of reasonable use. Plaintiff admits as much: "Plaintiff owns riparian land abutting the Great Pee Dee River, and ***Plaintiff has a property right in the reasonable use of these waters***, including for the provision of water to its customers." (*Compl.* ¶ 65) (emphasis added). Because Plaintiff does not enjoy exclusive possession of the Great Pee Dee River, Plaintiff cannot recover in trespass for Moving Defendants' alleged discharges.

### 4. Plaintiff's negligence claim fails because Defendant owes no duty to Plaintiff and Plaintiff fails to allege any cognizable damages.

#### a. Defendant owes no duty to plaintiff.

"An essential element in a cause of action for negligence is the existence of a legal duty of care owed by the defendant to the plaintiff." *Huggins v. Citibank, N.A.,* 355 S.C. 329, 332, 585 S.E.2d 275, 276 (2003). There can be no negligence liability unless the parties "have a relationship recognized by law as providing the foundation for a duty to prevent an injury." *McCullough v. Goodrich & Pennington Mortg. Fund, Inc.,* 373 S.C. 43, 47, 644 S.E.2d 43, 46 (2007). Such a duty "may be created by statute, a contractual relationship, status, property interest, or some other

10

ELECTRONICALLY FILED - 2025 Feb 19 10:34 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

special circumstance." *Madison ex rel. Bryant v. Babcock Ctr., Inc.,* 371 S.C. 123, 136, 638 S.E.2d 650, 656-57 (2006). Foreseeability of the alleged injury alone does not give rise to a duty absent such a relationship. *See Charleston Dry Cleaners & Laundry, Inc. v. Zurich Am. Ins. Co.,* 355 S.C. 614, 618, 586 S.E.2d 586, 588 (2003). "Absent a legally recognized duty, the defendant in a negligence action is entitled to a judgment as matter of law." *Wright v. S.C. Dep't of Transportation*, 437 S.C. 184, 191, 877 S.E.2d 788, 791 (Ct. App. 2022), *reh'g denied* (Sept. 23, 2022), *cert. denied* (May 24, 2023) (*citing Cole v. Boy Scouts of Am.*, 397 S.C. 247, 251, 725 S.E.2d 476, 478 (2011).

Plaintiff pleads no facts that could establish a duty of care owed by Moving Defendants to Plaintiff. Plaintiff does not allege Moving Defendants violated any applicable law or regulation. In fact, the only regulation referenced in the Complaint is the Rule, which Plaintiff concedes was enacted 2 years *after* Moving Defendants closed the Mill. Plaintiff's water treatment facility lies more than 30 miles from the Mill, and Plaintiff does not claim that any relationship existed at any time between Plaintiff and Moving Defendants. Plaintiff therefore alleges no duty "created by statute, a contractual relationship, status, property interest, or some other special circumstance." *McCullough,* 373 S.C. at 47, 644 S.E.2d at 46.

Instead, Plaintiff makes only the conclusory allegation that "Defendants have a duty to use due care in the handling, use, and disposal of products containing or degrading to [PFAS] to avoid causing an unreasonable risk of harm to others[.]" (*Compl*. ¶ 98). But Plaintiff fails to allege how the risk of the harm for which Plaintiff seeks recovery—the hypothetical future expense of complying with the Rule—was foreseeable years before the Rule was enacted. In any event, South Carolina law holds that "foreseeability of injury, in and of itself, does **not** give rise to a duty." *Charleston Dry Cleaners* at 618, 586 S.E.2d at 588 (*citing South Carolina State Ports Auth. v.*

11

ELECTRONICALLY FILED - 2025 Feb 19 10:34 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Feb 19 10:34 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

*Booz-Allen & Hamilton, Inc.*, 289 S.C. at 376, 346 S.E.2d at 325) (emphasis in original). Because no duty exists between Plaintiff and Moving Defendants, Plaintiff's negligence claim must fail.

### b. Plaintiff pleads no cognizable injury.

Damages is a required element of a negligence claim. *Babb*, 405 S.C. at 153, 747 S.E.2d at 481. "Generally, under South Carolina law, the damages element requires a plaintiff to establish physical injury or property damage." *Id*.

As stated in Section III.1. above, Plaintiff fails to allege cognizable damages because Plaintiff has not yet (and may never) incur costs to comply with the Rule. Other than the alleged future expenses to comply with the Rule, the Complaint asserts only conclusory allegations of harm. (*See, e.g., Compl.* ¶¶ 61, 82, 105, 115 (alleging unspecified "past, present, and future injury to property," and unnamed damages and "losses resulting from injury to its property")). These allegations are plainly insufficient to withstand a motion to dismiss. *Jones v. Gilstrap*, 288 S.C. 525, 528, 343 S.E.2d 646, 648 (Ct. App. 1986) (holding that, even under the liberal standard for a motion to dismiss, mere conclusory allegations, unsupported by allegations of fact, are insufficient). Consequently, Plaintiff's negligence claim must be dismissed on this basis as well.

### CONCLUSION

For all of the foregoing reasons, Moving Defendants' Motion to Dismiss should be granted, and Plaintiff's claims against Moving Defendants should be dismissed with prejudice.

**SIGNATURES ON FOLLOWING PAGE**

12

ELECTRONICALLY FILED - 2025 Feb 19 10:34 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

NELSON MULLINS RILEY & SCARBOROUGH LLP


By: s/ MERRITT G. ABNEY
Merritt G. Abney
SC Bar No. 71893
E-Mail: merritt.abney@nelsonmullins.com
Sarah Specter Powell
SC Bar No. 104261
E-Mail: sarah.powell@nelsonmullins.com
151 Meeting Street / Sixth Floor
Post Office Box 1806 (29402-1806)
Charleston, SC  29401-2239
(843) 853-5200

Wesley T. Moran
South Carolina Bar No. 102787
E-Mail: wes.moran@nelsonmullins.com
3751 Robert M. Grissom Parkway / Suite 300
Post Office Box 3939 (29578-3939)
Myrtle Beach, SC 29577-6412
(843) 448-3500

*Attorneys for Defendants Aladdin Manufacturing Corporation and Mohawk Industries, Inc.*

Charleston, South Carolina
February 19, 2025

13



# The Supreme Court of South Carolina

## Office of Bar Admissions

PATRICIA A. HOWARD
CLERK OF COURT

KATHLEEN "TINA" BRYANT
MANAGER, OFFICE OF BAR
ADMISSIONS

POST OFFICE BOX 11330
COLUMBIA, SOUTH CAROLINA 29211
TELEPHONE. (803) 734-1317
FAX. (803) 734-0394

February 18, 2025

The Honorable Doris Poulos O'Hara
Clerk of Court
181 N. Irby Street MSC-E
Florence, SC 29501

RE:     City of Florence, South Carolina v. Aladdin Manufacturing Corporation, et al.

        Case No.: 2024-CP-21-02844

Dear Ms. O'Hara:

I certify that the Office of Bar Admissions has received the verified application requesting Hamilton Jordan be admitted *pro hac vice* in the above action. The $250 filing fee for the applicant has been paid.

Sincerely,

M.J. Thames
Bar Admissions Coordinator

cc:     Hamilton Jordan
        John B. White, Jr.

ELECTRONICALLY FILED - 2025 Feb 24 4:39 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

**STATE OF NORTH CAROLINA**
**COUNTY OF WAKE**



ELECTRONICALLY FILED - 2025 Feb 25 11:17 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

Plaintiff Name:
CITY OF FLORENCE SOUTH CAROLINA

*Versus*

Defendant Name:
AURIA ALBEMARLE LLC
c/o CORPORATION SERVICE CO.
2626 GLENWOOD AVE., STE 550
RALEIGH, NC 27608

## DEPUTY'S AFFIDAVIT
## OF SERVICE

Court File No: 2024-CP-21-02844

I, _H. L. McClain_, being a duly sworn Deputy Sheriff of Wake County, Raleigh, North Carolina, States that in the above referenced matter,  on the _12th_ Day of _Feb_ ,20_25_ at _12:50_ { }AM {X}PM, HE/SHE {X} SERVED/ { } WAS UNABLE TO SERVE, AURIA ALBEMARLE LLC, legal service of AMENDED SUMMONS, and FIRST AMENDED COMPLAINT , on Defendant/Person to serve as follows: (check one):

[ ] BY DELIVERING TO DEFENDANT / PERSON TO SERVE A COPY (IES)

[ ] BY LEAVING A COPY (IES) AT THE DWELLING HOUSE OR USUAL PLACE OF ABODE OF THE DEFENDANT/ PERSON TO SERVE, WITH A PERSON OF SUITABLE AGE.

[X] AS THE DEFENDANT / PERSON TO SERVE IS A CORPORATION, SERVICE WAS EFFECTED BY DELIVERING A COPY(IES) TO WHO IS AN OFFICER OF THE CORPORATION. _Lilly Frazier – Register Agent_

[ ] NOT SERVED: DEFENDANT/PERSON NOT FOUND IN WAKE COUNTY.

[ ] OTHER:_____

Service Name:_____

**WILLIE ROWE**
SHERIFF OF WAKE COUNTY

BY:_____ #3689

*DEPUTY SHERIFF*

SUBSCRIBED AND SWORN TO BEFORE ME THIS THE _25_ DAY OF _February 2025_ ,

_Carolyn Monroe_

NOTARY PUBLIC/WAKE COUNTY, NORTH CAROLINA

MY COMMISSION EXPIRES THE _30_ DAY OF _June 2029_



R_Civi83

**STATE OF NORTH CAROLINA**
**COUNTY OF WAKE**



Plaintiff Name:
CITY OF FLORENCE SOUTH CAROLINA

*Versus*

Defendant Name:
MARCAL CORDOVA LLC
c/o CAPITAL CORPORATE SERVICES
INC., 176 MINE LAKE CT., STE 100,
RALEIGH, NC 27615

**STATE OF SOUTH CAROLINA**
**COUNTY OF FLORENCE**

# DEPUTY'S AFFIDAVIT
# OF SERVICE

## Court File No: 2024-CP-21-02844

I, ⸻ S R Carmichael ⸻ , being a duly sworn Deputy Sheriff of Wake County, Raleigh, North Carolina, States that in the above referenced matter,   on the 13ᵗʰ Day of February ,2025 at 1:10 }AM⁄{PM, HE/SHE SERVED/ { } WAS UNABLE TO SERVE, MARCAL CORDOVA LLC, legal service of AMENDED SUMMONS, and FIRST AMENDED COMPLAINT , on Defendant/Person to serve as follows: (check one):

[ ] BY DELIVERING TO DEFENDANT / PERSON TO SERVE A COPY (IES)

[ ] BY LEAVING A COPY (IES) AT THE DWELLING HOUSE OR USUAL PLACE OF ABODE OF THE DEFENDANT/ PERSON TO SERVE, WITH A PERSON OF SUITABLE AGE.

[X] AS THE DEFENDANT / PERSON TO SERVE IS A CORPORATION, SERVICE WAS EFFECTED BY DELIVERING A COPY(IES) TO WHO IS AN OFFICER OF THE CORPORATION. Clarissa Garcia (Reg. Ser Age)

[ ] NOT SERVED: DEFENDANT/PERSON NOT FOUND IN WAKE COUNTY.

[ ] OTHER:_____

Service Name:_____

**WILLIE ROWE**
SHERIFF OF WAKE COUNTY

BY: S R Carmichael (3445)
*DEPUTY SHERIFF*

SUBSCRIBED AND SWORN TO BEFORE ME THIS THE 18 DAY OF February 2025,

Carolyn Monroe
NOTARY PUBLIC, WAKE COUNTY, NORTH CAROLINA
MY COMMISSION EXPIRES THE 30 DAY OF June 2029



R_Civi83

ELECTRONICALLY FILED - 2025 Feb 25 8:54 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Feb 26 3:53 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STATE OF SOUTH CAROLINA

COUNTY OF FLORENCE

CITY OF FLORENCE, SOUTH CAROLINA,

Plaintiff,

v.

ALADDIN MANUFACTURING CORPORATION, *et al.*,

Defendants.

IN THE COURT OF COMMON PLEAS

FOR THE TWELFTH JUDICIAL CIRCUIT

CASE NO. 2024-CP-21-02844

**MOTION FOR PRO HAC VICE ADMISSION OF HAMILTON JORDAN**

The undersigned local counsel hereby moves, together with the attached Application and Affidavit, that Hamilton Jordan, of Cory Watson, P.C., 1033 Demonbreun St., #300, Nashville, TN 37203, be admitted *pro hac vice* in the above captioned matter. As local counsel I understand that:

1. I will personally sign each pleading, motion, discovery procedure, or other document that I serve or file in this court.

2. All pleadings and other documents that I file in this case will contain my name, firm name, address, and phone number and those of my associate counsel admitted *pro hac vice*; and service of all pleadings and notices as required shall be sufficient if served upon me, and it is my responsibility to serve my associate counsel admitted *pro hac vice*.

3. Unless excused by the court, I will be present at all pretrial conferences, hearings, and trials and may attend discovery proceedings. I will be prepared to actively participate, if necessary.

4. Undersigned counsel hereby certifies that they contacted counsel of record regarding Mr. Jordan's admission and received no objection.

1

Mr. Jordan is a member in good standing with his local bar association, and the Verified

Application for Admission *Pro Hac Vice* in the State of South Carolina setting forth the necessary

information required by Rule 404(d), SCACR, is attached to and incorporated into this motion.

Dated: February 26, 2025

RESPECTFULLY SUBMITTED,

**JOHN B. WHITE JR., PA**

By: *s /John B. White, Jr.*
John B. White, Jr. (SC Bar No. 5996)
Marghretta H. Shisko (SC Bar No. 100106)
Griffin L. Lynch (SC Bar No. 72518)
Christopher R. Jones (SC Bar No. 101265)
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
glynch@johnbwhitelaw.com
cjones@johnbwhitelaw.com

*Attorneys for Plaintiff*

2

ELECTRONICALLY FILED - 2025 Feb 26 3:53 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

# EXHIBIT

ELECTRONICALLY FILED - 2025 Feb 26 3:53 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Feb 26 3:53 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## VERIFIED APPLICATION FOR ADMISSION *PRO HAC VICE* IN THE STATE OF SOUTH CAROLINA

**Please type your answers in the space provided. Provide an answer for every question asked. In your own handwriting, sign in all spaces where a signature is required (no e-signatures). The accompanying certificate of good standing should not be older than 90 days at the time of the filing of this application.**

| City of Florence, South Carolina, | 2024-CP-21-02844 | In The Court of Common Pleas Twelfth Judicial Circuit |
|---|---|---|
| Plaintiff | Case No. | Tribunal |

vs.

Mailing Address of Tribunal:

| Aladdin Manufacturing Corporation, et al | | 180 N. Irby Street |
|---|---|---|
| Defendant | | Florence, SC 29501 |

Comes now  Hamilton Jordan                    , applicant herein, and respectfully represents the following:

1.  Applicant resides at:

██████████████████

**Street Address**

| ██████ | Davidson | TN | ██████ |
|---|---|---|---|
| **City** | **County** | **State** | **Zip Code** |

██████████

**Telephone**

2.  Applicant is an attorney and a member of the law firm of (or practices law under the name of)

Cory Watson, P.C.                                                                , with offices at

1033 Demonbreun St. #300

**Street Address**

| Nashville | Davidson | TN | 37203 |
|---|---|---|---|
| **City** | **County** | **State** | **Zip Code** |
| 615-903-4660 | 334-714-1783 | 866-327-4000 | hjordan@corywatson.com |
| **Primary Telephone** | **Cell Phone** | **Fax Number** | **Email Address** |

3.  Applicant has been retained personally or as a member of the above-named law firm by

City of Florence, South Carolina                                to provide legal representation in connection with the above case now pending before the above-named tribunal of the State of South Carolina.

4.  Since    October 19th  of    2017                    , Applicant has been, and presently is, a member in good standing of the bar of the highest court of the District of Columbia or the State of

Tennessee                    where Applicant regularly practices law. Attached is a certificate of good standing dated within the last 90 days from the bar of the highest court of the District of Columbia or the State where applicant regularly practices law. It is not necessary to provide a certificate of good standing from all courts before which you are admitted.

*Page 1 of 4*

5. List all courts before which Applicant has been admitted to practice law, including United States District Courts; United States Circuit Courts of Appeals; the Supreme Court of the United States; and state courts or the District of Columbia.

| Court: | Date Admitted: |
|---|---|
| Tennessee Supreme Court | 10/19/2017 |
| Tennessee State Courts | 10/19/2017 |
| United States District Court Eastern District of Tennessee | 3/16/2022 |
| United States District Court Middle District of Tennessee | 10/21/2016 |
| North Carolina State Courts | 7/21/2023 |
| | |
| | |

Is Applicant presently a member in good standing of the bars of those courts listed above? List any court named in the preceding paragraph that applicant is no longer admitted to practice before.

Yes

6. Is Applicant presently subject to any suspension or disbarment proceedings, or has Applicant been formally notified of any complaints pending before a disciplinary agency? If yes, give particulars, e.g., jurisdiction, court date.

No

7. Has Applicant had any application for admission *pro hac vice* in this or any other jurisdiction denied or any *pro hac vice* admission revoked? If yes give particulars, e.g., date, court, docket number, judge, circumstances; attach a copy of any order of denial or revocation.

No

8. Has Applicant had any certificate or privilege to appear and practice before any court or administrative body suspended or revoked? If yes, give particulars, e.g., date, court, administrative body, date of suspension and reinstatement.

No

9. Please be aware that local counsel must be Rule 403 certified. Local counsel of record associated

with Applicant in this case is ___John B. White, Jr.___ of the ___John B. White, Jr., P.A.___

law firm, which has offices at:

291 S. Pine Street/ P.O. Box 2465 (29304)
Street Address

| Spartanburg | Spartanburg | South Carolina | 29302 |
|---|---|---|---|
| City | County | State | Zip Code |
| 864-594-5988 | 864-706-8701 | 864-594-5870 | jwhite@johnbwhitelaw.com |
| Primary Telephone | Cell Phone | Fax Number | Email Address |

ELECTRONICALLY FILED - 2025 Feb 26 3:53 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Feb 26 3:53 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

5996
_____
South Carolina Bar Number
(You must provide Bar Number)

10.    Has Applicant previously filed an application to appear *pro hac vice* in South Carolina cases? If yes, give case name and status of litigation, date of application, local counsel of record in each case, and state whether application is pending or was granted.

| Yes  - See Attached Exhibit A |
|---|

11. Does Applicant agree to comply with the applicable statutes, laws and rules of the State of South Carolina and familiarize him/herself with and comply with the South Carolina Rules of Professional Conduct? Does Applicant consent to the jurisdiction of the South Carolina courts and Commission on Lawyer Conduct.

| Yes |
|---|

12. Applicant respectfully requests to be admitted to practice in the above-named tribunal for this case only.

DATED this ___3/ˢᵗ___ day of ___January___, 20 _25_

_____
APPLICANT

# VERIFICATION

STATE OF ___TENNESSEE___ )

COUNTY OF ___DAVIDSON___ )

I, ___HAMILTON JORDAN___, do hereby swear or affirm under penalty of perjury that I am the applicant in the above-styled matter; that I have read the foregoing application and know the contents thereof; and that the contents are true of my own knowledge, except as to those matters stated on information and belief, and that as to those matters I believe them to be true. I understand that I am under a continuing duty to promptly update the information provided in the application until the tribunal has ruled on the motion for admission pro hac vice. Further, if the motion is granted, I understand that I am under a continuing duty to promptly update the information provided in the application as long as I continue to appear pro hac vice in the action or proceeding. Any updated information shall be provided to both the tribunal that granted the motion and to the tribunal in which the action or proceeding may then be pending.

_____
APPLICANT/AFFIANT

Subscribed and sworn to before me this ___31___ day of ___Jan___, 20 _25_

_____
(Notary Signature)

Notary Public for the State of _Tennessee_

My Commission Expires: _Sept 5th 2025_

*(Notary Seal:* JEAN CARLOS COLLADO — STATE OF TENNESSEE NOTARY PUBLIC — DAVIDSON COUNTY — My Commission Expires Sept. 5, 2028*)*

# LOCAL COUNSEL CONSENT

I hereby consent, as local counsel of record, to the association of applicant in this cause pursuant to Rules Governing Admission *Pro Hac Vice* to the South Carolina Bar.

DATED this ___14th___ day of ___February___, 20 _25_

_____
LOCAL COUNSEL OF RECORD

# CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of this application upon the South Carolina Supreme Court by mail addressed to: South Carolina Supreme Court Office of Bar Admissions, PO Box 11330, Columbia, SC 29211, accompanied by payment of the $250 filing fee payable to the South Carolina Supreme Court on this ___14th___ day of ___February___, 20 _25_

_____

ELECTRONICALLY FILED - 2025 Feb 26 3:53 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

*Page 4 of 4*

**Exhibit A**

**Application to Appear *Pro Hac Vice* in South Carolina for Hamilton Jordan**

| Case Name | Status | Date of Application | Local Counsel | Granting/ Pending |
|---|---|---|---|---|
| Laurens County Water and Sewer Commission v. Cone Mills Receiver, LLC, et al | Active | 8/21/2024 | Marghretta Shisko | Granted |
| Grand Strand Water and Sewer Authority v. Aladdin Manufacturing Corporation, et al | Active | 8/21/2024 | Marghretta Shisko | Granted |
| City of Union v. Milliken & Company, et al | Active | 12/30/2024 | Marghretta Shisko | Granted |
| City of Clinton v. Fibertex Nonwovens, Inc., et al | Active | 1/23/2025 | John B. White Jr. | Pending |
| The Gaffney Board of Public Works v. Bommer Industries, Inc., et al | Active | 1/31/2025 | John B. White Jr. | Pending |
| Greenwood Commissioners of Public Works v. Cone Mills Receiver, LLC, et al | Active | 1/31/2025 | John B. White, Jr. | Pending |
| South Carolina Public Service Authority v. China Jushi USA Corporation, et al | Active | 1/31/2025 | John B. White, Jr. | Pending |

ELECTRONICALLY FILED - 2025 Feb 26 3:53 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## Supreme Court of Tennessee

## Certificate of Good Standing

I, James M. Hivner, Clerk of the Supreme Court of the State of Tennessee, do hereby certify that

### Hamilton G. Jordan

is a licensed and practicing attorney of the Courts of this State, having been admitted to practice on October 19, 2017, and is presently in good standing. The Supreme Court is the Court of last resort in Tennessee.

In testimony whereof, I have set my hand and affixed the seal of the Court on this the 20th day of December, 2024.

James M. Hivner
Clerk of the Supreme Court of Tennessee

By: _Kim Meador, D.C._
Kim Meador, D.C.

ELECTRONICALLY FILED - 2025 Feb 26 3:53 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Feb 27 8:13 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| | |
|---|---|
| STATE OF SOUTH CAROLINA | IN THE COURT OF COMMON PLEAS |
| COUNTY OF FLORENCE | FOR THE TWELFTH JUDICIAL CIRCUIT |

CITY OF FLORENCE, SOUTH CAROLINA,

Plaintiff,

v.

ALADDIN MANUFACTURING CORPORATION, *et al.*,

Defendants.

CASE NO. 2024-CP-21-02844

**ORDER GRANTING PRO HAC VICE ADMISSION OF HAMILTON JORDAN**

Having considered the Motion of John B. White, Jr., on behalf of Plaintiff City of Florence, South Carolina, to admit Hamilton Jordan, of Cory Watson, P.C., 1033 Demonbreun St., #300, Nashville, TN 37203, *pro hac vice*, to appear on behalf of the Plaintiff in the above captioned matter and the Verified Application for Admission *Pro Hac Vice* in support thereof, it is hereby

ORDERED that said motion is granted.

**(Judicial E-Signature to Follow)**



Florence Common Pleas

**Case Caption:**     Florence City Of South Carolina VS   Burlington Industries Inc ,
defendant, et al

**Case Number:**     2024CP2102844

**Type:**     Order/Pro Hac Vice

IT IS SO ORDERED.

S/GRACE GILCHRIST KNIE - 2760

Electronically signed on 2025-02-26 16:34:44     page 2 of 2

ELECTRONICALLY FILED - 2025 Feb 27 8:13 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844



# The Supreme Court of South Carolina

## Office of Bar Admissions

PATRICIA A. HOWARD
CLERK OF COURT

KATHLEEN "TINA" BRYANT
MANAGER, OFFICE OF BAR
ADMISSIONS

POST OFFICE BOX 11330
COLUMBIA, SOUTH CAROLINA 29211
TELEPHONE: (803) 734-1317
FAX: (803) 734-0394

February 18, 2025

The Honorable Doris Poulos O'Hara
Clerk of Court
181 N. Irby Street MSC-E
Florence, SC 29501

RE:    City of Florence, South Carolina v. Aladdin Manufacturing Corporation, et al.

Case No.: 2024-CP-21-02844

Dear Ms. O'Hara:

I certify that the Office of Bar Admissions has received the verified application requesting Hamilton Jordan be admitted *pro hac vice* in the above action. The $250 filing fee for the applicant has been paid.

Sincerely,

M.J. Thames
Bar Admissions Coordinator

cc:    Hamilton Jordan
John B. White, Jr.

ELECTRONICALLY FILED - 2025 Feb 26 3:53 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| | |
|---|---|
| **STATE OF SOUTH CAROLINA** | **IN THE COURT OF COMMON PLEAS** |
| **COUNTY OF FLORENCE** | **TWELFTH JUDICIAL CIRCUIT** |

CITY OF FLORENCE, SOUTH CAROLINA )
)
      Plaintiffs, )
)
vs. )
) C.A. No. 2024-CP-21-02844
)
ALADDIN MANUFACTURING )
CORPORATION; et al., )
)
      Defendants. )
)

## <u>NOTICE TO STATE COURT OF FILING NOTICE OF REMOVAL</u>

TO:    The Hon. Doris Poulos O'Hara
        Florence County Clerk of Court
        Twelfth Judicial Circuit

PLEASE TAKE NOTICE that Defendant BFI Waste Systems of North America, LLC, by and through counsel, has filed a Notice of Removal of this cause from the Court of Common Pleas, Twelfth Judicial Circuit, C.A. No. 2024-CP-21-02844 where it is now pending, to the United States District Court, District of South Carolina. *See* Notice of Removal attached hereto.

Dated: March 12, 2025

                                          Respectfully submitted:

                                          s/ Kevin A. Dunlap
                                          Kevin A. Dunlap (SC ID# 13081)
                                          Parker Poe Adams & Bernstein LLP
                                          110 East Court Street, Suite 200
                                          Greenville, SC 29601
                                          (704) 335-9065
                                          Attorney for Defendant

1

PPAB 12104620v1

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served upon all counsel of record by placing a copy of the same in the United States Mail this dated with sufficient postage affixed hereto, addressed as follows:

John B. White, Jr.
Marghretta H. Shisko
Christopher R. Jones
Griffin L. Lynch
John B. White, Jr., P.A.
291 S. Pine Street
Spartanburg, SC 29302
*Attorneys for Plaintiff*

March 12, 2025                                          s/ Kevin A. Dunlap
                                                        Attorney for Defendant

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

2

PPAB 12104620v1

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**FLORENCE DIVISION**

| | | |
|---|---|---|
| CITY OF FLORENCE, SOUTH CAROLINA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. |
| v. | ) | JURY TRIAL DEMANDED |
| | ) | |
| ALADDIN MANUFACTURING | ) | |
| CORPORATION; AMERICHEM, INC.; | ) | |
| AURIA ALBEMARLE, LLC; AURIA | ) | |
| SOLUTIONS USA, INC.; BFI WASTE | ) | |
| SYSTEMS OF NORTH AMERICA, LLC; | ) | |
| BURLINGTON INDUSTRIES, INC.; | ) | |
| CARVANA, LLC; CASCADES HOLDING | ) | |
| US, INC.; CHEM-TEX LABORATORIES, INC.; | ) | |
| DELTA MILLS, INC., its predecessors, successors, | ) | |
| assigns, and/or responsible parties; DOMTAR | ) | |
| PAPER COMPANY, LLC; ELEVATE | ) | |
| TEXTILES, INC.; HEIQ CHEMTEX, INC.; J.P. | ) | |
| STEVENS & COMPANY, INC., its predecessors, | ) | |
| successors, assigns, and/or responsible parties; | ) | |
| MARCAL CORDOVA LLC; MOHAWK | ) | |
| INDUSTRIES, INC.; REPUBLIC SERVICES, | ) | |
| INC.; and WASTE CONNECTIONS OF NORTH | ) | |
| CAROLINA, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**<u>NOTICE OF REMOVAL</u>**

Defendant BFI Waste Systems of North America, LLC ("BFI"), by and through

undersigned counsel, hereby gives notice of the removal of this action, pursuant to 28 U.S.C. §§

1442(a)(1) and 1446, from the Circuit Court for the Twelfth Judicial Circuit, County of Florence,

South Carolina, to the United States District Court for the District of South Carolina, Florence

Division. BFI is entitled to remove this case based on federal officer jurisdiction. As its basis for

removal, BFI alleges as follows.

1

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

**PRELIMINARY STATEMENT**

1.     Plaintiff City of Florence filed suit in state court seeking to hold BFI and other defendants liable for allegedly discharging per and polyfluoroalkyl substances ("PFAS") into the Great Pee Dee River, one of several sources of drinking water for the City. *See* Am. Compl, ¶¶ 4, 20.[1]

2.     The City, located South Carolina, alleges that BFI's Charlotte Motor Speedway Landfill ("CMS") in Concord, North Carolina discharges PFAS laden wastewater through a wastewater treatment plant into a tributary to the Great Pee Dee River upstream of its drinking water treatment intake.  *See* Am. Compl, ¶¶ 4, 20. The alleged sources of the PFAS are the "industrial processes" through which "Defendants utilize, or utilized, products that contain or degrade to" PFAS. Am. Compl. ¶55. BFI does not "utilize" any products that contain PFAS but rather receives PFAS in certain waste deposited in CMS. Because BFI accepted with the PFAS-impacted military waste at CMS at the direction of the federal government, part of the PFAS at issue in the City's claims stems from federal government waste. The City's claims relate, at least in part, to BFI's federal activities. Accordingly, BFI is entitled to remove this action to federal court under federal officer jurisdiction.

**BACKGROUND**

3.     On December 12, 2024, the City filed its First Amended Complaint in the Court of Common Pleas for the Twelfth Judicial Circuit, County of Florence, South Carolina, Case No. 2024-CP-21-02844.

4.     On February 10, 2025, BFI was served with the summons and First Amended Complaint. Copies of the summons and Amended Complaint are attached as Exhibit A. BFI was

---

[1] Republic Services, Inc., believes it was added to this lawsuit solely on the basis that it is the ultimate parent company of BFI Waste Systems of North America, LLC and consents to removal.

2

not named or served with the original complaint filed in this matter.[2]

5.      The City is a municipal corporation in South Carolina. Am. Compl. ¶ 15. BFI owns and operates CMS, a regulated Subtitle D landfill, located in Concord, North Carolina.[3]

6.      The City alleges that it owns the Pee Dee Regional Water Treatment Plant and a water intake along the Great Pee Dee River that provides water to City residents. Am. Compl. ¶ 3.

7.      According to the City, BFI discharges wastewater containing PFAS from CMS to the Rocky River Wastewater Treatment Plant ("Rocky River Plant"), which in turn discharges to the Rocky River, a tributary to Great Pee Dee River upstream of the City's intake. *Id.* ¶ 20.

8.      By BFI's calculation, there are over 160 river miles between the outfall of the Rocky River Plant and the City's intake. The alleged pathway travels from CMS through a treatment plant, down two rivers, across a hydroelectric dam, and across two states before reaching the intake

9.      Since at least 2023, BFI has accepted, managed, and disposed of PFAS-containing waste from federal remedial and investigation projects at CMS at the direction of the United States Department of Defense's ("DoD") Navy and United States Marine Corps. This government-directed activity directly contributes to the alleged presence of PFAS in its wastewater discharges and the City's claimed injury. Accordingly, BFI asserts a colorable federal defense that warrants removal as a federal officer under 28 U.S.C. § 1442(a)(1).

---

[2] To date, only the First Amended Complaint and Summons have been served on BFI. Accordingly, the requirement to provide a copy of all process, pleadings, and orders served upon removing defendant under 28 USC § 1446(a) is satisfied by Exhibit A.

[3] Subtitle D refers requirements of the Resource Conservation and Recovery Act ("RCRA") governing non-hazardous solid waste management and landfills.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## REMOVAL IS PROPER UNDER THE FEDERAL
## OFFICER REMOVAL STATUTE, 28 U.S.C. § 1442(A)(1)

10.    Under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), BFI is entitled to remove this action to have its federal government-related conduct adjudicated in a federal forum. Such removal "fulfills the federal officer removal statute's purpose of protecting persons who, through contractual relationships with the Government, perform jobs that the Government otherwise would have performed." *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 133 (2d Cir. 2008). Government contractors may remove a case pursuant to the federal officer removal statute where "the acts for which they are being sued . . . occurred because of what they were asked to do by the Government," even if the acts were not "specifically contemplated by the government contract." *Id.* at 138.

11.    Removal under 28 U.S.C. § 1442(a)(1) is appropriate where, as here, the removing defendant establishes that: (a) it acted under federal authority; (b) that the charged conduct was carried out for or in relation to that asserted federal authority; and (c) it can assert a "colorable" federal defense. *See Maryland v. 3M Co.*, No. 24-1218, 2025 WL 727831, at *4 (4th Cir. Mar. 7, 2025).[4]

12.    Federal officer removal affords defendants broad removal rights. *Maryland*, 2025 WL 727831, at *4. All statutory requirements should be "liberally construed" in favor of removal. *Id.* (quoting *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 147 (2007)); *Isaacson*, 517 F.3d at 136. Suits against defendants acting on behalf of federal officers "may be removed

---

[4] Some courts have considered a fourth element, whether the removing part is a person. BFI is a corporation and therefore a "person" for the purposes of federal officer removal under § 1442(a)(1). *See Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 812 (3d Cir. 2016), (quoting 1 U.S.C. § 1) (the term "person" includes "corporations, companies, associations, firms, [and] partnerships.")

4

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law." *Jefferson Cty. v. Acker*, 527 U.S. 423, 431 (1999). This is because "[o]ne of the primary purposes of the removal statute" is to have federal "defenses litigated in the federal courts." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969).

13.     All requirements for federal removal under § 1442(a)(1) are satisfied where, as here, the notice of removal alleges that the plaintiff's claimed injuries plausibly are at least in part caused by and/or related to the disposal of waste incidental to activity performed at the behest of the federal government. *See, e.g.*, *Illinois ex rel. Raoul v. Monsanto Co.*, 2023 WL 130525, at *3-4 (N.D. Ill. Jan. 9, 2023). Accordingly, this case is properly removed to this Court.

14.     Venue in this Court is proper pursuant to 28 U.S.C. §§ 121(3) and 1441(a) because the Circuit Court for the Twelfth Judicial Circuit, County of Florence, South Carolina, is located in the Florence Division of the District of South Carolina.

## I.     All the Requirements of 28 U.S.C. § 1442(a)(1) Are Satisfied.

### A.     The City's Claims Are Based on BFI's Conduct While "Acting Under" the United States.

15.     The requirement of "acting under" a federal officer is satisfied when an entity assists or helps carry out the duties or tasks of a federal officer. *Watson v. Philip Morris Companies, Inc.*, 551 U.S. 142, 143 (2007). The phrase "'acting under' is 'broad' and is to be 'liberally construed' in favor of the entity seeking removal." *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 255 (4th Cir. 2017) (quoting *Watson*, 551 U.S. at 147). Where, as here, "the federal government uses a private corporation to achieve an end it would have otherwise used its own agents to complete, that contractor is acting under the authority of a federal officer." *Papp*, 842 F.3d at 812 (internal quotations omitted) (citing *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1181 (7th Cir. 2012)).

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

16.     BFI meets the requirement of "acting under" federal office because the alleged PFAS contamination at issue stems from BFI's acceptance of PFAS waste at the direction of the federal government--waste that the government would otherwise have had to manage and dispose of itself. As the DoD stated in its *Interim Guidance on Destruction or Disposal of Materials Containing Per- and Polyfluoroalkyl Substances in the United States*, "DoD has determined that…quantities of PFAS-containing material are generated from DoD's nationwide cleanup program, and recovery of emergency use discharges or spills of AFFF. Given these combined quantities, DoD's long-term storage capabilities will be exceeded and thus DoD requires a comprehensive destruction and disposal strategy." *See* Exhibit B at 1, hereinafter "Interim Guidance." That disposal strategy includes solid waste landfills like CMS as one of the few disposal options. *Id*. at 2. Representatives of the Naval Facilities Engineering Systems Command Mid-Atlantic ("NAVFAC") overseeing remediation activities on behalf of the United States Marine Corps at the Camp Lejeune military base[5], and the Marine Corps Air Stations at Cherry Point[6] and New River[7], directed that BFI manage and dispose of Aqueous film-forming foam ("AFFF") and non-AFFF PFAS waste generated at federal military bases that the government otherwise would have had to manage on its own. *See* Exhibit F, Declaration of Rhonda Gora.  In accepting military PFAS waste from the federal government, BFI acted under the direction, order, monitoring, and supervision of federal officers.

17.     First, federal direction, supervision, and monitoring is demonstrated through the process and documentation required to dispose of military PFAS waste at CMS. Federal military

---

[5] *See* Exhibit C. The associated laboratory testing data includes hundreds of pages and has been omitted to minimize size of the exhibits.

[6] *See* Exhibit D. The associated laboratory testing data includes hundreds of pages and has been omitted to minimize size of the exhibits.

[7] *See* Exhibit E. The associated laboratory testing data includes hundreds of pages and has been omitted to minimize size of the exhibits.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

officials must conduct a detailed evaluation of the waste composition and physical characteristics, including laboratory analytical testing for PFAS, and complete a detailed form and certification of *each* waste load (called a Special Waste Profile). *See* Ex. F. The Special Waste Profile provides CMS with information needed to manage the PFAS waste and ensure it complies with CMS's disposal requirements. *Id*. No military waste can be disposed at CMS without an order of the federal official, laboratory testing, and completion of a Special Waste Profile certified by the federal official and signed by CMS. *Id*. As one example, CMS accepted PFAS waste from a remediation project involving the Building TC701 Camp Geiger Fire Station (Station 6) at Camp Lejeune. *See* Ex. G, Camp Geiger Special Waste Profiles. The attached Special Waste Profiles certified by Mr. Jeffrey Zahniser, Environmental Protection Specialist for the U.S. Marine Corps at Camp Lejeune, selected CMS Landfill for the disposal of soil and groundwater from Camp Lejeune suspected to be contaminated from "a release [of AFFF that] likely occurred during the transfer of AFFF from these containers to fire engines on site." *Id*. Additionally, federal military officials and CMS execute a Non-Hazardous Special Waste Manifest for each load destination facility, which includes generator information, waste contents, container type, waste quantity, and compliance with applicable laws. *See* Exhibit H. Additional specifications regarding the term, pricing, volume limits and disposal method are specified in the Agent Special Waste Service Agreements between BFI and DoD's agent, EVO for the disposal of military waste. *See* Exhibit I. The documentation and specifications demonstrate federal officials closely supervised and monitored PFAS waste disposal and selected and depended upon BFI to perform disposal at CMS on their behalf.

18.    Second, written NAVFAC plans mandated requirements and protocols for disposal facilities to accept and dispose of federal PFAS waste. For the TC701 Camp Geiger Fire

7

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

Station, NAVFAC followed the *Sampling and Analysis Plan, Remedial Investigation, Per and Polyfluoroalkyl Substances Site 113 Building TC701 Camp Geiger Fire Station 6 Camp Lejeune NC* ("Geiger Fire Station Plan"), which mandated that PFAS waste disposal comply with (1) a Standard Operating Procedure; (2) the *MCB Camp Lejeune and MCAS Investigation and Remediation Waste Management Plan* (*see* Exhibit J, hereinafter "Waste Management Plan"); (3) EPA's Interim Guidance, all of which established specifications for PFAS waste disposal, including that the landfill meet engineering requirements and environmental permits. *See* Exhibit K, Camp Geiger Plan. Each instance of waste disposal required the direction, order, and supervision of federal officers.  Accordingly, because the alleged PFAS contamination flows from BFI's work performed for the government, the "acting under" requirement is satisfied.

> **B.     The City's Claims Against BFI Are "For or Relating To" Acts Under Color of Federal Office.**

19.     Under the next requirement, often referred to as the "nexus" or "causation" requirement, "a defendant must show it is being sued for an act or acts that it claims were done under—or related to acts done under—federal authority." *Maryland*, No. 24-1218,2025 WL 727831, at *4. Courts have recognized that the "hurdle erected by this requirement is quite low." *Isaacson,* 517 F.3d at 137.[8]  "A removing defendant need not establish "an airtight case on the merits in order to show the required causal connection." *Maryland*, No. 24-1218, 2025 WL 727831 at *4. It is sufficient for a defendant to establish a connection or association between the lawsuit and the federal office. *See Sawyer*, 860 F.3d at 258. The court considers whether under defendant's "theory of the case, it plausibly alleged that its charged conduct was related to its federal work." *Id*. at *6. The court "credit[s] *Defendants'* theory of the case when determining

---

[8] The Fourth Circuit recognized that PFAS cases like these are "likely one[s] where "the acting-under and causal-nexus prongs . . . collapse into a single requirement." *Maryland*, No. 24-1218, 2025 WL 727831, at *8.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

whether there is such a connection or association." *Maryland*, No. 24-1218, 2025 WL 727831, at *12. (cleaned up) (emphasis in original). Where, as here, the case involves commingled PFAS, "the nexus element [is] satisfied because PFAS from different sources commingle to the point that it is impossible to identify the precise source of a contaminant…" *Id.* at *6. Because "some of the PFAS contamination charged by [plaintiffs] came from Military AFFF" "any remediation would necessarily implicate work that [defendant] did for the federal government." *Id*.

20.    This situation is directly analogous to that in *Maryland*. The City's claims of contamination from CMS arise in part from BFI's acceptance of federal PFAS waste. In addition to military waste, CMS accepts non-hazardous waste from residential, commercial, and industrial customers. When deposited at CMS, the federal PFAS waste is mixed with other industrial and municipal wastes which may also contain PFAS given its prevalence in consumer products. *See* Ex. L, Mike Gurley Declaration. Constituents in the commingled waste can partition to rainwater infiltrating through the landfill, creating a wastewater known as leachate.[9] *Id*. The chemical composition of leachate reflects that of the commingled waste such that any PFAS from government and non-governmental wastes is inseparable. *Id*.

21.    The federal government waste deposited in CMS containing PFAS from non-AFFF and AFFF sources is a source of that PFAS in leachate.[10] As such, the City's claims against BFI are "for or relating to" BFI's acts taken under color of federal office. 28 U.S.C. § 1442(a)(1); *see, e.g., Albritton v. A Clemente, Inc.,* No. 1:22-cv-00397, 2023 WL 2447422, at *6 (D.N.J. Mar.

---

[9] "Leachate" means a liquid that has passed through or emerged from solid waste and contains soluble, suspended, or miscible materials removed from such waste. N.C. Gen. Stat. § 130A-290(16a).

[10] *See, e.g.,* Exhibit C, Special Waste Profiles for Agan Street Project (identifying potential source as "Former Agan Street Dump was used to discard debris and received wastewater sludge that may have contained AFFF and/or PFAS. The wastewater treatment plant received wastewater from industrial activities that used material potentially containing PFAS. Street foam was also deployed twice on Agan Street historically.").

9

10, 2023) (Plaintiff claims arising out of PFAS disposal were connected to federal activities); *Raoul*, 2023 WL 130525, at *3 (same).

22.     The City's purported disclaimer of AFFF liability does not preclude BFI's federal officer removal. The Complaint's allegations under the section labeled "Disclaimer" assert that "Plaintiff makes no assertion of fact concerning, and brings no cause of action based on, the manufacture, sale, distribution, use, or disposal of PFAS associated with aqueous film forming foam ("AFFF"), whether commercial, Mil-Spec, or other variety," and "expressly disclaims any causes of action, injury, or damages resulting from the manufacture, sale, distribution, use, or disposal of any AFFF by any Defendant or third-party." Am Compl. ¶ 9.  In light of recent Fourth Circuit precedent, such disclaimers carry no effect, where, as here, the City's claims encompass PFAS from AFFF waste received from the federal government. *Maryland,* No. 24-1218, 2025 WL 727831, at *5 ("reject[ing] the notion that the States' purported disclaimers of 3M's federal conduct were dispositive."); *see also Gov't of Puerto Rico v. Express Scripts, Inc.*, 119 F.4th 174 (1st Cir. 2024) (holding that a plaintiff's disclaimer "cannot serve as an end run around the federal officer removal statute" where the federal and non-federal activities are indivisible).

23.     The City's putative disclaimer does not enable it to avoid federal officer jurisdiction because the PFAS at issue here would be derived from federal and non-federal wastes. Even the federal waste received at CMS includes PFAS from AFFF and non-AFFF sources. BFI's theory of the case trumps the City's attempted artful pleading through disclaimer. Because federal and non-federal activities are indivisible, the City cannot preclude removal on government officer grounds. *See Maryland,* No. 24-1218, 2025 WL 727831, at *4-6.

10

**C. BFI has a Colorable Federal Defense to the City's Claims.**

24.     BFI satisfies the third requirement by asserting the government contractor defense. A removing defendant must show that it has "a colorable federal defense." *Sawyer*, 860 F.3d at 254. To assert a colorable federal defense at the removal stage, "the defense need not be clearly sustainable, as the purpose of the statute is to secure that the validity of the defense will be tried in federal court." *Cnty. Bd. of Arlington Cnty., Virginia v. Express Scripts Pharmacy, Inc.*, 996 F.3d 243, 254 (4th Cir. 2021) (quotations omitted). "[A] federal defense is colorable unless it is 'immaterial and made solely for the purpose of obtaining jurisdiction' or 'wholly insubstantial and frivolous.'" *Moore v. Elec. Boat Corp*., 25 F.4th 30, 37 (1st Cir. 2022). Instead, BFI needs only to "raise a claim that is 'defensive' and 'based in federal law'" which is "plausible." *Arlington Cnty.*, 996 F.3d at 254 (quoting *Isaacson*, 517 F.3d at 138). A defendant is not required to "win his case before he can have it removed." *Jefferson Cnty*, 527 U.S. at 431 (1999).

25.     BFI has a colorable federal defense based on the government contractor defense as articulated in *Boyle v. United Technologies Corp*., 487 U.S. 500 (1988) which stated that the "uniquely federal interest" of "getting the Government's work done" requires that a private contractor must be protected from tort liability associated with its performance of government contract. *Boyle,* 487 U.S. at 504-05. The government contractor defense applies where "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Id*. at 512.

26.     BFI has satisfied these elements for purposes of removal, in that BFI provided its services for the federal government in accordance with the government's waste management

11

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

requirements and agreed upon special waste specifications, BFI's services conformed to those requirements and specifications, and the federal government knew at least as much, if not more, as BFI about the nature of the waste from the government's own properties.

27.     Under the first prong, the government approved reasonably precise specifications for the disposal of PFAS waste at CMS. For the defense to apply, the government need not specify every procedure, it can also approve specifications provided to it by the contractor. *In re Agent Orange Prod. Liab. Litig.*, 517 F.3d at 91 ("[i]t is necessary only that the government approve, rather than create the specifications....") (citation omitted).  The requirement of "reasonably precise specifications" can be met by evidence showing that the government's participation "amount[ed] to more than a rubber stamping…" *Ramey v. Martin-Baker Aircraft Co. Ltd.*, 874 F.2d 946, 950 (4th Cir. 1989). CMS was plainly subject to "reasonably precise" federal government specifications.

28.     First, NAVFAC provided "reasonably precise" specifications by issuing detailed plans and operating procedures for disposal of PFAS waste for each project at its federal facilities. In the Geiger Fire Station Plan (Ex. I), the specifications state that waste disposal will be performed "by a commercial firm under subcontract" "in a manner consistent with applicable solid waste, hazardous waste, and water quality regulations." *Id*. at App B SOP 005. It also required waste be managed "in accordance with the MCB Camp Lejeune and MCAS Investigation and Remediation Waste Management Plan" and "Disposal requirements will follow the memorandum *Interim Guidance on Destruction or Disposal of Materials Containing Per- and Polyfluoroalkyl Substances in the United State[s]* [sic]." *Id*. at 60. The Waste Management Plan outlines requirements for waste characterization, waste management, documentation and recordkeeping, including special waste profiles. *See* Exhibit J. The *Interim Guidance*

12

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

recommends solid waste landfills for disposal noting that "any solid waste landfill DoD uses for PFAS-containing materials must have a composite liner, gas and leachate collection and management systems, and an environmental permit." Ex. B at 5. The Department of Defense explained that "one of the most significant factors for DoD was additional oversight and controls provided at disposal and destruction facilities with environmental permits." *Id*. at 1-2. CMS is a modern landfill constructed in accordance with federally required engineering and pollution control requirements. Ex. J. It operates under a variety of environmental permits, including those issued by the federal government, and is routinely inspected to ensure compliance with environmental permits and laws, including "applicable solid waste, hazardous waste, and water quality regulations." *Id*. The extensive regulatory oversight ensures CMS conforms with NAVFAC's "reasonably precise" specifications for accepting such waste. Second, NAVFAC and/or its agents approved of the contents and requirements of BFI's Special Waste Profile form, Manifest, and Special Waste Agreement which lay out the specifications that must be met in order to accept the military PFAS waste, including information about odor, color, whether it contained free liquids, physical characteristics, whether it complies with RCRA, volume, contamination source, and laboratory testing data regarding the PFAS constituents in the waste. A Special Waste Profile and Manifest was completed for *each load sent to CMS*, which were directed, completed, and certified by federal officers. The specifications approved by the federal government through the Special Waste Profiles and related documentation was certainly "reasonably precise."

29.     Under the second prong, BFI's services conformed to those specifications. Since first accepting PFAS waste in 2023, the federal government has continued to dispose of PFAS waste at CMS, and there are no allegations to the contrary.  *See* Ex. F.

13

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

30. Under the third prong, the federal government knows as much or more about the PFAS waste from its military bases than CMS. *Albrecht v. A.O. Smith Water Prods.,* No. 11 CIV. 5990 BSJ, 2011 WL 5109532, at \*5 (S.D.N.Y. Oct. 21, 2011) ("A defendant is not required to warn the government where 'the government knew as much or more than the defendant contractor about the hazards of the product.'" (citation omitted)). As shown in the Special Waste Profiles, DoD officials conducted a detailed analysis of the government's waste, including analytical laboratory testing of the PFAS constituents in the waste. Clearly, the government is well apprised of the intimate details of the waste and means of disposal.

31. CMS's disposal of PFAS waste was directed by the military and performed in accordance with the relevant regulations and specifications. The government contractor defense precludes the City from using state tort law to attack BFI's federal activities.

WHEREFORE, BFI hereby removes this action from the Twelfth Judicial Circuit, County of Florence, South Carolina to this Court.

Dated: March 12, 2025

Respectfully submitted:

s/ Kevin A. Dunlap
Kevin A. Dunlap (ID# 5564)
Parker Poe Adams & Bernstein LLP
620 South Tryon Street, Suite 800
Charlotte, NC 28202
(704) 335-9065
Attorney for Defendant BFI Waste Systems
of North America, LLC

14

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a copy of the foregoing document was served upon all counsel of record by placing a copy of the same in the United States Mail this dated with sufficient postage affixed hereto, addressed as follows:

John B. White, Jr.
Marghretta H. Shisko
Christopher R. Jones
Griffin L. Lynch
John B. White, Jr., P.A.
291 S. Pine Street
Spartanburg, SC 29302
*Attorneys for Plaintiff*

March 12, 2025

s/ Kevin A. Dunlap
Attorney for Defendant BFI Waste Systems of North America, LLC

15

# EXHIBIT A

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844
ELECTRONICALLY FILED - 2024 Dec 12 11:51 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| | |
|---|---|
| **STATE OF SOUTH CAROLINA** | ) IN THE COURT OF COMMON PLEAS |
| | ) |
| **COUNTY OF FLORENCE** | ) TWELFTH JUDICIAL CIRCUIT |
| | ) |
| | ) |
| CITY OF FLORENCE, SOUTH CAROLINA, | ) C.A. No.: 2024-CP-21-02844 |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | ) |
| | ) |
| ALADDIN MANUFACTURING CORPORATION; AMERICHEM, INC.; AURIA ALBEMARLE, LLC; AURIA SOLUTIONS USA, INC.; BFI WASTE SYSTEMS OF NORTH AMERICA, LLC; BURLINGTON INDUSTRIES, INC.; CARVANA, LLC; CASCADES HOLDING US, INC.; CHEM-TEX LABORATORIES, INC.; DELTA MILLS, INC., its predecessors, successors, assigns, and/or responsible parties; DOMTAR PAPER COMPANY, LLC; ELEVATE TEXTILES, INC.; HEIQ CHEMTEX, INC.; J.P. STEVENS & COMPANY, INC., its predecessors, successors, assigns, and/or responsible parties; MARCAL CORDOVA LLC; MOHAWK INDUSTRIES, INC.; REPUBLIC SERVICES, INC.; WASTE CONNECTIONS, INC.; and WASTE CONNECTIONS OF NORTH CAROLINA, INC., | ) **AMENDED SUMMONS** <br> ) (JURY TRIAL DEMANDED) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |
| | ) |
| *Defendants.* | ) |
| | ) |

**TO THE DEFENDANTS ABOVE-NAMED:**

YOU ARE HEREBY SUMMONED and required to answer the First Amended Complaint herein, a copy of which is herewith served upon you, and to serve a copy of your answer to the First Amended Complaint upon the subscribers at 291 S. Pine Street, Spartanburg, South Carolina 29302, within thirty (30) days after service hereof, exclusive of the day of such service, and if you

fail to answer the Complaint, judgment by default will be rendered against you for the relief

demanded in the Complaint.

Respectfully submitted,

*/s/ John B. White. Jr.*
John B. White, Jr. (S.C. Bar No. 5996)
Marghretta H. Shisko (S.C. Bar No. 100106)
Christopher R. Jones (S.C. Bar No. 101265)
Griffin L. Lynch (S.C. Bar No. 72518)
John B. White, Jr., P.A.
291 S. Pine Street
P.O. Box 2465 (29304)
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

December 12, 2024

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844
ELECTRONICALLY FILED - 2024 Dec 12 11:51 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844
ELECTRONICALLY FILED - 2024 Dec 12 11:51 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| | |
|---|---|
| **STATE OF SOUTH CAROLINA** | ) IN THE COURT OF COMMON PLEAS |
| | ) |
| **COUNTY OF FLORENCE** | ) TWELFTH JUDICIAL CIRCUIT |
| | ) |
| | ) |
| CITY OF FLORENCE, SOUTH CAROLINA, | ) C.A. No.: 2024-CP-21-02844 |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | ) |
| | ) |
| ALADDIN MANUFACTURING CORPORATION; AMERICHEM, INC.; AURIA ALBEMARLE, LLC; AURIA SOLUTIONS USA, INC.; BFI WASTE SYSTEMS OF NORTH AMERICA, LLC; BURLINGTON INDUSTRIES, INC.; CARVANA, LLC; CASCADES HOLDING US, INC.; CHEM-TEX LABORATORIES, INC.; DELTA MILLS, INC., its predecessors, successors, assigns, and/or responsible parties; DOMTAR PAPER COMPANY, LLC; ELEVATE TEXTILES, INC.; HEIQ CHEMTEX, INC.; J.P. STEVENS & COMPANY, INC., its predecessors, successors, assigns, and/or responsible parties; MARCAL CORDOVA LLC; MOHAWK INDUSTRIES, INC.; REPUBLIC SERVICES, INC.; WASTE CONNECTIONS, INC.; and WASTE CONNECTIONS OF NORTH CAROLINA, INC., | ) **FIRST AMENDED COMPLAINT** (JURY TRIAL DEMANDED) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| | ) |
| *Defendants.* | ) |
| | ) |

Plaintiff, CITY OF FLORENCE, SOUTH CAROLINA, by and through the undersigned counsel, brings this action against the above-named Defendants for compensatory and punitive damages, injunctive relief, and abatement of a nuisance, and alleges as follows:

**STATEMENT OF THE CASE**

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844
ELECTRONICALLY FILED - 2024 Dec 12 11:51 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

1.     Plaintiff, City of Florence, South Carolina, brings this action to address Defendants' ongoing contamination of the Great Pee Dee River and Plaintiff's properties with certain toxic per- and polyfluoroalkyl substances ("PFAS"): perfluorooctanoic acid ("PFOA"); perfluorooctanesulfonic acid ("PFOS"); perfluorononanoic acid ("PFNA"); perfluorobutane sulfonate ("PFBS"); perfluorohexane sulfonate ("PFHxS"); and hexafluoropropylene oxide dimer acid ("HFPO-DA" or "GenX Chemicals").

2.     As Plaintiff has recently discovered, Defendants have discharged and continue to discharge products that contain or degrade to these PFAS to the Great Pee Dee River, which travel downstream to Plaintiff's water intake, thereby contaminating Plaintiff's properties and the domestic water supply for over 34,000 water customers in Florence County. Plaintiff seeks a declaratory judgment, injunctive relief, abatement, damages, and an award of costs, including attorneys' fees, for Defendants' repeated and ongoing PFAS contamination.

3.     Plaintiff provides potable water to Florence County residents. It owns and occupies two properties at issue in Florence County. At 2598 Florence Harllee Blvd., Florence, South Carolina 29506, Plaintiff operates the Pee Dee Regional Water Treatment Plant (a surface water treatment plant, or "SWTP") and related buildings, improvements, and equipment that make up its water distribution system. Plaintiff's other property abuts the Great Pee Dee River, where its water intake withdraws water for treatment at the SWTP before distribution to customers.

4.     Defendants own and/or operate industrial facilities upstream of Plaintiff's water intake and have in the past and/or currently use products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in their industrial processes. Defendants then discharge wastewater contaminated with these products to surface waters in the Great Pee Dee River upstream of Plaintiff's water intake. Some Defendants directly discharge PFAS-

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844
ELECTRONICALLY FILED - 2024 Dec 12 11:51 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

contaminated wastewater, while others do so indirectly via certain wastewater treatment plants ("WWTPs"). These WWTPs include the Anson County Regional WWTP in Wadesboro, North Carolina; the Long Creek WWTP in Albemarle, North Carolina; the Rockingham WWTP in Rockingham, North Carolina; and the Rocky River Regional WWTP in Concord, North Carolina.

5.    Industrial wastewater from Defendants' facilities contains high levels of PFAS, which cannot be adequately removed by conventional wastewater treatment processes, are discharged to the Great Pee Dee River, and flow downstream to Plaintiff's SWTP. As a direct and proximate result of Defendants' actions, Plaintiff has suffered losses to the use and enjoyment of its property rights, and Plaintiff's properties have been, and will continuously be, trespassed and damaged by water contaminated with dangerous concentrations of PFAS.

6.    Defendants' PFAS contaminate Plaintiff's water source at concentrations exceeding what the U.S. Environmental Protection Agency ("EPA") deems unsafe for consumption, and Plaintiff's existing water treatment processes cannot remove them. Instead, Plaintiff requires new water treatment technologies to remove, and provide water free from, Defendants' PFAS.

7.    As a result of Defendants' intentional, willful, wanton, reckless, and/or negligent acts and omissions and the nuisance thereby created, maintained, and continued, Plaintiff has suffered injury to its property rights and resulting damages, including compensatory and consequential damages. Plaintiff is also seeking equitable and injunctive relief requiring Defendants to fund the acquisition, installation, and operation of water treatment technologies at Plaintiff's SWTP that will remove Defendants' PFAS from drinking water. In addition, based on the Defendants' intentional, willful, wanton, reckless, malicious, and oppressive misconduct, Plaintiff is seeking the recovery of punitive damages.

## DISCLAIMER

8.    Plaintiff makes no assertion of fact concerning, and brings no cause of action based on, the manufacture, sale, distribution, use, or disposal of PFAS associated with aqueous film forming foam ("AFFF"), whether commercial, Mil-Spec, or other variety. Plaintiff expressly disclaims any causes of action, injury, or damages resulting from the manufacture, sale, distribution, use, or disposal of any AFFF by any Defendant or third-party.

9.    Plaintiff's causes of action against Americhem, Inc.; Auria Albemarle, LLC; Auria Solutions USA, Inc.; BFI Waste Systems of North America, LLC; Carvana, LLC; Cascades Holding US, Inc.; Chem-Tex Laboratories, Inc.; Elevate Textiles, Inc.; HeiQ ChemTex, Inc.; Marcal Cordova LLC; Republic Services, Inc.; Waste Connections, Inc.; and Waste Connections of North Carolina, Inc. arise under North Carolina law. Plaintiff brings no cause of action against these Defendants under South Carolina law.

10.    Plaintiff's causes of action against the remaining Defendants arise under South Carolina law.

11.    Plaintiff brings no cause of action against, and seeks no relief from, any Defendant under federal law or statute.

## JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction over this action pursuant to Article V of the Constitution of the State of South Carolina and sections 5-7-30 and 14-1-80 of the South Carolina Code.

13.    This Court has personal jurisdiction over all Defendants, consistent with due process and South Carolina's long-arm statute, section 36-2-803 of the South Carolina Code.

14.    Venue is also properly in this Court pursuant to sections 15-7-10 and -30 of the South Carolina Code because the subject of the action is for injuries sustained to

4

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844
ELECTRONICALLY FILED - 2024 Dec 12 11:51 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

Plaintiff's property located in Florence County, and the most substantial part of Defendants' alleged acts or omissions giving rise to Plaintiff's claims occurred in Florence County. *See id.* at § 15-7-30(B) ("If there is more than one defendant, the action may be tried in any county where the action properly may be maintained against one of the defendants pursuant to this section.").

## PARTIES

### I. Plaintiff

15. Plaintiff is a municipal corporation organized and existing under the laws of South Carolina. S.C. CODE ANN. §§ 5-7-10, *et seq.*; 5-31-610. Through its Department of Public Works, Plaintiff provides potable water services to its customers.

16. Plaintiff owns two properties at issue. The first is located at 2598 Florence Harllee Boulevard, Florence, South Carolina 29506, where Plaintiff operates the Pee Dee Regional SWTP. Approximately three miles to the northeast, Plaintiff owns land riparian to the Great Pee Dee River, where it operates a surface water intake.

17. The Pee Dee Regional SWTP provides potable water to approximately 34,000 customers.

### II. Defendants

18. Defendant **Americhem, Inc. ("Americhem")** is a Delaware corporation that operates an industrial facility located at 723 Commerce Drive, Concord, North Carolina 28025. There, Americhem uses products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the manufacture of plastics products for textile applications. As part of its processes, the Americhem facility discharges industrial wastewater contaminated with products that contain or degrade to these PFAS to the Rocky River Regional WWTP. The Rocky River WWTP cannot remove Americhem's PFAS, which it discharges to the Rocky River upstream of

5

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844
ELECTRONICALLY FILED - 2024 Dec 12 11:51 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

the Great Pee Dee River and Plaintiff's water intake. Americhem's PFAS resist environmental degradation, flow downstream from the Great Pee Dee River, and thereby contaminate Plaintiff's properties and its water source.

19.     Defendant **Auria Albemarle, LLC** is a Delaware limited liability company, and Defendant **Auria Solutions USA, Inc.** is a Delaware corporation **(collectively "Auria")**. Auria operates an industrial facility located at 313 Bethany Road, Albemarle, North Carolina 28001, where it uses products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the manufacture of textile products in the automotive industry. As part of its processes, the Auria facility discharges industrial wastewater contaminated with products that contain or degrade to these PFAS to the Long Creek WWTP. The Long Creek WWTP cannot remove Auria's PFAS, which it discharges to a tributary upstream of the Great Pee Dee River and Plaintiff's water intake. Auria's PFAS resist environmental degradation, flow downstream from the Great Pee Dee River, and thereby contaminate Plaintiff's properties and its water source.

20.     Defendants **BFI Waste Systems of North America, LLC ("BFI")** and **Republic Services, Inc. ("RSI")** are Delaware corporations that own and operate the Charlotte Motor Speedway Landfill, located at 5105 Morehead Road, Concord, North Carolina 28027. BFI and RSI discharge wastewater from the landfill, which contains significant amounts of PFOA, PFOS, PFHxs, PFNA, PFBS, GenX Chemicals, and/or their precursors, to the Rocky River WWTP. The Rocky River WWTP cannot remove these PFAS from BFI's and RSI's wastewater before the WWTP discharges their PFAS into the Rocky River upstream of the Great Pee Dee River and Plaintiff's water intake. BFI's and RSI's PFAS resist environmental degradation, flow downstream from the Great Pee Dee River, and thereby contaminate Plaintiff's properties and its water source.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844
ELECTRONICALLY FILED - 2024 Dec 12 11:51 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

21.    Defendant **Burlington Industries, Inc. ("Burlington")** was a Delaware corporation authorized to do business in South Carolina until its dissolution in 2004. On May 13, 2022, the South Carolina Circuit Court appointed Peter McCoy, Jr., a resident of Charleston County, South Carolina, as the receiver for Burlington. *See Mimms v. Burlington Indus., Inc. et al.*, C.A. No. 2021-CP-40-05873, Order Appointing Receiver Over Defendant Burlington Industries, Inc. (Richland Cnty. Ct. of Common Pleas May 13, 2022). Burlington was the owner and operator of an industrial facility located at 670 N. Main Street, Society Hill, South Carolina 29593. The facility is a former textile mill and finishing facility bordering Cedar Creek and the Great Pee Dee River. Over the course of the facility's operations, Burlington used products that contain or degrade to PFOA, PFOS, PFNA, PFHxS, PFBS, and/or GenX Chemicals in the manufacture of textile products. As part of its processes, Burlington discharged industrial wastewater contaminated with these PFAS from its own wastewater treatment plant to Cedar Creek and the Great Pee Dee River upstream of Plaintiff's water intake. Wastewater lagoons and other storage basins at the facility have accumulated PFOA, PFOS, PFNA, PFHxS, PFBS, GenX Chemicals, and/or their precursors for decades. These PFAS transport to the Great Pee Dee River upstream Plaintiff's water intake. Burlington's PFAS resist environmental degradation, flow downstream from the Great Pee Dee River, and thereby contaminate Plaintiff's properties and its water source. Burlington also manufactured and distributed agricultural biosolid products contaminated with PFOA, PFOS, PFHxS, PFNA, PFBS, GenX Chemicals, and/or their precursors to farms and other users throughout the Great Pee Dee River watershed upstream of Plaintiff's water intake. PFAS from Burlington's biosolids have accumulated in the Great Pee Dee River watershed, enter surface waters, continually flow downstream to Plaintiff's water intake, and contaminate Plaintiff's properties and its water source.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844
ELECTRONICALLY FILED - 2024 Dec 12 11:51 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844
ELECTRONICALLY FILED - 2024 Dec 12 11:51 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

22.     Defendant **Carvana, LLC ("Carvana")** is an Arizona limited liability company authorized to do business in South Carolina. Carvana owns and operates a facility located at 3045 New Town Way SW, Concord, North Carolina 28027, where it uses products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in automotive washing, detailing, and painting operations. As part of its processes, the Carvana facility discharges industrial wastewater contaminated with products that contain or degrade to these PFAS to the Rocky River Regional WWTP. The Rocky River Regional WWTP cannot remove Carvana's PFAS, which it discharges to the Rocky River upstream of the Great Pee Dee River and Plaintiff's water intake. Carvana's PFAS resist environmental degradation, flow downstream from the Great Pee Dee River, and thereby contaminate Plaintiff's properties and its water source.

23.     Defendant **Cascades Holding US, Inc. ("Cascades")** is a Delaware corporation authorized to do business in South Carolina. Cascades owns and operates industrial facilities located at 805 Midway Road and 112 Cascades Way—both in Rockingham, North Carolina 28739. At its facilities, Cascades uses products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the manufacture of products in the paper industry. As part of their processes, the Cascades facilities discharge industrial wastewater contaminated with products that contain or degrade to these PFAS to the Rockingham WWTP. The Rockingham WWTP cannot remove Cascades' PFAS, which it discharges to the Great Pee Dee River upstream of Plaintiff's water intake. Cascades' PFAS resist environmental degradation, flow downstream from the Great Pee Dee River, and thereby contaminate Plaintiff's properties and its water source.

24.     Defendants **HeiQ Chemtex, Inc.** and **Chem-Tex Laboratories, Inc. (collectively "Chem-Tex")** are North Carolina corporations that own and/or operate an industrial facility located at 2725 Armentrout Drive, North Carolina 28025. There, Chem-Tex uses products that

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844
ELECTRONICALLY FILED - 2024 Dec 12 11:51 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the manufacture of chemicals for textile, paper, and petroleum extraction industries. As part of its processes, the Chem-Tex facility discharges industrial wastewater contaminated with products that contain or degrade to these PFAS to the Rocky River Regional WWTP. The Rocky River Regional WWTP cannot remove Chem-Tex's PFAS, which it discharges to the Rocky River upstream of the Great Pee Dee River and Plaintiff's water intake. Chem-Tex's PFAS resist environmental degradation, flow downstream from the Great Pee Dee River, and thereby contaminate Plaintiff's properties and its water source.

25.    Defendant **Domtar Paper Company, LLC ("Domtar")** is a Delaware limited liability company that does business in South Carolina. Domtar owns and/or operates the Marlboro Mill, located at 585 Willamette Rd, Bennettsville, SC 29512. There, it uses products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the manufacture of certain paper products. As part of its processes, the Marlboro Mill directly discharges industrial wastewater contaminated with products that contain or degrade to these PFAS into the Great Pee Dee River upstream of Plaintiff's water intake. Domtar's PFAS resist environmental degradation, flow downstream from the Great Pee Dee River, and thereby contaminate Plaintiff's properties and its water source.

26.    Defendant **Elevate Textiles, Inc. ("Elevate")** is a Delaware corporation authorized to do business in South Carolina. Elevate owns and operates an industrial facility located at 740 Old Cheraw Highway, Rockingham, NC 28379 ("Richmond Plant"), which was previously owned and operated by Defendant Burlington. Throughout the facility's operation, both Burlington and Elevate used, and Elevate continues to use, products that contain or degrade to PFOA, PFOS, PFHxs, PFNA, PFBS, and/or GenX Chemicals. As part of their processes, Burlington and Elevate

9

discharged, and Elevate continues to discharge, industrial wastewater contaminated with products that contain or degrade to these PFAS from the Richmond Plant to Hitchcock Creek upstream of Great Pee Dee River. The Richmond Plant does not remove Defendants' PFAS, and it discharged and continues to discharge their PFAS into the Great Pee Dee River upstream of Plaintiff's water intake. Defendants' PFAS resist environmental degradation, flow downstream from the Great Pee Dee River, and thereby contaminate Plaintiff's properties and its water source.

27.     Defendant **J.P. Stevens & Company, Inc.** was a Delaware corporation authorized to do business in the State of South Carolina until 1999. J.P. Stevens & Company, Inc. and its predecessors, successors, assigns, and/or responsible parties are collectively referenced as **"JPS."** From 1946 to 1986 or 1987, JPS operated the Delta Mills industrial facility located at or around 4351 Brickyard Road, Wallace, South Carolina 29596. JPS transferred the Delta Mills facility to Defendant **Delta Mills, Inc.,** who owned and operated the facility from 1986 or 1987 to 2006. Delta Mills, Inc. was a Delaware corporation with its principal place of business located at 700 North Woods Drive, Fountain Inn, South Carolina 29644. Delta Mills, Inc. and its predecessors, successors, assigns, and/or responsible parties are collectively referenced as **"Delta Mills."** Over the course of the Delta Mills facility operations, Defendants JPS and Delta Mills used products that contain or degrade to PFOA, PFOS, PFNA, PFHxS, PFBS, and/or GenX Chemicals in the manufacture of textile products. As part of their processes, JPS and Delta Mills discharged industrial wastewater contaminated with these PFAS from the facility's own WWTP to the Great Pee Dee River upstream of Plaintiff's water intake. JPS and Delta Mills also created wastewater lagoons on the facility property, which were contaminated with high levels of these PFAS that accumulated over decades. JPS's and Delta Mills' PFAS continually overflow and/or migrate to the Great Pee Dee River upstream of Plaintiff's water intake. JPS's and Delta Mills' PFAS resist

10

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844
ELECTRONICALLY FILED - 2024 Dec 12 11:51 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844
ELECTRONICALLY FILED - 2024 Dec 12 11:51 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

environmental degradation, flow downstream from the Great Pee Dee River, and thereby contaminate Plaintiff's properties and its water source.

28.    Defendant **Marcal Cordova LLC ("Marcal")** is a Delaware corporation that owns and operates an industrial facility located at 126 1st Street, Cordova, North Carolina 28330. There, Marcal uses products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the manufacture of paper products. As part of its processes, the Marcal facility discharges industrial wastewater contaminated with products that contain or degrade to these PFAS to the Rockingham WWTP. The Rockingham WWTP cannot remove Marcal's PFAS, which it discharges to the Great Pee Dee River upstream of Plaintiff's water intake. Marcal's PFAS resist environmental degradation, flow downstream from the Great Pee Dee River, and thereby contaminate Plaintiff's properties and its water source at Pee Dee Regional SWTP.

29.    Defendants **Mohawk Industries, Inc.** and **Aladdin Manufacturing Corporation** are Delaware corporations authorized to do business in the State of South Carolina (collectively **"Mohawk"**). Mohawk owned Oak River Mill located at 2118 Marlboro Road, Blenheim, South Carolina 29516, which Mohawk operated until its closing in October 2022. For nearly 60 years, Mohawk used products that contain or degrade to PFOA, PFOS, PFHxs, PFNA, PFBS, and/or GenX Chemicals in the manufacture of carpet products at Oak River Mill. As part of its processes, Oak River Mill discharged industrial wastewater contaminated with products that contain or degrade to these PFAS directly into the Great Pee Dee River upstream of Plaintiff's water intake. Oak River Mill also utilized wastewater lagoons contaminated with high levels of these PFAS and/or their precursors on the border of the Great Pee Dee River. These lagoons currently and continually overflow and/or release PFAS-contaminated wastewater into the Great Pee Dee River upstream of Plaintiff's water intake. PFAS and/or their precursors from both Mohawk's legacy

discharges and continuing lagoon discharges resist environmental degradation, flow downstream from the Great Pee Dee River, and thereby contaminate Plaintiff's properties and its water source.

30.      Defendants **Waste Connections, Inc.** and **Waste Connections of North Carolina, Inc.** (collectively **"WC"**) are Delaware corporations that own and operate the Anson Landfill, located at 375 Dozer Drive, Polkton, North Carolina 28135. WC discharges wastewater from the landfill, which contains significant amounts of PFOA, PFOS, PFHxs, PFNA, PFBS, GenX Chemicals, and/or their precursors, to the Anson County Regional WWTP. The Anson County Regional WWTP cannot remove these PFAS from WC's wastewater before the WWTP discharges WC's PFAS into the Great Pee Dee River upstream of Plaintiff's water intake. WC's PFAS resist environmental degradation, flow downstream from the Great Pee Dee River, and thereby contaminate Plaintiff's properties and its water source.

## FACTUAL ALLEGATIONS

**I.      Background and Hazards of PFAS**

31.      PFAS are a large group of man-made chemicals that do not occur naturally in the environment. Due to their strong carbon-fluorine bonds, PFAS are extremely stable, repel both oil and water, and are resistant to heat and chemical reactions. As a result of these properties, PFAS have a wide variety of industrial, commercial, and consumer applications.

32.      The stable carbon-fluorine bonds that make PFAS pervasive in industrial, commercial, and consumer products also result in their persistence in the environment. They are colloquially termed "forever chemicals," as terminal PFAS have no known environmental breakdown mechanism, are readily absorbed into biota, and tend to bioaccumulate with repeated exposure.

33.      There are both polymer and non-polymer PFAS. Non-polymer PFAS include well-known substances like PFOA, PFOS, PFHxS, PFNA, PFBS, and HFPO-DA (a/k/a GenX

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844
ELECTRONICALLY FILED - 2024 Dec 12 11:51 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844
ELECTRONICALLY FILED - 2024 Dec 12 11:51 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

Chemicals). Polymer PFAS include fluoropolymers and side-chain fluorinated polymers that are often the active chemistry in PFAS products utilized by Defendants.

34.     There are also both terminal PFAS and their precursors. Precursors may undergo environmental degradation that ultimately results in the formation of terminal PFAS—meaning no further degradation occurs under normal environmental conditions. PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals are all terminal PFAS.

35.     Both polymer and non-polymer PFAS can degrade to terminal PFAS. Generally, terminal PFAS are present in or otherwise form from PFAS products via three primary routes: (1) as a direct byproduct of the manufacturing process; (2) the degradation of precursor PFAS that are byproducts of the manufacturing process; and/or (3) the degradation of polymer PFAS into terminal PFAS and precursor PFAS.

36.     PFAS leach from soil to groundwater and are highly mobile and water soluble, making groundwater and surface water particularly vulnerable to contamination. Therefore, a major source of human exposure to PFAS is through ingestion of contaminated drinking water. Exposure is dose-additive, meaning that exposure to low levels of multiple PFAS, which individually would pose little or no risk, can result in a combined dose capable of causing adverse health effects.

37.     While there are thousands of different PFAS chemicals, current scientific evidence shows that harmful health effects can result from consuming drinking water with any level of PFOA or PFOS, and at certain aggregate levels of PFHxS, PFNA, PFBS, and GenX Chemicals. Depending on the type of PFAS, negative health effects include increased risk of certain types of cancer and adverse impacts on fetal growth and development; reproduction; and on liver, thyroid, immune, cardiovascular, and/or nervous system function.

13

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844
ELECTRONICALLY FILED - 2024 Dec 12 11:51 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

38.     PFOA and PFOS have been the most widely used PFAS, and they are the most studied by regulators and the scientific community. While some industries voluntarily phased out products containing PFOA and PFOS by 2015, their limited use continues even in the United States. Due to their persistent nature, PFOA and PFOS remain in the environment from decades of legacy industrial use.

39.     Products based on PFAS consisting of shorter fluorinated carbon chains were developed to replace PFOA and PFOS, and they are now used in industrial applications to confer similar properties and characteristics. These "short-chain" PFAS are still bioaccumulative and environmentally persistent, and some short-chain PFAS products nevertheless still contain PFOA and PFOS and their precursors. Terminal short-chain PFAS include PFBS and GenX Chemicals.

40.     Based on the science available in 2009, EPA published provisional drinking water health advisories for short-term exposure to PFOA and PFOS. U.S.E.P.A., *Provisional Health Advisories for Perfluorooctanoic Acid (PFOA) and Perfluorooctane Sulfonate (PFOS)* (Jan. 8, 2009), *available at* https://www.epa.gov/sites/default/files/2015-09/documents/pfoa-pfos-provisional.pdf. The advisory levels were 400 parts per trillion ("ppt") for PFOA and 200 ppt for PFOS. In the same publication, EPA reported that it conducted sampling of public drinking water in Alabama communities, finding PFOA and PFOS levels lower than 40 ppt. It explained, "Based on its current understanding, EPA believes these levels are not of concern and residents may rely upon public water systems." *Id.*

41.     On May 16, 2016, due to the evolution of science on the health effects of PFOA and PFOS, EPA published lifetime health advisory levels for each chemical in drinking water. Lifetime Health Advisories and Health Effects Support Documents for Perfluorooctanoic Acid and Perfluorooctane Sulfonate, 81 Fed. Reg. 33250 (May 25, 2016). Superseding the 2009 provisional

14

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844
ELECTRONICALLY FILED - 2024 Dec 12 11:51 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

levels, the 2016 levels for PFOA and PFOS were 70 ppt, independently or in the aggregate. EPA explained that its new health advisories "identify the concentration of PFOA and PFOS in drinking water at or below which adverse health effects are not anticipated to occur over a lifetime of exposure."

42.    EPA's 2016 Health Advisories were based on peer-reviewed studies of the effects of PFOA and PFOS on laboratory animals and epidemiological studies of human populations exposed to PFOA and PFOS. These studies indicated that exposure to PFOA and PFOS over certain levels may result in adverse health effects, including developmental defects to fetuses, cancer (testicular, kidney), liver effects, immune effects, thyroid effects, and other adverse effects. But based on its review of the science, EPA stated that its analysis indicated exposure to PFOA and PFOS at or below health advisory levels "will not result in adverse health effects (including cancer and non-cancer) to the general population over a lifetime (or any shorter period) of exposure to these chemicals." *Id.*

43.    On June 15, 2022, EPA again updated health advisory levels for PFOA and PFOS on an interim basis, which replaced the 2016 advisory levels. Lifetime Drinking Water Health Advisories for Four Perfluoroalkyl Substances, 87 Fed. Reg. 36848 (June 21, 2022). EPA explained that updated human epidemiological data indicated "that the level at which negative health effects could occur are much lower than previously understood when the agency issued its 2016 health advisories for PFOA and PFOS"—finding "associations between PFOA and/or PFOS exposure and effects on the immune system, the cardiovascular system, development (e.g., decreased birth weight), and cancer." *Id.* Concerned with the public health implications of its data, EPA issued interim levels pending determination of maximum contaminant levels and maximum contaminant level goals. The interim levels were 0.004 ppt for PFOA and 0.02 ppt for PFOS.

44. Simultaneously, EPA also issued health advisories for the first time covering PFBS and GenX Chemicals. EPA reported that "GenX Chemicals have been linked to health effects on the liver, the kidney, the immune system, and developmental effects, as well as cancer." *Id.* For PFBS, it noted studies indicating health effects on the thyroid, reproductive system, development, and kidney. Based on its 2021 toxicity studies for these chemicals, EPA released final health advisories for each: GenX Chemicals at 10 ppt and PFBS at 2,000 ppt.

45. In March of 2023, EPA issued proposed maximum contaminant level ("MCL")s and maximum contaminant level goal ("MCLG")s for PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals. PFAS Nat'l Primary Drinking Water Regulation Rulemaking, 88 Fed. Reg. 18638 (Mar. 29, 2023) (to be codified at 40 C.F.R. pt. 141, 142). An MCLG is the maximum level of a contaminant in drinking water at which no known or anticipated adverse effect on the health of persons would occur, allowing an adequate margin of safety. An MCL is the maximum allowable level of a contaminant that may be delivered to any user of a public water system and is based on the feasibility of existing technology to detect PFAS at a threshold level.

46. At that time, EPA announced that, "[f]ollowing a systematic review of available human epidemiological and animal toxicity studies, EPA has determined that PFOA and PFOS are likely to cause cancer (e.g., kidney and liver cancer) and that there is no dose below which either chemical is considered safe." *Id.* Therefore, it proposed MCLG levels for both chemicals at zero ppt. Enforceable MCL levels for each chemical were proposed at 4 ppt. According to EPA, "[a]ny exceedance of this limit requires action to protect public health, regardless of any mixture in which they are found." *Id.*

47. Due to their toxic effects, dose additivity, and presence in drinking water, EPA proposed a hazard index approach covering mixtures of PFHxS, PFNA, PFBS, and GenX

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844
ELECTRONICALLY FILED - 2024 Dec 12 11:51 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

Chemicals. The hazard index is the sum of each PFAS's "hazard quotient." Hazard quotients are first calculated by dividing the applicable PFAS's "exposure metric" (i.e., concentration in drinking water) by its "health reference value" (PFHxS: 9 ppt; GenX Chemicals: 10 ppt; PFNA: 10 ppt; PFBS: 2,000 ppt). If the sum of each's hazard quotient is below 1.0, then it "represents a level at which no known or anticipated adverse effects on the health of persons is expected to occur and which allows for an adequate margin of safety." *Id.* If greater than 1.0, then "potential risk is indicated." *Id.*

48.    EPA stated that, once its proposed MCLs became final, it would "save thousands of lives and prevent tens of thousands of avoidable illnesses." U.S.E.P.A., *EPA Releases Annual Report Showing Steady Progress to Protect Communities from PFAS Pollution* (Dec. 14, 2023), *available at* https://www.epa.gov/newsreleases/epa-releases-annual-report-showing-steady-progress-protect-communities-pfas-pollution.

49.    EPA finalized its proposed MCLs and MCLGs on April 10, 2024. U.S.E.P.A., *PFAS Nat'l Primary Drinking Water Regulation Rulemaking* (Apr. 10, 2024), *available at* https://www.epa.gov/system/files/documents/2024-04/pfas-npdwr_prepubfederalregisternotice_4.8.24.pdf (pre-publication version). In accompanying publications, EPA declared, "The science is clear: exposure to these six PFAS is linked to significant health risks" that include "certain cancers and heart impacts in adults, and immune and developmental impacts in infants and children." U.S.E.P.A., *Frequently Asked Questions and Answers: Final PFAS Nat'l Drinking Water Regulation* (Apr. 10, 2024); *see also* U.S.E.P.A., *Final PFAS Nat'l Drinking Water Regulation Landing Page*, http://www.epa.gov/sdwa/and-polyfluoroalkyl-substances-pfas (providing links to EPA PFAS regulation publications).

17

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844
ELECTRONICALLY FILED - 2024 Dec 12 11:51 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844
ELECTRONICALLY FILED - 2024 Dec 12 11:51 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

50.     The final regulation solidifies MCLs of 4.0 ppt for PFOA and PFOS and 10.0 ppt for PFNA, PFHxS, and GenX Chemicals, including a Hazard Index that covers mixtures of PFBS with PFNA, PFHxS, and GenX Chemicals. It also enshrines MCLGs of zero ppt for PFOA and PFOS, which EPA states "reflects the latest science showing that there is no level of exposure to these two PFAS without risk of health impacts." U.S.E.P.A., *Presentation: Overview EPA PFAS NPDWR* (Apr. 10, 2024). According to EPA, "[t]he more you reduce your exposure to PFAS, the more you reduce your risk." U.S.E.P.A., *Frequently Asked Questions and Answers: Final PFAS Nat'l Drinking Water Regulation* (Apr. 10, 2024).

51.     EPA's final regulations mandate several new obligations regarding PFAS, including the implementation of solutions to reduce regulated PFAS concentrations in the drinking water that Plaintiff distributes, maintenance of ongoing compliance monitoring, and informing the public of PFAS levels in the water and of any violations. By 2027, Plaintiff must begin conducting and reporting regular PFAS monitoring, and by 2029, Plaintiff must comply with all MCLs. Plaintiff has conducted a diligent investigation into this issue, is seeking to address it in an expedited manner, and for this reason seeks prompt relief from the Court.

## II.     Contamination of the Great Pee Dee River with PFAS

52.     Plaintiff's water intake rests on the Great Pee Dee River in Florence, South Carolina, which draws water from the river for treatment at the Pee Dee Regional SWTP before distribution to customers.

53.     Defendants' industrial facilities, and/or their applicable WWTPs, operate along the Great Pee Dee River or one of its tributaries upstream of Plaintiff's water intake.

54.     PFAS sampling of the Great Pee Dee River upstream of Plaintiff's water intake confirms the presence of PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals throughout the river. These PFAS flow downstream and contaminate the water at Plaintiff's water intake at

18

concentrations exceeding EPA's MCLs and MCLGs. Indeed, sampling at Plaintiff's water intake confirms the presence of PFOA and PFOS at concentrations higher than what EPA deems unsafe for consumption. Defendants are the source.

55.     Defendants are, or were, owners and operators of manufacturing plants and waste disposal facilities upstream of Plaintiff's water intake. In their industrial processes, Defendants utilize, or utilized, products that contain or degrade to PFOS, PFOA, PFHxS, PFNA, PFBS, and/or GenX Chemicals. Defendants' industrial processes generate industrial wastewater containing these PFAS, which Defendants ultimately discharge to surface waters upstream of Plaintiff's water intake.

56.     Defendants' PFAS and their precursors flow downstream to Plaintiff's water intake, damaging Plaintiff's property and contaminating its water source.

57.     The Pee Dee Regional SWTP utilizes conventional water treatment technologies to treat raw water, none of which remove PFAS. Instead, the Pee Dee Regional SWTP requires new water treatment technologies to do so.

58.     All Defendants knew or should have known that conventional water treatment technologies used by direct discharger Defendants and WWTPs cannot remove PFAS from wastewater. All Defendants also knew or should have known that their treated wastewater contaminates surface waters and the water Plaintiff draws for its customers.

**III.     Defendants have harmed Plaintiff and Plaintiff's community.**

59.     For decades and unknown to Plaintiff, Defendants have discharged PFOA, PFOS, PFHxS, PFNA, PFBS, GenX Chemicals, and their precursors into the Great Pee Dee River, which has caused, and continues to cause, contamination of these waters with PFAS chemicals exceeding EPA's health advisories, MCLGs, and MCLs. Indeed, absent new treatment technologies, Plaintiff

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844
ELECTRONICALLY FILED - 2024 Dec 12 11:51 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

cannot use its properties and property rights to provide water that is either free of all PFOA and PFOS, or compliant with EPA's MCLs.

60.     Defendants' conduct has proximately caused the contamination of the Greet Pee Dee River; and of Plaintiff's land, its SWTP, and its water distribution system with PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals—including PFOA and PFOS at concentrations above EPA's MCLGs and MCLs.

61.     Defendants, individually and acting through their employees and agents, and in concert with each other, have knowingly, intentionally, recklessly, or negligently engaged in conduct or omissions that proximately caused unreasonable interference with Plaintiff's right to use and enjoy its properties, its right to use the Great Pee Dee River, and has caused Plaintiff additional past, present, and future injury to property.

62.     Despite knowing that there is no safe dose for PFOA or PFOS, and that PFHxS, PFNA, PFBS, and GenX Chemicals are hazardous to human health, Defendants, directly or indirectly, discharged industrial wastewater contaminated with these chemicals into the Great Pee Dee River, which they knew or should have known contaminated Plaintiff's properties.

## FIRST CAUSE OF ACTION

### Private Nuisance

63.     Plaintiff incorporates all prior allegations by reference as if fully set forth herein.

64.     Plaintiff is a municipal corporation engaged in constructing, operating, maintaining, improving, and extending a water distribution system for residents of Florence County. It uses its properties for those purposes, including the withdrawal of raw water from the Great Pee Dee River, the treatment of raw water, and the distribution of treated water to customers in Florence County.

20

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844
ELECTRONICALLY FILED - 2024 Dec 12 11:51 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844
ELECTRONICALLY FILED - 2024 Dec 12 11:51 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

65. Plaintiff owns riparian land abutting the Great Pee Dee River, and Plaintiff has a property right in the reasonable use of these waters, including for the provision of water to its customers.

66. Through the conduct described herein, Defendants created, contributed to, and/or maintained a nuisance; that is, the contamination of the Great Pee Dee River, with PFOA, PFOS, PFHxS, PFNA, PFBS, GenX Chemicals, and their precursors at concentrations exceeding those EPA deems unsafe for consumption.

67. Due to Defendants' contamination, Plaintiff cannot provide water to its customers without PFAS, or even at PFAS concentrations that comply with EPA's MCLs, absent new water treatment technology.

68. Defendants' contamination caused, contributed to, and/or maintains a nuisance that substantially and unreasonably interferes with Plaintiff's use and enjoyment of its properties, interferes with Plaintiff's properties and its riparian rights, damages Plaintiff's properties, and causes Plaintiff additional inconvenience, annoyance, and harm.

69. Defendants, individually and acting through their employees and agents, and in concert with each other, have knowingly, intentionally, recklessly, and/or negligently engaged in conduct that unreasonably interferes with Plaintiff's property rights.

70. As a direct and proximate result of Defendants' acts and omissions, Plaintiff has suffered, now suffers, and will continue to suffer damages related to Defendants' contamination of the Great Pee Dee River and Plaintiff's property, including loss in value, the cost of removing Defendants' PFAS, and other damages to be proved at trial.

71. In addition to its claims for damages, Plaintiff is entitled to injunctive and/or equitable relief to abate the nuisance created, contributed to, and maintained by Defendants.

21

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844
ELECTRONICALLY FILED - 2024 Dec 12 11:51 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

72.     The ongoing contamination of the Great Pee Dee River and Plaintiff's properties constitutes a continuing irreparable injury for which there is no adequate remedy at law. Plaintiff requests that this Court issue an order and decree requiring Defendants to fund the measures necessary to prevent these PFAS from continuing to interfere with Plaintiff's use and enjoyment of its land and its riparian use of the Great Pee Dee River to supply potable water to its customers.

73.     Defendants' interference with Plaintiff's use of its properties can be abated by funding the acquisition, installation, and operation of new water treatment technology at Plaintiff's SWTP to remove PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemical contamination.

74.     Defendants are jointly and severally liable to Plaintiff for all damages resulting from this nuisance, and the costs of its abatement, in an amount to be determined at trial, as well as punitive damages in an amount to be determined at trial, and costs and attorneys' fees.

## SECOND CAUSE OF ACTION

### Public Nuisance

75.     Plaintiff incorporates all prior allegations by reference as if fully set forth herein.

76.     Plaintiff is a municipal corporation engaged in the constructing, operating, maintaining, improving, and extending a water distribution system for residents of Florence County. It uses its properties for those purposes, including the withdrawal of raw water from the Great Pee Dee River, the treatment of raw water, and the distribution of treated water to customers in Florence County.

77.     Plaintiff's customers use the water Plaintiff provides for many purposes, including drinking, cooking, bathing, cleaning, washing, and watering plants and gardens.

78.     Plaintiff's customers, and indeed all residents in Plaintiff's community, have a right to potable water that is reasonably pure and safe for their use—and thus free from contamination

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844
ELECTRONICALLY FILED - 2024 Dec 12 11:51 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

by Defendants' PFOA, PFOS, PFNA, PFHxS, PFBS, and GenX Chemicals. Defendants' contamination unreasonably interferes with, disrupts, and threatens public health, safety, and order. Indeed, EPA makes clear that there is no safe dose for consuming PFOA and PFOS.

79.    Plaintiff has sustained special injuries as a result of Defendants' public nuisance, including but not limited to, the lost use of its properties; the inability to provide potable water to customers without concentrations of PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals deemed unsafe by EPA; expenses associated with future acquisition, installation, and operation of required treatment technologies to remove unsafe concentrations of these PFAS from water; expenses incurred in discovering and identifying sources of Defendants' contamination; interference with Plaintiff's riparian right to use the Great Pee Dee River; interference with the use of Plaintiff's SWTP and water distribution system; and lost revenue.

80.    As a direct and proximate result of Defendants' acts and omissions, Plaintiff has suffered, now suffers, and will continue to suffer special injury and damages related to Defendants' contamination of the Great Pee Dee River and Plaintiff's properties.

81.    Defendants, individually and acting through their employees and agents, and in concert with each other, have knowingly, intentionally, recklessly, and/or negligently engaged in conduct that unreasonably interferes with Plaintiff's property rights and endangers the health of Plaintiff's customers, consumers of Plaintiff's drinking water, and Plaintiff's community.

82.    As a result of the nuisance caused by Defendants, Plaintiff has suffered, and will continue to suffer, losses resulting from injury to its properties, including loss in value, the cost of removing Defendants' PFAS, and other damages to be proved at trial.

83.    In addition to its claims for damages, Plaintiff is entitled to injunctive and/or equitable relief to abate the nuisance created, contributed to, and maintained by Defendants.

84. Defendants' ongoing contamination constitutes a continuing threat to public health, safety, and order, and it constitutes irreparable injury for which there is no adequate remedy at law. Plaintiff requests that this Court issue an order and decree requiring Defendants to fund the measures necessary to prevent these PFAS from continuing to threaten public health and safety and ensure that Plaintiff's customers and residents of Plaintiff's community receive water free from PFAS.

85. Defendants' contamination of potable water with unsafe concentrations of PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals can be abated by requiring Defendants to fund the acquisition, installation, and operation of new water treatment technology at Plaintiff's SWTP to remove PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemical contamination.

86. Defendants are jointly and severally liable to Plaintiff for all damages resulting from this nuisance, and the costs of abatement, in an amount to be determined at trial, as well as punitive damages in an amount to be determined at trial, and costs and attorneys' fees.

## THIRD CAUSE OF ACTION

### Trespass

87. Plaintiff incorporates all prior allegations by reference as if fully set forth herein.

88. Plaintiff owns, possesses, and actively exercises its right to use its land, SWTP, and related buildings, improvements, and equipment that make up its water distribution systems.

89. Defendants Americhem, Auria, BFI, Carvana, Cascades, Chem-Tex, Marcal, RSI, and WC intentionally discharged and continue to discharge PFAS to their applicable WWTPs, respectively, notwithstanding that they knew and/or reasonably should have known that:

(a) these WWTPs cannot remove their PFAS from wastewater before discharging to surface waters upstream of Plaintiff's water intake on the Great Pee Dee River;

24

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844
ELECTRONICALLY FILED - 2024 Dec 12 11:51 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844
ELECTRONICALLY FILED - 2024 Dec 12 11:51 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

(b)    Plaintiff draws water from the Great Pee Dee River for the provision of potable water to its customers;

(c)    water Plaintiff draws from the Great Pee Dee River is contaminated with the PFAS the Defendants discharge to these WWTPs; and, thereby,

(d)    water contaminated with high concentrations of these Defendants' PFAS invades Plaintiff's properties.

90.    Defendants Burlington, Domtar, Delta Mills, Elevate, JPS, and Mohawk intentionally discharged and continue to discharge PFAS to the Great Pee Dee River, notwithstanding that these Defendants knew and/or reasonably should have known that:

(a)    Plaintiff draws water from the Great Pee Dee River for the provision of drinking water to its customers;

(b)    water Plaintiff draws from the Great Pee Dee River is contaminated with the PFAS they discharge to the River; and, thereby,

(c) water contaminated with high concentrations of Defendants' PFAS invades Plaintiff's properties.

91.    Plaintiff has not consented to, and does not consent to, the invasion of its properties by water contaminated with PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals at concentrations exceeding EPA's MCLs and MCLGs and beyond what EPA deems unsafe for consumption.

92.    Defendants' invasions of Plaintiff's properties are continuing and ongoing, and each separate invasion of PFAS-contaminated water constitutes a new trespass each time Plaintiff's water pumps are active.

93.    Defendants Americhem, Auria, BFI, Carvana, Cascades, Chem-Tex, Marcal, RSI, and WC intend that, while using PFAS in their industrial processes, PFAS-containing wastewater generated by those processes be discharged to their applicable WWTPs, respectively. Defendants Burlington, Domtar, Delta Mills, Elevate, JPS, and Mohawk intend and/or intended that, while using PFAS in their industrial processes, PFAS-containing wastewater be discharged to the Great Pee Dee River. Defendants' conduct is wanton, willful, and in reckless disregard of Plaintiff's property and riparian rights.

94.    Defendants' conduct is the actual and proximate cause of the invasion of PFAS-contaminated water into Plaintiff's properties, including its land, SWTP, and related buildings, improvements, and equipment that make up its water distribution systems. The damage to Plaintiff's properties is the direct and proximate result of Defendants' intentional conduct.

95.    As a direct, proximate, and foreseeable result of Defendants' trespasses, Plaintiff has suffered, now suffers, and will continue to suffer invasion of its property rights and damages, including loss in value, the cost of removing Defendants' PFAS, and other damages to be proved at trial.

96.    Defendants' ongoing trespasses can be abated by requiring Defendants to fund the acquisition, installation, and operation of new water treatment technology at Plaintiff's SWTP to remove PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemical contamination.

## FOURTH CAUSE OF ACTION

### Negligence, Gross Negligence, and/or Recklessness

97.    Plaintiff incorporates all prior allegations by reference as if fully set forth herein.

98.    Defendants have a duty to use due care in the handling, use, and disposal of products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to avoid causing an unreasonable risk of harm to others, which includes preventing the direct

26

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844
ELECTRONICALLY FILED - 2024 Dec 12 11:51 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

and/or indirect discharge of these PFAS into surface waters upstream of Plaintiff's SWTP, thereby interfering with Plaintiff's property rights and injuring Plaintiff's property.

99.    Defendants knew or should have known that the PFAS they discharged were environmentally persistent, bioaccumulative, and dose-additive; that conventional wastewater treatment technologies utilized by themselves or their WWTPs could not remove their PFAS; and that surface waters—including the Great Pee Dee River—were vulnerable to the contamination that has taken and now takes place.

100.    Defendants nonetheless negligently, recklessly, wantonly, and/or willfully breached their duty in causing products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to escape their premises and contaminate the Great Pee Dee River, thereby interfering with Plaintiff's property rights and injuring Plaintiff's properties.

101.    Additionally, Defendant Burlington had a duty to use due care in the manufacturing, handling, control, disposal, labeling, and instructing for the use and disposal of biosolid products that contain PFOA, PFOS, PFHxS, PFNA, PFBS, GenX Chemicals, and/or their precursors to ensure the proper use of these products and prevent contamination of surface waters.

102.    By continually suppling biosolid products without providing warnings, proper instructions, or direction on the dangers of these PFAS and their properties, or otherwise preventing their contamination of surface waters, Burlington negligently, recklessly, wantonly, and/or willfully created the risk that its PFAS would contaminate the Great Pee Dee River, thereby interfering with Plaintiff's property rights and injuring Plaintiff's property.

103.    Because Burlington created the risk of harm from PFAS-contaminated water, it had a duty to ensure that users of its biosolid products did not allow PFOA, PFOS, PFHxS, PFNA, PFBS, GenX Chemicals, and/or their precursors to escape its users' premises and contaminate the

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844
ELECTRONICALLY FILED - 2024 Dec 12 11:51 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

Great Pee Dee River. Burlington also had a duty to warn others, including Plaintiff, of the danger presented by water contaminated with its PFAS.

104.    Burlington negligently, recklessly, wantonly, and willfully breached its duty by failing to prevent the discharge of these PFAS from its biosolid products into the Great Pee Dee River, thereby interfering with Plaintiff's property rights and injuring Plaintiff's property, and by failing to warn Plaintiff of the danger presented by water contaminated by its PFAS.

105.    As a direct, proximate, and foreseeable result of Defendants' conduct, practices, actions, omissions, and inactions, Plaintiff has suffered, and will continue to suffer, losses resulting from injury to its properties, including but not limited to loss in value; the cost of removing Defendants' PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals; future costs of acquiring, installing, and operating adequate water treatment technologies; and other damages to be proved at trial.

106.    Defendants are jointly and severally liable to Plaintiff for all damages resulting from their conduct, practices, actions, omissions, and inactions, in an amount to be determined at trial, as well as punitive damages in an amount to be determined at trial, and costs and attorneys' fees.

**FIFTH CAUSE OF ACTION**
**Strict Products Liability – Ultrahazardous Activity**
**(Burlington)**

107.    Plaintiff incorporates the allegations of the preceding paragraphs as if fully set forth herein.

108.    PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals are unreasonably dangerous to humans and the environment.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844
ELECTRONICALLY FILED - 2024 Dec 12 11:51 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

109. Burlington manufactured, handled, sold, and distributed biosolid products containing or degrading to these PFAS chemicals to agricultural and/or other users, knowing that these PFAS chemicals have been, and are presently, discharged to surface waters, and thereby enter and contaminate Plaintiff's water source and Plaintiff's properties.

110. Burlington knew that these PFAS chemicals were environmentally persistent, bioaccumulative, toxic, and dose-additive; and Burlington knew that there was no safe dose of PFOA or PFOS.

111. Burlington knew or expected that these hazardous PFAS chemicals that it was manufacturing, handling, selling, and distributing would reach Plaintiff's water source and Plaintiff's properties while in essentially the same condition as when they left Burlington's hands.

112. Burlington manufactured, handled, sold, and distributed its biosolid products that were dangerous and unsafe for the uses and purposes for which they were intended, despite knowing the consequences of the use and of, and exposure to, its products.

113. Burlington and/or its agents were responsible for the unreasonably dangerous products that it sold and distributed, and Burlington and received financial benefits from their sales and distribution.

114. As a direct and proximate result of Burlington's ultrahazardous activities, its PFOA, PFOS, PFHxS, PFNA, PFBS, GenX Chemicals, and/or their precursors have damaged Plaintiff's water source and Plaintiff's properties, and Plaintiff is unable to provide potable water free from contamination with these chemicals.

115. As a direct, proximate, and foreseeable result of Burlington's ultrahazardous activities, Plaintiff has suffered, and will continue to suffer, losses resulting from injury to its

29

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844
ELECTRONICALLY FILED - 2024 Dec 12 11:51 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

properties, including loss in value, the cost of removing Burlington's PFAS, future costs of installing adequate water treatment technologies, and other damages to be proved at trial.

### SIXTH CAUSE OF ACTION
### Strict Products Liability – Design Defect
### (Burlington)

116.    Plaintiff incorporates the allegations of the preceding paragraphs as if fully set forth herein.

117.    PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals are unreasonably dangerous to humans and the environment.

118.    Burlington knew that agricultural users would purchase and use its biosolid products containing these PFAS and their precursors without inspection for defects.

119.    Burlington's biosolid products containing or degrading to these PFAS chemicals have been, and are presently, discharged to surface waters, and thereby enter and contaminate Plaintiff's water source and Plaintiff's properties.

120.    Burlington's biosolid products containing these PFAS and their precursors were used in a reasonably foreseeable manner and without substantial change in their condition.

121.    Burlington knew that the use of its biosolid products in their intended manner would result in PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals damaging Plaintiff's water source and Plaintiff's properties.

122.    Burlington's biosolid products were and are defective in design and unreasonably dangerous for their intended use because:

(a)     PFAS resist environmental degradation;

(b)     PFAS leach from soil to groundwater, are highly mobile and water soluble, making groundwater and surface water vulnerable to contamination;

(c)     Applying PFAS-contaminated biosolids to soil near surface waters exposes surface waters to PFAS contamination via overland and groundwater flow;

(d)     PFAS contamination in drinking water poses significant threats to public health and property; indeed, there is no safe dose of PFOA or PFOS in drinking water;

(e)     Burlington failed to conduct and/or failed to disclose reasonable, appropriate, and/or adequate scientific studies to evaluate the environmental fate and transport and potential human health effects of PFAS; and

(f)     There are and were safe or safer feasible alternatives to PFAS-contaminated biosolids that Burlington could have employed.

123.     Burlington's products containing or degrading to these PFAS chemicals were and are dangerous beyond that which was and is contemplated by the ordinary consumer.

124.     The foreseeable risk of harm to public health and property posed by Burlington's products containing these PFAS outweighed and outweigh the cost to Burlington of reducing or eliminating those risks.

125.     A reasonable product manufacturer knew or should have known of the significant dangers posed by Burlington's products containing PFOA, PFOS, PFHxS, PFNA, PFBS, GenX Chemicals, and/or their precursors.

126.     As a direct and proximate result of the sale and application of Burlington's defective and unsafe biosolid products, these PFAS have contaminated Plaintiff's water source and Plaintiff's properties, and Plaintiff is unable to provide potable water free from Burlington's PFAS.

127.     As a direct, proximate, and foreseeable result of the sale and application of Burlington's defective and unsafe biosolid products, Plaintiff has suffered, and will continue to

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844
ELECTRONICALLY FILED - 2024 Dec 12 11:51 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

suffer, losses resulting from injury to its properties, including loss in value, the cost of removing Burlington's PFAS, future costs of installing adequate water treatment technologies, and other damages to be proved at trial.

## SEVENTH CAUSE OF ACTION
### Strict Products Liability – Failure to Warn
### (Burlington)

128.    Plaintiff incorporates the allegations of the preceding paragraphs as if fully set forth herein.

129.    Burlington manufactured, formulated, promoted, marketed, and/or distributed biosolid products containing PFOA, PFOS, PFHxS, PFNA, PFBS, GenX Chemicals, and/or their precursors.

130.    Burlington's biosolid products were used by agricultural users in a reasonably foreseeable manner and without substantial change in the condition of such products, and Burlington knew that agricultural users purchased and used its products without inspection for defects.

131.    Burlington knew or should have known that the use of its biosolid products would result in these PFAS being discharged to surface waters, and thereby entering and contaminating Plaintiff's water source and Plaintiff's properties.

132.    Burlington knew that these PFAS in its biosolid products were environmentally persistent and bioaccumulative, that use of its biosolids would cause PFAS to accumulate in soil and groundwater, and that its PFAS would infiltrate surface waters that Plaintiff relies on to supply potable water to the public—making Burlington's biosolid products unreasonably dangerous.

133.    Despite the known and/or foreseeable risk of contaminating potable water sources and Plaintiff's properties, Burlington failed to provide adequate warnings to its customers and other users or to take any other precautionary measures to mitigate those hazards.

32

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844
ELECTRONICALLY FILED - 2024 Dec 12 11:51 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844
ELECTRONICALLY FILED - 2024 Dec 12 11:51 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

134.    Burlington failed to describe such dangers or provide precautionary statements regarding such hazards, and it failed to provide instruction or direction on the proper use and disposal of products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the labeling of such products. As a result of these failures, Burlington's biosolid products were sold and distributed in an unreasonably dangerous and defective condition.

135.    As a direct and proximate result of Burlington's failure to warn of the dangers and hazards posed by its biosolid products, PFOA, PFOS, PFHxS, PFNA, PFBS, GenX Chemicals, and their precursors have damaged Plaintiff's water source and Plaintiff's properties, and Plaintiff is unable to provide potable water free from contamination with these chemicals.

136.    As a direct, proximate, and foreseeable result of Burlington's conduct, practices, actions, omissions, and inactions, Plaintiff has suffered, and will continue to suffer, losses resulting from injury to its properties, including loss in value, the cost of removing Burlington's PFAS, future costs of installing adequate water treatment technologies, and other damages to be proved at trial.

## EIGHTH CAUSE OF ACTION
### Breach of Implied Warranties
### (Burlington)

137.    Plaintiff incorporates the allegations of the preceding paragraphs as if fully set forth herein.

138.    Burlington manufactured, sold, and distributed its biosolid products to be used in the agricultural context.

139.    Burlington's biosolid products include PFOA, PFOS, PFHxS, PFNA, PFBS, GenX Chemicals, and/or their precursors, and Burlington knew or had reason to know that such biosolids were not fit for the known and particular uses on agricultural lands.

140. Burlington knew that agricultural users of its biosolid products would apply its biosolids to lands nearby or abutting surface waters in the Great Pee Dee River, causing Burlington's PFAS to infiltrate these surface waters.

141. Burlington knew that these PFAS chemicals are environmentally persistent, bioaccumulative, toxic, and dose-additive, and Burlington knew that there is no safe dose of PFOA or PFOS.

142. Burlington breached applicable implied warranties, and as a result, caused the contamination of Plaintiff's water source and Plaintiff's properties, and Plaintiff is unable to provide potable water free from Burlington's PFAS.

143. As a direct, proximate, and foreseeable result of Burlington's ultrahazardous activities, Plaintiff has suffered, and will continue to suffer, losses resulting from injury to its properties, including loss in value, the cost of removing Burlington's PFAS, future costs of installing adequate water treatment technologies, and other damages to be proved at trial. Plaintiff is entitled to damages in an amount that will address its damages caused by Burlington's breaches of implied warranties.

<b><u>PRAYER FOR RELIEF</u></b>

**WHEREFORE,** Plaintiff demands trial by jury, and respectfully requests that the Court grant the following relief:

(a) Enter a judgment and decree against all Defendants, jointly and severally, requiring them to abate the nuisance they have caused, created, and maintained;

(b) Enter a judgment and decree against all Defendants requiring them to abate their trespasses onto Plaintiff's properties;

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844
ELECTRONICALLY FILED - 2024 Dec 12 11:51 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

(c)     Enter a judgment and decree against all Defendants, jointly and severally, requiring them to remove their PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX chemicals from Plaintiff's water systems by funding the acquisition, installation, and operation of treatment technology capable of removing them;

(d)     Enter a judgment against all Defendants, jointly and severally, for past, present, and future compensatory damages in such amounts as the evidence shows Plaintiff to be justly entitled to recover, including interest and reasonable attorneys' fees and litigation expenses, and punitive damages, as applicable, in an amount sufficient to punish and penalize Defendants, and to deter them from repeating their wrongful conduct, and all costs; and

(e)     Award such other relief and further relief as this Court deems just, proper, and equitable.

Respectfully submitted,

/s/ John B. White. Jr.
John B. White, Jr. (S.C. Bar No. 5996)
Marghretta H. Shisko (S.C. Bar No. 100106)
Christopher R. Jones (S.C. Bar No. 101265)
Griffin L. Lynch (S.C. Bar No. 72518)
John B. White, Jr., P.A.
291 S. Pine Street
P.O. Box 2465 (29304)
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

December 12, 2024

35

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844
ELECTRONICALLY FILED - 2024 Dec 12 11:51 AM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STATE OF SOUTH CAROLINA  ) IN THE COURT OF COMMON PLEAS
           )
COUNTY OF FLORENCE   ) TWELFTH JUDICIAL CIRCUIT
           )
           )
CITY OF FLORENCE, SOUTH  ) C.A. No.: 2024-CP-21-02844
CAROLINA,       )
           )
      *Plaintiff,* )
           ) **CERTIFICATE OF SERVICE BY**
    v.      ) **CERTIFIED MAIL**
           )
ALADDIN MANUFACTURING  )
CORPORATION, *et al.*,    )
           )
     *Defendants.* )
           )

IT IS HEREBY CERTIFIED that copies of the filed **Amended Summons and Amended Complaint to BFI Waste Systems of North America, LLC** in this action were served upon Defendant BFI Waste Systems of North America, LLC by placing copies of same via U.S. Mail, Certified Mail, Restricted Delivery, Return Receipt Requested this date with sufficient postage affixed thereto, addressed as follows:

BFI Waste Systems of North America, LLC
c/o Registered Agent
CT Corporation System
2 Office Park Court, Ste. 103
Columbia, SC 29223

JOHN B. WHITE, JR., PA

Nicole M. Rice, Paralegal

February 7, 2025

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

# EXHIBIT B

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844



ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

**ASSISTANT SECRETARY OF DEFENSE**
3400 DEFENSE PENTAGON
WASHINGTON, DC 20301-3400

**ENERGY, INSTALLATIONS, AND ENVIRONMENT**

7/11/23

MEMORANDUM FOR  ASSISTANT SECRETARY OF THE ARMY (INSTALLATIONS, ENERGY AND ENVIRONMENT)
ASSISTANT SECRETARY OF THE NAVY (ENERGY, INSTALLATIONS AND ENVIRONMENT)
ASSISTANT SECRETARY OF THE AIR FORCE (INSTALLATIONS, ENVIRONMENT AND ENERGY)
DIRECTOR, DEFENSE LOGISTICS AGENCY (LOGISTICS OPERATIONS)

SUBJECT:  Interim Guidance on Destruction or Disposal of Materials Containing Per- and Polyfluoroalkyl Substances in the United States

The DoD Per- and Polyfluoroalkyl Substances (PFAS) Task Force issues this interim guidance to help DoD make informed decisions in the evaluation of existing destruction and disposal options, and to comply with section 343 of the FY 2022 National Defense Authorization Act (NDAA).  Section 343 requires DoD to prohibit the incineration of covered DoD PFAS-containing materials[1] until DoD issues guidance implementing the U.S. Environmental Protection Agency (EPA) "Interim Guidance on the Destruction and Disposal of Perfluoroalkyl and Polyfluoroalkyl Substances and Materials Containing Perfluoroalkyl and Polyfluoroalkyl Substances," December 18, 2020 (hereinafter referred to as the EPA guidance), and section 330 of the FY 2020 NDAA.

Concurrent with its compliance with these requirements on PFAS destruction and disposal, DoD is transitioning to a PFAS-free firefighting agent for land-based applications over the next few years.  DoD has determined that this transition, which requires the removal of PFAS-containing firefighting foam (i.e., Aqueous Film Forming Foam (AFFF)) from installation fire protection inventories, will generate large quantities of PFAS-containing concentrate and rinsate for which DoD must find a safe disposal solution.  In addition, quantities of PFAS-containing material are generated from DoD's nationwide cleanup program, and recovery of emergency use discharges or spills of AFFF.  Given these combined quantities, DoD's long-term storage capabilities will be exceeded and thus DoD requires a comprehensive destruction and disposal strategy.

In choosing among disposal options, one of the most significant factors for DoD was the additional oversight and controls provided at disposal and destruction facilities with

---

[1] PFAS-containing materials covered under this guidance includes all "covered material" under Section 343 of the FY 2022 NDAA, which means "any [Aqueous Film Forming Foam] AFFF formulation containing PFAS, material contaminated by AFFF release, or spent filter or other PFAS-contaminated material resulting from site remediation or water filtration that—
  (A) has been used by the Department of Defense or a military department;
  (B) is being discarded for disposal by the Department of Defense or a military department; or
  (C) is being removed from sites or facilities owned or operated by the Department of Defense."

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

environmental permits.  In issuing this guidance to comply with section 343 of the FY 2022 NDAA, DoD continues to recognize the statutory authority and responsibility of the EPA and State environmental regulatory agencies to regulate the disposal of wastes that may threaten human health or the environment.

Based on the analysis contained in Attachment 1 and consistent with the EPA guidance, DoD has identified the following four commercially available options to destroy or dispose of DoD PFAS-containing materials, in the order of consideration:

- Carbon reactivation units with environmental permits (for used granular activated carbon only).
- Hazardous waste landfills with environmental permits.
- Solid waste landfills with environmental permits that have composite liners, and gas and leachate collection and treatment systems.
- Hazardous waste incinerators with environmental permits.

In addition to these four DoD-wide options, the DoD Components are directed to consider onsite hazardous waste storage on a site-specific basis, for storage over ninety days. The DoD Components may also consider underground injection control on a site-specific basis. Third, the DoD Components, upon notification to the Office of the Assistant Secretary of Defense for Energy, Installations, and Environment (OASD(EI&E)), may also consider other existing and developing PFAS treatment or destruction technologies that are accepted/permitted by the appropriate State or Federal regulator, instead of utilizing hazardous waste incinerators, on a site-specific basis.  The DoD Components, when selecting one of the options above for the destruction or disposal of PFAS-containing materials, including AFFF, must continue to make informed, fact-based decisions to mitigate the risk of PFAS releases to the environment for the protection of human health, consistent with the attached guidance and decision tree.

DoD continues to evaluate existing and developing PFAS destruction and disposal technologies, monitor studies on those technologies' effectiveness and potential environmental effects, and collaborate Administration-wide on best practices.For example, DoD's Strategic Environmental Research and Development Program has ongoing projects to develop an improved understanding of the effectiveness and sustainability of thermal destruction technologies for treatment of PFAS-containing materials.  Of particular interest is the assessment of the fate and behavior of PFAS throughout the thermal treatment process.  DoD also anticipates that EPA will be updating its guidance by December 2023.  OASD(EI&E) will update this guidance annually to reflect changes as technologies mature, EPA updates its guidance, and additional data becomes available.  The point of contact for this guidance is Ms. Alexandria Long, OASD(EI&E), at 703-571-9061 or alexandria.d.long.civ@mail.mil.

OWENS.BRENDA
N.M.1030451844

Digitally signed by
OWENS.BRENDAN.M.10304518
44
Date: 2023.07.11 18:11:14 -04'00'

Brendan M. Owens

Attachments:
As stated

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

**Attachment 1 — DoD Guidance on Options for the Destruction and Disposal of PFAS-Containing Materials and Implementation of Section 343 of the FY 2022 NDAA**

1. *DoD Implementation of the EPA's "Interim Guidance on the Destruction and Disposal of Perfluoroalkyl and Polyfluoroalkyl Substances and Materials Containing Perfluoroalkyl and Polyfluoroalkyl Substances," December 18, 2020*

The EPA issued the "Interim Guidance on the Destruction and Disposal of Perfluoroalkyl and Polyfluoroalkyl Substances and Materials Containing Perfluoroalkyl and Polyfluoroalkyl Substances," on December 18, 2020, (referred to as "the EPA guidance" in this document).[2] In the EPA guidance, EPA evaluated destruction and disposal technologies that are commercially available and have the potential to control the migration of PFAS to the environment and identified three destruction or disposal options: landfilling, thermal treatment, and underground injection. DoD reviewed the EPA guidance and is implementing that guidance through this interim policy. Specifically, DoD is using the EPA guidance to help DoD make informed decisions in the evaluation of existing destruction and disposal options, including the relative uncertainty associated with each technology's capability to control releases to the environment for the protection of human health. DoD is also implementing EPA's guidance on environmental justice considerations in disposal and destruction of PFAS-containing materials.

    A.  EPA Interim Guidance on Destruction and Disposal of PFAS and Materials Containing PFAS

EPA's guidance recognizes that interim storage is not a destruction or disposal method, but asserts that storage "may be an option" if the immediate destruction or disposal of PFAS-containing materials is "not imperative."[3] EPA defines "interim storage" as storage "estimated to be anywhere from 2 to 5 years."[4] EPA does not define the term "imperative." DoD finds that multi-year storage of large quantities of PFAS-containing materials is not a viable option, from either a safety, environmental, logistical, or economic perspective.[5] Thus, in general, DoD assesses that, due to the volume of PFAS-containing materials at issue, DoD will need to implement actual destruction or disposal solutions for those materials.

DoD is currently conducting cleanup investigations and response actions at over 700 military installations and State Guard facilities. These investigations and response actions generate PFAS-containing materials (e.g., granular activated carbon, soils, investigation-derived wastes). If DoD had to plan for, locate, and secure storage of all PFAS-containing materials at

---

[2] "Interim PFAS Destruction and Disposal Guidance (Notice of Availability for Public Comment)." 85 Federal Register 83554 (Dec. 22, 2020).

[3] "Interim Guidance on the Destruction and Disposal of Perfluoroalkyl and Polyfluoroalkyl Substances and Materials Containing Perfluoroalkyl and Polyfluoroalkyl Substances," pp. 5. Environmental Protection Agency, 18 Dec. 2020, https://www.epa.gov/pfas/interim-guidance-destroying-and-disposing-certain-pfas-and-pfas-containing-materials-are-not. *Referred to as "EPA Interim PFAS Disposal Guidance (Dec. 2020)" in later footnotes.*

[4] EPA Interim PFAS Disposal Guidance (Dec. 2020), page 5.

[5] EPA's proposed PFAS National Primary Drinking Water Regulation similarly states: "As part of this rulemaking, EPA considered that in drinking water treatment, large volumes of spent [granular activated carbon] and ion exchange resin must be removed which does not lend itself to on-site storage over time. The disposal options identified in the Interim Guidance (US EPA, 2020b) are landfill disposal and thermal treatment." 88 Federal Register at 18686 (Mar. 29, 2023).

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

applicable DoD/Guard facilities, these storage requirements would affect the pace of this necessary cleanup.  In addition, the storage would generate its own risks of release to the environment.

DoD is also required to transition to a new firefighting agent for land-based applications and remove existing AFFF.  The volume of AFFF that requires disposal is estimated to be over 2 million gallons.  DoD does not have the warehouse capacity to properly and safely store this AFFF and associated rinsate at individual bases.  DoD also is concerned with the risks of release to the environment from storage and believes that secondary containment would be needed to contain releases of PFAS.  Storage areas at individual military installations or Guard facilities, where these PFAS-containing materials could potentially be stored if space was available, are not likely to have secondary containment.  Building additional storage capacity, to include the necessary contracting actions, would negatively affect the pace of these required cleanup and AFFF replacement activities.  While DoD believes it does not have the capacity to properly store all PFAS-containing materials at its facilities, and thus disposal or destruction of those materials is imperative, the DoD Components are directed to consider if onsite hazardous waste storage capacity exists for storage over ninety days at an individual military installation.

DoD next considered all the existing destruction and disposal options identified in the EPA guidance to identify options that are protective of human health and the environment.  EPA identified several factors to consider in determining how to destroy or dispose of PFAS-containing materials:

- The relative uncertainty associated with the technologies' capabilities to control migration of PFAS,
- Whether it is imperative to destroy or dispose of these materials versus storing it and waiting for uncertainties to be reduced,
- The cost and availability of destruction and disposal options,
- The type of waste materials,
- The concentrations of PFAS in the waste, and
- Health risks from PFAS releases, especially for potentially vulnerable populations [6]

The first option DoD considered was deep well injection.  EPA acknowledged deep well injection has the capability to control migration of PFAS to the environment, and the limited number of these wells currently receiving PFAS "may significantly limit the practicability of this disposal option."[7]  Because of the limited availability of deep well injection locations, use for only liquid materials, and the volume of disposal required for DoD PFAS-containing materials, DoD believes this disposal option will rarely be an available option for DoD.  DoD, however, has identified deep well injection as a disposal option that maximizes reduction of PFAS releases or emissions to the environment and human health exposures, and the DoD Components may consider whether deep well injection is an available and cost-effective option at an individual military installation.

---

[6] EPA Interim PFAS Disposal Guidance (Dec. 2020), pages 5 and 83.
[7] EPA Interim PFAS Disposal Guidance (Dec. 2020), pages 5-6.

Consistent with the EPA guidance, DoD next considered permitted hazardous waste landfills. Hazardous waste landfills "have the most stringent environmental controls in place and higher potential capacity to manage the migration of PFAS into the environment."[8] Hazardous waste landfills are "more effective at minimizing PFAS migration into the environment than other landfill types."[9] Because "permitted hazardous waste landfills employ the most extensive set of environmental controls (e.g., double liner systems with leachate collection and leak detection) and practices (e.g., extensive record keeping) that are currently available for the containment of PFAS waste," DoD has identified these landfills as an available disposal option that maximizes reduction of PFAS releases or emissions to the environment and human health exposures.[10]

DoD next considered solid waste landfills. The EPA guidance identifies a variety of solid waste landfills: municipal solid waste, ash monofill, industrial, and construction and demolition landfills.[11] Because environmental controls can vary at landfills, EPA evaluated the viability of landfilling as a means of containing PFAS. Modern solid waste landfills "when constructed with appropriate controls (e.g., liner system and leachate and gas collection and management systems), can also control the migration of PFAS into the environment."[12] DoD has identified solid waste landfills with these controls in place (composite liner and gas and leachate collection and management) as an available disposal option that maximizes reduction of PFAS releases or emissions to the environment and human health exposures. Any solid waste landfill DoD uses for PFAS-containing materials must have a composite liner, gas and leachate collection and management systems, and an environmental permit.

The DoD Components, consistent with the Decision Tree in Attachment 2, will need to consider the type of PFAS-containing materials when considering the use of both hazardous waste and solid waste landfills. For example, liquids must be solidified to remove any free liquids before disposal in a landfill, which may increase the volume significantly (e.g., threefold).[13] The cost and availability of all destruction and disposal options are additional considerations that need evaluation.

DoD next considered thermal treatment technologies, recognizing that these options have higher levels of uncertainties regarding their capacity to control the migration of PFAS into the environment. Thermal treatment technologies include a wide-variety of technologies and controls, including hazardous waste combustors (e.g., incinerators, cement kilns, lightweight aggregate kilns), as well as other thermal treatment (e.g., carbon reactivation units, sewage sludge incinerators, municipal waste combustors, thermal oxidizers).[14] EPA, notwithstanding its acknowledgment of uncertainties with PFAS thermal treatment technologies, recognized that the subset of permitted hazardous waste combustors "may operate under conditions more conducive to destroying PFAS and controlling related [products of incomplete combustion] PICs relative to

---

[8] EPA Interim PFAS Disposal Guidance (Dec. 2020), page 5.
[9] EPA Interim PFAS Disposal Guidance (Dec. 2020), page 6.
[10] EPA Interim PFAS Disposal Guidance (Dec. 2020), page 6.
[11] EPA Interim PFAS Disposal Guidance (Dec. 2020), page 56.
[12] EPA Interim PFAS Disposal Guidance (Dec. 2020), page 55.
[13] https://www.geoengineer.org/education/web-class-projects/cee-549-geoenvironmental-engineering-winter-2013/assignments/stabilization-solidification ("Volume of the treated wastes usually increases significantly")
[14] EPA Interim PFAS Disposal Guidance (Dec. 2020), page 6.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

thermal treatment units that do not have both [Resource Conservation and Recovery Act] RCRA and [Clean Air Act] CAA permits."[15]  EPA also recognized that permitted hazardous waste incinerators "are designed to optimize temperatures, residence times, turbulence, and other parameters" to "maximize organic destruction and minimize the formation of PICs."[16]  These controls include pollution control devices which can remove hydrogen fluoride and other products of combustion.[17]  After considering the latest studies and additional information[18] presented in the next section of this guidance on implementation of section 330 of the FY 2020 NDAA, DoD has identified hazardous waste incinerators as an available destruction option that maximizes reduction of PFAS releases or emissions to the environment and human health exposures.

Because DoD, and others, have widely utilized granular activated carbon (GAC) to remove PFAS from drinking water and groundwater, and "GAC reactivation is economically favored over replacement with virgin carbon,"[19] DoD also considered carbon reactivation units.[20] While carbon reactivation units "use high temperatures to thermally desorb contaminants from GAC, which allows for the carbon to be used again,"[21] they are not "incinerators" and instead are a form of recycling/preserving virgin materials.  While there are about seventeen commercial carbon reactivation units across the country, currently only four "operate under RCRA permits and applicable air permits" which "provide additional regulatory oversight and include operating requirements and emission limitations to safely and effectively treat the hazardous contaminants."[22]  Due to these additional safeguards, RCRA-permitted carbon reactivation units "may operate under conditions more conducive to destroying PFAS and controlling related PICs."[23]  Therefore, DoD has identified RCRA permitted carbon reactivation units as an available  destruction option to address PFAS-containing GAC that maximizes reduction of PFAS releases or emissions to the environment and human health exposures.

B.  EPA Guidance on Environmental Justice

DoD also considered section 4 of the EPA guidance, which addresses environmental justice and impacts on vulnerable communities.  The recent April 2023 Executive Order on "Revitalizing Our Nation's Commitment to Environmental Justice for All",[24] emphasizes that every person has a right to breathe clean air, drink clean water, and live in a healthy community. Under Executive Order 12898, "Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations", Federal agencies are directed to identify and address,

---

[15] EPA Interim PFAS Disposal Guidance (Dec. 2020), page 35.

[16] EPA Interim PFAS Disposal Guidance (Dec. 2020), page 35.

[17] EPA Interim PFAS Disposal Guidance (Dec. 2020), pages 33-35.

[18] Several of those studies post-date EPA's December 2020 Guidance and its findings on relative uncertainty.

[19] EPA Interim PFAS Disposal Guidance (Dec. 2020), page 95.

[20] EPA's proposed PFAS National Primary Drinking Water Regulation similarly states:  "At present, the most likely management option for spent materials containing PFAS is reactivation for GAC and incineration for spent IX resin." 88 Federal Register at 18686 (Mar. 29, 2023).

[21] EPA Interim PFAS Disposal Guidance (Dec. 2020), page 36.

[22] EPA Interim PFAS Disposal Guidance (Dec. 2020), page 36.

[23] EPA Interim PFAS Disposal Guidance (Dec. 2020), page 36.

[24] "Executive Order 14096 of April 21, 2023, Revitalizing Our Nation's Commitment to Environmental Justice for All," *Federal Register* 88, no. 80 (April 26, 2023): 25251-25261.  https://www.govinfo.gov/content/pkg/FR-2023-04-26/pdf/2023-08955.pdf.

as appropriate, "disproportionately high and adverse human health or environmental effects of their actions on minority and low-income populations."[25]  In Executive Order 14008, "Tackling the Climate Crisis at Home and Abroad," Federal agencies shall "develop programs, policies, and activities to address the disproportionately high and adverse human health, environmental, climate-related and other cumulative impacts on disadvantaged communities, as well as the accompanying economic challenges of such impacts."[26]  DoD is also a signatory to a Memorandum of Understanding on Environmental Justice, and a member of the Environmental Justice Interagency Council under these Executive Orders.  DoD considered these White House documents, as well as the EPA guidance, in determining what currently available disposal and destruction options should be included in this interim guidance.

As the EPA guidance notes, certain communities "may be highly exposed to environmental contaminants because they live or work near the sources of release or presence in the environment."[27]  This includes "those living near and using PFAS-contaminated environments (e.g., drinking water, fishing, hunting, and recreation)."[28]  DoD acknowledges that many of the communities surrounding our military installations are communities with environmental justice concerns.  We have prioritized our cleanup program to address the highest risks first, regardless of the community demographics, and address exposures (e.g., drinking water) under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA, also known as Superfund).  Environmental justice principles are incorporated into CERCLA through public participation in the cleanup process, as well as the additional public outreach and engagement that DoD conducts (e.g., Restoration Advisory Boards).  It is this cleanup program that addresses high exposures to PFAS that generates a large volume of PFAS-containing materials for disposal.  Impact on vulnerable communities is thus addressed primarily in our cleanup program, and we support the Superfund Community Involvement Toolkit referenced in the EPA guidance.  DoD is working on improving its public outreach and community dialogue for our PFAS cleanups through expanded public outreach at both senior leadership and local levels, a more user-friendly DoD PFAS website, and updating our Restoration Advisory Board guidance.  We also note that EPA's Office of Land and Emergency Management is working with DoD and State representatives to develop "approaches to characterizing communities adjacent to three federal facility [National Priority List] NPL sites, to identify those with [Environmental Justice] EJ concerns."[29]  When completed, these projects will inform EPA's understanding of best practices and be publicly shared.  DoD supports this approach.

We also considered the vulnerable communities that exist near landfills and hazardous waste incinerators.  We found this to be more complex in helping to choose among existing

---

[25] "Executive Order 12898 of February 11, 1994, Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations," *Code of Federal Regulations,* title 3 (1994): 1-101, https://www.archives.gov/files/federal-register/executive-orders/pdf/12898.pdf.

[26] "Executive Order 14008 of January 27, 2021, Tackling the Climate Crisis at Home and Abroad," *Federal Register* 86, no. 19 (February 1, 2021): 7619-7633, https://www.govinfo.gov/content/pkg/FR-2021-02-01/pdf/2021-02177.pdf.

[27] EPA Interim PFAS Disposal Guidance (Dec. 2020), page 87.

[28] EPA Interim PFAS Disposal Guidance (Dec. 2020), page 87.

[29] EPA Office of Land and Emergency Management, "EJ Action Plan.  Building Up Environmental Justice in EPA's Land Protection and Cleanup Programs (Sept. 2022), page 25.

7

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

disposal and destruction options.  For example, studies have identified that a disproportionate number of landfills and other hazardous waste facilities, such as incinerators, are located in communities with environmental justice concerns.  DoD also used EPA's Environmental Justice Screening and Mapping Tool ("EJScreen")[30] to identify potentially impacted communities living near PFAS destruction or disposal sites identified in this guidance, as well as communities surrounding our military installations where PFAS cleanups are ongoing and AFFF will be replaced.  DoD also considered the relative risk between its top priority of addressing elevated levels of PFAS in drinking water from DoD activities versus indirect potential PFAS exposures from destruction and disposal facilities.

In choosing among disposal options, however, one of the most significant factors for DoD was the additional oversight and controls provided at disposal and destruction facilities with environmental permits.  We recognize the statutory authority and responsibility of the EPA and State environmental regulatory agencies to regulate the disposal of wastes that may threaten human health or the environment, and to issue environmental permits that are protective of human health and the environment.  Section 4 of the EPA guidance thus focuses on considering vulnerable populations and community engagement in the regulatory siting or permitting processes for destruction and disposal facilities.  DoD acknowledges that more work is needed to ensure that the impacts associated with the operation of destruction and disposal facilities are equitable. While DoD does not have a regulatory role, we encourage regulators and disposal facilities to consider PFAS in these regulatory processes.  In addition, to facilitate engagement with communities near our military installations, as well as possibly adjacent to PFAS destruction and disposal facilities, we have developed a DoD PFAS Disposal Fact Sheet that will be posted on our DoD PFAS website (https://www.acq.osd.mil/eie/eer/ecc/pfas/index.html). This fact sheet summarizes this DoD PFAS disposal guidance, provides background information on PFAS and potential health effects based on EPA and the Agency for Toxic Substances and Disease Registry statements, and provides information on how DoD is incorporating environmental justice principles when addressing PFAS. DoD will also explore new partnership opportunities with EPA and other federal agencies to advance environmental justice issues in accordance with Executive Order 14096.

C.  DoD Implementation

DoD is therefore identifying the following options, **in order of priority**, for the DoD Components to utilize for the destruction or disposal of PFAS-containing materials, including AFFF, that are not hazardous wastes:[31]

- **Carbon reactivation units with environmental permits (for used GAC only).** GAC is a common PFAS water treatment technique where PFAS attaches to the

---

[30] See https://www.epa.gov/ejscreen.

[31] Hazardous waste is regulated pursuant to RCRA authority.  See 42 U.S.C. § 6903.  The regulatory definition of hazardous waste is found in 40 CFR § 261.3.  PFAS is currently not a listed or characteristic hazardous waste, but a PFAS-containing material may meet the regulatory definition of hazardous waste if PFAS is mixed with a listed hazardous waste or if a PFAS-containing mixture exhibits a hazardous characteristic (e.g., ignitability).  Materials that qualify as a RCRA hazardous waste must follow RCRA storage and disposal requirements and are outside of the scope of this guidance.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

carbon until the carbon is full. Carbon reactivation units use high temperatures to thermally treat contaminants collected in GAC, which allows for the carbon to be used again. Carbon reactivation units permitted under RCRA and the CAA have additional regulatory oversight and include operating requirements and emission limitations to safely and effectively treat hazardous contaminants.

- **Hazardous waste landfills with environmental permits.** These landfills have stringent environmental controls in place to manage the migration of PFAS into the environment. Permitted hazardous waste landfills employ the most extensive set of environmental controls (e.g., double liner systems with leachate collection and leak detection) and practices (e.g., extensive record keeping) that are currently available for the containment of PFAS waste.
- **Solid waste landfills with environmental permits that have composite liners, and gas and leachate collection and treatment systems.** Modern municipal solid waste landfills, when constructed with appropriate controls (e.g., liner system, leachate and gas collection and management systems, permits), can also control the migration of PFAS into the environment.
- **Hazardous waste incinerators with environmental permits**. These high temperature incinerators have stringent regulatory controls on temperature and other operating parameters to achieve a 99.99 percent destruction efficiency for other (non-PFAS) organic chemicals, and evidence suggests that a similar destruction efficiency may apply to PFAS-containing materials (see below). Currently, thermal treatment is the only commercially available technology that has the potential capability to destroy PFAS, rather than contain it.

In addition to these four DoD-wide options, the DoD Components are directed to consider onsite hazardous waste storage on a site-specific basis, for storage over ninety days. The DoD Components may also consider underground injection control, on a site-specific basis. Third, the DoD Components, upon notification to OASD(EI&E), may also consider other existing and developing PFAS treatment or destruction technologies that are accepted/permitted by the appropriate State or Federal regulator, *instead of* utilizing hazardous waste incinerators, on a site-specific basis. For example, at one site with a large volume of PFAS-impacted soils, where landfills were not an option in that State, OASD(EI&E) was notified that a State permitted thermal desorption unit would be considered rather than hazardous waste incineration. The DoD Components, when selecting one of the options above for the destruction or disposal of PFAS-containing materials, must continue to make informed decisions consistent with this guidance and the Decision Tree.

2. *DoD Implementation of Section 330 of the FY 2020 NDAA*

Section 330 of the FY 2020 NDAA requires DoD to ensure that when PFAS-containing materials or AFFF are disposed:

"(1) all incineration is conducted at a temperature range adequate to break down PFAS chemicals while also ensuring the maximum degree of reduction in emission of PFAS, including elimination of such emissions where achievable;
(2) all incineration is conducted in accordance with Clean Air Act (42 USC 7401 et seq.), including controlling hydrogen fluoride;

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

(3) any materials containing PFAS that are designated for disposal are stored in accordance with the requirement under part 264 of title 40, Code of Federal Regulations; and

(4) all incineration is conducted at a facility that has been permitted to receive waste regulated under [the Resource Conservation and Recovery Act][32] (42 USC 6921 et seq.).”

This guidance addresses the second, third, and fourth criteria together, followed by the first criterion.

The second criterion in section 330 requires that all incineration of PFAS-containing materials is conducted in accordance with CAA requirements. The third criterion in section 330 requires that PFAS-containing materials stored at hazardous waste combustors prior to incineration be stored in accordance with RCRA requirements. The fourth criterion in section 330 requires that incineration is conducted at a RCRA-permitted hazardous waste facility. **Based upon the review of these three criteria, if a DoD Component chooses to incinerate PFAS-containing materials in its custody, the DoD Component must send those PFAS-containing materials, including AFFF, only to RCRA- and CAA-permitted Hazardous Waste Incinerators (HWIs).** RCRA-permitted HWIs with CAA Title V permits operate under conditions that represent the maximum commercially available destruction efficiencies for PFAS, including the control of hydrogen fluoride and other PICs. Additionally, RCRA- and CAA-permitted HWIs have experience in the proper storage of regulated hazardous wastes and must comply with part 264 of title 40, Code of Federal Regulations, concerning storage of material at their facilities. Therefore, the DoD Components will implement the CAA and RCRA permit and storage criteria in section 330 by ensuring that the HWIs utilized for the incineration of PFAS-containing materials, including AFFF, have valid RCRA and CAA operating permits.

The first criterion in section 330 requires that if DoD sends PFAS-containing materials to incinerators, the incinerators utilize a temperature range adequate to break down PFAS while also minimizing emissions of PFAS. Because the second, third, and fourth criterion in section 330 require incineration at permitted HWIs and because these permitted facilities are required to maintain minimum temperature thresholds, DoD used those minimum thresholds in determining whether it can reasonably conclude that its candidate HWIs will achieve the requirements of the first criterion in section 330.

A. Relevant RCRA and CAA permitting requirements

The regulatory requirements for RCRA- and CAA-permitted HWIs are summarized as follows:

RCRA-permitted HWIs must follow stringent regulatory requirements and are required by EPA to conduct testing to determine a Destruction and Removal Efficiency (DRE). The key factors in achieving a high DRE are time in the incinerator (residence time), high temperature, and turbulence (i.e., mixing). The purpose of DRE testing is to demonstrate that virtually all the molecules of a surrogate compound are destroyed in the incinerator.

---

[32] The Solid Waste Disposal Act of 1965 is commonly referred to as the Resource Conservation and Recovery Act (RCRA), which significantly amended the Solid Waste Disposal Act, in 1976.

For HWIs, EPA requires a minimum DRE of 99.99%. During DRE testing, a surrogate compound is fed into the incinerator that represents classes of compounds that are extremely difficult to destroy. EPA has developed a system of ranking these surrogate compounds, based on their difficulty to destroy. After a 99.99% DRE is achieved, EPA or the delegated State, issues a CAA Title V permit that includes requirements for operation. This includes a high temperature range and other parameters that are continuously monitored, and if not complied with, the incinerator will stop the flow of materials to the combustion unit automatically and immediately.

While there are several operating conditions specified in a HWI permit, the first criterion in section 330 focuses on a temperature range adequate to break down PFAS. DoD reviewed minimum temperatures specified in nine existing HWI permits to achieve their DRE and found their permits require a minimum temperature in the kiln that range from 1200°F to 1824°F. At these facilities, the kiln is followed by an afterburner/secondary combustion chamber to maximize organic destruction and their permits require a minimum temperature in the afterburner/secondary combustion chamber that ranges from 1488°F to 2026°F. Based on the studies and information described below, HWIs at their permitted temperature range will be adequate to break down detectable PFAS chemicals.

B.  Existing Data on Destruction Capabilities of Incinerators

EPA's guidance contains the following findings on the destruction capabilities of HWIs:

HWIs are designed to optimize temperatures, residence times, turbulence, and other parameters to ensure compliance with organic DRE requirements. Most commercial HWIs use rotary kilns…that maintain high temperatures. Typically, solids retention time in the kiln is 0.5 to 1.5 hours, while gas residence time through the kiln is usually around two seconds. Kiln flame/solids temperatures range from 650°C to 1,650°C (1,200°F to 3,000°F). The rotary kiln is followed by an afterburner where additional high-heating-value gaseous and liquid wastes, and auxiliary fuels are added. The afterburner is typically operated at about 1,100°C to 1,370°C (2,000°F to 2,500°F) with a gas residence time from 1 to 3 seconds to maximize organic destruction and minimize the formation of PICs.[33]

Studies and information on PFAS destruction indicate that the temperature ranges used in these types of HWIs are effective in destroying the 50 PFAS that can currently be detected in air emissions through an EPA methodology:

- In 2021, EPA began conducting pilot-scale PFAS incineration studies using its "Rainbow" furnace, which allows EPA to conduct incineration experiments under controlled conditions.[34] This research identified fluorocarbon tracer gases (surrogates) that could potentially be used to monitor destruction efficiencies during incineration, and then began experiments. The first publication from these

---

[33] EPA Interim PFAS Disposal Guidance (Dec. 2020), page 35.
[34] "Combustion of $C_1$ and $C_2$ PFAS: Kinetic Modeling and Experiments," Krug et al., *Journal of the Air & Waste Management Association*. 2022, 72:3, 256-270. Published Feb. 11, 2022.

11

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

experiments suggests that PFAS can be destroyed when subjected to aggressive thermal environments above 1100°C. EPA is also conducting experiments to understand the incineration of PFAS present in AFFF.[35]

- In 2021, the New York State Department of Environmental Conservation (NYSDEC) announced that it had completed a study to determine if the thermal treatment of PFAS-containing materials at the Norlite facility in Cohoes, New York, resulted in soil and surface water contamination. The Norlite facility is a RCRA- and CAA-permitted hazardous waste combustor that had treated AFFF over a number of years. This NYSDEC study found no clearly discernible pattern of aerial deposition of PFAS that could be traced to Norlite's operations. Sampling identified low-level detections of PFAS compounds in all soil samples collected at upwind, downwind, and at background locations, consistent with emerging research on the prevalence of PFAS in urban, suburban, and rural environments. Concentrations of PFAS found in soils in the vicinity of the facility were below guidance values NYSDEC developed, indicating that the facility successfully destroyed the PFAS material and did not emit traceable amounts of PFAS during combustion.[36]

- In 2021, a commercial RCRA- and CAA permitted HWI conducted a PFAS-specific study. In this study, AFFF was added in high concentrations to a waste feed, and sampled at various times throughout the incineration process. A 99.9999% DRE was obtained for Perfluorooctanesulfonic Acid, Perfluorooctanoic Acid, Perfluorohexane Sulfonic Acid, and hexafluoropropylene oxide dimer acid (otherwise known as Gen-X) at a temperature of 1800 °F. The study determined that the 50 specific PFAS that can currently be measured were turned into hydrogen fluoride, which was trapped in the air pollution control system.[37] To measure PFAS air emissions, this study utilized EPA test method OTM-45, published in 2021, for stack gas sampling of PFAS air emissions during this testing program. This study has undergone EPA and peer review, and became publicly available in August 2022.[38]

- In 2022, a literature review covering 163 published works on thermal treatment of PFAS was published.[39] This paper suggests that "complete combustion of PFAS will likely be most successful in incinerators that employ a two-stage process. In these, the waste is first fed into the primary combustion chamber where PFAS desorb and partially degrade. The gaseous byproducts are sent to a secondary chamber (the afterburner) that operates in excess air (stoichiometric excess of oxygen) at high

---

[35] Shields, E. "ER21-1288: Multi-Scale Evaluation of PFAS Thermal Destruction Requirements." Strategic Environmental Research and Development Program In-Progress Review Meeting, Aug. 17, 2022 (Virtual).

[36] *Norlite Environmental Sampling Report*, pp 25-26. New York State Department of Environmental Conservation, March 2021, https://www.dec.ny.gov/docs/materials_minerals_pdf/norlitesamplingfull0321.pdf.

[37] EPA's Interim PFAS Disposal Guidance (Dec. 2020), page 34, recognizes that hydrogen fluoride is a break-down product of PFAS destruction, and is captured in air pollution control devices. ("…PFAS destruction is defined as the complete severing of all carbon-fluorine bonds in a PFAS molecule. Severing all carbon-fluorine bonds results in conversion to carbon dioxide, hydrogen fluoride (HF), and other compounds. HF and some of the other products of combustion can be removed in pollution control devices.").

[38] http://cleanharbors.dev-cleanharbors.acsitefactory.com/services/industrial-field-services/field-services/PFAS-PFOA-PFOS-Remediation

[39] "Critical Review of Thermal Decomposition of Per- and Polyfluoroalkyl Substances: Mechanisms and Implications for Thermal Treatment Processes," Wang et al., *Environ. Sci. Technol.* 2022, 56, 5355-5370. Published April 21, 2022.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

temperature (>950 °C) and short residence times (1-3 seconds)."[40]  DoD notes that HWIs employ this two-stage process.  This paper also stated that the "general consensus across these lab-scale studies is that even the most stable PFAS (e.g., long-chain sulfonates) desorb at temperatures less than 1000°C, and they are destroyed in the gas phase at temperatures greater than 1000°C."[41]

DoD acknowledges that the studies mentioned above and the EPA guidance identified uncertainties regarding PFAS thermal treatment.  According to the EPA guidance:

> Key uncertainties include the lack of PFAS-specific information on these facilities.  EPA currently has no emission characterizations from these sources when they burn PFAS, and is working to develop measurement methodologies as well as gather information to conclude whether potential [PICs] are adequately controlled.  EPA recognizes that PICs are formed (even for nonfluorinated compounds); however, based on the unique characteristics of fluorine combustion chemistry, it needs to be determined whether thermal treatment devices and their associated post-combustion control devices are controlling fluorinated PICs.[42]

EPA, notwithstanding its general finding that there are uncertainties with PFAS thermal treatment technologies, recognized that there is less uncertainty for the permitted facilities that DoD will use for incineration if other disposal options are not deemed viable.  According to EPA, the subset of permitted HWIs "may operate under conditions more conducive to destroying PFAS and controlling related PICs relative to thermal treatment units that do not have both RCRA and CAA permits." [43]  EPA also recognized that permitted HWIs "are designed to optimize temperatures, residence times, turbulence, and other parameters" to "maximize organic destruction and minimize the formation of PICs." [44]  These controls include pollution control devices which can remove hydrogen fluoride and other products of combustion.[45]

---

[40] *Id.* at page 5363.
[41] *Id.* at page 5363.
[42] EPA Interim PFAS Disposal Guidance (Dec. 2020), page 6.
[43] EPA Interim PFAS Disposal Guidance (Dec. 2020), page 35.
[44] EPA Interim PFAS Disposal Guidance (Dec. 2020), page 35.
[45] EPA Interim PFAS Disposal Guidance (Dec. 2020), pages 33-35, 42-43.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

*3. DoD's Finding*

In light of the 2021 PFAS air emission methodology and studies identified above, including at a full-scale RCRA- and CAA-permitted HWI, DoD finds that incineration at these facilities at their permitted temperature range will be adequate to break down detectable PFAS chemicals while also ensuring the maximum degree of reduction in emission of detectable PFAS. Based on the above studies and information that show HWI permits specify a temperature range and other operating parameters to achieve a 99.99% DRE, and HWIs are required to have air emission control devices, RCRA- and CAA permitted HWIs meet section 330's requirements for an adequate temperature range to break down PFAS that currently can be detected in air emissions and meet emission reduction requirements.  Additional research is underway, and DoD will update this guidance annually to reflect changes as technologies mature, EPA updates its guidance, and additional data, including air emission detection methods, becomes available.

14

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## Interim PFAS Disposal Decision Tree[1]



Attachment 2 –DoD PFAS Disposal Decision Tree

[1] This Decision Tree considers availability, protective controls, ways to reduce the volume of materials requiring disposal, and costs of current disposal and destruction options, as well as the type of PFAS materials. See the full DoD guidance for a consideration of all factors.

[2] "DoD identified controls" for solid waste landfills are composite liners, gas and leachate collection/treatment systems, and permits.

[3] The economic evaluation among possible options includes transportation costs (i.e., distance), disposal or treatment costs, and pretreatment costs, if any.

# EXHIBIT C

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

# Special Waste Profile

**REPUBLIC** SERVICES

Disposal Facility: 5010 CMS Landfill NC

Waste Profile #     5010252041

Sales Rep #:     116

## I. Generator Information

Generator Name: MCB - CAMP LEJEUNE COMMANDING GENERAL ATTN: EMD

Generator Site Address: Building RR155 Stone Bay Fire Station (Station #10), Camp Lejeune

City: Camp Lejeune     County: Onslow     State: North Carolina     ZIP: 28445

State ID/Reg. No:     State Approval/Waste Code:     NAICS #:

Generator Mailing Address ☑ (if different     12 Post Lane

City: Camp Lejeune     County: Onslow     State: North Carolina     ZIP: 28547

Generator Contact Name: Jeffrey Zahniser     Email: jeffrey.zahniser@usmc.mil

Phone Number: 910-451-5306     Ext:     Fax Number:

## II. Billing Information

Bill to: Evo Corporation     Contact Name: Edith Basinger

Billing Address: 7535 Styers Ferry Road     Email: accountspayable@evocorp.net

City: Clemmons     State: North Carolina     ZIP: 27012     Phone: 336-725-5844

## III. Waste Stream Information

Name of Waste: Non-Hazardous Soil with PFAS

Process Generating Waste: Soil cuttings from monitoring well installation activities and sampling for environmental investigation. Potential Source: A release may have occurred due to the presence of aqueous film-forming foam (AFFF)-containing fire engines, documented storage of AFFF, and likely transfer of AFFF from containers into the fire engines.

Type of Waste: Pollution Control Waste     Physical State: Solid     Method of Shipment: Drum

Estimated Volume: 15     Volume Type: Drums

Frequency: One-time Event (single project)     Disposal Consideration: Solidification

## IV. Representative Sample Certification

☐ **No Sample Taken**

☑ **Sample Taken     Type of Sample** Composite and Grab

Is the representative sample collected to prepare this profile and laboratory analysis collected in accordance with U.S. EPA 40 CFR 261.20(c) guidelines or equivalent? ☑ **Yes** ☐ **No**

Sample Date: 09-24-24

Sample ID Numbers or SDS: eurofins Report ID: 410-189595-1 (TCLP) & 410-189595-2 (PFAS) Sample IDs: Site115-IDW-SO-092424-01/Site115-IDW-SO-092424-02 (TCLP) & Site115-IDW-SO-092424-01/Site115-IDW-SO-092424-02 (PFAS)

**Remember to attach Laboratory Analytical Report (and/or Material Safety Data Sheet) including Chain of Custody and required parameters provided for this profile.**

Initial here

Page 1     September 2023

MCB - CAMP LEJEUNE COMMANDING GENERAL ATTN:     Non-Hazardous Soil with PFAS

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

Special Waste Profile

### V. Physical Characteristics of Waste

Characteristic Components (must equal 100%):

% By Weight (out of 100% – ranges acceptable):

1. Non-Hazardous Soil — 98-100
2. Non-Hazardous Water — 0-2
3. PFAS — <0.0000001
4.
5.

| Color: | Odor (describe): | Does Waste Contain Free Liquids? | % Solids: | pH: | Flash Point: |
|---|---|---|---|---|---|
| Brown | None | ☑ Yes  ☐ No | 98-100 | 7.7-11.6 | >200  °F |

**Attach Laboratory Analytical Report (and/or Material Safety Data Sheet) including Chain of Custody and required parameters provided for this profile.**

### RCRA Regulatory Questions

1. Does this waste or generating process contain regulated concentrations of the following pesticides and/or herbicides: Chlordane, Endrin, Heptachlor (and its epoxides), Lindane, Methoxychlor, Toxaphene, 2,4-D, or 2,4,5-TP Silvex as defined in 40 CFR 261.33    ☐ Yes  ☑ No

2. Does this waste contain reactive sulfides (greater than 500 ppm) or reactive cyanide (greater than 250 ppm) [reference 40 CFR 261.23(a)(5)]?    ☐ Yes  ☑ No

3. Does this waste contain regulated concentrations of Polychlorinated Biphenyls (PCBs) as defined in 40 CFR Part 761    ☐ Yes  ☑ No

4. Does this waste contain concentrations of listed hazardous wastes defined in 40 CFR 261.31, 261.32, 261.33, including RCRA F-listed solvents?    ☐ Yes  ☑ No

5. Has this waste been delisted under 40 CFR 260.20 and 260.22? If yes, attach the final decision to delist the waste as published in the Federal Register.    ☐ Yes  ☑ No

6. Does this waste exhibit a hazardous characteristic as defined by federal and/or state regulations? If Yes, identify the applicable waste code and specify if the waste is hazardous as defined by federal, state or both    ☐ Yes  ☑ No

7. Does this waste contain regulated concentrations of 2,3,7,8-Tetrachlorodibenzodioxin (2,3,7,8-TCCD), or any other dioxin as defined in 40 CFR 261.31    ☐ Yes  ☑ No

8. Is this a regulated medical or infectious waste as defined by federal and/or state regulations    ☐ Yes  ☑ No

9. Is this a regulated radioactive waste as defined by federal and/or state regulations    ☐ Yes  ☑ No

10. Is this a solid waste that is not a hazardous waste in accordance with 40 CFR 261.4(b)? If yes, please provide the corresponding regulatory citation.    ☐ Yes  ☑ No

### Republic Services Waste Handling Questions

1. Does this waste generate heat or react when contacted with water/moisture?    ☐ Yes  ☑ No

2. Does the waste contain sulfur or sulfur by-products?    ☐ Yes  ☑ No

3. Is this waste generated at a state or federal Superfund cleanup site subject to regulation under CERCLA?    ☑ Yes  ☐ No

4a. Is this waste from a TSD facility, TSD-like facility or consolidator (i.e. multiple wastes/multiple generators)?    ☐ Yes  ☑ No

4b. If yes to the above question, please provide clarification

Initial here

Page 2

MCB - CAMP LEJEUNE COMMANDING GENERAL ATTN: ☐   Non-Hazardous Soil with PFAS

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

Special Waste Profile

 REPUBLIC SERVICES

## VI. Certification

*I hereby certify that I have knowledge about the waste material being offered for disposal ("Waste") and have the requisite authority to bind the Generator to the information contained in this Special Waste Profile ("Profile"). I further certify that to the best of my knowledge and belief, the information contained herein is a true, complete and accurate description of the Waste and all known or suspected hazards have been disclosed. All Analytical Results/Safety Data Sheets submitted are truthful and complete and are representative of the Waste.*

*I further certify that by utilizing this Profile, neither myself nor any other employee or representative of the company identified below ("Company") will deliver for disposal or attempt to deliver for disposal any Waste that: (i) is classified as toxic waste, hazardous waste or infectious waste; (ii) that does not conform to this Profile; or (iii) that this Disposal Facility is prohibiting from accepting by law. I shall immediately give written notice of any change or condition pertaining to the Waste not provided herein. Our Company hereby agrees to fully indemnify this Disposal Facility against any damages resulting from this Profile or Certification being inaccurate or untrue.*

*I understand that by attaching an electronic signature, I am signing this document and Company consents to complete this transaction and receive all related communications electronically, and agrees this document will be binding as though it had been physically signed. A printout of this Profile may be accepted with the same authority as the original.*

| Jeffrey Zahniser | Environmental Protection Specialist | USMC/Camp Lejeune/EMD/RCRS |
|---|---|---|
| Authorized Representative Name (Printed) | Title (Printed) | Company Name |

Representative Signature

**13 December 2024**

Date

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

# Special Waste Profile

 **REPUBLIC** SERVICES

Disposal Facility: 5010 CMS Landfill NC

Waste Profile #    5010252524

Sales Rep #:    116

## I. Generator Information

Generator Name: MCB - CAMP LEJEUNE COMMANDING GENERAL ATTN: EMD

Generator Site Address: Site 43, Agan Street, Marine Corps Base Camp Lejeune

City: Camp Lejeune    County: Onslow    State: North Carolina    ZIP: 28540

State ID/Reg. No:    State Approval/Waste Code:    NAICS #:

Generator Mailing Address ☑ (if different    12 Post Lane

City: Camp Lejeune    County: Onslow    State: North Carolina    ZIP: 28547

Generator Contact Name: Jeffrey Zahniser    Email: jeffrey.zahniser@usmc.mil

Phone Number: 910-451-5306    Ext:    Fax Number:

## II. Billing Information

Bill to: Evo Corporation    Contact Name: Edith Basinger

Billing Address: 7535 Styers Ferry Road    Email: accountspayable@evocorp.net

City: Clemmons    State: North Carolina    ZIP: 27012    Phone: 336-725-5844

## III. Waste Stream Information

Name of Waste: Non-Hazardous Soil with PFAS

Process Generating Waste: Soil from monitoring well installation and sampling activities from environmental investigation. Potential Source: Former Agan Street Dump was used to discard debris and received wastewater sludge that may have contained AFFF and/or PFAS. The wastewater treatment plant received wastewater from industrial activities that used material potentially containing PFAS. Street foam was also deployed twice on Agan Street historically.

Type of Waste: Pollution Control Waste    Physical State: Solid    Method of Shipment: Drum

Estimated Volume: 15    Volume Type: Drums

Frequency: One-time Event (single project)    Disposal Consideration: Solidification

## IV. Representative Sample Certification

☐ **No Sample Taken**

☑ **Sample Taken**    **Type of Sample** Composite and Grab

Is the representative sample collected to prepare this profile and laboratory analysis collected in accordance with U.S. EPA 40 CFR 261.20(c) guidelines or equivalent? ☑ Yes ☐ No

Sample Date: 09-06-24

Sample ID Numbers or SDS: eurofins report ID: 410-187235-1 (TCLP & PFAS)
Sample IDs: Site 43-IDW-SO-090624 & Site 43-IDW-SO-090624-01 (PFAS & TCLP)

---

Initial here

**Remember to attach Laboratory Analytical Report (and/or Material Safety Data Sheet) including Chain of Custody and required parameters provided for this profile.**

Page 1

MCB - CAMP LEJEUNE COMMANDING GENERAL ATTN: ⊞ Non-Hazardous Soil with PFAS

September 2023

Special Waste Profile

## V. Physical Characteristics of Waste

Characteristic Components (must equal 100%):     % By Weight (out of 100% – ranges acceptable):

1. Non-Hazardous Soil     98-100

2. Non-Hazardous Water     0-2

3. PFAS     <0.0000001

4.

5.

| Color: | Odor (describe): | Does Waste Contain Free Liquids? | % Solids: | pH: | Flash Point: | |
|---|---|---|---|---|---|---|
| Brown | None | ☑ Yes ☐ No | 98-100 | 6.8-7.5 | >200 | °F |

**Attach Laboratory Analytical Report (and/or Material Safety Data Sheet) including Chain of Custody and required parameters provided for this profile.**

### RCRA Regulatory Questions

1. Does this waste or generating process contain regulated concentrations of the following pesticides and/or herbicides: Chlordane, Endrin, Heptachlor (and its epoxides), Lindane, Methoxychlor, Toxaphene, 2,4-D, or 2,4,5-TP Silvex as defined in 40 CFR 261.33     ☐ Yes ☑ No

2. Does this waste contain reactive sulfides (greater than 500 ppm) or reactive cyanide (greater than 250 ppm) [reference 40 CFR 261.23(a)(5)]?     ☐ Yes ☑ No

3. Does this waste contain regulated concentrations of Polychlorinated Biphenyls (PCBs) as defined in 40 CFR Part 761     ☐ Yes ☑ No

4. Does this waste contain concentrations of listed hazardous wastes defined in 40 CFR 261.31, 261.32, 261.33, including RCRA F-listed solvents?     ☐ Yes ☑ No

5. Has this waste been delisted under 40 CFR 260.20 and 260.22? If yes, attach the final decision to delist the waste as published in the Federal Register.     ☐ Yes ☑ No

6. Does this waste exhibit a hazardous characteristic as defined by federal and/or state regulations? If Yes, identify the applicable waste code and specify if the waste is hazardous as defined by federal, state or both     ☐ Yes ☑ No

7. Does this waste contain regulated concentrations of 2,3,7,8-Tetrachlorodibenzodioxin (2,3,7,8-TCCD), or any other dioxin as defined in 40 CFR 261.31     ☐ Yes ☑ No

8. Is this a regulated medical or infectious waste as defined by federal and/or state regulations     ☐ Yes ☑ No

9. Is this a regulated radioactive waste as defined by federal and/or state regulations     ☐ Yes ☑ No

10. Is this a solid waste that is not a hazardous waste in accordance with 40 CFR 261.4(b)? If yes, please provide the corresponding regulatory citation.     ☐ Yes ☑ No

### Republic Services Waste Handling Questions

1. Does this waste generate heat or react when contacted with water/moisture?     ☐ Yes ☑ No

2. Does the waste contain sulfur or sulfur by-products?     ☐ Yes ☑ No

3. Is this waste generated at a state or federal Superfund cleanup site subject to regulation under CERCLA?     ☑ Yes ☐ No

4a. Is this waste from a TSD facility, TSD-like facility or consolidator (i.e. multiple wastes/multiple generators)?     ☐ Yes ☑ No

4b. If yes to the above question, please provide clarification

Initial here

Page 2

MCB - CAMP LEJEUNE COMMANDING GENERAL ATTN:     Non-Hazardous Soil with PFAS

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

Special Waste Profile


REPUBLIC
SERVICES

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## VI. Certification

*I hereby certify that I have knowledge about the waste material being offered for disposal ("Waste") and have the requisite authority to bind the Generator to the information contained in this Special Waste Profile ("Profile"). I further certify that to the best of my knowledge and belief, the information contained herein is a true, complete and accurate description of the Waste and all known or suspected hazards have been disclosed. All Analytical Results/Safety Data Sheets submitted are truthful and complete and are representative of the Waste.*

*I further certify that by utilizing this Profile, neither myself nor any other employee or representative of the company identified below ("Company") will deliver for disposal or attempt to deliver for disposal any Waste that: (i) is classified as toxic waste, hazardous waste or infectious waste; (ii) that does not conform to this Profile; or (iii) that this Disposal Facility is prohibiting from accepting by law. I shall immediately give written notice of any change or condition pertaining to the Waste not provided herein. Our Company hereby agrees to fully indemnify this Disposal Facility against any damages resulting from this Profile or Certification being inaccurate or untrue.*

*I understand that by attaching an electronic signature, I am signing this document and Company consents to complete this transaction and receive all related communications electronically, and agrees this document will be binding as though it had been physically signed. A printout of this Profile may be accepted with the same authority as the original.*

| | | |
|---|---|---|
| **Jeffrey Zahniser** | Environmental Protection Specialist | **USMC/Camp Lejeune/EMD/RCRS** |
| Authorized Representative Name (Printed) | Title (Printed) | Company Name |
| *Representative Signature* | | **13 December 2024** |
| | | Date |

MCB - CAMP LEJEUNE COMMANDING GENERAL ATTN: 📧 Non-Hazardous Soil with PFAS

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

# Special Waste Profile


**REPUBLIC** SERVICES

Disposal Facility: 5010 CMS Landfill NC

Waste Profile #    5010252525

Sales Rep #:    116

## I. Generator Information

Generator Name: MCB - CAMP LEJEUNE COMMANDING GENERAL ATTN: EMD

Generator Site Address: **Building RR155 Stone Bay Fire Station (Station #10), Camp Lejeune**

City: **Camp Lejeune**     County: **Onslow**     State: North Carolina     ZIP: **28445**

State ID/Reg. No:     State Approval/Waste Code:     NAICS #:

Generator Mailing Address ☑ (if different   **12 Post Lane**

City: **Camp Lejeune**     County: **Onslow**     State: North Carolina     ZIP: **28547**

Generator Contact Name: **Jeffrey Zahniser**     Email: **jeffrey.zahniser@usmc.mil**

Phone Number: **910-451-5306**     Ext:     Fax Number:

## II. Billing Information

Bill to: **Evo Corporation**     Contact Name: **Edith Basinger**

Billing Address: **7535 Styers Ferry Road**     Email: **accountspayable@evocorp.net**

City: **Clemmons**     State: North Carolina     ZIP: **27012**     Phone: **336-725-5844**

## III. Waste Stream Information

Name of Waste: Non-Hazardous Soil with PFAS

Process Generating Waste: Soil cuttings from monitoring well installation activities and sampling for environmental investigation.
Potential Source: A release may have occurred due to the presence of aqueous film-forming foam (AFFF)-containing fire engines, documented storage of AFFF, and likely transfer of AFFF from containers into the fire engines.

Type of Waste: Pollution Control Waste     Physical State: Solid     Method of Shipment: Drum

Estimated Volume: 15     Volume Type: Drums

Frequency: One-time Event (single project)     Disposal Consideration: Solidification

## IV. Representative Sample Certification

☐ **No Sample Taken**

☑ **Sample Taken     Type of Sample** Composite and Grab

Is the representative sample collected to prepare this profile and laboratory analysis collected in accordance with U.S. EPA 40 CFR 261.20(c) guidelines or equivalent? ☑ **Yes** ☐ **No**

Sample Date: 09-24-24

Sample ID Numbers or SDS: eurofins Report ID: 410-189595-1 (TCLP) & 410-189595-2 (PFAS)
Sample IDs: Site115-IDW-SO-092424-01/Site115-IDW-SO-092424-02 (TCLP) & Site115-IDW-SO-092424-01/Site115-IDW-SO-092424-02 (PFAS)

Initial here

**Remember to attach Laboratory Analytical Report (and/or Material Safety Data Sheet) including Chain of Custody and required parameters provided for this profile.**

Page 1     September 2023

MCB - CAMP LEJEUNE COMMANDING GENERAL ATTN: 🔒 Non-Hazardous Soil with PFAS

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

Special Waste Profile



## V. Physical Characteristics of Waste

| Characteristic Components (must equal 100%): | % By Weight (out of 100% – ranges acceptable): |
|---|---|
| 1. Non-Hazardous Soil | 98-100 |
| 2. Non-Hazardous Water | 0-2 |
| 3. PFAS | <0.0000001 |
| 4. | |
| 5. | |

| Color: | Odor (describe): | Does Waste Contain Free Liquids? | % Solids: | pH: | Flash Point: | |
|---|---|---|---|---|---|---|
| Brown | None | ☑ Yes ☐ No | 98-100 | 7.7-11.6 | >200 | °F |

**Attach Laboratory Analytical Report (and/or Material Safety Data Sheet) including Chain of Custody and required parameters provided for this profile.**

### RCRA Regulatory Questions

1. Does this waste or generating process contain regulated concentrations of the following pesticides and/or herbicides: Chlordane, Endrin, Heptachlor (and its epoxides), Lindane, Methoxychlor, Toxaphene, 2,4-D, or 2,4,5-TP Silvex as defined in 40 CFR 261.33    ☐ Yes ☑ No

2. Does this waste contain reactive sulfides (greater than 500 ppm) or reactive cyanide (greater than 250 ppm) [reference 40 CFR 261.23(a)(5)]?    ☐ Yes ☑ No

3. Does this waste contain regulated concentrations of Polychlorinated Biphenyls (PCBs) as defined in 40 CFR Part 761    ☐ Yes ☑ No

4. Does this waste contain concentrations of listed hazardous wastes defined in 40 CFR 261.31, 261.32, 261.33, including RCRA F-listed solvents?    ☐ Yes ☑ No

5. Has this waste been delisted under 40 CFR 260.20 and 260.22? If yes, attach the final decision to delist the waste as published in the Federal Register.    ☐ Yes ☑ No

6. Does this waste exhibit a hazardous characteristic as defined by federal and/or state regulations? If Yes, identify the applicable waste code and specify if the waste is hazardous as defined by federal, state or both    ☐ Yes ☑ No

7. Does this waste contain regulated concentrations of 2,3,7,8-Tetrachlorodibenzodioxin (2,3,7,8-TCCD), or any other dioxin as defined in 40 CFR 261.31    ☐ Yes ☑ No

8. Is this a regulated medical or infectious waste as defined by federal and/or state regulations    ☐ Yes ☑ No

9. Is this a regulated radioactive waste as defined by federal and/or state regulations    ☐ Yes ☑ No

10. Is this a solid waste that is not a hazardous waste in accordance with 40 CFR 261.4(b)? If yes, please provide the corresponding regulatory citation.    ☐ Yes ☑ No

### Republic Services Waste Handling Questions

1. Does this waste generate heat or react when contacted with water/moisture?    ☐ Yes ☑ No

2. Does the waste contain sulfur or sulfur by-products?    ☐ Yes ☑ No

3. Is this waste generated at a state or federal Superfund cleanup site subject to regulation under CERCLA?    ☑ Yes ☐ No

4a. Is this waste from a TSD facility, TSD-like facility or consolidator (i.e. multiple wastes/multiple generators)?    ☐ Yes ☑ No

4b. If yes to the above question, please provide clarification

---

Initial here _____

Page 2    MCB - CAMP LEJEUNE COMMANDING GENERAL ATTN: ▓ Non-Hazardous Soil with PFAS

Special Waste Profile

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## VI. Certification

*I hereby certify that I have knowledge about the waste material being offered for disposal ("Waste") and have the requisite authority to bind the Generator to the information contained in this Special Waste Profile ("Profile"). I further certify that to the best of my knowledge and belief, the information contained herein is a true, complete and accurate description of the Waste and all known or suspected hazards have been disclosed. All Analytical Results/Safety Data Sheets submitted are truthful and complete and are representative of the Waste.*

*I further certify that by utilizing this Profile, neither myself nor any other employee or representative of the company identified below ("Company") will deliver for disposal or attempt to deliver for disposal any Waste that: (i) is classified as toxic waste, hazardous waste or infectious waste; (ii) that does not conform to this Profile; or (iii) that this Disposal Facility is prohibiting from accepting by law. I shall immediately give written notice of any change or condition pertaining to the Waste not provided herein. Our Company hereby agrees to fully indemnify this Disposal Facility against any damages resulting from this Profile or Certification being inaccurate or untrue.*

*I understand that by attaching an electronic signature, I am signing this document and Company consents to complete this transaction and receive all related communications electronically, and agrees this document will be binding as though it had been physically signed. A printout of this Profile may be accepted with the same authority as the original.*

**Jeffrey Zahniser**

Authorized Representative Name
(Printed)

Environmental Protection Specialist

Title
(Printed)

USMC/Camp Lejeune/EMD/RCRS

Company Name

Representative Signature

**13 December 2024**

Date

MCB - CAMP LEJEUNE COMMANDING GENERAL ATTN:   Non-Hazardous Soil with PFAS

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

# Special Waste Profile

 **REPUBLIC** SERVICES

Disposal Facility: 5010 CMS Landfill NC

Waste Profile #: 5010253381

Sales Rep #: 116

## I. Generator Information

Generator Name: MCB - CAMP LEJEUNE COMMANDING GENERAL ATTN: EMD

Generator Site Address: Building LCH4022 Midway Park Fire Station (Station #2)

City: Camp Lejeune     County: Onslow     State: North Carolina     ZIP: 28445

State ID/Reg. No:     State Approval/Waste Code:     NAICS #:

Generator Mailing Address ☑ (if different  12 Post Lane

City: Camp Lejeune     County: Onslow     State: North Carolina     ZIP: 28547

Generator Contact Name: Jeffrey Zahniser     Email: jeffrey.zahniser@usmc.mil

Phone Number: 910-451-5306     Ext:     Fax Number:

## II. Billing Information

Bill to: Evo Corporation     Contact Name: Edith Basinger

Billing Address: 7535 Styers Ferry Road     Email: accountspayable@evocorp.net

City: Clemmons     State: North Carolina     ZIP: 27012     Phone: 336-725-5844

## III. Waste Stream Information

Name of Waste: Non-Hazardous Groundwater with PFAS

Process Generating Waste: Monitoring well development and sampling
Potential Source: A release may have occurred due to the presence of aqueous film-forming foam (AFFF)-containing fire engines, documented storage of AFFF, and likely transfer of AFFF from containers into the fire engines

Type of Waste: Pollution Control Waste     Physical State: Liquid     Method of Shipment: Other

Estimated Volume: 3     Volume Type: Totes

Frequency: One-time Event (single project)     Disposal Consideration: Solidification

## IV. Representative Sample Certification

☐ **No Sample Taken**

☑ **Sample Taken**     **Type of Sample** Composite and Grab

Is the representative sample collected to prepare this profile and laboratory analysis collected in accordance with U.S. EPA 40 CFR 261.20(c) guidelines or equivalent? ☑ Yes ☐ No

Sample Date: 09-06-24, 09-12-24, 11-01-24

Sample ID Numbers or SDS: eurofins Report ID: 410-195152-1 (TCLP) & 410-188074-1/410-187235-1 (PFAS)
Sample ID: Site112-AQ-110124-Tote123 (TCLP) & IDW-Site112-retreat-091224/Site 112-IDW-AQ-090624, Site 112-IDW-AQ-090624-01 (PFAS)

Initial here

**Remember to attach Laboratory Analytical Report (and/or Material Safety Data Sheet) including Chain of Custody and required parameters provided for this profile.**

Page 1

MCB - CAMP LEJEUNE COMMANDING GENERAL ATTN: ☐ Non-Hazardous Groundwater with PFAS

September 2023

Special Waste Profile

 **REPUBLIC** SERVICES

**VI. Certification**

*I hereby certify that I have knowledge about the waste material being offered for disposal ("Waste") and have the requisite authority to bind the Generator to the information contained in this Special Waste Profile ("Profile"). I further certify that to the best of my knowledge and belief, the information contained herein is a true, complete and accurate description of the Waste and all known or suspected hazards have been disclosed. All Analytical Results/Safety Data Sheets submitted are truthful and complete and are representative of the Waste.*

*I further certify that by utilizing this Profile, neither myself nor any other employee or representative of the company identified below ("Company") will deliver for disposal or attempt to deliver for disposal any Waste that: (i) is classified as toxic waste, hazardous waste or infectious waste; (ii) that does not conform to this Profile; or (iii) that this Disposal Facility is prohibiting from accepting by law. I shall immediately give written notice of any change or condition pertaining to the Waste not provided herein. Our Company hereby agrees to fully indemnify this Disposal Facility against any damages resulting from this Profile or Certification being inaccurate or untrue.*

*I understand that by attaching an electronic signature, I am signing this document and Company consents to complete this transaction and receive all related communications electronically, and agrees this document will be binding as though it had been physically signed. A printout of this Profile may be accepted with the same authority as the original.*

| Jeffrey Zahniser | Environmental Protection Specialist | USMC/Camp Lejeune/EMD/RCRS |
|---|---|---|
| Authorized Representative Name (Printed) | Title (Printed) | Company Name |

Representative Signature

**13 December 2024**

Date

MCB - CAMP LEJEUNE COMMANDING GENERAL ATTN: 🔋 Non-Hazardous Groundwater with PFAS

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

Special Waste Profile

## V. Physical Characteristics of Waste

Characteristic Components (must equal 100%):          % By Weight (out of 100% – ranges acceptable):

1. Non-Hazardous Groundwater          95-100

2. Non-Hazardous Sediment          0-5

3. PFAS          <0.0000001

4.

5.

| Color: | Odor (describe): | Does Waste Contain Free Liquids? | % Solids: | pH: | Flash Point: | |
|--------|------------------|----------------------------------|-----------|-----|--------------|---|
| Clear | None | ☑ Yes  ☐ No | 0-5 | 7.8 | >200 | °F |

**Attach Laboratory Analytical Report (and/or Material Safety Data Sheet) including Chain of Custody and required parameters provided for this profile.**

### RCRA Regulatory Questions

1. Does this waste or generating process contain regulated concentrations of the following pesticides and/or herbicides: Chlordane, Endrin, Heptachlor (and its epoxides), Lindane, Methoxychlor, Toxaphene, 2,4-D, or 2,4,5-TP Silvex as defined in 40 CFR 261.33          ☐ Yes  ☑ No

2. Does this waste contain reactive sulfides (greater than 500 ppm) or reactive cyanide (greater than 250 ppm) [reference 40 CFR 261.23(a)(5)]?          ☐ Yes  ☑ No

3. Does this waste contain regulated concentrations of Polychlorinated Biphenyls (PCBs) as defined in 40 CFR Part 761          ☐ Yes  ☑ No

4. Does this waste contain concentrations of listed hazardous wastes defined in 40 CFR 261.31, 261.32, 261.33, including RCRA F-listed solvents?          ☐ Yes  ☑ No

5. Has this waste been delisted under 40 CFR 260.20 and 260.22? If yes, attach the final decision to delist the waste as published in the Federal Register.          ☐ Yes  ☑ No

6. Does this waste exhibit a hazardous characteristic as defined by federal and/or state regulations? If Yes, identify the applicable waste code and specify if the waste is hazardous as defined by federal, state or both          ☐ Yes  ☑ No

7. Does this waste contain regulated concentrations of 2,3,7,8-Tetrachlorodibenzodioxin (2,3,7,8-TCCD), or any other dioxin as defined in 40 CFR 261.31          ☐ Yes  ☑ No

8. Is this a regulated medical or infectious waste as defined by federal and/or state regulations          ☐ Yes  ☑ No

9. Is this a regulated radioactive waste as defined by federal and/or state regulations          ☐ Yes  ☑ No

10. Is this a solid waste that is not a hazardous waste in accordance with 40 CFR 261.4(b)? If yes, please provide the corresponding regulatory citation.          ☐ Yes  ☑ No

### Republic Services Waste Handling Questions

1. Does this waste generate heat or react when contacted with water/moisture?          ☐ Yes  ☑ No

2. Does the waste contain sulfur or sulfur by-products?          ☐ Yes  ☑ No

3. Is this waste generated at a state or federal Superfund cleanup site subject to regulation under CERCLA?          ☑ Yes  ☐ No

4a. Is this waste from a TSD facility, TSD-like facility or consolidator (i.e. multiple wastes/multiple generators)?          ☐ Yes  ☑ No

4b. If yes to the above question, please provide clarification

Initial here

Page 2

MCB - CAMP LEJEUNE COMMANDING GENERAL ATTN: 🔲  Non-Hazardous Groundwater with PFAS

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

Special Waste Profile

 REPUBLIC SERVICES

Disposal Facility: 5010 CMS Landfill NC

Waste Profile #     5010253382

Sales Rep #:     116

## I. Generator Information

Generator Name:  MCB - CAMP LEJEUNE COMMANDING GENERAL ATTN: EMD

Generator Site Address:  Site 36, Former Groundwater Treatment Plant, Marine Corps Air Station Camp  Lejeune

City:  Camp Lejeune     County:  Onslow     State:  North Carolina     ZIP:  28540

State ID/Reg. No:     State Approval/Waste Code:     NAICS #:

Generator Mailing Address  ☑ (if different   12 Post Lane

City:  Camp Lejeune     County:  Onslow     State:  North Carolina     ZIP:  28547

Generator Contact Name:  Jeffrey Zahniser     Email:  jeffrey.zahniser@usmc.mil

Phone Number:  910-451-5306     Ext:     Fax Number:

## II. Billing Information

Bill to:  Evo Corporation     Contact Name:  Edith Basinger

Billing Address:  7535 Styers Ferry Road     Email:  accountspayable@evocorp.net

City:  Clemmons     State:  North Carolina     ZIP:  27012     Phone:  336-725-5844

## III. Waste Stream Information

Name of Waste:  Non-Hazardous Soil with PFAS

Process Generating Waste:  Soil from monitoring well installation and sampling activities from environmental investigation.
Potential Source: AFFF reportedly engulfed the Former Camp Geiger WWTP building at least one time. Additionally, there is potential for PFAS release from receipt of AFFF-containing wastewater from hangars and/or oil-water separators, and the historical presence of sludge drying beds.

Type of Waste:  Pollution Control Waste     Physical State:  Solid     Method of Shipment:  Drum

Estimated Volume: 8     Volume Type:  Drums

Frequency:  One-time Event (single project)     Disposal Consideration:  Solidification

## IV. Representative Sample Certification

☐ **No Sample Taken**

☑ **Sample Taken**     **Type of Sample**  Composite and Grab

Is the representative sample collected to prepare this profile and laboratory analysis collected in accordance with U.S. EPA 40 CFR 261.20(c) guidelines or equivalent?  ☑ **Yes**  ☐**No**

Sample Date:  See attached spreadsheet for IDW sample dates

Sample ID Numbers or SDS:  See attached spreadsheet (Site 36 Data Spreadsheet) for report numbers and sample IDs associated with this profile.

**Remember to attach Laboratory Analytical Report (and/or Material Safety Data Sheet) including Chain of Custody and required parameters provided for this profile.**

Initial here

Page 1

MCB - CAMP LEJEUNE COMMANDING GENERAL ATTN:     Non-Hazardous Soil with PFAS

September 2023

Special Waste Profile

 **REPUBLIC** SERVICES

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## V. Physical Characteristics of Waste

Characteristic Components (must equal 100%):

% By Weight (out of 100% – ranges acceptable):

1. Non-Hazardous Soil — 98-100
2. Non-hazardous water — 0-2
3. PFAS — <0.0000001
4.
5.

| Color: | Odor (describe): | Does Waste Contain Free Liquids? | % Solids: | pH: | Flash Point: | |
|---|---|---|---|---|---|---|
| Brown | None | ☑ Yes  ☐ No | 98-100 | 6.3 | >200 | °F |

**Attach Laboratory Analytical Report (and/or Material Safety Data Sheet) including Chain of Custody and required parameters provided for this profile.**

### RCRA Regulatory Questions

1. Does this waste or generating process contain regulated concentrations of the following pesticides and/or herbicides: Chlordane, Endrin, Heptachlor (and its epoxides), Lindane, Methoxychlor, Toxaphene, 2,4-D, or 2,4,5-TP Silvex as defined in 40 CFR 261.33 — ☐ Yes ☑ No

2. Does this waste contain reactive sulfides (greater than 500 ppm) or reactive cyanide (greater than 250 ppm) [reference 40 CFR 261.23(a)(5)]? — ☐ Yes ☑ No

3. Does this waste contain regulated concentrations of Polychlorinated Biphenyls (PCBs) as defined in 40 CFR Part 761 — ☐ Yes ☑ No

4. Does this waste contain concentrations of listed hazardous wastes defined in 40 CFR 261.31, 261.32, 261.33, including RCRA F-listed solvents? — ☐ Yes ☑ No

5. Has this waste been delisted under 40 CFR 260.20 and 260.22? If yes, attach the final decision to delist the waste as published in the Federal Register. — ☐ Yes ☑ No

6. Does this waste exhibit a hazardous characteristic as defined by federal and/or state regulations? If Yes, identify the applicable waste code and specify if the waste is hazardous as defined by federal, state or both — ☐ Yes ☑ No

7. Does this waste contain regulated concentrations of 2,3,7,8-Tetrachlorodibenzodioxin (2,3,7,8-TCCD), or any other dioxin as defined in 40 CFR 261.31 — ☐ Yes ☑ No

8. Is this a regulated medical or infectious waste as defined by federal and/or state regulations — ☐ Yes ☑ No

9. Is this a regulated radioactive waste as defined by federal and/or state regulations — ☐ Yes ☑ No

10. Is this a solid waste that is not a hazardous waste in accordance with 40 CFR 261.4(b)? If yes, please provide the corresponding regulatory citation. — ☐ Yes ☑ No

### Republic Services Waste Handling Questions

1. Does this waste generate heat or react when contacted with water/moisture? — ☐ Yes ☑ No

2. Does the waste contain sulfur or sulfur by-products? — ☐ Yes ☑ No

3. Is this waste generated at a state or federal Superfund cleanup site subject to regulation under CERCLA? — ☑ Yes ☐ No

4a. Is this waste from a TSD facility, TSD-like facility or consolidator (i.e. multiple wastes/multiple generators)? — ☐ Yes ☑ No

4b. If yes to the above question, please provide clarification

Initial here _GW3_

Page 2

MCB - CAMP LEJEUNE COMMANDING GENERAL, ATTN  Non-Hazardous Soil with PFAS

Special Waste Profile

 **REPUBLIC** SERVICES

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## VI. Certification

*I hereby certify that I have knowledge about the waste material being offered for disposal ("Waste") and have the requisite authority to bind the Generator to the information contained in this Special Waste Profile ("Profile"). I further certify that to the best of my knowledge and belief, the information contained herein is a true, complete and accurate description of the Waste and all known or suspected hazards have been disclosed. All Analytical Results/Safety Data Sheets submitted are truthful and complete and are representative of the Waste.*

*I further certify that by utilizing this Profile, neither myself nor any other employee or representative of the company identified below ("Company") will deliver for disposal or attempt to deliver for disposal any Waste that: (i) is classified as toxic waste, hazardous waste or infectious waste; (ii) that does not conform to this Profile; or (iii) that this Disposal Facility is prohibiting from accepting by law. I shall immediately give written notice of any change or condition pertaining to the Waste not provided herein. Our Company hereby agrees to fully indemnify this Disposal Facility against any damages resulting from this Profile or Certification being inaccurate or untrue.*

*I understand that by attaching an electronic signature, I am signing this document and Company consents to complete this transaction and receive all related communications electronically, and agrees this document will be binding as though it had been physically signed. A printout of this Profile may be accepted with the same authority as the original.*

| | | |
|---|---|---|
| **Jeffrey Zahniser** | Environmental Protection Specialist | **USMC/Camp Lejeune/EMD/RCRS** |
| Authorized Representative Name (Printed) | Title (Printed) | Company Name |

Representative Signature

**14 February 2025**

Date

MCB - CAMP LEJEUNE COMMANDING GENERAL ATTN:   Non-Hazardous Groundwater with PFAS

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

# Special Waste Profile

 **REPUBLIC** SERVICES

Disposal Facility: 5010 CMS Landfill NC

Waste Profile # 5010253383

Sales Rep #: 116 Marston

## I. Generator Information

Generator Name: MCB - CAMP LEJEUNE COMMANDING GENERAL ATTN: EMD

Generator Site Address: Building RR155 Stone Bay Fire Station (Station #10), Camp Lejeune

City: Camp Lejeune     County: Onslow     State: North Carolina     ZIP: 28445

State ID/Reg. No:     State Approval/Waste Code:     NAICS #:

Generator Mailing Address ☑ (if different  12 Post Lane

City: Camp Lejeune     County: Onslow     State: North Carolina     ZIP: 28547

Generator Contact Name: Jeffrey Zahniser     Email: jeffrey.zahniser@usmc.mil

Phone Number: 910-451-5306     Ext:     Fax Number:

## II. Billing Information

Bill to: Evo Corporation     Contact Name: Edith Basinger

Billing Address: 7535 Styers Ferry Road     Email: accountspayable@evocorp.net

City: Clemmons     State: North Carolina     ZIP: 27012     Phone: 336-725-5844

## III. Waste Stream Information

Name of Waste: Non-Hazardous Groundwater with PFAS

Process Generating Waste: Purge and development water from monitoring well installation activities and sampling for environmental investigation. Potential Source: A release may have occurred due to the presence of aqueous film-forming foam (AFFF)-containing fire engines, documented storage of AFFF, and likely transfer of AFFF from containers into the fire engines.

Type of Waste: Pollution Control Waste     Physical State: Liquid     Method of Shipment: Other

Estimated Volume: 3     Volume Type: Totes

Frequency: One-time Event (single project)     Disposal Consideration: Solidification

## IV. Representative Sample Certification

☐ **No Sample Taken**

☑ **Sample Taken     Type of Sample** Composite and Grab

Is the representative sample collected to prepare this profile and laboratory analysis collected in accordance with U.S. EPA 40 CFR 261.20(c) guidelines or equivalent? ☑ Yes  ☐ No

Sample Date: 09-06-24

Sample ID Numbers or SDS: eurofins Report ID: 410-187235-1
Sample IDs: Site 115-IDW-AQ-090624 & Site 115-IDW-AQ-090624-01

---

Initial here

**Remember to attach Laboratory Analytical Report (and/or Material Safety Data Sheet) including Chain of Custody and required parameters provided for this profile.**

Page 1

MCB - CAMP LEJEUNE COMMANDING GENERAL ATTN: ☐  Non-Hazardous Groundwater with PFAS

September 2023

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

Special Waste Profile  **REPUBLIC** SERVICES

## V. Physical Characteristics of Waste

Characteristic Components (must equal 100%):

| | % By Weight (out of 100% – ranges acceptable): |
|---|---|
| 1. Non-Hazardous Groundwater | 95-100 |
| 2. Non-Hazardous Sediment | 0-5 |
| 3. PFAS | <0.0000001 |
| 4. | |
| 5. | |

| Color: | Odor (describe): | Does Waste Contain Free Liquids? | % Solids: | pH: | Flash Point: | |
|---|---|---|---|---|---|---|
| Clear | None | ☑ Yes ☐ No | 0-5 | 6.8 | >200 | °F |

**Attach Laboratory Analytical Report (and/or Material Safety Data Sheet) including Chain of Custody and required parameters provided for this profile.**

## RCRA Regulatory Questions

1. Does this waste or generating process contain regulated concentrations of the following pesticides and/or herbicides: Chlordane, Endrin, Heptachlor (and its epoxides), Lindane, Methoxychlor, Toxaphene, 2,4-D, or 2,4,5-TP Silvex as defined in 40 CFR 261.33 — ☐ Yes ☑ No

2. Does this waste contain reactive sulfides (greater than 500 ppm) or reactive cyanide (greater than 250 ppm) [reference 40 CFR 261.23(a)(5)]? — ☐ Yes ☑ No

3. Does this waste contain regulated concentrations of Polychlorinated Biphenyls (PCBs) as defined in 40 CFR Part 761 — ☐ Yes ☑ No

4. Does this waste contain concentrations of listed hazardous wastes defined in 40 CFR 261.31, 261.32, 261.33, including RCRA F-listed solvents? — ☐ Yes ☑ No

5. Has this waste been delisted under 40 CFR 260.20 and 260.22? If yes, attach the final decision to delist the waste as published in the Federal Register. — ☐ Yes ☑ No

6. Does this waste exhibit a hazardous characteristic as defined by federal and/or state regulations? If Yes, identify the applicable waste code and specify if the waste is hazardous as defined by federal, state or both — ☐ Yes ☑ No

7. Does this waste contain regulated concentrations of 2,3,7,8-Tetrachlorodibenzodioxin (2,3,7,8-TCCD), or any other dioxin as defined in 40 CFR 261.31 — ☐ Yes ☑ No

8. Is this a regulated medical or infectious waste as defined by federal and/or state regulations — ☐ Yes ☑ No

9. Is this a regulated radioactive waste as defined by federal and/or state regulations — ☐ Yes ☑ No

10. Is this a solid waste that is not a hazardous waste in accordance with 40 CFR 261.4(b)? If yes, please provide the corresponding regulatory citation. — ☐ Yes ☑ No

## Republic Services Waste Handling Questions

1. Does this waste generate heat or react when contacted with water/moisture? — ☐ Yes ☑ No

2. Does the waste contain sulfur or sulfur by-products? — ☐ Yes ☑ No

3. Is this waste generated at a state or federal Superfund cleanup site subject to regulation under CERCLA? — ☑ Yes ☐ No

4a. Is this waste from a TSD facility, TSD-like facility or consolidator (i.e. multiple wastes/multiple generators)? — ☐ Yes ☑ No

4b. If yes to the above question, please provide clarification

Initial here ___

MCB - CAMP LEJEUNE COMMANDING GENERAL ATTN: ⬛ Non-Hazardous Groundwater with PFAS

Special Waste Profile



REPUBLIC
SERVICES

### VI. Certification

*I hereby certify that I have knowledge about the waste material being offered for disposal ("Waste") and have the requisite authority to bind the Generator to the information contained in this Special Waste Profile ("Profile"). I further certify that to the best of my knowledge and belief, the information contained herein is a true, complete and accurate description of the Waste and all known or suspected hazards have been disclosed. All Analytical Results/Safety Data Sheets submitted are truthful and complete and are representative of the Waste.*

*I further certify that by utilizing this Profile, neither myself nor any other employee or representative of the company identified below ("Company") will deliver for disposal or attempt to deliver for disposal any Waste that: (i) is classified as toxic waste, hazardous waste or infectious waste; (ii) that does not conform to this Profile; or (iii) that this Disposal Facility is prohibiting from accepting by law. I shall immediately give written notice of any change or condition pertaining to the Waste not provided herein. Our Company hereby agrees to fully indemnify this Disposal Facility against any damages resulting from this Profile or Certification being inaccurate or untrue.*

*I understand that by attaching an electronic signature, I am signing this document and Company consents to complete this transaction and receive all related communications electronically, and agrees this document will be binding as though it had been physically signed. A printout of this Profile may be accepted with the same authority as the original.*

| | | |
|---|---|---|
| **Jeffrey Zahniser** | Environmental Protection Specialist | **USMC/Camp Lejeune/EMD/RCRS** |
| Authorized Representative Name (Printed) | Title (Printed) | Company Name |

Representative Signature

## 13 December 2024
Date

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

# Special Waste Profile


**REPUBLIC** SERVICES

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

Disposal Facility: 5010 CMS Landfill NC

Waste Profile #    5010253384

Sales Rep #:    116

## I. Generator Information

Generator Name: MCB-Camp Lejeune-Commanding General Attention:EMD

Generator Site Address: Site 82, 626 Piney Green Road

City: Camp Lejeune    County: Onslow    State: North Carolina    ZIP: 28547

State ID/Reg. No: NC6170022580    State Approval/Waste Code: N/A    NAICS #: N/A

Generator Mailing Address ☑ (if different 12 Post Lane

City: Camp Lejeune    County: Onslow    State: North Carolina    ZIP:

Generator Contact Name: Jeffrey Zahniser    Email: jeffrey.zahniser@usmc.mil

Phone Number: 910-451-5256    Ext:    Fax Number:

## II. Billing Information

Bill to: Evo Corporation    Contact Name: Edith Basinger

Billing Address: 7535 Styers Ferry Road    Email: accountspayable@evocorp.net

City: Clemmons    State: North Carolina    ZIP: 27012    Phone: 336-725-5844

## III. Waste Stream Information

Name of Waste: Dried Sludge contaminated with non hazardous VOCs and PFAS.

Process Generating Waste: Sludge removed from filter press associated with groundwater treatment plant that treats groundwater contaminated with non hazardous VOCs from unknown historical releases.

Type of Waste: Pollution Control Waste    Physical State: Solid    Method of Shipment: Drum

Estimated Volume: 9    Volume Type: Drums

Frequency: On-going Waste Stream    Disposal Consideration: Solidification

## IV. Representative Sample Certification

☐ **No Sample Taken**

☑ **Sample Taken**    **Type of Sample**    Composite Sample

Is the representative sample collected to prepare this profile and laboratory analysis collected in accordance with U.S. EPA 40 CFR 261.20(c) guidelines or equivalent? ☑ Yes ☐ No

Sample Date: 11/26/24    02/11/24

Sample ID Numbers or SDS: Katahdin Analytical Services report number SR6554, Sample ID: Site82-RDW-002. Katahdin Analytical Services report number SR6803, Sample ID: Site82-RDW-002.

Initial here _JWZ_

**Remember to attach Laboratory Analytical Report (and/or Material Safety Data Sheet) including Chain of Custody and required parameters provided for this profile.**

Special Waste Profile



REPUBLIC
*SERVICES*

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## V. Physical Characteristics of Waste

Characteristic Components (must equal 100%):        % By Weight (out of 100% – ranges acceptable):

1. Dried Sludge        >99.998
2. VOCs        <0.001
3. PFAS        <0.0001
4.
5.

| Color: | Odor (describe): | Does Waste Contain Free Liquids? | % Solids: | pH: | Flash Point: |
|---|---|---|---|---|---|
| Brown | None | ☐ Yes  ☑ No | 100% | 5-10 | >200  °F |

**Attach Laboratory Analytical Report (and/or Material Safety Data Sheet) including Chain of Custody and required parameters provided for this profile.**

### RCRA Regulatory Questions

1. Does this waste or generating process contain regulated concentrations of the following pesticides and/or herbicides: Chlordane, Endrin, Heptachlor (and its epoxides), Lindane, Methoxychlor, Toxaphene, 2,4-D, or 2,4,5-TP Silvex as defined in 40 CFR 261.33        ☐ Yes  ☑ No

2. Does this waste contain reactive sulfides (greater than 500 ppm) or reactive cyanide (greater than 250 ppm) [reference 40 CFR 261.23(a)(5)]?        ☐ Yes  ☑ No

3. Does this waste contain regulated concentrations of Polychlorinated Biphenyls (PCBs) as defined in 40 CFR Part 761        ☐ Yes  ☑ No

4. Does this waste contain concentrations of listed hazardous wastes defined in 40 CFR 261.31, 261.32, 261.33, including RCRA F-listed solvents?        ☐ Yes  ☑ No

5. Has this waste been delisted under 40 CFR 260.20 and 260.22? If yes, attach the final decision to delist the waste as published in the Federal Register.        ☐ Yes  ☑ No

6. Does this waste exhibit a hazardous characteristic as defined by federal and/or state regulations? If Yes, identify the applicable waste code and specify if the waste is hazardous as defined by federal, state or both        ☐ Yes  ☑ No

7. Does this waste contain regulated concentrations of 2,3,7,8-Tetrachlorodibenzodioxin (2,3,7,8-TCCD), or any other dioxin as defined in 40 CFR 261.31        ☐ Yes  ☑ No

8. Is this a regulated medical or infectious waste as defined by federal and/or state regulations        ☐ Yes  ☑ No

9. Is this a regulated radioactive waste as defined by federal and/or state regulations        ☐ Yes  ☑ No

10. Is this a solid waste that is not a hazardous waste in accordance with 40 CFR 261.4(b)? If yes, please provide the corresponding regulatory citation.        ☐ Yes  ☑ No

### Republic Services Waste Handling Questions

1. Does this waste generate heat or react when contacted with water/moisture?        ☐ Yes  ☑ No

2. Does the waste contain sulfur or sulfur by-products?        ☐ Yes  ☑ No

3. Is this waste generated at a state or federal Superfund cleanup site subject to regulation under CERCLA?        ☑ Yes  ☐ No

4a. Is this waste from a TSD facility, TSD-like facility or consolidator (i.e. multiple wastes/multiple generators)?        ☐ Yes  ☑ No

4b. If yes to the above question, please provide clarification

Initial here  [signature]

Page 2

MCB-Camp Lejeune-Commanding General Attention:EM    Dried Sludge contaminated with non hazardous VOCs

Special Waste Profile  **REPUBLIC** SERVICES

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## VI. Certification

*I hereby certify that I have knowledge about the waste material being offered for disposal ("Waste") and have the requisite authority to bind the Generator to the information contained in this Special Waste Profile ("Profile"). I further certify that to the best of my knowledge and belief, the information contained herein is a true, complete and accurate description of the Waste and all known or suspected hazards have been disclosed. All Analytical Results/Safety Data Sheets submitted are truthful and complete and are representative of the Waste.*

*I further certify that by utilizing this Profile, neither myself nor any other employee or representative of the company identified below ("Company") will deliver for disposal or attempt to deliver for disposal any Waste that: (i) is classified as toxic waste, hazardous waste or infectious waste; (ii) that does not conform to this Profile; or (iii) that this Disposal Facility is prohibiting from accepting by law. I shall immediately give written notice of any change or condition pertaining to the Waste not provided herein. Our Company hereby agrees to fully indemnify this Disposal Facility against any damages resulting from this Profile or Certification being inaccurate or untrue.*

*I understand that by attaching an electronic signature, I am signing this document and Company consents to complete this transaction and receive all related communications electronically, and agrees this document will be binding as though it had been physically signed. A printout of this Profile may be accepted with the same authority as the original.*

| | | |
|---|---|---|
| Jeffrey Zahniser | Environmental Protection Specialist | USMC/Camp Lejeune/EMD/RCRS |
| Authorized Representative Name (Printed) | Title (Printed) | Company Name |

| | |
|---|---|
| Representative Signature | 28 January 2025 |
| | Date |

MCB-Camp Lejeune-Commanding General Attention:EM   Dried Sludge contaminated with non hazardous VOCs

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

# Special Waste Profile


**REPUBLIC** SERVICES

Disposal Facility: 5010 CMS Landfill NC

Waste Profile #    5010253385

Sales Rep #:    116

## I. Generator Information

Generator Name:  MCB-Camp Lejeune-Commanding General  Attention:EMD

Generator Site Address:  **Site 93-Camp Geiger, at the intersection of Tenth and E Streets**

City: **MCAS New River**        County: **Onslow**        State: North Carolina        ZIP: **28545**

State ID/Reg. No: NC6170022580    State Approval/Waste Code: **N/A**        NAICS #: **N/A**

Generator Mailing Address  ☑ (if different  **12 Post Lane**

City: **Camp Lejeune**        County: **Onslow**        State: North Carolina        ZIP:

Generator Contact Name:  **Jeffrey Zahniser**        Email: **jeffrey.zahniser@usmc.mil**

Phone Number: **910-451-5256**        Ext:        Fax Number:

## II. Billing Information

Bill to:  **Evo Corporation**        Contact Name:  **Edith Basinger**

Billing Address: **7535 Styers Ferry Road**        Email: **accountspayable@evocorp.net**

City: **Clemmons**        State: North Carolina        ZIP: **27012**    Phone: **336-725-5844**

## III. Waste Stream Information

Name of Waste:  Site 93 purged groundwater contaminated with non hazardous VOCs and PFAS.

Process Generating Waste: Purge water generated during annual groundwater sampling event. Site 93 groundwater is sampled bi-annually in conjunction with remediation efforts in response to historical VOC releases. Potential sources of contaminations are associated with the former UST located at the site.

Type of Waste:  Pollution Control Waste        Physical State: Liquid        Method of Shipment:  Drum

Estimated Volume: 1        Volume Type: Drums

Frequency: On-going Waste Stream        Disposal Consideration: Solidification

## IV. Representative Sample Certification

☐ **No Sample Taken**

☑ **Sample Taken**    **Type of Sample**  Composite and Grab

Is the representative sample collected to prepare this profile and laboratory analysis collected in accordance with U.S. EPA 40 CFR 261.20(c) guidelines or equivalent?  ☑ Yes  ☐ No

Sample Date:  11/5/24-11/6/24  12/19/23

Sample ID Numbers or SDS:  Katahdin Analytical Services report number  SR6150, Sample ID: All samples apply. Katahdin Analytical Services report number 649486_011924_1328, Sample ID: Site 93IDW001.

Initial here [signature]

**Remember to attach Laboratory Analytical Report (and/or Material Safety Data Sheet) including Chain of Custody and required parameters provided for this profile.**

Page 1

MCB-Camp Lejeune-Commanding General  Attention:EMD  Site 93 purged groundwater contaminated with non ha...

September 2023

Special Waste Profile


REPUBLIC
SERVICES

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## V. Physical Characteristics of Waste

| Characteristic Components (must equal 100%): | % By Weight (out of 100% – ranges acceptable): |
|---|---|
| 1. Groundwater | >99.99% |
| 2. VOCs | <0.001% |
| 3. PFAS | <0.0001% |
| 4. | |
| 5. | |

| Color: | Odor (describe): | Does Waste Contain Free Liquids? | % Solids: | pH: | Flash Point: | |
|---|---|---|---|---|---|---|
| Clear-Brown | Unkown | ☑ Yes ☐ No | 0% | 5-10 | >200 | °F |

**Attach Laboratory Analytical Report (and/or Material Safety Data Sheet) including Chain of Custody and required parameters provided for this profile.**

## RCRA Regulatory Questions

1. Does this waste or generating process contain regulated concentrations of the following pesticides and/or herbicides: Chlordane, Endrin, Heptachlor (and its epoxides), Lindane, Methoxychlor, Toxaphene, 2,4-D, or 2,4,5-TP Silvex as defined in 40 CFR 261.33  ☐ Yes ☑ No

2. Does this waste contain reactive sulfides (greater than 500 ppm) or reactive cyanide (greater than 250 ppm) [reference 40 CFR 261.23(a)(5)]?  ☐ Yes ☑ No

3. Does this waste contain regulated concentrations of Polychlorinated Biphenyls (PCBs) as defined in 40 CFR Part 761  ☐ Yes ☑ No

4. Does this waste contain concentrations of listed hazardous wastes defined in 40 CFR 261.31, 261.32, 261.33, including RCRA F-listed solvents?  ☐ Yes ☑ No

5. Has this waste been delisted under 40 CFR 260.20 and 260.22? If yes, attach the final decision to delist the waste as published in the Federal Register.  ☐ Yes ☑ No

6. Does this waste exhibit a hazardous characteristic as defined by federal and/or state regulations? If Yes, identify the applicable waste code and specify if the waste is hazardous as defined by federal, state or both  ☐ Yes ☑ No

7. Does this waste contain regulated concentrations of 2,3,7,8-Tetrachlorodibenzodioxin (2,3,7,8-TCCD), or any other dioxin as defined in 40 CFR 261.31  ☐ Yes ☑ No

8. Is this a regulated medical or infectious waste as defined by federal and/or state regulations  ☐ Yes ☑ No

9. Is this a regulated radioactive waste as defined by federal and/or state regulations  ☐ Yes ☑ No

10. Is this a solid waste that is not a hazardous waste in accordance with 40 CFR 261.4(b)? If yes, please provide the corresponding regulatory citation.  ☐ Yes ☑ No

## Republic Services Waste Handling Questions

1. Does this waste generate heat or react when contacted with water/moisture?  ☐ Yes ☑ No

2. Does the waste contain sulfur or sulfur by-products?  ☐ Yes ☑ No

3. Is this waste generated at a state or federal Superfund cleanup site subject to regulation under CERCLA?  ☑ Yes ☐ No

4a. Is this waste from a TSD facility, TSD-like facility or consolidator (i.e. multiple wastes/multiple generators)?  ☐ Yes ☑ No

4b. If yes to the above question, please provide clarification

Initial here _GW3_

Page 2

MCB-Camp Lejeune-Commanding General Attention EM Site 93 purged groundwater contaminated with non ha

Special Waste Profile

**REPUBLIC** SERVICES

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## VI. Certification

*I hereby certify that I have knowledge about the waste material being offered for disposal ("Waste") and have the requisite authority to bind the Generator to the information contained in this Special Waste Profile ("Profile"). I further certify that to the best of my knowledge and belief, the information contained herein is a true, complete and accurate description of the Waste and all known or suspected hazards have been disclosed. All Analytical Results/Safety Data Sheets submitted are truthful and complete and are representative of the Waste.*

*I further certify that by utilizing this Profile, neither myself nor any other employee or representative of the company identified below ("Company") will deliver for disposal or attempt to deliver for disposal any Waste that: (i) is classified as toxic waste, hazardous waste or infectious waste; (ii) that does not conform to this Profile; or (iii) that this Disposal Facility is prohibiting from accepting by law. I shall immediately give written notice of any change or condition pertaining to the Waste not provided herein. Our Company hereby agrees to fully indemnify this Disposal Facility against any damages resulting from this Profile or Certification being inaccurate or untrue.*

*I understand that by attaching an electronic signature, I am signing this document and Company consents to complete this transaction and receive all related communications electronically, and agrees this document will be binding as though it had been physically signed. A printout of this Profile may be accepted with the same authority as the original.*

| | | |
|---|---|---|
| Jeffrey Zahniser | Environmental Protection Specialist | USMC/Camp Lejeune/EMD/RCRS |
| Authorized Representative Name (Printed) | Title (Printed) | Company Name |
| *[signature]* Representative Signature | | 28 January 2025 |
| | | Date |

MCB-Camp Lejeune-Commanding General Attention:EM   Site 93 purged groundwater contaminated with non ha

# Special Waste Profile


**REPUBLIC** SERVICES

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

Disposal Facility: 5010 CMS Landfill NC

Waste Profile # 5010253386

Sales Rep #: 116

---

## I. Generator Information

Generator Name: MCB-Camp Lejeune-Commanding General Attention:EMD

Generator Site Address: **Site 89, Camp Geiger on the corner of 8th St and G St.**

City: **MCAS New River**       County: **Onslow**       State: North Carolina       ZIP: **28545**

State ID/Reg. No: NC6170022580    State Approval/Waste Code: N/A                NAICS #: N/A

Generator Mailing Address ☑ (if different  **12 Post Lane**

City: **Camp Lejeune**       County: **Onslow**       State: North Carolina       ZIP:

Generator Contact Name: **Jeffrey Zahniser**                Email: **jeffrey.zahniser@usmc.mil**

Phone Number: **910-451-5256**       Ext:       Fax Number:

## II. Billing Information

Bill to: **Evo Corporation**                Contact Name: **Edith Basinger**

Billing Address: **7535 Styers Ferry Road**                Email: **accountspayable@evocorp.net**

City: **Clemmons**       State: North Carolina       ZIP: **27012**       Phone: **336-725-5844**

## III. Waste Stream Information

Name of Waste: Site 89 purged groundwater contaminated with non hazardous VOCs and PFAS.

Process Generating Waste: Purge water generated during annual groundwater sampling event. Site 89 groundwater is sampled annually in conjunction with remediation efforts in response to historical VOC releases. The site was a former Base motor pool.

Type of Waste: Pollution Control Waste       Physical State: Liquid       Method of Shipment: Drum

Estimated Volume: 1                Volume Type: Drums

Frequency: On-going Waste Stream       Disposal Consideration: Solidification

## IV. Representative Sample Certification

☐ **No Sample Taken**

☑ **Sample Taken**    **Type of Sample** Composite and Grab

Is the representative sample collected to prepare this profile and laboratory analysis collected in accordance with U.S. EPA 40 CFR 261.20(c) guidelines or equivalent? ☑ Yes ☐ No

Sample Date: 10/22/24-10/24/24  12/19/23

Sample ID Numbers or SDS: Katahdin Analytical Services report number SR5942, Sample ID: All samples apply. Katahdin Analytical Services report number 649486_011924_1328, Sample ID: Site 89-IDW002.

---

Initial here [signature]

**Remember to attach Laboratory Analytical Report (and/or Material Safety Data Sheet) including Chain of Custody and required parameters provided for this profile.**

Page 1

September 2023

MCB-Camp Lejeune-Commanding General Attention:EM   Site 89 purged groundwater contaminated with non ha

Special Waste Profile


REPUBLIC
SERVICES

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## V. Physical Characteristics of Waste

Characteristic Components (must equal 100%):

% By Weight (out of 100% – ranges acceptable):

1. Groundwater                                          >99.98%

2. VOCs                                                 <0.001%

3. PFAS                                                 <0.0001%

4.

5.

| Color: | Odor (describe): | Does Waste Contain Free Liquids? | % Solids: | pH: | Flash Point: |
|---|---|---|---|---|---|
| Clear-Brown | Unkown | ☑ Yes  ☐ No | 0% | 5-10 | >200      °F |

**Attach Laboratory Analytical Report (and/or Material Safety Data Sheet) including Chain of Custody and required parameters provided for this profile.**

### RCRA Regulatory Questions

1. Does this waste or generating process contain regulated concentrations of the following pesticides and/or herbicides: Chlordane, Endrin, Heptachlor (and its epoxides), Lindane, Methoxychlor, Toxaphene, 2,4-D, or 2,4,5-TP Silvex as defined in 40 CFR 261.33     ☐ Yes  ☑ No

2. Does this waste contain reactive sulfides (greater than 500 ppm) or reactive cyanide (greater than 250 ppm) [reference 40 CFR 261.23(a)(5)]?     ☐ Yes  ☑ No

3. Does this waste contain regulated concentrations of Polychlorinated Biphenyls (PCBs) as defined in 40 CFR Part 761     ☐ Yes  ☑ No

4. Does this waste contain concentrations of listed hazardous wastes defined in 40 CFR 261.31, 261.32, 261.33, including RCRA F-listed solvents?     ☐ Yes  ☑ No

5. Has this waste been delisted under 40 CFR 260.20 and 260.22? If yes, attach the final decision to delist the waste as published in the Federal Register.     ☐ Yes  ☑ No

6. Does this waste exhibit a hazardous characteristic as defined by federal and/or state regulations? If Yes, identify the applicable waste code and specify if the waste is hazardous as defined by federal, state or both     ☐ Yes  ☑ No

7. Does this waste contain regulated concentrations of 2,3,7,8-Tetrachlorodibenzodioxin (2,3,7,8-TCCD), or any other dioxin as defined in 40 CFR 261.31     ☐ Yes  ☑ No

8. Is this a regulated medical or infectious waste as defined by federal and/or state regulations     ☐ Yes  ☑ No

9. Is this a regulated radioactive waste as defined by federal and/or state regulations     ☐ Yes  ☑ No

10. Is this a solid waste that is not a hazardous waste in accordance with 40 CFR 261.4(b)? If yes, please provide the corresponding regulatory citation.     ☐ Yes  ☑ No

### Republic Services Waste Handling Questions

1. Does this waste generate heat or react when contacted with water/moisture?     ☐ Yes  ☑ No

2. Does the waste contain sulfur or sulfur by-products?     ☐ Yes  ☑ No

3. Is this waste generated at a state or federal Superfund cleanup site subject to regulation under CERCLA?     ☑ Yes  ☐ No

4a. Is this waste from a TSD facility, TSD-like facility or consolidator (i.e. multiple wastes/multiple generators)?     ☐ Yes  ☑ No

4b. If yes to the above question, please provide clarification

Initial here _JWB_

Page 2

MCB-Camp Lejeune-Commanding General  Attention:E⬛  Site 89 purged groundwater contaminated with non ha⬛

Special Waste Profile



ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## VI. Certification

*I hereby certify that I have knowledge about the waste material being offered for disposal ("Waste") and have the requisite authority to bind the Generator to the information contained in this Special Waste Profile ("Profile"). I further certify that to the best of my knowledge and belief, the information contained herein is a true, complete and accurate description of the Waste and all known or suspected hazards have been disclosed. All Analytical Results/Safety Data Sheets submitted are truthful and complete and are representative of the Waste.*

*I further certify that by utilizing this Profile, neither myself nor any other employee or representative of the company identified below ("Company") will deliver for disposal or attempt to deliver for disposal any Waste that: (i) is classified as toxic waste, hazardous waste or infectious waste; (ii) that does not conform to this Profile; or (iii) that this Disposal Facility is prohibiting from accepting by law. I shall immediately give written notice of any change or condition pertaining to the Waste not provided herein. Our Company hereby agrees to fully indemnify this Disposal Facility against any damages resulting from this Profile or Certification being inaccurate or untrue.*

*I understand that by attaching an electronic signature, I am signing this document and Company consents to complete this transaction and receive all related communications electronically, and agrees this document will be binding as though it had been physically signed. A printout of this Profile may be accepted with the same authority as the original.*

| Jeffrey Zahniser | Environmental Protection Specialist | USMC/Camp Lejeune/EMD/RCRS |
|---|---|---|
| Authorized Representative Name (Printed) | Title (Printed) | Company Name |

Representative Signature

28 January 2025

Date

MCB-Camp Lejeune-Commanding General  Attention:E  Site 89 purged groundwater contaminated with non h

# Special Waste Profile


**REPUBLIC** SERVICES

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

Disposal Facility: 5010 CMS Landfill NC

Waste Profile #    50102410680

Sales Rep #:    116 Marston

## I. Generator Information

Generator Name: MCB - Camp Lejeune - Commanding General Attn: EMD

Generator Site Address: Loop Road

City: **Camp Lejeune**    County: **Onslow**    State: North Carolina    ZIP: **28547**

State ID/Reg. No:    State Approval/Waste Code:    NAICS #:

Generator Mailing Address ☑ (if different    12 Post Lane

City: **Camp Lejeune**    County: **Onslow**    State: North Carolina    ZIP: **28547**

Generator Contact Name: **Jeffrey Zahniser**    Email: **Jeffrey.zahniser@usmc.mil**

Phone Number: **910-451-5306**    Ext:    Fax Number:

## II. Billing Information

Bill to: **Evo Corporation**    Contact Name: **Edith Basinger**

Billing Address: **1703 Vargrave Street**    Email: **accountspayable@evcorp.net**

City: **Winston-Salem**    State: North Carolina    ZIP: **27107**    Phone: **336-725-5844**

## III. Waste Stream Information

Name of Waste: Decon Water with PFAS

Process Generating Waste: Waste was generated from geotechnical work being performed on the base for a new building that was going to be constructed. The site where drilling was performed was a natural, undisturbed wooded area. The Navy required the decon water to be containerized and sampled. Analytical results indicated the decon water was contaminated with low levels of PFAS. The source of the contamination is unknown

Type of Waste: Pollution Control Waste    Physical State: Liquid    Method of Shipment: Drum

Estimated Volume: 1    Volume Type: Drums

Frequency: One-time Event (single project)    Disposal Consideration: Solidification

## IV. Representative Sample Certification

☐ **No Sample Taken**

☑ **Sample Taken    Type of Sample** Grab Sample

Is the representative sample collected to prepare this profile and laboratory analysis collected in accordance with U.S. EPA 40 CFR 261.20(c) guidelines or equivalent? ☑ **Yes** ☐ **No**

Sample Date: 07/24/23 16:00    07/24/23 16:30

Sample ID Numbers or SDS:    Pace Project Number: 92679680 Sample ID: DRUM Lab ID: 92679680003
Pace Project Number: 92679683 Sample ID: DRUM Lab ID: 92679683001

**Remember to attach Laboratory Analytical Report (and/or Material Safety Data Sheet) including Chain of Custody and required parameters provided for this profile.**

Initial here [signature]

Page 1

Special Waste Profile

 REPUBLIC SERVICES

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## V. Physical Characteristics of Waste

Characteristic Components (must equal 100%):     % By Weight (out of 100% – ranges acceptable):

1. Decon Water     >99.99%
2. PFAS     <.001%
3.
4.
5.

| Color: | Odor (describe): | Does Waste Contain Free Liquids? | % Solids: | pH: | Flash Point: | |
|---|---|---|---|---|---|---|
| Clear | None | ☑ Yes ☐ No | 0% | 5-10 | >200 | °F |

**Attach Laboratory Analytical Report (and/or Material Safety Data Sheet) including Chain of Custody and required parameters provided for this profile.**

### RCRA Regulatory Questions

1. Does this waste or generating process contain regulated concentrations of the following pesticides and/or herbicides: Chlordane, Endrin, Heptachlor (and its epoxides), Lindane, Methoxychlor, Toxaphene, 2,4-D, or 2,4,5-TP Silvex as defined in 40 CFR 261.33   ☐ Yes ☑ No

2. Does this waste contain reactive sulfides (greater than 500 ppm) or reactive cyanide (greater than 250 ppm) [reference 40 CFR 261.23(a)(5)]?   ☐ Yes ☑ No

3. Does this waste contain regulated concentrations of Polychlorinated Biphenyls (PCBs) as defined in 40 CFR Part 761   ☐ Yes ☑ No

4. Does this waste contain concentrations of listed hazardous wastes defined in 40 CFR 261.31, 261.32, 261.33, including RCRA F-listed solvents?   ☐ Yes ☑ No

5. Has this waste been delisted under 40 CFR 260.20 and 260.22? If yes, attach the final decision to delist the waste as published in the Federal Register.   ☐ Yes ☑ No

6. Does this waste exhibit a hazardous characteristic as defined by federal and/or state regulations? If Yes, identify the applicable waste code and specify if the waste is hazardous as defined by federal, state or both   ☐ Yes ☑ No

7. Does this waste contain regulated concentrations of 2,3,7,8-Tetrachlorodibenzodioxin (2,3,7,8-TCCD), or any other dioxin as defined in 40 CFR 261.31   ☐ Yes ☑ No

8. Is this a regulated medical or infectious waste as defined by federal and/or state regulations   ☐ Yes ☑ No

9. Is this a regulated radioactive waste as defined by federal and/or state regulations   ☐ Yes ☑ No

10. Is this a solid waste that is not a hazardous waste in accordance with 40 CFR 261.4(b)? If yes, please provide the corresponding regulatory citation.   ☐ Yes ☑ No

### Republic Services Waste Handling Questions

1. Does this waste generate heat or react when contacted with water/moisture?   ☐ Yes ☑ No

2. Does the waste contain sulfur or sulfur by-products?   ☐ Yes ☑ No

3. Is this waste generated at a state or federal Superfund cleanup site subject to regulation under CERCLA?   ☐ Yes ☑ No

4a. Is this waste from a TSD facility, TSD-like facility or consolidator (i.e. multiple wastes/multiple generators)?   ☐ Yes ☑ No

4b. If yes to the above question, please provide clarification

Initial here

Page 2     MCB - Camp Lejeune - Commanding General Attn: EMD     Decon Water with PFAS

Special Waste Profile



**REPUBLIC**
SERVICES

## VI. Certification

*I hereby certify that I have knowledge about the waste material being offered for disposal ("Waste") and have the requisite authority to bind the Generator to the information contained in this Special Waste Profile ("Profile"). I further certify that to the best of my knowledge and belief, the information contained herein is a true, complete and accurate description of the Waste and all known or suspected hazards have been disclosed. All Analytical Results/Safety Data Sheets submitted are truthful and complete and are representative of the Waste.*

*I further certify that by utilizing this Profile, neither myself nor any other employee or representative of the company identified below ("Company") will deliver for disposal or attempt to deliver for disposal any Waste that: (i) is classified as toxic waste, hazardous waste or infectious waste; (ii) that does not conform to this Profile; or (iii) that this Disposal Facility is prohibiting from accepting by law. I shall immediately give written notice of any change or condition pertaining to the Waste not provided herein. Our Company hereby agrees to fully indemnify this Disposal Facility against any damages resulting from this Profile or Certification being inaccurate or untrue.*

*I understand that by attaching an electronic signature, I am signing this document and Company consents to complete this transaction and receive all related communications electronically, and agrees this document will be binding as though it had been physically signed. A printout of this Profile may be accepted with the same authority as the original.*

**Jeffery Zahniser**

Authorized Representative Name
(Printed)

Environmental Protection Specialist

Title
(Printed)

## United States Marine Corps.

Company Name

Representative Signature

17 July 2024

Date

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

MCB - Camp Lejeune - Commanding General Attn EMD    Decon Water with PFAS

# Special Waste Profile

 **REPUBLIC** SERVICES

Disposal Facility: 5010 CMS Landfill NC

Waste Profile # 50102413205

Sales Rep #: 116 Marston

---

## I. Generator Information

Generator Name: MCB - CAMP LEJEUNE COMMANDING GENERAL ATTN: EMD

Generator Site Address: Building 2600 Paradise Point Fire Station (Station #4)

City: Camp Lejeune    County: Onslow    State: North Carolina    ZIP: 28547

State ID/Reg. No:    State Approval/Waste Code:    NAICS #:

Generator Mailing Address ☑ (if different    12 Post Lane

City: Camp Lejeune    County: Onslow    State: North Carolina    ZIP: 28547

Generator Contact Name: Jeffrey Zahniser    Email: jeffrey.zahniser@usmc.mil

Phone Number: 910-451-5306    Ext:    Fax Number:

## II. Billing Information

Bill to: Evo Corporation    Contact Name: Edith Basinger

Billing Address: 7535 Styers Ferry Road    Email: accountspayable@evocorp.net

City: Clemmons    State: North Carolina    ZIP: 27012    Phone: 336-725-5844

## III. Waste Stream Information

Name of Waste: Non-Hazardous Soil

Process Generating Waste: Soil from from monitoring well installation for environmental investigation.
Potential Source: The presence of aqueous film-forming foam (AFFF) in was documented in fire engines and in storage containers used on-site. A release likely occurred during the transfer of AFFF from these containers to fire engines on-site.

Type of Waste: Pollution Control Waste    Physical State: Solid    Method of Shipment: Drum

Estimated Volume: 9    Volume Type: Drums

Frequency: One-time Event (single project)    Disposal Consideration: Solidification

## IV. Representative Sample Certification

☐ **No Sample Taken**

☑ **Sample Taken    Type of Sample** Composite and Grab

Is the representative sample collected to prepare this profile and laboratory analysis collected in accordance with U.S. EPA 40 CFR 261.20(c) guidelines or equivalent? ☑ Yes  ☐ No

Sample Date: 05-16-24    Sample ID Numbers or SDS: Site114-IDW-SO-051624

---

Initial here _GW3_

**Remember to attach Laboratory Analytical Report (and/or Material Safety Data Sheet) including Chain of Custody and required parameters provided for this profile.**

Page 1    September 2023

MCB - CAMP LEJEUNE COMMANDING GENERAL ATTN. ☐ Non-Hazardous Soil

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

Special Waste Profile



ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## V. Physical Characteristics of Waste

Characteristic Components (must equal 100%):                    % By Weight (out of 100% – ranges acceptable):

1. Non-Hazardous Soil                                          >99%

2. Water                                                       <1%

3.

4.

5.

| Color: | Odor (describe): | Does Waste Contain Free Liquids? | % Solids: | pH: | Flash Point: |
|---|---|---|---|---|---|
| Brown | None | ☐ Yes  ☑ No | 99% | 7 | >200  °F |

**Attach Laboratory Analytical Report (and/or Material Safety Data Sheet) including Chain of Custody and required parameters provided for this profile.**

### RCRA Regulatory Questions

1. Does this waste or generating process contain regulated concentrations of the following pesticides and/or herbicides: Chlordane, Endrin, Heptachlor (and its epoxides), Lindane, Methoxychlor, Toxaphene, 2,4-D, or 2,4,5-TP Silvex as defined in 40 CFR 261.33 — **Yes** ☑ **No**

2. Does this waste contain reactive sulfides (greater than 500 ppm) or reactive cyanide (greater than 250 ppm) [reference 40 CFR 261.23(a)(5)]? — ☐ **Yes** ☑ **No**

3. Does this waste contain regulated concentrations of Polychlorinated Biphenyls (PCBs) as defined in 40 CFR Part 761 — ☐ **Yes** ☑ **No**

4. Does this waste contain concentrations of listed hazardous wastes defined in 40 CFR 261.31, 261.32, 261.33, including RCRA F-listed solvents? — ☐ **Yes** ☑ **No**

5. Has this waste been delisted under 40 CFR 260.20 and 260.22? If yes, attach the final decision to delist the waste as published in the Federal Register. — ☐ **Yes** ☑ **No**

6. Does this waste exhibit a hazardous characteristic as defined by federal and/or state regulations? If Yes, identify the applicable waste code and specify if the waste is hazardous as defined by federal, state or both — ☐ **Yes** ☑ **No**

7. Does this waste contain regulated concentrations of 2,3,7,8-Tetrachlorodibenzodioxin (2,3,7,8-TCCD), or any other dioxin as defined in 40 CFR 261.31 — ☐ **Yes** ☑ **No**

8. Is this a regulated medical or infectious waste as defined by federal and/or state regulations — ☐ **Yes** ☑ **No**

9. Is this a regulated radioactive waste as defined by federal and/or state regulations — ☐ **Yes** ☑ **No**

10. Is this a solid waste that is not a hazardous waste in accordance with 40 CFR 261.4(b)? If yes, please provide the corresponding regulatory citation. — ☐ **Yes** ☑ **No**

### Republic Services Waste Handling Questions

1. Does this waste generate heat or react when contacted with water/moisture? — ☐ **Yes** ☑ **No**

2. Does the waste contain sulfur or sulfur by-products? — ☐ **Yes** ☑ **No**

3. Is this waste generated at a state or federal Superfund cleanup site subject to regulation under CERCLA? — ☑ **Yes** ☐ **No**

4a. Is this waste from a TSD facility, TSD-like facility or consolidator (i.e. multiple wastes/multiple generators)? — ☐ **Yes** ☑ **No**

4b. If yes to the above question, please provide clarification

Initial here

Page 2

MCB - CAMP LEJEUNE COMMANDING GENERAL ATTN: ☐ Non-Hazardous Soil

Special Waste Profile

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## VI. Certification

*I hereby certify that I have knowledge about the waste material being offered for disposal ("Waste") and have the requisite authority to bind the Generator to the information contained in this Special Waste Profile ("Profile"). I further certify that to the best of my knowledge and belief, the information contained herein is a true, complete and accurate description of the Waste and all known or suspected hazards have been disclosed. All Analytical Results/Safety Data Sheets submitted are truthful and complete and are representative of the Waste.*

*I further certify that by utilizing this Profile, neither myself nor any other employee or representative of the company identified below ("Company") will deliver for disposal or attempt to deliver for disposal any Waste that: (i) is classified as toxic waste, hazardous waste or infectious waste; (ii) that does not conform to this Profile; or (iii) that this Disposal Facility is prohibiting from accepting by law. I shall immediately give written notice of any change or condition pertaining to the Waste not provided herein. Our Company hereby agrees to fully indemnify this Disposal Facility against any damages resulting from this Profile or Certification being inaccurate or untrue.*

*I understand that by attaching an electronic signature, I am signing this document and Company consents to complete this transaction and receive all related communications electronically, and agrees this document will be binding as though it had been physically signed. A printout of this Profile may be accepted with the same authority as the original.*

| Jeffrey Zahniser | Environmental Protection Specialist | USMC/Camp Lejeune |
|---|---|---|
| Authorized Representative Name (Printed) | Title (Printed) | Company Name |
| Representative Signature | | 30 AUG 2024 |
| | | Date |

MCB - CAMP LEJEUNE COMMANDING GENERAL ATTN:    Non-Hazardous Soil

Special Waste Profile



ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

Disposal Facility:  5010 CMS Landfill NC

Waste Profile #     50102413200

Sales Rep #:     116 Marston

## I. Generator Information

Generator Name:  MCB - CAMP LEJEUNE COMMANDING GENERAL ATTN: EMD

Generator Site Address:  Building LCH4022 Midway Park Fire Station (Station #2)

City:  Camp Lejeune          County:  Onslow          State:  North Carolina          ZIP:  28547

State ID/Reg. No:          State Approval/Waste Code:          NAICS #:

Generator Mailing Address  ☑ (if different   12 Post Lane

City:  Camp Lejeune          County:  Onslow          State:  North Carolina          ZIP:  28547

Generator Contact Name:  Jeffrey Zahniser          Email:  jeffrey.zahniser@usmc.mil

Phone Number:  910-451-5306          Ext:          Fax Number:

## II. Billing Information

Bill to:  Evo Corporation          Contact Name:  Edith Basinger

Billing Address:  7535 Styers Ferry Road          Email:  accountspayable@evocorp.net

City:  Clemmons          State:  North Carolina          ZIP:  27012          Phone:  336-725-5844

## III. Waste Stream Information

Name of Waste:  Soil with Non-Hazardous PFAS

Process Generating Waste:  Soil from from monitoring well installation for environmental investigation.
Potential Source: The presence of aqueous film-forming foam (AFFF) in was documented in fire engines and in storage containers used on-site. A release likely occurred during the transfer of AFFF from these containers to fire engines on-site.

Type of Waste:  Pollution Control Waste          Physical State:  Solid          Method of Shipment:  Drum

Estimated Volume: 7          Volume Type:  Drums

Frequency:  One-time Event (single project)          Disposal Consideration:  Solidification

## IV. Representative Sample Certification

☐ **No Sample Taken**

☑ **Sample Taken**     **Type of Sample**  Composite and Grab
Is the representative sample collected to prepare this profile and laboratory analysis collected in accordance with U.S. EPA 40 CFR 261.20(c) guidelines or equivalent?  ☑ Yes  ☐ No

Sample Date:  052324          Sample ID Numbers or SDS:  SITE 112-IDW-SO-052324

Initial here

**Remember to attach Laboratory Analytical Report (and/or Material Safety Data Sheet) including Chain of Custody and required parameters provided for this profile.**

Page 1

September 2023

MCB - CAMP LEJEUNE COMMANDING GENERAL ATTN:     Soil with Non-Hazardous PFAS

Special Waste Profile



ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## V. Physical Characteristics of Waste

Characteristic Components (must equal 100%):

% By Weight (out of 100% – ranges acceptable):

1. non hazardous soil   >99.99%
2. PFAS   <0.01%
3.
4.
5.

| Color: | Odor (describe): | Does Waste Contain Free Liquids? | % Solids: | pH: | Flash Point: | |
|---|---|---|---|---|---|---|
| Brown | None | ☐ Yes ☑ No | <1% | 7.3 | >200 | °F |

**Attach Laboratory Analytical Report (and/or Material Safety Data Sheet) including Chain of Custody and required parameters provided for this profile.**

### RCRA Regulatory Questions

1. Does this waste or generating process contain regulated concentrations of the following pesticides and/or herbicides: Chlordane, Endrin, Heptachlor (and its epoxides), Lindane, Methoxychlor, Toxaphene, 2,4-D, or 2,4,5-TP Silvex as defined in 40 CFR 261.33    **Yes** ☑ **No**

2. Does this waste contain reactive sulfides (greater than 500 ppm) or reactive cyanide (greater than 250 ppm) [reference 40 CFR 261.23(a)(5)]?    **Yes** ☑ **No**

3. Does this waste contain regulated concentrations of Polychlorinated Biphenyls (PCBs) as defined in 40 CFR Part 761    **Yes** ☑ **No**

4. Does this waste contain concentrations of listed hazardous wastes defined in 40 CFR 261.31, 261.32, 261.33, including RCRA F-listed solvents?    **Yes** ☑ **No**

5. Has this waste been delisted under 40 CFR 260.20 and 260.22? If yes, attach the final decision to delist the waste as published in the Federal Register.    **Yes** ☑ **No**

6. Does this waste exhibit a hazardous characteristic as defined by federal and/or state regulations? If Yes, identify the applicable waste code and specify if the waste is hazardous as defined by federal, state or both    **Yes** ☑ **No**

7. Does this waste contain regulated concentrations of 2,3,7,8-Tetrachlorodibenzodioxin (2,3,7,8-TCCD), or any other dioxin as defined in 40 CFR 261.31    **Yes** ☑ **No**

8. Is this a regulated medical or infectious waste as defined by federal and/or state regulations    **Yes** ☑ **No**

9. Is this a regulated radioactive waste as defined by federal and/or state regulations    **Yes** ☑ **No**

10. Is this a solid waste that is not a hazardous waste in accordance with 40 CFR 261.4(b)? If yes, please provide the corresponding regulatory citation.    **Yes** ☑ **No**

### Republic Services Waste Handling Questions

1. Does this waste generate heat or react when contacted with water/moisture?    ☐ **Yes** ☑ **No**

2. Does the waste contain sulfur or sulfur by-products?    ☐ **Yes** ☑ **No**

3. Is this waste generated at a state or federal Superfund cleanup site subject to regulation under CERCLA?    ☑ **Yes** ☐ **No**

4a. Is this waste from a TSD facility, TSD-like facility or consolidator (i.e. multiple wastes/multiple generators)?    **Yes** ☑ **No**

4b. If yes to the above question, please provide clarification

Initial here

Page 2

MCB - CAMP LEJEUNE COMMANDING GENERAL ATTN:    Soil with Non-Hazardous PFAS

Special Waste Profile



ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## VI. Certification

*I hereby certify that I have knowledge about the waste material being offered for disposal ("Waste") and have the requisite authority to bind the Generator to the information contained in this Special Waste Profile ("Profile"). I further certify that to the best of my knowledge and belief, the information contained herein is a true, complete and accurate description of the Waste and all known or suspected hazards have been disclosed. All Analytical Results/Safety Data Sheets submitted are truthful and complete and are representative of the Waste.*

*I further certify that by utilizing this Profile, neither myself nor any other employee or representative of the company identified below ("Company") will deliver for disposal or attempt to deliver for disposal any Waste that: (i) is classified as toxic waste, hazardous waste or infectious waste; (ii) that does not conform to this Profile; or (iii) that this Disposal Facility is prohibiting from accepting by law. I shall immediately give written notice of any change or condition pertaining to the Waste not provided herein. Our Company hereby agrees to fully indemnify this Disposal Facility against any damages resulting from this Profile or Certification being inaccurate or untrue.*

*I understand that by attaching an electronic signature, I am signing this document and Company consents to complete this transaction and receive all related communications electronically, and agrees this document will be binding as though it had been physically signed. A printout of this Profile may be accepted with the same authority as the original.*

**Jeffrey Zahniser**

Authorized Representative Name
(Printed)

Environmental Protection Specialist

Title
(Printed)

**USMC/Camp Lejeune**

Company Name

*Representative Signature*

30 AUG 2024

Date

MCB - CAMP LEJEUNE COMMANDING GENERAL ATTN:   Soil with Non-Hazardous PFAS

# Special Waste Profile

 **REPUBLIC** SERVICES

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

Disposal Facility: 5010 CMS Landfill NC

Waste Profile #: 50102413202

Sales Rep #: 116 Marston

## I. Generator Information

Generator Name: MCB - CAMP LEJEUNE COMMANDING GENERAL ATTN: EMD

Generator Site Address: Building TC701 Camp Geiger Fire Station (Station #6)

City: Camp Lejeune    County: Onslow    State: North Carolina    ZIP: 28547

State ID/Reg. No:    State Approval/Waste Code:    NAICS #:

Generator Mailing Address ☑ (if different    12 Post Lane

City: Camp Lejeune    County:    State: North Carolina    ZIP: 28547

Generator Contact Name: Jeffrey Zahniser    Email: jeffrey.zahniser@usmc.mil

Phone Number: 910-451-5306    Ext:    Fax Number:

## II. Billing Information

Bill to: Evo Corporation    Contact Name: Edith Basinger

Billing Address: 7535 Styers Ferry Road    Email: accountspayable@evocorp.net

City: Clemmons    State: North Carolina    ZIP: 27012    Phone: 336-725-5844

## III. Waste Stream Information

Name of Waste: Non-Hazardous Water with PFAS

Process Generating Waste: Groundwater from sampling for environmental investigation.
Potential Source: The presence of aqueous film-forming foam (AFFF) in was documented in fire engines and in storage containers used on-site. A release likely occurred during the transfer of AFFF from these containers to fire engines on-site.

Type of Waste: Pollution Control Waste    Physical State: Liquid    Method of Shipment: Drum

Estimated Volume: 23    Volume Type: Drums

Frequency: One-time Event (single project)    Disposal Consideration: Solidification

## IV. Representative Sample Certification

☐ **No Sample Taken**

☑ **Sample Taken    Type of Sample** Composite and Grab

Is the representative sample collected to prepare this profile and laboratory analysis collected in accordance with U.S. EPA 40 CFR 261.20(c) guidelines or equivalent? ☑ Yes ☐ No

Sample Date: 06-26-24    Sample ID Numbers or SDS: Site 113-IDW-AQ-062624, Site 113-IDW-01-AQ-062624, & Site 113-IDW-01-AQ-062624

Initial here (signature)

**Remember to attach Laboratory Analytical Report (and/or Material Safety Data Sheet) including Chain of Custody and required parameters provided for this profile.**

Page 1

MCB - CAMP LEJEUNE COMMANDING GENERAL ATTN:    Non-Hazardous Water with PFAS

September 2023

Special Waste Profile


REPUBLIC SERVICES

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## V. Physical Characteristics of Waste

Characteristic Components (must equal 100%):     % By Weight (out of 100% – ranges acceptable):

1. Non Hazardous Water     >90%

2. Non-Hazardous Sediment     <10%

3. PFAS     <0.01%

4.

5.

| Color: | Odor (describe): | Does Waste Contain Free Liquids? | % Solids: | pH: | Flash Point: | |
|--------|------------------|----------------------------------|-----------|-----|--------------|---|
| Brown | None | ☑ Yes  ☐ No | <10% | 7.6-7.8 | >200 | °F |

**Attach Laboratory Analytical Report (and/or Material Safety Data Sheet) including Chain of Custody and required parameters provided for this profile.**

## RCRA Regulatory Questions

1. Does this waste or generating process contain regulated concentrations of the following pesticides and/or herbicides: Chlordane, Endrin, Heptachlor (and its epoxides), Lindane, Methoxychlor, Toxaphene, 2,4-D, or 2,4,5-TP Silvex as defined in 40 CFR 261.33      **Yes** ☑ **No**

2. Does this waste contain reactive sulfides (greater than 500 ppm) or reactive cyanide (greater than 250 ppm) [reference 40 CFR 261.23(a)(5)]?      ☐ **Yes** ☑ **No**

3. Does this waste contain regulated concentrations of Polychlorinated Biphenyls (PCBs) as defined in 40 CFR Part 761      ☐ **Yes** ☑ **No**

4. Does this waste contain concentrations of listed hazardous wastes defined in 40 CFR 261.31, 261.32, 261.33, including RCRA F-listed solvents?      ☐ **Yes** ☑ **No**

5. Has this waste been delisted under 40 CFR 260.20 and 260.22? If yes, attach the final decision to delist the waste as published in the Federal Register.      ☐ **Yes** ☑ **No**

6. Does this waste exhibit a hazardous characteristic as defined by federal and/or state regulations? If Yes, identify the applicable waste code and specify if the waste is hazardous as defined by federal, state or both      ☐ **Yes** ☑ **No**

7. Does this waste contain regulated concentrations of 2,3,7,8-Tetrachlorodibenzodioxin (2,3,7,8-TCCD), or any other dioxin as defined in 40 CFR 261.31      ☐ **Yes** ☑ **No**

8. Is this a regulated medical or infectious waste as defined by federal and/or state regulations      ☐ **Yes** ☑ **No**

9. Is this a regulated radioactive waste as defined by federal and/or state regulations      ☐ **Yes** ☑ **No**

10. Is this a solid waste that is not a hazardous waste in accordance with 40 CFR 261.4(b)? If yes, please provide the corresponding regulatory citation.      ☐ **Yes** ☑ **No**

## Republic Services Waste Handling Questions

1. Does this waste generate heat or react when contacted with water/moisture?      ☐ **Yes** ☑ **No**

2. Does the waste contain sulfur or sulfur by-products?      ☐ **Yes** ☑ **No**

3. Is this waste generated at a state or federal Superfund cleanup site subject to regulation under CERCLA?      ☑ **Yes** ☐ **No**

4a. Is this waste from a TSD facility, TSD-like facility or consolidator (i.e. multiple wastes/multiple generators)?      ☐ **Yes** ☑ **No**

4b. If yes to the above question, please provide clarification

Initial here [signature]

Page 2

MCB - CAMP LEJEUNE COMMANDING GENERAL ATTN.     Non-Hazardous Water with PFAS

# Special Waste Profile

 **REPUBLIC** SERVICES

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## VI. Certification

*I hereby certify that I have knowledge about the waste material being offered for disposal ("Waste") and have the requisite authority to bind the Generator to the information contained in this Special Waste Profile ("Profile"). I further certify that to the best of my knowledge and belief, the information contained herein is a true, complete and accurate description of the Waste and all known or suspected hazards have been disclosed. All Analytical Results/Safety Data Sheets submitted are truthful and complete and are representative of the Waste.*

*I further certify that by utilizing this Profile, neither myself nor any other employee or representative of the company identified below ("Company") will deliver for disposal or attempt to deliver for disposal any Waste that: (i) is classified as toxic waste, hazardous waste or infectious waste; (ii) that does not conform to this Profile; or (iii) that this Disposal Facility is prohibiting from accepting by law. I shall immediately give written notice of any change or condition pertaining to the Waste not provided herein. Our Company hereby agrees to fully indemnify this Disposal Facility against any damages resulting from this Profile or Certification being inaccurate or untrue.*

*I understand that by attaching an electronic signature, I am signing this document and Company consents to complete this transaction and receive all related communications electronically, and agrees this document will be binding as though it had been physically signed. A printout of this Profile may be accepted with the same authority as the original.*

| Jeffrey Zahniser | Environmental Protection Specialist | USMC/Camp Lejeune |
|---|---|---|
| Authorized Representative Name (Printed) | Title (Printed) | Company Name |
| *Jeffy W. Zeu* Representative Signature | | 30 AUG 2024 Date |

MCB - CAMP LEJEUNE COMMANDING GENERAL ATTN:  Non-Hazardous Water with PFAS

# Special Waste Profile


**REPUBLIC** *SERVICES*

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

Disposal Facility: 5010 CMS Landfill NC

Waste Profile #: 50102413203

Sales Rep #: 116 Marston

---

## I. Generator Information

Generator Name: MCB - CAMP LEJEUNE COMMANDING GENERAL ATTN: EMD

Generator Site Address: Building TC701 Camp Geiger Fire Station (Station #6)

City: Camp Lejeune     County: Onslow     State: North Carolina     ZIP: 28547

State ID/Reg. No:     State Approval/Waste Code:     NAICS #:

Generator Mailing Address ☑ (if different     12 Post Lane

City: Camp Lejeune     County:     State: North Carolina     ZIP: 28547

Generator Contact Name: Jeffrey Zahniser     Email: jeffrey.zahniser@usmc.mil

Phone Number: 910-451-5306     Ext:     Fax Number:

## II. Billing Information

Bill to: Evo Corporation     Contact Name: Edith Basinger

Billing Address: 7535 Styers Ferry Road     Email: accountspayable@evocorp.net

City: Clemmons     State: North Carolina     ZIP: 27012     Phone: 336-725-5844

## III. Waste Stream Information

Name of Waste: Non-Hazardous Soil with PFAS

Process Generating Waste: Soil from from monitoring well installation for environmental investigation.
Potential Source: The presence of aqueous film-forming foam (AFFF) in was documented in fire engines and in storage containers used on-site. A release likely occurred during the transfer of AFFF from these containers to fire engines on-site.

Type of Waste: Pollution Control Waste     Physical State: Solid     Method of Shipment: Drum

Estimated Volume: 8     Volume Type: Drums

Frequency: One-time Event (single project)     Disposal Consideration: Solidification

## IV. Representative Sample Certification

☐ **No Sample Taken**

☑ **Sample Taken     Type of Sample** Composite and Grab

Is the representative sample collected to prepare this profile and laboratory analysis collected in accordance with U.S. EPA 40 CFR 261.20(c) guidelines or equivalent? ☑ **Yes** ☐**No**

Sample Date: 06-12-24     Sample ID Numbers or SDS: Site113-IDW-SO-061224

---

Initial here

**Remember to attach Laboratory Analytical Report (and/or Material Safety Data Sheet) including Chain of Custody and required parameters provided for this profile.**

Page 1

September 2023

MCB - CAMP LEJEUNE COMMANDING GENERAL ATTN.     Non-Hazardous Soil with PFAS

Special Waste Profile


REPUBLIC
SERVICES

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## V. Physical Characteristics of Waste

Characteristic Components (must equal 100%):

% By Weight (out of 100% – ranges acceptable):

1. Non Hazardous Soil    >99%
2. PFAS    <0.01%
3.
4.
5.

| Color: | Odor (describe): | Does Waste Contain Free Liquids? | % Solids: | pH: | Flash Point: | |
|---|---|---|---|---|---|---|
| Brown | None | ☐ Yes  ☑ No | >99 | 7.3 | >200 | °F |

**Attach Laboratory Analytical Report (and/or Material Safety Data Sheet) including Chain of Custody and required parameters provided for this profile.**

### RCRA Regulatory Questions

1. Does this waste or generating process contain regulated concentrations of the following pesticides and/or herbicides: Chlordane, Endrin, Heptachlor (and its epoxides), Lindane, Methoxychlor, Toxaphene, 2,4-D, or 2,4,5-TP Silvex as defined in 40 CFR 261.33    **Yes** ☑ **No**

2. Does this waste contain reactive sulfides (greater than 500 ppm) or reactive cyanide (greater than 250 ppm) [reference 40 CFR 261.23(a)(5)]?    ☐ **Yes** ☑ **No**

3. Does this waste contain regulated concentrations of Polychlorinated Biphenyls (PCBs) as defined in 40 CFR Part 761    ☐ **Yes** ☑ **No**

4. Does this waste contain concentrations of listed hazardous wastes defined in 40 CFR 261.31, 261.32, 261.33, including RCRA F-listed solvents?    ☐ **Yes** ☑ **No**

5. Has this waste been delisted under 40 CFR 260.20 and 260.22? If yes, attach the final decision to delist the waste as published in the Federal Register.    ☐ **Yes** ☑ **No**

6. Does this waste exhibit a hazardous characteristic as defined by federal and/or state regulations? If Yes, identify the applicable waste code and specify if the waste is hazardous as defined by federal, state or both    ☐ **Yes** ☑ **No**

7. Does this waste contain regulated concentrations of 2,3,7,8-Tetrachlorodibenzodioxin (2,3,7,8-TCCD), or any other dioxin as defined in 40 CFR 261.31    ☐ **Yes** ☑ **No**

8. Is this a regulated medical or infectious waste as defined by federal and/or state regulations    ☐ **Yes** ☑ **No**

9. Is this a regulated radioactive waste as defined by federal and/or state regulations    ☐ **Yes** ☑ **No**

10. Is this a solid waste that is not a hazardous waste in accordance with 40 CFR 261.4(b)? If yes, please provide the corresponding regulatory citation.    ☐ **Yes** ☑ **No**

### Republic Services Waste Handling Questions

1. Does this waste generate heat or react when contacted with water/moisture?    ☐ **Yes** ☑ **No**

2. Does the waste contain sulfur or sulfur by-products?    ☐ **Yes** ☑ **No**

3. Is this waste generated at a state or federal Superfund cleanup site subject to regulation under CERCLA?    ☑ **Yes** ☐ **No**

4a. Is this waste from a TSD facility, TSD-like facility or consolidator (i.e. multiple wastes/multiple generators)?    ☐ **Yes** ☑ **No**

4b. If yes to the above question, please provide clarification

Initial here

Page 2    CB - CAMP LEJEUNE COMMANDING GENERAL ATTN. ⊞    Non-Hazardous Soil with PFAS

Special Waste Profile



ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## VI. Certification

*I hereby certify that I have knowledge about the waste material being offered for disposal ("Waste") and have the requisite authority to bind the Generator to the information contained in this Special Waste Profile ("Profile"). I further certify that to the best of my knowledge and belief, the information contained herein is a true, complete and accurate description of the Waste and all known or suspected hazards have been disclosed. All Analytical Results/Safety Data Sheets submitted are truthful and complete and are representative of the Waste.*

*I further certify that by utilizing this Profile, neither myself nor any other employee or representative of the company identified below ("Company") will deliver for disposal or attempt to deliver for disposal any Waste that: (i) is classified as toxic waste, hazardous waste or infectious waste; (ii) that does not conform to this Profile; or (iii) that this Disposal Facility is prohibiting from accepting by law. I shall immediately give written notice of any change or condition pertaining to the Waste not provided herein. Our Company hereby agrees to fully indemnify this Disposal Facility against any damages resulting from this Profile or Certification being inaccurate or untrue.*

*I understand that by attaching an electronic signature, I am signing this document and Company consents to complete this transaction and receive all related communications electronically, and agrees this document will be binding as though it had been physically signed. A printout of this Profile may be accepted with the same authority as the original.*


| Jeffrey Zahniser | Environmental Protection Specialist | USMC/Camp Lejeune |
|---|---|---|
| Authorized Representative Name (Printed) | Title (Printed) | Company Name |
| Representative Signature | | 30 AUG 2024 |
| | | Date |

MCB - CAMP LEJEUNE COMMANDING GENERAL ATTN:    Non-Hazardous Soil with PFAS

# Special Waste Profile



ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

Disposal Facility: 5010 CMS Landfill NC

Waste Profile #: 50102413204

Sales Rep #: 116 Marston

## I. Generator Information

Generator Name: MCB - CAMP LEJEUNE COMMANDING GENERAL ATTN: EMD

Generator Site Address: **Building 2600 Paradise Point Fire Station (Station #4)**

City: **Camp Lejeune**    County: **Onslow**    State: North Carolina    ZIP: **28547**

State ID/Reg. No:    State Approval/Waste Code:    NAICS #:

Generator Mailing Address ☑ (if different **12 Post Lane**

City: **Camp Lejeune**    County: **Onslow**    State: North Carolina    ZIP: **28547**

Generator Contact Name: **Jeffrey Zahniser**    Email: **jeffrey.zahniser@usmc.mil**

Phone Number: **910-451-5306**    Ext:    Fax Number:

## II. Billing Information

Bill to: **Evo Corporation**    Contact Name: **Edith Basinger**

Billing Address: **7535 Styers Ferry Road**    Email: **accountspayable@evocorp.net**

City: **Clemmons**    State: North Carolina    ZIP: **27012**    Phone: **336-725-5844**

## III. Waste Stream Information

Name of Waste: Non-Hazardous Groundwater with PFAS

Process Generating Waste: Groundwater sampling for environmental investigation.
Potential Source: The presence of aqueous film-forming foam (AFFF) in was documented in fire engines and in storage containers used on-site. A release likely occurred during the transfer of AFFF from these containers to fire engines on-site.

Type of Waste: Pollution Control Waste    Physical State: Liquid    Method of Shipment: Drum

Estimated Volume: 11    Volume Type: Drums

Frequency: One-time Event (single project)    Disposal Consideration: Solidification

## IV. Representative Sample Certification

☐ **No Sample Taken**

☑ **Sample Taken**    **Type of Sample** Composite and Grab

Is the representative sample collected to prepare this profile and laboratory analysis collected in accordance with U.S. EPA 40 CFR 261.20(c) guidelines or equivalent? ☑ Yes ☐ **No**

Sample Date: 05-16-24    Sample ID Numbers or SDS: Site114-IDW-AQ-051624

Initial here

**Remember to attach Laboratory Analytical Report (and/or Material Safety Data Sheet) including Chain of Custody and required parameters provided for this profile.**

Page 1    September 2023

MCB - CAMP LEJEUNE COMMANDING GENERAL ATTN: E    Non-Hazardous Groundwater with PFAS

Special Waste Profile  **REPUBLIC** SERVICES

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## V. Physical Characteristics of Waste

Characteristic Components (must equal 100%): | % By Weight (out of 100% – ranges acceptable):

1. Non Hazardous Groundwater — 99.99%

2. PFAS Compounds — <0.01%

3.

4.

5.

| Color: | Odor (describe): | Does Waste Contain Free Liquids? | % Solids: | pH: | Flash Point: |
|---|---|---|---|---|---|
| Brown | None | ☑ Yes  ☐ No | <1% | 12.1 | 200  °F |

**Attach Laboratory Analytical Report (and/or Material Safety Data Sheet) including Chain of Custody and required parameters provided for this profile.**

### RCRA Regulatory Questions

1. Does this waste or generating process contain regulated concentrations of the following pesticides and/or herbicides: Chlordane, Endrin, Heptachlor (and its epoxides), Lindane, Methoxychlor, Toxaphene, 2,4-D, or 2,4,5-TP Silvex as defined in 40 CFR 261.33 — ☐ Yes ☑ No

2. Does this waste contain reactive sulfides (greater than 500 ppm) or reactive cyanide (greater than 250 ppm) [reference 40 CFR 261.23(a)(5)]? — ☐ Yes ☑ No

3. Does this waste contain regulated concentrations of Polychlorinated Biphenyls (PCBs) as defined in 40 CFR Part 761 — ☐ Yes ☑ No

4. Does this waste contain concentrations of listed hazardous wastes defined in 40 CFR 261.31, 261.32, 261.33, including RCRA F-listed solvents? — ☐ Yes ☑ No

5. Has this waste been delisted under 40 CFR 260.20 and 260.22? If yes, attach the final decision to delist the waste as published in the Federal Register. — ☐ Yes ☑ No

6. Does this waste exhibit a hazardous characteristic as defined by federal and/or state regulations? If Yes, identify the applicable waste code and specify if the waste is hazardous as defined by federal, state or both — ☐ Yes ☑ No

7. Does this waste contain regulated concentrations of 2,3,7,8-Tetrachlorodibenzodioxin (2,3,7,8-TCCD), or any other dioxin as defined in 40 CFR 261.31 — ☐ Yes ☑ No

8. Is this a regulated medical or infectious waste as defined by federal and/or state regulations — ☐ Yes ☑ No

9. Is this a regulated radioactive waste as defined by federal and/or state regulations — ☐ Yes ☑ No

10. Is this a solid waste that is not a hazardous waste in accordance with 40 CFR 261.4(b)? If yes, please provide the corresponding regulatory citation. — ☐ Yes ☑ No

### Republic Services Waste Handling Questions

1. Does this waste generate heat or react when contacted with water/moisture? — ☐ Yes ☑ No

2. Does the waste contain sulfur or sulfur by-products? — ☐ Yes ☑ No

3. Is this waste generated at a state or federal Superfund cleanup site subject to regulation under CERCLA? — ☑ Yes ☐ No

4a. Is this waste from a TSD facility, TSD-like facility or consolidator (i.e. multiple wastes/multiple generators)? — ☐ Yes ☑ No

4b. If yes to the above question, please provide clarification

Initial here

Page 2

MCB - CAMP LEJEUNE COMMANDING GENERAL ATTN:  Non-Hazardous Groundwater with PFAS

Special Waste Profile



ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## VI. Certification

*I hereby certify that I have knowledge about the waste material being offered for disposal ("Waste") and have the requisite authority to bind the Generator to the information contained in this Special Waste Profile ("Profile"). I further certify that to the best of my knowledge and belief, the information contained herein is a true, complete and accurate description of the Waste and all known or suspected hazards have been disclosed. All Analytical Results/Safety Data Sheets submitted are truthful and complete and are representative of the Waste.*

*I further certify that by utilizing this Profile, neither myself nor any other employee or representative of the company identified below ("Company") will deliver for disposal or attempt to deliver for disposal any Waste that: (i) is classified as toxic waste, hazardous waste or infectious waste; (ii) that does not conform to this Profile; or (iii) that this Disposal Facility is prohibiting from accepting by law. I shall immediately give written notice of any change or condition pertaining to the Waste not provided herein. Our Company hereby agrees to fully indemnify this Disposal Facility against any damages resulting from this Profile or Certification being inaccurate or untrue.*

*I understand that by attaching an electronic signature, I am signing this document and Company consents to complete this transaction and receive all related communications electronically, and agrees this document will be binding as though it had been physically signed. A printout of this Profile may be accepted with the same authority as the original.*

| | | |
|---|---|---|
| **Jeffrey Zahniser** | Environmental Protection Specialist | **USMC/Camp Lejeune** |
| Authorized Representative Name (Printed) | Title (Printed) | Company Name |
| Representative Signature | | 30 AUG 2024 |
| | | Date |

Page 3

MCB - CAMP LEJEUNE COMMANDING GENERAL ATTN:   Non-Hazardous Groundwater with PFAS

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

# Special Waste Profile



**REPUBLIC** SERVICES

Disposal Facility: 5010 CMS Landfill NC

Waste Profile #: 50102418779

Sales Rep #: 116 Marston

## I. Generator Information

Generator Name: MCB - CAMP LEJEUNE COMMANDING GENERAL ATTN. EMD

Generator Site Address: **Site 43, Agan Street, Marine Corps Base Camp Lejeune**

| | | | |
|---|---|---|---|
| City: **Camp Lejeune** | County: **Onslow** | State: North Carolina | ZIP: **28540** |

State ID/Reg. No:             State Approval/Waste Code:                NAICS #:

Generator Mailing Address ☑ (if different **12 Post Lane**

| | | | |
|---|---|---|---|
| City: **Camp Lejeune** | County: **Onslow** | State: North Carolina | ZIP: **28547** |

Generator Contact Name: **Jeffrey Zahniser**          Email: **jeffrey.zahniser@usmc.mil**

Phone Number: **910-451-5306**        Ext:        Fax Number:

## II. Billing Information

Bill to: **Evo Corporation**                Contact Name: **Edith Basinger**

Billing Address: **7535 Styers Ferry Road**          Email: **accountspayable@evocorp.net**

City: **Clemmons**        State: North Carolina        ZIP: **27012**        Phone: **336-725-5844**

## III. Waste Stream Information

Name of Waste: Non-Hazardous Groundwater with PFAS

Process Generating Waste: Purge and Development water from monitoring well installation and sampling activities for environmental investigation. Potential Source: Former Agan Street Dump was used to discard debris and received wastewater sludge that may have contained AFFF and/or PFAS. The wastewater treatment plant received wastewater from industrial activities that used material potentially containing PFAS. Street foam was also deployed twice on Agan Street historically.

Type of Waste: Pollution Control Waste        Physical State: Liquid        Method of Shipment: Other

Estimated Volume: 6                Volume Type: Totes

Frequency: One-time Event (single project)        Disposal Consideration: Solidification

## IV. Representative Sample Certification

☐ **No Sample Taken**

☑ **Sample Taken**    **Type of Sample** Composite and Grab

Is the representative sample collected to prepare this profile and laboratory analysis collected in accordance with U.S. EPA 40 CFR 261.20(c) guidelines or equivalent? ☑ **Yes**   ☐ **No**

Sample Date: 09-06-2024

Sample ID Numbers or SDS: eurofins Report ID: 410-187235-1 (TCLP & PFAS) Sample IDs: Site 43-IDW-AQ-090624, Site 43-IDW-AQ-090624-01, Site 43-IDW-AQ-090624-02 (PFAS & TCLP)

**Remember to attach Laboratory Analytical Report (and/or Material Safety Data Sheet) including Chain of Custody and required parameters provided for this profile.**

Initial here

Page 1

September 2023

Special Waste Profile


REPUBLIC
SERVICES

## V. Physical Characteristics of Waste

Characteristic Components (must equal 100%):      % By Weight (out of 100% – ranges acceptable):

1. Non-Hazardous Groundwater      95-100

2. Non-Hazardous Sediment      0-5

3. PFAS      <0.0000001

4.

5.

| Color: | Odor (describe): | Does Waste Contain Free Liquids? | % Solids: | pH: | Flash Point: | |
|---|---|---|---|---|---|---|
| Clear | None | ☑ Yes ☐ No | 0-5 | 7.2-7.3 | >200 | °F |

**Attach Laboratory Analytical Report (and/or Material Safety Data Sheet) including Chain of Custody and required parameters provided for this profile.**

### RCRA Regulatory Questions

1. Does this waste or generating process contain regulated concentrations of the following pesticides and/or herbicides: Chlordane, Endrin, Heptachlor (and its epoxides), Lindane, Methoxychlor, Toxaphene, 2,4-D, or 2,4,5-TP Silvex as defined in 40 CFR 261.33      ☐ Yes ☑ No

2. Does this waste contain reactive sulfides (greater than 500 ppm) or reactive cyanide (greater than 250 ppm) [reference 40 CFR 261.23(a)(5)]?      ☐ Yes ☑ No

3. Does this waste contain regulated concentrations of Polychlorinated Biphenyls (PCBs) as defined in 40 CFR Part 761      ☐ Yes ☑ No

4. Does this waste contain concentrations of listed hazardous wastes defined in 40 CFR 261.31, 261.32, 261.33, including RCRA F-listed solvents?      ☐ Yes ☑ No

5. Has this waste been delisted under 40 CFR 260.20 and 260.22? If yes, attach the final decision to delist the waste as published in the Federal Register.      ☐ Yes ☑ No

6. Does this waste exhibit a hazardous characteristic as defined by federal and/or state regulations? If Yes, identify the applicable waste code and specify if the waste is hazardous as defined by federal, state or both      ☐ Yes ☑ No

7. Does this waste contain regulated concentrations of 2,3,7,8-Tetrachlorodibenzodioxin (2,3,7,8-TCCD), or any other dioxin as defined in 40 CFR 261.31      ☐ Yes ☑ No

8. Is this a regulated medical or infectious waste as defined by federal and/or state regulations      ☐ Yes ☑ No

9. Is this a regulated radioactive waste as defined by federal and/or state regulations      ☐ Yes ☑ No

10. Is this a solid waste that is not a hazardous waste in accordance with 40 CFR 261.4(b)? If yes, please provide the corresponding regulatory citation.      ☐ Yes ☑ No

### Republic Services Waste Handling Questions

1. Does this waste generate heat or react when contacted with water/moisture?      ☐ Yes ☑ No

2. Does the waste contain sulfur or sulfur by-products?      ☐ Yes ☑ No

3. Is this waste generated at a state or federal Superfund cleanup site subject to regulation under CERCLA?      ☑ Yes ☐ No

4a. Is this waste from a TSD facility, TSD-like facility or consolidator (i.e. multiple wastes/multiple generators)?      ☐ Yes ☑ No

4b. If yes to the above question, please provide clarification

Initial here

Page 2      MCB - CAMP LEJEUNE COMMANDING GENERAL ATTN      Non-Hazardous Groundwater with PFAS

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

Special Waste Profile

 **REPUBLIC** SERVICES

## VI. Certification

*I hereby certify that I have knowledge about the waste material being offered for disposal ("Waste") and have the requisite authority to bind the Generator to the information contained in this Special Waste Profile ("Profile"). I further certify that to the best of my knowledge and belief, the information contained herein is a true, complete and accurate description of the Waste and all known or suspected hazards have been disclosed. All Analytical Results/Safety Data Sheets submitted are truthful and complete and are representative of the Waste.*

*I further certify that by utilizing this Profile, neither myself nor any other employee or representative of the company identified below ("Company") will deliver for disposal or attempt to deliver for disposal any Waste that: (i) is classified as toxic waste, hazardous waste or infectious waste; (ii) that does not conform to this Profile; or (iii) that this Disposal Facility is prohibiting from accepting by law. I shall immediately give written notice of any change or condition pertaining to the Waste not provided herein. Our Company hereby agrees to fully indemnify this Disposal Facility against any damages resulting from this Profile or Certification being inaccurate or untrue.*

*I understand that by attaching an electronic signature, I am signing this document and Company consents to complete this transaction and receive all related communications electronically, and agrees this document will be binding as though it had been physically signed. A printout of this Profile may be accepted with the same authority as the original.*

**Jeffrey Zahniser**

Authorized Representative Name
(Printed)

Environmental Protection Specialist

Title
(Printed)

**USMC/Camp Lejeune/EMD/RCRS**

Company Name

Representative Signature

**13 December 2024**

Date

MCB - CAMP LEJEUNE COMMANDING GENERAL ATTN: Non-Hazardous Groundwater with PFAS

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

# Special Waste Profile


**REPUBLIC** SERVICES

Disposal Facility: 5010 CMS Landfill NC

Waste Profile #    50102418782

Sales Rep #:    116

## I. Generator Information

Generator Name: MCB - CAMP LEJEUNE COMMANDING GENERAL ATTN- EMD

Generator Site Address: Site 43, Agan Street, Marine Corps Base Camp Lejeune

City: Camp Lejeune    County: Onslow    State: North Carolina    ZIP: 28540

State ID/Reg. No:    State Approval/Waste Code:    NAICS #:

Generator Mailing Address ☑ (if different    12 Post Lane

City: Camp Lejeune    County: Onslow    State: North Carolina    ZIP: 28547

Generator Contact Name: Jeffrey Zahniser    Email: jeffrey.zahniser@usmc.mil

Phone Number: 910-451-5306    Ext:    Fax Number:

## II. Billing Information

Bill to: Evo Corporation    Contact Name: Edith Basinger

Billing Address: 7535 Styers Ferry Road    Email: accountspayable@evocorp.net

City: Clemmons    State: North Carolina    ZIP: 27012    Phone: 336-725-5844

## III. Waste Stream Information

Name of Waste: Non-Hazardous Soil with Hydraulic Fluid

Process Generating Waste: While drilling monitoring wells, the drill rig blew a hydraulic line and hydraulic fluid leaked onto the soil. Excess hydraulic fluid was absorbed with pads and the soil was shoveled into a drum.

Type of Waste: Pollution Control Waste    Physical State: Solid    Method of Shipment: Drum

Estimated Volume: 1    Volume Type: Drums

Frequency: One-time Event (single project)    Disposal Consideration: Solidification

## IV. Representative Sample Certification

☐ No Sample Taken

☑ Sample Taken    Type of Sample  Composite and Grab

Is the representative sample collected to prepare this profile and laboratory analysis collected in accordance with U.S. EPA 40 CFR 261.20(c) guidelines or equivalent? ☑ Yes  ☐ No

Sample Date: 09-06-24    Sample ID Numbers or SDS: eurofins Report ID: 410-187235-1 (TCLP & PFAS) Sample IDs: Site 43-IDW-SO-090624 & Site 43-IDW-SO-090624-01 (TCLP & PFAS)

**Remember to attach Laboratory Analytical Report (and/or Material Safety Data Sheet) including Chain of Custody and required parameters provided for this profile.**

Initial here

Page 1    MCB - CAMP LEJEUNE COMMANDING GENERAL ATTN: E   Non-Hazardous Soil with Hydraulic Fluid

September 2023

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

# Special Waste Profile



## V. Physical Characteristics of Waste

| Characteristic Components (must equal 100%): | % By Weight (out of 100% – ranges acceptable): |
|---|---|
| 1. Non-Hazardous Soil | 99-100 |
| 2. Hydraulic Fluid | 0-1 |
| 3. PFAS | <0.0000001 |
| 4. | |
| 5. | |

| Color: | Odor (describe): | Does Waste Contain Free Liquids? | % Solids: | pH: | Flash Point: | |
|---|---|---|---|---|---|---|
| Brown | None | ☐ Yes  ☑ No | 100 | 6.8-7.5 | >200 | °F |

**Attach Laboratory Analytical Report (and/or Material Safety Data Sheet) including Chain of Custody and required parameters provided for this profile.**

### RCRA Regulatory Questions

1. Does this waste or generating process contain regulated concentrations of the following pesticides and/or herbicides: Chlordane, Endrin, Heptachlor (and its epoxides), Lindane, Methoxychlor, Toxaphene, 2,4-D, or 2,4,5-TP Silvex as defined in 40 CFR 261.33 — ☐ Yes  ☑ No

2. Does this waste contain reactive sulfides (greater than 500 ppm) or reactive cyanide (greater than 250 ppm) [reference 40 CFR 261.23(a)(5)]? — ☐ Yes  ☑ No

3. Does this waste contain regulated concentrations of Polychlorinated Biphenyls (PCBs) as defined in 40 CFR Part 761 — ☐ Yes  ☑ No

4. Does this waste contain concentrations of listed hazardous wastes defined in 40 CFR 261.31, 261.32, 261.33, including RCRA F-listed solvents? — ☐ Yes  ☑ No

5. Has this waste been delisted under 40 CFR 260.20 and 260.22? If yes, attach the final decision to delist the waste as published in the Federal Register. — ☐ Yes  ☑ No

6. Does this waste exhibit a hazardous characteristic as defined by federal and/or state regulations? If Yes, identify the applicable waste code and specify if the waste is hazardous as defined by federal, state or both — ☐ Yes  ☑ No

7. Does this waste contain regulated concentrations of 2,3,7,8-Tetrachlorodibenzodioxin (2,3,7,8-TCCD), or any other dioxin as defined in 40 CFR 261.31 — ☐ Yes  ☑ No

8. Is this a regulated medical or infectious waste as defined by federal and/or state regulations — ☐ Yes  ☑ No

9. Is this a regulated radioactive waste as defined by federal and/or state regulations — ☐ Yes  ☑ No

10. Is this a solid waste that is not a hazardous waste in accordance with 40 CFR 261.4(b)? If yes, please provide the corresponding regulatory citation. — ☐ Yes  ☑ No

### Republic Services Waste Handling Questions

1. Does this waste generate heat or react when contacted with water/moisture? — ☐ Yes  ☑ No

2. Does the waste contain sulfur or sulfur by-products? — ☐ Yes  ☑ No

3. Is this waste generated at a state or federal Superfund cleanup site subject to regulation under CERCLA? — ☑ Yes  ☐ No

4a. Is this waste from a TSD facility, TSD-like facility or consolidator (i.e. multiple wastes/multiple generators)? — ☐ Yes  ☑ No

4b. If yes to the above question, please provide clarification

Initial here _____

Page 2      MCB - CAMP LEJEUNE COMMANDING GENERAL ATTN.      Non-Hazardous Soil with Hydraulic Fluid

Special Waste Profile



ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## VI. Certification

*I hereby certify that I have knowledge about the waste material being offered for disposal ("Waste") and have the requisite authority to bind the Generator to the information contained in this Special Waste Profile ("Profile"). I further certify that to the best of my knowledge and belief, the information contained herein is a true, complete and accurate description of the Waste and all known or suspected hazards have been disclosed. All Analytical Results/Safety Data Sheets submitted are truthful and complete and are representative of the Waste.*

*I further certify that by utilizing this Profile, neither myself nor any other employee or representative of the company identified below ("Company") will deliver for disposal or attempt to deliver for disposal any Waste that: (i) is classified as toxic waste, hazardous waste or infectious waste; (ii) that does not conform to this Profile; or (iii) that this Disposal Facility is prohibiting from accepting by law. I shall immediately give written notice of any change or condition pertaining to the Waste not provided herein. Our Company hereby agrees to fully indemnify this Disposal Facility against any damages resulting from this Profile or Certification being inaccurate or untrue.*

*I understand that by attaching an electronic signature, I am signing this document and Company consents to complete this transaction and receive all related communications electronically, and agrees this document will be binding as though it had been physically signed. A printout of this Profile may be accepted with the same authority as the original.*

| | | |
|---|---|---|
| **Jeffrey Zahniser** | Environmental Protection Specialist | **USMC/Camp Lejeune/EMD/RCRS** |
| Authorized Representative Name (Printed) | Title (Printed) | Company Name |
| *[signature]* Representative Signature | | **13 December 2024** Date |

MCB - CAMP LEJEUNE COMMANDING GENERAL ATTN: ⊞ Non-Hazardous Soil with Hydraulic Fluid

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

# Special Waste Profile

 **REPUBLIC** SERVICES

Disposal Facility: 5010 CMS Landfill NC

Waste Profile #     50102512795

Sales Rep #:     116

## I. Generator Information

Generator Name: MCB - CAMP LEJEUNE COMMANDING GENERAL ATTN. EMD

Generator Site Address: **Site 43, Agan Street, Marine Corps Base Camp Lejeune**

City: **Camp Lejeune**     County: **Onslow**     State: North Carolina     ZIP: **28540**

State ID/Reg. No:     State Approval/Waste Code:     NAICS #:

Generator Mailing Address ☑ (if different   **12 Post Lane**

City: **Camp Lejeune**     County: **Onslow**     State: North Carolina     ZIP: **28547**

Generator Contact Name: **Jeffrey Zahniser**     Email: **jeffrey.zahniser@usmc.mil**

Phone Number: **910-451-5306**     Ext:     Fax Number:

## II. Billing Information

Bill to: **Evo Corporation**     Contact Name: **Edith Basinger**

Billing Address: **7535 Styers Ferry Road**     Email: **accountspayable@evocorp.net**

City: **Clemmons**     State: North Carolina     ZIP: **27012**     Phone: **336-725-5844**

## III. Waste Stream Information

Name of Waste: Non-Hazardous Groundwater with PFAS

Process Generating Waste: Purge and Development water from monitoring well installation and sampling activities for environmental investigation. Potential Source: Former Agan Street Dump was used to discard debris and received wastewater sludge that may have contained AFFF and/or PFAS. The wastewater treatment plant received wastewater from industrial activities that used material potentially containing PFAS. Street foam was also deployed twice on Agan Street historically.

Type of Waste: Pollution Control Waste     Physical State: Liquid     Method of Shipment: Other

Estimated Volume: 6     Volume Type: Totes

Frequency: One-time Event (single project)     Disposal Consideration: Solidification

## IV. Representative Sample Certification

☐ **No Sample Taken**

☑ **Sample Taken     Type of Sample** Composite and Grab

Is the representative sample collected to prepare this profile and laboratory analysis collected in accordance with U.S. EPA 40 CFR 261.20(c) guidelines or equivalent? ☑ Yes ☐ No

Sample Date: 09-06-2024

Sample ID Numbers or SDS: eurofins Report ID: 410-187235-1 (TCLP & PFAS) Sample IDs: Site 43-IDW-AQ-090624, Site 43-IDW-AQ-090624-01, Site 43-IDW-AQ-090624-02 (PFAS & TCLP)

**Remember to attach Laboratory Analytical Report (and/or Material Safety Data Sheet) including Chain of Custody and required parameters provided for this profile.**

Initial here

Page 1     MCB - CAMP LEJEUNE COMMANDING GENERAL ATTN: E1   Non-Hazardous Groundwater with PFAS

September 2023

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

Special Waste Profile  **REPUBLIC** SERVICES

## V. Physical Characteristics of Waste

| Characteristic Components (must equal 100%): | % By Weight (out of 100% – ranges acceptable): |
|---|---|
| 1. Non-Hazardous Groundwater | 95-100 |
| 2. Non-Hazardous Sediment | 0-5 |
| 3. PFAS | <0.0000001 |
| 4. | |
| 5. | |

| Color: | Odor (describe): | Does Waste Contain Free Liquids? | % Solids: | pH: | Flash Point: | |
|---|---|---|---|---|---|---|
| Clear | None | ☑ Yes ☐ No | 0-5 | 7.2-7.3 | >200 | °F |

**Attach Laboratory Analytical Report (and/or Material Safety Data Sheet) including Chain of Custody and required parameters provided for this profile.**

### RCRA Regulatory Questions

1. Does this waste or generating process contain regulated concentrations of the following pesticides and/or herbicides: Chlordane, Endrin, Heptachlor (and its epoxides), Lindane, Methoxychlor, Toxaphene, 2,4-D, or 2,4,5-TP Silvex as defined in 40 CFR 261.33 ☐ Yes ☑ No

2. Does this waste contain reactive sulfides (greater than 500 ppm) or reactive cyanide (greater than 250 ppm) [reference 40 CFR 261.23(a)(5)]? ☐ Yes ☑ No

3. Does this waste contain regulated concentrations of Polychlorinated Biphenyls (PCBs) as defined in 40 CFR Part 761 ☐ Yes ☑ No

4. Does this waste contain concentrations of listed hazardous wastes defined in 40 CFR 261.31, 261.32, 261.33, including RCRA F-listed solvents? ☐ Yes ☑ No

5. Has this waste been delisted under 40 CFR 260.20 and 260.22? If yes, attach the final decision to delist the waste as published in the Federal Register. ☐ Yes ☑ No

6. Does this waste exhibit a hazardous characteristic as defined by federal and/or state regulations? If Yes, identify the applicable waste code and specify if the waste is hazardous as defined by federal, state or both ☐ Yes ☑ No

7. Does this waste contain regulated concentrations of 2,3,7,8-Tetrachlorodibenzodioxin (2,3,7,8-TCCD), or any other dioxin as defined in 40 CFR 261.31 ☐ Yes ☑ No

8. Is this a regulated medical or infectious waste as defined by federal and/or state regulations ☐ Yes ☑ No

9. Is this a regulated radioactive waste as defined by federal and/or state regulations ☐ Yes ☑ No

10. Is this a solid waste that is not a hazardous waste in accordance with 40 CFR 261.4(b)? If yes, please provide the corresponding regulatory citation. ☐ Yes ☑ No

### Republic Services Waste Handling Questions

1. Does this waste generate heat or react when contacted with water/moisture? ☐ Yes ☑ No

2. Does the waste contain sulfur or sulfur by-products? ☐ Yes ☑ No

3. Is this waste generated at a state or federal Superfund cleanup site subject to regulation under CERCLA? ☑ Yes ☐ No

4a. Is this waste from a TSD facility, TSD-like facility or consolidator (i.e. multiple wastes/multiple generators)? ☐ Yes ☑ No

4b. If yes to the above question, please provide clarification

---

Initial here

MCB - CAMP LEJEUNE COMMANDING GENERAL ATTN:   Non-Hazardous Groundwater with PFAS

Special Waste Profile

## VI. Certification

*I hereby certify that I have knowledge about the waste material being offered for disposal ("Waste") and have the requisite authority to bind the Generator to the information contained in this Special Waste Profile ("Profile"). I further certify that to the best of my knowledge and belief, the information contained herein is a true, complete and accurate description of the Waste and all known or suspected hazards have been disclosed. All Analytical Results/Safety Data Sheets submitted are truthful and complete and are representative of the Waste.*

*I further certify that by utilizing this Profile, neither myself nor any other employee or representative of the company identified below ("Company") will deliver for disposal or attempt to deliver for disposal any Waste that: (i) is classified as toxic waste, hazardous waste or infectious waste; (ii) that does not conform to this Profile; or (iii) that this Disposal Facility is prohibiting from accepting by law. I shall immediately give written notice of any change or condition pertaining to the Waste not provided herein. Our Company hereby agrees to fully indemnify this Disposal Facility against any damages resulting from this Profile or Certification being inaccurate or untrue.*

*I understand that by attaching an electronic signature, I am signing this document and Company consents to complete this transaction and receive all related communications electronically, and agrees this document will be binding as though it had been physically signed. A printout of this Profile may be accepted with the same authority as the original.*


**Jeffrey Zahniser**

Authorized Representative Name
(Printed)

Environmental Protection Specialist

Title
(Printed)

**USMC/Camp Lejeune/EMD/RCRS**

Company Name


Representative Signature

**13 December 2024**

Date

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

# EXHIBIT D

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

# Special Waste Profile


**REPUBLIC** SERVICES

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

Disposal Facility:  5010 CMS Landfill NC

Waste Profile #:    5010245905
~~5010245903~~

Sales Rep #:    116 Marston

---

## I. Generator Information

Generator Name:  **MCAS-Cherry Point**

Generator Site Address:  **P235, 6th Avenue**

City: **Cherry Point**          County: **Craven**          State: North Carolina          ZIP: **28533**

State ID/Reg. No:          State Approval/Waste Code:          NAICS #:

Generator Mailing Address ☐ (if different)  **PSC Box 8006**

City: **Cherry Point**          County: **Craven**          State: North Carolina          ZIP: **28533**

Generator Contact Name:  **Erik Delany**          Email:  **erik.delaney@usmc.mil**

Phone Number: **252-466-4591**          Ext:          Fax Number:

## II. Billing Information

Bill to:  **Evo Corporation**          Contact Name:  **Edith Basinger**

Billing Address:  **7535 Styers Ferry Road**          Email:  **accountspayable@evocorp.net**

City: **Clemmons**          State: North Carolina          ZIP: **27012**          Phone: **336-725-5844**

## III. Waste Stream Information

Name of Waste:  Filter Media with Petroleum and PFAS

Process Generating Waste:  **Filter media change out from a groundwater treatment unit treating groundwater contaminated with petroleum and PFAS.**

Type of Waste:  Pollution Control Waste          Physical State: Semi-Solid          Method of Shipment: Bulk

Estimated Volume: 10          Volume Type: Tons

Frequency:  One-time Event (single project)          Disposal Consideration: Solidification

## IV. Representative Sample Certification

☐ **No Sample Taken**

☑ **Sample Taken**    **Type of Sample**  Composite Sample

Is the representative sample collected to prepare this profile and laboratory analysis collected in accordance with U.S. EPA 40 CFR 261.20(c) guidelines or equivalent? ☑ **Yes** ☐ **No**

Sample Date:  01-16-2024          Sample ID Numbers or SDS:  **SGS Lab Report FC1262-1**
**Sample ID P-197 Disposal**

---

Initial here  _✍_

**Remember to attach Laboratory Analytical Report (and/or Material Safety Data Sheet) including Chain of Custody and required parameters provided for this profile.**

Page 1          April 2023

# Special Waste Profile

**REPUBLIC SERVICES**

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## V. Physical Characteristics of Waste

**Characteristic Components (must equal 100%:)** | **% By Weight (out of 100% – ranges acceptable):**

| | |
|---|---|
| 1. Carbon and Ion Exchange Media | 95-99% |
| 2. Groundwater | 1-5% |
| 3. Sediment | <1% |
| 4. Petroleum | <.001% |
| 5. PFAS | <.001% |

| Color: | Odor (describe): | Does Waste Contain Free Liquids? | % Solids: | pH: | Flash Point: | |
|---|---|---|---|---|---|---|
| Brown-Black | None | ☑ Yes  ☐ No | 95% | 5-10 | >200 | °F |

**Attach Laboratory Analytical Report (and/or Material Safety Data Sheet) including Chain of Custody and required parameters provided for this profile.**

## RCRA Regulatory Questions

1. Does this waste or generating process contain regulated concentrations of the following pesticides and/or herbicides: Chlordane, Endrin, Heptachlor (and its epoxides), Lindane, Methoxychlor, Toxaphene, 2,4-D, or 2,4,5-TP Silvex as defined in 40 CFR 261.33?   ☐ Yes  ☑ No

2. Does this waste contain reactive sulfides (greater than 500 ppm) or reactive cyanide (greater than 250 ppm) [reference 40 CFR 261.23(a)(5)]?   ☐ Yes  ☑ No

3. Does this waste contain regulated concentrations of Polychlorinated Biphenyls (PCBs) as defined in 40 CFR Part 761?   ☐ Yes  ☑ No

4. Does this waste contain concentrations of listed hazardous wastes defined in 40 CFR 261.31, 261.32, 261.33, including RCRA F-listed solvents?   ☐ Yes  ☑ No

5. Has this waste been delisted under 40 CFR 260.20 and 260.22? If yes, attach the final decision to delist the waste as published in the Federal Register.   ☐ Yes  ☑ No

6. Does this waste exhibit a hazardous characteristic as defined by federal and/or state regulations? If Yes, identify the applicable waste code and specify if the waste is hazardous as defined by federal, state or both.   ☐ Yes  ☑ No

7. Does this waste contain regulated concentrations of 2,3,7,8-Tetrachlorodibenzodioxin (2,3,7,8-TCCD), or any other dioxin as defined in 40 CFR 261.31?   ☐ Yes  ☑ No

8. Is this a regulated medical or infectious waste as defined by federal and/or state regulations?   ☐ Yes  ☑ No

9. Is this a regulated radioactive waste as defined by federal and/or state regulations?   ☐ Yes  ☑ No

10. Is this a solid waste that is not a hazardous waste in accordance with 40 CFR 261.4(b)? If yes, please provide the corresponding regulatory citation.   ☐ Yes  ☑ No

## Republic Services Waste Handling Questions

1. Does this waste generate heat or react when contacted with water/moisture?   ☐ Yes  ☑ No

2. Does the waste contain sulfur or sulfur by-products?   ☐ Yes  ☑ No

3. Is this waste generated at a state or federal Superfund cleanup site subject to regulation under CERCLA?   ☐ Yes  ☑ No

4a. Is this waste from a TSD facility, TSD-like facility or consolidator (i.e. multiple wastes/multiple generators)?   ☐ Yes  ☑ No

4b. If yes to the above question, please provide clarification.

---

**Initial here**

Filter Media with Petroleum and PFAS

April 2023

# Special Waste Profile



ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## VI. Certification

*I hereby certify that I have knowledge about the waste material being offered for disposal ("Waste") and have the requisite authority to bind the Generator to the information contained in this Special Waste Profile ("Profile"). I further certify that to the best of my knowledge and belief, the information contained herein is a true, complete and accurate description of the Waste and all known or suspected hazards have been disclosed. All Analytical Results/Safety Data Sheets submitted are truthful and complete and are representative of the Waste.*

*I further certify that by utilizing this Profile, neither myself nor any other employee or representative of the company identified below ("Company") will deliver for disposal or attempt to deliver for disposal any Waste that: (i) is classified as toxic waste, hazardous waste or infectious waste; (ii) that does not conform to this Profile; or (iii) that this Disposal Facility is prohibiting from accepting by law. I shall immediately give written notice of any change or condition pertaining to the Waste not provided herein. Our Company hereby agrees to fully indemnify this Disposal Facility against any damages resulting from this Profile or Certification being inaccurate or untrue.*

*I understand that by attaching an electronic signature, I am signing this document and Company consents to complete this transaction and receive all related communications electronically, and agrees this document will be binding as though it had been physically signed. A printout of this Profile may be accepted with the same authority as the original.*

| | | |
|---|---|---|
| **Timothy Lawrence** | *Env. Compliance Sup.* | Environmental Affairs Dept. MCAS-Cherry Point |
| Authorized Representative Name (Printed) | Title (Printed) | Company Name |
| *[signature]* | | 04/19/24 |
| Representative Signature | | Date |

April 2023

# Special Waste Profile

**REPUBLIC** SERVICES

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

**Disposal Facility:** 5010 CMS Landfill NC

**Waste Profile #** 5010248360

**Sales Rep #:** John Marston

## I. Generator Information

**Generator Name:** Commanding Officer MCAS New River

**Generator Site Address:** AS4141 White Street

**City:** Jacksonville    **County:** Onslow    **State:** North Carolina    **ZIP:** 28545

**State ID/Reg. No:**    **State Approval/Waste Code:**    **NAICS #:**

**Generator Mailing Address** ☑ (if different    AS208 Bancroft St MCAS New River

**City:** Jacksonville    **County:** Onslow    **State:** North Carolina    **ZIP:** 28545

**Generator Contact Name:** Michael Rogers    **Email:** michael.s.rogers@usmc.mil

**Phone Number:** 910-449-6143    **Ext:**    **Fax Number:**

## II. Billing Information

**Bill to:** Evo Corporation    **Contact Name:** Edith Basinger

**Billing Address:** 7535 Styers Ferry Road    **Email:** accountspayable@evocorp.net

**City:** Clemmons    **State:** North Carolina    **ZIP:** 27012    **Phone:** 336-725-5844

## III. Waste Stream Information

**Name of Waste:** Solids/Sediment with Petroleum and PFAS

**Process Generating Waste:** Clean out of a 3,000 gallon poly storage tank

**Type of Waste:** Pollution Control Waste    **Physical State:** Semi-Solid    **Method of Shipment:** Drum

**Estimated Volume:** 9    **Volume Type:** Drums

**Frequency:** One-time Event (single project)    **Disposal Consideration:** Solidification

## IV. Representative Sample Certification

☐ **No Sample Taken**

☑ **Sample Taken    Type of Sample** Composite Sample

Is the representative sample collected to prepare this profile and laboratory analysis collected in accordance with U.S. EPA 40 CFR 261.20(c) guidelines or equivalent? ☑ **Yes** ☐**No**

**Sample Date:** 04-25-2024

**Sample ID Numbers or SDS:** Pace Project # L1729782, Sample ID AS4141 Drum
Pace Project # L1729865, Sample ID AS4141 Drum

**Initial here** MSR

**Remember to attach Laboratory Analytical Report (and/or Material Safety Data Sheet) including Chain of Custody and required parameters provided for this profile.**

# Special Waste Profile

 **REPUBLIC** SERVICES

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## V. Physical Characteristics of Waste

**Characteristic Components (must equal 100%):**  **% By Weight (out of 100% – ranges acceptable):**

1. Solids/Sediment    >50%
2. Water    <50%
3. Petroleum    <1%
4. PFAS    <.1%
5.

| Color: | Odor (describe): | Does Waste Contain Free Liquids? | % Solids: | pH: | Flash Point: | |
|---|---|---|---|---|---|---|
| Yellow to Tan | Slight Petroleum | ☑ Yes  ☐ No | >50% | 5-10 | >200 | °F |

**Attach Laboratory Analytical Report (and/or Material Safety Data Sheet) including Chain of Custody and required parameters provided for this profile.**

## RCRA Regulatory Questions

1. Does this waste or generating process contain regulated concentrations of the following pesticides and/or herbicides: Chlordane, Endrin, Heptachlor (and its epoxides), Lindane, Methoxychlor, Toxaphene, 2,4-D, or 2,4,5-TP Silvex as defined in 40 CFR 261.33    ☐ Yes  ☑ No

2. Does this waste contain reactive sulfides (greater than 500 ppm) or reactive cyanide (greater than 250 ppm) [reference 40 CFR 261.23(a)(5)]?    ☐ Yes  ☑ No

3. Does this waste contain regulated concentrations of Polychlorinated Biphenyls (PCBs) as defined in 40 CFR Part 761    ☐ Yes  ☑ No

4. Does this waste contain concentrations of listed hazardous wastes defined in 40 CFR 261.31, 261.32, 261.33, including RCRA F-listed solvents?    ☐ Yes  ☑ No

5. Has this waste been delisted under 40 CFR 260.20 and 260.22? If yes, attach the final decision to delist the waste as published in the Federal Register.    ☐ Yes  ☑ No

6. Does this waste exhibit a hazardous characteristic as defined by federal and/or state regulations? If Yes, identify the applicable waste code and specify if the waste is hazardous as defined by federal, state or both    ☐ Yes  ☑ No

7. Does this waste contain regulated concentrations of 2,3,7,8-Tetrachlorodibenzodioxin (2,3,7,8-TCCD), or any other dioxin as defined in 40 CFR 261.31    ☐ Yes  ☑ No

8. Is this a regulated medical or infectious waste as defined by federal and/or state regulations    ☐ Yes  ☑ No

9. Is this a regulated radioactive waste as defined by federal and/or state regulations    ☐ Yes  ☑ No

10. Is this a solid waste that is not a hazardous waste in accordance with 40 CFR 261.4(b)? If yes, please provide the corresponding regulatory citation.    40CFR261.4 (b)(10)    ☑ Yes  ☐ No
06-07-24
MSR

## Republic Services Waste Handling Questions

1. Does this waste generate heat or react when contacted with water/moisture?    ☐ Yes  ☑ No

2. Does the waste contain sulfur or sulfur by-products?    ☐ Yes  ☑ No

3. Is this waste generated at a state or federal Superfund cleanup site subject to regulation under CERCLA?    ☐ Yes  ☑ No

4a. Is this waste from a TSD facility, TSD-like facility or consolidator (i.e. multiple wastes/multiple generators)?    ☐ Yes  ☑ No

4b. If yes to the above question, please provide clarification

Initial here    MSR

# Special Waste Profile

 **REPUBLIC** SERVICES

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## VI. Certification

*I hereby certify that I have knowledge about the waste material being offered for disposal ("Waste") and have the requisite authority to bind the Generator to the information contained in this Special Waste Profile ("Profile"). I further certify that to the best of my knowledge and belief, the information contained herein is a true, complete and accurate description of the Waste and all known or suspected hazards have been disclosed. All Analytical Results/Safety Data Sheets submitted are truthful and complete and are representative of the Waste.*

*I further certify that by utilizing this Profile, neither myself nor any other employee or representative of the company identified below ("Company") will deliver for disposal or attempt to deliver for disposal any Waste that: (i) is classified as toxic waste, hazardous waste or infectious waste; (ii) that does not conform to this Profile; or (iii) that this Disposal Facility is prohibiting from accepting by law. I shall immediately give written notice of any change or condition pertaining to the Waste not provided herein. Our Company hereby agrees to fully indemnify this Disposal Facility against any damages resulting from this Profile or Certification being inaccurate or untrue.*

*I understand that by attaching an electronic signature, I am signing this document and Company consents to complete this transaction and receive all related communications electronically, and agrees this document will be binding as though it had been physically signed. A printout of this Profile may be accepted with the same authority as the original.*

| Michael Rogers | ENV Supervisor | MCAS New River USMC |
|---|---|---|
| Authorized Representative Name (Printed) | Title (Printed) | Company Name |

*Michael S Rogers*

Representative Signature

4 June 2024

Date

Commanding Officer MCAS New River     Solids/Sediment with Petroleum and PFAS     September 2023

# Special Waste Profile

**REPUBLIC** SERVICES

**Disposal Facility:** 5010 CMS Landfill NC

**Waste Profile #**

**Sales Rep #:**

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## I. Generator Information

**Generator Name:** Commanding Officer MCAS New River

**Generator Site Address:** AS4141 White Street

**City:** Jacksonville     **County:** Onslow     **State:** North Carolina     **ZIP:** 28545

**State ID/Reg. No:**     **State Approval/Waste Code:**     **NAICS #:**

**Generator Mailing Address** ☑ (if different     AS208 Bancroft St MCAS New River

**City:** Jacksonville     **County:** Onslow     **State:** North Carolina     **ZIP:** 28545

**Generator Contact Name:** Michael Rogers     **Email:** michael.s.rogers@usmc.mil

**Phone Number:** 910-449-6143     **Ext:**     **Fax Number:**

## II. Billing Information

**Bill to:** Evo Corporation     **Contact Name:** Edith Basinger

**Billing Address:** 7535 Styers Ferry Road     **Email:** accountspayable@evocorp.net

**City:** Clemmons     **State:** North Carolina     **ZIP:** 27012     **Phone:** 336-725-5844

## III. Waste Stream Information

**Name of Waste:** Solids/Sediment with Petroleum and PFAS

**Process Generating Waste:** Clean out of a 3,000 gallon poly storage tank

**Type of Waste:** Pollution Control Waste     **Physical State:** Semi-Solid     **Method of Shipment:** Drum

**Estimated Volume:** 9     **Volume Type:** Drums

**Frequency:** One-time Event (single project)     **Disposal Consideration:** Solidification

## IV. Representative Sample Certification

☐ **No Sample Taken**

☑ **Sample Taken**     **Type of Sample** Composite Sample

Is the representative sample collected to prepare this profile and laboratory analysis collected in accordance with U.S. EPA 40 CFR 261.20(c) guidelines or equivalent? ☑ **Yes** ☐ **No**

**Sample Date:** 04-25-2024

**Sample ID Numbers or SDS:** Pace Project # L1729782, Sample ID AS4141 Drum
Pace Project # L1729865, Sample ID AS4141 Drum

**Initial here** _MSR_

**Remember to attach Laboratory Analytical Report (and/or Material Safety Data Sheet) including Chain of Custody and required parameters provided for this profile.**

# Special Waste Profile



ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## V. Physical Characteristics of Waste

**Characteristic Components (must equal 100%):**  **% By Weight (out of 100% – ranges acceptable):**

1. Solids/Sediment    >50%

2. Water    <50%

3. Petroleum    <1%

4. PFAS    <.1%

5.

| Color: | Odor (describe): | Does Waste Contain Free Liquids? | % Solids: | pH: | Flash Point: | |
|---|---|---|---|---|---|---|
| Yellow to Tan | Slight Petroleum | ☑ Yes  ☐ No | >50% | 5-10 | >200 | °F |

**Attach Laboratory Analytical Report (and/or Material Safety Data Sheet) including Chain of Custody and required parameters provided for this profile.**

## RCRA Regulatory Questions

1. Does this waste or generating process contain regulated concentrations of the following pesticides and/or herbicides: Chlordane, Endrin, Heptachlor (and its epoxides), Lindane, Methoxychlor, Toxaphene, 2,4-D, or 2,4,5-TP Silvex as defined in 40 CFR 261.33    ☐ Yes  ☑ No

2. Does this waste contain reactive sulfides (greater than 500 ppm) or reactive cyanide (greater than 250 ppm) [reference 40 CFR 261.23(a)(5)]?    ☐ Yes  ☑ No

3. Does this waste contain regulated concentrations of Polychlorinated Biphenyls (PCBs) as defined in 40 CFR Part 761    ☐ Yes  ☑ No

4. Does this waste contain concentrations of listed hazardous wastes defined in 40 CFR 261.31, 261.32, 261.33, including RCRA F-listed solvents?    ☐ Yes  ☑ No

5. Has this waste been delisted under 40 CFR 260.20 and 260.22? If yes, attach the final decision to delist the waste as published in the Federal Register.    ☐ Yes  ☑ No

6. Does this waste exhibit a hazardous characteristic as defined by federal and/or state regulations? If Yes, identify the applicable waste code and specify if the waste is hazardous as defined by federal, state or both    ☐ Yes  ☑ No

7. Does this waste contain regulated concentrations of 2,3,7,8-Tetrachlorodibenzodioxin (2,3,7,8-TCCD), or any other dioxin as defined in 40 CFR 261.31    ☐ Yes  ☑ No

8. Is this a regulated medical or infectious waste as defined by federal and/or state regulations    ☐ Yes  ☑ No

9. Is this a regulated radioactive waste as defined by federal and/or state regulations    ☐ Yes  ☑ No

10. Is this a solid waste that is not a hazardous waste in accordance with 40 CFR 261.4(b)? If yes, please provide the corresponding regulatory citation.    40CFR261.4 (b)(10)    ☑ Yes  ☐ No
06-07-24
MSR

## Republic Services Waste Handling Questions

1. Does this waste generate heat or react when contacted with water/moisture?    ☐ Yes  ☑ No

2. Does the waste contain sulfur or sulfur by-products?    ☐ Yes  ☑ No

3. Is this waste generated at a state or federal Superfund cleanup site subject to regulation under CERCLA?    ☐ Yes  ☑ No

4a. Is this waste from a TSD facility, TSD-like facility or consolidator (i.e. multiple wastes/multiple generators)?    ☐ Yes  ☑ No

4b. If yes to the above question, please provide clarification

Initial here    *MSR*

Commanding Officer MCAS New River            Solids/Sediment with Petroleum and PFAS            September 2023

# Special Waste Profile



ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## VI. Certification

*I hereby certify that I have knowledge about the waste material being offered for disposal ("Waste") and have the requisite authority to bind the Generator to the information contained in this Special Waste Profile ("Profile"). I further certify that to the best of my knowledge and belief, the information contained herein is a true, complete and accurate description of the Waste and all known or suspected hazards have been disclosed. All Analytical Results/Safety Data Sheets submitted are truthful and complete and are representative of the Waste.*

*I further certify that by utilizing this Profile, neither myself nor any other employee or representative of the company identified below ("Company") will deliver for disposal or attempt to deliver for disposal any Waste that: (i) is classified as toxic waste, hazardous waste or infectious waste; (ii) that does not conform to this Profile; or (iii) that this Disposal Facility is prohibiting from accepting by law. I shall immediately give written notice of any change or condition pertaining to the Waste not provided herein. Our Company hereby agrees to fully indemnify this Disposal Facility against any damages resulting from this Profile or Certification being inaccurate or untrue.*

*I understand that by attaching an electronic signature, I am signing this document and Company consents to complete this transaction and receive all related communications electronically, and agrees this document will be binding as though it had been physically signed. A printout of this Profile may be accepted with the same authority as the original.*

| Michael Rogers | ENV Supervisor | MCAS New River USMC |
|---|---|---|
| Authorized Representative Name (Printed) | Title (Printed) | Company Name |

| *Michael S Rogers* | 4 June 2024 |
|---|---|
| Representative Signature | Date |

# Special Waste Profile



ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

Disposal Facility: 5010 CMS Landfill NC

Waste Profile #: 5010248360

Sales Rep #: 116 Marston

## I. Generator Information

Generator Name: Commanding Officer MCAS New River

Generator Site Address: AS4141 White Street

City: Jacksonville    County: Onslow    State: North Carolina    ZIP: 28545

State ID/Reg. No:    State Approval/Waste Code:    NAICS #:

Generator Mailing Address ☑ (if different    AS208 Bancroft St MCAS New River

City: Jacksonville    County: Onslow    State: North Carolina    ZIP: 28545

Generator Contact Name: Michael Rogers    Email: michael.s.rogers@usmc.mil

Phone Number: 910-449-6143    Ext:    Fax Number:

## II. Billing Information

Bill to: Evo Corporation    Contact Name: Edith Basinger

Billing Address: 7535 Styers Ferry Road    Email: accountspayable@evocorp.net

City: Clemmons    State: North Carolina    ZIP: 27012    Phone: 336-725-5844

## III. Waste Stream Information

Name of Waste: Solids/Sediment with Petroleum and PFAS

Process Generating Waste: Clean out of a 3,000 gallon poly storage tank / Jet Fuel

Type of Waste: Pollution Control Waste    Physical State: Semi-Solid    Method of Shipment: Drum

Estimated Volume: 9    Volume Type: Drums

Frequency: One-time Event (single project)    Disposal Consideration: Solidification

## IV. Representative Sample Certification

☐ **No Sample Taken**

☑ **Sample Taken**    **Type of Sample**    Composite Sample

Is the representative sample collected to prepare this profile and laboratory analysis collected in accordance with U.S. EPA 40 CFR 261.20(c) guidelines or equivalent?    ☑ Yes    ☐ No

Sample Date: 04-25-2024

Sample ID Numbers or SDS: Pace Project # L1729782, Sample ID AS4141 Drum
Pace Project # L1729865, Sample ID AS4141 Drum

Initial here    *MSR*

**Remember to attach Laboratory Analytical Report (and/or Material Safety Data Sheet) including Chain of Custody and required parameters provided for this profile.**

# Special Waste Profile

**REPUBLIC SERVICES**

ELECTRONICALLY FILED - 2025 Mar 12 5:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## V. Physical Characteristics of Waste

Characteristic Components (must equal 100%):     % By Weight (out of 100% – ranges acceptable):

1. Solids/Sediment     >50%
2. Water     <50%
3. Petroleum     <1%
4. PFAS     <.1%
5. 

| Color: | Odor (describe): | Does Waste Contain Free Liquids? | % Solids: | pH: | Flash Point: |
|---|---|---|---|---|---|
| Yellow to Tan | Slight Petrolelum | ☑ Yes   ☐ No | >50% | 5-10 | >200 |

**Attach Laboratory Analytical Report (and/or Material Safety Data Sheet) including Chain of Custody and required parameters provided for this profile.**

### RCRA Regulatory Questions

1. Does this waste or generating process contain regulated concentrations of the following pesticides and/or herbicides: Chlordane, Endrin, Heptachlor (and its epoxides), Lindane, Methoxychlor, Toxaphene, 2,4-D, or  2,4,5-TP Silvex as defined in 40 CFR 261.33    ☐ **Yes**  ☑ **No**

2. Does this waste contain reactive sulfides (greater than 500 ppm) or reactive cyanide (greater than 250 ppm) [reference 40 CFR 261.23(a)(5)]?    ☐ **Yes**  ☑ **No**

3. Does this waste contain regulated concentrations of Polychlorinated Biphenyls (PCBs) as defined in 40 CFR Part 761    ☐ **Yes**  ☑ **No**

4. Does this waste contain concentrations of listed hazardous wastes defined in 40 CFR 261.31, 261.32, 261.33, including RCRA F-listed solvents?    ☐ **Yes**  ☑ **No**

5. Has this waste been delisted under 40 CFR 260.20 and 260.22? If yes, attach the final decision to delist the waste as published in the Federal Register.    ☐ **Yes**  ☑ **No**

6. Does this waste exhibit a hazardous characteristic as defined by federal and/or state regulations? If Yes, identify the applicable waste code and specify if the waste is hazardous as defined by federal, state or both    ☐ **Yes**  ☑ **No**

7. Does this waste contain regulated concentrations of 2,3,7,8-Tetrachlorodibenzodioxin (2,3,7,8-TCCD), or any other dioxin as defined in 40 CFR 261.31    ☐ **Yes**  ☑ **No**

8. Is this a regulated medical or infectious waste as defined by federal and/or state regulations    ☐ **Yes**  ☑ **No**

9. Is this a regulated radioactive waste as defined by federal and/or state regulations    ☐ **Yes**  ☑ **No**

10. Is this a solid waste that is not a hazardous waste in accordance with 40 CFR 261.4(b)? If yes, please provide the corresponding regulatory citation.    ☐ **Yes**  ☑ **No**

### Republic Services Waste Handling Questions

1. Does this waste generate heat or react when contacted with water/moisture?    ☐ **Yes**  ☑ **No**

2. Does the waste contain sulfur or sulfur by-products?    ☐ **Yes**  ☑ **No**

3. Is this waste generated at a state or federal Superfund cleanup site subject to regulation under CERCLA?    ☐ **Yes**  ☑ **No**

4a. Is this waste from a TSD facility, TSD-like facility or consolidator (i.e. multiple wastes/multiple generators)?    ☐ **Yes**  ☑ **No**

4b. If yes to the above question, please provide clarification

Initial here    *MSR*

Commanding Officer MCAS New River          Solids/Sediment with Petroleum and PFAS          September 2023

# Special Waste Profile

**REPUBLIC** SERVICES

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

**VI. Certification**

*I hereby certify that I have knowledge about the waste material being offered for disposal ("Waste") and have the requisite authority to bind the Generator to the information contained in this Special Waste Profile ("Profile"). I further certify that to the best of my knowledge and belief, the information contained herein is a true, complete and accurate description of the Waste and all known or suspected hazards have been disclosed. All Analytical Results/Safety Data Sheets submitted are truthful and complete and are representative of the Waste.*

*I further certify that by utilizing this Profile, neither myself nor any other employee or representative of the company identified below ("Company") will deliver for disposal or attempt to deliver for disposal any Waste that: (i) is classified as toxic waste, hazardous waste or infectious waste; (ii) that does not conform to this Profile; or (iii) that this Disposal Facility is prohibiting from accepting by law. I shall immediately give written notice of any change or condition pertaining to the Waste not provided herein. Our Company hereby agrees to fully indemnify this Disposal Facility against any damages resulting from this Profile or Certification being inaccurate or untrue.*

*I understand that by attaching an electronic signature, I am signing this document and Company consents to complete this transaction and receive all related communications electronically, and agrees this document will be binding as though it had been physically signed. A printout of this Profile may be accepted with the same authority as the original.*

| Michael Rogers | ENV Supervisor | MCAS New River USMC |
|---|---|---|
| Authorized Representative Name (Printed) | Title (Printed) | Company Name |

*Michael S Rogers*

Representative Signature

4 June 2024

Date

Commanding Officer MCAS New River    Solids/Sediment with Petroleum and PFAS    September 2023

# Special Waste Profile

**REPUBLIC SERVICES**

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

**Disposal Facility:** 5010 CMS Landfill NC

**Waste Profile #** 50102410497

**Sales Rep #:** 116 Marston

## I. Generator Information

**Generator Name:** MCAS - Cherry Point

**Generator Site Address:** Building 250, MCAS Cherry Point

**City:** Cherry Point    **County:** Craven    **State:** North Carolina    **ZIP:** 28532

**State ID/Reg. No:**    **State Approval/Waste Code:**    **NAICS #:**

**Generator Mailing Address** ☑ (if different    PCS Box 8006

**City:** Cherry Point    **County:** Craven    **State:** North Carolina    **ZIP:** 28533

**Generator Contact Name:** Stan Kegley    **Email:** stanley.kegley@usmc.mil

**Phone Number:** 252-466-4674    **Ext:**    **Fax Number:**

## II. Billing Information

**Bill to:** Evo Corporation    **Contact Name:** Edith Basinger

**Billing Address:** 7535 Styers Ferry Road    **Email:** accountspayable@evocorp.net

**City:** Clemmons    **State:** North Carolina    **ZIP:** 27012    **Phone:** 339-725-5844

## III. Waste Stream Information

**Name of Waste:** Soil/Sludge with Petroleum and PFAS Contaminants

**Process Generating Waste:** Soil and sludge generated during well installation. Subsurface in area of well installation is impacted with petroleum from historical releases of JP Jet Fuel from USTs, ASTs and undeground fuel pipelines. Source of PFAS contaminants is unknown.

**Type of Waste:** Pollution Control Waste    **Physical State:** Semi-Solid    **Method of Shipment:** Drum

**Estimated Volume:** 6    **Volume Type:** Drums

**Frequency:** One-time Event (single project)    **Disposal Consideration:** Solidification

## IV. Representative Sample Certification

☐ **No Sample Taken**

☑ **Sample Taken    Type of Sample** Composite Sample

Is the representative sample collected to prepare this profile and laboratory analysis collected in accordance with U.S. EPA 40 CFR 261.20(c) guidelines or equivalent? ☑ Yes  ☐ No

**Sample Date:** 01-17-2024    **Sample ID Numbers or SDS:** 90GW09R-WC

**Initial here** S/K

**Remember to attach Laboratory Analytical Report (and/or Material Safety Data Sheet) including Chain of Custody and required parameters provided for this profile.**

# Special Waste Profile



ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## V. Physical Characteristics of Waste

Characteristic Components (must equal 100%):    % By Weight (out of 100% – ranges acceptable):

1. Soil and Sludge    Greater than 99.99%

2. Petroleum Contaminants    Less than 0.001%

3. PFAS Contaminants    Less than 0.00000001%

4.

5.

| Color: | Odor (describe): | Does Waste Contain Free Liquids? | % Solids: | pH: | Flash Point: |
|---|---|---|---|---|---|
| Brown | None | ☑ Yes ☐ No | 48.8 | 5-10 | >200    °F |

**Attach Laboratory Analytical Report (and/or Material Safety Data Sheet) including Chain of Custody and required parameters provided for this profile.**

### RCRA Regulatory Questions

1. Does this waste or generating process contain regulated concentrations of the following pesticides and/or herbicides: Chlordane, Endrin, Heptachlor (and its epoxides), Lindane, Methoxychlor, Toxaphene, 2,4-D, or 2,4,5-TP Silvex as defined in 40 CFR 261.33    ☐ Yes ☑ No

2. Does this waste contain reactive sulfides (greater than 500 ppm) or reactive cyanide (greater than 250 ppm) [reference 40 CFR 261.23(a)(5)]?    ☐ Yes ☑ No

3. Does this waste contain regulated concentrations of Polychlorinated Biphenyls (PCBs) as defined in 40 CFR Part 761    ☐ Yes ☑ No

4. Does this waste contain concentrations of listed hazardous wastes defined in 40 CFR 261.31, 261.32, 261.33, including RCRA F-listed solvents?    ☐ Yes ☑ No

5. Has this waste been delisted under 40 CFR 260.20 and 260.22? If yes, attach the final decision to delist the waste as published in the Federal Register.    ☐ Yes ☑ No

6. Does this waste exhibit a hazardous characteristic as defined by federal and/or state regulations? If Yes, identify the applicable waste code and specify if the waste is hazardous as defined by federal, state or both    ☐ Yes ☑ No

7. Does this waste contain regulated concentrations of 2,3,7,8-Tetrachlorodibenzodioxin (2,3,7,8-TCCD), or any other dioxin as defined in 40 CFR 261.31    ☐ Yes ☑ No

8. Is this a regulated medical or infectious waste as defined by federal and/or state regulations    ☐ Yes ☑ No

9. Is this a regulated radioactive waste as defined by federal and/or state regulations    ☐ Yes ☑ No

10. Is this a solid waste that is not a hazardous waste in accordance with 40 CFR 261.4(b)? If yes, please provide the corresponding regulatory citation.    ☐ Yes ☑ No

### Republic Services Waste Handling Questions

1. Does this waste generate heat or react when contacted with water/moisture?    ☐ Yes ☑ No

2. Does the waste contain sulfur or sulfur by-products?    ☐ Yes ☑ No

3. Is this waste generated at a state or federal Superfund cleanup site subject to regulation under CERCLA?    ☐ Yes ☑ No

4a. Is this waste from a TSD facility, TSD-like facility or consolidator (i.e. multiple wastes/multiple generators)?    ☐ Yes ☑ No

4b. If yes to the above question, please provide clarification

Initial here _S/L_

MCAS - Cherry Point    Soil/Sludge with Petroleum and PFAS Contaminants    September 2023

# Special Waste Profile



ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## VI. Certification

*I hereby certify that I have knowledge about the waste material being offered for disposal ("Waste") and have the requisite authority to bind the Generator to the information contained in this Special Waste Profile ("Profile"). I further certify that to the best of my knowledge and belief, the information contained herein is a true, complete and accurate description of the Waste and all known or suspected hazards have been disclosed. All Analytical Results/Safety Data Sheets submitted are truthful and complete and are representative of the Waste.*

*I further certify that by utilizing this Profile, neither myself nor any other employee or representative of the company identified below ("Company") will deliver for disposal or attempt to deliver for disposal any Waste that: (i) is classified as toxic waste, hazardous waste or infectious waste; (ii) that does not conform to this Profile; or (iii) that this Disposal Facility is prohibiting from accepting by law. I shall immediately give written notice of any change or condition pertaining to the Waste not provided herein. Our Company hereby agrees to fully indemnify this Disposal Facility against any damages resulting from this Profile or Certification being inaccurate or untrue.*

*I understand that by attaching an electronic signature, I am signing this document and Company consents to complete this transaction and receive all related communications electronically, and agrees this document will be binding as though it had been physically signed. A printout of this Profile may be accepted with the same authority as the original.*

Stan C. Kegley

**Authorized Representative Name**
**(Printed)**

phy Scientist

**Title**
**(Printed)**

MCAS - Cherry Point

**Company Name**

**Representative Signature**

16 - July - 2024

**Date**

MCAS - Cherry Point     Soil/Sludge with Petroleum and PFAS Contaminants     September 2023

# Special Waste Profile

**REPUBLIC SERVICES**

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

**Disposal Facility:** 5010 CMS Landfill NC

**Waste Profile #** 50102410498

**Sales Rep #:** 116 Marston

## I. Generator Information

**Generator Name:** MCAS - Cherry Point

**Generator Site Address:** Flightline - Pit 4 Area

**City:** Cherry Point    **County:** Craven    **State:** North Carolina    **ZIP:** 28533

**State ID/Reg. No:**    **State Approval/Waste Code:**    **NAICS #:**

**Generator Mailing Address** ☑ (if different    PSC Box 8006

**City:** Cherry Point    **County:** Craven    **State:** North Carolina    **ZIP:** 28533

**Generator Contact Name:** Stan Kegely    **Email:** stanley.kegley@usmc.mil

**Phone Number:** 252-466-4674    **Ext:**    **Fax Number:**

## II. Billing Information

**Bill to:** EVO Corporation    **Contact Name:** Edith Basinger

**Billing Address:** 7535 Styers Ferry Road    **Email:** accountspayable@evocorp.net

**City:** Clemmons    **State:** North Carolina    **ZIP:** 27012    **Phone:** 336-725-5844

## III. Waste Stream Information

**Name of Waste:** Soil Cuttings (1 drum) with JP-5 and PFAS

**Process Generating Waste:** Soil cuttings from well installation. Subsurface in area of well installation is impacted with petroleum from historical releases of JP5 Jet Fuel from underground fuel pipelines. Source of PFAS contaminants is unknown.

**Type of Waste:** Pollution Control Waste    **Physical State:** Semi-Solid    **Method of Shipment:** Drum

**Estimated Volume:** 1    **Volume Type:** Drums

**Frequency:** One-time Event (single project)    **Disposal Consideration:** Solidification

## IV. Representative Sample Certification

☐ **No Sample Taken**

☑ **Sample Taken**    **Type of Sample** Composite Sample

Is the representative sample collected to prepare this profile and laboratory analysis collected in accordance with U.S. EPA 40 CFR 261.20(c) guidelines or equivalent? ☑ **Yes** ☐ **No**

**Sample Date:** 12-01-2023    **Sample ID Numbers or SDS:** Pit 4 - WC for soil

**Initial here**

**Remember to attach Laboratory Analytical Report (and/or Material Safety Data Sheet) including Chain of Custody and required parameters provided for this profile.**

Page 1

MCAS - Cherry Point    Soil Cuttings (1 drum)    September 2023

# Special Waste Profile

**REPUBLIC** SERVICES

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## V. Physical Characteristics of Waste

Characteristic Components (must equal 100%):          % By Weight (out of 100% – ranges acceptable):

1. Soil and mud                                       Greater than 99.75%

2. Petroleum Contaminants                             Less than 0.25%

3. PFAS Contaminants                                  Less than 0.000001%

4.

5.

| Color: | Odor (describe): | Does Waste Contain Free Liquids? | % Solids: | pH: | Flash Point: |
|--------|-----------------|----------------------------------|-----------|-----|--------------|
| Brown | None | ☑ Yes  ☐ No | 84.1% | 5-10 | >200  °F |

**Attach Laboratory Analytical Report (and/or Material Safety Data Sheet) including Chain of Custody and required parameters provided for this profile.**

### RCRA Regulatory Questions

1. Does this waste or generating process contain regulated concentrations of the following pesticides and/or herbicides: Chlordane, Endrin, Heptachlor (and its epoxides), Lindane, Methoxychlor, Toxaphene, 2,4-D, or 2,4,5-TP Silvex as defined in 40 CFR 261.33    ☐ Yes  ☑ No

2. Does this waste contain reactive sulfides (greater than 500 ppm) or reactive cyanide (greater than 250 ppm) [reference 40 CFR 261.23(a)(5)]?    ☐ Yes  ☑ No

3. Does this waste contain regulated concentrations of Polychlorinated Biphenyls (PCBs) as defined in 40 CFR Part 761    ☐ Yes  ☑ No

4. Does this waste contain concentrations of listed hazardous wastes defined in 40 CFR 261.31, 261.32, 261.33, including RCRA F-listed solvents?    ☐ Yes  ☑ No

5. Has this waste been delisted under 40 CFR 260.20 and 260.22? If yes, attach the final decision to delist the waste as published in the Federal Register.    ☐ Yes  ☑ No

6. Does this waste exhibit a hazardous characteristic as defined by federal and/or state regulations? If Yes, identify the applicable waste code and specify if the waste is hazardous as defined by federal, state or both    ☐ Yes  ☑ No

7. Does this waste contain regulated concentrations of 2,3,7,8-Tetrachlorodibenzodioxin (2,3,7,8-TCCD), or any other dioxin as defined in 40 CFR 261.31    ☐ Yes  ☑ No

8. Is this a regulated medical or infectious waste as defined by federal and/or state regulations    ☐ Yes  ☑ No

9. Is this a regulated radioactive waste as defined by federal and/or state regulations    ☐ Yes  ☑ No

10. Is this a solid waste that is not a hazardous waste in accordance with 40 CFR 261.4(b)? If yes, please provide the corresponding regulatory citation.    ☐ Yes  ☑ No

### Republic Services Waste Handling Questions

1. Does this waste generate heat or react when contacted with water/moisture?    ☐ Yes  ☑ No

2. Does the waste contain sulfur or sulfur by-products?    ☐ Yes  ☑ No

3. Is this waste generated at a state or federal Superfund cleanup site subject to regulation under CERCLA?    ☐ Yes  ☑ No

4a. Is this waste from a TSD facility, TSD-like facility or consolidator (i.e. multiple wastes/multiple generators)?    ☐ Yes  ☑ No

4b. If yes to the above question, please provide clarification

Initial here  _SK_

Page 2

MCAS  Cherry Point                          Soil Cuttings (1 drum)                          September 2023

# Special Waste Profile



ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## VI. Certification

*I hereby certify that I have knowledge about the waste material being offered for disposal ("Waste") and have the requisite authority to bind the Generator to the information contained in this Special Waste Profile ("Profile"). I further certify that to the best of my knowledge and belief, the information contained herein is a true, complete and accurate description of the Waste and all known or suspected hazards have been disclosed. All Analytical Results/Safety Data Sheets submitted are truthful and complete and are representative of the Waste.*

*I further certify that by utilizing this Profile, neither myself nor any other employee or representative of the company identified below ("Company") will deliver for disposal or attempt to deliver for disposal any Waste that: (i) is classified as toxic waste, hazardous waste or infectious waste; (ii) that does not conform to this Profile; or (iii) that this Disposal Facility is prohibiting from accepting by law. I shall immediately give written notice of any change or condition pertaining to the Waste not provided herein. Our Company hereby agrees to fully indemnify this Disposal Facility against any damages resulting from this Profile or Certification being inaccurate or untrue.*

*I understand that by attaching an electronic signature, I am signing this document and Company consents to complete this transaction and receive all related communications electronically, and agrees this document will be binding as though it had been physically signed. A printout of this Profile may be accepted with the same authority as the original.*

_Stan C. Kesley_
**Authorized Representative Name**
**(Printed)**

_phy Scientist_
**Title**
**(Printed)**

_MCAS Cherry Point_
**Company Name**

_Stan C. Thy_
**Representative Signature**

_16 - July - 2024_
**Date**

MCAS - Cherry Point                Soil Cuttings (1 drum)

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

# Special Waste Profile

**REPUBLIC** SERVICES

**Disposal Facility:** 5010 CMS Landfill NC

**Waste Profile #** 50102410499

**Sales Rep #:** 116 Marston

## I. Generator Information

**Generator Name:** MCAS - Cherry Point

**Generator Site Address:** Flightline - Pit 4 Area

**City:** Cherry Point     **County:** Craven     **State:** North Carolina     **ZIP:** 28533

**State ID/Reg. No:**     **State Approval/Waste Code:**     **NAICS #:**

**Generator Mailing Address** ☑ (if different     PSC Box 8006

**City:** Cherry Point     **County:** Craven     **State:** North Carolina     **ZIP:** 28533

**Generator Contact Name:** Stan Kegely     **Email:** stanley.kegley@usmc.mil

**Phone Number:** 252-466-4674     **Ext:**     **Fax Number:**

## II. Billing Information

**Bill to:** EVO Corporation     **Contact Name:** Edith Basinger

**Billing Address:** 7535 Styers Ferry Road     **Email:** accountspayable@evocorp.net

**City:** Clemmons     **State:** North Carolina     **ZIP:** 27012     **Phone:** 336-725-5844

## III. Waste Stream Information

**Name of Waste:** Decon Water (1 drum) with JP-5 and PFAS

**Process Generating Waste:** Water from decontaminating drilling equipment during well installation. Subsurface in area of well installation is impacted with petroleum from historical releases of JP5 Jet Fuel from underground fuel pipelines. Source of PFAS contaminants is unknown.

**Type of Waste:** Pollution Control Waste     **Physical State:** Liquid     **Method of Shipment:** Drum

**Estimated Volume:** 1     **Volume Type:** Drums

**Frequency:** One-time Event (single project)     **Disposal Consideration:** Solidification

## IV. Representative Sample Certification

☐ **No Sample Taken**

☑ **Sample Taken**     **Type of Sample** Composite Sample

Is the representative sample collected to prepare this profile and laboratory analysis collected in accordance with U.S. EPA 40 CFR 261.20(c) guidelines or equivalent? ☑ Yes ☐ No

**Sample Date:** 12-01-2023     **Sample ID Numbers or SDS:** Pit 4 - WC for water

**Initial here** _SK_

**Remember to attach Laboratory Analytical Report (and/or Material Safety Data Sheet) including Chain of Custody and required parameters provided for this profile.**

# Special Waste Profile

**REPUBLIC** SERVICES

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## V. Physical Characteristics of Waste

| Characteristic Components (must equal 100%): | % By Weight (out of 100% – ranges acceptable): |
|---|---|
| 1. Water | Greater than 99.99% |
| 2. Petroleum Contaminants | Less than 0.0001% |
| 3. PFAS Contaminants | Less than 0.000001% |
| 4. | |
| 5. | |

| Color: | Odor (describe): | Does Waste Contain Free Liquids? | % Solids: | pH: | Flash Point: |
|---|---|---|---|---|---|
| Brown | None | ☑ Yes    ☐ No | 0 | 5-10 | >200    °F |

**Attach Laboratory Analytical Report (and/or Material Safety Data Sheet) including Chain of Custody and required parameters provided for this profile.**

### RCRA Regulatory Questions

1. Does this waste or generating process contain regulated concentrations of the following pesticides and/or herbicides: Chlordane, Endrin, Heptachlor (and its epoxides), Lindane, Methoxychlor, Toxaphene, 2,4-D, or 2,4,5-TP Silvex as defined in 40 CFR 261.33    ☐ Yes  ☑ No

2. Does this waste contain reactive sulfides (greater than 500 ppm) or reactive cyanide (greater than 250 ppm) [reference 40 CFR 261.23(a)(5)]?    ☐ Yes  ☑ No

3. Does this waste contain regulated concentrations of Polychlorinated Biphenyls (PCBs) as defined in 40 CFR Part 761    ☐ Yes  ☑ No

4. Does this waste contain concentrations of listed hazardous wastes defined in 40 CFR 261.31, 261.32, 261.33, including RCRA F-listed solvents?    ☐ Yes  ☑ No

5. Has this waste been delisted under 40 CFR 260.20 and 260.22? If yes, attach the final decision to delist the waste as published in the Federal Register.    ☐ Yes  ☑ No

6. Does this waste exhibit a hazardous characteristic as defined by federal and/or state regulations? If Yes, identify the applicable waste code and specify if the waste is hazardous as defined by federal, state or both    ☐ Yes  ☑ No

7. Does this waste contain regulated concentrations of 2,3,7,8-Tetrachlorodibenzodioxin (2,3,7,8-TCCD), or any other dioxin as defined in 40 CFR 261.31    ☐ Yes  ☑ No

8. Is this a regulated medical or infectious waste as defined by federal and/or state regulations    ☐ Yes  ☑ No

9. Is this a regulated radioactive waste as defined by federal and/or state regulations    ☐ Yes  ☑ No

10. Is this a solid waste that is not a hazardous waste in accordance with 40 CFR 261.4(b)? If yes, please provide the corresponding regulatory citation.    ☐ Yes  ☑ No

### Republic Services Waste Handling Questions

1. Does this waste generate heat or react when contacted with water/moisture?    ☐ Yes  ☑ No

2. Does the waste contain sulfur or sulfur by-products?    ☐ Yes  ☑ No

3. Is this waste generated at a state or federal Superfund cleanup site subject to regulation under CERCLA?    ☐ Yes  ☑ No

4a. Is this waste from a TSD facility, TSD-like facility or consolidator (i.e. multiple wastes/multiple generators)?    ☐ Yes  ☑ No

4b. If yes to the above question, please provide clarification

Initial here    _s/_

Page 2

MCAS - Cherry Point                    Decon Water (1 drum)                    September 2023

# Special Waste Profile



ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## VI. Certification

*I hereby certify that I have knowledge about the waste material being offered for disposal ("Waste") and have the requisite authority to bind the Generator to the information contained in this Special Waste Profile ("Profile"). I further certify that to the best of my knowledge and belief, the information contained herein is a true, complete and accurate description of the Waste and all known or suspected hazards have been disclosed. All Analytical Results/Safety Data Sheets submitted are truthful and complete and are representative of the Waste.*

*I further certify that by utilizing this Profile, neither myself nor any other employee or representative of the company identified below ("Company") will deliver for disposal or attempt to deliver for disposal any Waste that: (i) is classified as toxic waste, hazardous waste or infectious waste; (ii) that does not conform to this Profile; or (iii) that this Disposal Facility is prohibiting from accepting by law. I shall immediately give written notice of any change or condition pertaining to the Waste not provided herein. Our Company hereby agrees to fully indemnify this Disposal Facility against any damages resulting from this Profile or Certification being inaccurate or untrue.*

*I understand that by attaching an electronic signature, I am signing this document and Company consents to complete this transaction and receive all related communications electronically, and agrees this document will be binding as though it had been physically signed. A printout of this Profile may be accepted with the same authority as the original.*

Stan C. Kesley

**Authorized Representative Name (Printed)**

Phy Scientist

**Title (Printed)**

MCAS-Cherry Point

**Company Name**

**Representative Signature**

16 - July - 2024

**Date**

MCAS - Cherry Point                     Decon Water (1 drum)                     September 2023

# Special Waste Profile

**REPUBLIC** SERVICES

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

**Disposal Facility:** 5010 CMS Landfill NC

**Waste Profile #** 50102413199

**Sales Rep #:** 116 Marston

## I. Generator Information

**Generator Name:** MCAS Cherry Point

**Generator Site Address:** Containment Pad - Mockingbird Hill

**City:** Cherry Point   **County:** Onslow   **State:** North Carolina   **ZIP:** 28533

**State ID/Reg. No:**   **State Approval/Waste Code:**   **NAICS #:**

**Generator Mailing Address** ☑ (if different   PSC Box 8006

**City:** Cherry Point   **County:** Onslow   **State:** North Carolina   **ZIP:** 28533

**Generator Contact Name:** Timothy Lawrence   **Email:** timothy.lawrence@usmc.mil

**Phone Number:** 252-466-4598   **Ext:**   **Fax Number:** 252-466-2000

## II. Billing Information

**Bill to:** Evo Corporation   **Contact Name:** Edith Basinger

**Billing Address:** 7535 Styers Ferry Road   **Email:** accountspayable@evocorp.net

**City:** Clemmons   **State:** North Carolina   **ZIP:** 27012   **Phone:** 336-725-5844

## III. Waste Stream Information

**Name of Waste:** Water with AFFF

**Process Generating Waste:** Cleaning and replacing AFFF with PFAS-free alternative in military fire vehicles and fire systems inside aircraft maintenance hangers. AFFF water has not been recovered from fires or spills and is not contaminated with other constituents.

**Type of Waste:** Pollution Control Waste   **Physical State:** Liquid   **Method of Shipment:** Bulk

**Estimated Volume:** 6200   **Volume Type:** Gallons

**Frequency:** One-time Event (single project)   **Disposal Consideration:** Solidification

## IV. Representative Sample Certification

☑ **No Sample Taken**

☐ **Sample Taken**   **Type of Sample** --Select Sample Type--

Is the representative sample collected to prepare this profile and laboratory analysis collected in accordance with U.S. EPA 40 CFR 261.20(c) guidelines or equivalent? ☐Yes ☐No

**Sample Date:**

**Sample ID Numbers or SDS:** ANSULITE 3% AFFF (AFC-3MS-C)

**Remember to attach Laboratory Analytical Report (and/or Material Safety Data Sheet) including Chain of Custody and required parameters provided for this profile.**

**Initial here**

Page 1   September 2023

# Special Waste Profile

**REPUBLIC** SERVICES

ELECTRONICALLY FILED - 2025 Mar 12 5:09 PM - FLORENCE - COMMON PLEAS CASE#2024CP2102844

## V. Physical Characteristics of Waste

Characteristic Components (must equal 100%):          % By Weight (out of 100% – ranges acceptable):

1. Water          97%
2. AFFF          3%
3.
4.
5.

| Color: | Odor (describe): | Does Waste Contain Free Liquids? | % Solids: | pH: | Flash Point: |
|--------|-----------------|----------------------------------|-----------|-----|--------------|
| Clear to Yellow | None | ☑ Yes  ☐ No | 0 | 5-7 | >200 |

**Attach Laboratory Analytical Report (and/or Material Safety Data Sheet) including Chain of Custody and required parameters provided for this profile.**

### RCRA Regulatory Questions

1. Does this waste or generating process contain regulated concentrations of the following pesticides and/or herbicides: Chlordane, Endrin, Heptachlor (and its epoxides), Lindane, Methoxychlor, Toxaphene, 2,4-D, or 2,4,5-TP Silvex as defined in 40 CFR 261.33      ☐ Yes  ☑ No

2. Does this waste contain reactive sulfides (greater than 500 ppm) or reactive cyanide (greater than 250 ppm) [reference 40 CFR 261.23(a)(5)]?      ☐ Yes  ☑ No

3. Does this waste contain regulated concentrations of Polychlorinated Biphenyls (PCBs) as defined in 40 CFR Part 761      ☐ Yes  ☑ No

4. Does this waste contain concentrations of listed hazardous wastes defined in 40 CFR 261.31, 261.32, 261.33, including RCRA F-listed solvents?      ☐ Yes  ☑ No

5. Has this waste been delisted under 40 CFR 260.20 and 260.22? If yes, attach the final decision to delist the waste as published in the Federal Register.      ☐ Yes  ☑ No

6. Does this waste exhibit a hazardous characteristic as defined by federal and/or state regulations? If Yes, identify the applicable waste code and specify if the waste is hazardous as defined by federal, state or both      ☐ Yes  ☑ No

7. Does this waste contain regulated concentrations of 2,3,7,8-Tetrachlorodibenzodioxin (2,3,7,8-TCCD), or any other dioxin as defined in 40 CFR 261.31      ☐ Yes  ☑ No

8. Is this a regulated medical or infectious waste as defined by federal and/or state regulations      ☐ Yes  ☑ No

9. Is this a regulated radioactive waste as defined by federal and/or state regulations      ☐ Yes  ☑ No

10. Is this a solid waste that is not a hazardous waste in accordance with 40 CFR 261.4(b)? If yes, please provide the corresponding regulatory citation.      ☐ Yes  ☑ No

### Republic Services Waste Handling Questions

1. Does this waste generate heat or react when contacted with water/moisture?      ☐ Yes  ☑ No

2. Does the waste contain sulfur or sulfur by-products?      ☐ Yes  ☑ No

3. Is this waste generated at a state or federal Superfund cleanup site subject to regulation under CERCLA?      ☐ Yes  ☑ No

4a. Is this waste from a TSD facility, TSD-like facility or consolidator (i.e. multiple wastes/multiple generators)?      ☐ Yes  ☑ No

4b. If yes to the above question, please provide clarification

Initial here

September 2023

# Special Waste Profile

**REPUBLIC** SERVICES

---

## VI. Certification

*I hereby certify that I have knowledge about the waste material being offered for disposal ("Waste") and have the requisite authority to bind the Generator to the information contained in this Special Waste Profile ("Profile"). I further certify that to the best of my knowledge and belief, the information contained herein is a true, complete and accurate description of the Waste and all known or suspected hazards have been disclosed. All Analytical Results/Safety Data Sheets submitted are truthful and complete and are representative of the Waste.*

*I further certify that by utilizing this Profile, neither myself nor any other employee or representative of the company identified below ("Company") will deliver for disposal or attempt to deliver for disposal any Waste that: (i) is classified as toxic waste, hazardous waste or infectious waste; (ii) that does not conform to this Profile; or (iii) that this Disposal Facility is prohibiting from accepting by law. I shall immediately give written notice of any change or condition pertaining to the Waste not provided herein. Our Company hereby agrees to fully indemnify this Disposal Facility against any damages resulting from this Profile or Certification being inaccurate or untrue.*

*I understand that by attaching an electronic signature, I am signing this document and Company consents to complete this transaction and receive all related communications electronically, and agrees this document will be binding as though it had been physically signed. A printout of this Profile may be accepted with the same authority as the original.*

| | | |
|---|---|---|
| **Timothy Lawrence** | Environmental Compliance Supervisor | Environmental Affairs Dept. MCAS-Cherry Point |
| Authorized Representative Name (Printed) | Title (Printed) | Company Name |
| *[signature]* | | 09/03/24 |
| Representative Signature | | Date |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

# EXHIBIT E

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

# Special Waste Profile

**REPUBLIC** SERVICES

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

Disposal Facility: 5010 CMS Landfill NC

Waste Profile # 50102416878

Sales Rep #: 116

---

## I. Generator Information

Generator Name: MCAS New River

Generator Site Address: Hangar P378 off White Street at MCAS New River

City: MCAS New River     County: Onslow     State: North Carolina     ZIP: 28545

State ID/Reg. No:     State Approval/Waste Code:     NAICS #:

Generator Mailing Address ☑ (if different   I&E Department

City: MCAS New River     County: Onslow     State: North Carolina     ZIP: 28545

Generator Contact Name: Gregory R. Ottey     Email: Gregory.r.ottey.civ@usmc.mil

Phone Number: 910-449-6143     Ext:     Fax Number:

## II. Billing Information

Bill to: Evo Corporation     Contact Name: Edith Basinger

Billing Address: 7535 Styers Ferry Road     Email: accountspayable@evocorp.net

City: Clemmons     State: North Carolina     ZIP: 27012     Phone: 339-725-5844

## III. Waste Stream Information

Name of Waste: Soil, Water and Mud with Petroleum and PFAS Contaminants

Process Generating Waste: Soil, water and mud generated during well installation. Subsurface in area of well installation is impacted with petroleum from historical releases of JP Jet Fuel from USTs, ASTs and undeground fuel pipelines. Source of PFAS contaminants is unknown.

Type of Waste: Pollution Control Waste     Physical State: Semi-Solid     Method of Shipment: Drum

Estimated Volume: 8     Volume Type: Drums

Frequency: One-time Event (single project)     Disposal Consideration: Solidification

## IV. Representative Sample Certification

☐ **No Sample Taken**

☑ **Sample Taken     Type of Sample** Composite Sample

Is the representative sample collected to prepare this profile and laboratory analysis collected in accordance with U.S. EPA 40 CFR 261.20(c) guidelines or equivalent? ☑ Yes   ☐ No

Sample Date: 06-21-2024     Sample ID Numbers or SDS: P378-IDW-WC

---

Initial here GRO

**Remember to attach Laboratory Analytical Report (and/or Material Safety Data Sheet) including Chain of Custody and required parameters provided for this profile.**

Special Waste Profile

**REPUBLIC** SERVICES

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## V. Physical Characteristics of Waste

Characteristic Components (must equal 100%):

% By Weight (out of 100% – ranges acceptable):

1. Soil, Water and Mud — Greater than 99.99%

2. Petroleum Contaminants — Less than 0.001%

3. PFAS Contaminants — Less than 0.00000001%

4.

5.

| Color: | Odor (describe): | Does Waste Contain Free Liquids? | % Solids: | pH: | Flash Point: |
|---|---|---|---|---|---|
| Brown | None | ☑ Yes  ☐ No | 78.4 | 5-10 | >200  °F |

**Attach Laboratory Analytical Report (and/or Material Safety Data Sheet) including Chain of Custody and required parameters provided for this profile.**

## RCRA Regulatory Questions

1. Does this waste or generating process contain regulated concentrations of the following pesticides and/or herbicides: Chlordane, Endrin, Heptachlor (and its epoxides), Lindane, Methoxychlor, Toxaphene, 2,4-D, or 2,4,5-TP Silvex as defined in 40 CFR 261.33  ☐ Yes  ☑ No

2. Does this waste contain reactive sulfides (greater than 500 ppm) or reactive cyanide (greater than 250 ppm) [reference 40 CFR 261.23(a)(5)]?  ☐ Yes  ☑ No

3. Does this waste contain regulated concentrations of Polychlorinated Biphenyls (PCBs) as defined in 40 CFR Part 761  ☐ Yes  ☑ No

4. Does this waste contain concentrations of listed hazardous wastes defined in 40 CFR 261.31, 261.32, 261.33, including RCRA F-listed solvents?  ☐ Yes  ☑ No

5. Has this waste been delisted under 40 CFR 260.20 and 260.22? If yes, attach the final decision to delist the waste as published in the Federal Register.  ☐ Yes  ☑ No

6. Does this waste exhibit a hazardous characteristic as defined by federal and/or state regulations? If Yes, identify the applicable waste code and specify if the waste is hazardous as defined by federal, state or both  ☐ Yes  ☑ No

7. Does this waste contain regulated concentrations of 2,3,7,8-Tetrachlorodibenzodioxin (2,3,7,8-TCCD), or any other dioxin as defined in 40 CFR 261.31  ☐ Yes  ☑ No

8. Is this a regulated medical or infectious waste as defined by federal and/or state regulations  ☐ Yes  ☑ No

9. Is this a regulated radioactive waste as defined by federal and/or state regulations  ☐ Yes  ☑ No

10. Is this a solid waste that is not a hazardous waste in accordance with 40 CFR 261.4(b)? If yes, please provide the corresponding regulatory citation.  ☐ Yes  ☑ No

## Republic Services Waste Handling Questions

1. Does this waste generate heat or react when contacted with water/moisture?  ☐ Yes  ☑ No

2. Does the waste contain sulfur or sulfur by-products?  ☐ Yes  ☑ No

3. Is this waste generated at a state or federal Superfund cleanup site subject to regulation under CERCLA?  ☐ Yes  ☑ No

4a. Is this waste from a TSD facility, TSD-like facility or consolidator (i.e. multiple wastes/multiple generators)?  ☐ Yes  ☑ No

4b. If yes to the above question, please provide clarification

Initial here  GRO

Special Waste Profile

**REPUBLIC** SERVICES

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## VI. Certification

*I hereby certify that I have knowledge about the waste material being offered for disposal ("Waste") and have the requisite authority to bind the Generator to the information contained in this Special Waste Profile ("Profile"). I further certify that to the best of my knowledge and belief, the information contained herein is a true, complete and accurate description of the Waste and all known or suspected hazards have been disclosed. All Analytical Results/Safety Data Sheets submitted are truthful and complete and are representative of the Waste.*

*I further certify that by utilizing this Profile, neither myself nor any other employee or representative of the company identified below ("Company") will deliver for disposal or attempt to deliver for disposal any Waste that: (i) is classified as toxic waste, hazardous waste or infectious waste; (ii) that does not conform to this Profile; or (iii) that this Disposal Facility is prohibiting from accepting by law. I shall immediately give written notice of any change or condition pertaining to the Waste not provided herein. Our Company hereby agrees to fully indemnify this Disposal Facility against any damages resulting from this Profile or Certification being inaccurate or untrue.*

*I understand that by attaching an electronic signature, I am signing this document and Company consents to complete this transaction and receive all related communications electronically, and agrees this document will be binding as though it had been physically signed. A printout of this Profile may be accepted with the same authority as the original.*

| | | |
|---|---|---|
| Gregory R. Ottey | Hazardous Waste Manager | MCAS New River I&E |
| Authorized Representative Name (Printed) | Title (Printed) | Company Name |
| *Representative Signature* | | 07 November 2024 |
| | | Date |

MCAS New River                    Soil, Water and Mud with Petroleum and PFAS Contam...                    September 2023

# EXHIBIT F

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**FLORENCE DIVISION**

| | | |
|---|---|---|
| City of Florence, South Carolina | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. |
| v. | ) | |
| | ) | |
| Aladdin Manufacturing Corporation, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**<u>DECLARATION OF RHONDA GORA</u>**

I, Rhonda Gora, pursuant to the provisions of 28 U.S.C. § 1746, state and declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.　　I currently serve as Sales Coordinator for BFI Waste Systems of North America, LLC ("BFI") at the Charlotte Motor Speedway landfill. In this role, I work with generators and their representatives to manage disposal of special wastes. I am responsible for coordinating the evaluation, approval, and acceptance of special waste streams, including Special Waste Profiles and associated analytical data. I am familiar with state, federal, and landfill special waste rules and requirements.

2.　　Since at least 2023, the federal government has used CMS to dispose of special wastes containing per- and polyfluoroalkyl substances from remedial and investigation activities performed by the federal government at Marine Corps Base Camp Lejeune and the Marine Corps Air Stations at Cherry Point and New River ("Military Waste"). CMS continues to accept Military Waste from the federal government.

1

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

3.      A federal government officer must complete and certify an agreed upon Special Waste Profile for each load of Military Waste delivered to CMS. The Special Waste Profile describes the waste composition, physical state of waste, disposal specifications, and other information. For instance, the generator may designate that solidification is required for liquid wastes and CMS will solidify the waste to meet disposal requirements. Each Special Waste Profile is certified by the federal government's signing official. I review, approve and authorize Special Waste Profiles and analytical data for the Military Waste prior to acceptance at CMS. If the Special Waste Profile or Military Waste does not conform the required specifications, the waste may be rejected, acceptance may be conditioned, or other action may be required.

4.      Each load of Military Waste sent to CMS is also manifested using a Non-hazardous Special Waste & Asbestos Manifest ("Manifest"). The Manifest is completed by the generator, and describes and certifies the specifications for disposal, including the destination facility, generator information, waste contents, container type, waste quantity, and compliance with applicable laws. A federal officer representative must sign and certify each Manifest prior to disposing of Military Waste at CMS. The transporter and disposal facility each also execute the Manifest.

5.      BFI also executes an Agent Special Waste Service Agreement Non-Hazardous Wastes ("Special Waste Agreement") with the federal government's agent, AVO, for each load of Military Waste sent to CMS. The Special Waste Agreement sets forth additional specifications, terms, and conditions for Military Waste disposal, including waste disposal method, disposal fees, waste types, volume limits, and term.

[Signature on Next Page]

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

03/12/2025

DATE

Rhonda Gora
Sales Coordinator
BFI Waste Systems of North America, LLC

3

# EXHIBIT G

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

# Special Waste Profile



ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

Disposal Facility: 5010 CMS Landfill NC

Waste Profile #    50102413203

Sales Rep #:    116 Marston

## I. Generator Information

Generator Name: MCB - CAMP LEJEUNE COMMANDING GENERAL ATTN: EMD

Generator Site Address: Building TC701 Camp Geiger Fire Station (Station #6)

City: Camp Lejeune    County: Onslow    State: North Carolina    ZIP: 28547

State ID/Reg. No:    State Approval/Waste Code:    NAICS #:

Generator Mailing Address ☑ (if different    12 Post Lane

City: Camp Lejeune    County:    State: North Carolina    ZIP: 28547

Generator Contact Name: Jeffrey Zahniser    Email: jeffrey.zahniser@usmc.mil

Phone Number: 910-451-5306    Ext:    Fax Number:

## II. Billing Information

Bill to: Evo Corporation    Contact Name: Edith Basinger

Billing Address: 7535 Styers Ferry Road    Email: accountspayable@evocorp.net

City: Clemmons    State: North Carolina    ZIP: 27012    Phone: 336-725-5844

## III. Waste Stream Information

Name of Waste: Non-Hazardous Soil with PFAS

Process Generating Waste: Soil from from monitoring well installation for environmental investigation.
Potential Source: The presence of aqueous film-forming foam (AFFF) in was documented in fire engines and in storage containers used on-site. A release likely occurred during the transfer of AFFF from these containers to fire engines on-site.

Type of Waste: Pollution Control Waste    Physical State: Solid    Method of Shipment: Drum

Estimated Volume: 8    Volume Type: Drums

Frequency: One-time Event (single project)    Disposal Consideration: Solidification

## IV. Representative Sample Certification

☐ **No Sample Taken**

☑ **Sample Taken**    **Type of Sample** Composite and Grab

Is the representative sample collected to prepare this profile and laboratory analysis collected in accordance with U.S. EPA 40 CFR 261.20(c) guidelines or equivalent? ☑ Yes ☐ No

Sample Date: 06-12-24    Sample ID Numbers or SDS: Site113-IDW-SO-061224

---

**Remember to attach Laboratory Analytical Report (and/or Material Safety Data Sheet) including Chain of Custody and required parameters provided for this profile.**

Initial here

Page 1

MCB - CAMP LEJEUNE COMMANDING GENERAL ATTN:    Non-Hazardous Soil with PFAS

September 2023

# Special Waste Profile

**REPUBLIC SERVICES**

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## V. Physical Characteristics of Waste

Characteristic Components (must equal 100%):          % By Weight (out of 100% – ranges acceptable):

1. Non Hazardous Soil          >99%
2. PFAS          <0.01%
3. 
4. 
5. 

| Color: | Odor (describe): | Does Waste Contain Free Liquids? | % Solids: | pH: | Flash Point: | |
|---|---|---|---|---|---|---|
| Brown | None | ☐ Yes  ☑ No | >99 | 7.3 | >200 | °F |

**Attach Laboratory Analytical Report (and/or Material Safety Data Sheet) including Chain of Custody and required parameters provided for this profile.**

### RCRA Regulatory Questions

1. Does this waste or generating process contain regulated concentrations of the following pesticides and/or herbicides: Chlordane, Endrin, Heptachlor (and its epoxides), Lindane, Methoxychlor, Toxaphene, 2,4-D, or 2,4,5-TP Silvex as defined in 40 CFR 261.33     **Yes** ☑ **No**

2. Does this waste contain reactive sulfides (greater than 500 ppm) or reactive cyanide (greater than 250 ppm) [reference 40 CFR 261.23(a)(5)]?     ☐ **Yes** ☑ **No**

3. Does this waste contain regulated concentrations of Polychlorinated Biphenyls (PCBs) as defined in 40 CFR Part 761     ☐ **Yes** ☑ **No**

4. Does this waste contain concentrations of listed hazardous wastes defined in 40 CFR 261.31, 261.32, 261.33, including RCRA F-listed solvents?     ☐ **Yes** ☑ **No**

5. Has this waste been delisted under 40 CFR 260.20 and 260.22? If yes, attach the final decision to delist the waste as published in the Federal Register.     ☐ **Yes** ☑ **No**

6. Does this waste exhibit a hazardous characteristic as defined by federal and/or state regulations? If Yes, identify the applicable waste code and specify if the waste is hazardous as defined by federal, state or both     ☐ **Yes** ☑ **No**

7. Does this waste contain regulated concentrations of 2,3,7,8-Tetrachlorodibenzodioxin (2,3,7,8-TCCD), or any other dioxin as defined in 40 CFR 261.31     ☐ **Yes** ☑ **No**

8. Is this a regulated medical or infectious waste as defined by federal and/or state regulations     ☐ **Yes** ☑ **No**

9. Is this a regulated radioactive waste as defined by federal and/or state regulations     ☐ **Yes** ☑ **No**

10. Is this a solid waste that is not a hazardous waste in accordance with 40 CFR 261.4(b)? If yes, please provide the corresponding regulatory citation.     ☐ **Yes** ☑ **No**

### Republic Services Waste Handling Questions

1. Does this waste generate heat or react when contacted with water/moisture?     ☐ **Yes** ☑ **No**

2. Does the waste contain sulfur or sulfur by-products?     ☐ **Yes** ☑ **No**

3. Is this waste generated at a state or federal Superfund cleanup site subject to regulation under CERCLA?     ☑ **Yes** ☐ **No**

4a. Is this waste from a TSD facility, TSD-like facility or consolidator (i.e. multiple wastes/multiple generators)?     ☐ **Yes** ☑ **No**

4b. If yes to the above question, please provide clarification

Initial here _GWЗ_

Page 2

MCB - CAMP LEJEUNE COMMANDING GENERAL ATTN:          Non-Hazardous Soil with PFAS

# Special Waste Profile



ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## VI. Certification

*I hereby certify that I have knowledge about the waste material being offered for disposal ("Waste") and have the requisite authority to bind the Generator to the information contained in this Special Waste Profile ("Profile"). I further certify that to the best of my knowledge and belief, the information contained herein is a true, complete and accurate description of the Waste and all known or suspected hazards have been disclosed. All Analytical Results/Safety Data Sheets submitted are truthful and complete and are representative of the Waste.*

*I further certify that by utilizing this Profile, neither myself nor any other employee or representative of the company identified below ("Company") will deliver for disposal or attempt to deliver for disposal any Waste that: (i) is classified as toxic waste, hazardous waste or infectious waste; (ii) that does not conform to this Profile; or (iii) that this Disposal Facility is prohibiting from accepting by law. I shall immediately give written notice of any change or condition pertaining to the Waste not provided herein. Our Company hereby agrees to fully indemnify this Disposal Facility against any damages resulting from this Profile or Certification being inaccurate or untrue.*

*I understand that by attaching an electronic signature, I am signing this document and Company consents to complete this transaction and receive all related communications electronically, and agrees this document will be binding as though it had been physically signed. A printout of this Profile may be accepted with the same authority as the original.*

| Jeffrey Zahniser | Environmental Protection Specialist | USMC/Camp Lejeune |
|---|---|---|
| Authorized Representative Name (Printed) | Title (Printed) | Company Name |
| *[signature]* Representative Signature | | 30 AUG 2024 Date |

MCB - CAMP LEJEUNE COMMANDING GENERAL ATTN: 🔋 Non-Hazardous Soil with PFAS

# Special Waste Profile


**REPUBLIC**
SERVICES

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

Disposal Facility: 5010 CMS Landfill NC

Waste Profile #    50102413202

Sales Rep #:    116 Marston

## I. Generator Information

Generator Name:  MCB - CAMP LEJEUNE COMMANDING GENERAL ATTN: EMD

Generator Site Address:  **Building TC701 Camp Geiger Fire Station (Station #6)**

City: **Camp Lejeune**    County: **Onslow**    State: North Carolina    ZIP: **28547**

State ID/Reg. No:    State Approval/Waste Code:    NAICS #:

Generator Mailing Address  ☑ (if different  **12 Post Lane**

City: **Camp Lejeune**    County:    State: North Carolina    ZIP: **28547**

Generator Contact Name:  **Jeffrey Zahniser**    Email:  **jeffrey.zahniser@usmc.mil**

Phone Number: **910-451-5306**    Ext:    Fax Number:

## II. Billing Information

Bill to:  **Evo Corporation**    Contact Name:  **Edith Basinger**

Billing Address:  **7535 Styers Ferry Road**    Email:  **accountspayable@evocorp.net**

City: **Clemmons**    State: North Carolina    ZIP: **27012**    Phone: **336-725-5844**

## III. Waste Stream Information

Name of Waste:  Non-Hazardous Water with PFAS

Process Generating Waste:  Groundwater from sampling for environmental investigation.
Potential Source: The presence of aqueous film-forming foam (AFFF) in was documented in fire engines and in storage containers used on-site. A release likely occurred during the transfer of AFFF from these containers to fire engines on-site.

Type of Waste: Pollution Control Waste    Physical State: Liquid    Method of Shipment: Drum

Estimated Volume: 23    Volume Type: Drums

Frequency: One-time Event (single project)    Disposal Consideration: Solidification

## IV. Representative Sample Certification

☐ **No Sample Taken**

☑ **Sample Taken**    **Type of Sample**  Composite and Grab

Is the representative sample collected to prepare this profile and laboratory analysis collected in accordance with U.S. EPA 40 CFR 261.20(c) guidelines or equivalent? ☑ **Yes** ☐**No**

Sample Date: 06-26-24    Sample ID Numbers or SDS: Site 113-IDW-AQ-062624, Site 113-IDW-01-AQ-062624, & Site 113-IDW-01-AQ-062624

Initial here _JWZ_

**Remember to attach Laboratory Analytical Report (and/or Material Safety Data Sheet) including Chain of Custody and required parameters provided for this profile.**

# Special Waste Profile



ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## V. Physical Characteristics of Waste

Characteristic Components (must equal 100%):                    % By Weight (out of 100% – ranges acceptable):

1. Non Hazardous Water          >90%

2. Non-Hazardous Sediment       <10%

3. PFAS                         <0.01%

4.

5.

| Color: | Odor (describe): | Does Waste Contain Free Liquids? | % Solids: | pH: | Flash Point: |
|---|---|---|---|---|---|
| Brown | None | ☑ Yes  ☐ No | <10% | 7.6-7.8 | >200    °F |

**Attach Laboratory Analytical Report (and/or Material Safety Data Sheet) including Chain of Custody and required parameters provided for this profile.**

### RCRA Regulatory Questions

1. Does this waste or generating process contain regulated concentrations of the following pesticides and/or herbicides: Chlordane, Endrin, Heptachlor (and its epoxides), Lindane, Methoxychlor, Toxaphene, 2,4-D, or 2,4,5-TP Silvex as defined in 40 CFR 261.33     Yes  ☑ No

2. Does this waste contain reactive sulfides (greater than 500 ppm) or reactive cyanide (greater than 250 ppm) [reference 40 CFR 261.23(a)(5)]?     ☐ Yes  ☑ No

3. Does this waste contain regulated concentrations of Polychlorinated Biphenyls (PCBs) as defined in 40 CFR Part 761     ☐ Yes  ☑ No

4. Does this waste contain concentrations of listed hazardous wastes defined in 40 CFR 261.31, 261.32, 261.33, including RCRA F-listed solvents?     ☐ Yes  ☑ No

5. Has this waste been delisted under 40 CFR 260.20 and 260.22? If yes, attach the final decision to delist the waste as published in the Federal Register.     ☐ Yes  ☑ No

6. Does this waste exhibit a hazardous characteristic as defined by federal and/or state regulations? If Yes, identify the applicable waste code and specify if the waste is hazardous as defined by federal, state or both     ☐ Yes  ☑ No

7. Does this waste contain regulated concentrations of 2,3,7,8-Tetrachlorodibenzodioxin (2,3,7,8-TCCD), or any other dioxin as defined in 40 CFR 261.31     ☐ Yes  ☑ No

8. Is this a regulated medical or infectious waste as defined by federal and/or state regulations     ☐ Yes  ☑ No

9. Is this a regulated radioactive waste as defined by federal and/or state regulations     ☐ Yes  ☑ No

10. Is this a solid waste that is not a hazardous waste in accordance with 40 CFR 261.4(b)? If yes, please provide the corresponding regulatory citation.     ☐ Yes  ☑ No

### Republic Services Waste Handling Questions

1. Does this waste generate heat or react when contacted with water/moisture?     ☐ Yes  ☑ No

2. Does the waste contain sulfur or sulfur by-products?     ☐ Yes  ☑ No

3. Is this waste generated at a state or federal Superfund cleanup site subject to regulation under CERCLA?     ☑ Yes  ☐ No

4a. Is this waste from a TSD facility, TSD-like facility or consolidator (i.e. multiple wastes/multiple generators)?     ☐ Yes  ☑ No

4b. If yes to the above question, please provide clarification

Initial here

Page 2

MCB - CAMP LEJEUNE COMMANDING GENERAL ATTN:      Non-Hazardous Water with PFAS

# Special Waste Profile



ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## VI. Certification

*I hereby certify that I have knowledge about the waste material being offered for disposal ("Waste") and have the requisite authority to bind the Generator to the information contained in this Special Waste Profile ("Profile"). I further certify that to the best of my knowledge and belief, the information contained herein is a true, complete and accurate description of the Waste and all known or suspected hazards have been disclosed. All Analytical Results/Safety Data Sheets submitted are truthful and complete and are representative of the Waste.*

*I further certify that by utilizing this Profile, neither myself nor any other employee or representative of the company identified below ("Company") will deliver for disposal or attempt to deliver for disposal any Waste that: (i) is classified as toxic waste, hazardous waste or infectious waste; (ii) that does not conform to this Profile; or (iii) that this Disposal Facility is prohibiting from accepting by law. I shall immediately give written notice of any change or condition pertaining to the Waste not provided herein. Our Company hereby agrees to fully indemnify this Disposal Facility against any damages resulting from this Profile or Certification being inaccurate or untrue.*

*I understand that by attaching an electronic signature, I am signing this document and Company consents to complete this transaction and receive all related communications electronically, and agrees this document will be binding as though it had been physically signed. A printout of this Profile may be accepted with the same authority as the original.*

| Jeffrey Zahniser | Environmental Protection Specialist | USMC/Camp Lejeune |
|---|---|---|
| Authorized Representative Name (Printed) | Title (Printed) | Company Name |
| *[signature]* | | 30 AUG 2024 |
| Representative Signature | | Date |

MCB - CAMP LEJEUNE COMMANDING GENERAL ATTN:  Non-Hazardous Water with PFAS

# EXHIBIT H

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844



# NON-HAZARDOUS SPECIAL WASTE & ASBESTOS MANIFEST

If waste is asbestos waste, complete Sections I, II, III and IV
If waste is **NOT** asbestos waste, complete Sections I, II and III

## I.     GENERATOR  (Generator completes Ia-r)

| a. Generator's US EPA ID Number | b. Manifest Document Number | c. Page 1 of 1 |
|---|---|---|

d. Generator's Name and Location:
MCB Camp LeJeune Commanding General Attn:EMD
Bldg TC701 Camp Gieger Fire Station (Station #5)
Camp LeJeune NC 28547
f. Phone:9104515306

e. Generator's Mailing Address:

g. Phone:

If owner of the generating facility differs from the generator, provide:

h. Owner's Name:                i. Owner's Phone No.:

| j. Waste Profile # | k. Exp. Date | l. Waste Shipping Name and Description | m. Containers No. | Type | n. Total Quantity | o. Unit Wt/Vol |
|---|---|---|---|---|---|---|
| 50102413203 Acct# 333592 | 08/30/2025 | PFAS Soil | | | | |
| | | | | | | |
| | | | | | | |

GENERATOR'S CERTIFICATION:  I hereby certify that the above named material is not a hazardous waste as defined by 40 CFR 261 or any applicable state law, has been properly described, classified and packaged, and is in proper condition for transportation according to applicable regulations; AND, if this waste is a treatment residue of a previously restricted hazardous waste subject to the Land Disposal Restrictions.  I certify and warrant that the waste has been treated in accordance with the requirements of 40 CFR 268 and is no longer a hazardous waste as defined by 40 CFR 261.

| p. Generator Authorized Agent Name (Print) | q. Signature | r. Date |
|---|---|---|

## II.     TRANSPORTER  (Generator completes IIa-b and Transporter completes IIc-e)

a. Transporter's Name and Address:

b. Phone:

| c. Driver Name (Print) | d. Signature | e. Date |
|---|---|---|

## III.     DESTINATION  (Generator complete IIIa-c and Destination Site completes IIId-g)

| a. Disposal Facility and Site Address: CMS Landfill 5105 Morehead Rd Concord, NC 28027 b. Phone: 704-782-2004 | c. US EPA Number | d. Discrepancy Indication Space: |
|---|---|---|

I herby certify that the above named material has been accepted and to the best of my knowledge the foregoing is true and accurate.

| e. Name of Authorized Agent (Print) | f. Signature | g. Date |
|---|---|---|

## IV.     ASBESTOS  (Generator completes IVa-f and Operator complete IVg-i)

| a. Operator's Name and Address: | c. Responsible Agency Name and Address: |
|---|---|
| b. Phone: | d. Phone: |

e. Special Handling Instructions and Additional Information:

f. ☐  Friable     ☐  Non-Friable     ☐  Both          % Friable          % Non-Friable

OPERATOR'S CERTIFICATION: I hereby declare that the contents of this consignment are fully and accurately described above by proper shipping name and are classified, packed, marked and labeled and are in all respects in proper condition for transport by highway according to applicable international and

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| national governmental regulations. | | |
|---|---|---|
| | | |
| g. Operator's Name and Title (Print) | h. Signature | i. Date |
| *Operator refers to the company which owns, leases, operates, controls, or supervises the facility being demolished or renovated, or the demolition or renovation operation or both | | |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

# EXHIBIT I

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844



# AGENT SPECIAL WASTE SERVICE AGREEMENT
## NON-HAZARDOUS WASTES

Special Waste Profile Number:   See additional information

| **Agent Billing Information** | **Republic Waste Location (Company)** |
|---|---|

Name:   Evo  Corporation

Address:   1703 Vargrave Ave.

CMS Landfill

5105 Morehead Rd.

Concord, NC 28027

City:   Winston-Salem

704 622 1769 John Marston

State:   NC          Zip:   27107

Phone:   336 725 5844     Fax:

Contact:   Tony Disher

**Project:** _____     **County of Origin:** _____

**Generator Address:** _____

Additional Information: _____

1. **Special Waste Service**. Subject to the terms and conditions contained herein, the Company and the Agent agree to be legally bound hereby and the Company agrees to accept at its Facility, Acceptable Waste (hereinafter referred to as "Special Waste" or "Waste") delivered by Agent, and which is acceptable to the Company as herein provided.

2. **Acceptable Waste**. Only those Special Wastes described in Paragraph 3 herein and in any Special Waste Profile(s) which number is identical to the contract number referenced above, and which Profile(s) are hereby incorporated by reference herein, and which Waste is subsequently approved by the Company and is otherwise in accordance with all laws, regulations and permits, shall be acceptable for disposal at the Facility ("Acceptable Waste").All Waste described below and in this profile number shall be managed exclusively by company described in this Agreement.

3. **(A)    Rates for Disposal**:

| **Waste** | **Disposal Method** | **Disposal Rate:** | **Fees / Taxes / Misc.** | **Transportation** |
|---|---|---|---|---|
| Non haz drums | Pit/ burial | $150.00 per ton | no | no |
| | | | | |

Additional Information: _____

Agent shall also be liable for all taxes, fees, or other charges imposed by federal, state, local or provincial laws and regulations.

County and State of Origin of Waste: _____

Cannot Exceed Daily Volume of   2000 tons per day     Without Prior Approval of Company.

**(B)    Incorporation by Reference.**  In addition to Special Waste Profile(s), the following documents are incorporated by reference into this Agreement as if fully set forth herein.

1) Need PO number

2)

4. **Term of Agreement**.  This Agreement is effective for 12 months, commencing 9/16/24 and shall automatically be renewed for a similar term thereafter unless either party shall give written notice (via certified mail) of termination to the other party at least thirty (30) days prior written notice.

**THE COMPANY AND THE AGENT, IN CONSIDERATION OF THE MUTUAL OBLIGATIONS CONTAINED HEREIN, AGREE THAT THIS IS A LEGALLY BINDING AGREEMENT WHICH IS SUBJECT TO THE TERMS AND CONDITIONS SET FORTH ON THIS PAGE AND ON THE REVERSE SIDE OF THIS DOCUMENT.**

**AGENT**

SIGNATURE (AUTHORIZED REPRESENTATIVE)

Tony Disher, President
NAME AND TITLE (PLEASE PRINT)
9/16/24
DATE

**COMPANY**

SIGNATURE (AUTHORIZED REPRESENTATIVE)

John Marston, sales
NAME AND TITLE (PLEASE PRINT)
9/16/24
DATE

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

# Terms and Conditions of Agent Special Waste Service Agreement

5. <u>The Agreement</u>. This agreement of the parties ("Agreement") for the disposal of Special Waste shall consist of this Agreement, riders to the Agreement (if any) and any Application, permit and approval that may be applicable to such Waste.

6. <u>Waste Accepted at Facility</u>. Agent represents, warrants and covenants that the Waste delivered to Company at its Facility hereunder will be Acceptable Waste and will not contain any unacceptable quantity of hazardous materials or substances, radioactive materials or substances, or toxic waste or substances, as defined by applicable federal, state, local or provincial laws or regulations. Any Waste which does not meet these requirements shall hereinafter be referred to as "Unacceptable Waste". The Agent shall in all matters relating to the collection, transportation and disposal of the Waste hereunder, comply with all applicable federal, state and local laws, regulations, rules and orders regarding the same. The word "Facility" shall mean any landfill, transfer station or other location used to transfer, process or otherwise dispose of such Waste.

7. <u>Special Waste</u>. Agent represents, warrants and covenants that the Waste delivered to Company hereunder (i) will not contain any Special Waste that is not specifically described on any Application which is attached hereto and which is subsequently approved by the Company, (ii) will meet the material description as set forth in any Application and otherwise in all significant respects and (iii) will not contain Unacceptable Waste. The parties may incorporate additional Special Waste as part of this Agreement if prior to delivery of such Waste to Company, Agent has provided an Application for such Waste and Company has approved disposal of such Waste within the limitations and conditions contained in Company's written notice of approval of Special Waste. Title to acceptable waste shall transfer to Company upon final acceptance of such waste. At no time shall Company take title to unacceptable waste.

8. <u>Rights of Refusal/Rejection</u>. The Agent shall inspect all Waste at the place(s) of collection and shall remove any and all Unacceptable Waste. Company has the right to refuse, or to reject after acceptance, any load(s) of Waste(s) delivered to its Facility including if the Company believes the Agent has breached (or is breaching) its representations, warranties, covenants or agreements hereunder, or any applicable federal, state or local laws, regulations, rules or orders, even if only a portion of such Waste load is unacceptable. The Company shall have the right to inspect all vehicles of Waste haulers, including the Agent's vehicles, in order to determine whether the Waste is Acceptable Waste or Unacceptable Waste pursuant to this Agreement and all applicable federal, state and local laws, rules and regulations. The Company's exercise, or failure to exercise, its rights hereunder shall not operate to relieve the Agent of its responsibilities or liability under this Agreement. The Agent shall be responsible for, and bear all reasonable expenses and damages incurred by the Company, as a result of the Unacceptable Waste and in the reloading and removal of Unacceptable Waste disposed in the Facility. The Company, may also, in its sole discretion, require the Agent to promptly remove the Unacceptable Waste.

9. <u>Limited License to Enter</u>. This Agreement provides Agent with a license to enter the Facility for the limited purpose of, and only to the extent necessary for, off-loading Acceptable Waste at the Facility in the manner directed by Company. Except in an emergency, Agent's personnel shall not leave the immediate vicinity of their vehicle. After off-loading the Waste, Agent's personnel shall promptly leave the Facility. Under no circumstances shall Agent or its personnel engage in any scavenging of Waste or other materials at the Facility. The Company reserves the right to make and enforce reasonable rules and regulations concerning the operation of the Facility, the conduct of the drivers and others on the Facility premises, quantities and sources of Waste, and any other matters necessary or desirable for the safe, legal and efficient operation of the Facility including, but not limited to, speed limits on haul roads imposed by the Company, and the wearing of hard hats and other personal protection equipment by all individuals allowed on the Facility premises. Agent agrees to conform to such rules and regulations as they may be established and amended from time to time. Company may refuse to accept Waste from and shall deny an entrance license to, any of Agent's personnel whom Company believes is under the influence of alcohol or other chemical substances. Agent shall be solely responsible for its employees and subcontractors performing their obligations in a safe manner when at the facility of Company.

10. <u>Charges and Payment</u>. Payment shall be made by Agent within thirty (30) days after receipt of invoice from Company. In the event that any amount is overdue, the Company may terminate this Agreement. Agent agrees to pay a finance charge equal to the maximum interest rate permitted by law. Agent shall be liable for all taxes, fees, or other charges imposed upon the disposal of the Waste by federal, state, local or provincial laws and regulations. Company, from time to time, may modify its rates upon sixty (60) days written notice to Agent. Agent hereby agrees that the Company's right to receive payments under this Agreement is unconditional and is not conditioned upon Agent first receiving payment from Generator or any other party.

11. <u>Termination</u>. Agent's obligations, representations, warranties and covenants regarding the Waste delivered and all indemnities shall survive termination of this Agreement. Should Agent materially default in any of its obligations hereunder, then Company may immediately terminate this Agreement and Agent shall be liable for all costs and damages incurred by the Company.

12. <u>Driver's Knowledge and Authority</u>. Agent represents, warrants and covenants that its drivers who deliver Waste to Company's Facility have been advised by Agent of the Company's prohibition on deliveries of hazardous materials or substances, radioactive materials or substances, or toxic waste or substances or any other Unacceptable Waste to the Facility, of Company's restrictions on deliveries of Special Waste to the Facility of the definitions of "Hazardous Waste and Hazardous Substances" as provided by applicable federal, state and local law, rules and regulations and "Special Waste" as provided herein, and of the terms of this license to enter Company's Facility.

13. <u>Indemnification</u>. Agent shall indemnify, defend and hold harmless the Company and its subsidiaries, affiliates and parent corporations, as applicable and their respective officers, directors, lenders, employees, subcontractors and agents from and against any and all claims, suits, losses, liabilities, assessments, damages, fines, costs and expenses, including reasonable attorneys fees arising under federal, state or local laws, regulations or ordinances, or relating to the content of the Waste, or arising out of or in connection with any breach of this Agreement or arising out of the negligent collection, transportation and disposal of Waste by Agent or Agent's employees, agents, subcontractors or representatives thereof. Agent shall also be responsible for increased inspection, testing, study and analysis costs made necessary due to reasonable concerns of the Company as to the content of the Waste following discovery of potentially Unacceptable Waste. This indemnification and other obligations stated in this paragraph shall survive the termination of this Agreement.

14. <u>Insurance</u>. Agent shall maintain in full force and effect throughout the term of this Agreement the following types of insurance in at least the amounts specified below:

| **Coverages** | **Minimum Amounts of Insurance** |
| --- | --- |
| Worker's Compensation | Statutory |
| General Liability | $500,000 combined single limit |
| Automobile Liability | $500,000 combined single limit |

All insurance will be by insurers authorized to do business in the state in which the Facility is located. Prior to Agent being allowed on Facility premises, Agent shall provide the Company with certificates of insurance or other satisfactory evidence that such insurance has been procured and is in force. Said policies shall not thereafter be canceled, be permitted to expire, or be changed without thirty (30) days advance written notice to the Company. Agent warrants that it will secure the above minimum amounts of insurance from any transportation of the Waste to the Facility.

15. <u>Failure to Perform</u>. Neither party hereto shall be liable for its failure to perform hereunder due to circumstances not its fault and beyond its reasonable control, including, but not limited to, strikes or other labor disputes, riots, protests, civil disturbances or sabotage, changes in law, fires, floods, compliance with government requests, explosions, accidents, weather, lack of required natural resources, or acts of God affecting either party hereto. In the event of any of the circumstances provided for in the preceding sentence, including, but not limited, to whether any federal, state or local court or governmental authority takes any action which would (i) close or restrict operations at the Facility, (ii) limit the quantity or prohibit the disposal of Waste at the Facility, or (iii) limit the ability of or prohibit Agent from delivering Waste to the Facility, the Company shall have the right, at its option, to reduce, suspend or terminate Agent's access to the Facility immediately, without prior notice and without any additional liabilities between the parties, other than Agent's payment obligation hereunder. Neither Party is required hereunder to settle any labor dispute against its own best judgment.

16. <u>Other Termination</u>. The occurrence of any of the following events shall also constitute an event of default by the Agent and shall give the Company the right to immediately terminate this Agreement:

(A) A petition for reorganization or bankruptcy filed by or against the Agent.

(B) Failure by Agent to pay any amounts due to Company.

(C) Any breach by Agent of any of its obligations pursuant to the Agreement.

Agent shall be liable for and shall indemnify, defend and hold harmless Company from any losses, claims expenses or damages incurred by the Company as a result of termination hereunder.

17. <u>Assignment</u>. Agent may not assign, transfer or otherwise vest in any other Company, entity or person, in whole or in part, any of its rights or obligations under the Agreement without the prior written consent of the Company, provided, however, that the Company may without any such prior written consent, assign its rights and/or obligations under the Agreement to a subsidiary or affiliate corporation.

18. <u>Right of Disposal</u>. This Agreement does not grant any rights to dispose of Waste other than in accordance herewith. The Company reserves the right to immediately terminate access to the Facility by Agent and Agent's personnel in the event of breach or violation by Agent of any of the terms of this Agreement, the Company's operating rules or payment policies or any applicable laws or regulations.

19. <u>Continuing Compliance</u>. The Agent has a continuing obligation to inform the Company of any new information, or information not previously provided to the Company by Agent and/or Generator which may affect the acceptability of the Waste by the Company. Further, the Agent shall comply with all Company requests for evidence of Agent's continuing compliance with the terms of the Agreement including but not limited to the following: (i) providing new, updated Waste profiles on the Waste(s) offered for disposal or, (ii) providing appropriate certification that the Waste being offered for disposal is accurately reflected by the appropriate Application or, (iii) re-sample the Waste at Agent's expense if reasonable cause exists as to its acceptability under the terms of this Agreement or, (iv) allow the Company to re-sample the Waste at Agent's expense if reasonable cause exists as to its acceptability under the terms of this Agreement or (v) all of the above.

20. <u>Miscellaneous</u>.

(A) This Agreement shall be governed by the laws of the State in which the Facility is located.

(B) No waiver of a breach of any of the obligations contained in the Agreement shall be construed to be a waiver of any prior or succeeding breach of the same obligation or of any other obligation in this Agreement.

(C) No modification, release, discharge or waiver of any provision or obligation hereof shall be of any force, or effect, unless in writing signed by all parties to this Agreement.

(D) Agent shall treat as confidential and not disclose to others during or subsequent to the terms of this Agreement, except as is necessary to perform this Agreement, or to comply with any applicable law or regulation any information (including any technical information, experience or date) regarding the Company's plans, programs, plants, processes, products, costs, equipment or operations which may come within the knowledge of the Agent or its employees in the performance of this Agreement, without in each instance securing the prior written consent of the other Company.

(E) If any term, phrase, obligation or provision of this Agreement shall be held to be invalid, illegal or unenforceable in any respect, this Agreement shall remain in effect and be construed without regard to such term, phrase, obligation or provision.

(F) This Agreement constitutes the entire understanding between the parties, replacing and amending any prior agreements between the parties, and shall be binding upon all parties hereto, their successors, heirs, representatives and assigns. Any provision, term or condition in any acknowledgement, purchase order or other response by Agent which is in addition to or different from the provisions of this Agreement shall be deemed objected to by the Company and shall be of no effect.

(G) Agent represents, warrants and covenants that it is and during the term of this Agreement, will remain, in compliance with and will perform its obligations pursuant to all applicable laws and regulations and shall indemnify, defend and hold harmless the Company from any breach thereof.

(H) It is the understanding and agreement of the parties that the Company is an independent contractor, and is not an agent, nor an authorized representative of the Agent. It is the further understanding and agreement of the parties that Agent is an authorized representative of Generator.

21. <u>Notices</u>. All notices herein provided for shall be considered as having been given upon being placed in the mail, certified postage prepaid addressed to the Company or Agent at the address herein set forth in this Agreement or to such other address as may be given to the other party in writing.

22. <u>Liquidated Damages</u>. In the event that this Agreement is terminated by the Agent in a manner not in accordance with paragraph 4 hereof, or terminated due to a breach of this Agreement by the Agent, the Agent shall pay, as liquidated damages, and not as a penalty, the greater of an amount equal to six (6) months' service charges or the Agent's most recent monthly charge multiplied by six (6). The Agent shall be given credit for any advance payments made hereunder, however, in computing the amount owed as liquidated damages hereunder. The Agent acknowledges that this liquidated damages clause is reasonable and is applicable to recover damages related to its investment in equipment, development of landfills and hiring of employees undertaken by the Company to service its customers including the Agent. This liquidated damages clause in no way relieves the Agent from its obligations and liability for other cost or damages as set forth elsewhere in this Agreement.

BROKER: _____   COMPANY: _____   May 2009

# EXHIBIT J

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844



Naval Facilities Engineering Systems Command Mid-Atlantic
Norfolk, Virginia

# Investigation and Remediation Waste Management Plan

Marine Corps Base Camp Lejeune and Marine Corps Air Station
North Carolina

Updated March 2023

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844



Naval Facilities Engineering Systems Command Mid-Atlantic
Norfolk, Virginia

# Investigation and Remediation Waste Management Plan

Marine Corps Base Camp Lejeune and Marine Corps Air Station
North Carolina

Updated March 2023

Prepared for NAVFAC Mid-Atlantic
by CH2M HILL, Inc.
14120 Ballantyne Corporate Place, Suite 200
Charlotte, North Carolina, 28277
Contract N62470-16-D-9000
CTO 4490



# Contents

Acronyms and Abbreviations ............................................................................................ vii

1    Introduction ........................................................................................................... 1-1

2    Types of Waste ...................................................................................................... 2-1
    2.1    Soil ............................................................................................................. 2-1
    2.2    Water ........................................................................................................ 2-2
    2.3    Solid Debris ............................................................................................... 2-3

3    Waste Characterization ........................................................................................ 3-1

4    Waste Management ............................................................................................... 4-1
    4.1    Waste Storage Time Limit ......................................................................... 4-1
    4.2    Labels ........................................................................................................ 4-1
    4.3    Containers and Accumulation ................................................................... 4-2
        4.3.1    Drums and Small Containers ........................................................ 4-3
        4.3.2    Roll-off Boxes .............................................................................. 4-4
        4.3.3    Portable Tanks ............................................................................. 4-4
        4.3.4    Soil Stockpiles .............................................................................. 4-4

5    Shipping Documentation ....................................................................................... 5-1

6    Transportation for Off-Site Disposal ..................................................................... 6-1

7    Disposal ................................................................................................................. 7-1
    7.1    Onsite Disposal ......................................................................................... 7-1
    7.2    Offsite Disposal ......................................................................................... 7-1

8    Recordkeeping ...................................................................................................... 8-1

9    References ............................................................................................................. 9-1

**Attachments**

1    NCDENR Email – IDW/RDW Management
2    Transportation and Disposal Log

**Table**

3-1    Typical Analyte List

**Figures**

2-1    Waste Disposal Flow Chart
2-2    Site Locations Map

4-1    Drum Staging with Secondary Containment

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

# Acronyms and Abbreviations

| | |
|---|---|
| °F | degree Fahrenheit |
| CERCLA | Comprehensive Environmental Response, Compensation, and Liability Act |
| CFR | Code of Federal Regulations |
| CTO | Contract Task Order |
| DEQ | Department of Environmental Quality |
| DOD | Department of Defense |
| DON | Department of the Navy |
| DOT | Department of Transportation |
| DRO | diesel range organics |
| EMD | Environmental Management Division |
| GRO | gasoline range organics |
| GS | General Statutes |
| GWTP | groundwater treatment plant |
| ID | identification |
| IDW | investigation-derived waste |
| IR | Installation Restoration |
| MCAS | Marine Corps Air Station |
| MCB | Marine Corps Base |
| NCAC | North Carolina Administration Code |
| NCDEQ | North Carolina Department of Environmental Quality |
| NC SSL | North Carolina Soil Screening Level |
| NFA | No Further Action |
| OWS | oil water separator |
| PFAS | per- and polyfluoroalkyl substances |
| POL | petroleum, oils, and lubricants |
| PPE | personal protective equipment |
| RCRA | Resource Conservation and Recovery Act |
| RCRS | Resource Conservation and Recovery Section |
| RDW | remediation-derived waste |
| SVOC | semivolatile organic compound |
| TCLP | Toxicity Characteristic Leaching Procedure |
| TO | Task Order |
| TPH | total petroleum hydrocarbons |
| USEPA | United States Environmental Protection Agency |
| UST | underground storage tank |
| VOC | volatile organic compound |
| WMP | Waste Management Plan |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SECTION 1

# Introduction

The scope of this Waste Management Plan (WMP) addresses the management and disposal requirements for wastes generated during investigation and remediation activities at Marine Corps Base (MCB) Camp Lejeune and Marine Corps Air Station (MCAS) New River (the Base). It is anticipated that the following wastes will be generated during these activities:

- Non-hazardous and hazardous soil from investigation and remedial activities
- Non-hazardous and hazardous water from investigation and remedial activities
- Solid debris, including disposable sampling equipment and personal protective equipment (PPE)

This investigation-derived waste (IDW) and remediation-derived waste (RDW) will require management and disposal in a manner that is consistent with state and federal law and minimizes potential hazards to the public. IDW is defined as waste that is generated while performing an investigation action. Investigations include all phases of work that take place before finalizing the remedial design, excluding any removal actions. Pilot studies are considered investigations. RDW is defined as waste that is generated during any remedial, removal, or corrective action. The Environmental Management Division (EMD) has the primary responsibility for wastes generated at the Base. This plan describes methodologies and procedures that responsible contractors will implement to handle, manage, and dispose of waste at the Base. Procedures for managing, handling, and disposing of project-specific waste will be addressed in the project-specific plan. This plan is prepared for the overall management of waste generated during environmental investigation and remediation work at the Base under the following remediation frameworks:

- Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA)
- Resource Conservation and Recovery Act (RCRA)
- Underground Storage Tank (UST) Program
- Non-UST with petroleum, oils, or lubricants (POL)

Wastes generated while performing activities in each framework may have different requirements that are addressed in the following sections. In order to use this document you must know which framework the work will be operating under so that the proper requirements are met. It should be noted that CERCLA actions are subject to the Applicable or Relevant and Appropriate Requirements that are established for them and these requirements may differ from the requirements of this plan. This WMP does not address hazardous wastes generated as part of operational processes. Refer to the Installation's Hazardous Waste Management Plan maintained by EMD/Resource Conservation and Recovery Section (RCRS).

SECTION 2

# Types of Waste

## 2.1   Soil

Soil may be generated from either investigation or remediation activities and may consist of soil cuttings generated during drilling activities, soils that accumulate in the decontamination pad from washing equipment, and soils generated during remedial activities. Soil that is IDW and is not from a known source area or area of suspected soil contamination based on generator knowledge and/or historical data may be returned to the borehole or spread on the ground surface near the boring from which it was removed. All cuttings will be screened with an organic vapor analyzer and flame ionization detector before spreading. If a large volume of soil will be generated that will require grading, seeding, and/or erosion control measures, other disposal options should be considered. If it cannot be presumed that the soil can be spread around the borehole during fieldwork, the soil should be properly accumulated in containers, as described in **Section 4**. If subsequent analytical results show that the soil is not contaminated and the soils from multiple boreholes have not been aggregated or have only been aggregated with other boreholes in close proximity (such as a well cluster), the soil may be returned to the site and spread around the original borehole.

IDW soil that cannot be spread around the borehole and RDW soil will be used as soil cover at the Base landfill if it is non-hazardous and contains no POL. If the soil cannot be used at the Base landfill, offsite disposal will be arranged at an appropriate facility, as described in **Section 7.2**. Soil will be accumulated in drums, bulk containers, or stockpiles in accordance with the procedures discussed in **Section 4**. If waste containers cannot be stored in a fenced, secured area or if hazardous waste is generated, the waste must be transported to a less-than-90-day storage facility on the Base. This location will be identified in a project-specific plan (such as a Work Plan or Sampling and Analysis Plan)**.** All containers used to accumulate waste will be kept closed and secured when waste is not being added or removed. Roll-offs will be lined and covered while awaiting transportation and disposal.

In accordance with United States Environmental Protection Agency (USEPA) guidance (Guide to Management of Investigation–Derived Wastes, USEPA, 1992), soil generated at remediation sites should not be assumed hazardous unless proven to be so, either through generator knowledge or analytical testing. Determinations of generator knowledge require documented coordination with the Base EMD. Generator knowledge currently includes the knowledge of previous operations conducted at the various investigation and remediation sites as well as up to thirty years of analytical data that has been collected during various investigation and remediation activities. These data indicate that the large majority of IDW and RDW generated at the Base is non-hazardous waste, with hazardous waste rarely encountered outside of areas with known high concentrations. This supports an initial determination that waste is nonhazardous while awaiting the results of confirmation samples, managing in the proactive manner that is described in this plan, and temporarily labeling as "Analysis Pending" as described in **Section 4.2**.

Soil that is determined to be subject to solid waste management rules will be assessed to determine if it is a listed hazardous waste as defined under 40 Code of Federal Regulations (CFR) 261, Subpart D. If the waste is not a listed waste it will be assessed through a combination of generator knowledge and analytical testing to determine if it has a characteristic of hazardous waste as defined under 40 CFR 261, Subpart C. If waste is a listed hazardous waste or has a characteristic of hazardous waste then it will be managed as hazardous waste. No site currently being investigated or remediated at Camp Lejeune has been found to have listed hazardous waste; however, some sites have been found to have characteristic hazardous waste. All new sites require documented coordination with the Base EMD to make that determination.

Characteristically hazardous waste exhibits at least one of the following characteristics:

- **Ignitability** – Flashpoint that is less than 140 degrees Fahrenheit (°F)

- **Corrosivity** – pH of 2 or lower or a pH of 12.5 or higher

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

- **Reactivity –** The waste is normally unstable and undergoes violent change without detonating, is explosive, or reacts violently or produces toxic gas when exposed to water, air, or heat.

- **Toxicity –** The waste contains constituents that exceed the toxicity limits listed in 40 CFR 261.24.

Soil to be disposed of will be characterized, and a formal waste characterization will be made using analytical results and generator knowledge, as described in **Section 3**. All wastes should be disposed of within 90 days of the accumulation start date. All containers should be labeled in accordance with the instructions in **Section 4.2**. The soil disposal process is shown on **Figure 2-1**.

## 2.2    Water

Aqueous waste will be produced from investigation or remediation activities during monitoring well development, groundwater purging and sampling, and possibly during remedial operations. Aqueous wastes that are from the same site may be aggregated as long as they are the same type of waste. Different types of hazardous aqueous waste will never be aggregated.

Under certain circumstances, small volumes of non-hazardous aqueous IDW (i.e., purge water, development water, etc.) generated as part of investigation activities may be discharged on the ground surface within a specific area it was generated, so long as the material:

- stays on site and remains in the contaminated area

- is secured

- does not increase the spread of contamination or concentrations in a particular medium

- does not cause mobilization of contaminants

- does not introduce contamination to uncontaminated soil (causing an increase in contaminant concentrations) (Department of Environmental Quality [DEQ], 2022)

In addition to these rules, aqueous IDW cannot be transferred and discharged to another area of concern. In order for rule (3) to be met, historical concentrations for each point of generation (i.e., well head, borehole, etc.) must be available and confirm concentrations will not cross-contaminate soils/aquifers above current levels. If historical data is available for groundwater, and concentrations will not cross-contaminate soils above current levels, then discharge on the ground is acceptable. However, if purge water from deeper aquifers is more contaminated than the surficial aquifer, this waste should not be discharged on-site.

For rule (5) to be met, contaminated groundwater cannot be disposed of on clean soil, as this would increase contaminant concentrations within the soil.

Under no circumstances should monitoring well purge water be placed back into the well from which it came. In addition, decontamination fluids where surfactants are used are not to be placed on the ground surface.

For aqueous IDW that cannot be placed on the ground surface, the groundwater treatment plant (GWTP) at Lot 203 can be used to dispose of aqueous waste that is generated during CERCLA work at the approved Installation Restoration (IR) Sites 3, 6, 78, 82, 88, and 96. **Figure 2-2** shows the locations of these sites. Prior notification and approval from the GWTP operator is required for disposal, and any paperwork requested by the operator must be completed. At a minimum, the IDW Management Form supplied by the operator must be completed at least 3 days before any planned IDW water disposal at Lot 203. All aqueous waste that can be disposed of in this manner will be discharged before demobilization from the site. Based on the design limitations of the plant, the following practices will be adhered to when disposing of aqueous waste at the GWTP:

- Water containing sediment will be allowed to settle for at least 8 hours and filtered before disposal at the GWTP

- No free product will be disposed of at the GWTP

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

- Working with the GWTP operator, the responsible contractor's personnel will supervise all subcontractors that dispose of aqueous waste at the GWTP

The use of an oil water separator (OWS) may be required by some POL sites in situations that require the holding of petroleum contaminates until they can be recovered and properly disposed. In the event the use of an OWS will be used, RCRS (910-451-5306) or the Pollution Abatement Section (910-451-5264) will be contacted for further instruction.

Aqueous waste that cannot be placed on the ground surface, disposed of at the GWTP, or the OWS will be accumulated in containers, as described in **Section 4**, and containers will be staged at a fenced and secured location or at a less-than-90-day storage area. All containers used to accumulate aqueous waste will be kept closed and secured when waste is not being added or removed.

In accordance with USEPA guidance (Guide to Management of Investigation–Derived Wastes, USEPA, 1992), aqueous waste generated at remediation sites should not be assumed hazardous unless proven to be so, either through generator knowledge or analytical testing. Determinations of generator knowledge require documented coordination with the Base EMD. Generator knowledge currently includes the knowledge of previous operations conducted at the various investigation and remediation sites as well as up to thirty years of analytical data that has been collected during various investigation and remediation activities. These data indicate that the large majority of IDW and RDW generated at the Base is non-hazardous waste, with hazardous waste rarely encountered outside of areas with known high concentrations. This supports an initial determination that waste is nonhazardous while awaiting the results of confirmation samples, managing in the proactive manner that is described in this plan, and temporarily labeling as "Analysis Pending" as described in **Section 4.2**.

Aqueous waste that is determined to be subject to solid waste management rules will be assessed to determine if it is a listed hazardous waste as defined under 40 CFR 261, Subpart D. If the waste is not a listed waste it will be assessed through a combination of generator knowledge and analytical testing to determine if it has a characteristic of hazardous waste as defined under 40 CFR 261, Subpart C. If waste is a listed hazardous waste or has a characteristic of hazardous waste then it will be managed as hazardous waste. No site currently being investigated or remediated at Camp Lejeune has been found to have listed hazardous waste; however, some sites have been found to have characteristic hazardous waste. All new sites require documented coordination with the Base EMD to make that determination.

Characteristically hazardous aqueous waste exhibits at least one of the following characteristics:

- **Ignitablity –** Flashpoint that is less than 140°F

- **Corrosivity –** pH of 2 or lower or a pH of 12.5 or higher

- **Reactivity –** The waste is normally unstable and undergoes violent change without detonating, is explosive, or reacts violently or produces toxic gas when exposed to water, air, or heat

- **Toxicity –** The waste contains constituents in concentrations that exceed the toxicity limits listed in 40 CFR 261.24

Aqueous waste will be analyzed before offsite disposal, and a formal waste characterization will be made using the results, as described in **Section 3**. All aqueous waste disposed of offsite should be disposed of within 90 days of the accumulation start date. The procedure for disposing of IR site-related aqueous waste is shown on **Figure 2-1**. For UST site-related aqueous waste, refer to UST Guidance (North Carolina Department of Environmental Quality [NCDEQ], 2021.).

## 2.3    Solid Debris

Other debris that may be generated at the site includes plastic sheeting, PPE, and disposable sampling equipment. These items will be characterized according to the waste that they are associated with. Debris associated with non-hazardous waste should be accumulated in black, non-translucent trash bags. The bags should be secured

INVESTIGATION AND REMEDIATION WASTE MANAGEMENT PLAN
MARINE CORPS BASE CAMP LEJEUNE AND MARINE CORPS AIR STATION, NORTH CAROLINA

and disposed of in a dumpster on the Base. Debris associated with hazardous waste will be accumulated in drums or bulk containers as hazardous waste. These items will be disposed of offsite in accordance with the procedures described in **Section 7** of this WMP. The steps for disposing of solid debris are shown on **Figure 2-1**.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

230307084610_0ee3d57f

# Things to Consider

- Determine what types of contaminants are at the site (e.g., petroleum/non-petroleum, metals, cVOCs). Determine where you anticipate disposal and begin coordination with that facility. Always have an alternate plan; disposal facilities can refuse any waste for any reason.

- Is significant contamination expected? If so, engage compliance. May need to manage as hazardous waste until analytical proves otherwise.

- Could generator knowledge be used to classify the waste? (LTM or engage compliance)?

- Is the site a high traffic area or remote? In high traffic areas additional security for containers/ stockpiles is needed.

- What types of containers will be used? Consider the volume and properties of the waste. Determine how containers will be procured and transported to the site.

- Where/how will waste be secured? All waste must be secured (i.e. inside of a fence). Do not demobilize from the site until waste is properly secured. Ensure that the location has adequate capacity. Ensure that bulk containers can be maneuvered into the space. For non-hazardous wastes use the storage bays at Building S-960, or within a locked, fenced in area on site. Hazardous waste must be moved to the less-than-90-day storage facility in Building S-962 on Michael Road in a timely manner as approved by the Base EMD/RCRS, or the site where the waste is stored must comply with the requirements identified in 40 CFR 262.34.

- Small volumes of IDW can be disposed on the ground near the area of generation as long as concentrations are low/will not increase contamination and meet the criteria outlined in Section 2.2 of the WMP

- How will the waste be moved?

- Non-hazardous: The preferred method of waste transportation is to use a subcontractor. Contractor personnel can move small quantities of non-hazardous waste only if it can be done SAFELY. Hazardous: Hazardous wastes will only be transported by a certified waste hauler.



Figure 2-1
Waste Disposal Flow Chart
Waste Management Plan
*MCB Camp Lejeune and MCAS New River*

\*As defined by 40 CFR 261

WWTP – Wastewater Treatment Plant
LTM – Long-Term Monitoring
RDW – Remediation-Derived Waste
IDW – Investigation-Derived Waste

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

CH2MHILL.



Figure 2-2
Site Locations Map
Waste Management Plan
MCB Camp Lejeune and MCAS New River
North Carolina

**Legend**

- Less than 90 Day Storage Area
- Highways
- DRMO Area Lot 203
- IR Sites
- Installation Area
- Hadnot Point Industrial Area
- Wallace Creek Construction Area
- Air Station
- Camp Devil Dog
- Camp Geiger
- Courthouse Bay
- Greater Sandy Run/K - Impact Area
- Main Side
- Montford Point/Tarawa Terrace
- Rifle Range/Stone Bay

Notes:
IR Sites 3, 6, 78, 82, 88, and 96 are CERCLA sites approved for wastewater disposal at the WWTP at Lot 203.

1 inch = 12,500 feet

Imagery Source: Esri 2019

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SECTION 3

# Waste Characterization

Historical documentation will be reviewed from each site to determine whether the waste from that site is hazardous as defined by 40 CFR 261, Subpart D. The Base, as the generator, will make the final determination concerning the existence of listed hazardous waste. A combination of analytical testing and generator knowledge may be used to determine if waste is characteristically hazardous as defined by 40 CFR 261, Subpart C. Where analytical testing is used, both site conditions and historical data will be taken into account to establish the sampling frequency and analyte list. At sites that have a single, roughly homogenous plume, and where wastes are collected in bulk containers, one sample per medium per site is required. In other cases where waste is collected in bulk containers, one sample per 500 tons of solid media and one sample per bulk liquid container are required. Where waste is collected in drums, one sample per 10 drums of each medium is required. The typical analyte list for CERCLA, RCRA, UST, and Non-UST POL sites is presented in **Table 3-1**. In the case of UST sites, the abbreviated analyte list in **Table 3-1** is typically appropriate based on the nature of contamination at those sites; but if non-petroleum contaminants are present, the analyte list should be reassessed. If the Site Inspection report (CH2M, 2022) recommends additional investigation as part of a Data Gap Site Inspection or Remedial Investigation, per- and/or polyfluoroalkyl substances (PFAS) analyses should be included for waste characterization, in accordance with the Department of the Navy's (DON's) Interim PFAS Site Guidance for NAVFAC Remedial Project Managers (DON, 2020) and Department of Defense's (DOD's) Memorandum for Investigating PFAS within the DOD Cleanup Program (DOD, 2022). When planning to characterize waste with generator knowledge, the Base must approve of this practice and the disposal facility that will be used must also agree to accept the waste with only generator knowledge to support the waste profile. The use of generator knowledge may be appropriate for long-term monitoring sites, UST sites, or sites where remedial actions have been completed. Deviations from the sampling frequency and analyte lists in this WMP will be detailed in the site-specific work plan.

For wastes generated at CERCLA or RCRA sites where the use of generator knowledge is not adequate for characterization, the following analyses should be performed: Toxicity Characteristic Leaching Procedure (TCLP) for volatile organic compounds (VOCs), semivolatile organic compounds (SVOCs), pesticides, herbicides, and metals; ignitability; corrosivity; reactive cyanide; and reactive sulfide. In addition, for soil that will be used at the Base landfill, the following analyses must be added: total petroleum hydrocarbons (TPH) for gasoline range organics (GRO) and diesel range organics (DRO) and any analyte related to the contaminant of concern at that site. Waste generated from UST sites typically may be characterized using TPH-GRO, TPH-DRO, and RCRA metals. In special cases, generator knowledge may be used to characterize waste.

Table 3-1. Typical Analyte List

| | Analysis Required | CERCLA/RCRA Site Waste | Use at Base Landfill (Soil) | UST/Non-UST POL Site Waste |
|---|---|---|---|---|
| TCLP | VOCs Method SW846-8260B | X | X | |
| | SVOCs Method SW846-1311/8270C | X | X | |
| | Pesticides Method SW846-8081A | X | X | |
| | Herbicides Method SW846-8151A | X | X | |
| | Metals Method SW846-6010B | X | X | |

INVESTIGATION AND REMEDIATION WASTE MANAGEMENT PLAN
MARINE CORPS BASE CAMP LEJEUNE AND MARINE CORPS AIR STATION, NORTH CAROLINA

Table 3-1. Typical Analyte List

| Analysis Required | CERCLA/RCRA Site Waste | Use at Base Landfill (Soil) | UST/Non-UST POL Site Waste |
|---|---|---|---|
| Ignitability Method SW846-1010A | X | X | |
| Corrosivity Method SW846-9040B | X | X | |
| Reactive Cyanide Method SW846-9012A | X | X | |
| Reactive Sulfide Method SW846-9034R | X | X | |
| TPH-GRO USEPA Method 8015C | | X | X |
| TPH-DRO USEPA Method 8015C | | X | X |
| RCRA 9 Metals Method SW846-6010B/7000 | | | X |
| PFAS Compounds 40 PFAS referenced in 2nd Draft USEPA Method 1633 [Compliant with DOD Quality Systems Manual Version 5.4 Table B-24 | X* | X* | X* |

Notes:

\*  If the Site Inspection report (CH2M, 2022) recommends additional investigation as part of a Data Gap Site Inspection or Remedial Investigation, PFAS analyses should be included for waste characterization, in accordance with current guidance (DON, 2020 and DOD, 2022).

Waste characterization information will be documented on a waste profile form provided by the treatment and/or disposal facility as part of the waste acceptance process. For offsite disposal, the responsible contractor will provide a profile package to the Base that includes a draft profile for review and signature, a data summary table, analytical data package, and documentation of any relevant generator knowledge. A unique profile tracking number will be assigned to the analytical package and the profile. In addition, this profile number will be incorporated into waste container numbers to allow personnel to easily match waste streams with containers. Profile tracking numbers will be assigned using the following format:

CTO/TO Number -Site#- Media|count number

An explanation of each of these identifiers is given as follows.

**Contract Task Order (CTO)/ Task Order (TO) Number**  Number identifying which project generated the waste

**Site Number**  Identifies the location where the waste was generated

**Media**  Describes the waste:
W-water
S – soil
SL – sludge (or mud)
D-debris

**Count number**  The running count of the waste streams of this medium generated by this project.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

Under this format, "CTO040-IR78-S02" would mean the following:

| | |
|---|---|
| **CTO040**-IR78-S02 | The waste was generated for work conducted under CTO 040. |
| CTO040-**IR78**-S02 | The waste was generated at Site IR78. |
| CTO040-IR78-**S**02 | The waste is soil. |
| CTO040-IR78-S**02** | This is the second soil profile generated by this project. |

Base personnel will provide any required generator certification and/or signatures. Signed profile(s) will then be submitted to the appropriate offsite disposal facility (see **Section 7**) for approval.

The profile for offsite disposal typically requires the following information but may have additional requirements:

- Generator information including USEPA Generator Identification (ID) Number (see **Section 4.2** for generator number), name, mailing address, contact, and phone number

- Site name and street address

- Process generating waste (such as soil removal or well installation)

- Source of contamination

- Historical use for area

- Waste composition

- Physical state of waste

- Applicable hazardous waste codes

- Soils/soil materials generated from a site recommended for additional investigation in the Site Inspection report (CH2M, 2022), should be manifested as "may contain PFAS".

The offsite disposal facility will be approved by the regional environmental manager before a contract for disposal is awarded. The facility will have the certifications and permits listed in **Section 7**. A copy of the waste profile or approval letter will be received from the disposal facility before scheduling offsite transportation of the waste.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SECTION 4

# Waste Management

## 4.1    Waste Storage Time Limit

Based on thirty years of historical waste characterization results, hazardous wastes are not expected to be generated. Even though all generated soil, debris, and liquids are assumed to be non-hazardous for management purposes (unless there are indications otherwise), samples will be collected and wastes will be characterized according to the results of sample analyses. All CERCLA or RCRA site-related waste should be disposed of within 90 days of the accumulation start date. Soils generated under the UST Guidance must be disposed within 45 days of when the drums and containers are full. Unauthorized storage of soil or storage in excess of 45 days may be considered a violation of General Statutes (GS) 143-215.1.

To facilitate tracking, each container will be assigned a unique number using the following format:

Profile Tracking Number-Event Number-Count Number/Total Count

An explanation of each of these identifiers is given below.

| | |
|---|---|
| **Profile Tracking Number** | Number identifying the waste stream associated with the container. **Section 3** of this WMP provides more information. |
| **Event Number** | The running count of events where this profile has been used. |
| **Count Number** | The running count of drums related to this waste profile number generated during this event. |
| **Total Count** | The total number of drums generated during this event. |

Under this format, "CTO040-IR78-S02-02-05/10" would mean the following:

| | |
|---|---|
| <u>**CTO040-IR78-S02**</u>-02-05-10 | This waste stream is associated with this profile number |
| CTO040-IR78-S02-<u>**02**</u>-05-10 | This is the second field event that will utilize this profile |
| CTO040-IR78-S02-02-<u>**05/**</u>10 | This is the fifth container related to this profile that was generated during this event |
| CTO040-IR78-S02-02-05<u>**/10**</u> | Ten containers that are related to this profile were generated during this event |

## 4.2    Labels

Waste containers will be labeled in accordance with 49 CFR 172, 173, and 178. Labels will include the container ID number, type of waste, location from which the waste was generated, and accumulation start date (the date that waste first enters the container). Soils/soil materials generated from a site recommended for additional investigation in the Site Inspection report (CH2M, 2022), should be labelled as "may contain PFAS". Containers and portable tanks used to store/accumulate waste (including soil and groundwater) will be clearly marked with and include one of the following labels:

### "Analysis Pending"

Temporary or handwritten label used until analytical results are received and reviewed. This label will include the container ID number, generator information, site, and accumulation start date. If the waste is produced from

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

CERCLA or CERCLA-like[1] work, the words, "CERCLA derived" must also be on the label. If the label is handwritten, a paint pen should be used.

### "Hazardous Waste"

- Pre-printed hazardous waste labels with the following information:
- Accumulation start date
- Generator name
- USEPA ID number:

    – For IDW and RDW generated aboard MCB Camp Lejeune (Mainside, Courthouse Bay, Greater Sandy Run Area, Camp Geiger, and Air Station [**Attachment 1**]) (**Figure 2-2**): NC6170022580

- Waste codes
- Hazardous properties of the waste (flammable, reactive, toxic, etc)
- Container ID (see **Section 4.1**)
- Prior to transport, the manifest number must be added (for containers of less than 110-gallon capacity)

### "Non-Hazardous Waste"

Preprinted labels with the following information:

- Accumulation start date
- Generator name and telephone number
- Waste-specific information (for example, contaminated soil)
- Container ID
- Where applicable, the major hazards (such as flammable, oxidizer, or carcinogen) will be included on the label
- Large containers such as roll-off boxes may require more than one label

## 4.3    Containers and Accumulation

Waste materials will be collected in drums, bulk containers, or stockpiles. Containers will be staged in a fenced and secured area pending characterization and disposal. Roll-off containers used to accumulate waste will be lined and covered to await transportation and disposal. Hazardous wastes will be segregated from non-hazardous wastes. Incompatible wastes such as flammable and corrosive wastes also will be segregated. Wastes of the same matrix, contamination, and source may be aggregated to facilitate storage and disposal.

Generally, waste containers will be moved to secure locations approved by EMD (such as the S-960 facility bays on Michael Road [**Figure 2-2**] or a secure area onsite) as part of demobilization. The location of Building S-960 is shown on **Figure 2-2**. Site conditions may warrant the movement of containers to secure locations more frequently, as determined by EMD.

Some staging locations may require secondary containment. The design requirements for secondary containment will be included in site or project-specific work plans. The responsible contractor will coordinate with EMD to ensure that any inspections required by Clean Water Act regulations or permits prior to discharging stormwater from the containment area are conducted and properly documented.

---

[1] Any remedial or removal action involving the off-site transfer of any hazardous substance, pollutant, or contaminant as defined under CERCLA sections 101 (14) and (33) ("CERCLA waste") that is conducted by USEPA, States, private parties, or other Federal agencies, that is Fund-financed and/or is taken pursuant to any CERCLA authority, including cleanups at Federal facilities under section 120 of CERCLA, and cleanups under section 311 of the Clean Water Act (except for cleanup of petroleum exempt under CERCLA). Is subject to the CERCLA Offsite Rule (40 CFR 300.440).  The applicability extends to those actions taken jointly under CERCLA and another authority.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

If secondary containment is not used, the following considerations must be taken into account:

- The waste staging area will have the appropriate equipment and PPE required to contain and clean-up a spill to the ground surface.

- In the event that a leak occurs, the affected ground surface will need to be removed and disposed of, or calculations must be made in a memo-to-file for the Base showing that the leak could not have caused the impacted soil to have concentrations of contaminants exceeding North Carolina Soil Screening Levels (NC SSLs).

- If the drum staging area will be in the path of sheet flow from rain events, basic diversions will need to be constructed to protect the drums and containers.

Waste in containers will be staged in the storage bays at Building S-960 on Michael Road unless another secure location is approved by EMD. Operating hours for this facility are from 0700 – 1630 Monday through Friday ([910] 451-1482). If hazardous waste is generated, it must be moved to the less-than-90-day storage facility in Building S-962 on Michael Road ([910] 451-5306) in a timely manner as approved by the Base EMD/RCRS, or the site where the waste is stored must comply with the requirements identified in 40 CFR 262.17. The less-than-90-day storage area in Building S-962 meets these requirements and contains appropriate emergency response equipment, including a fire extinguisher, spill response equipment, and appropriate PPE. Arrangements will be made with the Base for hazardous wastes to be stored at this location until disposal.

Transportation of waste from its originating site to its temporary storage location, whether it be the 90-day storage facility on Michael Road (Building S-960) or an approved secure location, is exempt of the transportation requirements outlined in **Section 6** so long as travel is only conducted within Base boundaries or roads adjacent to Base property, as outlined in 40 CFR 262.20(f). A certified waste transportation contractor must be hired to move hazardous waste on an off-Base road that is not adjacent to the property line.

All containers will be inspected upon arrival at the site for disrepair and for any contamination or contents left from previous customers. If a container contains waste upon arrival or is in disrepair, it will be rejected and documented.

The decision as to whether to use small or bulk containers is a management decision that depends on several criteria. The following will be considered when selecting containers:

- Compatibility with waste
- Storage location capacity
- Anticipated method of disposal and the containers that the disposal facility will accept
- Method of transportation
- Number of characterization samples required
- The effect of aggregating waste in bulk containers on the overall management of waste

## 4.3.1    Drums and Small Containers

- Drums will be inspected and inventoried upon arrival onsite for signs of contamination and/or deterioration.

- Adequate aisle space (at least 30 inches) will be provided for containers such as 55-gallon drums to allow the unobstructed movement of personnel and equipment. Drums will be arranged in rows that are not more than two drums wide (**Figure 4-1**).

- Each drum will be provided with its own label, and labels will be visible and clearly marked.

- Drums will remain closed, with all locking mechanisms engaged, except when removing or adding waste to the drum.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

INVESTIGATION AND REMEDIATION WASTE MANAGEMENT PLAN
MARINE CORPS BASE CAMP LEJEUNE AND MARINE CORPS AIR STATION, NORTH CAROLINA

- Drums will be disposed of with the contents. If the contents are removed from the drums for offsite transportation and treatment or disposal, the drums will be decontaminated before re-use or before leaving the site.

- Drums containing liquids or hazardous waste will be provided with secondary containment.

- Drums will be filled no more than three-quarters full.

## 4.3.2    Roll-off Boxes

- Roll-off boxes will be inspected upon arrival onsite. Any roll-off container arriving with contents or in poor condition will be rejected.

- Roll-off boxes will be provided with covers and disposable liners. Liners will be disposed of as contaminated debris along with the soil.

- When not in use, securely fastened covers will be installed on all roll-off boxes.

- Old labels will be removed or completely obliterated, and a new, appropriate label will be applied, as discussed in **Section 4.2**.

- Roll-off containers will be inspected by the transporter after removal of the liner and decontaminated in the event of evidence of liner failure.

## 4.3.3    Portable Tanks

- Portable tanks will be inspected upon arrival onsite for signs of deterioration and contamination. Any tank arriving onsite with contents or in poor condition will be rejected.

- Portable tanks will be provided with covers and secondary containment.

- Only non-stationary tanks (such as a cargo tank or other wheeled tank) will be used to accumulate hazardous waste.

- Each tank will be labeled as discussed in **Section 4.2**.

## 4.3.4    Soil Stockpiles

- Stockpiles of contaminated soil will be located near the excavation areas and within an area of existing contamination.

- Stockpiles will be provided with liners, covers, and perimeter berms to prevent release or infiltration of liquids.

    – A minimum of 10- and 6-millimeter polyethylene sheeting will be used for liners and covers, respectively.

    – A perimeter berm will be constructed of clean materials (such as hay bales under the liner) and will allow for collection of any free liquids draining from the stockpile.

    – Accumulated free liquids will be pumped to a container or tank.

- Covers and perimeter berms will be secured in-place when not in use and at the end of each work day, or as necessary to prevent wind dispersion or run-off from major precipitation events.

- Construction materials for the stockpiles that contact contaminated soil will be disposed of as contaminated debris.

- Accumulation start dates will be recorded on a log or a sign located at the stockpile.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844



LEGEND

○ DOT 55-gallon drum

Fence

Secondary Containment

5   0   5   10   Feet

**FIGURE 4-1**
Drum Staging with Secondary Containment
Waste Management Plan
*MCB Camp Lejeune and MCAS New River, North Carolina*

**CH2M**HILL

SECTION 5

# Shipping Documentation

Before offsite disposal of any waste, the responsible contractor will provide the Base with a profile package for each waste stream. This package will include a waste profile naming MCB Camp Lejeune as the generator of the waste, analytical summary table(s) applicable to the waste, a completed waste manifest, and any other applicable information necessary for the Base Resource Conservation and Recovery Section to complete its review of the disposal package and sign as the generator. **The waste profile and waste manifest can be signed by designated EMD personnel only.** The point of contact for EMD/RCRS is Tony Recob at Building 977 (office: 910-451-5306, email: Anthony.recob@usmc.mil).

The signed profile will be submitted to the disposal facility for acceptance and approval. Once the approved profile or approval letter is received from the disposal facility, transportation can be scheduled.

Each load of waste material will be manifested before leaving the site. At a minimum, the manifest form will include the following information:

• Generator information including name, address, contact, phone number, and USEPA ID number
• Transporter information including name, address, contact, phone number, and USEPA ID number
• Facility information including name, address, phone number, and USEPA ID number
• Site name including street and mailing address
• United States Department of Transportation (DOT) proper shipping name
• Types and numbers of containers
• Quantity of waste (volumetric estimate)
• Disposal facility profile number and/or approval code
• Twenty-four-hour emergency response phone number
• MCB Camp Lejeune profile tracking number

Additionally, each shipment of bulk waste will also have a weight ticket.

The generator and the transporter must sign the manifest prior to the load of waste leaving the site. A copy of this manifest will be retained by Base personnel. The original signed manifest will be returned to the address of the generator. The disposal facility will provide a copy of the facility-signed manifest to the Base.

If the signed hazardous waste manifest has not been received by EMD within 45 days, the responsible contractor will prepare an Exception Report for the Base to submit to the State of North Carolina, as required under 40 CFR 262.42 and as referenced by 15 North Carolina Administration Code (NCAC) 13A .0107(b).

While MCAS New River maintains a separate USEPA ID number (NC8170022570) as a hazardous waste generator, the MCB Camp Lejeune USEPA ID number (NC6170022580) listed in **Section 4.2** should be used for all IDW or RDW generated from CERCLA, RCRA, UST, and non-UST POL investigation and remediation sites. Refer to **Attachment 1** for further guidance.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SECTION 6

# Transportation for Off-Site Disposal

Each transportation vehicle will be inspected before waste is loaded by the responsible contractor. This inspection will be documented. The quantities of waste being transported and its final destination will be recorded in the field notes for the day. A contractor licensed for commercial transportation will transport non-hazardous wastes. If the wastes are hazardous, the transporter must have a USEPA ID number and must comply with transportation requirements outlined in 49 CFR 171-179 (DOT) and 40 CFR 263.11 and 263.31 (Hazardous Waste Transportation). A copy of the documentation indicating that the selected transporter has appropriate licenses will be received and approved by the responsible contractor before any waste is transported.

The transporter will be responsible for weighing loads at a certified scale. For each load of material, weight measurements will be obtained for each full and empty container, dump truck, or tanker truck. Disposal quantities will be based on the difference of weight measurements between the full and empty container and dump truck. Weights will be recorded on the waste manifest. The transporter will provide copies of weight tickets to the responsible contractor.

The transporter will observe the following practices when hauling and transporting wastes offsite:

- Minimize impacts to general public traffic

- Repair road damage caused by construction and/or hauling traffic

- Clean-up waste spilled in transit

- Line and cover trucks and trailers used for hauling contaminated waste to prevent releases and contamination

- Decontaminate vehicles before re-use

- Seal trucks transporting liquids

- All personnel involved in offsite disposal activities will follow safety and spill response procedures outlined in the site-specific Health and Safety Plan

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SECTION 7

# Disposal

The responsible contractor will assess the potential hazards posed by wastes and submit waste management recommendations to the Base. If test results indicate that a waste is not hazardous, the responsible contractor will recommend that soil waste be disposed at a non-hazardous landfill, that aqueous waste be disposed of at an industrial treatment plant, and that PPE and expendable sampling items be disposed of in a trash dumpster with other non-hazardous trash generated at the Base.

## 7.1    Onsite Disposal

The Base manages a landfill onsite where soil that is non-hazardous and contains no POL can be disposed of. The Base landfill does accept PFAS, lead-based paint, and asbestos impacted materials. Analytical results will be submitted to the Base to determine if waste solids can be disposed of there. If the waste is approved for onsite disposal, the Base will generate a waste profile form and provide instructions for disposal. Transportation will need to be provided by a waste hauler with the appropriate qualifications, as described in **Section 6**. Waste characterization documentation should accompany waste to the Base landfill. If landfill personnel are unable to verify the disposal authorization, the Base IR or UST manager should be contacted as is appropriate.

PPE and other debris associated with the generation of non-hazardous waste will be collected and secured in black, non-translucent trash bags and disposed of at the Base.

## 7.2    Offsite Disposal

For offsite disposal of wastes, disposal facilities with proper permits and in good standing with the state and federal agencies will be used. Permits and standing information will be received and approved by the responsible contractor prior to the profiling of any waste.

Offsite disposal of waste generated during UST corrective action must adhere to the disposal requirements as outlined in Section 6.0 of the UST Guidance. Offsite disposal of waste generated during non-UST petroleum releases must adhere to the disposal requirements as outlined in Section 14.0 of the Non-UST Petroleum Release Guidance.

Wastes generated during CERCLA or CERCLA-like work that is shipped offsite may only be transferred to a facility that has been reviewed by the USEPA Region under and found to be acceptable. This approval is in addition to the facility's USEPA or state permit, and the disposal facility must show proof of its approval in addition to its RCRA facility or treatment permit.

Offsite treatment and disposal facilities will use their waste profile and supporting documentation (analytical data) to determine whether they will accept a waste:

- Non-hazardous wastes will be disposed at an offsite RCRA Subtitle D facility permitted to receive such wastes or at an offsite treatment facility permitted to receive such wastes.

- PFAS containing waste should be managed in accordance with current guidance (DON, 2020 and DOD, 2022). For soil IDW, it can be disposed of as nonhazardous solid waste but if PFAS compounds are detected, the manifest should indicate that the waste is PFAS-containing. For aqueous IDW where PFAS concentrations are above 70 parts per trillion, additional treatment will be required prior to disposal. Depending on the offsite disposal facility's waste acceptance criteria, additional treatment may be required if any PFAS are detected. Construction debris that has not come in contact with contaminated media or is generated from a CERCLA site that has reached No Further Action (NFA) may be sent to municipal landfills, or landfills designated for construction and demolition debris.

INVESTIGATION AND REMEDIATION WASTE MANAGEMENT PLAN
MARINE CORPS BASE CAMP LEJEUNE AND MARINE CORPS AIR STATION, NORTH CAROLINA

- Hazardous wastes will be disposed of at an offsite, permitted, RCRA Subtitle C treatment, storage, or disposal facility.

- PPE associated with the generation of hazardous waste will be properly contained and disposed of at an offsite, permitted, RCRA Subtitle C treatment, storage, or disposal facility.

The treatment and disposal facility will be responsible for providing a copy of the final facility-signed waste manifest and a certificate of treatment or disposal for each load of waste received.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

230307084610_0ee3d57f

SECTION 8

# Recordkeeping

Records concerning waste management will be maintained. The responsible contractor will track wastes from generation to transportation offsite either in field notes or a form similar to the transportation and disposal log provided in **Attachment 2**. A specific inventory of each container and stockpile will be maintained, and all waste will be logged the day that it is generated and inventoried the day of transportation. The responsible contractor will maintain copies of the following records:

- Waste analytical results

- Waste profiles (and any required supporting documentation)

- Manifests, land disposal restriction notifications (only for hazardous waste), certificates of disposal, destruction, and recycle (as needed for site/project specific reporting)

- Field notes documenting waste tracking

- Field notes documenting waste management, including the volumes and methods of disposal, if applicable

- The Base, as the generator, will maintain waste management documents as part of its operating records in accordance with its policies. The Base maintains the following:

- Waste analytical results

- Waste profiles (and any required supporting documentation)

- Manifests, land disposal restriction notifications (only for hazardous waste), certificates of disposal, destruction, and recycle

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SECTION 9

# References

CH2M. 2022. *Basewide Per- and Polyfluoroalkyl Substances Site Inspection, Marine Corps Base Camp Lejeune and Marine Corps Air Station New River, North Carolina*. January.

Department of Defense (DOD). 2022. *Memorandum for Investigating Per-and Polyfluoroalkyl Substances within the Department of Defense Cleanup Program.* September.

Department of the Navy (DON). 2020. *Interim Per-and Polyfluoroalkyl Substances (PFAS) Site Guidance for Naval Facilities Engineering Systems Command (NAVFAC) Remedial Project Managers (RPMs).* November.

Department of Environmental Quality (DEQ) 2022. Inactive Hazardous Sites Branch *Guidelines for Cleanup of Contaminated Sites*. September.

North Carolina Department of Environmental Quality (NCDEQ). 2021. *UST Section Assessment Guidelines and UST Section Corrective Action Guidelines.* January 19.

United States Environmental Protection Agency (USEPA) 1992. *Guide to Management of Investigation-Derived Wastes.* April.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

Attachment 1

NCDENR Email - IDW/RDW Management

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

**Twamley, Erin/RDU**

---

**From:** Patterson, Jenny [mailto:jenny.patterson@ncdenr.gov]
**Sent:** Monday, June 24, 2013 10:52 PM
**To:** Rychak CIV Charity M
**Cc:** Hartzell, Beth; Recob CIV Anthony L; Kropinack CIV Kirk R; Reid CIV Merrick C; Oneal, Katherine; Nelms, Robert
**Subject:** RE: IDW at Camp Lejeune

Good Morning,
Thank you for sending the detailed summary.  The Hazardous Waste Section will allow your request as stated below.

Please let me know if you have any questions or need additional information as it pertains to this request.
Thank you,
Jenny


Jenny Patterson, CHMM
Eastern Region Compliance Supervisor
Hazardous Waste Section -Division of Waste Management
NC Department of Environment & Natural Resources
1646 Mail Service Center
Raleigh, NC 27699-1646
Office: 336-767-0031
jenny.patterson@ncdenr.gov



*Email correspondence to and from this address is subject to the North Carolina Public Records Law*
*and may be disclosed to third parties unless the content is exempt by statute or other regulation.*

---

**From:** Rychak CIV Charity M [mailto:charity.rychak@usmc.mil]
**Sent:** Thursday, June 13, 2013 10:27 AM
**To:** Patterson, Jenny
**Cc:** Hartzell, Beth; Recob CIV Anthony L; Kropinack CIV Kirk R; Reid CIV Merrick C
**Subject:** RE: IDW at Camp Lejeune

Good morning Ms. Patterson,

As requested I'm sending you a follow-up email per our discussion on Monday, June 10, 2013, to clarify our request with regards to management of hazardous and non-hazardous waste generated aboard our property.

We respectfully request clarification on the management of waste (both hazardous and non-hazardous) generated aboard Marine Corps Air Station (MCAS) New River property as part of investigation and remediation activities.  As you are aware, there are two EPA Generator ID numbers for Camp Lejeune: one for MCAS New River (EPA ID # NC8170022570) and one for the rest of Camp Lejeune (EPA ID # NC6170022580).  Our Hazardous and Solid Waste Amendments Permit (NC6170022580 R2), however, covers both Camp Lejeune and MCAS New River.

We would like to be able to handle all investigation and remediation waste for sites listed in the HSWA permit under the Camp Lejeune EPA ID number.  This would include all wastes generated during investigation and remedial activities at

1

Camp Lejeune Environmental Restoration Program sites (CERCLA), Resource Conservation and Recovery Act (RCRA) solid waste management units (SWMUs), and underground storage tank (UST) remediation sites only.  We request this to simplify requirements for handling waste from remediation/corrective action sites, as our remediation sites can sometimes be co-located on MCAS property and Camp Lejeune property.  In addition, Camp Lejeune is responsible for management and implementation of all CERCLA and RCRA remedial activities aboard Camp Lejeune and MCAS New River.  Utilizing the Camp Lejeune EPA ID for all CERCLA and RCRA remedial activities will maintain consistency in personnel and minimize the possibility of error in documentation.

The 90-day facility on Camp Lejeune (Bldg S-962) will be used for temporary storage of all IDW (unless a location can be secured at the originating site) and hazardous waste generated from these sites.  Transportation to the Mainside 90-day storage facility from MCAS New River and other locations aboard Camp Lejeune will be conducted under the provisions of 40 CFR 262.20(f) (as adopted by 15A NCAC 13A.0107).

Hazardous wastes generated aboard MCAS New River as part of their operational processes will continue to be managed under the MCAS New River EPA ID and will be stored in the 90-day facility on MCAS New River (Bldg AS-4225).  This would include any spills that might occur as part of current MCAS New River  operations (i.e., within a maintenance bay at MCAS New River).

If you are agreeable to this, we will update our Investigation and Remediation Waste Management Plan, which is provided to NCDENR and the EPA for concurrence under the CERCLA Partnering Process.

Thanks much,

Charity M. Rychak, P.E.
Environmental Engineer
G-F/EMD/EQB
12 Post Lane
Camp Lejeune, NC 28547

Ph: (910) 451-9385
Fax: (910) 451-5997
mobile:  (910) 320-7656
E-mail: charity.rychak@usmc.mil

Privacy Act - 1974 As amended applies, this E-Mail may contain information
which must be protected IAW DoD 5400.11R, and is For Official Use Only
(FOUO).  This email and any files transmitted with it are intended solely
for the use of the individual or agency to which they are addressed.  If you
have received this email in error, please notify me immediately.

For Official Use Only - Privacy Sensitive:  Any misuse or unauthorized
disclosure may result in both civil and criminal penalties.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

# Attachment 2
# Transportation and Disposal Log

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## Transportation and Disposal Log

**Location**
**Site**

**Project Number**

**(Sub)Contractor**

**Task Description**
**Staging Location(s)**

| | | | | |
|---|---|---|---|---|
| **Container ID** | | | | |
| **Boring/Well Number** | | | | |
| **Container Type** | | | | |
| **Waste Profile No** | | | | |
| **Accumulation Start Date** | | | | |
| **Date Transported to Staging Location** | | | | |
| **Comments/Notes** | | | | |

**Note:  All waste should be included on the Waste Tracking Log from the moment of generation.**

# EXHIBIT K

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

M67001_009922
MCB CAMP LEJUENE, NC
SSIC 5000-33a

**FINAL SAMPLING AND ANALYSIS PLAN REMEDIAL INVESTIGATION PER AND POLYFLUOROALKYL SUBSTANCES SITE 113 BUILDING TC701 CAMP GEIGER FIRE STATION 6 MCB CAMP LEJEUNE NC**
12/01/2023
CH2M HILL

Approved for public release: distribution unlimited.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844



Naval Facilities Engineering Systems Command Mid-Atlantic
Norfolk, Virginia

**Final**

**Sampling and Analysis Plan**
**Remedial Investigation**
**Per- and Polyfluoroalkyl Substances**
**Site 113, Building TC701 Camp Geiger Fire Station (Station #6)**

Marine Corps Base Camp Lejeune
North Carolina

December 2023

APPROVE FOR PUBLIC RELEASE: DISTRIBUTION UNLIMITED

This page intentionally left blank.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

2:25-cv-11725-RMG    Date Filed 08/29/25    Entry Number 1-2    Page 313 of 700

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 1

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAP Worksheet #1—Title and Approval Page



Naval Facilities Engineering Systems Command Mid-Atlantic
Norfolk, Virginia

**Final**

**Sampling and Analysis Plan**
**Remedial Investigation**
**Per- and Polyfluoroalkyl Substances**
**Site 113, Building TC701 Camp Geiger Fire Station (Station #6)**

Marine Corps Base Camp Lejeune
North Carolina

December 2023

Prepared for NAVFAC Mid-Atlantic
by CH2M HILL, Inc.
Charlotte, North Carolina
Contract N62470-21-D-0007
CTO N4008522F5824



SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 2

This page intentionally left blank.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 3

SAP Worksheet #1—Title and Approval Page (continued)

**Review Signatures:**

Hockett, Dan AAB00104605    Digitally signed by Hockett, Dan AAB00104605
Date: 2023.12.11 10:19:22 -05'00'

Daniel Hockett           Date
CH2M HILL, Inc. - Project Manager

Jessica Skeean    Digitally signed by Jessica Skeean
DN: cn=Jessica Skeean, c=US,
email=jessica.skeean@jacobs.com
Date: 2023.12.12 12:31:23 -05'00'

Jessica Skeean           Date
CH2M HILL, Inc. - Activity Quality Manager

**Approval Signatures:**

Dana Stonelake           Date
Naval Facilities Engineering Systems Command Atlantic
Chemist/Quality Assurance Officer

**Other Approval Signatures:**

FRANCISCO.BENJAMIN.HAGOOD.1623303523    Digitally signed by
FRANCISCO.BENJAMIN.HAGOOD.1623303523
Date: 2023.12.14 09:20:25 -05'00'

Ben Francisco           Date
Naval Facilities Engineering Systems Command Mid-Atlantic
Remedial Project Manager

JENNIFER TUFTS    Digitally signed by JENNIFER TUFTS
Date: 2023.12.15 12:16:59 -05'00'

Jennifer Tufts           Date
United States Environmental Protection Agency Region 4
Remedial Project Manager

Angela M. Moore

Angela Moore           Date
North Carolina Department of Environmental Quality
Remedial Project Manager

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 4

This page intentionally left blank.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 5

# Executive Summary

This Uniform Federal Policy Sampling and Analysis Plan (SAP) was prepared under the Department of the Navy (Navy), Comprehensive Long-term Environmental Action–Navy Contract N62470-21-D-0007, Contract Task Order N4008522F5824, for submittal to Naval Facilities Engineering Systems Command (NAVFAC) Mid-Atlantic, the U.S Environmental Protection Agency (EPA) Region 4, and the North Carolina Department of Environmental Quality (NCDEQ). This SAP outlines the sampling activities in support of a Remedial Investigation (RI) specific to a confirmed release of per- and polyfluoroalkyl substances (PFAS) to the environment at Site 113, Building TC701 Camp Geiger Fire Station (Station #6), Marine Corps Base Camp Lejeune and Marine Corps Air Station New River in Onslow Country, North Carolina. This document was prepared in accordance with the Navy's SAP policy guidance to help ensure that collected environmental data are scientifically sound, of known and documented quality, and suitable for intended uses.

Site 113 is an active fire station (Building TC701) built in 1956 within Camp Geiger, located on the southwestern corner of Seventh Street and A Street. There is no documentation or institutional knowledge of aqueous film-forming foam (AFFF), or other PFAS-containing materials being released at this location. During a site visit in July 2018, conducted as part of the Preliminary Assessment (PA), there were seven 5-gallon containers (35 gallons total) of AFFF stored in Building G700A, a storage building adjacent to Building TC701. Also, there was one fire engine at the fire station with one full 50-gallon AFFF tank (CH2M, 2019).

Soil and groundwater in the surficial aquifer were investigated between July and September 2020 as part of the Basewide Site Inspection (SI). Groundwater samples from three locations contained perfluorooctanoic acid (PFOA) and perfluorooctane sulfonate (PFOS) above the Basewide SI screening levels (SLs). SLs for the Basewide SI were the regional screening levels (RSLs) current at the time of the report (CH2M, 2022a). The human health risk screening identified potential unacceptable risks associated with exposure to PFOA and PFOS in groundwater (CH2M, 2022a). Because the SI data confirmed a release of PFAS and potential unacceptable human health risks, an RI was recommended.

The nature and extent of and resulting risks to human and ecological receptors from PFAS within the surficial and upper Castle Hayne (UCH) aquifers, soils, and media associated with additional transport pathways, such as surface water and sediment, have not been fully investigated. The final SI was completed in January 2022, prior to the EPA updates to the RSLs in May 2022 and the subsequent update in May 2023. The Basewide SI data were rescreened against the May 2023 RSLs based on a HQ of 0.1 to develop the approach. The May 2023 RSLs based on a HQ of 0.1, are the RI project action limits (PALs).

The following are the objectives and approach of the RI:

- **Objective:** Delineate the nature and extent of PFAS in soil in excess of RI PALs and assess potential risks to human health and ecological receptors.
  **Approach:** Collect soil samples for analysis of 40 PFAS via 3rd Draft EPA Method 1633 (compliant with Department of Defense [DoD] Quality Systems Manual [QSM] Version 5.4 Table B-24 [DoD/DOE, 2021]), in accordance with the laboratory's Environmental Laboratory Accreditation Program letters. Results will be used to conduct a human health risk assessment (HHRA) and ecological risk assessment (ERA).

- **Objective:** Delineate the nature and extent of PFAS in groundwater in excess of RI PALs, evaluate vertical migration of PFAS from the surficial aquifer to the UCH aquifer, and assess potential risks to human health.
  **Approach:** Install additional surficial monitoring wells and UCH aquifer monitoring wells and collect groundwater samples (from both proposed and existing monitoring wells) for analysis of 40 PFAS via the 3rd Draft EPA Method 1633 (Compliant with DoD QSM Version 5.4 Table B-24 [DoD/DOE, 2021]), in accordance

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 6

with the laboratory's Environmental Laboratory Accreditation Program letters. Two rounds of groundwater samples will be collected to assess seasonal variability. Results will be used to conduct a HHRA and an ERA.

- **Objective:** Evaluate the presence of PFAS in secondary migration pathway media (surface water and sediment) and determine whether past site-related activities have resulted in impacts in excess of RI PALs and assess potential risks to human health and ecological receptors.

  **Approach:** Collect surface water and sediment samples for analysis of 40 PFAS via the 3rd Draft EPA Method 1633 [Compliant with DoD QSM Version 5.4 Table B-24 (DoD/DOE, 2021)], in accordance with the laboratory's Environmental Laboratory Accreditation Program letters. Two rounds of surface water and sediment samples will be collected to assess seasonal variability. Results will be used to conduct a HHRA and an ERA. Each sediment samples collected during each round will also be analyzed for total organic carbon (TOC) to support the ERA.

- **Objective:** Refine the understanding of the groundwater flow direction and hydraulic properties in the surficial and UCH aquifers and evaluate site-specific parameters that may impact fate and transport.

  **Approach:** Use an electrical conductivity/hydraulic profiling tool to evaluate site-specific lithology to determine whether potential confining units/fine-grained lenses are present and if identified, evaluate the depth and thickness of these units. Collect synoptic groundwater levels to develop potentiometric surfaces and estimate groundwater flow direction. Collect soil samples for additional fate and transport analysis (bulk density, total porosity, grain size, percent moisture, TOC, and ion exchange capacity), and measure pH using a field screening tool to support refinement of the conceptual site model and evaluation of PFAS fate and transport at the site.

The findings from the work presented in this SAP will be presented in an RI Report and will aid in determining the path forward for the site.

This SAP consists of 37 worksheets specific to the scope of work for this RI. Additional SLs are provided in **Appendix A**. Field standard operating procedures are included in **Appendix B**. Laboratory DoD Environmental Laboratory Accreditation Program Accreditation letters are included in **Appendix C**.

The laboratory information cited in this SAP is specific to Eurofins Lancaster Laboratories Environment Testing LLC in Lancaster, Pennsylvania, Eurofins Test America in Burlington, Vermont, and Eurofins Xenco in Houston, Texas. If Eurofins Laboratories Environment Testing LLC in Lancaster, Pennsylvania requires a backup laboratory, Eurofins Sacramento will be utilized. If additional laboratory services are requested requiring modification to the existing SAP, revised SAP worksheets will be submitted to the Navy for approval.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 7

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

# SAP Worksheets

**Executive Summary** ......................................................................................................................**5**

**Acronyms and Abbreviations** .......................................................................................................**9**

SAP Worksheet #1—Title and Approval Page ............................................................................. 1

SAP Worksheet #2—SAP Identifying Information ..................................................................... 15

SAP Worksheet #3—Distribution List ....................................................................................... 17

SAP Worksheet #4—Project Personnel Sign-Off Sheet ............................................................ 19

SAP Worksheet #5—Project Organizational Chart ................................................................... 21

SAP Worksheet #6—Communication Pathways ....................................................................... 23

SAP Worksheet #7—Personnel Responsibilities Table ............................................................. 29

SAP Worksheet #8—Special Personnel Training Requirements Table ...................................... 31

SAP Worksheet #9—Project Scoping Session Participants Sheet ............................................. 33

SAP Worksheet #10—Conceptual Site Model ........................................................................... 35

SAP Worksheet #11—Project Quality Objectives/Systematic Planning Process Statements ................................... 41

SAP Worksheet #12-1—Measurement Performance Criteria Table for Field QC Samples ...................................... 49

SAP Worksheet #12-2—Measurement Performance Criteria for Field QC Samples ................................................ 50

SAP Worksheet #12-3—Measurement Performance Criteria for Field QC Samples ................................................ 51

SAP Worksheet #12-4—Measurement Performance Criteria Table – Field QC Samples ......................................... 52

SAP Worksheet #13—Secondary Data Criteria and Limitations Table ..................................... 53

SAP Worksheet #14—Summary of Project Tasks ...................................................................... 55

SAP Worksheet #15-1—Reference Limits and Evaluation Table .............................................. 65

SAP Worksheet #15-2—Reference Limits and Evaluation Table .............................................. 68

SAP Worksheet #15-3—Reference Limits and Evaluation Table .............................................. 71

SAP Worksheet #15-4—Reference Limits and Evaluation Table .............................................. 74

SAP Worksheet #15-5—Reference Limits and Evaluation Table .............................................. 77

SAP Worksheet #16—Project Schedule / Timeline Table .......................................................... 79

SAP Worksheet #17—Sampling Design and Rationale .............................................................. 81

SAP Worksheet #18—Sampling Locations and Methods/SOP Requirements Table ................................................. 87

SAP Worksheet #19—Analytical SOP Requirements Table ....................................................... 95

SAP Worksheet #20 – Field Quality Control Sample Summary Table ........................................ 97

SAP Worksheet #21—Project Sampling SOP References Table ................................................. 99

SAP Worksheet #22—Field Equipment Calibration, Maintenance, Testing, and Inspection Table ......................... 103

SAP Worksheet #23—Labs Analytical SOP References Table .................................................. 105

SAP Worksheet #24—Analytical Instrument Calibration Table ............................................... 107

SAP Worksheet #25—Analytical Instrument and Equipment Maintenance, Testing, and Inspection Table ......... 113

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 8

SAP Worksheet #26—Sample Handling System ..................................................................................... 115

SAP Worksheet #27—Sample Custody Requirements Table ................................................................ 117

SAP Worksheet #28-1—Laboratory QC Samples Table ....................................................................... 119

SAP Worksheet #28-2—Laboratory QC Samples.................................................................................. 128

SAP Worksheet #29—Project Documents and Records Table ............................................................. 138

SAP Worksheet #30—Analytical Services Table ................................................................................... 141

SAP Worksheet #31—Planned Project Assessments Table.................................................................. 143

SAP Worksheet #32-1–Laboratory Corrective Action Form ................................................................ 147

SAP Worksheet #32-2–Field Performance Audit Checklist.................................................................. 149

SAP Worksheet #32-3–Safety Observation Report Form .................................................................... 151

SAP Worksheet #33–QA Management Reports Table .......................................................................... 153

SAP Worksheets #34-36—Data Verification and Validation (Steps I and IIa/IIb) Process Table ............................ 155

SAP Worksheet #37—Usability Assessment........................................................................................ 159

**References ...................................................................................................................................... 163**

**Appendixes**

A    Ecological Screening Values
B    Field Standard Operating Procedures – CH2M/Jacobs
C    Laboratory DoD ELAP Accreditation Letters

**Tables**

10-1    Site 113 Conceptual Site Model
10-2    PFAS SI Analytical Results in Soil
10-3    PFAS SI Analytical Results in Groundwater

11-1    Objectives, Environmental Questions, and Project Quality Objectives

14-1    New Monitoring Well Details
14-2    Existing Well Details

17-1    Sampling Design and Rationale for Site 113 Sampling

**Figures**

1    Base Location Map
2    Building TC701 Camp Geiger Fire Station (Station #6) SI Results
3    Proposed Sample Locations

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 9

# Acronyms and Abbreviations

| | |
|---|---|
| °C | degree(s) Celsius |
| μm | micrometer(s) |
| 3:3FTCA | 3-perfluoropropyl propanoic acid |
| 4:2FTS | 1h,1h, 2h, 2h-perfluorohexane sulfonic acid |
| 5:3FTCA | 2h,2h,3h,3h-perfluorooctanoic acid |
| 6:2FTS | 1h,1h, 2h, 2h-perfluorooctane sulfonic acid |
| 7:3FTCA | 3-perfluoroheptyl propanoic acid |
| 8:2FTS | 1h,1h, 2h, 2h-perfluorodecane sulfonic acid |
| 9Cl-PF3ONS | 9-chlorohexadecafluoro-3-oxanonane-1-sulfonic acid |
| 11Cl-PF3OUdS | 11-chloroeicosafluoro-3-oxaundecane-1-sulfonic acid |
| AEC | anion exchange capacity |
| ADONA | 4,8-dioxa-3H-perfluorononanoic acid |
| AFFF | aqueous film-forming foam |
| AM | Activity Manager |
| AQM | Activity Quality Manager |
| ASTM | ASTM International |
| bgs | below ground surface |
| CA | corrective action |
| CAS | Chemical Abstracts Service |
| CCV | continuing calibration verification |
| CEC | cation exchange capacity |
| CH2M | CH2M HILL, Inc. |
| CLEAN | Comprehensive Long-term Environmental Action—Navy |
| CSM | conceptual site model |
| DL | detection limit |
| DO | dissolved oxygen |
| DoD | Department of Defense |
| DQI | data quality indicator |
| DQO | data quality objective |
| DV | data validation |
| EB | equipment blank |
| EC | electrical conductivity |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 10

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| | |
|---|---|
| EDD | electronic data deliverable |
| EDS | Environmental Data Services |
| EIS | extracted internal standard |
| ELAP | Environmental Laboratory Accreditation Program |
| ELLE | Eurofins Lancaster Laboratories Environment Testing LLC |
| EMD | Environmental Management Division |
| EPA | Environmental Protection Agency |
| ERA | ecological risk assessment |
| ESV | ecological screening value |
| ETAB | Eurofins Test America, Burlington |
| EXH | Eurofins Xenco – Houston |
| FB | field blank |
| FCR | Field Change Request |
| FD | field duplicate |
| ft/day | foot (feet) per day |
| FTL | Field Team Leader |
| GIS | geographic information system |
| g | gram |
| GW | groundwater |
| H&S | health and safety |
| HDPE | high-density polyethylene |
| HFPO-DA | hexafluoropropylene oxide dimer acid |
| HHRA | human health risk assessment |
| HPT | hydraulic profiling tool |
| HQ | hazard quotient |
| HSM | Health and Safety Manager |
| HSP | Health and Safety Plan |
| ICAL | initial calibration |
| ICC | initial calibration confirmation |
| ICP | inductively coupled plasma |
| ICV | initial calibration verification |
| ID | identification |
| IDW | investigation-derived waste |
| IR | Installation Restoration |

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 11

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| ISC | instrument sensitivity check |
| LCL | lower control limit |
| LC-MS/MS | liquid chromatography tandem mass spectrometry |
| LCS | laboratory control sample |
| LIMS | Laboratory Information Management Systems |
| LOD | limit of detection |
| LOQ | limit of quantitation |
| MB | method blank |
| MCAS | Marine Corps Air Station |
| MCB | Marine Corps Base |
| meq/100g | milliequivalents per 100 grams |
| mL | milliliter(s) |
| MPC | Measurement Performance Criterion |
| MS | matrix spike |
| MSD | matrix spike duplicate |
| N/A | not applicable |
| NA | not available |
| NAVFAC | Naval Facilities Engineering Systems Command |
| Navy | Department of the Navy |
| NCDEQ | North Carolina Department of Environmental Quality |
| NEtFOSA | N-ethyl perfluorooctanesulfonamide |
| NEtFOSAA | N-ethyl perfluorooctanesulfonamidoacetic acid |
| NEtFOSE | N-ethyl perfluorooctanesulfonamidoethanol |
| NFDHA | nonafluoro-3,6-dioxaheptanoic acid |
| ng/g | nanogram(s) per gram |
| ng/L | nanogram(s) per liter |
| NIRIS | Naval Installation Restoration Information Solution |
| NIS | non-extracted internal standard |
| NMeFOSA | N-methyl perfluorooctanesulfonamide |
| NMeFOSAA | N-methyl perfluorooctanesulfonamidoacetic acid |
| NMeFOSE | N-methyl perfluorooctanesulfonamidoethanol |
| ORP | oxidation-reduction potential |
| PA | preliminary assessment |
| PAL | project action limit |

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 12

| | |
|---|---|
| PARCCS | Precision, Accuracy, Representativeness, Comparability, Completeness, and Sensitivity |
| PCT_P | percent passed |
| PDL | Project Delivery Lead |
| PFAS | per- and polyfluoroalkyl substances |
| PFBA | perfluorobutanoic acid |
| PFBS | perfluorobutanesulfonic acid |
| PFDA | perfluorodecanoic acid |
| PFDoA | perfluorododecanoic acid |
| PFDoS | perfluorododecanesulfonic acid |
| PFDS | perfluorodecanesulfonic acid |
| PFEESA | perfluoro(2-ethoxyethane)sulfonic acid |
| PFHpA | perfluoroheptanoic acid |
| PFHpS | perfluoroheptanesulfonic acid |
| PFHxA | perfluorohexanoic acid |
| PFHxS | perfluorohexanesulfonic acid |
| PFMBA | perfluoro-4-methoxybutanoic acid |
| PFMPA | perfluoro-3-methoxypropanoic acid |
| PFNA | perfluorononanoic acid |
| PFNS | perfluorononanesulfonic acid |
| PFOA | perfluorooctanoic acid |
| PFOS | perfluorooctane sulfonate |
| PFOSA | perfluorooctanesulfonamide |
| PFPeA | perfluoropentanoic acid |
| PFPeS | perfluoropentansulfonic acid |
| PFTeDA | perfluorotetradecanoic acid |
| PFTrDA | perfluorotridecanoic acid |
| PFUnA | perfluoroundecanoic acid |
| PID | photoionization detector |
| PM | Project Manager |
| POC | point of contact |
| ppm | part(s) per million |
| PQO | project quality objective |
| PVC | polyvinyl chloride |
| QA | quality assurance |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 13

| | |
|---|---|
| QAO | Quality Assurance Officer |
| QAPP | Quality Assurance Project Plan |
| QC | quality control |
| QSM | Quality Systems Manual |
| RI | Remedial Investigation |
| RPD | relative percent difference |
| RPM | Remedial Project Manager |
| RSL | regional screening level |
| RT | retention time |
| S/N | signal-to-noise ratio |
| SAP | Sampling and Analysis Plan |
| SB | subsurface soil |
| SD | sediment |
| SI | Site Inspection |
| SL | screening level |
| SOP | standard operating procedure |
| SPE | solid phase extraction |
| SS | surface soil |
| SSL | Site Safety Liaison |
| STC | Senior Technical Consultant |
| SW | surface water |
| TBD | to be determined |
| TOC | total organic carbon |
| UCH | Upper Castle Hayne |
| UCL | upper control limit |
| USCS | Unified Soil Classification System |
| VOC | volatile organic compound |
| WQP | water quality parameter |
| WWTP | wastewater treatment plant |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 14

This page intentionally left blank.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 15

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## SAP Worksheet #2—SAP Identifying Information

*(Uniform Federal Policy [UFP] Quality Assurance Project Plan [QAPP] Manual Section 2.2.4)*

**Site Name/Number:**   Site 113, Building TC701 Camp Geiger Fire Station (Station #6), Marine Corps Base (MCB) Camp Lejeune and Marine Corps Air Station (MCAS) New River

**Operable Unit:**   Operable Unit 36

**Contractor Name:**   CH2M HILL, Inc. (CH2M)

**Contract Number:**   N62470-21-D-0007

**Contract Title:**   Comprehensive Long-term Environmental Action—Navy (CLEAN) 0007 Program

**Work Assignment Number (optional):**   Contract Task Order N4008522F5824

1. **This Remedial Investigation (RI) Sampling and Analysis Plan (SAP) was prepared in accordance with the requirements of the following:**

   – *Guidance for Quality Assurance Project Plans* (EPA, 2002)

   – *Uniform Federal Policy for Quality Assurance Project Plans* (EPA, 2005)

   – *Guidance on Systematic Planning Using the Data Quality Objectives Process* (EPA, 2006)

   – *Interim Per-and Polyfluoroalkyl Substances (PFAS) Site Guidance for Naval Facilities Engineering Systems Command (NAVFAC) Remedial Project Managers (RPMs)/November 2020 Update* (Navy, 2020)

   – *Memorandum for Investigating PFAS within the Department of Defense Cleanup Program* (DoD, 2022b)

2. **Identify regulatory program:**

   – Comprehensive Environmental Response, Compensation, and Liability Act, as amended by Superfund Amendments and Reauthorization Act

3. **This document is a project-specific SAP.**

4. **List dates of scoping sessions that were held:**

| Scoping Session | Date |
| --- | --- |
| MCB Camp Lejeune Partnering Meeting | June 28, 2022 |

5. **List dates and titles of any SAP documents written for previous site work that are relevant to the current investigation.**

| Title | Date |
| --- | --- |
| SAP for Basewide Per- and Polyfluoroalkyl Substances Site Inspection (CH2M, 2020) | May 2020 |

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 16

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

### SAP Worksheet #2—SAP Identifying Information (continued)

6.  **List organizational partners (stakeholders) and connection with lead organization:**

    – Marine Corps Installations East – MCB Camp Lejeune (MCB Camp Lejeune) – Base stakeholder
    – U.S Environmental Protection Agency (EPA) Region 4 – Regulatory Stakeholder
    – North Carolina Department of Environmental Quality (NCDEQ) – Regulatory Stakeholder

7.  **Lead organization:**

    – Department of the Navy (Navy) – NAVFAC Mid-Atlantic

8.  **If any required SAP elements or required information are not applicable (N/A) to the project or are provided elsewhere, then note the omitted SAP elements and provide an explanation for their exclusion as follows:**

    – No worksheets are excluded from this SAP.

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 17

## SAP Worksheet #3—Distribution List

| Name of SAP Recipients | Title/Role | Organization | Telephone Number | Email Address or Mailing Address |
|---|---|---|---|---|
| Ben Francisco | Remedial Project Manager (RPM) | NAVFAC Mid-Atlantic | (757) 341-0329 | benjamin.h.francisco.civ@us.navy.mil |
| Thomas Richard | Installation Restoration (IR) Program Manager | MCB Camp Lejeune – Environmental Management Division (EMD) | (910) 451-9641 | thomas.richard@usmc.mil |
| Laura Spung | IR Program Support Engineer | MCB Camp Lejeune – EMD | (910) 451-9610 | laura.spung@usmc.mil |
| Jennifer Tufts | RPM | EPA Region 4 | (404) 562-8513 | tufts.jennifer@epa.gov |
| Angela Moore | RPM | NCDEQ | (919) 707-8368 | angela.moore@deq.nc.gov |
| Matt Louth | Activity Manager (AM) | CH2M | (757) 286-7629 | matt.louth@jacobs.com |
| Kim Henderson | Deputy AM | CH2M | (757) 513-6632 | kimberly.henderson@jacobs.com |
| Jessica Skeean | Project Delivery Lead (PDL)/Activity Quality Manager(AQM)/SAP Reviewer | CH2M | (704) 544-4040 | jessica.skeean@jacobs.com |
| Maggie Radford | Senior Technical Consultant (STC) | CH2M | (919) 749-9479 | maggie.radford@jacobs.com |
| Daniel Hockett | Project Manager (PM) | CH2M | (704) 516-2665 | daniel.hockett@jacobs.com |
| Mike Zamboni | Program Chemist/SAP Reviewer | CH2M | (703) 376-5301 | michael.zamboni@jacobs.com |
| Sonya Gordon | Project Chemist | CH2M | (615) 828-0406 | sonya.gordon@jacobs.com |
| Elizabeth Martin | Eurofins Laboratories PM | Eurofins Lancaster Laboratories Environmental Testing LLC (ELLE), Eurofins Test America – Burlington (ETAB) Eurofins Xenco – Houston (EXH) | (717) 205-3949 | Elizabeth.Martin@et.eurofinsus.com |
| Doug Weaver | Data Validator | Environmental Data Services (EDS) | (757) 564-0090 | dweaver@env-data.com |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 18

This page intentionally left blank.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 19

## SAP Worksheet #4—Project Personnel Sign-Off Sheet

| Name | Organization/Title/Role | Telephone Number | Signature/Email receipt | SAP Section Reviewed | Date SAP Read |
|---|---|---|---|---|---|
| Matt Louth | CH2M/AM | (757) 286-7629 | | | |
| Kim Henderson | CH2M/Deputy AM | (757) 513-6632 | | | |
| Maggie Radford | CH2M/STC | (919) 749-9479 | | | |
| Daniel Hockett | CH2M/PM | (704) 516-2665 | | | |
| Mike Zamboni | CH2M/Navy Program Chemist | (703) 376-5301 | | | |
| Sonya Gordon | CH2M/Project Chemist | (615) 828-0406 | | | |
| Elizabeth Martin | ELLE, ETAB, EXH/Eurofins Laboratories PM | (717) 205-3949 | | | |
| Doug Weaver | EDS /Data Validator | (757) 564-0090 | | | |

Any signed version of **Worksheet #4** will be kept on file at CH2M along with other project documents.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 20

This page intentionally left blank.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 21

## SAP Worksheet #5—Project Organizational Chart



-  -  -  -  -  -  -  -  -    Lines of Communication

_____    Lines of Authority

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 22

This page intentionally left blank.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 23

## SAP Worksheet #6—Communication Pathways

| Communication Drivers | Responsible Affiliation | Name | Phone Number and/or Email | Procedure, Pathway, and so forth. |
|---|---|---|---|---|
| Communication with NAVFAC (lead agency) | NAVFAC RPM | Ben Francisco | benjamin.h.francisco.civ@us.navy.mil (757) 341-0329 | Primary point of contact (POC) for NAVFAC; can delegate communication to other internal or external POCs. NAVFAC RPM will notify EPA and NCDEQ by email or telephone call for field changes affecting the scope or implementation. Data will be presented and discussed during partnering meetings. |
| Communication with MCB Camp Lejeune | MCB Camp Lejeune EMD | Thomas Richard | thomas.richard@usmc.mil (910) 451-9641 | Primary POC for MCB Camp Lejeune; can delegate communication to other internal or external POCs. EMD will notify NAVFAC RPM, EPA, and NCDEQ by email or telephone call for field changes affecting the scope or implementation. Data will be presented and discussed during partnering meetings. |
| Communication with EPA Region 4 | EPA Region 4 RPM | Jennifer Tufts | tufts.jennifer@epa.gov (404) 562-8513 | Primary POC for EPA; can delegate communication to other internal or external POCs. Upon notification of field changes, EPA will approve or comment on the field changes by email. Data results will be presented and discussed during partnering meetings. |
| Communication with NCDEQ | NCDEQ RPM | Angela Moore | angela.moore@deq.nc.gov (919) 707-8368 | Primary POC for NCDEQ; can delegate communication to other internal or external POCs. Upon notification of field changes, NCDEQ will approve or comment on the field changes by email. Data results will be presented and discussed during partnering meetings. |
| Quality Assurance (QA)/Quality control (QC) input | NAVFAC Chemist/ QAO | Dana Stonelake | dana.m.stonelake.civ@us.navy.mil (757) 322-4942 | Provides review comments to NAVFAC contractor on Pre-draft SAP via the Naval Installation Restoration Information Solution (NIRIS) submittal. Provides overall NAVFAC guidance via direct communication with NAVFAC contractor chemist, as warranted. |

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 24

## SAP Worksheet #6—Communication Pathways (continued)

| Communication Drivers | Responsible Affiliation | Name | Phone Number and/or Email | Procedure, Pathway, and so forth. |
|---|---|---|---|---|
| Communication regarding overall project status and implementation and primary POC with NAVFAC RPM, EPA, and NCDEQ | CH2M AM | Matt Louth | matt.louth@jacobs.com (757) 286-7629 | Oversees project and will be informed of project status by the PM. If field changes occur, AM will work with the NAVFAC RPM to communicate in-field changes to the team by email. All data results will be communicated to the project team during the first partnering meeting following data receipt. |
| | CH2M Deputy AM | Kim Henderson | kimberly.henderson@jacobs.com (757) 513-6632 | |
| Communication with CLEAN program | CH2M Deputy Program Manager | Doug Dronfield | doug.dronfield@jacobs.com (703) 376-5090 | Oversees the CLEAN program for CH2M. Will be notified by email if field changes occur that require program support. |
| Quality issues during project implementation and data interpretation | CH2M AQM | Jessica Skeean | jessica.skeean@jacobs.com (704) 544-4040 | Contact the AQM regarding quality issues during project implementation by email or telephone call. The AQM will report to the AM. |
| Technical communications for project implementation and data interpretation | CH2M STC | Maggie Radford | maggie.radford@jacobs.com (919) 749-9479 | Contact STC by email or telephone call regarding questions/issues encountered in the field, input on data interpretation, as needed. STC will review the data as necessary prior to Partnering Team discussion and reporting review. |
| Communication for project delivery | CH2M PDL | Jessica Skeean | jessica.skeean@jacobs.com (704) 544-4040 | Contact PDL by email or telephone call as needed regarding questions/issues encountered in delivering the work. |
| Communications regarding the SAP | CH2M SAP Reviewer | Jessica Skeean | jessica.skeean@jacobs.com (704) 544-4040 | Changes/revisions to the SAP will be communicated by email and reviewed by the SAP reviewer, as soon as possible, as necessary. |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 25

## SAP Worksheet #6—Communication Pathways (continued)

| Communication Drivers | Responsible Affiliation | Name | Phone Number and/or Email | Procedure, Pathway, and so forth. |
|---|---|---|---|---|
| Communications regarding project management and implementation | CH2M PM | Daniel Hockett | daniel.hockett@jacobs.com (704) 516-2665 | All information and materials about the project will be forwarded to the NAVFAC RPM, as necessary. POC for task manager, senior consultants, and sampling team. |
| Health and Safety (H&S) | CH2M Health and Safety Manager (HSM) | Carl Woods | carl.woods@jacobs.com (513) 319-5771 | Responsible for generation of the Health and Safety Plan (HSP) and approval of the activity hazard analyses prior to the start of fieldwork. The PM will contact the HSM by telephone call or email as needed regarding questions/issues encountered in the field. |
| H&S | CH2M Site Safety Liaison | TBD | TBD | Responsible for the adherence of team members to the site safety requirements described in the HSP. Will report H&S incidents and near losses to PM as soon as possible by telephone call with follow-up email. |
| QAPP field changes/ field progress reports | CH2M Field Team Leader | TBD | TBD | Documents field activities and work plan deviations (made with the approval of PM) in field logbooks; provide daily progress reports to PM by telephone call or email. |
| Stop Work Order | CH2M AM | Matt Louth | matt.louth@jacobs.com (757) 286-7629 | Any field member can immediately stop work if an unsafe condition that is immediately threatening to human health is observed. The field staff, FTL, or SSL should notify the CH2M PM and AM immediately by telephone call, along with the NAVFAC RPM. Ultimately, the FTL, PM, and AM can stop work for a period of time. NAVFAC Mid-Atlantic can stop work at any time. |
| | CH2M PM | Daniel Hockett | daniel.hockett@jacobs.com (704) 516-2665 | |
| | CH2M FTL/SSL | TBD | TBD | |
| | Field Team Members | TBD | TBD | |
| SAP changes in field | CH2M FTL | TBD | TBD | Documentation of deviations from the work plan will be made in the field logbook, and the PM will be notified immediately by telephone call with follow-up email. Deviations will be made only with approval from the PM. |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 26

## SAP Worksheet #6—Communication Pathways (continued)

| Communication Drivers | Responsible Affiliation | Name | Phone Number and/or Email | Procedure, Pathway, and so forth. |
|---|---|---|---|---|
| Presentation of data | CH2M Geographic Information System (GIS) | Allison Mitchum | allison.mitchum@jacobs.com (757) 671-6303 | Provides support as needed for field activities and evaluation of data by generating figures using GIS. |
| Reporting laboratory quality issues | ELLE, ETAB, EXH/ Laboratories PM | Elizabeth Martin | Elizabeth.Martin@et.eurofinsus.com (717) 205-3949 | Laboratory will report QA/QC issues with project field samples within 2 days to the Project Chemist. |
| Analytical corrective actions (CAs) | CH2M Program Chemist/SAP Reviewer | Mike Zamboni | michael.zamboni@jacobs.com (703) 376-5301 | CAs for analytical issues will be determined by the Project Chemist and reported to the PM. If serious laboratory issues are discovered, the NAVFAC RPM and QAO will be notified. |
| Communications regarding SAP changes | CH2M Program Chemist | Mike Zamboni | michael.zamboni@jacobs.com (703) 376-5301 | Changes to the project that would prompt a SAP change that would require NAVFAC QAO approval include: the addition of an analytical suite not previously included in the SAP, the addition of an environmental matrix not previously included in the SAP, laboratory accreditation to a new Department of Defense (DoD) Quality Systems Manual (QSM) version, inclusion of a new laboratory in the SAP, or updates to the conceptual site model (CSM) that prompt new data quality objectives (DQOs). Updated laboratory limit of quantitation (LOQ), limit of detection (LOD), and detection limit (DL) values will not prompt a SAP update for NAVFAC QAO approval unless those updates negatively impact the ability to meet project action levels. <br><br> Notifies the NAVFAC QAO of any laboratory issues that would prevent the project from meeting project quality objectives (PQOs) or would cause significant delays in the project schedule. |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 27

## SAP Worksheet #6—Communication Pathways (continued)

| Communication Drivers | Responsible Affiliation | Name | Phone Number and/or Email | Procedure, Pathway, and so forth. |
|---|---|---|---|---|
| Data tracking from field collection to database upload, including sample receipt variances. Release of analytical data, including data validation corrective actions | CH2M Project Chemist | Sonya Gordon | sonya.gordon@jacobs.com (615) 828-0406 | Tracks data from sample collection through database upload daily and communicates variances to PM by email or telephone call. No analytical data can be released until validation of the data is completed and has been approved by the Project Chemist. The Project Chemist will review analytical results for release to the project team and will notify the project team if there are any laboratory issues that would prevent the project from meeting PQOs or would cause significant delay in project schedule. |
| Reporting data quality issues | EDS/Data Validator | Doug Weaver | dweaver@env-data.com (757) 564-0090 | The data validator reviews and qualifies analytical data, as necessary. The data along with a validation narrative are returned to the Project Chemist within 14 calendar days. |
| Field CAs | CH2M FTL | TBD | TBD | Field issues requiring CA will be determined by the FTL and/or PM on an as-needed basis; the PM will ensure QAPP requirements are met by field staff for the duration of the project. The FTL will notify the PM via phone of any need for CA. The PM/AM may notify the NAVFAC RPM of any field issues that would negatively affect schedule or the ability to meet project DQOs. |
| | CH2M PM | Daniel Hockett | daniel.hockett@jacobs.com (704) 516-2665 | |
| Changes in the field | Utility Locator Driller EC/HPT Surveyor IDW Transportation and Disposal Provider | TBD | TBD | Documentation of deviations from planned field procedures during project work will be discussed with PM prior to implementation. Deviations will only be made with approval from the PM. |

Notes:

Stop Work Order: Any field member can immediately stop work if an unsafe condition that is immediately threatening to human health is observed. Ultimately, the FTL, PM, and AM can stop work for a period. NAVFAC Mid-Atlantic can stop work at any time.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 28

This page intentionally left blank.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 29

## SAP Worksheet #7—Personnel Responsibilities Table

| Name | Title/Role | Organizational Affiliation | Responsibilities |
|---|---|---|---|
| Ben Francisco | RPM | NAVFAC Mid-Atlantic | Oversees project. |
| Thomas Richard | IR Program Manager | MCB Camp Lejeune | Oversees project. |
| Dana Stonelake | Chemist/QAO | NAVFAC Atlantic | NAVFAC Review of SAP and QA input. |
| Jennifer Tufts | RPM | EPA Region 4 | EPA POC. |
| Angela Moore | RPM | NCDEQ | NCDEQ POC. |
| Matt Louth | AM | CH2M | Oversees project activities. |
| Kim Henderson | Deputy AM | CH2M | Oversees project activities. |
| Doug Dronfield | Deputy Program Manager | CH2M | Oversees program. |
| Daniel Hockett | PM | CH2M | Manages project. |
| Jessica Skeean | PDL/AQM/SAP Reviewer | CH2M | Provides support for project delivery. Provides QA oversight. Reviews and approves changes or revisions to the SAP. |
| Maggie Radford | STC | CH2M | Provides senior technical support for project approach and execution. |
| Carl Woods | HSM | CH2M | Prepares HSP and manages H&S for all field activities. |
| Mike Zamboni | Program Chemist | CH2M | Provides SAP project delivery support, reviews and approves SAPs, and performs final data evaluation and QA oversight. |
| Sonya Gordon | Project Chemist | CH2M | Data management: Performs data evaluation and QA oversight, is the POC with laboratory and validator for analytical issues. |
| Allison Mitchum | GIS | CH2M | Manages the generation of maps and figures using GIS. |
| TBD | FTL | CH2M | Coordinates all field activities and sampling. |
| TBD | Field Quality Manager | CH2M | Oversees field activities and provides QA oversight for field activities. |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 30

## SAP Worksheet #7—Personnel Responsibilities Table (continued)

| Name | Title/Role | Organizational Affiliation | Responsibilities |
|---|---|---|---|
| TBD | Field Staff | CH2M | Conducts field activities. |
| Elizabeth Martin | Eurofins Laboratories PM | ELLE, ETAB, EXH | Manages sample tracking and maintains good communication with Project Chemist. |
| Doug Weaver | Data Validator | EDS | Validate laboratory data from an analytical standpoint prior to data use. |
| TBD | Utility Locator | TBD | Locate underground utilities before intrusive work begins. |
| TBD | Driller | TBD | Installs monitoring wells. |
| TBD | EC/HPT | TBD | Evaluate lithology. |
| TBD | Surveyor | TBD | Collects data positions of environmental sample locations. |
| TBD | IDW Transportation and Disposal Provider | TBD | Responsible for manifesting, transporting, and disposing of IDW generated during field activities. |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 31

SAP Worksheet #8—Special Personnel Training Requirements Table

| Project Function | Specialized Training by Title or Description of Course | Training Provider | Training Date | Personnel / Groups Receiving Training | Personnel Titles / Organizational Affiliation | Location of Training Records / Certificates |
|---|---|---|---|---|---|---|
| There are no special personnel training requirements for this work. | | | | | | |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 32

This page intentionally left blank.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 33

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## SAP Worksheet #9—Project Scoping Session Participants Sheet

| | |
|---|---|
| **Project Name:** Site 113 - Building TC701 Camp Geiger Fire Station (Station #6) PFAS RI | **Site Name**: Site 113 - Building TC701 Camp Geiger Fire Station (Station #6) |
| **Projected Date(s) of Sampling:** 11/2023 – 8/2024 | **Site Location:** MCB Camp Lejeune and MCAS New River, North Carolina |
| **PM:** Daniel Hockett | |

**Date of Session:** June 28, 2022

**Scoping Session Purpose:** To obtain Team agreement on the objectives and approach for the RI at Site 113.

| Name | Title/Project Role | Affiliation | Phone # | Email Address |
|---|---|---|---|---|
| David Cleland[a] | RPM | NAVFAC Mid-Atlantic | (757) 341-0329 | david.t.cleland@navy.mil |
| Lindsey Mills | Environmental Engineer | NAVFAC Mid-Atlantic | (757) 341-0484 | lindsey.e.mills@navy.mil |
| Thomas Richard | IR Program Manager | MCB Camp Lejeune—EMD | (910) 451-9641 | thomas.richard@usmc.mil |
| Laura Spung | IR Program Support Engineer | MCB Camp Lejeune—EMD | (910) 451-9610 | laura.spung@usmc.mil |
| Jennifer Tufts | RPM | EPA Region 4 | (404) 562-8513 | tufts.jennifer@epa.gov |
| Randy McElveen | RPM | NCDEQ | (919) 707-8341 | randy.mcelveen@ncdenr.gov |
| Beth Hartzell | RPM | NCDEQ | (919) 707-8335 | beth.hartzell@ncdenr.gov |
| Angela Moore | RPM | NCDEQ | (919) 707-8368 | angela.moore@deq.nc.gov |
| Matt Louth | AM | CH2M | (757) 286-7629 | matt.louth@jacobs.com |
| Monica Fulkerson | IR Lead | CH2M | (704) 544-5177 | monica.fulkerson@jacobs.com |
| Kim Henderson | Deputy AM | CH2M | (757) 513-6632 | kimberly.henderson@jacobs.com |
| Maggie Radford | STC | CH2M | (425) 233-3328 | maggie.radford@jacobs.com |

[a] David Cleland was RPM at the time of scoping; Ben Francisco has since taken over as RPM.

**Comments:**

The Team reviewed and discussed the Site 113 background, Site Inspection (SI) results, data needs, and objectives and approach for the PFAS RI. The RI objectives and approach were discussed as follows:

**Objectives**

- Delineate nature and extent of PFAS in the soil, surficial aquifer groundwater, and upper Castle Hayne (UCH) aquifer groundwater in excess of PFAS RI project action limits (PALs).

- Refine the understanding of the groundwater flow direction and hydraulic properties and potential PFAS migration pathways.

- Evaluate PFAS impacts to secondary migration pathways (for example, surface water and sediment).

- Evaluate potential risks to human health and ecological receptors.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 34

## SAP Worksheet #9 – Project Scoping Session Participants Sheet (continued)

**Approach**

- Use an EC/HPT to evaluate site-specific lithology.

- Install monitoring wells in the surficial and UCH aquifers.

- Collect soil, groundwater, surface water, and sediment samples. Analyze samples for 40 compounds referenced in the 3rd Draft EPA Method 1633 (Compliant with DoD QSM Version 5.4 Table B-24 [DoD/DOE, 2021]).

- Collect soil samples for additional fate and transport analysis (bulk density, total porosity, grain size, percent moisture, total organic carbon, and ion exchange capacity), and measure pH using a field screening tool.

- Collect synoptic groundwater levels from new and existing surficial and UCH monitoring wells.

- Conduct human health and ecological risk assessments.

**Consensus:**

The Team agreed to the objectives and general approach for the Site 113 PFAS RI SAP. The schedule was reviewed and Team consensus was obtained for the SAP.

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 35

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## SAP Worksheet #10—Conceptual Site Model

The site location is shown on **Figure 1**. The CSM for Site 113, Building TC701 Camp Geiger Fire Station (Station #6), is presented in **Table 10-1**.

Table 10-1. Site 113 Conceptual Site Model

| | |
|---|---|
| **Site Name** | Site 113 – Building TC701 Camp Geiger Fire Station (Station #6) |
| **Site Location** | Located at Camp Geiger on the southwestern corner of Seventh Street and A Street. Site 113 is within 1 mile of the Base Boundary towards the east, west, and north (**Figure 1**). |
| **Site Description and Operational History** | Site 113 is an active fire station built in 1956 and has been used as a fire station since its construction. |
| **Land Use** | The current and historical land use includes the fire station (Building TC701) and storage building G700A. Barracks and military training areas are located east of Site 113. |
| **Investigation History** | Site 113 was identified in the Basewide PFAS PA and recommended for an SI because a release may have occurred due to the presence of aqueous film-forming foam (AFFF)-containing fire engines, documented storage of AFFF, and likely transfer of AFFF from containers into the fire engines (CH2M, 2019).<br><br>The SI fieldwork was conducted between July and September 2020. Two surface soil samples (0-1 feet below ground surface [bgs]), 2 subsurface soil samples (ranging from 9-10 to 11-12 feet bgs), and 3 surficial aquifer groundwater samples from permanent monitoring wells with screened intervals ranging from 12-22 feet bgs to 15-25 feet bgs were collected for analysis of PFAS (method liquid chromatography tandem mass spectrometry [LC-MS/MS] compliant with QSM 5.3 Table B-15) (CH2M, 2022a). Surface soil concentrations did not exceed the SI screening levels (SLs), though perfluorononanoic acid (PFNA) was detected at both sampled locations, BW-TC701-MW01 and BW-TC701-MW02. PFAS with an SI SL were not detected in the subsurface soil sample collected from BW-TC701-MW01, although one PFAS (perfluoroheptanoic acid) was detected. There were no PFAS detections in the subsurface soil sample collected from BW-TC701-MW02. Groundwater concentrations exceeded the SI SLs for perfluorooctanoic acid (PFOA) and perfluorooctane sulfonate (PFOS) at the three sampling locations. The highest PFAS concentrations in groundwater were from the sample collected from BW-TC701-MW02, with PFOA at 2,116.03 nanograms per liter (ng/L) and PFOS at 4,594.20 ng/L.<br><br>The SI human health risk screening (using SI SLs) identified potential unacceptable risks associated with exposure to PFOA and PFOS in groundwater. Because the SI data confirmed a release of PFAS based on the PFOA and PFOS exceedances of SI SLs and potential unacceptable human health risks, an RI was recommended.<br><br>The SI was finalized in January 2022, prior to the EPA updates to the regional screening levels (RSLs) in May 2022 and subsequent update in May 2023. The Basewide SI data were rescreened against the May 2023 RSLs to develop the approach for the RI. The Basewide SI soil and groundwater sample data screened against the May 2023 RSLs, based on a hazard quotient (HQ) = 0.1, are provided in **Figure 2** and **Tables 10-2** and **10-3,** respectively. There were no exceedances of the RSLs in soil. Groundwater concentrations of PFOA, PFOS, perfluorohexanoic acid (PFHxA), perfluorohexanesulfonic acid (PFHxS), and PFNA exceeded the May 2023 RSLs. |
| **Surface Features, Topography, and Hydrology** | Site 113 contains buildings, paved areas, and maintained grassy areas. Approximately 290 acres of woodlands is west of Site 113, across Church Street. The ground surface elevation ranges from approximately 16 to 20 feet (**Figure 2**).<br><br>Drainage features along Church Street and A Street and south of Building TC701 drain to the south and west, under Church Street, and into the wetlands west of Church Street. The drainage feature parallel to Church Street passes through maintained lawn vegetation along the east side of the feature and against timber and concrete retaining walls on the west side of the feature to prevent erosion of Church Street. The southern drainage feature drains from a culvert under A Street to a culvert under Church Street. The southern drainage feature contains flowing surface water and wetland vegetation such as cattails. Storm water retention ponds are located on the opposite side of this southern drainage feature and contain cattails and lily pads; however, these ponds have been observed with no standing water present while the southern drainage feature did contain flowing water. Stormwater runoff from Site 113 is intercepted by the southern drainage feature before reaching the retention ponds. |

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 36

## SAP Worksheet #10—Conceptual Site Model (continued)

Table 10-1. Site 113 Conceptual Site Model

| | |
|---|---|
| **Geology and Hydrogeology** | Comprehensive environmental investigations have been conducted at Installation Restoration Sites 35 and 89 located approximately 2,000 feet east and 2,500 feet southeast, respectively, from Site 113. Based on these investigations, the uppermost undifferentiated formation at Site 113 consists of loose to medium dense sands with a lesser amount of silt and clay and is present at depths to approximately 30 ft bgs. Thin discontinuous lenses of silt and clay are found within the undifferentiated formation, likely remnants of the Belgrade Formation which is associated with the UCH confining unit. Underlying the undifferentiated formation and the UCH confining unit (if present at Site 113), the Castle Hayne Formation is composed of sands, silt, shell fragments, and trace amounts of clay. With increasing depth, fine to medium sands predominate with only trace amounts of shells and silt to approximately 90 feet bgs.

Site-specific lithology based on the Site 113 SI investigation indicates surface soils are fine to medium grained sands extending to 10 to 20 feet bgs overlying either a silt with shells or a fossiliferous cemented sand (CH2M, 2022a).

The hydrogeologic setting is assumed to be that of a two-aquifer system—the surficial aquifer and the Castle Hayne aquifer, with the two aquifers potentially separated by the UCH confining unit. In the Camp Geiger area, the Castle Hayne confining unit appears to be laterally discontinuous and only provides semi-confining conditions to the Castle Hayne aquifer. The Castle Hayne aquifer has been informally subdivided into the UCH and the lower Castle Hayne (LCH), which are potentially separated by the LCH confining unit. The UCH and LCH are expected to be hydraulically connected.

Site-specific hydrogeology based on the SI investigation of the surficial aquifer indicates the water table is present at approximately 2 to 4 ft bgs. Based on groundwater level measurements collected on November 30, 2020, the surficial groundwater flow direction near Site 113 is generally to the southeast (**Figure 2**) (CH2M, 2022a). |
| **Chemicals of Potential Concern** | 40 PFAS referenced in the 3rd Draft EPA Method 1633 (listed in **Worksheet #15**) |
| **Nature and Extent** | The SI analytical results screened against the May 2023 RSLs are included in **Figure 2** and in **Tables 10-2** and **10-3**. Perfluorobutanoic acid (PFBA) was not analyzed in groundwater or soil samples as part of the Basewide SI.

**Soil**

There were no PFAS analyte exceedances in surface and subsurface soil samples collected during the SI field activities. However, the samples were limited to 2 monitoring well locations. There is the potential for the release(s) to have occurred in areas at the site where soil samples were not collected during the SI.

**Groundwater**

PFOA, PFOS, and PFHxS concentrations exceed in the surficial aquifer at all three monitoring well locations sampled during the SI (**Figure 2**). PFHxA concentrations exceed at two monitoring wells (BW-TC701-MW01 and BW-TC701-MW03) and PFNA concentrations exceed at BW-TC701-MW01 and BW-TC701-MW02. There are no exceedances of perfluorobutanesulfonic acid (PFBS), and hexafluoropropylene oxide dimer acid (HFPO-DA) was not detected in the surficial aquifer.

The horizontal and vertical extent of PFAS in soil and groundwater are not fully defined and secondary migration pathways (surface water and sediment) have not been evaluated. Further, there is limited information available on the deeper lithology and the Castle Hayne confining unit across Site 113. |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 37

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## SAP Worksheet #10—Conceptual Site Model (continued)

Table 10-1. Site 113 Conceptual Site Model

| | |
|---|---|
| **Migration Pathways** | PFAS have been released to the environment at Site 113. PFAS are a large family of compounds with varying properties. Research into defining the properties of individual PFAS and the impact on their migration in the environment is ongoing. Some PFAS, such as PFOA, PFOS, and PFBS are not known to degrade under typical environmental conditions (ITRC, 2022); because of this, they persist in the environment. PFAS present in unsaturated soils are subject to downward leaching during precipitation or irrigation events (ITRC, 2022). In general, PFAS are mobile in groundwater but also tend to associate with the organic carbon fraction of soil or sediment (ITRC, 2022). Many PFAS exhibit surfactant properties and preferentially accumulate at interfaces such as the air-water interface, which may contribute to enhanced retention of PFAS in the vadose zone and capillary fringe where unsaturated conditions provide significant air-water interfacial area (ITRC, 2022). Potential PFAS migration pathways to be evaluated in this RI include the following:<br><br>• Direct release of PFAS to surface soil<br>• Soil transport via soil erosion, construction, or other ground-disturbing activities<br>• Leaching of PFAS from surface soil to subsurface soil and/or surficial aquifer groundwater<br>• Transport via advection in groundwater<br>• Overland flow of media containing PFAS to downslope sediment and surface water<br>• Transport to surface water via groundwater discharge<br>• Leaching of PFAS from sediment to surface water<br>• Adsorption to sediment from surface water or groundwater discharge<br>• Transport via vertical migration from the surficial aquifer into the Castle Hayne aquifer<br><br>Locally and during high water table occurrences (such as during precipitation events associated with tropical weather patterns), groundwater could discharge into the surrounding drainage features. Across the Camp Geiger geographic setting, Brinson Creek is located approximately 4,500 feet to the east of Site 113. Brinson Creek is a groundwater discharge feature for the broader Camp Geiger area (CH2M, 2022b and Baker, 1998). Surficial groundwater from Building TC701 is unlikely to migrate off-Base since it is intercepted by Brinson Creek and/or the New River and significant underflow is not anticipated due to the size of these surface water features and documented interactions between groundwater and surface water. |
| **Human Health Receptors and Exposure Scenarios** | **Soil**<br><br>Workers (including current military personnel), visitors, trespassers, and residents near the PFAS releases could potentially be exposed to PFAS in soil through incidental ingestion of and dermal contact with surface and subsurface soil. Construction or other ground-disturbing activities, including landscaping, could result in potential exposure to soil.<br><br>**Groundwater**<br><br>Groundwater within the surficial aquifer is not used as a drinking water source; however, it is within the potential depth of construction activities (groundwater is within about 2 to 4 feet of ground surface). Construction workers could be exposed to PFAS in groundwater through dermal contact during excavation activities.<br><br>The surficial aquifer, sampled for PFAS during the SI, is potentially hydraulically connected to the deeper Castle Hayne aquifer. Groundwater within the Castle Hayne aquifer is the primary drinking water source on-Base and off-Base in the surrounding area. If PFAS migrates into the Castle Hayne aquifer near an existing or future water supply well, current and/or future workers and residents could be exposed to PFAS in groundwater through ingestion and dermal contact. There are three active off-base public drinking water supply wells screened within the Castle Hayne aquifer within 1-mile of Site 113. Two of the off-Base public drinking water supply wells are located to the northwest, upgradient of the site based on the surficial and UCH aquifers groundwater flow directions. The third off-base drinking water public supply well is located to the north upgradient of Site 113 and across Brinson Creek. Since the off-Base drinking water supply wells are located upgradient of Site 113 and/or across Brinson Creek are groundwater discharge features between Site 113 and the off-base drinking water supply wells, no off-Base drinking water sampling is warranted at this time. |

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 38

## SAP Worksheet #10—Conceptual Site Model (continued)

Table 10-1. Site 113 Conceptual Site Model

| | |
|---|---|
| **Human Health Receptors and Exposure Scenarios** (continued) | **Surface Water and Sediment**<br><br>Workers, visitors, and trespassers could potentially be exposed to PFAS through incidental ingestion of and dermal contact with surface water and sediment.<br><br>Current military personnel may be exposed to PFAS through incidental ingestion and dermal contact with surface water and sediment during training exercises.<br><br>**Biota**<br><br>Because there is some evidence that PFAS may bioaccumulate in food items, upper trophic level receptors (such as birds and mammals) could potentially be indirectly exposed to PFAS in soil and surface water through the consumption of terrestrial and aquatic organisms (i.e. fish), and surface water. Potential recreational hunters could ingest game that had been exposed to PFAS in soil and surface water and potential recreational anglers could ingest fish that had been exposed to PFAS in surface water. |
| **Ecological Receptors and Exposure Scenarios** | The analytical data collected for this RI will be evaluated to determine complete exposure pathways and evaluate the potential for unacceptable risk to be present for ecological receptors. At the current time, EPA has not issued consensus based ecological screening values (ESVs) for PFAS in any environmental media. Initial ESVs, based on available documents in the literature are included in **Appendix A** to ensure that data collected during the RI are suitable to meet the needs to complete a future ecological risk assessment (ERA); however, the final ESVs utilized for the initiation of a screening level ERA completed during the overall RI will be reviewed and updated based on the state of the science at the time of the evaluation and presented to regulatory partners.<br><br>**Soil**<br><br>Site 113 consists of pavement and mowed maintained vegetation with drainage features to the west and south. There are wetlands to the west of the site. Consequently, terrestrial habitat within the site itself is of limited quality. However, lower trophic level terrestrial ecological receptors (such as terrestrial plants and soil invertebrates) could be exposed to PFAS released to surface soils through root uptake, direct contact, and/or direct ingestion in this area. Lower trophic-level terrestrial ecological receptors (such as terrestrial plants, soil invertebrates) could be exposed to PFAS released to surface soils through root uptake, direct contact, and/or direct ingestion in this area. Because there is evidence that PFAS bioaccumulate in food items, there is the potential that upper-trophic level receptors (such as birds and mammals) could be exposed to these substances via the food web, as well as through incidental ingestion of soil.<br><br>**Groundwater**<br><br>While ecological receptors generally do not have direct exposure to groundwater, shallow groundwater at Site 113 may be hydraulically connected to the drainage feature south of Building TC701 (**Figure 2**). This pathway accounted for based on surface water sample evaluation and is discussed further below.<br><br>**Surface Water and Sediment**<br><br>Surface water features exist along the eastern, western, and southern boundaries of Site 113. Lower trophic level ecological receptors (such as plants, reptiles, and amphibians) could be exposed to PFAS released to surface water or sediment (either directly or indirectly via surface runoff and drainage from onsite terrestrial areas or through groundwater discharge), through root uptake, direct contact, or direct ingestion. Because there is evidence that PFAS bioaccumulate in food items, there is the potential that upper trophic level receptors (such as birds, fish, and mammals) could be exposed to these compounds via the food web, as well as through incidental ingestion of sediment and direct ingestion of fresh surface water. |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 39

## SAP Worksheet #10—Conceptual Site Model (continued)

Table 10-1. Site 113 Conceptual Site Model

| Current Data Gaps | The following data gaps were identified for this RI:<br>• Soil samples were previously collected from two locations. Results did not exceed May 2023 RSLs; however, there is the potential for the release(s) to have occurred in areas at the site where soil samples were not collected. Additional soil data is needed to confirm if the release(s) impacted soil in other near-by areas.<br>• The extent of PFAS within groundwater has not been fully defined horizontally or vertically within Site 113. Additional groundwater data are needed to define the horizontal and vertical extent of PFAS in groundwater.<br>• Secondary migration pathways to onsite drainage and surface water features have not been evaluated but are potentially present at the site. Soil and/or surface water/sediment data are needed to evaluate potential transport from overland flow and/or groundwater discharge.<br>• Additional analysis (dry bulk density, total porosity, grain size, percent moisture, total organic carbon [TOC], and ion exchange capacity) for surface and subsurface soil at the EC/HPT borings and soil pH using a field screening tool are needed to support refinement of the CSM and evaluation of fate and transport of PFAS. |
|---|---|

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 40

This page intentionally left blank.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 41

## SAP Worksheet #11—Project Quality Objectives/Systematic Planning Process Statements

Previous investigations have confirmed PFAS are present in the surficial aquifer above the RI PALs. The nature and extent of, and resulting risks to human and ecological receptors from, PFAS within soils and groundwater as well as additional transport pathways such as surface water and sediment have not been fully investigated. The objectives, environmental questions, investigation approach, and PQOs are presented in **Table 11-1**.

Table 11-1. Objectives, Environmental Questions, and Project Quality Objectives

| Objectives | Environmental Questions | General Investigation Approach | Project Quality Objectives |
|---|---|---|---|
| Delineate the nature and extent of PFAS in soil in excess of RI PALs and assess potential risks to human health and ecological receptors. | What is the nature and extent of PFAS in soil and do PFAS present a potentially unacceptable risk to human and/or ecological receptors?<br><br>Are there soil impacts in the drainage features that indicate a secondary migration pathway? | Proposed soil sample locations are shown on **Figure 3**.<br><br>Soil samples will be analyzed for the 40 PFAS referenced in the 3rd Draft EPA Method 1633 (Compliant with DoD QSM v.5.4 Table B-24 [DoD/DOE, 2021]), in accordance with the laboratory's Environmental Laboratory Accreditation Program Accreditation letters. pH will also be recorded for each soil sample using a field meter to support the evaluation of PFAS fate and transport in soil.<br><br>• Collect surface (0-1 foot bgs) and subsurface (immediately above the water table) soil samples at three proposed monitoring well locations and two additional soil sampling locations (within drainage features) and analyze samples for PFAS. | If the extent of PFAS are horizontally and vertically delineated to the RI PALs in soil, then additional soil sampling is not required.<br><br>If the extent of PFAS are not horizontally and vertically delineated to the RI PALs in soil, then additional soil sampling may be considered by the Project Team. If additional sampling is warranted and the CSM has changed based on the data collected, a SAP Addendum or Field Change Request (FCR) will be completed to document the approach, rationale, and updated CSM for additional sampling locations.<br><br>Delineation to the RSLs will be conducted. Delineation to ESVs when relevant based on ecological receptors and habitat will be considered.<br><br>A human health risk assessment (HHRA) and an ERA will be conducted for those media that support complete exposure pathways.<br><br>If unacceptable risks are identified and/or a potential soil to groundwater leaching concern is identified (see additional screening level section below), then the RI Report will recommend an evaluation of remedial alternatives for media with unacceptable risks and/or specifically for soil with the potential to impact groundwater resulting in potential unacceptable risks as part of a Feasibility Study; this may include additional sampling to refine a treatment volume.<br><br>If there are no unacceptable risks associated with exposure to soil and/or no groundwater leaching concerns; then the Partnering Team will meet to discuss the path forward for soil at the site. |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 42

## SAP Worksheet #11—Project Quality Objectives/Systematic Planning Process Statements (continued)

Table 11-1. Objectives, Environmental Questions, and Project Quality Objectives

| Objectives | Environmental Questions | General Investigation Approach | Project Quality Objectives |
|---|---|---|---|
| Delineate the nature and extent of PFAS in groundwater in excess of RI PALs, evaluate vertical migration of PFAS from the surficial aquifer to the UCH aquifer, and assess potential risks to human health. | What is the nature and extent of PFAS in groundwater and do PFAS present a potentially unacceptable risk to human health? Do seasonal variations in groundwater levels result in PFAS concentration variations? | Proposed groundwater sample locations are shown on **Figure 3**. Groundwater samples will be analyzed for the 40 PFAS referenced in the 3rd Draft EPA Method 1633 [Compliant with DoD QSM v.5.4 Table B-24 (DoD/DOE, 2021)], in accordance with the laboratory's Environmental Laboratory Accreditation Program Accreditation letters. <br>• Install 11 new surficial aquifer monitoring wells at the top of the water table. <br>• Install 3 new surficial monitoring wells at the bottom of the aquifer. <br>• Install 3 new UCH aquifer monitoring wells. <br>• Collect 2 rounds of groundwater samples from 3 existing and 14 new surficial aquifer monitoring wells and 3 new UCH aquifer monitoring wells in conjunction with 2 rounds of sediment and surface water samples (see below) and analyze samples for PFAS. | If the extent of PFAS are horizontally and vertically delineated to the RI PALs in groundwater, then additional groundwater sampling is not required. <br><br>If the extent of PFAS are not horizontally and vertically delineated to the RI PALs in groundwater, then additional groundwater sampling may be considered by the Project Team. If additional monitoring well locations or sampling are warranted and the CSM has changed based on the data collected, a SAP Addendum or FCR will be completed to document the approach, rationale, and updated CSM for additional sampling locations. <br><br>A HHRA will be conducted for groundwater. <br><br>If unacceptable risks are identified, then the RI Report will recommend an evaluation of remedial alternatives for media with unacceptable risks as part of a Feasibility Study; this may include additional sampling to refine delineation in treatment areas. <br><br>If there are no unacceptable risks associated with exposure to groundwater, then the Partnering Team will meet to discuss the path forward for groundwater at the site. |

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 43

SAP Worksheet #11—Project Quality Objectives/Systematic Planning Process Statements (continued)

Table 11-1. Objectives, Environmental Questions, and Project Quality Objectives

| Objectives | Environmental Questions | General Investigation Approach | Project Quality Objectives |
|---|---|---|---|
| Evaluate presence of PFAS in secondary migration pathway media (surface water and sediment) and determine whether past site-related activities have resulted in impacts in excess of RI PALs and assess potential risks to human health and ecological receptors. | Have past activities caused PFAS impacts in surface water and sediment?<br><br>What are the potential risks to human and ecological receptors? | Proposed surface water and sediment sample locations are shown on **Figure 3**.<br><br>Surface water and sediment samples will be analyzed for the 40 PFAS referenced in the 3rd Draft EPA Method 1633 (Compliant with DoD QSM v.5.4 Table B-24 [DoD/DOE, 2021]), in accordance with the laboratory's Environmental Laboratory Accreditation Program Accreditation letters.<br><br>• Collect two rounds of co-located surface water and sediment samples from 3 locations within the drainage features to the south of Building TC701 during seasonally high and low groundwater table conditions.<br><br>Each sediment sample collected during each round will also be analyzed for TOC to support the ERA. | If PFAS are detected in surface water and/or sediment samples then past site-related activities may have impacted secondary migration pathway media. If additional sampling is warranted to refine the impacts to surface water and/or sediment and the CSM has changed based on the data collected, a SAP Addendum or FCR will be completed to document the approach, rationale, and updated CSM for additional sampling locations.<br><br>A HHRA and an ERA will be conducted for those media that support complete exposure pathways.<br><br>If unacceptable risks are identified, then the RI Report will recommend an evaluation of remedial alternatives for media with unacceptable risks as part of a Feasibility Study; this may include additional sampling to refine treatment areas.<br><br>If there are no unacceptable risks and migration pathways to surface water and/or sediment are fully evaluated, then the Partnering Team will meet to discuss the path forward for the site. |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 44

## SAP Worksheet #11—Project Quality Objectives/Systematic Planning Process Statements (continued)

Table 11-1. Objectives, Environmental Questions, and Project Quality Objectives

| Objectives | Environmental Questions | General Investigation Approach | Project Quality Objectives |
|---|---|---|---|
| Refine the understanding of the groundwater flow direction and hydraulic properties in the surficial and UCH aquifers and evaluate site-specific parameters that may impact fate and transport. | What are the hydraulic and fate and transport properties that may affect transport of PFAS? How do ion exchange capacity and TOC affect transport of PFAS? What is the correlation between these parameters in the soil and PFAS concentrations in the groundwater? What is the depth and thickness of potential confining units/fine-grained lenses? | Two EC/HPT borings will be advanced (**Figure 3**) to evaluate lithology based on EC measurements and porosity/hydraulic conductivity. Approximately six soil samples will be collected for fate and transport analysis (grain size, bulk density, porosity, TOC, and percent moisture) to help quantify the fate and transport properties and to provide site-specific input data for fate and transport evaluation. The depths of the soil samples will be chosen to obtain fate and transport characteristics for the range of lithologies that comprise the aquifer systems at Site 113. Samples will be collected from two to three depths, representing the various types of soils encountered within the surficial aquifer, the confining unit (if present), and in the UCH aquifer as determined by the field geologist/engineer using the Unified Soil Classification System (USCS) and the EC/HPT data. Additionally, ion exchange capacity samples (one surface soil sample and one subsurface soil sample) will be collected in the unsaturated zone of each EC/HPT location. Synoptic groundwater levels will be collected during each groundwater sampling event to develop potentiometric surfaces and estimate groundwater flow direction. | The soil fate and transport data and the associated groundwater PFAS data will be used to quantify the transport properties across the range of lithologies that comprise the aquifer system within Site 113. The anion and cation exchange capacity will be used in conjunction with the soil and groundwater analytical data to evaluate how these parameters influence the fate and transport of PFAS across Site 113. Groundwater elevation data will be used to evaluate fate and transport through the aquifer system. |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 45

## SAP Worksheet #11—Project Quality Objectives/Systematic Planning Process Statements (continued)

Table 11-1. Objectives, Environmental Questions, and Project Quality Objectives

| Objectives | Environmental Questions | General Investigation Approach | Project Quality Objectives |
|---|---|---|---|
| Refine the understanding of the groundwater flow direction and hydraulic properties in the surficial and UCH aquifers and evaluate site-specific parameters that may impact fate and transport. (continued) | What are the hydraulic and fate and transport properties that may affect transport of PFAS? How do ion exchange capacity and TOC affect transport of PFAS? What is the correlation between these parameters in the soil and PFAS concentrations in the groundwater? What is the depth and thickness of potential confining units/fine-grained lenses? (continued) | Proposed EC/HPT locations are shown on **Figure 3**. EC/HPT will be conducted at two locations to evaluate aquifer properties with depth and to evaluate hydrostatic pressure at up to three locations per boring. The HPT information will be used to estimate hydraulic conductivity and the presence of fine-grained lithology that may impact PFAS fate and transport. | If confining unit/fine-grained lenses are observed, the depth and thickness will be used to determine the screen depth for new surficial monitoring wells at the bottom of the aquifer and the depth of the surface casing for the new UCH aquifer monitoring wells. If a confining unit is not identified through the EC/HPT activities and/or is not encountered during monitoring well installation, then the surficial aquifer monitoring wells at the bottom of the aquifer will be installed 25 feet deeper than the water table surficial monitoring wells (using 5-feet long screens) and the UCH wells will be screened within the upper portion of the lithology typically consistent with the Castle Hayne aquifer (such as the minimal presence of fine-grained clays and silts and the potential presence of cemented and/or shelly sands) but at least 20 feet below the surficial aquifer monitoring wells at the bottom of the aquifer. Lithology data will be used to refine the CSM and evaluate PFAS fate and transport at the site. |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 46

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## SAP Worksheet #11—Project Quality Objectives/
## Systematic Planning Process Statements (continued)

***What are the project action limits?***

The RI results will be compared to the current version of the EPA RSL table for human health and DoD-approved screening levels for ecological receptors at the time of reporting to ensure the latest science is being considered during the RI. Only the analytes with a PAL as described below are being evaluated at this time. PFAS results for constituents without a human health or ecological screening value will be provided in an appendix to the RI Report for comparison to appropriate screening values if they become available in the future.

- **Soil:**

  – **Human Health**: Surface and subsurface soil data for PFOA, PFOS, PFBA, PFBS, PFHxA, PFHxS, PFNA, and HFPO-DA will be compared to residential soil RSLs based on an HQ of 0.1 from May 2023 (EPA, 2023).

  – **Ecological (0 to 5 ft bgs)**: For ecological exposure pathways confirmed to be complete during the RI, the potential for ecological risk from PFAS compounds will be evaluated. For purposes of this SAP, the lowest soil ESV for all available receptors will be selected. ESVs are included in **Appendix A**. ESVs applied during completion of the ERA may differ from what is presented in **Appendix A** and will be based on state-of-the-science data at the time of the evaluation.

- **Groundwater:**

  – **Human Health:** Groundwater data for PFOA, PFOS, PFBA, PFBS, PFHxA, PFHxS, PFNA, and HFPO-DA will be compared to tapwater RSLs based on the May 2023 (EPA, 2023).

- **Surface Water:**

  – **Human Health:** Surface water data for PFOA, PFOS, PFBA, PFBS, PFHxA, PFHxS, PFNA, and HFPO-DA will be compared to tapwater RSLs based on the May 2023 RSLs (EPA, 2023).

  – **Ecological:** For ecological exposure pathways confirmed to be complete during the RI, the potential for ecological risk from PFAS compounds will be evaluated. For purposes of this SAP, the lowest surface water ESV for all available receptors will be selected. A complete list of currently evaluated ESVs is included in **Appendix A**.

- **Sediment:**

  – **Human Health:** Sediment data for PFOA, PFOS, PFBA, PFBS, PFHxA, PFHxS, PFNA, and HFPO-DA will be compared to residential soil RSLs based on the May 2023 RSLs (EPA, 2023).

  – **Ecological:** For ecological exposure pathways confirmed to be complete during the RI, the potential for ecological risk from PFAS compounds will be evaluated. For purposes of this SAP, the lowest sediment ESV for all available receptors will be selected. A complete list of currently evaluated ESVs is included in **Appendix A**. ESVs applied during completion of the ERA may differ from what is presented in **Appendix A** and will be based on state-of-the-science data at the time of the evaluation.

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 47

## SAP Worksheet #11—Project Quality Objectives/ Systematic Planning Process Statements (continued)

The following additional SLs will be considered as part of the data evaluation in the RI as part of the multiple lines of evidence approach to assess soil to groundwater leaching potential; however, they are not considered cleanup levels or intended for sole use in the risk assessments or for remedial actions. Promulgated state cleanup values will be evaluated as Applicable or Relevant and Appropriate Requirements during Feasibility Studies, if needed.

- **Soil:** Soil data will also be evaluated for leaching potential based on a multiple lines of evidence approach. Leaching from soil to groundwater will be assessed using PFAS concentrations in soil and groundwater, bulk density, organic carbon, anion and cation exchange capacity, and pH, as well as the impact of air-water interfacial adsorption for PFAS (Brusseau, 2023).

### What types of data are needed (matrix, target analytes, analytical groups, field screening, onsite analytical or offsite laboratory techniques, sampling techniques)?

The data to be collected during this investigation will include the following:

- EC/HPT logs that detail site-specific lithology and hydraulic properties.

- Soil boring logs that describe lithology will be generated during the monitoring well installations.

- Laboratory analytical results for PFAS in soil, groundwater, surface water, and sediment samples.

  - The specific target analytes and PALs are included in **Worksheet #15**.

- Water quality parameters (WQPs), including pH, conductivity, oxidation-reduction potential (ORP), dissolved oxygen (DO), temperature, and turbidity will be collected during groundwater sample collection. With the exception of turbidity, these WQPs will also be collected during surface water sampling. Salinity measurements for surface water samples will also be collected.

- Soil and sediment pH field measurements will be collected during soil and sediment sampling.

- Parameters to support CSM development and fate and transport evaluations including dry bulk density, total porosity, grain size, percent moisture, TOC, and anion and cation exchange capacity.

- Surveyed coordinates for new groundwater monitoring well locations will be collected by a North Carolina-registered land surveyor.

- Groundwater level measurements will be collected prior to groundwater sample collection.

### Are there any special data quality needs, field or laboratory, to support environmental decisions?

Offsite laboratory analytical data will be of the quantity and quality necessary to provide technically sound and defensible assessments with respect to the aforementioned project objectives. Laboratory DLs will be suitable to detect PFAS at or below the PALs in accordance with **Worksheet #15**. QC sample requirements are detailed in **Worksheet #20**. For action decisions, the laboratory will follow the Measurement Performance Criteria (MPC) in **Worksheets #12, #24,** and **#28** for laboratory QC samples. These MPC are consistent with the latest version of the DoD QSM, as applicable, and method-specific or laboratory in-house limits where the QSM does not apply.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 48

## SAP Worksheet #11—Project Quality Objectives/ Systematic Planning Process Statements (continued)

***Where, when, and how should the data be collected/generated?***

- All sampling locations are shown on **Figure 3** and are based on the rationale presented in **Worksheet #17** and in accordance with the project schedule outlined in **Worksheet #16**.

- The data will be collected following the methodologies in **Worksheet #14** and the standard operating procedures (SOPs) presented in **Worksheet #21**.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 49

## SAP Worksheet #12-1—Measurement Performance Criteria Table for Field QC Samples

**Matrix:** GW, SW
**Analytical Group:** PFAS
**Analytical Method**: 3rd Draft EPA Method 1633[a]

| QC Sample[b] | Analytical Group | Frequency | Data Quality Indicators (DQIs) | MPC |
|---|---|---|---|---|
| Field Duplicate (FD) | PFAS | One per 10 normal field samples. | Precision | If both the original and duplicate results are > the LOQ, the relative percent difference (RPD) must be < 30%. If either result is < LOQ, use professional judgment |
| Equipment Blank (EB) | | One per day for decontaminated equipment. One per event for disposable equipment. | Contamination | No analytes detected > ½ LOQ or > 1/10 sample concentration, whichever is greater |
| Field Blank (FB) | | One per investigation area. | Bias/Contamination | No analytes detected > 1/2 LOQ or > 1/10 sample concentration, whichever is greater |
| Temperature Blank | | One per cooler. | Representativeness | 0 - 6 degrees Celsius (°C) |

[a] Compliant with DoD QSM v.5.4 Table B-24 (DoD/DOE, 2021).

[b] QC will be collected separately for each matrix.

> = greater than

< = less than

GW = groundwater

SW = surface water

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 50

## SAP Worksheet #12-2—Measurement Performance Criteria for Field QC Samples

**Matrix:** SS, SB, SD
**Analytical Group:** PFAS
**Analytical Method**: 3rd Draft EPA Method 1633[a]

| QC Sample[b] | Analytical Group | Frequency | DQIs | MPC |
|---|---|---|---|---|
| FD | PFAS | One per 10 normal field samples. | Precision | If both the original and duplicate results are > the LOQ, the relative percent difference (RPD) must be < 50%. If either result is < LOQ, use professional judgment |
| EB | | One per day for decontaminated equipment. One per event for disposable equipment. | Contamination | No analytes detected > 1/2 LOQ or > 1/10 sample concentration, whichever is greater |
| FB | | One per investigation area. | Bias/Contamination | No analytes detected > 1/2 LOQ or > 1/10 sample concentration, whichever is greater |
| Temperature Blank | | One per cooler. | Representativeness | 0 - 6°C |

[a] Compliant with DoD QSM v.5.4 Table B-24 (DoD/DOE, 2021).

[b] QC will be collected separately for each matrix.

SB = subsurface soil

SD = sediment

SS = surface soil

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 51

SAP Worksheet #12-3—Measurement Performance Criteria for Field QC Samples

**Matrix:** SS, SB, SD
**Analytical Group:** TOC
**Analytical Method:** Walkley Black

| QC Sample | Analytical Group | Frequency | DQIs | MPC |
|---|---|---|---|---|
| Temperature Blank | TOC | One per cooler. | Representativeness | 0 - 6°C |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 52

## SAP Worksheet #12-4—Measurement Performance Criteria Table – Field QC Samples

**Matrix:** SS, SB, SD

**Analytical Group:** Fate and Transport Parameters

**Analytical Method:** ASTM D2937-04, ASTM D854-06, ASTM D422, SW846 9081. Laboratory method

| QC Sample | Analytical Group | Frequency | DQIs | MPC |
|---|---|---|---|---|
| NA: Field QC samples are not planned for grain size (sieve & hydrometer), bulk density, AEC, CEC, or porosity analysis. | | | | |

AEC = anion exchange capacity

ASTM = ASTM International

CEC = cation exchange capacity

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 53

## SAP Worksheet #13—Secondary Data Criteria and Limitations Table

| Secondary Data | Data Source (originating organization, report title and date) | Data Generator(s) (originating organization, data types, data generation/collection dates) | How Data Will Be Used | Limitations on Data Use |
|---|---|---|---|---|
| Analytical PFAS results from soil and groundwater samples | CH2M. 2022. Final *Basewide Per- and Polyfluoroalkyl Substances Site Inspection, Marine Corps Base Camp Lejeune and Marine Corps Air Station New River, North Carolina.* January. | CH2M, analytical laboratory data from groundwater samples, 2020 | Data will be used for risk assessment in the RI report and to select sample locations. | None. All data has been validated and is deemed usable. |

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 54

This page intentionally left blank.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 55

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## SAP Worksheet #14—Summary of Project Tasks

The technical approach for the proposed field activities is detailed herein. The SOPs tabulated on **Worksheet #21** and provided in **Appendix B** address the protocols to be used for the RI. Any modification to the work approach will be documented in the field notes.

### Pre-Investigation Tasks

- Subcontractor procurement
  - Analytical laboratory
  - Data Validator
  - Utility locator
  - EC/HPT direct-push technology provider
  - Driller
  - Surveyor
  - IDW transportation and disposal contractor
- Fieldwork scheduling

### Field Investigation Tasks

- Mobilization
- Utility clearance
- EC/HPT
- Soil sampling
- Monitoring well installation
- Well development
- Groundwater sampling
- Surface water and sediment sampling
- Decontamination
- Surveying
- IDW management
- Sample shipping
- Demobilization

## Mobilization

Mobilization for the field effort includes procurement of necessary field equipment and initial transport to the investigation area. Equipment and supplies will be brought to the field when the CH2M field team mobilizes for field activities. Field notes will be captured on loose leaf notebook paper and forms each day or on tablets in accordance with SOPs in **Appendix B**. A concrete paved and curbed location or impervious secondary containment for the placement of IDW will be determined before field activities. Before beginning any phase of work, CH2M and its subcontractors will have field meetings to discuss the work items and worker responsibilities, and to familiarize workers with the HSP.

In general, work will be performed in Level D personal protective equipment, consisting of a hard hat, safety glasses, safety-toed boots, and hearing protection. Field activities will take place during normal daylight working hours. Weekend work might be necessary to accommodate Base operations.

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 56

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## SAP Worksheet #14—Summary of Project Tasks (continued)

## Utility Clearance

Utilities will be cleared before beginning intrusive activities in accordance with the SOP listed in **Worksheet #21** and provided in **Appendix B**. CH2M will coordinate utility clearance. A third-party utility clearance subcontractor will be procured by CH2M to clearly mark subsurface utilities near the proposed soil sample and monitoring well locations. Any proposed soil sample or monitoring well location within 5 feet of utility locations will be relocated to avoid impact to utilities. The FTL will consult with the PM and STC to confirm that the new location will meet the PQOs.

## Electrical Conductivity/Hydraulic Profiling Tool Investigation

The EC/HPT tool will be used to further characterize the subsurface lithology. The investigation will identify the depth and thickness of potential confining units/fine-grained lenses. The data will be used to determine the depth intervals for monitoring wells installed at the bottom of the surficial aquifer and within the UCH aquifer. If a confining unit is not identified through the EC/HPT activities and/or is not encountered during monitoring well installation, then the surficial aquifer monitoring wells at the bottom of the aquifer will be installed 25 feet deeper than the water table surficial monitoring wells (using 5-feet long screens) and the UCH wells will be screened within the upper portion of the lithology typically consistent with the Castle Hayne aquifer (such as the minimal presence of fine-grained clays and silts and the potential presence of cemented and/or shelly sands) but at least 20 feet below the surficial aquifer monitoring wells at the bottom of the aquifer.

As the probe is advanced into the subsurface, continuous data of the subsurface EC, temperature, and the hydraulic behavior is recorded with depth. The EC sensor is used to identify a change in soil type (such as sand versus clay) due to a change in the EC. The temperature meter assists in estimating the depth to the saturated zone. Typically, the temperature shows a sharp decline as the probe enters the saturated zone. The HPT portion injects a constant stream of water into the underlying formation to determine the amount of pressure needed to transmit water through the formation layers. As the probe is advanced into the subsurface (approximately 2 centimeters per second), water is injected (less than 300 milliliters per minute) into the formation through a screened port on the side of the HPT probe. The pressure transducer in the probe measures the total pressure required to inject the water into the formation, while a flow controller at the surface monitors the injection flow rate. A formation that yields a response of low pressure is relatively easy to transmit and indicates more permeable material, such as sand. Conversely, a formation with a high-pressure response where water flow is impeded indicates a less permeable material such as clay or silty sand.

Two EC/HPT locations are proposed for Site 113 (**Figure 3**). The EC/HPT borings will be advanced until refusal is encountered or until a maximum of 80 feet bgs, which is typically below the depths where the Castle Hayne confining unit is encountered across MCB Camp Lejeune. Geologic data from soil boring logs and fate and transport analysis results will be used to help interpret and calibrate the EC/HPT results. Data will be collected over an area large enough to identify lithological variations, which, in turn, can be used to identify potential preferential flow pathways.

At each EC/HPT borehole, one to three dissipation tests will be conducted to establish the absolute hydrostatic pressure. During dissipation testing, the advancement of the probe will be stopped, and the flow of water injected into the subsurface will be turned off. The hydrostatic pressures will then be allowed to stabilize before advancing the EC/HPT probe again. The dissipation test data are used in conjunction with the HPT pressures and flow rates to calculate corrected HPT pressure data and estimated hydraulic conductivity data with depth.

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 57

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## SAP Worksheet #14—Summary of Project Tasks (continued)

The subcontractor will create electronic records of each EC/HPT profile, including continuous measurements of EC, temperature, flow rate, and pressure.

## Soil Sampling

Soil samples for PFAS analysis will be collected at the surface (0 to 1 foot bgs) and at the top of the capillary fringe in the unsaturated soil (to be determined in the field) at locations near the SI soil exceedances of the RI PALs (**Table 14-1**) in accordance with **Worksheet #18** and with the SOPs listed in **Worksheet #21** and provided in **Appendix B**. Locations of soil samples were selected in areas likely to contain PFAS releases to the ground surface based on the CSM provided in **Worksheet #10**.

Soil will be collected in the laboratory-supplied high-density polyethylene (HDPE) jars using reusable decontaminated equipment or single-use dedicated equipment. Soil samples will be placed into coolers containing enough ice to keep the samples 0 to 6°C (but not frozen) until they are received by the laboratory.

Up to three soil samples will be collected at each of the EC/HPT locations for grain size, bulk density, porosity, TOC, and percent moisture from the various types of soils encountered within the surficial aquifer, the confining unit (if present), and in the UCH aquifer as determined by the field geologist/engineer using the USCS. Samples will be selected from borings across the site in the saturated zone, representing the soil types encountered in the surficial aquifer including the fine sands and mixtures of sand, silt, and clay in varying percentages. In addition, two soil samples, from the surface and top of the capillary fringe in the unsaturated soil, at each of the EC/HPT locations will be collected for TOC, AEC, and CEC. Soil will be collected in the laboratory-supplied containers and shipped to the laboratory. pH will also be recorded for each soil sample using a field meter.

Following completion of the PFAS and fate and transport parameter sampling, each area will be restored to its original condition or converted to a monitoring well.

## Monitoring Well Installation

### Monitoring Wells Screened within the Surficial Aquifer

New monitoring wells will be installed using sonic drilling method. Continuous soil cores will be collected and logged. During the drilling process, an inner 4-inch-diameter core barrel will be advanced to collect continuous soil cores for lithologic characterization followed by a 6-inch diameter over-ride sonic casings override sonic casing that is advanced following the core barrel sampler. A 2-inch, Schedule 40 polyvinyl chloride (PVC) monitoring well with 0.010-inch slot screen will be constructed within the 6-inch-diameter override sonic casing. Each monitoring well will be constructed with a 10-foot-long screen at depths specified in **Table 14-1**. Monitoring wells screened at the bottom of the surficial aquifer will be installed at select locations specified in **Table 14-1**, in this case the length of the screen in collocated top and bottom of the surficial aquifer monitoring wells may be reduced from 10 feet long to 5 feet long to achieve a 20-foot spacing between surficial aquifer screened intervals. The annular space around the well screens will be backfilled with a well-graded, fine to medium silica sand filter pack consisting of a thoroughly washed, round, durable, siliceous material containing less than 5 percent calcareous particles. The filter pack will extend from the bottom of the boring to 2 feet above the top of screen. A minimum 2-foot-thick bentonite layer will be placed above the sand pack. After the bentonite has been hydrated, a cement-bentonite grout will be placed in the remaining annular space.

Monitoring wells will be installed in the bottom of the surficial aquifer if there is more than 20 feet of water below the water table wells. If EC/HPT indicates there is less than 30 feet of water between the bottom screen of the water table wells and a confining unit, a 5-foot-long screen may be used in the bottom of the surficial aquifer wells to allow for 20 feet between the surficial and bottom of the surficial aquifer wells.

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 58

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAP Worksheet #14—Summary of Project Tasks (continued)

## Monitoring Wells Screened within the UCH Aquifer

Monitoring wells screened in the UCH aquifer will be installed as double-cased Type III monitoring wells to limit the potential for cross-contamination of deeper aquifer zones during drilling. First, an 8-inch-diameter Schedule 40 PVC surface casing will be installed and grouted into the clay layer (if present) typically described as the UCH confining unit and then a 2-inch, Schedule 40 PVC monitoring well with 0.010-inch slot screen will be constructed within a temporary 6-inch-diameter isolation casing advanced by sonic drilling through the 8-inch PVC surface casing. The screen interval and well construction depths will be determined in the field, following an evaluation of lithology and the results of EC/HPT activities. If a confining unit is not identified through the EC/HPT activities and/or is not encountered during monitoring well installation, then the deeper well installed to evaluate the vertical extent of PFAS will be screened within the upper portion of the lithology typically consistent with the Castle Hayne aquifer, such as the minimal presence of fine-grained clays and silts and the potential presence of cemented and/or shelly sands.

Boreholes will be advanced by sonic drilling methods. During the drilling process, an inner 4-inch-diameter core barrel will be advanced to collect continuous soil cores for lithologic characterization. Progressively large over-ride sonic casings will be advanced following the core barrel sampler. For the installation of the permanently grouted 8-inch surface casing, 6-inch, 8-inch, 10-inch, and finally 12-inch sonic casing will be advanced to the depth of the clay layer (if present) typically described as the UCH clay confining unit at approximately 40 to 50 feet bgs. The 8-inch surface casing, fitted with a grout shoe, will be lowered into the 12-inch sonic casing. A bentonite-cement grout mixture will be pumped through the grout shoe attachment into the annular space between the isolation casing and the borehole as the 12-inch sonic casing is withdrawn.

The grout mixture will be allowed to cure for 24 hours prior to advancement of the 6-inch temporary isolation casing (preceded by the 4-inch sonic sample core). Advancement of the boring will continue to the proposed target screen depths via 4-inch sample core and 6-inch override casing. The 2-inch monitoring wells will be built with 10 feet long screened intervals for the UCH aquifer monitoring wells.

## Well Development

Upon completion of the well installation, each monitoring well will be developed after 24 hours using a combination of surging and pumping throughout the well screen. During monitoring well development, WQPs, including pH, temperature, conductivity, and turbidity will be measured. Development will continue for approximately 1 hour and until the turbidity of the water removed from the well is as clear as practicable, using professional judgment. Surge blocks and pumps with Teflon parts will be avoided during development.

Newly installed monitoring wells will be developed in accordance with the SOP listed in **Worksheet #21** and provided in **Appendix B**.

## Groundwater Sampling

### Groundwater Level Measurements

Before groundwater sampling, and at least 24 hours after well installation and development has been completed, the depth to groundwater, to the nearest 0.01 foot, will be measured in accordance with SOP-056 listed in **Worksheet #21** and provided in **Appendix B**. Synoptic (within approximately 8 hours) measurements will be made from the top of the PVC riser, which will be marked. If during removal of the locking well cap, the well demonstrates signs of being under pressure (escaping air sounds or cap being pushed off by pressure), then the

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 59

## SAP Worksheet #14—Summary of Project Tasks (continued)

depth to water in that monitoring well will be measured repeatedly over a period of several minutes to determine whether the water level has reached static equilibrium (SOP-009). If over several minutes the water level continues to change, the water level in that well will not be measured for a period of 1 hour to allow the water level to equilibrate. Depth to water and time measured will be recorded in the field notes.

### Collection of Groundwater Samples

Groundwater samples will be collected from the newly installed monitoring wells (**Table 14-1**) and existing monitoring wells (**Table 14-2**), in accordance with **Worksheet #17** and with the SOPs listed in **Worksheet #21** and provided in **Appendix B.** Groundwater samples will not be collected until at least 24 hours after development with the actual time between development and sampling based on hydrogeological factors such as recharge observed during development (for example, the time between development and sampling at monitoring wells that recharged very slowly during development will be extended greater than 24 hours). Groundwater samples will be collected under low flow/low stress conditions. For monitoring wells screened within the surficial aquifer, a peristaltic pump will be used, and the intake will be placed at the middle of the wetted well screen interval. For monitoring wells screened within the UCH aquifer, a PFAS-free stainless steel, submersible, variable speed sampling pump will be used and placed at the middle of the well screen interval. If the groundwater level at static equilibrium in the UCH wells is within 20 feet of the ground surface, then a peristaltic pump may be used to collect the sample from tubing placed so that the intake is placed in the screen interval.

Depth-to-water readings and WQPs will be measured and recorded (approximately every 5 minutes) before sampling using a depth-to-water meter and water quality meter, calibrated daily (at a minimum). Sampling will begin when three well volumes have been purged or when minimal water-level drawdown requirements are met and WQPs have stabilized for three consecutive readings in accordance with the Low Flow Groundwater Sampling SOP listed in **Worksheet #21** and located in **Appendix B**. If excessive drawdown occurs at very low flow rates (for example less than 100 milliliter [mL]/minute), then the well will be purged by removing three well volumes or until groundwater can no longer be removed from the well, and then sampled once the groundwater level has recovered to the extent where a sample can be obtained in accordance with the Groundwater Sampling SOP listed in **Worksheet #21** and located in **Appendix B**. Depth-to-water, total depth, and WQPs will be recorded on Groundwater Sampling Data Sheets. Groundwater will be collected into laboratory-supplied HDPE bottles and placed into coolers containing enough ice to keep the samples 0 to 6°C (but not frozen) until they are received by the laboratory.

## Surface Water and Sediment Sampling

Surface water and sediment sample collection is planned along the drainage features surrounding the site (**Figure 3**). Although estimated surface water flow direction is depicted on **Figure 3**, the surface water flow direction will be confirmed before collecting any samples. If surface water is not present at a location identified for sampling, then the sample will be moved to a location with surface water present and the FTL will consult with the PM and STC to confirm that the new location will meet the PQO. Samples will not be collected within 24 hours of a rain event with more than 0.5 inches of accumulation.

Surface water samples will be collected from downstream to upstream using PFAS-free sampling equipment in accordance with applicable SOPs in **Worksheet #21** and located in **Appendix B**. Surface water will be collected within the water column, from approximately 2 inches above the sediment surface, into laboratory-supplied HDPE bottles and placed into coolers containing enough ice to keep the samples 0 to 6°C (but not frozen) until they are received by the laboratory. After the surface water sample is collected, the depth of the water will be measured

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 60

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## SAP Worksheet #14—Summary of Project Tasks (continued)

using a PFAS-free water-level indicator and WQPs, including conductivity, temperature, pH, DO, salinity, and ORP, will be collected using a hand-held water quality meter. The water quality meter will be calibrated daily (at a minimum) and the calibration documented in the field notes. Appropriate QA/QC samples will be collected as specified in **Worksheet #20**.

Sediment samples will be collected following surface water sample collection using PFAS-free sampling equipment in accordance with applicable SOPs in **Worksheet #21**. Sediment samples will be collected from 0 to 6 inches bgs and analyzed for the site-specific laboratory analytical parameters listed in **Worksheet #17**. Each sediment sample will additionally be analyzed for TOC to support the ERA. Sediment will be collected into laboratory-supplied HDPE jars and placed into coolers containing enough ice to keep the samples 0 to 6°C until they are received by the laboratory. pH will also be recorded for each sediment sample using a field meter.

## Decontamination

All non-disposable sampling equipment will be decontaminated immediately after each use in accordance with the SOP listed in **Worksheet #21** and provided in **Appendix B**. Decontamination fluids will be contained in a tank or 55-gallon drum and disposed of offsite as described in the IDW management section below. Water used for decontamination will be obtained from the MCB Camp Lejeune potable water system, which is tested semi-annually for PFAS, which have not been detected above the PALs (CH2M, 2022a).

## Surveying

Newly installed permanent monitoring well locations will be horizontally and vertically located by a North Carolina-licensed surveyor in accordance with SOP listed in **Worksheet #21** and provided in **Appendix B**. The surveyor will provide coordinates of all horizontal points X, Y, to the nearest 0.5 foot and vertical point Z (top of casing) to the nearest 0.01 foot. The ground surface elevations will be surveyed to the nearest 0.01 foot for asphalt and concrete surfaces and to 0.1 foot for unpaved ground surfaces.

## Investigation-derived Waste Management

IDW is expected to consist of drill cuttings from the soil borings generated during soil sampling and monitoring well installations, purge water from well development and groundwater sampling, and decontamination fluids. Solid IDW and aqueous IDW will be stored in separate 55-gallon drums. IDW will be managed in accordance with the MCB Camp Lejeune and MCAS Investigation and Remediation Waste Management Plan (CH2M, 2023) and the SOP referenced in **Worksheet #21** and included in **Appendix B**. Disposal requirements will follow the memorandum *Interim Guidance on Destruction or Disposal of Materials Containing Per- and Polyfluoroalkyl Substances in the United State* (DoD, 2023); however, if Navy guidance is updated before IDW management is initiated, the new guidance will be followed upon direction by the NAVFAC RPM. Disposable equipment, including personal protective equipment, will be disposed of in an opaque trash bag in an on-Base dumpster.

## Sample Shipment

Analytical samples and equipment will be shipped by overnight courier in accordance with the SOP referenced in **Worksheet #21** and included in **Appendix B**.

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 61

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

### SAP Worksheet #14—Summary of Project Tasks (continued)

## Demobilization

Full demobilization will occur when the project is complete and appropriate QA/QC checks have been performed. Personnel no longer needed during the course of field operations may be demobilized before the final project completion date.

The following will occur before demobilization:

- Chain-of-custody records will be reviewed to verify that all samples were collected as planned and submitted for appropriate analyses Restoration of the area to an appropriate level (for example, repair of deep ruts) will be verified.

- All equipment will be inspected, packaged, and shipped to the appropriate location.

## Sample Analysis

The laboratory will maintain, test, inspect, and calibrate analytical instruments (**Worksheets #24** and **#25**). The laboratory will analyze aqueous and solid samples for PFAS as shown on **Worksheets #15** and **#18**. The laboratory will analyze solid samples for fate and transport analysis as shown on **Worksheets #15** and **#18**. QC samples are described on **Worksheet #28**. SOPs for all laboratory analytical tasks are tabulated on **Worksheet #23** and will be provided upon request.

Analyses will be conducted by Eurofins Lancaster Laboratories Environment Testing LLC, Eurofins Test America Burlington, and Eurofins Xenco Houston as listed in **Worksheet #30**.

## Data Validation, Review, and Management Tasks

Data from all media samples (soil, groundwater, surface water, and sediment) obtained from the analytical laboratory will be validated. The Project Chemist is responsible for data tracking and storage. Definitive analytical laboratory data will be reported as a Stage 4 data package including certificates of analysis for traceability and 10 percent of the data, selected randomly by the third party data validator, will undergo Stage 4 validation before use by the Navy. All WQP data will be checked by the Project Chemist before use. The FTL is responsible for ensuring the photoionization detector (PID) and WQP meter are calibrated prior to sample collection (Refer to **Worksheet #36** for more information). All analytical data (from soil, groundwater, surface water, and sediment samples) will be loaded into the NIRIS database.

### Procedures for Recording and Correcting Data

- Field data will be recorded on loose leaf paper and on tablets
- Project Assessment/Audit: **Worksheets #31** and **#32**
- Data Validation: **Worksheets #35** and **#36**
- Data Usability Assessment: **Worksheet #37**

### Analytical and Validation Tasks

The analytical laboratory will process and prepare samples for analyses and will analyze all samples in accordance **Worksheets #19** and **#23**. QC samples are described on **Worksheet #28**. SOPs for all laboratory analytical tasks are tabulated on **Worksheet #23**.

- The laboratory will maintain, test, inspect, and calibrate analytical instruments (**Worksheets #24** and **#25)**.

- The laboratory will process and prepare samples for analysis.

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 62

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## SAP Worksheet #14—Summary of Project Tasks (continued)

- All analytical data to be used for chemical characterization of the investigated areas will be validated (Refer to **Worksheet #36** for more details).

- A data usability assessment will be performed on the RI data. See **Worksheet #37** for more details.

## Reporting

A summary of the field activities, nature and extent, human health and ecological risk assessments, fate and transport (including preparation of potentiometric surface maps, calculations of potential vertical head gradients in nested well clusters, and qualitative assessments of potential leaching from soil to groundwater and of potential discharge from groundwater to surface water based on comparing analytical PFAS results and PFAS ratios between the different media), conclusions, and recommendations will be presented in an RI Report, according to the anticipated schedule outlined in **Worksheet #16**. Deviations from this SAP will be discussed in a dedicated section of the RI report.

Table 14-1. New Monitoring Well Details

| Potential Well Identification (ID) | Proposed Screened Interval (feet bgs)[a] | Aquifer | Well Diameter (inches) | Well Completion[b] |
|---|---|---|---|---|
| IR113-MW04 | 5 to 15 | Surficial | 2 | Flush Mount |
| IR113-MW05 | 5 to 15 | Surficial | 2 | Flush Mount |
| IR113-MW06 | 5 to 15 | Surficial | 2 | Flush Mount |
| IR113-MW07 | 5 to 15 | Surficial | 2 | Flush Mount |
| IR113-MW08 | 5 to 15 | Surficial | 2 | Flush Mount |
| IR113-MW9 | 5 to 15 | Surficial | 2 | Flush Mount |
| IR113-MW10 | 5 to 15 | Surficial | 2 | Flush Mount |
| IR113-MW11 | 5 to 15 | Surficial | 2 | Flush Mount |
| IR113-MW12 | 5 to 15 | Surficial | 2 | Flush Mount |
| IR113-MW13 | 5 to 15 | Surficial | 2 | Flush Mount |
| IR113-MW14 | 5 to 15 | Surficial | 2 | Flush Mount |
| IR113-MW15 | 20 to 30 | Surficial[c] | 2 | Flush Mount |
| IR113-MW16 | 20 to 30 | Surficial[c] | 2 | Flush Mount |
| IR113-MW17 | 20 to 30 | Surficial[c] | 2 | Flush Mount |
| IR113-MW18 | 40 to 50 | UCH | 2 | Flush Mount |
| IR113-MW19 | 40 to 50 | UCH | 2 | Flush Mount |
| IR113-MW20 | 40 to 50 | UCH | 2 | Flush Mount |

[a] Actual screened intervals to target the surficial aquifer will be determined in the field based on soil boring logs.

[b] Well completions may change based on field conditions and Base operations.

[c] Monitoring wells will be installed at the bottom of the surficial aquifer if there is more than 20 feet of water below the water table well screens. If EC/HPT indicates there is less than 30 feet of water between the bottom screen of the water table wells and a confining unit, a 5-foot-long screen may be used in the bottom of the surficial wells to allow for 20 feet between the surficial aquifer wells and the bottom of the surficial aquifer wells.

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 63

## SAP Worksheet #14—Summary of Project Tasks (continued)

Table 14-2. Existing Well Details

| Well ID | Screened Interval (feet bgs) | Aquifer | Well Diameter (inches) |
|---|---|---|---|
| BW-TC701-MW01 | 12 to 22 | Surficial | 2 |
| BW-TC701-MW02 | 15 to 25 | Surficial | 2 |
| BW-TC701-MW03 | 15 to 25 | Surficial | 2 |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 64

This page intentionally left blank.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 65

## SAP Worksheet #15-1—Reference Limits and Evaluation Table

**Matrix:** GW

**Analytical Group:** PFAS (3rd Draft EPA Method 1633[a])

| Analyte[b] | CAS # | PAL (RSL) (ng/L)[c] | Laboratory Limits (ng/L) | | | LCS and MS/MSD Recovery Limits and RPD (%)[d] | | |
|---|---|---|---|---|---|---|---|---|
| | | | LOQ | LOD | DL | LCL | UCL | RPD |
| Perfluorooctanoic acid (PFOA) | 335-67-1 | 6 | 2.00 | 1.30 | 0.640 | 40 | 150 | 30 |
| Perfluorooctanesulfonic acid (PFOS) | 1763-23-1 | 4 | 2.00 | 1.00 | 0.500 | 40 | 150 | 30 |
| Perfluorobutanesulfonic acid (PFBS) | 375-73-5 | 600 | 2.00 | 1.00 | 0.300 | 40 | 150 | 30 |
| Perfluorohexanesulfonic acid (PFHxS) | 355-46-4 | 39 | 2.00 | 1.10 | 0.570 | 40 | 150 | 30 |
| Perfluorononanoic acid (PFNA) | 375-95-1 | 5.9 | 2.00 | 1.00 | 0.500 | 40 | 150 | 30 |
| Hexafluoropropylene oxide dimer acid (HFPO-DA) | 13252-13-6 | 6 | 8.00 | 4.00 | 2.00 | 40 | 150 | 30 |
| 11-Chloroeicosafluoro-3-oxaundecane-1-sulfonic acid (11Cl-PF3OUdS) | 763051-92-9 | -- | 8.00 | 7.60 | 2.00 | 40 | 150 | 30 |
| 1H,1H, 2H, 2H-Perfluorodecane sulfonic acid (8:2FTS) | 39108-34-4 | -- | 8.00 | 7.70 | 2.60 | 40 | 150 | 30 |
| 1H,1H, 2H, 2H-Perfluorohexane sulfonic acid (4:2FTS) | 757124-72-4 | -- | 8.00 | 3.80 | 1.70 | 40 | 150 | 30 |
| 1H,1H, 2H, 2H-Perfluorooctane sulfonic acid (6:2FTS) | 27619-97-2 | -- | 8.00 | 7.60 | 2.50 | 40 | 150 | 30 |
| 2H,2H,3H,3H-Perfluorooctanoic acid (5:3FTCA) | 914637-49-3 | -- | 50.0 | 25.0 | 10.0 | 40 | 150 | 30 |
| 3-Perfluoroheptyl propanoic acid (7:3FTCA) | 812-70-4 | -- | 50.0 | 25.0 | 10.0 | 40 | 150 | 30 |
| 3-Perfluoropropyl propanoic acid (3:3FTCA) | 356-02-5 | -- | 10.0 | 5.00 | 1.50 | 40 | 150 | 30 |
| 4,8-Dioxa-3H-perfluorononanoic acid (ADONA) | 919005-14-4 | -- | 8.00 | 3.80 | 1.50 | 40 | 150 | 30 |
| 9-Chlorohexadecafluoro-3-oxanonane-1-sulfonic acid (9Cl-PF3ONS) | 756426-58-1 | -- | 8.00 | 3.80 | 1.00 | 40 | 150 | 30 |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 66

## SAP Worksheet #15-1—Reference Limits and Evaluation Table (continued)

| Analyte[b] | CAS # | PAL (RSL) (ng/L)[c] | Laboratory Limits (ng/L) | | | LCS and MS/MSD Recovery Limits and RPD (%)[d] | | |
|---|---|---|---|---|---|---|---|---|
| | | | LOQ | LOD | DL | LCL | UCL | RPD |
| N-ethyl perfluorooctanesulfonamide (NEtFOSA) | 4151-50-2 | -- | 2.00 | 1.00 | 0.500 | 40 | 150 | 30 |
| N-ethyl perfluorooctanesulfonamidoacetic acid (NEtFOSAA) | 2991-50-6 | -- | 2.00 | 1.40 | 0.700 | 40 | 150 | 30 |
| N-ethyl perfluorooctanesulfonamidoethanol (NEtFOSE) | 1691-99-2 | -- | 20.0 | 10.0 | 5.00 | 40 | 150 | 30 |
| N-methyl perfluorooctanesulfonamide (NMeFOSA) | 31506-32-8 | -- | 2.00 | 1.00 | 0.500 | 40 | 150 | 30 |
| N-methyl perfluorooctanesulfonamidoacetic acid (NMeFOSAA) | 2355-31-9 | -- | 4.00 | 2.40 | 1.20 | 40 | 150 | 30 |
| N-methyl perfluorooctanesulfonamidoethanol (NMeFOSE) | 24448-09-7 | -- | 20.0 | 10.0 | 5.00 | 40 | 150 | 30 |
| Nonafluoro-3,6-dioxaheptanoic acid (NFDHA) | 151772-58-6 | -- | 4.00 | 2.00 | 1.00 | 40 | 150 | 30 |
| Perfluoro(2-ethoxyethane)sulfonic acid (PFEESA) | 113507-82-7 | -- | 4.00 | 1.80 | 0.500 | 40 | 150 | 30 |
| Perfluoro-3-methoxypropanoic acid (PFMPA) | 377-73-1 | -- | 4.00 | 2.00 | 0.500 | 40 | 150 | 30 |
| Perfluoro-4-methoxybutanoic acid (PFMBA) | 863090-89-5 | -- | 4.00 | 2.00 | 1.00 | 40 | 150 | 30 |
| Perfluorobutanoic acid (PFBA) | 375-22-4 | 1,800 | 8.00 | 4.00 | 2.00 | 40 | 150 | 30 |
| Perfluorodecanesulfonic acid (PFDS) | 335-77-3 | -- | 2.00 | 1.00 | 0.500 | 40 | 150 | 30 |
| Perfluorodecanoic acid (PFDA) | 335-76-2 | -- | 2.00 | 1.00 | 0.500 | 40 | 150 | 30 |
| Perfluorododecanesulfonic acid (PFDoS) | 79780-39-5 | -- | 2.00 | 1.90 | 0.900 | 40 | 150 | 30 |
| Perfluorododecanoic acid (PFDoA) | 307-55-1 | -- | 2.00 | 1.00 | 0.500 | 40 | 150 | 30 |
| Perfluoroheptanesulfonic acid (PFHpS) | 375-92-8 | -- | 2.00 | 1.00 | 0.400 | 40 | 150 | 30 |
| Perfluoroheptanoic acid (PFHpA) | 375-85-9 | -- | 2.00 | 1.00 | 0.520 | 40 | 150 | 30 |
| Perfluorohexanoic acid (PFHxA) | 307-24-4 | 990 | 2.00 | 1.00 | 0.500 | 40 | 150 | 30 |
| Perfluorononanesulfonic acid (PFNS) | 68259-12-1 | -- | 2.00 | 1.00 | 0.400 | 40 | 150 | 30 |

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 67

## SAP Worksheet #15-1—Reference Limits and Evaluation Table (continued)

| Analyte[b] | CAS # | PAL (RSL) (ng/L)[c] | Laboratory Limits (ng/L) | | | LCS and MS/MSD Recovery Limits and RPD (%)[d] | | |
|---|---|---|---|---|---|---|---|---|
| | | | LOQ | LOD | DL | LCL | UCL | RPD |
| N-ethyl perfluorooctanesulfonamide (NEtFOSA) | 4151-50-2 | -- | 2.00 | 1.00 | 0.500 | 40 | 150 | 30 |
| Perfluorooctanesulfonamide (PFOSA) | 754-91-6 | -- | 2.00 | 1.00 | 0.500 | 40 | 150 | 30 |
| Perfluoropentanoic acid (PFPeA) | 2706-90-3 | -- | 4.00 | 2.00 | 1.00 | 40 | 150 | 30 |
| Perfluoropentansulfonic acid (PFPeS) | 2706-91-4 | -- | 2.00 | 1.00 | 0.500 | 40 | 150 | 30 |
| Perfluorotetradecanoic acid (PFTeDA) | 376-06-7 | -- | 2.00 | 1.00 | 0.500 | 40 | 150 | 30 |
| Perfluorotridecanoic acid (PFTrDA) | 72629-94-8 | -- | 2.00 | 1.00 | 0.500 | 40 | 150 | 30 |
| Perfluoroundecanoic acid (PFUnA) | 2058-94-8 | -- | 2.00 | 1.00 | 0.500 | 40 | 150 | 30 |

[a] Compliant with DoD QSM v.5.4 Table B-24 (DoD/DOE, 2021).

[b] The analyte list is based on 40 PFAS referenced in the 3rd Draft EPA Method 1633. All isomers are reported for each analyte as a sum.

[c] RSLs listed above are based on an HQ of 0.1 and the May 2023 RSLs. Ecological exposure to groundwater is accounted for based on surface water sample evaluation using the surface water ESVs presented in **Worksheet #15-2**.

[d] The DoD QSM v.5.4 (DoD/DOE, 2021) is the basis for LCS and MS/MSD limits.

CAS = Chemical Abstract Service

LCL = lower control limit

LCS = laboratory control sample

MS = matrix spike

MSD = matrix spike duplicate

UCL = upper control limit

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 68

## SAP Worksheet #15-2—Reference Limits and Evaluation Table

**Matrix:** SW

**Analytical Group:** PFAS (3rd Draft EPA Method 1633[a])

| Analyte[b] | CAS # | PAL (RSL) (ng/L)[c] | PAL (ESV) (ng/L)[c] | Laboratory Limits (ng/L) | | | LCS and MS/MSD Recovery Limits and RPD (%)[d] | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | LOQ | LOD | DL | LCL | UCL | RPD |
| Perfluorooctanoic acid (PFOA) | 335-67-1 | 6 | 6,120 | 2.00 | 1.30 | 0.640 | 40 | 150 | 30 |
| Perfluorooctanesulfonic acid (PFOS) | 1763-23-1 | 4 | 117 | 2.00 | 1.00 | 0.500 | 40 | 150 | 30 |
| Perfluorobutanesulfonic acid (PFBS) | 375-73-5 | 600 | 37,000 | 2.00 | 1.00 | 0.300 | 40 | 150 | 30 |
| Perfluorohexanesulfonic acid (PFHxS) | 355-46-4 | 39 | 5,500 | 2.00 | 1.10 | 0.570 | 40 | 150 | 30 |
| Perfluorononanoic acid (PFNA) | 375-95-1 | 5.9 | 2,080 | 2.00 | 1.00 | 0.500 | 40 | 150 | 30 |
| Hexafluoropropylene oxide dimer acid (HFPO-DA) | 13252-13-6 | 6 | -- | 8.00 | 4.00 | 2.00 | 40 | 150 | 30 |
| 11-Chloroeicosafluoro-3-oxaundecane-1-sulfonic acid (11Cl-PF3OudS) | 763051-92-9 | -- | -- | 8.00 | 7.60 | 2.00 | 40 | 150 | 30 |
| 1H,1H, 2H, 2H-Perfluorodecane sulfonic acid (8:2FTS) | 39108-34-4 | -- | -- | 8.00 | 7.70 | 2.60 | 40 | 150 | 30 |
| 1H,1H, 2H, 2H-Perfluorohexane sulfonic acid (4:2FTS) | 757124-72-4 | -- | -- | 8.00 | 3.80 | 1.70 | 40 | 150 | 30 |
| 1H,1H, 2H, 2H-Perfluorooctane sulfonic acid (6:2FTS) | 27619-97-2 | -- | -- | 8.00 | 7.60 | 2.50 | 40 | 150 | 30 |
| 2H,2H,3H,3H-Perfluorooctanoic acid (5:3FTCA) | 914637-49-3 | -- | -- | 50.0 | 25.0 | 10.0 | 40 | 150 | 30 |
| 3-Perfluoroheptyl propanoic acid (7:3FTCA) | 812-70-4 | -- | -- | 50.0 | 25.0 | 10.0 | 40 | 150 | 30 |
| 3-Perfluoropropyl propanoic acid (3:3FTCA) | 356-02-5 | -- | -- | 10.0 | 5.00 | 1.50 | 40 | 150 | 30 |
| 4,8-Dioxa-3H-perfluorononanoic acid (ADONA) | 919005-14-4 | -- | -- | 8.00 | 3.80 | 1.50 | 40 | 150 | 30 |
| 9-Chlorohexadecafluoro-3-oxanonane-1-sulfonic acid (9Cl-PF3ONS) | 756426-58-1 | -- | -- | 8.00 | 3.80 | 1.00 | 40 | 150 | 30 |
| N-ethyl perfluorooctanesulfonamide (NEtFOSA) | 4151-50-2 | -- | -- | 2.00 | 1.00 | 0.500 | 40 | 150 | 30 |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 69

## SAP Worksheet #15-2—Reference Limits and Evaluation Table (continued)

| Analyte[b] | CAS # | PAL (RSL) (ng/L)[c] | PAL (ESV) (ng/L)[c] | Laboratory Limits (ng/L) | | | LCS and MS/MSD Recovery Limits and RPD (%)[d] | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | LOQ | LOD | DL | LCL | UCL | RPD |
| N-ethyl perfluorooctanesulfonamidoacetic acid (NEtFOSAA) | 2991-50-6 | -- | -- | 2.00 | 1.40 | 0.700 | 40 | 150 | 30 |
| N-ethyl perfluorooctanesulfonamidoethanol (NEtFOSE) | 1691-99-2 | -- | -- | 20.0 | 10.0 | 5.00 | 40 | 150 | 30 |
| N-methyl perfluorooctanesulfonamide (NMeFOSA) | 31506-32-8 | -- | -- | 2.00 | 1.00 | 0.500 | 40 | 150 | 30 |
| N-methyl perfluorooctanesulfonamidoacetic acid (NMeFOSAA) | 2355-31-9 | -- | -- | 4.00 | 2.40 | 1.20 | 40 | 150 | 30 |
| N-methyl perfluorooctanesulfonamidoethanol (NMeFOSE) | 24448-09-7 | -- | -- | 20.0 | 10.0 | 5.00 | 40 | 150 | 30 |
| Nonafluoro-3,6-dioxaheptanoic acid (NFDHA) | 151772-58-6 | -- | -- | 4.00 | 2.00 | 1.00 | 40 | 150 | 30 |
| Perfluoro(2-ethoxyethane)sulfonic acid (PFEESA) | 113507-82-7 | -- | -- | 4.00 | 1.80 | 0.500 | 40 | 150 | 30 |
| Perfluoro-3-methoxypropanoic acid (PFMPA) | 377-73-1 | -- | -- | 4.00 | 2.00 | 0.500 | 40 | 150 | 30 |
| Perfluoro-4-methoxybutanoic acid (PFMBA) | 863090-89-5 | -- | -- | 4.00 | 2.00 | 1.00 | 40 | 150 | 30 |
| Perfluorobutanoic acid (PFBA) | 375-22-4 | 1,800 | 11,000 | 8.00 | 4.00 | 2.00 | 40 | 150 | 30 |
| Perfluorodecanesulfonic acid (PFDS) | 335-77-3 | -- | -- | 2.00 | 1.00 | 0.500 | 40 | 150 | 30 |
| Perfluorodecanoic acid (PFDA) | 335-76-2 | -- | 660 | 2.00 | 1.00 | 0.500 | 40 | 150 | 30 |
| Perfluorododecanesulfonic acid (PFDoS) | 79780-39-5 | -- | -- | 2.00 | 1.90 | 0.900 | 40 | 150 | 30 |
| Perfluorododecanoic acid (PFDoA) | 307-55-1 | -- | -- | 2.00 | 1.00 | 0.500 | 40 | 150 | 30 |
| Perfluoroheptanesulfonic acid (PFHpS) | 375-92-8 | -- | -- | 2.00 | 1.00 | 0.400 | 40 | 150 | 30 |
| Perfluoroheptanoic acid (PFHpA) | 375-85-9 | -- | -- | 2.00 | 1.00 | 0.520 | 40 | 150 | 30 |
| Perfluorohexanoic acid (PFHxA) | 307-24-4 | 990 | 28,800 | 2.00 | 1.00 | 0.500 | 40 | 150 | 30 |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 70

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## SAP Worksheet #15-2—Reference Limits and Evaluation Table (continued)

| Analyte[b] | CAS # | PAL (RSL) (ng/L)[c] | PAL (ESV) (ng/L)[c] | Laboratory Limits (ng/L) | | | LCS and MS/MSD Recovery Limits and RPD (%)[d] | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | LOQ | LOD | DL | LCL | UCL | RPD |
| Perfluorononanesulfonic acid (PFNS) | 68259-12-1 | -- | -- | 2.00 | 1.00 | 0.400 | 40 | 150 | 30 |
| Perfluorooctanesulfonamide (PFOSA) | 754-91-6 | -- | -- | 2.00 | 1.00 | 0.500 | 40 | 150 | 30 |
| Perfluoropentanoic acid (PFPeA) | 2706-90-3 | -- | 3,200 | 4.00 | 2.00 | 1.00 | 40 | 150 | 30 |
| Perfluoropentansulfonic acid (PFPeS) | 2706-91-4 | -- | -- | 2.00 | 1.00 | 0.500 | 40 | 150 | 30 |
| Perfluorotetradecanoic acid (PFTeDA) | 376-06-7 | -- | -- | 2.00 | 1.00 | 0.500 | 40 | 150 | 30 |
| Perfluorotridecanoic acid (PFTrDA) | 72629-94-8 | -- | -- | 2.00 | 1.00 | 0.500 | 40 | 150 | 30 |
| Perfluoroundecanoic acid (PFUnA) | 2058-94-8 | -- | -- | 2.00 | 1.00 | 0.500 | 40 | 150 | 30 |

[a] Compliant with DoD QSM v.5.4 Table B-24 (DoD/DOE, 2021).

[b] The analyte list is based on 40 PFAS referenced in the 3rd Draft EPA Method 1633. All isomers are reported for each analyte as a sum.

[c] RSLs listed above are based on an HQ of 0.1 and the May 2023 RSL Table. ESVs listed above are the lowest surface water ESV for all available receptors. See **Appendix A**.

[d] The QSM v.5.4 (DoD/DOE, 2021) is the basis for LCS and MS/MSD limits.

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 71

## SAP Worksheet #15-3—Reference Limits and Evaluation Table

**Matrix:** SS and SB

**Analytical Group:** PFAS (3rd Draft EPA Method 1633[a])

| Analyte[b] | CAS # | PAL (RSL) (ng/g)[c] | PAL (ESV) (ng/g)[c] | Laboratory Limits (ng/g) | | | LCS and MS/MSD Recovery Limits and RPD (%)[d] | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | LOQ | LOD | DL | LCL | UCL | RPD |
| Perfluorooctanoic acid (PFOA) | 335-67-1 | 19 | 3,480 | 0.200 | 0.100 | 0.0510 | 40 | 150 | 30 |
| Perfluorooctanesulfonic acid (PFOS) | 1763-23-1 | 13 | 8.7 | 0.200 | 0.100 | 0.0510 | 40 | 150 | 30 |
| Perfluorobutanesulfonic acid (PFBS) | 375-73-5 | 1,900 | 817 | 0.200 | 0.100 | 0.0500 | 40 | 150 | 30 |
| Perfluorohexanesulfonic acid (PFHxS) | 355-46-4 | 130 | 2.8 | 0.200 | 0.100 | 0.0500 | 40 | 150 | 30 |
| Perfluorononanoic acid (PFNA) | 375-95-1 | 19 | 24.2 | 0.200 | 0.100 | 0.0500 | 40 | 150 | 30 |
| Hexafluoropropylene oxide dimer acid (HFPO-DA) | 13252-13-6 | 23 | -- | 0.800 | 0.400 | 0.100 | 40 | 150 | 30 |
| 11-Chloroeicosafluoro-3-oxaundecane-1-sulfonic acid (11Cl-PF3OudS) | 763051-92-9 | -- | -- | 0.800 | 0.400 | 0.200 | 40 | 150 | 30 |
| 1H,1H, 2H, 2H-Perfluorodecane sulfonic acid (8:2FTS) | 39108-34-4 | -- | -- | 1.00 | 0.800 | 0.350 | 40 | 150 | 30 |
| 1H,1H, 2H, 2H-Perfluorohexane sulfonic acid (4:2FTS) | 757124-72-4 | -- | -- | 0.800 | 0.400 | 0.200 | 40 | 150 | 30 |
| 1H,1H, 2H, 2H-Perfluorooctane sulfonic acid (6:2FTS) | 27619-97-2 | -- | -- | 1.00 | 0.800 | 0.350 | 40 | 150 | 30 |
| 2H,2H,3H,3H-Perfluorooctanoic acid (5:3FTCA) | 914637-49-3 | -- | -- | 5.00 | 2.50 | 1.00 | 40 | 150 | 30 |
| 3-Perfluoroheptyl propanoic acid (7:3FTCA) | 812-70-4 | -- | -- | 5.00 | 2.50 | 1.00 | 40 | 150 | 30 |
| 3-Perfluoropropyl propanoic acid (3:3FTCA) | 356-02-5 | -- | -- | 1.00 | 0.500 | 0.250 | 40 | 150 | 30 |
| 4,8-Dioxa-3H-perfluorononanoic acid (ADONA) | 919005-14-4 | -- | -- | 0.800 | 0.400 | 0.200 | 40 | 150 | 30 |
| 9-Chlorohexadecafluoro-3-oxanonane-1-sulfonic acid (9Cl-PF3ONS) | 756426-58-1 | -- | -- | 0.800 | 0.400 | 0.200 | 40 | 150 | 30 |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 72

## SAP Worksheet #15-3—Reference Limits and Evaluation Table (continued)

| Analyte[b] | CAS # | PAL (RSL) (ng/g)[c] | PAL (ESV) (ng/g)[c] | Laboratory Limits (ng/g) | | | LCS and MS/MSD Recovery Limits and RPD (%)[d] | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | LOQ | LOD | DL | LCL | UCL | RPD |
| N-ethyl perfluorooctanesulfonamide (NEtFOSA) | 4151-50-2 | -- | -- | 0.200 | 0.100 | 0.0500 | 40 | 150 | 30 |
| N-ethyl perfluorooctanesulfonamidoacetic acid (NEtFOSAA) | 2991-50-6 | -- | -- | 0.200 | 0.100 | 0.0500 | 40 | 150 | 30 |
| N-ethyl perfluorooctanesulfonamidoethanol (NEtFOSE) | 1691-99-2 | -- | -- | 2.00 | 1.00 | 0.500 | 40 | 150 | 30 |
| N-methyl perfluorooctanesulfonamide (NMeFOSA) | 31506-32-8 | -- | -- | 0.200 | 0.100 | 0.0500 | 40 | 150 | 30 |
| N-methyl perfluorooctanesulfonamidoacetic acid (NMeFOSAA) | 2355-31-9 | -- | -- | 0.200 | 0.100 | 0.0500 | 40 | 150 | 30 |
| N-methyl perfluorooctanesulfonamidoethanol (NMeFOSE) | 24448-09-7 | -- | -- | 2.00 | 1.00 | 0.500 | 40 | 150 | 30 |
| Nonafluoro-3,6-dioxaheptanoic acid (NFDHA) | 151772-58-6 | -- | -- | 0.400 | 0.200 | 0.104 | 40 | 150 | 30 |
| Perfluoro(2-ethoxyethane)sulfonic acid (PFEESA) | 113507-82-7 | -- | -- | 0.400 | 0.200 | 0.100 | 40 | 150 | 30 |
| Perfluoro-3-methoxypropanoic acid (PFMPA) | 377-73-1 | -- | -- | 0.400 | 0.200 | 0.100 | 40 | 150 | 30 |
| Perfluoro-4-methoxybutanoic acid (PFMBA) | 863090-89-5 | -- | -- | 0.400 | 0.200 | 0.100 | 40 | 150 | 30 |
| Perfluorobutanoic acid (PFBA) | 375-22-4 | 7,800 | 2,980 | 0.800 | 0.400 | 0.100 | 40 | 150 | 30 |
| Perfluorodecanesulfonic acid (PFDS) | 335-77-3 | -- | -- | 0.200 | 0.100 | 0.0500 | 40 | 150 | 30 |
| Perfluorodecanoic acid (PFDA) | 335-76-2 | -- | 67.7 | 0.200 | 0.100 | 0.0500 | 40 | 150 | 30 |
| Perfluorododecanesulfonic acid (PFDoS) | 79780-39-5 | -- | -- | 0.200 | 0.100 | 0.0500 | 40 | 150 | 30 |
| Perfluorododecanoic acid (PFDoA) | 307-55-1 | -- | -- | 0.200 | 0.100 | 0.0500 | 40 | 150 | 30 |
| Perfluoroheptanesulfonic acid (PFHpS) | 375-92-8 | -- | -- | 0.200 | 0.100 | 0.0500 | 40 | 150 | 30 |
| Perfluoroheptanoic acid (PFHpA) | 375-85-9 | -- | 1,000 | 0.200 | 0.100 | 0.0500 | 40 | 150 | 30 |
| Perfluorohexanoic acid (PFHxA) | 307-24-4 | 3,200 | 6,200 | 0.200 | 0.120 | 0.0590 | 40 | 150 | 30 |

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 73

### SAP Worksheet #15-3—Reference Limits and Evaluation Table (continued)

| Analyte[b] | CAS # | PAL (RSL) (ng/g)[c] | PAL (ESV) (ng/g)[c] | Laboratory Limits (ng/g) | | | LCS and MS/MSD Recovery Limits and RPD (%)[d] | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | LOQ | LOD | DL | LCL | UCL | RPD |
| N-ethyl perfluorooctanesulfonamide (NEtFOSA) | 4151-50-2 | -- | -- | 0.200 | 0.100 | 0.0500 | 40 | 150 | 30 |
| Perfluorononanesulfonic acid (PFNS) | 68259-12-1 | -- | -- | 0.200 | 0.100 | 0.0500 | 40 | 150 | 30 |
| Perfluorooctanesulfonamide (PFOSA) | 754-91-6 | -- | -- | 0.200 | 0.100 | 0.0500 | 40 | 150 | 30 |
| Perfluoropentanoic acid (PFPeA) | 2706-90-3 | -- | -- | 0.400 | 0.200 | 0.100 | 40 | 150 | 30 |
| Perfluoropentansulfonic acid (PFPeS) | 2706-91-4 | -- | -- | 0.200 | 0.100 | 0.0500 | 40 | 150 | 30 |
| Perfluorotetradecanoic acid (PFTeDA) | 376-06-7 | -- | -- | 0.200 | 0.100 | 0.0500 | 40 | 150 | 30 |
| Perfluorotridecanoic acid (PFTrDA) | 72629-94-8 | -- | -- | 0.200 | 0.100 | 0.0500 | 40 | 150 | 30 |
| Perfluoroundecanoic acid (PFUnA) | 2058-94-8 | -- | -- | 0.200 | 0.100 | 0.0500 | 40 | 150 | 30 |

[a] Compliant with DoD QSM v.5.4 Table B-24 (DoD/DOE, 2021).

[b] The analyte list is based on 40 PFAS referenced in the 3rd Draft EPA Method 1633. All isomers are reported for each analyte as a sum.

[c] RSLs listed above are based on an HQ of 0.1 and the May 2023 RSL Table. ESVs listed above are the lowest surface soil ESV for all available receptors. Soil ESVs apply to samples collected between 0 and 5 ft bgs. See **Appendix A**.

[d] DoD QSM v.5.4 (DoD/DOE, 2021) is the basis for LCS and MS/MSD limits.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 74

## SAP Worksheet #15-4—Reference Limits and Evaluation Table

**Matrix:** SD

**Analytical Group:** PFAS (3rd Draft EPA Method 1633[a])

| Analyte[b] | CAS # | PAL (RSL) (ng/g)[c] | PAL (ESV) (ng/g)[c] | Laboratory Limits (ng/g) | | | LCS and MS/MSD Recovery Limits and RPD (%)[d] | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | LOQ | LOD | DL | LCL | UCL | RPD |
| Perfluorooctanoic acid (PFOA) | 335-67-1 | 19 | 6 | 0.200 | 0.100 | 0.0510 | 40 | 150 | 30 |
| Perfluorooctanesulfonic acid (PFOS) | 1763-23-1 | 13 | 1.4 | 0.200 | 0.100 | 0.0510 | 40 | 150 | 30 |
| Perfluorobutanesulfonic acid (PFBS) | 375-73-5 | 1,900 | 730 | 0.200 | 0.100 | 0.0500 | 40 | 150 | 30 |
| Perfluorohexanesulfonic acid (PFHxS) | 355-46-4 | 130 | -- | 0.200 | 0.100 | 0.0500 | 40 | 150 | 30 |
| Perfluorononanoic acid (PFNA) | 375-95-1 | 19 | 10 | 0.200 | 0.100 | 0.0500 | 40 | 150 | 30 |
| Hexafluoropropylene oxide dimer acid (HFPO-DA) | 13252-13-6 | 23 | -- | 0.800 | 0.400 | 0.100 | 40 | 150 | 30 |
| 11-Chloroeicosafluoro-3-oxaundecane-1-sulfonic acid (11Cl-PF3OudS) | 763051-92-9 | -- | -- | 0.800 | 0.400 | 0.200 | 40 | 150 | 30 |
| 1H,1H, 2H, 2H-Perfluorodecane sulfonic acid (8:2FTS) | 39108-34-4 | -- | -- | 1.00 | 0.800 | 0.350 | 40 | 150 | 30 |
| 1H,1H, 2H, 2H-Perfluorohexane sulfonic acid (4:2FTS) | 757124-72-4 | -- | -- | 0.800 | 0.400 | 0.200 | 40 | 150 | 30 |
| 1H,1H, 2H, 2H-Perfluorooctane sulfonic acid (6:2FTS) | 27619-97-2 | -- | -- | 1.00 | 0.800 | 0.350 | 40 | 150 | 30 |
| 2H,2H,3H,3H-Perfluorooctanoic acid (5:3FTCA) | 914637-49-3 | -- | -- | 5.00 | 2.50 | 1.00 | 40 | 150 | 30 |
| 3-Perfluoroheptyl propanoic acid (7:3FTCA) | 812-70-4 | -- | -- | 5.00 | 2.50 | 1.00 | 40 | 150 | 30 |
| 3-Perfluoropropyl propanoic acid (3:3FTCA) | 356-02-5 | -- | -- | 1.00 | 0.500 | 0.250 | 40 | 150 | 30 |
| 4,8-Dioxa-3H-perfluorononanoic acid (ADONA) | 919005-14-4 | -- | -- | 0.800 | 0.400 | 0.200 | 40 | 150 | 30 |
| 9-Chlorohexadecafluoro-3-oxanonane-1-sulfonic acid (9Cl-PF3ONS) | 756426-58-1 | -- | -- | 0.800 | 0.400 | 0.200 | 40 | 150 | 30 |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 75

## SAP Worksheet #15-4—Reference Limits and Evaluation Table (continued)

| Analyte[b] | CAS # | PAL (RSL) (ng/g)[c] | PAL (ESV) (ng/g)[c] | Laboratory Limits (ng/g) | | | LCS and MS/MSD Recovery Limits and RPD (%)[d] | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | LOQ | LOD | DL | LCL | UCL | RPD |
| N-ethyl perfluorooctanesulfonamide (NEtFOSA) | 4151-50-2 | -- | -- | 0.200 | 0.100 | 0.0500 | 40 | 150 | 30 |
| N-ethyl perfluorooctanesulfonamidoacetic acid (NEtFOSAA) | 2991-50-6 | -- | -- | 0.200 | 0.100 | 0.0500 | 40 | 150 | 30 |
| N-ethyl perfluorooctanesulfonamidoethanol (NEtFOSE) | 1691-99-2 | -- | -- | 2.00 | 1.00 | 0.500 | 40 | 150 | 30 |
| N-methyl perfluorooctanesulfonamide (NMeFOSA) | 31506-32-8 | -- | -- | 0.200 | 0.100 | 0.0500 | 40 | 150 | 30 |
| N-methyl perfluorooctanesulfonamidoacetic acid (NMeFOSAA) | 2355-31-9 | -- | -- | 0.200 | 0.100 | 0.0500 | 40 | 150 | 30 |
| N-methyl perfluorooctanesulfonamidoethanol (NMeFOSE) | 24448-09-7 | -- | -- | 2.00 | 1.00 | 0.500 | 40 | 150 | 30 |
| Nonafluoro-3,6-dioxaheptanoic acid (NFDHA) | 151772-58-6 | -- | -- | 0.400 | 0.200 | 0.104 | 40 | 150 | 30 |
| Perfluoro(2-ethoxyethane)sulfonic acid (PFEESA) | 113507-82-7 | -- | -- | 0.400 | 0.200 | 0.100 | 40 | 150 | 30 |
| Perfluoro-3-methoxypropanoic acid (PFMPA) | 377-73-1 | -- | -- | 0.400 | 0.200 | 0.100 | 40 | 150 | 30 |
| Perfluoro-4-methoxybutanoic acid (PFMBA) | 863090-89-5 | -- | -- | 0.400 | 0.200 | 0.100 | 40 | 150 | 30 |
| Perfluorobutanoic acid (PFBA) | 375-22-4 | 7,800 | 1,600 | 0.800 | 0.400 | 0.100 | 40 | 150 | 30 |
| Perfluorodecanesulfonic acid (PFDS) | 335-77-3 | -- | -- | 0.200 | 0.100 | 0.0500 | 40 | 150 | 30 |
| Perfluorodecanoic acid (PFDA) | 335-76-2 | -- | -- | 0.200 | 0.100 | 0.0500 | 40 | 150 | 30 |
| Perfluorododecanesulfonic acid (PFDoS) | 79780-39-5 | -- | -- | 0.200 | 0.100 | 0.0500 | 40 | 150 | 30 |
| Perfluorododecanoic acid (PFDoA) | 307-55-1 | -- | -- | 0.200 | 0.100 | 0.0500 | 40 | 150 | 30 |
| Perfluoroheptanesulfonic acid (PFHpS) | 375-92-8 | -- | -- | 0.200 | 0.100 | 0.0500 | 40 | 150 | 30 |
| Perfluoroheptanoic acid (PFHpA) | 375-85-9 | -- | -- | 0.200 | 0.100 | 0.0500 | 40 | 150 | 30 |
| Perfluorohexanoic acid (PFHxA) | 307-24-4 | 3,200 | 1,800 | 0.200 | 0.120 | 0.0590 | 40 | 150 | 30 |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 76

SAP Worksheet #15-4—Reference Limits and Evaluation Table (continued)

| Analyte[b] | CAS # | PAL (RSL) (ng/g)[c] | PAL (ESV) (ng/g)[c] | Laboratory Limits (ng/g) | | | LCS and MS/MSD Recovery Limits and RPD (%)[d] | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | LOQ | LOD | DL | LCL | UCL | RPD |
| Perfluorononanesulfonic acid (PFNS) | 68259-12-1 | -- | -- | 0.200 | 0.100 | 0.0500 | 40 | 150 | 30 |
| Perfluorooctanesulfonamide (PFOSA) | 754-91-6 | -- | -- | 0.200 | 0.100 | 0.0500 | 40 | 150 | 30 |
| Perfluoropentanoic acid (PFPeA) | 2706-90-3 | -- | -- | 0.400 | 0.200 | 0.100 | 40 | 150 | 30 |
| Perfluoropentansulfonic acid (PFPeS) | 2706-91-4 | -- | -- | 0.200 | 0.100 | 0.0500 | 40 | 150 | 30 |
| Perfluorotetradecanoic acid (PFTeDA) | 376-06-7 | -- | -- | 0.200 | 0.100 | 0.0500 | 40 | 150 | 30 |
| Perfluorotridecanoic acid (PFTrDA) | 72629-94-8 | -- | -- | 0.200 | 0.100 | 0.0500 | 40 | 150 | 30 |
| Perfluoroundecanoic acid (PFUnA) | 2058-94-8 | -- | -- | 0.200 | 0.100 | 0.0500 | 40 | 150 | 30 |

[a] Compliant with DoD QSM v.5.4 Table B-24 (DoD/DOE, 2021).

[b] The analyte list is based on 40 PFAS referenced in the 3rd Draft EPA Method 1633. All isomers are reported for each analyte as a sum.

[c] RSLs listed above are based on an HQ of 0.1 and the May 2023 RSL Table. ESVs listed above are the lowest sediment ESV for all available receptors. See **Appendix A**.

[d] QSM v.5.4 (DoD/DOE, 2021) is the basis for LCS and MS/MSD limits.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 77

## SAP Worksheet #15-5—Reference Limits and Evaluation Table

**Matrix:** SS, SB, Saturated SB, SD[d]
**Analytical Group**: Fate and Transport Parameters

| Analyte[a] | Method[b] | CAS Number[c] | Units |
|---|---|---|---|
| GS05 Sieve 2" (50-millimeter [mm]) | ASTM D422 | SIEVE50.0 | PCT_P (percent passed) |
| GS06 Sieve 1.5" (37.5 mm) | ASTM D422 | SIEVE37.5 | PCT_P |
| GS07 Sieve 1" (25.0 mm) | ASTM D422 | SIEVE25.0 | PCT_P |
| GS08 Sieve 0.75" (19.0 mm) | ASTM D422 | SIEVE19.0 | PCT_P |
| GS10 Sieve 0.375" (9.5 mm) | ASTM D422 | SIEVE9.5 | PCT_P |
| Sieve No. 004 (4.75 mm) | ASTM D422 | SIEVE4.75 | PCT_P |
| Sieve No. 010 (2.00 mm) | ASTM D422 | SIEVE2.0 | PCT_P |
| Sieve No. 020 (850-micrometer [μm]) | ASTM D422 | SIEVE850 | PCT_P |
| Sieve No. 040 (425 μm) | ASTM D422 | SIEVE425 | PCT_P |
| Sieve No. 060 (250 μm) | ASTM D422 | SIEVE250 | PCT_P |
| Sieve No. 080 (180 μm) | ASTM D422 | SIEVE180 | PCT_P |
| Sieve No. 100 (150 μm) | ASTM D422 | SIEVE150 | PCT_P |
| Sieve No. 200 (75 μm) | ASTM D422 | SIEVE75 | PCT_P |
| 36.1 μm (Hydrometer Reading 1) | ASTM D422 | SIEVE36.1 | μm (micrometer) |
| 22.9 μm (Hydrometer Reading 2) | ASTM D422 | SIEVE22.9 | μm |
| 13.4 μm (Hydrometer Reading 3) | ASTM D422 | SIEVE13.4 | μm |
| 9.8 μm (Hydrometer Reading 4) | ASTM D422 | SIEVE9.8 | μm |
| 6.7 μm (Hydrometer Reading 5) | ASTM D422 | SIEVE6.7 | μm |
| 3.3 μm (Hydrometer Reading 6) | ASTM D422 | SIEVE3.3 | μm |
| 1.4 μm (Hydrometer Reading 7) | ASTM D422 | SIEVE1.4 | μm |
| Gravel (%) | ASTM D422 | GRAVEL | PCT (percent) |
| Sand (%) | ASTM D422 | 14808-60-7 | PCT |
| Coarse Sand (%) | ASTM D422 | COARSESAND | PCT |
| Medium Sand (%) | ASTM D422 | MEDIUMSAND | PCT |
| Fine Sand (%) | ASTM D422 | FINESAND | PCT |
| Silt (%) | ASTM D422 | SILT | PCT |
| Clay (%) | ASTM D422 | 1318-74-7 | PCT |
| Anion Exchange Capacity (AEC) | Lab Method | AEC | milliequivalents per 100 grams (meq/100g) |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 78

## SAP Worksheet #15-5—Reference Limits and Evaluation Table (continued)

| Analyte[a] | Method[b] | CAS Number[c] | Units |
|---|---|---|---|
| Bulk Density | ASTM D2937-04 | DENSITY | grams per cubic meter |
| Cation Exchange Capacity (CEC) | SW-846 9081 | CEC | meq/100g |
| Porosity | ASTM D854-06 | -3080 | % |
| Total Organic Carbon (TOC) | Walkley Black | TOC | milligrams per kilogram (mg/kg) |
| Solids, Percent Moisture | SM 2540G | %MOIST | % |

[a] There are no action limits, laboratory reporting limits, or LCS recovery limits for fate and transport parameters.

[b] Fate and transport parameters are not DoD-certified. Data will be used to assess soil characteristics and are considered screening-level data.

[c] In some instances, a contractor-specific CAS number is used.

[d] AEC, CEC, and TOC for SS and SB. Grain size, bulk density, porosity, and TOC for saturated SB. TOC for SD.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 79

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## SAP Worksheet #16—Project Schedule / Timeline Table

| Activities | Organization | Dates (MM/YYYY) | |
|---|---|---|---|
| | | Anticipated Date(s) of Initiation | Anticipated Date(s) of Completion |
| **SAP** | | | |
| Draft SAP preparation | CH2M | 8/2022 | 6/2023 |
| NAVFAC QAO/LANT / Base SAP Review | NAVFAC, MCB Camp Lejeune | 7/2023 | 8/2023 |
| EPA/NCDEQ SAP review | NAVFAC, MCB Camp Lejeune, NCDEQ, EPA Region 4 | 9/2023 | 11/2023 |
| Final SAP acceptance | NAVFAC, MCB Camp Lejeune, NCDEQ, EPA Region 4 | 11/2023 | 12/2023 |
| **Field Implementation** | | | |
| Groundwater sampling (Round 1, existing monitoring wells ) | CH2M | 11/2023 | 11/2023 |
| Laboratory analyses, data validation (DV), and data management | CH2M, subcontractor | 11/2023 | 1/2024 |
| Utility locating, monitoring well installation | CH2M, subcontractor | 1/2024 | 2/2024 |
| Round 1 groundwater, soil, surface water, and sediment sampling | CH2M, subcontractor | 2/2024 | 2/2024 |
| Laboratory analyses, data validation (DV), and data management | CH2M, subcontractor | 2/2024 | 4/2024 |
| Round 2 groundwater, surface water, and sediment sampling | CH2M | 5/2024 | 5/2024 |
| Monitoring well survey | CH2M | 5/2024 | 5/2024 |
| Laboratory analyses, DV, and data management | CH2M, subcontractor | 5/2024 | 7/2024 |

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 80

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## SAP Worksheet #16—Project Schedule / Timeline Table (continued)

| Activities | Organization | Dates (MM/YYYY) | |
|---|---|---|---|
| | | Anticipated Date(s) of Initiation | Anticipated Date(s) of Completion |
| *RI Report* | | | |
| Draft report preparation | CH2M | 8/2024 | 10/2024 |
| NAVFAC/Base Review | NAVFAC, MCB Camp Lejeune | 3/2025 | 5/2025 |
| EPA/NCDEQ report review | NAVFAC, MCB Camp Lejeune, NCDEQ, EPA Region 4 | 6/2025 | 7/2025 |
| Final report acceptance | NAVFAC, MCB Camp Lejeune, NCDEQ, EPA Region 4 | 8/2025 | 8/2025 |

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 81

## SAP Worksheet #17—Sampling Design and Rationale

Soil, groundwater, surface water, and sediment samples will be collected as detailed in **Table 17-1**. The sample depth information is provided in the Sampling Strategy and Rationale column. Samples will be analyzed for 40 PFAS by 3rd Draft EPA Method 1633. Actual sample locations may vary from the proposed sample locations presented on **Figure 3** due to field conditions or conflicts with Base operations.

Table 17-1. Sampling Design and Rationale for Site 113 Sampling

| Matrix | Number of Samples | Sampling Locations | Analysis | Laboratory Method | Sampling Strategy and Rationale |
|---|---|---|---|---|---|
| SS/SB | Round 1:<br>SS: 7<br>SB: 7 | Refer to **Figure 3** | PFAS | 3rd Draft EPA Method 1633[a] | Soil samples will be collected from two depths (one sample collected at the surface [0-1 foot bgs] and the second at the top of the capillary fringe in the unsaturated soil) to evaluate the nature and extent of PFAS in soil and potential PFAS transport. The pH of soil samples will be measured using a pH field meter to facilitate fate and transport evaluations.<br><br>Soil sample locations were selected as follows:<br>• IR113-MW10, IR113-MW11, IR113-MW12, and IR113-IS04 – to evaluate if release(s) occurred in areas where soil samples were not collected during the SI.<br>• IR113-IS01 through IR113-IS03 – collected along the drainage features to evaluate PFAS impacts and potential PFAS transport pathways. |
| Saturated SB | Round 1:<br>SB: 6 | Refer to **Figure 3** | Bulk Density<br>Porosity<br>TOC<br>Grain Size (sieve and hydrometer)<br>Solids, Percent Moisture | ASTM D2937-04<br>ASTM D854-06<br>Walkley Black<br>ASTM D422<br>Laboratory Method | At each EC/HPT location, soil samples (up to three at each location) will be collected for fate and transport analysis (dry bulk density, total porosity, grain size, percent moisture, and TOC). Soil sample depths will be selected in the field to cover the range of lithologies through which PFAS may be transported (typically clay/silt, silty sand, sand, and organic rich material, if present). The results will be used to refine the site CSM and to parameterize the groundwater flow model, and fate and transport. |

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 82

## SAP Worksheet #17—Sampling Design and Rationale (continued)

Table 17-1. Sampling Design and Rationale for Site 113 Sampling

| Matrix | Number of Samples | Sampling Locations | Analysis | Laboratory Method | Sampling Strategy and Rationale |
|---|---|---|---|---|---|
| SS/SB | Round 1:<br>SS: 2<br>SB: 2 | Refer to **Figure 3** | AEC<br>CEC<br>TOC | Laboratory Method<br>SW-846 9081<br>Walkley Black | One surface soil and one subsurface soil sample will be collected from the unsaturated zone from each EC/HPT location and analyzed for ion exchange capacity and TOC. The results will be used to refine the site CSM and to parameterize the groundwater flow direction and fate and transport. |
| GW | Round 1:<br>17 Surficial<br>4 UCH<br>Round 2:<br>17 Surficial<br>4 UCH | Refer to **Figure 3** | PFAS | 3rd Draft EPA Method 1633[a] | **Surficial Aquifer**<br>Groundwater samples will be collected from 14 proposed surficial aquifer monitoring well locations and 3 existing surficial aquifer monitoring well locations. Three of the proposed surficial wells are to be deep surficial aquifer monitoring wells. Two rounds of groundwater sampling will be conducted to assess potential seasonal variability. If the extent of PFAS are not horizontally and/or vertically delineated to the RI PALs in groundwater, then additional groundwater sampling may be considered by the Project Team.<br><br>Existing surficial aquifer monitoring well locations were selected as follows:<br>• BW-TC701-MW01, BW-TC701-MW02, and BW-TC701-MW03 – to confirm initial results and evaluate potential seasonal variability.<br><br>New surficial aquifer monitoring well locations were selected as follows:<br>• IR113-MW04 and IR113-MW08 - screened from approximately 5 to 15 feet bgs to bracket the water table, located downgradient of BW-TC701-MW01 and BW-TC701-MW02 (that exceeds PFAS RI PALs), to delineate impacted groundwater in the surficial aquifer.<br>• IR113-MW05 through IR113-MW07 – screened from approximately 5 to 15 feet bgs to bracket the water table, downgradient of Site 113 to delineate the downgradient extent of impacted groundwater in the surficial aquifer. |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 83

## SAP Worksheet #17—Sampling Design and Rationale (continued)

Table 17-1. Sampling Design and Rationale for Site 113 Sampling

| Matrix | Number of Samples | Sampling Locations | Analysis | Laboratory Method | Sampling Strategy and Rationale |
|---|---|---|---|---|---|
| GW (continued) | Round 1:<br>17 Surficial<br>4 UCH<br>Round 2:<br>17 Surficial<br>4 UCH | Refer to **Figure 3** | PFAS | 3rd Draft EPA Method 1633[a] | • IR113-MW09 – screened from approximately 5 to 15 feet bgs to bracket the water table, located south of BW-TC701-MW02 (that exceeds PFAS RI PALs) to evaluate the potential for a southerly component of groundwater flow towards the drainage feature and to delineate impacted groundwater in the surficial aquifer.<br><br>• IR113-MW10 – screened from approximately 5 to 15 feet bgs to bracket the water table, to assess potential impacts from the activities associated with the paved areas around the AFFF storage shed (G700A), to evaluate the potential for a southerly component of groundwater flow towards the surface water feature, and to delineate impacted groundwater in the surficial aquifer.<br><br>• IR113-MW11 and IR113-MW12 – screened from approximately 5 to 15 feet bgs to bracket the water table, to assess potential impacts from the activities associated with the paved areas between the AFFF storage shed (G700A) and Building TC701 and to delineate impacted groundwater in the surficial aquifer.<br><br>• IR113-MW13 and IR113-MW14 – screened from approximately 5 to 15 feet bgs to bracket the water table, located upgradient of Site 113 to delineate impacted groundwater in the surficial aquifer.<br><br>• IR113-MW15 through IR113-MW17 – screened 20 to 30 feet bgs, deep surficial aquifer wells co-located with BW-TC701-MW01, BW-TC701-MW02, and BW-TC701-MW03 to delineate vertical extent of PFAS in the surficial aquifer.<br><br>If a confining unit is not identified through the EC/HPT activities and/or is not encountered during monitoring well installation, then the deeper well installed to evaluate the vertical extent of PFAS (IR113-MW15 through IR113-MW17) will be screened within the upper portion of the lithology typically consistent with the Castle Hayne aquifer, such as the minimal presence of fine-grained clays and silts and the potential presence of cemented and/or shelly sands. |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 84

## SAP Worksheet #17—Sampling Design and Rationale (continued)

Table 17-1. Sampling Design and Rationale for Site 113 Sampling

| Matrix | Number of Samples | Sampling Locations | Analysis | Laboratory Method | Sampling Strategy and Rationale |
|---|---|---|---|---|---|
| GW (continued) | Round 1:<br>17 Surficial<br>4 UCH<br>Round 2:<br>17 Surficial<br>4 UCH | Refer to **Figure 3** | PFAS | 3rd Draft EPA Method 1633[a] | **UCH Aquifer**<br>Groundwater samples will be collected from three proposed UCH aquifer monitoring well locations. Two rounds of groundwater sampling will be conducted to assess potential temporal variability. If the extent of PFAS are not horizontally and/or vertically delineated to the RI PALs in groundwater, then additional groundwater sampling will be conducted. The screen interval and well construction depths for new monitoring well locations will be determined in the field, following an evaluation of lithology and informed by the results of EC/HPT activities.<br><br>New UCH aquifer monitoring well locations were selected as follows:<br><br>• IR113-MW18 – screened from approximately 40 to 50 feet bgs and co-located with BW-TC701-MW03 (which exceeded RI PALs) to evaluate whether impacted groundwater is migrating vertically from the surficial to the UCH.<br><br>• IR113-MW19 – screened from approximately 40 to 50 feet bgs and co-located with BW-TC701-MW02 (which exceeded RI PALs) to evaluate whether impacted groundwater is migrating vertically from the surficial to the UCH.<br><br>• IR113-MW20 – screened from approximately 40 to 50 feet bgs and collocated with BW-TC701-MW01 (which exceeded RI PALs) to evaluate whether impacted groundwater is migrating vertically from the surficial to the UCH.<br><br>• IR113-MW21 – screened from approximately 40 to 50 feet bgs and collocated with IR113-MW07 to evaluate whether impacted groundwater is migrating vertically from the surficial to the UCH. |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 85

## SAP Worksheet #17—Sampling Design and Rationale (continued)

Table 17-1. Sampling Design and Rationale for Site 113 Sampling

| Matrix | Number of Samples | Sampling Locations | Analysis | Laboratory Method | Sampling Strategy and Rationale |
|---|---|---|---|---|---|
| SW | Round 1: 3 Round 2: 3 | Refer to **Figure 3** | PFAS | 3rd Draft EPA Method 1633[a] | Surface water and sediment samples (IR113-SW01/SD01 through IR113-SW03/SD03) will be collected within the surface water features south of Building TC701 and west of Church Street to assess whether PFAS has migrated into these media either through overland flow or groundwater infiltration/discharge. Samples were proposed at locations likely to have received surface runoff or groundwater discharge from the release area. Surface water samples will be collected approximately 2 inches from the sediment surface. Sediment samples will be collected from approximately 0-6 inches below sediment surface to capture the biologically active zones of each medium. The pH of sediment samples will be measured using a pH field meter to facilitate fate and transport evaluations. |
| SD | Round 1: 3 Round 2: 3 | Refer to **Figure 3** | PFAS | 3rd Draft EPA Method 1633[a] | Two rounds of samples will be collected from surface water and sediment locations approximately 6 months apart assess seasonal variability and changes in water table on surface water concentrations. |
| | Round 1: 3 | Refer to **Figure 3** | TOC | Walkley Black | Sediment samples (IR113-SD01 through IR113-SD03) will be analyzed for TOC. |

[a] Compliant with DoD QSM v.5.4 Table B-24 (DoD/DOE, 2021).

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 86

This page intentionally left blank.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 87

SAP Worksheet #18—Sampling Locations and Methods/SOP Requirements Table

| Sampling Location | Sample ID[a] | Matrix | Depth (feet bgs) | Analytical Group | Number of Samples (identify field duplicates)[b] | Sampling SOP Reference |
|---|---|---|---|---|---|---|
| **Round 1** | | | | | | |
| **Analytical Samples** | | | | | | |
| BW-TC701-MW01 | IR113-TC701-GW01-YYQ | GW – Surficial | 12 to 22 | PFAS | 2 (FD) | Refer to **Worksheet #21**. |
| BW-TC701-MW02 | IR113-TC701-GW02-YYQ | GW – Surficial | 15 to 25 | PFAS | 3 (MS/MSD) | Refer to **Worksheet #21**. |
| BW-TC701-MW03 | IR113-TC701-GW03-YYQ | GW – Surficial | 15 to 25 | PFAS | 1 | Refer to **Worksheet #21**. |
| IR113-MW04 | IR113-GW04-YYQ | GW – Surficial | 5 to 15 | PFAS | 1 | Refer to **Worksheet #21**. |
| IR113-MW05 | IR113-GW05-YYQ | GW – Surficial | 5 to 15 | PFAS | 1 | Refer to **Worksheet #21**. |
| IR113-MW06 | IR113-GW06-YYQ | GW – Surficial | 5 to 15 | PFAS | 1 | Refer to **Worksheet #21**. |
| IR113-MW07 | IR113-GW07-YYQ | GW – Surficial | 5 to 15 | PFAS | 3 (MS/MSD) | Refer to **Worksheet #21**. |
| IR113-MW08 | IR113-GW08-YYQ | GW – Surficial | 5 to 15 | PFAS | 1 | Refer to **Worksheet #21**. |
| IR113-MW09 | IR113-GW09-YYQ | GW – Surficial | 5 to 15 | PFAS | 1 | Refer to **Worksheet #21**. |
| IR113-MW10 | IR113-GW10-YYQ | GW – Surficial | 5 to 15 | PFAS | 1 | Refer to **Worksheet #21**. |
| IR113-MW11 | IR113-GW11-YYQ | GW – Surficial | 5 to 15 | PFAS | 2 (FD) | Refer to **Worksheet #21**. |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 88

## SAP Worksheet #18—Sampling Locations and Methods/SOP Requirements Table (continued)

| Sampling Location | Sample ID[a] | Matrix | Depth (feet bgs) | Analytical Group | Number of Samples (identify field duplicates)[b] | Sampling SOP Reference |
|---|---|---|---|---|---|---|
| IR113-MW12 | IR113-GW12-YYQ | GW – Surficial | 5 to 15 | PFAS | 1 | Refer to **Worksheet #21**. |
| IR113-MW13 | IR113-GW13-YYQ | GW – Surficial | 5 to 15 | PFAS | 1 | Refer to **Worksheet #21**. |
| IR113-MW14 | IR113-GW14-YYQ | GW – Surficial | 5 to 15 | PFAS | 1 | Refer to **Worksheet #21**. |
| IR113-MW15 | IR113-GW15-YYQ | GW – Surficial (deep) | 20 to 30 | PFAS | 1 | Refer to **Worksheet #21**. |
| IR113-MW16 | IR113-GW16-YYQ | GW – Surficial (deep) | 20 to 30 | PFAS | 1 | Refer to **Worksheet #21**. |
| IR113-MW17 | IR113-GW17-YYQ | GW – Surficial (deep) | 20 to 30 | PFAS | 1 | Refer to **Worksheet #21**. |
| IR113-MW18 | IR113-GW18-YYQ | GW – UCH | 40 to 50 | PFAS | 1 | Refer to **Worksheet #21**. |
| IR113-MW19 | IR113-GW19-YYQ | GW – UCH | 40 to 50 | PFAS | 1 | Refer to **Worksheet #21**. |
| IR113-MW20 | IR113-GW20-YYQ | GW – UCH | 40 to 50 | PFAS | 1 | Refer to **Worksheet #21**. |
| IR113-MW21 | IR113-GW21-YYQ | GW – UCH | 40 to 50 | PFAS | 2 (FD) | Refer to **Worksheet #21**. |
| IR113-MW10 | IR113-SS10-YYQ | SS | 0 to 1 | PFAS | 2 (FD) | Refer to **Worksheet #21**. |
| | IR113-SB10-TDBD-YYQ | SB | Approximately 4 to 5 | PFAS | 3 (MS/MSD) | Refer to **Worksheet #21**. |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 89

## SAP Worksheet #18—Sampling Locations and Methods/SOP Requirements Table (continued)

| Sampling Location | Sample ID[a] | Matrix | Depth (feet bgs) | Analytical Group | Number of Samples (identify field duplicates)[b] | Sampling SOP Reference |
|---|---|---|---|---|---|---|
| IR113-MW11 | IR113-SS11-YYQ | SS | 0 to 1 | PFAS | 1 | Refer to **Worksheet #21**. |
| | IR113-SB11-TDBD-YYQ | SB | Approximately 4 to 5 | PFAS | 1 | Refer to **Worksheet #21**. |
| IR113-MW12 | IR113-SS12-YYQ | SS | 0 to 1 | PFAS | 1 | Refer to **Worksheet #21**. |
| | IR113-SB12-TDBD-YYQ | SB | Approximately 4 to 5 | PFAS | 1 | Refer to **Worksheet #21**. |
| IR113-IS01 | IR113-SS01-YYQ | SS | 0 to 1 | PFAS | 1 | Refer to **Worksheet #21** |
| | IR113-SB01-TDBD-YYQ | SB | Approximately 4 to 5 | PFAS | 1 | Refer to **Worksheet #21** |
| IR113-IS02 | IR113-SS02-YYQ | SS | 0 to 1 | PFAS | 1 | Refer to **Worksheet #21** |
| | IR113-SB02-TDBD-YYQ | SB | Approximately 4 to 5 | PFAS | 1 | Refer to **Worksheet #21** |
| IR113-IS03 | IR113-SS03-YYQ | SS | 0 to 1 | PFAS | 1 | Refer to **Worksheet #21** |
| | IR113-SB03-TDBD-YYQ | SB | Approximately 4 to 5 | PFAS | 1 | Refer to **Worksheet #21** |
| IR113-IS04 | IR113-SS04-YYQ | SS | 0 to 1 | PFAS | 1 | Refer to **Worksheet #21** |
| | IR113-SB04-TDBD-YYQ | SB | Approximately 4 to 5 | PFAS | 1 | Refer to **Worksheet #21** |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 90

## SAP Worksheet #18—Sampling Locations and Methods/SOP Requirements Table (continued)

| Sampling Location | Sample ID[a] | Matrix | Depth (feet bgs) | Analytical Group | Number of Samples (identify field duplicates)[b] | Sampling SOP Reference |
|---|---|---|---|---|---|---|
| IR113-SW/SD01 | IR113-SW01-YYQ | SW | Approximately 2 inches above the sediment surface | PFAS | 2 (FD) | Refer to **Worksheet #21** |
| | IR113-SD01-SD01-YYQ | SD | 0 to 0.5 below sediment surface | PFAS | 2 (FD) | Refer to **Worksheet #21** |
| IR113-SW/SD02 | IR113-SW02-YYQ | SW | Approximately 2 inches above the sediment surface | PFAS | 3 (MS/MSD) | Refer to **Worksheet #21** |
| | IR113-SD02-SD01-YYQ | SD | 0 to 0.5 below sediment surface | PFAS | 3 (MS/MSD) | Refer to **Worksheet #21** |
| IR113-SW/SD03 | IR113-SW03-YYQ | SW | Approximately 2 inches above the sediment surface | PFAS | 1 | Refer to **Worksheet #21** |
| | IR113-SD03-SD01-YYQ | SD | 0 to 0.5 below sediment surface | PFAS | 1 | Refer to **Worksheet #21** |
| Site113-QC | IR113-EB-MMDDYY | QC (equipment rinseate blank) | n/a | PFAS | 1 EB per day for decontaminated equipment | Refer to **Worksheet #21** |
| Site113-QC | IR113-EB-MMDDYY | QC (equipment rinseate blank) | n/a | PFAS | 1 EB per event for disposable equipment | Refer to **Worksheet #21** |
| Site113-QC | IR113-FB-MMDDYY | QC (ambient field blank) | n/a | PFAS | 1 FB per event | Refer to **Worksheet #21** |

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 91

## SAP Worksheet #18—Sampling Locations and Methods/SOP Requirements Table (continued)

| Sampling Location | Sample ID[a] | Matrix | Depth (feet bgs) | Analytical Group | Number of Samples (identify field duplicates)[b] | Sampling SOP Reference |
|---|---|---|---|---|---|---|
| **Fate and Transport** | | | | | | |
| IR113-IS03 | IR113-SB03-TDBD-YYQ | Saturated SB | TBD, representative of a range of lithologies | Bulk Density, Porosity, TOC, Grain Size (sieve and hydrometer), Solids, Percent Moisture | 3 (one each representing 3 different lithologies) | Refer to **Worksheet #21** |
| | IR113-SS03-YYQ | SS | 0 to 1 | AEC, CEC, TOC | 1 | Refer to **Worksheet #21**. |
| | IR113-SB03-TDBD-YYQ | SB | Approximately 4 to 5 | AEC, CEC, TOC | 1 | Refer to **Worksheet #21**. |
| IR113-IS04 | IR113-SB04-TDBD-YYQ | Saturated SB | TBD, representative of a range of lithologies | Bulk Density, Porosity, TOC, Grain Size (sieve and hydrometer), Solids, Percent Moisture | 3 (one each representing 3 different lithologies) | Refer to **Worksheet #21** |
| | IR113-SS04-YYQ | SS | 0 to 1 | AEC, CEC, TOC | 1 | Refer to **Worksheet #21**. |
| | IR113-SB04-TDBD-YYQ | SB | Approximately 4 to 5 | AEC, CEC, TOC | 1 | Refer to **Worksheet #21**. |
| IR113-SW/SD01 | IR113-SD01-YYQ | SD | 0 to 0.5 | TOC | 1 | Refer to **Worksheet #21**. |
| IR113-SW/SD02 | IR113-SD02-YYQ | SD | 0 to 0.5 | TOC | 1 | Refer to **Worksheet #21**. |
| IR113-SW/SD03 | IR113-SD03-YYQ | SD | 0 to 0.5 | TOC | 1 | Refer to **Worksheet #21**. |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 92

## SAP Worksheet #18—Sampling Locations and Methods/SOP Requirements Table (continued)

| Sampling Location | Sample ID[a] | Matrix | Depth (feet bgs) | Analytical Group | Number of Samples (identify field duplicates)[b] | Sampling SOP Reference |
|---|---|---|---|---|---|---|
| *Round 2* | | | | | | |
| BW-TC701-MW01 | IR113-TC701-GW01-YYQ | GW – Surficial | 12 to 22 | PFAS | 2 (FD) | Refer to **Worksheet #21** |
| BW-TC701-MW02 | IR113-TC701-GW02-YYQ | GW – Surficial | 15 to 25 | PFAS | 3 (MS/MSD) | Refer to **Worksheet #21**. |
| BW-TC701-MW03 | IR113-TC701-GW03-YYQ | GW – Surficial | 15 to 25 | PFAS | 1 | Refer to **Worksheet #21**. |
| IR113-MW04 | IR113-GW04-YYQ | GW – Surficial | 5 to 15 | PFAS | 1 | Refer to **Worksheet #21**. |
| IR113-MW05 | IR113-GW05-YYQ | GW – Surficial | 5 to 15 | PFAS | 1 | Refer to **Worksheet #21**. |
| IR113-MW06 | IR113-GW06-YYQ | GW – Surficial | 5 to 15 | PFAS | 1 | Refer to **Worksheet #21**. |
| IR113-MW07 | IR113-GW07-YYQ | GW – Surficial | 5 to 15 | PFAS | 3 (MS/MSD) | Refer to **Worksheet #21**. |
| IR113-MW08 | IR113-GW08-YYQ | GW – Surficial | 5 to 15 | PFAS | 1 | Refer to **Worksheet #21**. |
| IR113-MW09 | IR113-GW09-YYQ | GW – Surficial | 5 to 15 | PFAS | 1 | Refer to **Worksheet #21**. |
| IR113-MW10 | IR113-GW10-YYQ | GW – Surficial | 5 to 15 | PFAS | 1 | Refer to **Worksheet #21**. |
| IR113-MW11 | IR113-GW11-YYQ | GW – Surficial | 5 to 15 | PFAS | 2 (FD) | Refer to **Worksheet #21**. |
| IR113-MW12 | IR113-GW12-YYQ | GW – Surficial | 5 to 15 | PFAS | 1 | Refer to **Worksheet #21**. |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 93

## SAP Worksheet #18—Sampling Locations and Methods/SOP Requirements Table (continued)

| Sampling Location | Sample ID[a] | Matrix | Depth (feet bgs) | Analytical Group | Number of Samples (identify field duplicates)[b] | Sampling SOP Reference |
|---|---|---|---|---|---|---|
| IR113-MW13 | IR113-GW13-YYQ | GW – Surficial | 5 to 15 | PFAS | 1 | Refer to **Worksheet #21**. |
| IR113-MW14 | IR113-GW14-YYQ | GW – Surficial | 5 to 15 | PFAS | 1 | Refer to **Worksheet #21**. |
| IR113-MW15 | IR113-GW15-YYQ | GW – Surficial | 20 to 30 | PFAS | 1 | Refer to **Worksheet #21**. |
| IR113-MW16 | IR113-GW16-YYQ | GW – Surficial | 20 to 30 | PFAS | 1 | Refer to **Worksheet #21**. |
| IR113-MW17 | IR113-GW17-YYQ | GW – Surficial | 20 to 30 | PFAS | 1 | Refer to **Worksheet #21** |
| IR113-MW18 | IR113-GW18-YYQ | GW – UCH | 40 to 50 | PFAS | 1 | Refer to **Worksheet #21**. |
| IR113-MW19 | IR113-GW19-YYQ | GW – UCH | 40 to 50 | PFAS | 1 | Refer to **Worksheet #21** |
| IR113-MW20 | IR113-GW20-YYQ | GW – UCH | 40 to 50 | PFAS | 1 | Refer to **Worksheet #21**. |
| IR113-MW21 | IR113-GW21-YYQ | GW – UCH | 40 to 50 | PFAS | 2 (FD) | Refer to **Worksheet #21**. |
| IR113-SW/SD01 | IR113-SW01-YYQ | SW | Approximately 2 inches above the sediment surface | PFAS | 2 (FD) | Refer to **Worksheet #21** |
| | IR113-SD01-YYQ | SD | 0 to 0.5 below sediment surface | PFAS | 2 (FD) | Refer to **Worksheet #21** |
| IR113-SW/SD02 | IR113-SW02-YYQ | SW | Approximately 2 inches above the sediment surface | PFAS | 3 (MS/MSD) | Refer to **Worksheet #21**. |
| | IR113-SD02-YYQ | SD | 0 to 0.5 below sediment surface | PFAS | 3 (MS/MSD) | Refer to **Worksheet #21** |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 94

## SAP Worksheet #18—Sampling Locations and Methods/SOP Requirements Table (continued)

| Sampling Location | Sample ID[a] | Matrix | Depth (feet bgs) | Analytical Group | Number of Samples (identify field duplicates)[b] | Sampling SOP Reference |
|---|---|---|---|---|---|---|
| IR113-SW/SD03 | IR113-SW03-YYQ | SW | Approximately 2 inches above the sediment surface | PFAS | 1 | Refer to **Worksheet #21** |
| | IR113-SD03-SD01-YYQ | SD | 0 to 0.5 below sediment surface | PFAS | 1 | Refer to **Worksheet #21** |
| Site113-QC | IR113-EB-MMDDYY | QC (equipment rinseate blank) | n/a | PFAS | 1 EB per day for decontaminated equipment | Refer to **Worksheet #21** |
| Site113-QC | IR113-EB-MMDDYY | QC (equipment rinseate blank) | n/a | PFAS | 1 EB per event for disposable equipment | Refer to **Worksheet #21**. |
| Site113-QC | IR113-FB-MMDDYY | QC (ambient field blank) | n/a | PFAS | 1 FB per event | Refer to **Worksheet #21** |

[a] TDBD = Top Depth and Bottom Depth of sample interval. YYQ = Year and Quarter. MMDDYY = Month, Day, and Year.

[b] Locations of field duplicates and MS/MSDs are shown above for convenience, and their actual locations are determined in the field. Field duplicates should be collected from areas which are expected to be relatively contaminated. MS/MSDs should be collected from areas which are expected to be relatively uncontaminated. In practice, these samples can be collected from anywhere there is sufficient volume.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 95

## SAP Worksheet #19—Analytical SOP Requirements Table

| Matrix | Analytical Group | Analytical and Preparation Method/SOP Reference | Containers (number, size, and type) | Sample Volume (units) | Preservation Requirements (chemical, temperature, light-protected) | Maximum Holding Time[a] (preparation/analysis) |
|---|---|---|---|---|---|---|
| GW, SW | PFAS | 3rd Draft EPA Method 1633[b] /WI46412 | 2 x 500-mL HDPE | 500 mL | 0 - 6°C | 7 days if 0 to 6°C or 90 days if stored at ≤ -20°C and protected from light |
| SS, SB, SD | PFAS | 3rd Draft EPA Method 1633[b] /WI48593 | 1 x 500-mL HDPE Jar | 100 g | 0 - 6°C | 90 days if stored at 0 to 6°C or ≤ -20°C and protected from light |
| SS, SB, Saturated SB, SD | TOC | Walkley Black / WC-03-199 | 1 x 4-ounce Glass Jar | 20 g | ≤6°C, but not frozen | 28 days |
| Saturated SB | Solids, Percent Moisture | Lab Method / WI10070 | 1 x 4-ounce Glass Jar | 20 g | ≤6°C, but not frozen | 7 days |
| Saturated SB | Grain Size | ASTM D422-63 / WI46354 | 1 x 16-ounce Glass Jar or 1 gallon Ziploc bag | 100 g | ≤6°C, but not frozen | Holding times are not applicable |
| Saturated SB | Bulk Density | ASTM D2937-04 / BR-GT-018 | 1 × 2-inch diameter × 6-inch-long sleeve | 500 g | NA | Holding times are not applicable |
| Saturated SB | Porosity | ASTM D854-06 / BR-GT-004 | 1 × 2-inch diameter × 6-inch-long sleeve | 200 g | NA | Holding times are not applicable |
| SS, SB | AEC | Lab Method / WC-22-008 | 1 x 4 ounce glass jar | 250 g | NA | 6 months |
| SS, SB | CEC | SW-846 9081 / WC-22-007 | 1 x 4 ounce glass jar | 250 g | NA | 6 months |

Notes:

[a] Maximum holding time is calculated from the time the sample is collected to the time the sample is prepared/extracted.

[b] Compliant with DoD QSM v.5.4 Table B-24 (DoD/DOE, 2021).

g = gram

mL = milliliter(s)

NA = not available

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 96

This page intentionally left blank.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 97

SAP Worksheet #20 – Field Quality Control Sample Summary Table

| Matrix | Analytical Group | Number of Sampling Locations | Number of Field Duplicates | Number of MS/MSDs | Number of Equipment Blanks[a] | Number of Field Blanks | Total Number of Samples to Lab |
|---|---|---|---|---|---|---|---|
| **Round 1** | | | | | | | |
| GW | PFAS | 21 | 3 | 2/2 | 1 | 1 | 30 |
| SW | PFAS | 3 | 1 | 1/1 | 1 | 1 | 8 |
| SD | PFAS | 3 | 1 | 1/1 | 1 | 1 | 8 |
| SD | TOC | 3 | -- | -- | -- | -- | 3 |
| SS | PFAS | 7 | 1 | 1/1 | 1 | 1 | 19 |
| SB | PFAS | 7 | | | | | |
| Saturated SB | Bulk Density, Porosity, TOC, Grain Size (sieve and hydrometer), Solids, Percent Moisture | 6 | -- | -- | -- | -- | 6 |
| SS | AEC, CEC, TOC | 3 | -- | -- | -- | -- | 3 |
| SB | ACE, CEC, TOC | 3 | -- | -- | -- | -- | 3 |
| **Round 2** | | | | | | | |
| GW | PFAS | 21 | 3 | 2/2 | 1 | 1 | 30 |
| SW | PFAS | 3 | 1 | 1/1 | 1 | 1 | 8 |
| SD | PFAS | 3 | 1 | 1/1 | 1 | 1 | 8 |

[a] The number of field QC samples to be collected is dependent on the number of parent samples and the number of days of the sampling event. The sample numbers shown are the maximum number of samples that will be collected at each site. Field QC will be sampled at the frequency specified on **Worksheet #12** and summarized as follows:

Field duplicates are collected at a frequency of 1 per 10 field samples per matrix.

MS/MSD pairs are collected at a frequency of 1 per 20 samples per matrix sent to the laboratory (including duplicates).

Equipment Blanks for decontaminated equipment are collected once per day of sampling, per media, per type of equipment. Equipment Blanks for disposable equipment are collected once per lot, per media.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 98

This page intentionally left blank.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 99

## SAP Worksheet #21—Project Sampling SOP References Table

| Reference Number | Title, Revision Date and/or Number | Originating Organization of Sampling SOP | Equipment Type | Modified for Project Work? (Yes/No) | Comments |
|---|---|---|---|---|---|
| SOP-001 | Preparing Field Logbooks, rev. 03/2023 | CH2M | Loose leaf paper or tablet for electronic data capture | No | Loose leaf paper substituted for standard field logbooks. |
| SOP-002 | General Considerations for PFAS Investigations, rev. 04/2023 | CH2M | Supplies and sampling equipment | No | |
| SOP-003 | Decontamination of Personnel and Equipment, rev. 02/2023 | CH2M | For cleansing reusable samplers | No | |
| SOP-004 | Decontamination of Drill Rigs and Equipment, rev. 02/2023 | CH2M | Steam cleaner, potable water, phosphate-free, detergent, brushes, personal protective equipment | No | |
| SOP-005 | Disposal of Waste Fluids and Solids, rev. 02/2023 | CH2M | United States Department of Transportation 55-gallon drums or tank | No | |
| SOP-017 | Field Measurement of pH, Specific Conductance, DO, ORP, and Temperature Using a WQP Meter with Flow-through Cell, rev. 02/2023 | CH2M | Water quality meter with flow-through cell | No | |
| SOP-026 | Low-Flow Groundwater Sampling from Monitoring Wells - EPA Region 4, MCB Camp Lejeune, rev. 02/2023 | CH2M | Pump, HDPE tubing | Yes | Reflects most recent Base and EPA Region 4 low-flow sampling guidance. |
| SOP-028 | Groundwater Sampling from Monitoring Wells - EPA Region 4, rev. 02/2023 | CH2M | Pump, HDPE tubing | No | For volumetric purge. |
| SOP-040 | MultiRAE PID, rev. 03/2023 | CH2M | PID | No | |
| SOP-051 | Installation of Monitoring Wells by Sonic Drilling, rev. 03/2023 | CH2M | Sonic drill rig, well materials | No | |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 100

## SAP Worksheet #21—Project Sampling SOP References Table (continued)

| Reference Number | Title, Revision Date and/or Number | Originating Organization of Sampling SOP | Equipment Type | Modified for Project Work? (Yes/No) | Comments |
|---|---|---|---|---|---|
| SOP-056 | Water Level Measurements, rev. 03/2023 | CH2M | Electronic water-level meter, Interface probe | No | |
| SOP-059 | Civil Surveying, rev. 03/2023 | CH2M | | No | |
| SOP-060 | Sampling Contents of Tanks and Drums, rev. 03/2023 | CH2M | Rubber mallet, socket wrench, laboratory-supplied sample bottles | No | |
| SOP-061 | Global Positioning System, rev. 03/2023 | CH2M | Hand-held global positioning system unit | No | |
| SOP-066 | Equipment Blank and Field Blank Preparation, rev. 03/2023 | CH2M | Laboratory provided blank liquid and sample bottles | No | |
| SOP-067 | Chain-of-Custody, rev. 03/2023 | CH2M | Chain-of-custody form | No | |
| SOP-069 | Packaging and Shipping Procedures for Low-Concentration Samples, rev. 03/2023 | CH2M | Laboratory-supplied coolers, plastic bags, ice, tape | No | No Teflon supplies, Samples will be kept on ice and shipped to laboratory via FedEx. |
| SOP-074 | Logging of Soil Borings, rev. 02/2023 | CH2M | Indelible pen, ruler, logbook, spatula, soil color chart, grain size chart, hand lens, USCS index charts | No | |
| SOP-075 | Shallow Soil Sampling, rev. 02/2023 | CH2M | Stainless steel trowel, sample jars, pin flags | No | |
| SOP-087 | Locating and Clearing Underground Utilities, rev. 02/2022 | CH2M | EM-31, Ground Penetrating Radar systems, Magnetic and Optical field methods | No | |
| SOP-090 | Groundwater Sampling for Per- and Polyfluoroalkyl Substances, rev. 3/2023 | CH2M | Teflon-free tubing, Teflon-free bailer (if using bailer), PFAS-free pump, sample bottles (HDPE bottle with HDPE screw cap), laboratory prepared deionized, certified PFAS-free water for field blank collection, loose leaf paper without waterproof coating or tablet, metal clip board, pen (not Sharpie), nitrile or latex gloves | No | No Teflon components, PFAS-free shipping materials |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 101

## SAP Worksheet #21—Project Sampling SOP References Table (continued)

| Reference Number | Title, Revision Date and/or Number | Originating Organization of Sampling SOP | Equipment Type | Modified for Project Work? (Yes/No) | Comments |
|---|---|---|---|---|---|
| SOP-093 | Sediment Sampling for Per- and Polyfluoroalkyl Substances, rev. 3/2023 | CH2M | PFAS-free sample collection device (hand corer, scoop, dredge, or grab sampler), measuring tape, sample jars, loose leaf paper without waterproof coating or tablet, metal clip board if using paper, pen (not Sharpie), nitrile or latex gloves, meters for specific conductance, temperature, pH, and DO. | No | No Teflon components, PFAS-free shipping materials |
| SOP-094 | Soil Sampling for Per- and Polyfluoroalkyl Substances, rev. 3/2023 | CH2M | Sample jars (HDPE bottle with HDPE screw cap), laboratory prepared deionized, certified PFAS-free water for field blank collection, loose leaf paper without waterproof coating or tablet, clip board, pen (not Sharpie), nitrile or latex gloves | No | No Teflon components, PFAS-free shipping materials |
| SOP-095 | Surface Water Sampling for Per- and Polyfluoroalkyl Substances, rev. 3/2023 | CH2M | PFAS-free sampler (open tube sampler, dip sampler, weighted bottle sampler [no glass], hand pump without Teflon components, Van Dorn sampler, depth-integrating sampler, peristaltic pump and PFAS-free tubing), sampling containers (HDPE with HDPE screw cap), loose leaf paper without waterproof coating or tablet, metal clip board if using paper, pen (not Sharpie), nitrile or latex gloves, meters for specific conductance, temperature, pH, and DO. | No | No Teflon components, PFAS-free shipping materials |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 102

This page intentionally left blank.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 103

## SAP Worksheet #22—Field Equipment Calibration, Maintenance, Testing, and Inspection Table

| Field Equipment | Activity[a] | Frequency | Acceptance Criteria | CA | Responsible Person | SOP Reference | Comments |
|---|---|---|---|---|---|---|---|
| Water Quality Meter | Calibrate probes using Auto-Calibration Standard Solution | Daily and as needed | To properly calibrate the water quality meter, immerse the instrument in the premixed standard solutions. Each solution has a standard solution value on the container. Enter the standard solution value from the container into the YSI. Observe the reading on the water quality meter for each parameter (specific conductance, DO, pH, and ORP). When the reading shows no significant change for approximately 30 seconds, press enter. The screen will indicate the calibration has been accepted. pH will be calibrated using a minimum of 2-point calibration. Typical standard solution values are: conductivity – 1.413 milliSiemens/ centimeter; DO – 100%; pH – 4.0, 7.0, and 10.0 standard unit; ORP – 240 millivolts. | Manufacturer technical support for calibration errors | FTL | SOP-017 | **Appendix B** |
| Water Level Meter | Key checks for proper functioning | Mobilization | Perform key checks: Inspect numbering on tape and verify legible. Before each use, verify that the battery is charged by pressing the test button on the water-level meter. Verify that the unit is operating correctly by testing the probe in water. Leave the unit turned off when not in use. | Replace battery if not functioning. Replace unit if changing battery does not result in proper functioning. | FTL | SOP-056 | **Appendix B** |
| Hand-held global positioning system unit | Self-calibration | When unit is turned on | The unit antenna will receive signal from satellites (a minimum of three satellites is necessary for signal and data collection/operation). | Manufacturer technical support for calibration errors | FTL | SOP-061 | **Appendix B** |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 104

## SAP Worksheet #22—Field Equipment Calibration, Maintenance, Testing, and Inspection Table (continued)

| Field Equipment | Activity[a] | Frequency | Acceptance Criteria | CA | Responsible Person | SOP Reference | Comments |
|---|---|---|---|---|---|---|---|
| PID | Calibrate using ambient air and isobutylene 100 parts per million (ppm) calibration gas | Daily and as needed | Parameter-specific, as defined in SOP-013, Section 4A. <br> PID calibration acceptance criteria: <br> 1) Fresh air calibration using a Zero Air bottle (HAZCO Services Part Number SGZA or RAE Systems Part Number 600-0024) to zero out carbon monoxide, volatile organic compounds (VOCs), lower explosive limit, oxygen, and hydrogen sulfide. If no Zero Air is available, perform the fresh air calibration in an area free from any detectable vapors. <br> 2) Multiple sensor calibration using a mixed gas bottle (HAZCO Services Part Number R-SGRAE4 or RAE Systems Part Number 008-3002) to calibrate carbon monoxide to 50 ppm, lower explosive limit to 50%, oxygen to 20.9%, and hydrogen sulfide to 25 ppm. <br> 3) Single sensor calibration using VOC gas isobutylene (HAZCO Services Part number r-SGISO or RAE Part Number 600-0002) to calibrate VOCs to 100 ppm. | Manufacturer technical support for calibration errors | FTL | SOP-040 | **Appendix B** |

Notes:

[a] Activities may include calibration, verification, testing, and maintenance.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 105

## SAP Worksheet #23—Labs Analytical SOP References Table

| Lab SOP Number | Title, Revision Date, and/or Number | Date Last Revisited if not Revised | Definitive or Screening Data | Matrix and Analytical Group | Instrument | Organization Performing Analysis | Variance to QSM | Modified for Project Work? (Yes or No) |
|---|---|---|---|---|---|---|---|---|
| WI46412 | Analysis of Per and Polyfluoroalkyl Substances (PFAS) in Aqueous Samples by LC-MS/MS Using Draft Method 1633/QSM5.4 Table B24; 08/31/2022; Rev. 2 | | Definitive | GW/PFAS | LC-MS/MS | ELLE | None | No |
| WI48593 | Analysis of Per and Polyfluoroalkyl Substances (PFAS) in Solid Samples by LC-MS/MS Using Draft Method 1633/QSM5.4 Table B24; 09/26/2022; Rev. 2 | | Definitive | SS, SB/PFAS | LC-MS/MS | ELLE | None | No |
| WI46354 | Particle Size Distribution of Soils and Solids/Grain Size Classification by ASTM D422-63 (reapproved 2007) – Modified; Revision 1, 11/25/2021 | 03/23/2023 | Screening | SB/Grain Size | Sieve/Hydro meter | ELLE | None | No |
| WI10070 | Moisture by Moisture Analyzer in Solids; Revision 12, 09/06/2022 | | Screening | SB/Moisture | Gravimetric | ELLE | None | No |
| WI10725 | Environmental Sample Receipt and Unpacking; Revision 24, 05/19/2023 | | N/A | N/A | N/A | ELLE | None | No |
| WI12042 | Automated Storage, Retrieval, and Discarding of Samples; Revision 15, 04/10/2023 | | N/A | N/A | N/A | ELLE | None | No |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 106

## SAP Worksheet #23—Labs Analytical SOP References Table (continued)

| Lab SOP Number | Title, Revision Date, and/or Number | Date Last Revisited if not Revised | Definitive or Screening Data | Matrix and Analytical Group | Instrument | Organization Performing Analysis | Variance to QSM | Modified for Project Work? (Yes or No) |
|---|---|---|---|---|---|---|---|---|
| BR-GT-018 | Density in Soils by Drive Cylinder Method (ASTM D2937-04); Revision 9, 08/03/2021 | In review | Screening | SB/Bulk Density | Gravimetric | ETAB | No | No |
| T-GEO-SOP48247 | Specific Gravity of Soil Solids by Water Pycnometer (ASTM D854-06 – Method B); Revision 11, 04/13/2023 | | Screening | SB/Porosity | Gravimetric | ETAB | No | No |
| S-SS-SOP49959 | Sample Management; Revision 19, 05/08/2023 | | N/A | N/A | N/A | ETAB | No | No |
| WC-22-008 | Anion Exchange Capacity; Revision 0, 09/30/2022 | | Screening | SS, SB/AEC | ICP | EXH | None | No |
| WC-22-007 | LDNR 29B Parameters; Revision 0, 09/09/2022 | | Screening | SS, SB/CEC | ICP | EXH | None | No |
| WC-03-199 | Total Organic Carbon in Soil by Walkley Black [SG 90.3.1]; Revision 0, 07/08/2022 | | Screening | SS, SB/TOC | Titration | EXH | None | No |
| QS-16-008 | Sample Custody; Revision 2019.1, 04/08/2019 | 11/22/2022 | N/A | N/A | N/A | EXH | None | No |
| QS-16-002 | Waste Disposal and Pollution Prevention; Revision 2020.1, 01/22/2020 | 11/22/2022 | N/A | N/A | N/A | EXH | None | No |

ICP = Inductively Coupled Plasma

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 107

## SAP Worksheet #24—Analytical Instrument Calibration Table

| Instrument[a] | Calibration Procedure | Frequency of Calibration | Acceptance Criteria | CA | Person Responsible for CA | SOP Reference[b] |
|---|---|---|---|---|---|---|
| LC-MS/MS (for PFAS) | Mass Calibration | Instrument must have a valid mass calibration prior to any sample analysis. Mass calibration must be performed at least annually to maintain instrument sensitivity and stability. Mass calibration is verified after each mass calibration, prior to initial calibration (ICAL). | Calibrate the mass scale of the MS with calibration compounds and procedures described by the manufacturer. Mass calibration range must bracket the ion masses of interest. The most recent mass calibration must be used for every acquisition in an analytical run. Multiple Reaction Monitoring analysis is required to achieve better sensitivity than full scan analysis. Mass calibration must be verified after each mass calibration, prior to any sample analysis. Mass calibration must be performed according to the instrument manufacturer's instructions. A mass calibration verification must be performed using standards whose mass range brackets the masses of interest (quantitative and qualitative ions). | If the mass calibration fails, then recalibrate. If it fails again, consult manufacturer's instructions on corrective maintenance. Flagging is not appropriate. Problem must be corrected. No samples may be analyzed under a failing mass calibration. The mass calibration is updated as needed (for example, QC failures, ion masses fall outside of the ±0.5 atomic mass unit of the true value, ≤ 0.1 Dalton, major instrument maintenance is performed, or the instrument is moved). | Analyst | WI46412/ WI48593 |
| LC-MS/MS (for PFAS) | Mass Calibration Verification | Performed following any mass calibration with a mid-level calibration standard. | Check the instrument mass resolution to ensure that it is at least unit resolution. Inject a mid-level calibration (CAL) standard under LC-MS/MS conditions to obtain the retention times (RTs) of each method analyte. Divide the chromatogram into RT windows, each of which contains one or more chromatographic peaks. During MS/MS analysis, fragment a small number of selected precursor ions ([M-H]-) for the analytes in each window and choose the most abundant product ion. Unit resolution must meet the manufacturer's criteria. Check the mass calibration by measuring the amount of peak drift from the expected masses. | If the peak apex has shifted more than approximately 0.2 Dalton, then the instrument will need to be recalibrated following the manufacturer's instructions. | Analyst | WI46412/ WI48593 |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 108

## SAP Worksheet #24—Analytical Instrument Calibration Table (continued)

| Instrument[a] | Calibration Procedure | Frequency of Calibration | Acceptance Criteria | CA | Person Responsible for CA | SOP Reference[b] |
|---|---|---|---|---|---|---|
| LC-MS/MS (for PFAS) | Mass Spectral Acquisition Rate | Each analyte, Extracted Internal Standard (EIS) Analyte. | A minimum of 10 spectra scans are acquired across each chromatographic peak. | N/A. | Analyst | WI46412/ WI48593 |
| LC-MS/MS (for PFAS) | Calibration, Calibration Verification, and Spiking Standards | All analytes. | Standards containing both branched and linear isomers must be used when commercially available.<br><br>PFAS method analytes may consist of both branched and linear isomers, but quantitative standards that contain the linear and branched isomers do not exist for all method analytes.<br><br>For PFAS that do not have a quantitative branched and linear standard, identify the branched isomers by analyzing a qualitative standard that includes both linear and branched isomers and determine RTs, transitions, and transition ion ratios. Quantitate samples by integrating the total response (that is, accounting for peaks that are identified as linear and branched isomers) and relying on the ICAL that uses the linear isomer quantitative standard. | Flagging is not appropriate.<br><br>Standards containing both branched and linear isomers are to be used during method validation and when reestablishing RTs, to ensure the total response is quantitated for that analyte.<br><br>Technical grade standards cannot be used for quantitative analysis. | Analyst | WI46412/ WI48593 |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 109

## SAP Worksheet #24—Analytical Instrument Calibration Table (continued)

| Instrument[a] | Calibration Procedure | Frequency of Calibration | Acceptance Criteria | CA | Person Responsible for CA | SOP Reference[b] |
|---|---|---|---|---|---|---|
| LC-MS/MS (for PFAS) | ICAL | At instrument setup and after ICV or Continuing Calibration Verification (CCV) failure, prior to sample analysis. | Calibration can be linear (minimum of 5 standards) or quadratic (minimum of 6 standards); weighting is allowed.<br><br>The isotopically labeled analog of an analyte (EIS Analyte) must be used for quantitation if commercially available (Isotope Dilution Quantitation).<br><br>Commercial PFAS standards available as salts are acceptable providing the measured mass is corrected to the neutral acid concentration. Results shall be reported as the neutral acid with appropriate CAS number.<br><br>If a labeled analog is not commercially available, the EIS Analyte with the closest RT or chemical similarity to the analyte must be used for quantitation. (Internal Standard Quantitation)<br><br>Analytes must be within 70 to 130% of their true value for each calibration standard.<br><br>ICAL must meet one of the two options below:<br><br>Option 1: The relative standard deviation of the response factors for all analytes must be ≤ 20%.<br><br>Option 2: Linear or nonlinear calibrations must have $r2 ≥ 0.99$ for each analyte. | Correct problem, then repeat ICAL. | Analyst | WI46412/ WI48593 |
| LC-MS/MS (for PFAS) | RT window position establishment | Once per ICAL and at the beginning of the analytical sequence. | Position shall be set using the midpoint standard of the ICAL curve when ICAL is performed.<br><br>On days when ICAL is not performed, the initial CCV is used. | N/A. | Analyst | WI46412/ WI48593 |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 110

## SAP Worksheet #24—Analytical Instrument Calibration Table (continued)

| Instrument[a] | Calibration Procedure | Frequency of Calibration | Acceptance Criteria | CA | Person Responsible for CA | SOP Reference[b] |
|---|---|---|---|---|---|---|
| LC-MS/MS (for PFAS) | RT window width | Every field sample, standard, blank, and QC sample for each analyte and EIS. | RT of each analyte and EIS analyte must fall within 0.4 minute of the predicted RTs from the daily calibration verification or, on days when ICAL is performed, from the midpoint standard of the ICAL or initial daily CCV. All branched isomer peaks identified in either the calibration standard or the qualitative (technical grade) standard must fall within the RT window for that analyte.\n\nAnalytes must elute within 0.1 minute of the associated EIS. This criterion applies only to analyte and labeled analog pairs. | Correct problem and reanalyze samples. | Analyst | WI46412/ WI48593 |
| LC-MS/MS (for PFAS) | CCV | Prior to sample analysis, after every 10 field samples or every 12 hours, whichever occurs first, and at the end of the analytical sequence. | Concentration of analytes must range from the LOQ to the mid-level calibration concentration.\n\nAnalyte concentrations must be within ±30% of their true value. | Immediately analyze two additional consecutive CCVs. If both pass, samples may be reported without reanalysis. If either fails, or if two consecutive CCVs cannot be run, perform CA(s), and repeat CCV and all associated samples since last successful CCV.\n\nAlternately, recalibrate if necessary; then reanalyze all associated samples since the last acceptable CCV. | Analyst | WI46412/ WI48593 |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 111

## SAP Worksheet #24—Analytical Instrument Calibration Table (continued)

| Instrument[a] | Calibration Procedure | Frequency of Calibration | Acceptance Criteria | CA | Person Responsible for CA | SOP Reference[b] |
|---|---|---|---|---|---|---|
| LC-MS/MS (for PFAS) | Ion Transitions (Precursor-> Product) | Every field sample, standard, blank, and QC sample. | To avoid biasing results high due to known interferences for some transitions as provided in the draft method must be used for the quantification of analytes.<br><br>If a qualitative or quantitative standard containing an isomeric mixture (branched and linear isomers) of an analyte is commercially available for an analyte, the quantification ion used must be the quantification ion identified in the draft method unless interferences render the product ion unusable as the quantification ion. If these transitions are not used, the reason must be technically justified and documented (for example, alternate transition was used due to observed interferences). In cases where interferences render the product ion unusable as the quantification ion, project approval is required before using the alternative product ion. | N/A. | Analyst | WI46412/ WI48593 |
| LC-MS/MS (for PFAS) | Ion Ratios | All analytes detected in samples. | DoD QSM v.5.4 defers to the requirements of 3rd Draft EPA Method 1633, which includes:<br><br>For concentrations at or above the method LOQ, the total (branched and linear isomer) quantification ion response to the total (branched and linear isomer) confirmation ion response ratio must fall within ± 50% of the ratio observed in the midpoint ICAL standard. If project-specific requirements involve reporting sample concentrations below the LOQ or DL, the response ratio must also fall within ± 50% of the ratio observed in the initial daily CV. | Document and discuss the failure in Case Narrative. | Analyst | WI46412/ WI48593 |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 112

## SAP Worksheet #24—Analytical Instrument Calibration Table (continued)

| Instrument[a] | Calibration Procedure | Frequency of Calibration | Acceptance Criteria | CA | Person Responsible for CA | SOP Reference[b] |
|---|---|---|---|---|---|---|
| LC-MS/MS (for PFAS) | Instrument Sensitivity Check (ISC) | Prior to analysis and at least once every 12 hours. | DoD QSM v.5.4 requires: All analyte concentrations must be within ±30% of their true values. DoD QSM v.5.4 defers to the requirements of 3rd Draft EPA Method 1633, which includes: Analyte concentrations must be at LOQ. Ion ratios must be within 50-150% (except PFNS, which is 50-200%) of the ratios determined from ICAL. The LOQ verification must be run at a concentration between 1 and 2 times the LOQ. S:N ≥ 3:1 for quantification and confirmation ion. | Correct problem, re-run ISC. If problem persists, repeat ICAL. | Analyst | WI46412/ WI48593 |
| LC-MS/MS (for PFAS) | Initial Calibration Verification (ICV) | Once after each ICAL, analysis of a second source standard prior to sample analysis. | Analyte concentrations must be within ±30% of their true value. | Correct problem, re-run ICV. If problem persists, repeat ICAL. | Analyst | WI46412/ WI48593 |
| *Project-Specific Requirement* | | | | | | |
| LC-MS/MS (for PFAS) | Aqueous Sample Preparation Samples with >1% solids may require centrifugation before solid phase extraction (SPE) | Each sample and associated batch QC samples. | SPE must be used unless samples are known to contain high PFAS concentrations (for example, AFFF formulations). In-line SPE is acceptable. Entire sample plus bottle rinsate must be extracted using SPE. Known high PFAS concentration samples require performing serial dilution in duplicate. Documented project approval is needed for samples prepared by serial dilution as opposed to SPE. | N/A. | Analyst | WI46412/ WI48593 |

[a] 3rd Draft EPA Method 1633 and DoD/DOE QSM v.5.4 (2021) is the basis for specifications on this table.
[b] Refer to Analytical SOP References table (**Worksheet #23**).

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 113

## SAP Worksheet #25—Analytical Instrument and Equipment Maintenance, Testing, and Inspection Table

| Instrument/ Equipment | Maintenance Activity | Testing Activity | Inspection Activity | Frequency | Acceptance Criteria | CA | Responsible Person | SOP Reference[a] |
|---|---|---|---|---|---|---|---|---|
| LC-MS/MS | Clean Curtain Plate | PFAS | Visual inspection of curtain plate for residue. | As needed when curtain plate has visible residue present | No visible residue on curtain plate | Remove and clean the instrument curtain plate. | Analyst | WI46412/ WI48593 |
| LC-MS/MS | Preventative Maintenance | PFAS | Degradation of instrument performance | Every 6 months or when instrument performance deteriorates | ICAL within acceptance criteria on **Worksheet #24** and internal standards (IS) recovery within acceptance criteria on **Worksheet #28** | Service provider performs Preventative Maintenance and mass calibration. Run tune check. Reanalyze samples with new ICAL, ICC, ISC, and instrument blank. | Analyst | WI46412/ WI48593 |
| LC-MS/MS | Replace analytical column | PFAS | Review peak shape, RTs, and peak separation on ICAL, initial calibration confirmation (ICC), and CCV samples. | Performed when chromatography deteriorates | ICAL within acceptance criteria on **Worksheet #24** and IS recovery within acceptance criteria on **Worksheet #28** | Replace analytical column. Reanalyze samples with new ICAL, ICC, ISC, and instrument blank. | Analyst | WI46412/ WI48593 |
| Balance | Verification | Weight | -- | Daily | +/- 0.02 gram or +/- 0.1% of calibration weight used (whichever is greater) | Refer to manufacturer's instruction manual. | Analyst | WI46412/ WI48593 |
| Balance | Calibration | Weight | -- | Annually | Per manufacturer | Remove from service, repair, replace. | Analyst | WI46412/ WI48593 |
| Pipette | Verification | Volume | -- | Daily | +/- 2% difference from true value, < 1% relative standard deviation (n=3) | Remove from service, repair, replace. | Analyst | WI46412/ WI48593 |
| Pipette | Calibration | Volume | -- | Quarterly | Per manufacturer | Remove from service, repair, replace. | Analyst | WI46412/ WI48593 |

[a] Refer to Analytical SOP References table (**Worksheet #23**).

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 114

This page intentionally left blank.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 115

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## SAP Worksheet #26—Sample Handling System

| SAMPLE COLLECTION, PACKAGING, AND SHIPMENT |
|---|
| **Sample Collection (Personnel/Organization):** FTL/CH2M |
| **Sample Packaging (Personnel/Organization):** FTL or Field Team Member/CH2M |
| **Coordination of Shipment (Personnel/Organization):** FTL or Field Team Member/CH2M |
| **Type of Shipment/Carrier:** Overnight/FedEx |
| **SAMPLE RECEIPT AND ANALYSIS** |
| **Sample Receipt (Personnel/Organization):** Sample Receipt Personnel/ELLE (PFAS, grain size), ETAB (bulk density, porosity), EXH (AEC, CEC, TOC) |
| **Sample Custody and Storage (Personnel/Organization):** Sample Receipt Personnel/ELLE, ETAB, EXH |
| **Sample Preparation (Personnel/Organization):** Extractions Personnel/ELLE, ETAB, EXH |
| **Sample Determinative Analysis (Personnel/Organization):** Analyst/ELLE, ETAB, EXH |
| **SAMPLE ARCHIVING** |
| **Field Sample Storage (Number of days from sample collection):** 90 days |
| **Sample Extract/Digestate Storage (Number of days from extraction/digestion):** Extracts may be disposed of 90 days after extraction |
| **Biological Sample Storage (Number of days from sample collection):** N/A |
| **SAMPLE DISPOSAL** |
| **Personnel/Organization:** Environmental H&S Office/ELLE, ETAB, EXH |
| **Number of Days from Analysis:** Samples may be disposed of 90 days after report mail date |

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 116

This page intentionally left blank.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 117

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## SAP Worksheet #27—Sample Custody Requirements Table

### Sample Labeling

Sample labels will include, at a minimum, client name, area name, sample ID, date and time collected, analysis group or method, and sampler's initials. Labels will be applied to the jar using a PFAS-free tape to ensure that they do not separate.

### Field Sample Custody Procedures (sample collection, packaging, shipment, and delivery to laboratory)

Samples will be collected by field team members under the supervision of the FTL. As samples are collected, they will be placed into containers and labeled, as outlined in the previous paragraph. Samples collected for PFAS, TOC, solids, percent moisture, and grain size analysis will be cushioned with packaging material and placed into coolers containing enough ice to keep the samples less than or equal to 6°C until they are received by the laboratory. Samples collected for bulk density, porosity, AEC, and CEC analysis will be cushioned with packaging material but not on ice (**Worksheet #19**). Due to increased shipping uncertainties, sufficient ice should be added to keep the samples less than or equal to 6°C for an extra 24 hours. The chain of custody will also be placed into the cooler. Coolers will be shipped to the laboratory via methods described in **Worksheet #21**, with the airbill number indicated on the chain of custody (to relinquish custody). Upon delivery, the laboratory will log in each cooler and report the status of the samples.

### Laboratory Sample Custody Procedures (receipt of samples, archiving, disposal)

Shipments are received, opened, and processed. Broken and/or leaking containers are assessed. The cooler temperature is measured and recorded. Fractions with short holding times (for example, unpreserved EnCores, aqueous Hexavalent Chromium, and so on) are noted so that they can be given priority. The samples are logged into the laboratory's Laboratory Information Management Systems (LIMS) database.

Waste is disposed of properly according to the laboratory's SOPs and Environmental H&S program. Measures are taken to prevent pollution. Compatible wastes are stored together in containers which are clearly marked. A timeline is established and drums are shipped frequently so that waste storage facility requirements are met.

### Sample Identification Procedures

Upon opening the cooler, the receiving clerk signs the chain of custody and then takes the temperature using the temperature blank (if absent, then a sample container or infrared thermometer is used). The sample containers in the cooler are unpacked and checked against the client's and any discrepancies or breakage is noted on the chain of custody. The clerk will deliver the chain of custody (and any other paperwork; for example, temperature or pH QA notice) to the PM for LIMS entry and client contact (if needed). The field notes will identify the sample ID with the location, depth, date/time collected, and the parameters requested. The laboratory will assign each field sample a laboratory sample ID based on information in the chain of custody.

The laboratory will send sample login forms to the Project Chemist to check that sample IDs and parameters are correct.

### Chain-of-Custody Procedures

Chains-of-custody will include, at a minimum, laboratory contact information, client contact information, sample information, and relinquished by/received by information. Sample information will include sample ID, date/time collected, number and type of containers, analysis method, and comments. The chain of custody will also have the sampler's name and signature. The chain of custody will link location of the sample from the field notes to the laboratory receipt of the sample. The laboratory will use the sample information to populate the LIMS database for each sample.

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 118

This page intentionally left blank.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 119

## SAP Worksheet #28-1—Laboratory QC Samples Table

**Matrix:** GW, SW

**Analytical Group:** PFAS

**Analytical Method/ SOP Reference:** 3rd Draft EPA Method 1633[a] / WI46412

| QC Sample[b] | Frequency/ Number | Method/SOP QC Acceptance Limits | CA | Person(s) Responsible for CA | DQI | MPC |
|---|---|---|---|---|---|---|
| Aqueous Sample Preparation | Each sample and associated batch QC samples. | SPE must be used unless samples are known to contain high PFAS concentrations (for example, AFFF formulations). In-line SPE is acceptable. Entire sample plus bottle rinsate must be extracted using SPE. Known high PFAS concentration samples require serial dilution be performed in duplicate. Documented project approval is needed for samples prepared by serial dilution as opposed to SPE. Pre-screening of separate aliquots of aqueous samples is recommended. | N/A. | Analyst | N/A | Same as Method / SOP QC Acceptance Limits |
| Sample Cleanup Procedure | Each sample and associated batch QC samples. Not applicable to AFFF formulation samples. | ENVI-Carb or equivalent must be used on each sample and batch QC sample. Extracts must be cleaned with carbon powder prior to analysis, unless demonstrated detrimental to the analysis. | Flagging is not appropriate. | Analyst | N/A | Same as Method / SOP QC Acceptance Limits |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 120

## SAP Worksheet #28-1—Laboratory QC Samples Table (continued)

| QC Sample[b] | Frequency/ Number | Method/SOP QC Acceptance Limits | CA | Person(s) Responsible for CA | DQI | MPC |
|---|---|---|---|---|---|---|
| Sample PFAS Identification | All analytes detected in a sample. | The chemical derivation of the ion transitions must be documented. A minimum of two ion transitions (precursor → quant ion and precursor → confirmation ion) and the ion transitions ratio per analyte are required for confirmation. Exception is made for analytes where two transitions do not exist (PFBA and PFPeA). Documentation of the primary and confirmation transitions and the ion ratio is required. In-house acceptance criteria for evaluation of ion ratios must be used and must not exceed 50 to 150%. Signal-to-Noise Ratio (S/N) must be ≥ 10 for all ions used for quantification and must be ≥ 3 for all ions used for confirmation. Quant ion and confirmation ion must be present and must maximize simultaneously (±2 seconds). The response of all isomers in the quantitative standards should be used to define ratio. In samples, the total response should include only the branched isomer peaks that have been identified in either the quantitative or qualitative standard. If standards (either quantitative or qualitative) are not available for purchase, only the linear isomer can be identified and quantitated in samples. The ratio requirement does not apply for PFBA, PFPeA, NMeFOSE, NEtFOSE, PFMPA, and PFMBA because suitable (not detectable or inadequate S/N) secondary transitions are unavailable. | PFAS identified with Ion ratios that fail acceptance criteria must be flagged. Any quantitation ion peak that does not meet the maximization criteria shall be included in the summed integration and the resulting data flagged as "estimated, biased high." | Analyst | Accuracy/ Bias | Same as Method / SOP QC Acceptance Limits |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 121

## SAP Worksheet #28-1—Laboratory QC Samples Table (continued)

| QC Sample[b] | Frequency/ Number | Method/SOP QC Acceptance Limits | CA | Person(s) Responsible for CA | DQI | MPC |
|---|---|---|---|---|---|---|
| Instrument Blanks | Immediately following the highest standard analyzed and daily prior to sample analysis and immediately following samples with PFAS concentrations exceeding the quantification range. | DoD QSM v.5.4 requires:<br><br>Concentration of each analyte must be ≤ 1/2 the LOQ.<br><br>DoD QSM v.5.4 defers to the requirements of 3rd Draft EPA Method 1633[a], which includes:<br><br>Instrument Blank must contain EIS to enable quantitation of contamination.<br><br>3rd Draft EPA Method 1633[a] specification is ≤ 0.3 % carryover from the highest concentration of the ICAL or after the CCV standard into following instrument blank or from any sample into the following injection. | If acceptance criteria are not met after the highest calibration standard, calibration must be performed using a lower concentration for the highest standard until acceptance criteria are met.<br><br>If sample concentrations exceed the highest allowed standard and the sample(s) following exceed this acceptance criteria (>1/2 LOQ), they must be reanalyzed.<br><br>Flagging is only appropriate in cases where the extract cannot be reanalyzed and re-extraction is not possible. | Analyst | Precision/ Accuracy/ Bias | Same as Method / SOP QC Acceptance Limits |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 122

## SAP Worksheet #28-1—Laboratory QC Samples Table (continued)

| QC Sample[b] | Frequency/ Number | Method/SOP QC Acceptance Limits | CA | Person(s) Responsible for CA | DQI | MPC |
|---|---|---|---|---|---|---|
| EIS Analytes | Every field sample, standard, blank, and QC sample. | QSM v.5.4 requires:<br><br>1) Isotopically labeled analogs of analytes must be used when they are commercially available.<br><br>2) QC samples and field samples must recover within in-house limits if project limits are not provided; otherwise, project limits must be met. Preliminary in-house acceptance criteria of 20-150% must be used until in-house limits are generated in accordance with Sections 9.4.1 and 9.4.2 of 3rd Draft EPA Method 1633. Repeat the analysis using a fresh aliquot of the extract. If failure does not confirm, report the second analysis. If the failure confirms, follow the requirements listed in 3rd Draft EPA Method 1633, Section 15.3.2. If EIS recoveries still fall outside of the acceptance range, the client must be contacted for additional measures to be taken. Document and discuss the failure in the Case Narrative. Apply Q-flag to the result associated with the failure.<br><br>3) The lower limit of in-house acceptance criteria cannot be < 20%.<br><br>QSM v.5.4 defers to the requirements of 3rd Draft EPA Method 1633, which includes:<br><br>Suggested recovery limits of instrument blanks is 70 to 130%. | Correct problem. If required, re-extract and reanalyze associated field and QC samples.<br><br>If recoveries are acceptable for QC samples, but not field samples, the field samples must be reextracted and analyzed (greater dilution may be needed).<br><br>Samples may be reextracted and analyzed outside of hold times, as necessary for CA associated with QC failure.<br><br>Document and discuss the failure in the Case Narrative. Apply Q-flag to the result associated with the failure. | Analyst | Precision/ Accuracy/ Bias | Same as Method / SOP QC Acceptance Limits |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 123

## SAP Worksheet #28-1—Laboratory QC Samples Table (continued)

| QC Sample[b] | Frequency/ Number | Method/SOP QC Acceptance Limits | CA | Person(s) Responsible for CA | DQI | MPC |
|---|---|---|---|---|---|---|
| Non-extracted Internal Standard (NIS) Compounds | Every field sample, standard, blank, and QC sample. | QSM v.5.4 defers to the requirements of 3rd Draft EPA Method 1633, which includes: NIS analyte recovery is calculated by external standards with a specification of 50% to 200%. QSM v.5.4 requires: 1) NIS areas must be greater than 30% of the average area of the calibration standards in undiluted sample extracts and sample extracts that required additional NIS to be added. 2) NIS areas corrected for the dilution factor must be greater than 30% of the average area of the calibration standards in diluted samples when additional NIS was not added post dilution of the extract. | Repeat the analysis using a fresh aliquot of the extract. If failure does not confirm, report the second analysis. If the failure confirms, examine the project-specific requirements. Contact the client as to additional measures to be taken. Document and discuss the failure in the Case Narrative. Apply Q-flag to the result associated with the failure. | Analyst | Bias/ Contamination | Same as Method / SOP QC Acceptance Limits |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 124

## SAP Worksheet #28-1—Laboratory QC Samples Table (continued)

| QC Sample[b] | Frequency/ Number | Method/SOP QC Acceptance Limits | CA | Person(s) Responsible for CA | DQI | MPC |
|---|---|---|---|---|---|---|
| Method Blank (MB) | One per preparatory batch. | QSM v.5.4 requires: No analytes detected > 1/2 LOQ, or > 1/10 the amount measured in any sample, or > 1/10 the regulatory limit, whichever is greater. QSM v.5.4 defers to the requirements of 3rd Draft EPA Method 1633, which includes: Criteria that are less stringent than what QSM v.5.4 advises (above), use QSM v.5.4 criteria. | Correct problem. Re-prep and reanalyze MB and all QC samples and field samples processed with the contaminated blank. Samples may be reextracted and analyzed outside of hold times, as necessary for CA associated with QC failure. If continued re-testing results in repeated blank contamination, the laboratory must document and report the failures. Examine the project-specific requirements. Contact the client as to additional measures to be taken. If reanalysis cannot be performed, data must be qualified and explained in the Case Narrative. Apply B-flag to all results for the specific analyte(s) in all samples in the associated preparatory batch. | Analyst | Bias/ Contamination | Same as Method / SOP QC Acceptance Limits |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 125

## SAP Worksheet #28-1—Laboratory QC Samples Table (continued)

| QC Sample[b] | Frequency/ Number | Method/SOP QC Acceptance Limits | CA | Person(s) Responsible for CA | DQI | MPC |
|---|---|---|---|---|---|---|
| LCS and Low-Level Laboratory Control Sample (LLLCS) | One per preparatory batch. | QSM v.5.4 defers to the requirements of 3rd Draft EPA Method 1633, which includes: Blank spiked with all analytes at a concentration ≥ LOQ and ≤ the mid-level calibration concentration. QSM v.5.4 requires: 1) Analyte recoveries must be within in-house limits if project limits are not provided; otherwise, project limits must be met. Preliminary in-house acceptance criteria of 40-150% must be used until in-house limits are generated in accordance with Section 14.5.4 of 3rd Draft EPA Method 1633. 2) The lower limit of in-house acceptance criteria cannot be < 40%. | Correct problem, then re-extract and reanalyze the LCS and all samples in the associated preparatory batch for failed analytes if sufficient sample material is available. Samples may be reextracted and analyzed outside of hold times, as necessary for CA associated with QC failure. Examine the project-specific requirements. Contact the client as to additional measures to be taken. If reanalysis cannot be performed, data must be qualified and explained in the Case Narrative. Apply Q-flag to specific analyte(s) in all samples in the associated preparatory batch. | Analyst | Precision/ Accuracy/ Bias | Same as Method / SOP QC Acceptance Limits |

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 126

## SAP Worksheet #28-1—Laboratory QC Samples Table (continued)

| QC Sample[b] | Frequency/ Number | Method/SOP QC Acceptance Limits | CA | Person(s) Responsible for CA | DQI | MPC |
|---|---|---|---|---|---|---|
| MS/MSD | One MS/MSD pair per preparatory batch. The data shall be evaluated to determine the source of difference. | QSM v.5.4 defers to the requirements of 3rd Draft EPA Method 1633, which includes:<br>Sample spiked with all analytes at a concentration ≥ LOQ and ≤ the mid-level calibration concentration.<br>QSM v.5.4 requires:<br>Analyte recoveries must be within in-house LCS limits if project limits are not provided; otherwise, project limits must be met. RPD ≤ 30% (between MS and MSD). | Examine the project-specific requirements. Contact the client as to additional measures to be taken.<br>For the specific analyte(s) in the parent sample, apply J-flag if acceptance criteria are not met and explain in the Case Narrative. | Analyst | Accuracy | Same as Method / SOP QC Acceptance Limits |
| Matrix Duplicate (MD) | Each AFFF sample prepared using an aliquot of the field sample must be prepared in duplicate. | QSM v.5.4 requires:<br>RPD ≤ 30% (between sample and MD)<br>QSM v.5.4 defers to the requirements of 3rd Draft EPA Method 1633, which includes:<br>RPD criteria only applies to analytes whose concentration in the sample is ≥LOQ<br>Acceptance limits are those used for the LCS. | Examine the project-specific requirements. Contact the client as to additional measures to be taken.<br>For the specific analyte(s) in the parent sample, apply J-flag if acceptance criteria are not met and explain in the Case Narrative. | Analyst | Accuracy/ Precision | Same as Method / SOP QC Acceptance Limits |
| Bile Salt Standards | Daily, prior to analysis of all matrix types (aqueous, solid, tissue, and AFFF). No samples shall be analyzed until acceptance criteria for the bile salt standard(s) has been met. | All 3rd Draft EPA Method 1633 requirements for evaluation of the relationship of the retention time of the bile salt peak(s) to the retention time window of PFOS must be met for all matrix types. The retention time window of PFOS applies to the retention time of all isomers of PFOS. The retention time of the bile salt(s) peak must fall out of the retention time window of PFOS by at least one minute. | N/A. | Analyst | Accuracy/ Precision | Same as Method / SOP QC Acceptance Limits |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 127

## SAP Worksheet #28-1—Laboratory QC Samples Table (continued)

| QC Sample[b] | Frequency/ Number | Method/SOP QC Acceptance Limits | CA | Person(s) Responsible for CA | DQI | MPC |
|---|---|---|---|---|---|---|
| LOD Verification | Quarterly for every analyte | Spike a quality system matrix at concentration 2-4x the DL. Must meet 3:1 S/N, or for data systems that do not measure noise, results must be at least 3 SDs greater than the mean MB concentration. | If verification fails, the DL determination must be repeated and a LOD verification. Alternatively pass two consecutive LOD verification at a higher spike and set the LOD at the higher concentration. | Analyst | Accuracy | Same as Method / SOP QC Acceptance Limits |
| LOQ Verification | Quarterly for every analyte | Spike a quality system matrix at a concentration equal to or greater than the low point of the calibration curve. | Must meet laboratory specified precision and bias limits. If LOQ fails, repeat at a higher level until limits are met. | Analyst | Precision/ Bias | Same as Method / SOP QC Acceptance Limits |
| Results reported between DL and LOQ | -- | Apply J-flag to all results between DL and LOQ. Non-detect results are reported as U-Values at the LOD. | -- | Analyst | Accuracy | Same as Method / SOP QC Acceptance Limits |

Notes:

[a] Compliant with DoD QSM v.5.4 Table B-24 (DoD/DOE, 2021).

[b] 3rd Draft EPA Method 1633 and DoD/DOE QSM v.5.4 (2021) is the basis for specifications on this table.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 128

## SAP Worksheet #28-2—Laboratory QC Samples

**Matrix:** SS, SB, SD

**Analytical Group:** PFAS

**Analytical Method/ SOP Reference:** 3rd Draft EPA Method 1633[a] / WI48593

| QC Sample[b] | Frequency/ Number | Method/SOP QC Acceptance Limits | CA | Person(s) Responsible for CA | DQI | Measurement Performance Criteria |
|---|---|---|---|---|---|---|
| Sample Cleanup Procedure | Each sample and associated batch QC samples. Not applicable to AFFF formulation samples. | ENVI-CarbTM or equivalent must be used on each sample and batch QC sample. Extracts must be cleaned with carbon powder prior to analysis, unless demonstrated detrimental to the analysis. | Flagging is not appropriate. | Analyst | -- | Same as Method / SOP QC Acceptance Limits |

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 129

## SAP Worksheet #28-2—Laboratory QC Samples (continued)

| QC Sample[b] | Frequency/ Number | Method/SOP QC Acceptance Limits | CA | Person(s) Responsible for CA | DQI | Measurement Performance Criteria |
|---|---|---|---|---|---|---|
| Sample PFAS Identification | All analytes detected in a sample. | The chemical derivation of the ion transitions must be documented. A minimum of two ion transitions (precursor → quant ion and precursor → confirmation ion) and the ion transitions ratio per analyte are required for confirmation. Exception is made for analytes where two transitions do not exist (PFBA and PFPeA). Documentation of the primary and confirmation transitions and the ion ratio is required. In-house acceptance criteria for evaluation of ion ratios must be used and must not exceed 50 to 150%. Signal-to-Noise Ratio (S/N) must be ≥ 10 for all ions used for quantification and must be ≥ 3 for all ions used for confirmation. Quant ion and confirmation ion must be present and must maximize simultaneously (±2 seconds). The response of all isomers in the quantitative standards should be used to define ratio. In samples, the total response should include only the branched isomer peaks that have been identified in either the quantitative or qualitative standard. If standards (either quantitative or qualitative) are not available for purchase, only the linear isomer can be identified and quantitated in samples. The ratio requirement does not apply for PFBA, PFPeA, NMeFOSE, NEtFOSE, PFMPA, and PFMBA because suitable (not detectable or inadequate S/N) secondary transitions are unavailable. | PFAS identified with Ion ratios that fail acceptance criteria must be flagged. Any quantitation ion peak that does not meet the maximization criteria shall be included in the summed integration and the resulting data flagged as "estimated, biased high". | Analyst | Accuracy/ Bias | Same as Method / SOP QC Acceptance Limits |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 130

## SAP Worksheet #28-2—Laboratory QC Samples (continued)

| QC Sample[b] | Frequency/ Number | Method/SOP QC Acceptance Limits | CA | Person(s) Responsible for CA | DQI | Measurement Performance Criteria |
|---|---|---|---|---|---|---|
| Instrument Blanks | Immediately following the highest standard analyzed and daily prior to sample analysis and immediately following samples with PFAS concentrations exceeding the quantification range. | QSM v.5.4 requires: Concentration of each analyte must be ≤ 1/2 the LOQ. QSM v.5.4 defers to the requirements of 3rd Draft EPA Method 1633, which includes: Instrument Blank must contain EIS to enable quantitation of contamination. 3rd Draft EPA Method 1633 specification is ≤ 0.3 % carryover from the highest concentration of the ICAL or after the CCV standard into following instrument blank or from any sample into the following injection. | If acceptance criteria are not met after the highest calibration standard, calibration must be performed using a lower concentration for the highest standard until acceptance criteria is met. If sample concentrations exceed the highest allowed standard and the sample(s) following exceed this acceptance criteria (>1/2 LOQ), they must be reanalyzed. Flagging is only appropriate in cases where the extract cannot be reanalyzed and re-extraction is not possible. | Analyst | Precision/ Accuracy/ Bias | |

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 131

## SAP Worksheet #28-2—Laboratory QC Samples (continued)

| QC Sample[b] | Frequency/ Number | Method/SOP QC Acceptance Limits | CA | Person(s) Responsible for CA | DQI | Measurement Performance Criteria |
|---|---|---|---|---|---|---|
| EIS Analytes | Every field sample, standard, blank, and QC sample. | QSM v.5.4 requires:<br><br>1) Isotopically labeled analogs of analytes must be used when they are commercially available.<br><br>2) QC samples and field samples must recover within in-house limits if project limits are not provided; otherwise, project limits must be met. Preliminary in-house acceptance criteria of 20-150% must be used until in-house limits are generated in accordance with Sections 9.4.1 and 9.4.2 of 3rd Draft EPA Method 1633. Repeat the analysis using a fresh aliquot of the extract. If failure does not confirm, report the second analysis. If the failure confirms, follow the requirements listed in 3rd Draft EPA Method 1633, Section 15.3.2. If EIS recoveries still fall outside of the acceptance range, the client must be contacted for additional measures to be taken. Document and discuss the failure in the Case Narrative. Apply Q-flag to the result associated with the failure.<br><br>3) The lower limit of in-house acceptance criteria cannot be < 20%.<br><br>QSM v.5.4 defers to the requirements of 3rd Draft EPA Method 1633, which includes:<br><br>Suggested recovery limits of instrument blanks is 70 to 130%. | Correct problem. If required, re-extract and reanalyze associated field and QC samples.<br><br>If recoveries are acceptable for QC samples, but not field samples, the field samples must be reextracted and analyzed (greater dilution may be needed).<br><br>Samples may be reextracted and analyzed outside of hold times, as necessary for CA associated with QC failure.<br><br>Document and discuss the failure in the Case Narrative. Apply Q-flag to the result associated with the failure. | Analyst | Precision/ Accuracy/ Bias | Same as Method / SOP QC Acceptance Limits |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 132

## SAP Worksheet #28-2—Laboratory QC Samples (continued)

| QC Sample[b] | Frequency/ Number | Method/SOP QC Acceptance Limits | CA | Person(s) Responsible for CA | DQI | Measurement Performance Criteria |
|---|---|---|---|---|---|---|
| NIS Compounds | Every field sample, standard, blank, and QC sample. | QSM v.5.4 defers to the requirements of 3rd Draft EPA Method 1633, which includes: NIS analyte recovery is calculated by external standards with a specification of 50% to 200%. QSM v.5.4 requires: 1) NIS areas must be greater than 30% of the average area of the calibration standards in undiluted sample extracts and sample extracts that required additional NIS to be added. 2) NIS areas corrected for the dilution factor must be greater than 30% of the average area of the calibration standards in diluted samples when additional NIS was not added post dilution of the extract. | Repeat the analysis using a fresh aliquot of the extract. If failure does not confirm, report the second analysis. If the failure confirms, examine the project-specific requirements. Contact the client as to additional measures to be taken. Document and discuss the failure in the Case Narrative. Apply Q-flag to the result associated with the failure. | Analyst | Bias/ Contamination | Same as Method / SOP QC Acceptance Limits |

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 133

## SAP Worksheet #28-2—Laboratory QC Samples (continued)

| QC Sample[b] | Frequency/ Number | Method/SOP QC Acceptance Limits | CA | Person(s) Responsible for CA | DQI | Measurement Performance Criteria |
|---|---|---|---|---|---|---|
| MB | One per preparatory batch. | QSM v.5.4 requires:<br>No analytes detected > 1/2 LOQ, or > 1/10 the amount measured in any sample, or > 1/10 the regulatory limit, whichever is greater.<br>QSM v.5.4 defers to the requirements of 3rd Draft EPA Method 1633, which includes:<br>Criteria that are less stringent than what QSM v.5.4 advises (above), use QSM v.5.4 criteria. | Correct problem. Re-prep and reanalyze MB and all QC samples and field samples processed with the contaminated blank.<br>Samples may be reextracted and analyzed outside of hold times, as necessary for CA associated with QC failure.<br>If continued re-testing results in repeated blank contamination, the laboratory must document and report the failures.<br>Examine the project-specific requirements. Contact the client as to additional measures to be taken.<br>If reanalysis cannot be performed, data must be qualified and explained in the Case Narrative. Apply B-flag to all results for the specific analyte(s) in all samples in the associated preparatory batch. | Analyst | Bias/ Contamination | Same as Method / SOP QC Acceptance Limits |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 134

## SAP Worksheet #28-2—Laboratory QC Samples (continued)

| QC Sample[b] | Frequency/ Number | Method/SOP QC Acceptance Limits | CA | Person(s) Responsible for CA | DQI | Measurement Performance Criteria |
|---|---|---|---|---|---|---|
| LCS and LLLCS | One per preparatory batch. | QSM v.5.4 defers to the requirements of 3rd Draft EPA Method 1633, which includes: Blank spiked with all analytes at a concentration ≥ LOQ and ≤ the mid-level calibration concentration. QSM v.5.4 requires: 1) Analyte recoveries must be within in-house limits if project limits are not provided; otherwise, project limits must be met. Preliminary in-house acceptance criteria of 40-150% must be used until in-house limits are generated in accordance with Section 14.5.4 of 3rd Draft EPA Method 1633. 2) The lower limit of in-house acceptance criteria cannot be < 40%. | Correct problem, then re-extract and reanalyze the LCS and all samples in the associated preparatory batch for failed analytes if sufficient sample material is available. Samples may be reextracted and analyzed outside of hold times, as necessary for CA associated with QC failure. Examine the project-specific requirements. Contact the client as to additional measures to be taken. If reanalysis cannot be performed, data must be qualified and explained in the Case Narrative. Apply Q-flag to specific analyte(s) in all samples in the associated preparatory batch. | Analyst | Precision/ Accuracy/ Bias | Same as Method / SOP QC Acceptance Limits |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 135

## SAP Worksheet #28-2—Laboratory QC Samples (continued)

| QC Sample[b] | Frequency/ Number | Method/SOP QC Acceptance Limits | CA | Person(s) Responsible for CA | DQI | Measurement Performance Criteria |
|---|---|---|---|---|---|---|
| MS/MSD | One MS/MSD pair per preparatory batch. The data shall be evaluated to determine the source of difference. | QSM v.5.4 defers to the requirements of 3rd Draft EPA Method 1633, which includes: Sample spiked with all analytes at a concentration ≥ LOQ and ≤ the mid-level calibration concentration. QSM v.5.4 requires: Analyte recoveries must be within in-house LCS limits if project limits are not provided; otherwise, project limits must be met. RPD ≤ 30% (between MS and MSD). | Examine the project-specific requirements. Contact the client as to additional measures to be taken. For the specific analyte(s) in the parent sample, apply J-flag if acceptance criteria are not met and explain in the Case Narrative. | Analyst | Accuracy | Same as Method / SOP QC Acceptance Limits |
| Matrix Duplicate (MD) | Each AFFF sample prepared using an aliquot of the field sample must be prepared in duplicate. | QSM v.5.4 requires: RPD ≤ 30% (between sample and MD) QSM v.5.4 defers to the requirements of 3rd Draft EPA Method 1633, which includes: RPD criteria only applies to analytes whose concentration in the sample is ≥ LOQ Acceptance limits are those used for the LCS. | Examine the project-specific requirements. Contact the client as to additional measures to be taken. For the specific analyte(s) in the parent sample, apply J-flag if acceptance criteria are not met and explain in the Case Narrative. | Analyst | Accuracy/ Precision | Same as Method / SOP QC Acceptance Limits |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 136

## SAP Worksheet #28-2—Laboratory QC Samples (continued)

| QC Sample[b] | Frequency/ Number | Method/SOP QC Acceptance Limits | CA | Person(s) Responsible for CA | DQI | Measurement Performance Criteria |
|---|---|---|---|---|---|---|
| Bile Salt Standards | Daily, prior to analysis of all matrix types (aqueous, solid, tissue, and AFFF). No samples shall be analyzed until acceptance criteria for the bile salt standard(s) has been met. | All 3rd Draft EPA Method 1633[a] requirements for evaluation of the relationship of the retention time of the bile salt peak(s) to the retention time window of PFOS must be met for all matrix types. The RT window of PFOS applies to the RT of all isomers of PFOS. The RT of the bile salt(s) peak must fall out of the RT window of PFOS by at least one minute. | NA. | Analyst | Accuracy/ Precision | Same as Method / SOP QC Acceptance Limits |
| LOD Verification | Quarterly for every analyte | Spike a quality system matrix at concentration 2-4x the DL. Must meet 3:1 S:N, or for data systems that do not measure noise, results must be at least 3 SDs greater than the mean MB concentration. | If verification fails, the DL determination must be repeated and a LOD verification. Alternatively pass two consecutive LOD verification at a higher spike and set the LOD at the higher concentration. | Analyst | Accuracy | Same as Method / SOP QC Acceptance Limits |
| LOQ Verification | Quarterly for every analyte | Spike a quality system matrix at a concentration equal to or greater than the low point of the calibration curve. | Must meet laboratory specified precision and bias limits. If LOQ fails, repeat at a higher level until limits are met. | Analyst | Precision/ Bias | Same as Method / SOP QC Acceptance Limits |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 137

## SAP Worksheet #28-2—Laboratory QC Samples (continued)

| QC Sample[b] | Frequency/ Number | Method/SOP QC Acceptance Limits | CA | Person(s) Responsible for CA | DQI | Measurement Performance Criteria |
|---|---|---|---|---|---|---|
| Results reported between DL and LOQ | -- | Apply J-flag to all results between DL and LOQ. Non-detect results are reported as U-Values at the LOD. | -- | Analyst | Accuracy | Same as Method / SOP QC Acceptance Limits |

Notes:

[a] Compliant with DoD QSM v.5.4 Table B-24 (DoD/DOE, 2021).

[b] 3rd Draft EPA Method 1633 and DoD/DOE QSM v.5.4 (2021) is the basis for specifications on this table.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 138

This page intentionally left blank.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 139

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAP Worksheet #29—Project Documents and Records Table

| Document | Where Maintained[a] |
|---|---|
| • Field notes<br>• Chain-of-custody records<br>• Air bills<br>• Custody seals<br>• CA forms<br>• Electronic data deliverable (EDD)<br>• Identification of QC Samples<br>• Meteorological data from field<br>• Sampling instrument calibration logs<br>• Sampling locations and sampling plan<br>• Sampling notes and drilling logs<br>• WQPs<br>• Sample receipt, chain-of-custody record, and tracking records<br>• Standard traceability logs<br>• Equipment calibration logs<br>• Sample prep logs<br>• Run logs<br>• Equipment maintenance, testing, and inspection logs<br>• Reported field sample results<br>• Reported result for standards, QC checks, and QC samples<br>• Instrument printouts (raw data) for field samples, standards, QC checks, and QC samples<br>• Data package completeness checklists<br>• Sample disposal records<br>• Extraction/cleanup records<br>• Raw data (stored on disk)<br>• DV reports | • Field data deliverables (field notes, chain-of-custody forms, air bills, EDDs) will be kept on CH2M's local intranet server.<br>• Field parameter data will be loaded with the analytical data into Data Warehouse.<br>• Analytical laboratory hardcopy deliverables and DV reports will be saved on the network server.<br>• Electronic data from the laboratory will be loaded into the Data Warehouse and NIRIS. |

[a] Offsite documents, except for analytical laboratory data, are archived with Iron Mountain Inc., which is headquartered at 1000 Campus Drive, Collegeville, Pennsylvania 19426. Analytical laboratory data are archived with the Federal Records Center. It is possible that the archiving protocol for the Navy may change for deliverables completed after December 2022. In that circumstance, the deliverables will be archived in accordance with the Navy protocol at the time of archiving.

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 140

This page intentionally left blank.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 141

## SAP Worksheet #30—Analytical Services Table

| Matrix | Analytical Group | Sample Locations/ID Number | Analytical Method | Data Package Turnaround Time | Laboratory / Organization (name and address, contact person, and telephone number) | Backup Laboratory / Organization[b] (name and address, contact person, and telephone number) |
|---|---|---|---|---|---|---|
| GW, SW, SS, SB, SD | PFAS, Fate and Transport | Refer to **Worksheet #18** | 3rd Draft EPA Method 1633[a]<br><br>Grain size (sieve and hydrometer) – ASTM D422<br><br>Solids, percent moisture – Lab Method | 28 Calendar-day turnaround time | Eurofins Lancaster Laboratories 2425 New Holland Pike Lancaster, PA 17601<br><br>Elizabeth Martin (717) 205-3949 | Eurofins Sacramento 880 Riverside Parkway West Sacramento, CA 95605<br><br>Jill Kellmann (916) 374-4402 |
| SB | Fate and Transport | | Bulk Density - ASTM D2937-04<br><br>Porosity ASTM - D854-06 | | Eurofins Test America – Burlington 30 Community Drive, Suite 11 South Burlington, VT 05403<br><br>Elizabeth Martin (717) 205-3949 | TBD[c] |
| SS, SB, SD | Fate and Transport | | AEC – Lab Method<br><br>CEC – SW-846 9081<br><br>TOC - Walkley Black | | Eurofins Xenco – Houston 4145 Greenbriar Dr. Stafford, TX 77477<br><br>Elizabeth Martin (717) 205-3949 | |

Notes:

[a] Compliant with DoD QSM v.5.4 Table B-24 (DoD/DOE, 2021).

[b] Should it be necessary to use the backup laboratory for sample analysis the laboratory SAP worksheets will be submitted to the NAVFAC QAO for review prior to sample analysis.

[c] Backup laboratory has not been identified. If circumstances render the subcontracted laboratory unable to perform the analytical services, another laboratory will be determined at that time and applicable SAP worksheets will be submitted to the Navy QAO for review.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 142

This page intentionally left blank.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 143

## SAP Worksheet #31—Planned Project Assessments Table

| Assessment Type | Frequency | Internal or External | Organization Performing Assessment | Person(s) Responsible for Performing Assessment (title and organizational affiliation) | Person(s) Responsible for Responding to Assessment Findings (title and organizational affiliation) | Person(s) Responsible for Identifying and Implementing CA (title and organizational affiliation) | Person(s) Responsible for Monitoring Effectiveness of CA (title and organizational affiliation) |
|---|---|---|---|---|---|---|---|
| Offsite Laboratory Technical System Audit | Laboratory must have current DoD ELAP accreditation which will identify the period of performance | External | Laboratory Accreditation Bureau in accordance with DoD ELAP | TBD Laboratory Accreditation Bureau | Kenneth Boley Laboratory QAO ELLE | Kenneth Boley Laboratory QAO ELLE | Laboratory Accreditation Bureau |
| Safe Work Observation | One during each week of the sampling event | Internal | CH2M | SSL CH2M | Field Team Member observed CH2M | HSM CH2M | SSL CH2M |
| Field Performance Audit | One during beginning of soil sampling/ well drilling activities. Second audit during second round of groundwater sampling. | Internal | CH2M | PM CH2M | FTL CH2M | PM CH2M | PM CH2M |
| Field Document Review | Daily during the sampling event | Internal | CH2M | PM CH2M | FTL CH2M | PM CH2M | PM CH2M |

ELAP = Environmental Laboratory Accreditation Program

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 144

This page intentionally left blank.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 145

## SAP Worksheet #32–Assessment Findings and Corrective Action Responses

| Assessment Type | Nature of Deficiencies Documentation | Individual(s) Notified of Findings (name, title, organization) | Timeframe of Notification | Nature of CA Response Documentation | Individual(s) Receiving CA Response (name, title, organization) | Timeframe for Response | Assessment Type |
|---|---|---|---|---|---|---|---|
| Laboratory Performance Review | Laboratory Corrective Action Form | CH2M | Within 1 week of finding | Verbal and Corrective Action Form | CH2M | Within 1 day of receipt of CA Form | Laboratory Corrective Action Form |
| Safety Observation Report | Safety Observation Report Form | Carl Woods HSM CH2M | Within 1 week of Safe Behavior Observation | Memorandum | Field Team Member CH2M | Immediately | Safety Observation Report |
| Field Document Review | Markup copy of field documentation | FTL CH2M | Within 1 day of review | Verbal and Memorandum | FTL CH2M | Within 1 day of receipt of markup | Field Document Review |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

2:25-cv-11725-RMG    Date Filed 08/29/25    Entry Number 1-2    Page 458 of 700

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 146

This page intentionally left blank.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

# EXHIBIT L

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**FLORENCE DIVISION**

| | | |
|---|---|---|
| City of Florence, South Carolina | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. |
| v. | ) | Jury Demand |
| | ) | |
| Aladdin Manufacturing Corporation, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**DECLARATION OF MIKE GURLEY**

1.      I, Mike Gurley, pursuant to the provisions of 28 U.S.C. § 1746, state and declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.      I currently serve as Environmental Manager of Charlotte Motor Speedway ("CMS") Landfill for BFI Waste Systems of North America, LLC. In this role, I am responsible for overseeing disposal, operation of environmental management systems, compliance, and permitting at CMS. I am familiar with state, federal, and landfill rules and requirements.

2.      CMS is a modern solid waste landfill constructed and equipped with an engineered liner, leachate and gas collection systems, and other pollution control equipment.

3.      CMS holds environmental permits and approvals issued by state and federal environmental regulatory agencies, including among others, a solid waste permit, Clean Air Act permit, a Clean Water Act permit, and an industrial wastewater permit which include detailed operational, reporting, and technical requirements. CMS is regularly inspected by and subject to extensive oversight from federal and state environmental agencies.

4.      Special waste received at CMS is managed in accordance with specifications determined by the generators and CMS and pursuant to CMS's permits and state, federal, and landfill rules and requirements.

5.      Since at least 2023, federal government has used CMS to dispose of special wastes containing per- and polyfluoroalkyl substances at CMS from remedial investigations performed by the federal government at Marine Corps Base Camp Lejeune and the Marine Corps Air Stations at Cherry Point and New River ("Military Waste"). CMS continues to accept Military Waste from the federal government.

6.      Once special waste received at CMS meets disposal specifications, it is disposed of and mixed with other commercial and municipal waste in the current working area of the landfill.

7.      Leachate is generated at CMS when precipitation infiltrates the waste mass and collects in the leachate collection system. Constituents within the waste mass may partition in the infiltrating liquid. Because waste disposed of at CMS is commingled, the constituents in leachate do not reflect a singular waste stream but rather the commingled waste.


03/12/2025
DATE

*Mike Gurley*

Mike Gurley
Environmental Manager, CMS
BFI Waste Systems of North America, LLC

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

**UNITED STATED DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**FLORENCE DIVISION**

| | |
|---|---|
| CITY OF FLORENCE, SOUTH CAROLINA,<br><br>*Plaintiff,*<br><br>v.<br><br>ALADDIN MANUFACTURING CORPORATION; AMERICHEM, INC.; AURIA ALBEMARLE, LLC; AURIA SOLUTIONS USE, INC; BFI WASTE SYSTEMS OF NORTH AMERICA, LLC; BURLINGTON INDUSTRIES, INC; CARVANA, LLC; CASCADES HOLDING US, INC.; CHEM-TEX LABORATORIES, INC.; DELTA MILLS, INC., its predecessors, successors, assigns, and/or responsible parties; DOMTAR PAPER COMPANY, LLC; ELEVATE TEXTILES, INC.; HEIQ CHEMTEX, INC., its predecessors, successors, assigns, and/or responsible parties; MARCAL CORDOVA LLC; MOHAWK INDUSTRIES, INC.; REPUBLIC SERVICES, INC.; and WASTE CONNECTIONS OF NORTH CAROLINA, INC.,<br><br>*Defendants.* | **BFI WASTE SYSTEMS OF NORTH AMERICA, LLC'S ANSWERS TO LOCAL RULE 26.01 INTERROGATORIES** |

Defendant BFI Waste Systems of North America, LLC ("BFI") answers the following Interrogatories pursuant to Local Rule 26.01:

(A)    State the full name, address, and telephone number of all persons or legal entities who may have a subrogation interest in each claim and state the basis and extent of that interest.

**ANSWER:    BFI is not aware of any such subrogation interests at this time.**

(B)    As to each claim, state whether it should be tried jury or nonjury and why.

**ANSWER:    BFI requests trial by jury.**

(C)     State whether the party submitting these responses is a publicly-owned company and separately identify (1) any parent corporation and any publicly-held corporation owning ten percent (10%) or more of the party's stock; (2) each publicly-owned company of which it is a parent; and (3) each publicly-owned company in which the party owns ten (10%) or more of the outstanding shares.

**ANSWER:  BFI is not a publicly traded company.  Responding to subparagraph (1), BFI's ultimate parent company: Republic Services, Inc., is a publicly held corporation trading on the NYSE under the symbol "RSG."  Responding to subparagraph (2), BFI is not a parent of any publicly-owned company.  Responding to subparagraph (3), BFI does not own ten (10%) or more of the outstanding shares of any publicly-owned company.**

(D)     State the basis for asserting the claim in the division in which it was filed (or the basis of any challenge to the appropriateness of the division).  *See* Local Civil Rule 3.01.

**ANSWER:  This is a removal action from a state court action brought within the division because it is the division where the corporate plaintiff does business.**

(E)     Is this action related in whole or in part to any other matter filed in this district, whether civil or criminal?  If so, provide (1) a short caption and the full case number of the related action; (2) an explanation of how the matters are related; and (3) a statement of the status of the related action.  Counsel should disclose any cases that *may be* related regardless of whether they are still pending.  Whether cases *are* related such that they should be assigned to a single judge will be determined by the clerk of court based on a determination of whether the cases arise from the same or identical transactions, happenings, or events; involve the identical parties or property; or for any other reason would entail substantial duplication of labor if heard by different judges.

**ANSWER:     *City of Columbia v. 3M et al.*, Master Docket No. 2:18-mn-02873-RMG, Case No. 2:24 cv-03794-RMG;  *Woodruff-Roebuck Water District v. AFL***

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

*Telecommunications, LLC et al.*, **Master Docket No. 2:18-mn-02873-RMG, Case No. 2:24 cv-04618-RMG.**

**These cases also allege impacts to public drinking water supplies from PFAS allegedly from defendants' wastewater discharges that allegedly cannot be treated by plaintiff's drinking water treatment technologies. The related cases have been transferred to the pending Aqueous Film-Forming Foam Multidistrict Litigation in the Charleston Division.**

(F)     If the defendant is improperly identified, give the proper identification and state whether counsel will accept service of an amended summons and pleading reflecting the correct identification.

   **ANSWER:     Not Applicable.**

(G)     If you contend that some other person or legal entity is, in whole or in part, liable to you or the party asserting a claim against you in this matter, identify such person or entity and describe the basis of their liability.

   **ANSWER:     BFI has not made a determination of any such person.**

(H)     Parties or Intervenors in a Diversity Case.  In an action in which jurisdiction is based on diversity under 28 U.S.C. § 1332(a), a party or intervenor must, unless the court orders otherwise, name – and identify the citizenship of – every individual or entity whose citizenship is attributed to that party or intervenor. This response must be supplemented when any later event occurs that could affect the court's jurisdiction under § 1332(a).

   **ANSWER: Not applicable.**

PPAB 12103465v1                                           3

/s/ *Kevin A. Dunlap*

Kevin A. Dunlap
SC State Bar No. 13081
PARKER POE ADAMS & BERNSTEIN LLP
110 East Court Street, Suite 200
Greenville, SC 29601
Telephone: (864) 577-6370
Email: kevindunlap@parkerpoe.com

*Attorney for Defendant*

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

✎JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
CITY OF FLORENCE, SOUTH CAROLINA

## DEFENDANTS
ALADDIN MANUFACTURING CORPORATION, et al.

**(b)** County of Residence of First Listed Plaintiff  Florence County
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
John B. White, Jr., P.A.291 S. Pine Street, Spartanburg, SC 29302 (864) 594-5988

Attorneys (If Known)
Counsel for BFI Waste Systems of North America, LLC: Kevin A. Dunlap, Parker Poe Adams & Bernstein LLP, 620 S. Tryon St., Ste 800, Charlotte, NC

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

❏ 1 U.S. Government Plaintiff

☒ 3 Federal Question (U.S. Government Not a Party)

❏ 2 U.S. Government Defendant

❏ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ❏ 1 | ❏ 1 | Incorporated or Principal Place of Business In This State | ❏ 4 | ❏ 4 |
| Citizen of Another State | ❏ 2 | ❏ 2 | Incorporated and Principal Place of Business In Another State | ❏ 5 | ❏ 5 |
| Citizen or Subject of a Foreign Country | ❏ 3 | ❏ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ❏ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ❏ 610 Agriculture | ❏ 422 Appeal 28 USC 158 | ❏ 400 State Reapportionment |
| ❏ 120 Marine | ❏ 310 Airplane | ❏ 362 Personal Injury - Med. Malpractice | ❏ 620 Other Food & Drug | ❏ 423 Withdrawal 28 USC 157 | ❏ 410 Antitrust |
| ❏ 130 Miller Act | ❏ 315 Airplane Product Liability | ❏ 365 Personal Injury - Product Liability | ❏ 625 Drug Related Seizure of Property 21 USC 881 | | ❏ 430 Banks and Banking |
| ❏ 140 Negotiable Instrument | ❏ 320 Assault, Libel & Slander | ❏ 368 Asbestos Personal Injury Product Liability | ❏ 630 Liquor Laws | **PROPERTY RIGHTS** | ❏ 450 Commerce |
| ❏ 150 Recovery of Overpayment & Enforcement of Judgment | ❏ 330 Federal Employers' Liability | | ❏ 640 R.R. & Truck | ❏ 820 Copyrights | ❏ 460 Deportation |
| ❏ 151 Medicare Act | ❏ 340 Marine | **PERSONAL PROPERTY** | ❏ 650 Airline Regs. | ❏ 830 Patent | ❏ 470 Racketeer Influenced and Corrupt Organizations |
| ❏ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ❏ 345 Marine Product Liability | ❏ 370 Other Fraud | ❏ 660 Occupational Safety/Health | ❏ 840 Trademark | ❏ 480 Consumer Credit |
| ❏ 153 Recovery of Overpayment of Veteran's Benefits | ❏ 350 Motor Vehicle | ❏ 371 Truth in Lending | ❏ 690 Other | **LABOR** | ❏ 490 Cable/Sat TV |
| ❏ 160 Stockholders' Suits | ❏ 355 Motor Vehicle Product Liability | ❏ 380 Other Personal Property Damage | | ❏ 710 Fair Labor Standards Act | ❏ 810 Selective Service |
| ❏ 190 Other Contract | ❏ 360 Other Personal Injury | ❏ 385 Property Damage Product Liability | | **SOCIAL SECURITY** | ❏ 850 Securities/Commodities/ Exchange |
| ❏ 195 Contract Product Liability | | | | ❏ 861 HIA (1395ff) | ❏ 875 Customer Challenge 12 USC 3410 |
| ❏ 196 Franchise | | | | ❏ 862 Black Lung (923) | |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ❏ 720 Labor/Mgmt. Relations | ❏ 863 DIWC/DIWW (405(g)) | ❏ 890 Other Statutory Actions |
| ❏ 210 Land Condemnation | ❏ 441 Voting | ❏ 510 Motions to Vacate Sentence | ❏ 730 Labor/Mgmt.Reporting & Disclosure Act | ❏ 864 SSID Title XVI | ❏ 891 Agricultural Acts |
| ❏ 220 Foreclosure | ❏ 442 Employment | **Habeas Corpus:** | ❏ 740 Railway Labor Act | ❏ 865 RSI (405(g)) | ❏ 892 Economic Stabilization Act |
| ❏ 230 Rent Lease & Ejectment | ❏ 443 Housing/ Accommodations | ❏ 530 General | ❏ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ❏ 893 Environmental Matters |
| ☒ 240 Torts to Land | ❏ 444 Welfare | ❏ 535 Death Penalty | ❏ 791 Empl. Ret. Inc. Security Act | ❏ 870 Taxes (U.S. Plaintiff or Defendant) | ❏ 894 Energy Allocation Act |
| ❏ 245 Tort Product Liability | ❏ 445 Amer. w/Disabilities - Employment | ❏ 540 Mandamus & Other | | ❏ 871 IRS—Third Party 26 USC 7609 | ❏ 895 Freedom of Information Act |
| ❏ 290 All Other Real Property | ❏ 446 Amer. w/Disabilities - Other | ❏ 550 Civil Rights | | | ❏ 900Appeal of Fee Determination Under Equal Access to Justice |
| | ❏ 440 Other Civil Rights | ❏ 555 Prison Condition | | | ❏ 950 Constitutionality of State Statutes |

## V. ORIGIN (Place an "X" in One Box Only)

❏ 1 Original Proceeding

☒ 2 Removed from State Court

❏ 3 Remanded from Appellate Court

❏ 4 Reinstated or Reopened

❏ 5 Transferred from another district (specify)

❏ 6 Multidistrict Litigation

❏ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. §§ 1442(a)(1) and 1446
Brief description of cause:
Private Nuisance, Trespass, Negligence

## VII. REQUESTED IN COMPLAINT:
❏ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ❏ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):
JUDGE  Hon. Richard Gergel
DOCKET NUMBER  2:18mn02873 (D.S.C)

DATE  03/12/2025

SIGNATURE OF ATTORNEY OF RECORD
s/ Kevin A. Dunlap

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

ELECTRONICALLY FILED - 2025 Mar 12 6:08 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

JS 44 Reverse  (Rev. 11/04)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

**I.**      **(a) Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations.  If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence.  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing.  In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing.  (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys.  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**      **Jurisdiction**.  The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings.  Place an "X" in one of the boxes.  If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.

United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States.  In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked.  (See Section III below; federal question actions take precedence over diversity cases.)

**III.**      **Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

**IV.**      **Nature of Suit**.  Place an "X" in the appropriate box.  If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit.  If the cause fits more than one nature of suit, select the most definitive.

**V.**      **Origin**.  Place an "X" in one of the seven boxes.

Original Proceedings.  (1) Cases which originate in the United States district courts.

Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.  When the petition for removal is granted, check this box.

Remanded from Appellate Court.  (3) Check this box for cases remanded to the district court for further action.  Use the date of remand as the filing date.

Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.

Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.  When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment.  (7) Check this box for an appeal from a magistrate judge's decision.

**VI.**      **Cause of Action**.  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity**.          Example:          U.S. Civil Statute: 47 USC 553
                                                             Brief Description: Unauthorized reception of cable service

**VII.**      **Requested in Complaint**.  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand.  In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**      **Related Cases**.  This section of the JS 44 is used to reference related pending cases if any.  If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature**.  Date and sign the civil cover sheet.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| | |
|---|---|
| **From:** | do_not_reply@psc.uscourts.gov |
| **To:** | Stafford, Janice W. |
| **Subject:** | Pay.gov Payment Confirmation: SOUTH CAROLINA DISTRICT COURT |
| **Date:** | Wednesday, March 12, 2025 3:05:18 PM |

Your payment has been successfully processed and the details are below. If you have any questions or you wish to cancel this payment, please contact: Diane Green at 803-253-3527.

Account Number: 7304162
Court: SOUTH CAROLINA DISTRICT COURT
Amount: $405.00
Tracking Id: BSCDC-12319976
Approval Code: 05255Z
Card Number: ************3377
Date/Time: 03/12/2025 03:05:07 ET

Person Completing Transaction: Janice Stafford
Attorney Name: Kevin Dunlap
Attorney Phone: 864-706-7150

NOTE: This is an automated message. Please do not reply

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 061, GLOBAL POSITIONING SYSTEM



2.      Configure unit settings: To open Units form, tap Units in the Setup screen. Use this form to specify the units used for measurements and display.



3.      Starting the TerraSync Software:

- When you are outside and ready to begin, switch on your data collector and start the TerraSync software. The GPS receiver should activate automatically.

- On the Microsoft Windows® or Windows Mobile® taskbar, tap the windows icon and the select Programs/TerraSync. While the software is loading, a Trimble identification screen appears.

4.      Getting a clear view of the sky. Move to a location where the receiver has a clear view of the sky. Signals can be received from any direction. Satellite signals can be blocked by

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 061, GLOBAL POSITIONING SYSTEM

people, buildings, heavy tree cover, large vehicles, or powerful transmitters. GPS signals can go through leaves, plastic, and glass, but they will weaken the signal.

5.   Checking the GPS status. When you start the TerraSync software, it automatically connects to the GPS receiver and begins to track visible satellites to calculate its current position. Use the satellite icon on the status bar to check whether the receiver is computing GPS positions.

6.   To view the GPS status: The Skyplot screen appears when you first run the TerraSync software. If this screen is not visible, tap the Section button, select Status, tap the Subsection list button and then select Skyplot.



- Filled black boxes represent satellites that the receiver is using to compute its current GPS position.

- White boxes represent satellites that the receiver is getting signals from but is not using because the signals are too weak.

7.   You need a minimum of four satellites with good geometry to computer a 3D GPS position.

8.   Status Bar: The status bar appears in the top row of the TerraSync screen. It is always visible, but the icons displayed depend on the current status of the TerraSync software.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 061, GLOBAL POSITIONING SYSTEM



9.      Creating a New Data File: Before starting the data collection session, you need t create a new data file to store the new features and attributes you collect. Use the Data section to do this.

- Tap the Section list button and then select Data

- Tap the Subsection list button and then select New.



ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 061, GLOBAL POSITIONING SYSTEM

- In the Dictionary Name field, select a data dictionary.

- Tap **Create**. The Collect Features screen appears:



10.  Collecting a Point Feature: When you record a point feature, you remain stationary for some time. The TerraSync software logs a number of GPS positions during this time. These positions are averaged together to compute the final GPS position of the point feature.

When the TerraSync software is logging GPS positions, the logging icon appears in the status bar. The number beside the icon indicates how many positions have been logged for the selected feature. It is recommended that a minimum of 20 positions are logged prior to recording the feature.

To record a Point Feature:

- Make sure the Collect Features screen is open.

- In the Choose Feature list, highlight an appropriate point feature and then tap **Create**. The attribute entry form for the feature type appears:

- Fill in the attribute field with appropriate values

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 061, GLOBAL POSITIONING SYSTEM



- Once you have reached the desired amount of positions, tap OK to close the road sign feature. The attribute entry form closes and you are returned to the Collect Features screen.

- Refer to the TerraSync Orientation Guide for steps on how to collect other features.

11.     Ending the data collection session: When the data collection session is complete, close the data file and then exit the Terra Sync software.

- In the Collect Features screen, tap **Close**.

- A message appears asking you to confirm that you want to close the open file. Tap **Yes** to close.

- Tap the X button in the top right corner of the screen.

- A message appears asking you to confirm that you want to close the TerraSync software. Tap **Yes** to close.

## C.     Preventive Maintenance

Data should be downloaded from the datalogger a minimum of once daily, twice daily is preferred. At the end of each day the receiver batteries should be recharged. For technical assistance call the rental company through which you acquired the Trimble® unit. Guidance is also provided in the manual and at http://www.trimble.com.

# V.     References

GeoExplorer® 6000 series, Trimble, February 2011.

TerraSync and GPS Pathfinder Office Software Guide, December 2006

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 066

# Equipment Blank and Field Blank Preparation

## I.    Purpose

To prepare blanks to determine whether decontamination procedures are adequate and whether any cross-contamination is occurring during sampling due to contaminated air and dust.

## II.   Scope

The general protocols for preparing the blanks are outlined. The actual equipment to be rinsed will depend on the requirements of the specific sampling procedure.

## III.  Equipment and Materials

- Blank liquid (use ASTM Type II or lab grade deionized water)
- Sample bottles as appropriate
- Gloves
- Preservatives as appropriate

## IV.   Procedures and Guidelines

*A.*   Decontaminate all sampling equipment that has come in contact with sample according to Standard Operating Procedure 003, *Decontamination of Personnel and Equipment.*

B.    To collect an equipment blank for volatile analysis from the surfaces of sampling equipment other than pumps, pour blank water over one piece of equipment and into two or three (laboratory dependent) 40-millilter vials until there is a positive meniscus, then seal the vials. Note the sample number and associated piece of equipment in the field notes as well as the type and lot number of the water used.

For non-volatiles analyses, one aliquot is to be used for equipment. For example, if a pan and trowel are used, place trowel in pan and pour blank fluid in pan such that pan and trowel surfaces which contacted the sample are contacted by the blank fluid. Pour blank fluid from pan into appropriate sample bottles.

Do not let the blank fluid come in contact with any equipment that has not been decontaminated.

C.    When collecting an equipment blank from a pump, run an extra gallon of deionized water through the pump while collecting the pump outflow into appropriate containers. Make sure the flow rate is low when sampling volatile organic compounds. If a submersible pump with disposable tubing is used, remove the disposable tubing after sampling but before decontamination. When decontamination is complete, put a 3- to 5-foot segment of new tubing onto the pump to collect the equipment blank.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 006, EQUIPMENT BLANK AND FIELD BLANK PREPARATION

D. To collect a field blank, slowly pour ASTM Type II or laboratory grade deionized water directly into sample containers.

E. Document and ship samples in accordance with the procedures for other samples.

F. Collect next field sample.

# V.   Attachments

None.

# VI.   Key Checks and Items

- Wear gloves.
- Do not use any non-decontaminated equipment to prepare blank.
- Use ASTM-Type II or labortatory grade deionized water.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

S T A N D A R D   O P E R A T I N G   P R O C E D U R E   0 6 7

# Chain-of-Custody

## I.  Purpose

The purpose of this SOP is to provide information on chain-of-custody procedures to be used under the CLEAN Program.

## II.  Scope

This procedure describes the steps necessary for transferring samples using Chain-of-Custody Records. A Chain-of-Custody Record is required, without exception, for the tracking and recording of samples collected for on-site or off-site analysis (chemical or geotechnical) during program activities (except wellhead samples taken for measurement of field parameters). Use of the Chain-of-Custody Record Form creates an accurate written record that can be used to trace the possession and handling of the sample from the moment of its collection through analysis. This procedure identifies the necessary custody records and describes their completion. This procedure does not take precedence over region specific or site-specific requirements for chain-of-custody.

## III.  Definitions

**Chain-of-Custody Record Form -** A Chain-of-Custody Record Form is a printed two-part form that accompanies a sample or group of samples as custody of the sample(s) is transferred from one custodian to another custodian. One copy of the form must be retained in the project file.

**Custodian -** The person responsible for the custody of samples at a particular time, until custody is transferred to another person (and so documented), who then becomes custodian. A sample is under one's custody if:

- It is in one's actual possession.
- It is in one's view, after being in one's physical possession.
- It was in one's physical possession and then they locked it up to prevent tampering.
- It is in a designated and identified secure area.

**Sample -** A sample is physical evidence collected from a facility or the environment, which is representative of conditions at the point and time that it was collected.

## IV.  Procedures

The term "chain-of-custody" refers to procedures which ensure that evidence presented in a court of law is valid. The chain-of-custody procedures track the evidence from the time and place it is first obtained to the courtroom, as well as providing security for the evidence as it is moved and/or passed from the custody of one individual to another.

QC AND REVIEWED 3/2023                                      1

STANDARD OPERATING PROCEDURE 067, CHAIN-OF-CUSTODY

Chain-of-custody procedures, recordkeeping, and documentation are an important part of the management control of samples. Regulatory agencies must be able to provide the chain-of-possession and custody of any samples that are offered for evidence, or that form the basis of analytical test results introduced as evidence. Written procedures must be available and followed whenever evidence samples are collected, transferred, stored, analyzed, or destroyed.

## A.    Sample Identification

The method of identification of a sample depends on the type of measurement or analysis performed. When in situ measurements are made, the data are recorded directly in bound logbooks or other field data records with identifying information.

Information which shall be recorded in the field logbook, when in-situ measurements or samples for laboratory analysis are collected, includes:

- Field Sampler(s),
- Contract Task Order (CTO) Number,
- Project Sample Number,
- Sample location or sampling station number,
- Date and time of sample collection and/or measurement,
- Field observations,
- Equipment used to collect samples and measurements, and
- Calibration data for equipment used

Measurements and observations shall be recorded using waterproof ink.

## B.    Sample Label

Samples, other than for in situ measurements, are removed and transported from the sample location to a laboratory or other location for analysis. Before removal, however, a sample is often divided into portions, depending upon the analyses to be performed. Each portion is preserved in accordance with the Sampling and Analysis Plan. Each sample container is identified by a sample label (**Attachment 1**). Sample labels are provided, along with sample containers, by the analytical laboratory. The information recorded on the sample label includes:

- **Project:** Name of project site.

- **Sample Identification:** The unique sample number identifying this sample.

- **Date:** A six-digit number indicating the day, month, and year of sample collection (for example, 05/21/17).

- **Time:** A four-digit number indicating the 24-hour time of collection (for example: 0954 is 9:54 a.m., and 1629 is 4:29 p.m.).

- **Medium:** Water, soil, sediment, sludge, waste, etc.

- **Sample Type:** Grab or composite.

- **Preservation:** Type and quantity of preservation added.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

- **Analysis:** VOA, BNAs, PCBs, pesticides, metals, cyanide, other.

- **Sampled By:** Printed name or initials of the sampler.

- **Remarks:** Any pertinent additional information.

The field team should always follow the sample ID system prepared by the Project Chemist and reviewed by the Project Manager.

## C.      Chain-of-Custody Procedures

After collection, separation, identification, and preservation, the sample is maintained under chain-of-custody procedures until it is in the custody of the analytical laboratory and has been stored or disposed.

## D.      Field Custody Procedures

- Samples are collected as described in the site Sampling and Analysis Plan. Care must be taken to precisely record the sample location and to ensure that the sample number on the label matches the Chain-of-Custody Record exactly.

- A Chain-of-Custody Record will be prepared for each individual cooler shipped and will include only the samples contained within that cooler. The Chain-of-Custody Record for that cooler will then be sealed in a zip-log bag and placed in the cooler prior to sealing. This ensures that the laboratory properly attributes trip blanks with the correct cooler and allows for easier tracking should a cooler become lost during transit.

- The person undertaking the actual sampling in the field is responsible for the care and custody of the samples collected until they are properly transferred or dispatched.

- When photographs are taken of the sampling as part of the documentation procedure, the name of the photographer, date, time, site location, and site description are entered sequentially in the site logbook as photos are taken. Once downloaded to the server or developed, the electronic files or photographic prints shall be serially numbered, corresponding to the logbook descriptions; photographic prints will be stored in the project files. To identify sample locations in photographs, an easily read sign with the appropriate sample location number should be included.

- Sample labels shall be completed for each sample, using waterproof ink unless prohibited by weather conditions (e.g., a logbook notation would explain that a pencil was used to fill out the sample label if the pen would not function in freezing weather.)

## E.      Transfer of Custody and Shipment

Samples are accompanied by a Chain-of-Custody Record Form. A Chain-of-Custody Record Form must be completed for each cooler and should include only the samples contained within that cooler. A Chain-of-Custody Record Form example is shown in **Attachment 2**. When transferring the possession of samples, the individuals relinquishing and receiving will sign, date, and note the time on the Record. This Record documents sample custody transfer from the sampler,

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 067, CHAIN-OF-CUSTODY

often through another person, to the analyst in the laboratory. The Chain-of-Custody Record is filled out as given below:

- Enter header information (CTO number, samplers, and project name).

- Enter sample specific information (sample number, media, sample analysis required and analytical method grab or composite, number and type of sample containers, and date/time sample was collected).

- Sign, date, and enter the time under "Relinquished by" entry.

- Have the person receiving the sample sign the "Received by" entry. If shipping samples by a common carrier, print the carrier to be used and enter the airbill number under "Remarks," in the bottom right corner.

- Place the original (top, signed copy) of the Chain-of-Custody Record Form in a plastic zipper-type bag or other appropriate sample-shipping package. Retain the copy with field records.

- Sign and date the custody seal, a 1-inch by 3-inch white paper label with black lettering and an adhesive backing. **Attachment 3** is an example of a custody seal. The custody seal is part of the chain-of-custody process and is used to prevent tampering with samples after they have been collected in the field. Custody seals shall be provided by the analytical laboratory.

- Place the seal across the shipping container opening (front and back) so that it would be broken if the container were to be opened.

- Complete other carrier-required shipping papers.

The custody record is completed using waterproof ink. Any corrections are made by drawing a line through and initialing and dating the change, then entering the correct information. Erasures are not permitted.

Common carriers will usually not accept responsibility for handling Chain-of-Custody Record Forms; this necessitates packing the record in the shipping container (enclosed with other documentation in a plastic zipper-type bag). If custody forms are sealed inside the shipping container and the custody seals are intact, commercial carriers are not required to sign the custody form.

The laboratory representative who accepts the incoming sample shipment signs and dates the Chain-of-Custody Record, completing the sample transfer process. It is then the laboratory's responsibility to maintain internal logbooks and custody records throughout sample preparation and analysis.

# V.   Quality Assurance Records

Once samples have been packaged and shipped, the Chain-of-Custody copy and airbill receipt become part of the quality assurance record.

# VI.  Attachments

1. Sample Label
2. Chain of Custody Form
3. Custody Seal

# VII.  References

USEPA. User's Guide to the Contract Laboratory Program. Office of Emergency and Remedial Response, Washington, D.C. (EPA/540/P-91/002), January 1991.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE CHAIN-OF-CUSTODY 067
ATTACHMENT 1 - EXAMPLE SAMPLE LABEL

**QAL**

Quality Analytical Laboratories, Inc.
2567 Fairlane Drive
Montgomery, Alabama 36116
PH. (334)271-2440

Client _____
Sample No. _____
Location _____
_____
Analysis _____
_____
Preservative  **HCL** _____
Date _____ By _____

**CEIMIC CORPORATION**
10 Dean Knauss Drive, Narragansett, R.I. 02882 • (401) 782-8900

| SITE NAME | DATE |
|---|---|
| ANALYSIS | TIME |
|  | PRESERVATIVE |

SAMPLE TYPE

☐ Grab  ☐ Composite  ☐ Other _____

COLLECTED BY:

STANDARD OPERATING PROCEDURE CHAIN-OF-CUSTODY 067
ATTACHMENT 2 EXAMPLE CHAIN-OF-CUSTODY RECORD

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

7

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE CHAIN-OF-CUSTODY 067
ATTACHMENT 3 EXAMPLE CUSTODY SEAL

**CUSTODY SEAL**

Date

Signature

CH2M HILL

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 069

# Packaging and Shipping Procedures for Low-Concentration Samples

## I.    Purpose and Scope

The purpose of this guideline is to describe the packaging and shipping of low-concentration samples of various media to a laboratory for analysis.

## II.    Scope

The guideline only discusses the packaging and shipping of samples that are anticipated to have low concentrations of chemical constituents. Whether or not samples should be classified as low-concentration or otherwise will depend upon the site history, observation of the samples in the field, odor, and photoionization-detector readings.

If the site is known to have produced high-concentration samples in the past or the sampler suspects that high concentrations of contaminants might be present in the samples, then the sampler should conservatively assume that the samples cannot be classified as low-concentration. Samples that are anticipated to have medium to high concentrations of constituents should be packaged and shipped accordingly.

If warranted, procedures for dangerous-goods shipping may be implemented.  Dangerous goods and hazardous materials pose an unreasonable risk to health, safety, or property during transportation without special handling. As a result only employees who are trained under Jacobs Dangerous Goods Shipping course may ship or transport dangerous goods. Employees should contact a designated Jacobs HazMat advisor with questions.

### A.    Equipment and Materials

  – Coolers
  – Clear tape
  – Strapping tape
  – Contractor bags
  – Absorbent pads or equivalent
  – Resealable bags
  – Bubble bags (for glass bottle ware)
  – Bubble wrap (if needed)
  – Ice
  – Chain-of-Custody form (completed)
  – Custody seals

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 069, PACKAGING AND SHIPPING PROCEDURES FOR LOW-CONCENTRATION SAMPLES

## B.     Procedures and Guidelines

1. Low-Concentration Samples

   A. Prepare coolers for shipment:

      - Tape drains shut.

      - Place mailing label with laboratory address on top of coolers.

      - Fill bottom of coolers with absorbent pads or similar material.

      - Place a contractor bag inside the cooler.

   B. Affix appropriate adhesive sample labels to each container.  Protect with clear packing tape.

   C. Arrange decontaminated sample containers in groups by sample number. Consolidate VOC samples into one cooler to minimize the need for trip blanks. Cross check CoC to ensure all samples are present.

   D. Seal each glass sample bottle within a separate bubble bag (VOCs grouped per sample location). Sample labels should be visible through the bag.  Whenever possible, group samples per location for all analytes and place in resealable bags. Make sure to release as much air as practicable from the bag before sealing.

   E. Arrange sample bottles in coolers so that they do not touch.

   F. If ice is required to preserve the samples, cubes should be repackaged in resealable bags and placed on and around the containers.

   G. Fill remaining spaces with bubble wrap if needed.

   H. Complete and sign chain-of-custody form (or obtain signature) and indicate the time and date it was relinquished to Federal Express or the courier.

   I. Close lid and latch.

   J. Carefully peel custody seals from backings and place intact over lid openings (right front and left back). Cover seals with clear packing tape.

   K. Tape cooler shut on both ends, making several complete revolutions with strapping tape. Cover custody seals with clear packing tape to avoid seals being able to be peeled from the cooler.

   L. Relinquish to Federal Express or to a courier arranged with the laboratory.  Scan air bill receipt and CoC and send to the sample documentation coordinator along with the other documentation.

## C.     Medium- and High-Concentration Samples:

Medium- and high-concentration samples are packaged using the same techniques used to package low-concentration samples, with potential additional restrictions. If applicable, the sample handler must refer to instructions associated with the shipping of dangerous goods for the necessary procedures for shipping by Federal Express (preferred) or other overnight carrier (if necessary). If warranted, procedures for

dangerous-goods shipping may be implemented. Dangerous goods and hazardous materials pose an unreasonable risk to health, safety, or property during transportation without special handling. As a result, only employees who are trained under Jacobs Dangerous Goods Shipping course may ship or transport dangerous goods. Employees should contact a designated Jacobs HazMat advisor with questions.

# III.  Attachments

None.

# IV.  Key Checks and Items

- Be sure laboratory address is correct on the mailing label

- Pack sample bottles carefully, with adequate packaging and without allowing bottles to touch

- Be sure there is adequate ice

- Include chain-of-custody form

- Include custody seals

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 069, PACKAGING AND SHIPPING PROCEDURES FOR LOW-CONCENTRATION SAMPLES

This page intentionally left blank.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 074

# Logging of Soil Borings

## I.     Purpose and Scope

This SOP provides guidance to obtain accurate and consistent descriptions of soil characteristics during soil-sampling operations. The characterization is based on visual examination and manual tests, not on laboratory determinations.

## II.     Equipment and Materials

- Indelible pens

- Tape measure or ruler

- Field logbook

- Spatula

- HCL, 10 percent solution

- Squirt bottle with water

- Rock- or soil-color chart (e.g., Munsell)

- Grain-size chart

- Hand lens

- Unified Soil Classification System (USCS) index charts and tables to help with soil classification (attached)

## III.     Procedures and Guidelines

This section covers several aspects of soil characterization: instructions for completing the soil boring log form (attached), field classification of soil, and standard penetration test procedures.

### A.     Instructions for Completing Soil Boring Logs

Soil boring logs will be completed in the field log books or on separate soil boring log sheets. Information collected will be consistent with that required for ASTM D1586, a standard soil boring log form (attached), or an equivalent form that supplies the same information.

The information collected in the field to perform the soil characterization is described below.

Field personnel should review completed logs for accuracy, clarity, and thoroughness of detail. Samples also should be checked to see that information is correctly recorded on both sample jar labels and on the log sheets.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 074, LOGGING OF SOIL BORINGS

## B.     Heading Information

1. **Boring/Well Number.** Enter the boring/well number. A numbering system should be chosen that does not conflict with information recorded for previous exploratory work done at the site. Number the sheets consecutively for each boring.

2. **Location.** If station, coordinates, mileposts, or similar project layout information is available, indicate the position of the boring to that system using modifiers such as "approximate" or "estimated" as appropriate.

3. **Elevation.** Elevation will be determined at the conclusion of field activities through a survey.

4. **Drilling Contractor.** Enter the name of the drilling company and the city and state where the company is based.

5. **Drilling Method and Equipment.** Identify the bit size and type, drilling fluid (if used), and method of drilling (e.g., rotary, hollow-stem auger, sonic). Information on the drilling equipment (e.g., CME 55, Mobile B61) also is noted.

6. **Water Level and Date.** Enter the depth below ground surface to the apparent water level in the borehole. The information should be recorded as a comment. If free water is not encountered during drilling or cannot be detected because of the drilling method, this information should be noted. Record date and time of day (for tides, river stage) of each water level measurement.

7. **Date of Start and Finish.** Enter the dates the boring was begun and completed. Time of day should be added if several borings are performed on the same day.

8. **Logger.** Enter the first and last name.

## C.     Technical Data

1. **Depth Below Surface**. Use a depth scale that is appropriate for the sample spacing and for the complexity of subsurface conditions.

2. **Sample Interval.** Note the depth at the top and bottom of the sample interval.

3. **Sample Type and Number.** Enter the sample type and number. SS-1 = split spoon, first sample. Number samples consecutively regardless of type. Enter a sample number even if no material was recovered in the sampler.

4. **Sample Recovery.** Enter the length to the nearest 0.1-foot of soil sample recovered from the sampler. Often, there will be some wash or caved material above the sample; do not include the wash material in the measurement. Record soil recovery in feet.

5. **Standard Penetration Test Results.** In this column, enter the number of blows required for each 6 inches of sampler penetration and the "N" value, which is the sum of the blows in the middle two 6-inch penetration intervals. A typical standard penetration test involving successive blow counts of 2, 3, 4, and 5 is recorded as 2-3-4-5 and (7). The standard penetration test is terminated if the sampler encounters refusal. Refusal is a penetration of less than 6 inches with a blow count of 50. A partial penetration of 50 blows for 4 inches is

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 074, LOGGING OF SOIL BORINGS

recorded as 50/4 inches. Penetration by the weight of the slide hammer only is recorded as "WOH."

6.   Samples should be collected using a 140-pound hammer and 2-inch diameter split spoons. Samples may be collected using direct push sampling equipment. However, blow counts will not be available. A pocket penetrometer may be used instead to determine relative soil consistency of fine grained materials (silts and clays).

7.   Sample also may be collected using a 300-pound hammer or 3-inch-diameter split-spoon samples at the site. However, use of either of these sample collection devices invalidates standard penetration test results and should be noted in the comments section of the log. The 300-pound hammer should only be used for collection of 3-inch-diameter split-spoon samples. Blow counts should be recorded for collection of samples using either a 3-inch split-spoon, or a 300-pound hammer. An "N" value need not be calculated.

8.   **Soil Description.** The soil classification should follow the format described in the "Field Classification of Soil" subsection below.

9.   **Comments.** Include all pertinent observations (changes in drilling fluid color, rod drops, drilling chatter, rod bounce as in driving on a cobble, damaged Shelby tubes, and equipment malfunctions). In addition, note if casing was used, the sizes and depths installed, and if drilling fluid was added or changed. You should instruct the driller to alert you to any significant changes in drilling (changes in material, occurrence of boulders, and loss of drilling fluid). Such information should be attributed to the driller and recorded in this column.

10.  Specific information might include the following:

   - The date and the time drilling began and ended each day
   - The depth and size of casing and the method of installation
   - The date, time, and depth of water level measurements
   - Depth of rod chatter
   - Depth and percentage of drilling fluid loss
   - Depth of hole caving or heaving
   - Depth of change in material
   - Health and safety monitoring data
   - Drilling interval through a boulder

## D.   Field Classification of Soil

This section presents the format for the field classification of soil. In general, the approach and format for classifying soils should conform to ASTM D 2488, Visual-Manual Procedure for Description and Identification of Soils.

The Unified Soil Classification System is based on numerical values of certain soil properties that are measured by laboratory tests. It is possible, however, to estimate these values in the field with reasonable accuracy using visual-manual procedures (ASTM D 2488). In addition, some elements of a complete soil description, such as the presence of cobbles or boulders, changes in strata, and the relative proportions of soil types in a bedded deposit, can be obtained only in the field.

STANDARD OPERATING PROCEDURE 074, LOGGING OF SOIL BORINGS

Soil descriptions should be precise and comprehensive without being verbose. The correct overall impression of the soil should not be distorted by excessive emphasis on insignificant details. In general, similarities rather than differences between consecutive samples should be stressed.

Soil descriptions must be recorded for every soil sample collected. The format and order for soil descriptions should be as follows:

- Soil name (synonymous with ASTM D 2488 Group Name) with appropriate modifiers. Soil name should be in all capitals in the log, for example "POORLY-GRADED SAND."

- Group symbol, in parentheses, for example, "(SP)."

- Color, using Munsell color designation

- Moisture content

- Relative density (coarse grained) or consistency (fine grained)

- Soil structure, mineralogy, or other descriptors

This order follows, in general, the format described in ASTM D 2488.

## E.    Soil Name

The basic name of a soil should be the ASTM D 2488 Group Name on the basis of visual estimates of gradation and plasticity. The soil name should be capitalized.

Examples of acceptable soil names are illustrated by the following descriptions:

- A soil sample is visually estimated to contain 15 percent gravel, 55 percent sand, and 30 percent fines (passing No. 200 sieve). The fines are estimated as either low or highly plastic silt. This visual classification is SILTY SAND WITH GRAVEL, with a Group Symbol of (SM).

- Another soil sample has the following visual estimate: 10 percent gravel, 30 percent sand, and 60 percent fines (passing the No. 200 sieve). The fines are estimated as low plastic silt. This visual classification is SANDY SILT. The gravel portion is not included in the soil name because the gravel portion was estimated as less than 15 percent. The Group Symbol is (ML).

The gradation of coarse-grained soil (more than 50 percent retained on No. 200 sieve) is included in the specific soil name in accordance with ASTM D 2488. There is no need to further document the gradation. However, the maximum size and angularity or roundness of gravel and sand-sized particles should be recorded. For fine-grained soil (50 percent or more passing the No. 200 sieve), the name is modified by the appropriate plasticity/elasticity term in accordance with ASTM D 2488.

Interlayered soil should each be described starting with the predominant type. An introductory name, such as "Interlayered Sand and Silt," should be used. In addition, the relative proportion of each soil type should be indicated (see Table 1 for example).

Where helpful, the evaluation of plasticity/elasticity can be justified by describing results from any of the visual-manual procedures for identifying fine-grained soils, such as reaction to shaking, toughness of a soil thread, or dry strength as described in ASTM D 2488.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 074, LOGGING OF SOIL BORINGS

## F.    Group Symbol

The appropriate group symbol from ASTM D 2488 must be given after each soil name. The group symbol should be placed in parentheses to indicate that the classification has been estimated.

In accordance with ASTM D 2488, dual symbols (e.g., GP-GM or SW-SC) can be used to indicate that a soil is estimated to have about 10 percent fines. Borderline symbols (e.g., GM/SM or SW/SP) can be used to indicate that a soil sample has been identified as having properties that do not distinctly place the soil into a specific group. Generally, the group name assigned to a soil with a borderline symbol should be the group name for the first symbol. The use of a borderline symbol should not be used indiscriminately. Every effort should be made to first place the soil into a single group.

## G.    Color

The color of a soil must be given. The color description should be based on the Munsell system. The color name and the hue, value, and chroma should be given.

## H.    Moisture Content

The degree of moisture present in a soil sample should be defined as dry, moist, or wet. Moisture content can be estimated from the criteria listed on **Table 2**.

## I.    Relative Density or Consistency

Relative density of a coarse-grained (cohesionless) soil is based on N-values (ASTM D 1586 ). If the presence of large gravel, disturbance of the sample, or non-standard sample collection makes determination of the in situ relative density or consistency difficult, then this item should be left out of the description and explained in the Comments column of the soil boring log.

Consistency of fine-grained (cohesive) soil is properly based on results of pocket penetrometer or torvane results. In the absence of this information, consistency can be estimated from N-values. Relationships for determining relative density or consistency of soil samples are given in **Tables 3 and 4**.

## J.    Soil Structure, Mineralogy, and Other Descriptors

Discontinuities and inclusions are important and should be described. Such features include joints or fissures, slickensides, bedding or laminations, veins, root holes, and wood debris.

Significant mineralogical information such as cementation, abundant mica, or unusual mineralogy should be described.

Other descriptors may include particle size range or percentages, particle angularity or shape, maximum particle size, hardness of large particles, plasticity of fines, dry strength, dilatancy, toughness, reaction to HCl, and staining, as well as other information such as organic debris, odor, or presence of free product.

STANDARD OPERATING PROCEDURE 074, LOGGING OF SOIL BORINGS

### K.    Equipment and Calibration

Before starting the testing, the equipment should be inspected for compliance with the requirements of ASTM D 1586. The split-barrel sampler should measure 2-inch or 3-inch OD, and should have a split tube at least 18 inches long. The minimum size sampler rod allowed is "A" rod (1-5/8-inch OD). A stiffer rod, such as an "N" rod (2-5/8-inch OD), is required for depths greater than 50 feet. The drive weight assembly should consist of a 140-pound or 300-pound hammer weight, a drive head, and a hammer guide that permits a free fall of 30 inches.

## IV.    Attachments

- Soil Boring Log (Sample Soil Boring Log.xls)
- Soil Boring Log Site 56 Example (Soil Boring Log_Site 56_Example)
- Soil Boring Log Form with a completed example (Soil_Log_Examp.pdf)
- Tables 1 through 4 (Tables 1-4.pdf)

## V.    Key Checks and Preventive Maintenance

- Check entries to the soil-boring log and field logbook in the field; because the samples will be disposed of at the end of fieldwork, confirmation and corrections cannot be made later.

- Check that sample numbers and intervals are properly specified.

- Check that drilling and sampling equipment is decontaminated using the procedures defined in SOP *Decontamination of Drilling Rigs and Equipment.*

## VI.    References

ASTM D2488-17e1, Standard Practice for Description and Identification of Soils (Visual-Manual Procedures), ASTM International, West Conshohocken, PA, 2017, www.astm.org

ASTM D1586 / D1586M-18, Standard Test Method for Standard Penetration Test (SPT) and Split-Barrel Sampling of Soils, ASTM International, West Conshohocken, PA, 2018, www.astm.org

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| SOIL BORING LOG | | | | | PROJECT NUMBER | | | BORING NUMBER | |
|---|---|---|---|---|---|---|---|---|---|
| PROJECT : | | | | | | LOCATION : | | | |
| ELEVATION : | | | | | DRILLING CONTRACTOR : | | | | |
| DRILLING METHOD AND EQUIPMENT USED : | | | | | | | | | |
| ATD WATER LEVEL : | | | | | START : | | END : | LOGGER : | |
| DEPTH BELOW SURFACE (FT) | INTERVAL (FT) | RECOVERY (FT) | SAMPLE #/TYPE | STANDARD PENETRATION TEST RESULTS 6"-6"-6"-6" (N') | SOIL DESCRIPTION SOIL NAME, USCS GROUP SYMBOL, COLOR, MOISTURE CONTENT, RELATIVE DENSITY, OR CONSISTENCY, SOIL STRUCTURE, MINERALOGY. | | | USCS | COMMENTS DEPTH OF CASING, DRILLING RATE, DRILLING FLUID LOSS, TESTS, AND INSTRUMENTATION. DRILLING ACTIONS/DRILLER COMMENTS PID Readings: Breathing Zone: Above Hole: |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| SOIL BORING LOG | | | | PROJECT NUMBER 663482CH | | | BORING NUMBER PX-S56-SO32 | |
|---|---|---|---|---|---|---|---|---|
| PROJECT: Patuxent NAS Site 6 Remedial Investigation | | | | | LOCATION : PX-S56-SO32 | | | |
| ELEVATION : TBD | | | | DRILLING CONTRACTOR:  A-Zone | | | | |
| DRILLING METHOD AND EQUIPMENT USED : 3.4" outer diameter, using DPT GeoProbe 7822DT | | | | | | | | |
| ATD WATER LEVEL : 20 ft bgs | | | | START : 3/4/2020 | | END : 3/4/2020 | LOGGER :  E. Anzinger | |

| DEPTH BELOW SURFACE (FT) | INTERVAL (FT) | RECOVERY (FT) | SAMPLE #/TYPE | STANDARD PENETRATION TEST RESULTS 6"-6"-6"-6" (N') | SOIL DESCRIPTION SOIL NAME, USCS GROUP SYMBOL, COLOR, MOISTURE CONTENT, RELATIVE DENSITY, OR CONSISTENCY, SOIL STRUCTURE, MINERALOGY. | | USCS | COMMENTS DEPTH OF CASING, DRILLING RATE, DRILLING FLUID LOSS, TESTS, AND INSTRUMENTATION. DRILLING ACTIONS/DRILLER COMMENTS PID Readings:  Breathing Zone:  Above Hole: |
|---|---|---|---|---|---|---|---|---|
| | 5 | 4 | Surface Interval (0 - 1') | NA | 0.0 - 0.5 | Dark brown sandy clayey silt MC, 10YR 4/4, dry, loose | MC | 0.0 ppm |
| | | | | | 0.5 - 1.25 | Brown clayey fine to coarse sand, well graded SW, 10YR 4/4, moist , loose with some sub round to subangular gravel and silt; some vegetation and twigs | SW | 0.0 ppm |
| | | | | | 1.25 - 3.5 | Tan/orange clayey fine to coarse sand, well graded SW 10YR 4/6, with trace subangular gravel and large cobble (35mm+), moist, medium dense | SW | 0.0 ppm |
| | | | | | 3.5 - 6.0 | Light brown/tan fine to coarse sand, well graded SW 10YR 6/6 with subround to subangular gravels, moist, medium dense | SW | 0.0 ppm |
| | 10 | 3.5 | NA | NA | 6.0 - 10.0 | Light brown/gray fine to coarse sand, well graded SW 2.5YR 6/2 with some subround to subangular gravels, some large cobbles (35mm+) moist, medium dense | SW | 0.0 ppm |
| | 15 | 5 | Midpoint (15 - 16') | NA | 10.0 - 13.0 | Light brown/gray fine to coarse sand, poorly graded SP 2.5YR 6/2 with some subround to subangular gravels, some large cobbles (35mm+) moist, medium dense | SP | 0.0 ppm |
| | | | | | 13 - 14.5 | Dark brown medium sand, poorly graded SP 10YR 4/4 with trace large subround cobbles moist, medium dense | SP | 0.0 ppm |
| | | | | | 14.5 - 16.0 | Tan/orange  fine to coarse sand, well graded SW 10YR 6/6, with trace subround to subangular gravel and large cobbles (35mm+), moist, medium dense | SW | 0.0 ppm |
| | 20 | 4 | Above Water (19 20') | NA | 16.0 - 21.5 | Tan/orange very fine to fine sand poorly graded, 10YR 6/6, with trace small subround to subangular gravels throughout, moist to saturated (saturated from 20' - 21.5' bgs), dense | SP | Water at 20 feet bgs, well screen set from 20 - 30 feet bgs. 0.0 ppm. |
| | 25 | 5 | NA | NA | 21.5 - 24.0 | Light gray/orange/tan very fine to fine sand poorly graded SP 2.5YR 6/2, with trace subround gravel, saturated at top of interval (moist to wet), dense | SP | 0.0 ppm |
| | | | | | 24.0 - 26.0 | Light brown/gray fine sand, poorly graded SP 2.5YR 6/2, moist to wet, dense | SP | 0.0 ppm |
| | 30 | 5 | NA | NA | 26.0 - 28.0 | Tan/orange/brown fine sand, poorly graded SP 10YR 5/6 trace subangular gravel and cobbles, moist to wet, dense | SP | 0.0 ppm |
| | | | | | 28.0 - 30.0 | Orange/tan fine to medium sand, well graded SW 10YR 5/6 moist, medium dense | SW | 0.0 ppm |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

**Table 1**
**EXAMPLE SOIL DESCRIPTIONS**

POORLY GRADED SAND (SP), light brown, moist, loose, fine sand size

FAT CLAY (CH), dark gray, moist, stiff

SILT (ML), light greenish gray, wet, very loose, some mica, lacustrine

WELL-GRADED SAND WITH GRAVEL (SM), reddish brown, moist, dense, subangular gravel to 0.6 inches max

POORLY GRADED SAND WITH SILT (SP-SM), white, wet, medium dense

ORGANIC SOIL WITH SAND (OH), dark brown to black, wet, firm to stiff but spongy undisturbed, becomes soft and sticky when remolded, many fine roots, trace of mica

SILTY GRAVEL WITH SAND (GM), brownish red, moist, very dense, subrounded gravel to 1.2 inches max

INTERLAYERED SILT (60 percent) AND CLAY (40 percent): SILT WITH SAND (ML), medium greenish gray, nonplastic, sudden reaction to shaking, layers mostly 1.5 to 8.3 inches thick; LEAN CLAY (CL), dark gray, firm and brittle undisturbed, becomes very soft and sticky when remolded, layers 0.2 to 1.2 inches thick

SILTY SAND WITH GRAVEL (SM), light yellowish brown, moist, medium dense, weak gravel to 1.0 inches max, very few small particles of coal, fill

SANDY ELASTIC SILT (MH), very light gray to white, wet, stiff, weak calcareous cementation

LEAN CLAY WITH SAND (CL/MH), dark brownish gray, moist, stiff

WELL-GRADED GRAVEL WITH SILT (GW-GM), brown, moist, very dense, rounded gravel to 1.0 inches max

SF032/010.50

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

**Table 2**
**CRITERIA FOR DESCRIBING MOISTURE CONDITION**

| Description | Criteria |
|---|---|
| Dry | Absence of moisture, dusty, dry to the touch |
| Moist | Damp, but no visible water |
| Wet | Visible free water, usually soil is below water table |

**Table 3**
**RELATIVE DENSITY OF COARSE-GRAINED SOIL**
**(Developed from Sowers, 1979)**

| Blows/Ft | Relative Density | Field Test |
|---|---|---|
| 0-4 | Very loose | Easily penetrated with ½-in. steel rod pushed by hand |
| 5-10 | Loose | Easily penetrated with ½-in. steel rod pushed by hand |
| 11-30 | Medium | Easily penetrated with ½-in. steel rod driven with 5-lb hammer |
| 31-50 | Dense | Penetrated a foot with ½-in. steel rod driven with 5-lb hammer |
| >50 | Very dense | Penetrated only a few inches with ½-in. steel rod driven with 5-lb hammer |

**Table 4**
**CONSISTENCY OF FINE-GRAINED SOIL**
**(Developed from Sowers, 1979)**

| Blows/Ft | Consistency | Pocket Penetrometer (TSF) | Torvane (TSF) | Field Test |
|---|---|---|---|---|
| <2 | Very soft | <0.25 | <0.12 | Easily penetrated several inches by fist |
| 2-4 | Soft | 0.25-0.50 | 0.12-0.25 | Easily penetrated several inches by thumb |
| 5-8 | Firm | 0.50-1.0 | 0.25-0.5 | Can be penetrated several inches by thumb with moderate effort |
| 9-15 | Stiff | 1.0-2.0 | 0.5-1.0 | Readily indented by thumb, but penetrated only with great effort |
| 16-30 | Very stiff | 2.0-4.0 | 1.0-2.0 | Readily indented by thumbnail |
| >30 | Hard | >4.0 | >2.0 | Indented with difficulty by thumbnail |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 075

# Shallow Soil Sampling

## I.    Purpose

To provide general guidelines for the collection and handling of surface soil samples during field operations.

## II.    Scope

The method described for surface soil sampling is applicable for loosely packed earth and is used to collect disturbed-soil samples.

## III.    Equipment and Materials

- Sample jars.

- A hand auger or other device that can be used to remove the soil from the ground. Stainless-steel is preferred. However, split spoons, which are most commonly available in carbon steel are acceptable for use only if they are not rusty.

- A stainless-steel spatula or disposable plastic scoop should be used to remove material from the sampling device.

- Unpainted wooden stakes or pin flags

- Fiberglass measuring tape (at least 200 feet in length)

- GPS Unit (if available)

## IV.    Procedures and Guidelines

Wear protective gear, as specified in the Health and Safety Plan.

To locate samples, identify the correct location using the pin flags or stakes. Proceed to collect a sample from the undisturbed soil adjacent to the marker following steps C and D. If markers are not present, the following procedures will be used.

**For samples on a grid:**

- Use measuring tape to locate each sampling point on the first grid line as prescribed in the sampling plan. As each point is located, drive a numbered stake in the ground and record its location on the site map and in the logbook.

- Proceed to sample the points on the grid line.

- Measure to location where next grid line is to start and stake first sample. For subsequent samples on the line take two orthogonal measurements: one to the previous grid line, and one to the previous sample on the same grid line.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 075, SHALLOW SOIL SAMPLING

- Proceed to sample the points on the grid line as described in Section C below.

- Repeat 1c and 1d above until all samples are collected from the area.

- Or, a GPS unit can be used to identify each location based on map coordinated, if available.

**For non-grid samples:**

- Use steel measuring tape to position sampling point at location described in the sampling plan by taking two measurements from fixed landmarks (e.g., corner of house and fence post).

- Note measurements, landmarks, and sampling point on a sketch in the field notebook, and on a site location map.

- Proceed to sample as described in Section C below.

- Repeat 2a through 2c above until all samples are collected from the area.

- Or, a GPS unit can be used to identify each location based on map coordinated, if available.

To the extent possible, differentiate between fill and natural soil. If both are encountered at a boring location, sample both as prescribed in the field sampling plan. Do not locate samples in debris, tree roots, or standing water. In residential areas, do not sample in areas where residents' activities may impact the sample (e.g., barbecue areas, beneath eaves of roofs, driveways, garbage areas). If an obstacle prevents sampling at a measured grid point, move as close as possible, but up to a distance of one half the grid spacing in any direction to locate an appropriate sample. If an appropriate location cannot be found, consult with the Field Team Leader (FTL). If the FTL concurs, the sampling point will be deleted from the program. The FTL will contact the project manager (PM) immediately. The PM and Navy Technical Representative (NTR) will discuss whether the point should be deleted from the program. If it is deleted, the PM will follow-up with the NTR in writing.

**To collect samples:**

- Use a decontaminated stainless-steel scoop/trowel or disposable plastic scoop to scrape away surficial organic material (grass, leaves, etc.) adjacent to the stake. New disposable scoops or trowels may also be used to reduce the need for equipment blanks.

- If sampling:

  - Surface soil: Obtain soil sample by scooping soil using the augering scoop/trowel, starting from the surface and digging down to a depth of about 6 inches, or the depth specified in the workplan.

  - Subsurface soil: Obtain the subsurface soil sample using an auger down to the depths prescribed in the field sampling plan.

- Take a photo ionization detector (PID) reading of the sampled soil if organics are anticipated to be present and record the response in the field notebook. Also record lithologic description and any pertinent observations (such as discoloration) in the logbook.

- Empty the contents of the scoop/trowel into a decontaminated stainless-steel pan or dedicated sealable bag.

- Repeat this procedure until sufficient soil is collected to meet volume requirements.

- For TCL VOC and field GC aliquots, fill sample jars directly with the trowel or scoop or specialized sampling equipment (i.e. Encore® or Terra Core® sampler) and cap immediately upon filling. DO NOT HOMOGENIZE.

- For TCL pesticides/PCBs and SVOCs, TAL metals, and field XRF aliquots, homogenize cuttings in the pan using a decontaminated stainless-steel utensil in accordance with SOP *Decontamination of Drilling Rigs and Equipment*.

- For TCL PCBs, soil samples should include rocks and hard chunks encountered. The extraction procedure may require that the lab screen the soil to eliminate rocks larger than 3/8 inch in diameter, but the criteria are too complicated to allow a decision to be made in the field.

- Transfer sample for analysis into appropriate containers with a decontaminated utensil.

- Immediately upon collection, all samples for chemical analysis are to be placed in a closed container on ice unless it is not possible to do so. Although unusual and uncommon, there may be instances where it is not possible to have containers with ice at the sample location. In these instances, the samples should be placed on ice as soon as practical and during the time between collection and placing the samples on ice, the samples should be kept as cool as possible

- Backfill the hole with soil removed from the borehole. To the extent possible, replace topsoil and grass and attempt to return appearance of sampling area to its pre-sampled condition. For samples in non-residential, unmowed areas, mark the sample number on the stake and leave stake in place. In mowed areas, remove stake.

# V.   Attachments

None.

# VI.   Key Checks and Items

- Use phthalate-free latex or surgical gloves and other personal protective equipment.
- Transfer volatiles first, avoid mixing.
- Decontaminate utensils before reuse, or use dedicated, disposable utensils.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 075, SHALLOW SOIL SAMPLING

This page intentionally left blank.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 087

# Locating and Clearing Underground Utilities

## I.     Purpose

The purpose of this SOP is to provide general guidelines and specific procedures that must be followed on Navy CLEAN projects for locating underground utilities and clearing dig locations in order to maximize our ability to avoid hitting underground utilities and to minimize liabilities to Jacobs and its subcontractors and health and safety risks to our project staff.

This SOP shall be used by Activity Managers and Project Managers to, in-turn, develop Activity-specific and project-specific utility location procedures. The activity and project-specific procedures will become part of work plans and project instructions and will be used to prepare scopes of work (SOWs) for the procurement of utility location subcontractors to meet the needs of individual projects.

This SOP also identifies the types of utility locating services that are available from subcontractors and the various tools that are used to locate utilities, and discusses when each type of service and tool may or may not be applicable.

## II.     Scope

Depending on the Navy/Marine Activity we typically find ourselves in one of two scenarios:

### A.     Scenario 1

The Activity provides utility locating (or dig clearance) services through the public works department or similar organization, or has a contract with an outside utility clearance service. Some of these services are provided in the form of dig permits which are required before you can dig or drill. In other cases no official permit is required and the process is somewhat vague.

### B.     Scenario 2

The Activity does not get involved in any utility locating processes aside from possibly providing the most recent utility maps, and relies on Jacobs to clear the dig locations.

Scenario 1 is preferred because under this scenario the Navy tends to assume the responsibility if the location is improperly cleared, a utility is struck, and property damage results. However, our experience has been that the clearance services provided by the Navy do not meet the standards that we consider to be adequate, in that they often simply rely on available base maps to mark utilities and do not verify locations using field geophysics. And if they do use locating tools, they do not provide adequate documentation or marking to confirm that a location has been cleared. So, while the Navy's process may protect us from liability for property damage, it does not adequately protect our staff and subcontractors from health risks nor does it compensate us for down time, should a utility be hit.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 087, LOCATING AND CLEARING UNDERGROUND UTILITIES

Therefore, regardless of what services the Navy provides, in most cases we still need to supplement this effort with clearance services from our own third-party utility location subcontractor following the procedures and guideline outlined in Section IV of this SOP. The cost implications of providing this service will range from $500 to several $1,000 depending on the size of the project.

The scope of services that we ask our subcontractors to provide can involve utility marking/mapping or the clearing of individual dig locations. In the former we ask our subs to mark all utilities within a "site" and often ask them to prepare a map based on their work. In the later, we ask them to clear (identify if there are any utilities within) a certain radius of a proposed dig/drill location.

The appropriate requested scope of services for a project will depend on the project. Clearing individual boreholes is often less expensive and allows the sub to concentrate their efforts on a limited area. However if the scope of the investigation is fluid (all borehole locations are not predetermined) it may be best to mark and map an entire site or keep the subcontractor on call.

Clearance of individual dig locations should be done to a minimum 20-foot radius around the location.

An example SOW for a utility subcontractor procurement is provided in Attachment 1.

# III.  Services and Equipment

This section provides a general description of the services available to help us locate subsurface utilities and describes the types of equipment that these services may (or may not) use to perform their work. It identifies the capabilities of each type of equipment to help the PM specify what they should require from our utility location subs.

## A.  Services

The services that are available to us for identifying and marking underground utilities are:

- The local public/private utility-run service such as Miss Utility or 811
- Utility location subcontractors (hired by us)
- Jacobs internal Subsurface Utility Investigation team

Attachment 2 provides a detailed description of each type of organization. It also provides contact numbers and web sites for the various Miss-Utility-type organizations in the areas where we do work for the Navy and contacts and services provided by several subcontractors that we have used or spoken to in the past.

## B.  Equipment

Attachment 3 provides a summary of the various types of equipment used for subsurface utility location. It describes the capabilities and limitations of each in order to help the PM determine if the equipment being used by a subcontractor is adequate.

It is important to make the potential subcontractors aware of the possible types of utilities (and utility materials) that are at the site, and to have them explain in their bid what types of

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 087,LOCATING AND CLEARING UNDERGROUND UTILITIES

equipment they will use to locate utilities /clear dig locations, and what the limitations of these equipment are.

A list of in-house experts that can be used to help you evaluate bids or answer questions you may have is provided in Appendix C.

# IV.   Procedures and Guidelines

This section presents specific procedures to be followed for the utility location work to be conducted by Jacobs and our subcontractors. In addition, a PM will have to follow the procedures required by the Activity to obtain their approvals, clearances and dig permits where necessary. These "dig permit" requirements vary by Activity and must be added to the project-specific SOP, or project instructions. It is preferable that the Activity perform their clearance processes before we follow up with our clearance work.

## A.     Activity Notification and Dig Permit Procedures

- Identify Activity-specific permit and/or procedural requirements for excavation and drilling activities. Contact the Base Civil Engineer and obtain the appropriate form to begin the clearance process.

- Activity Specific: To be provided by Activity or Project Manager

## B.     Jacobs Utility Clearance Procedures

Do not begin subsurface construction activities (e.g., trenching, excavation, drilling, etc.) until a check for underground utilities and similar obstructions has been conducted by Jacobs as a follow-up to the services provided by the Navy. The use of as-built drawings and utility company research will be compiled and must be supplemented with a geophysical or other survey by a qualified, independent survey contractor (subcontracted to Jacobs) to identify additional and undiscovered buried utilities.

Examples of the type of geophysical technologies include (these are further described in Attachment 3):

- Ground Penetrating Radar (GPR), which can detect pipes, including gas pipes, tanks, conduits, cables etc, both metallic and non-metallic at depths up to 30 feet depending on equipment. Sensitivity for both minimum object size and maximum depth detectable depends on equipment selected, soil conditions, etc.

- Radio Frequency (RF), involves inducing an RF signal in the pipe or cable and using a receiver to trace it. Some electric and telephone lines emit RF naturally and can be detected without an induced signal. This method requires knowing where the conductive utility can be accessed to induce RF field if necessary.

- Dual RF, a modified version of RF detection using multiple frequencies to enhance sensitivity but with similar limitations to RF

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 087, LOCATING AND CLEARING UNDERGROUND UTILITIES

- Ferromagnetic Detectors, are metal detectors that will detect ferrous and non-ferrous utilities. Sensitivity is limited (such as, a 100 mm iron disk to a depth of about 1 meter, 25 mm steel paper clip to a depth of about 20 cm).

- Electronic markers, are emerging technologies that impart a unique electronic signature to materials such as polyethylene pipe to facilitate location and tracing after installation. Promising for future installations but not of help for most existing utilities already in place.

The following procedures shall be used to identify and mark underground utilities during subsurface construction activities on the project:

- Contact utility companies or the state/regional utility protection service (such as Miss Utility) at least two (2) working days prior to intrusive activities to advise of the proposed work and ask them to establish the location of the utility underground installations prior to the start of actual excavation: this is a law. These services will only mark the location of public-utility-owned lines and not Navy-owned utilities. In many cases there will not be any public-utility-owned lines on the Activity. There may also be Base-access issues to overcome.

- Procure and schedule the independent survey.

- The survey contractor shall determine the most appropriate geophysical technique or combinations of techniques to identify the buried utilities on the project site, based on the survey contractor's experience and expertise, types of utilities anticipated to be present and specific site conditions. The types of utilities must be provided to the bidding subcontractors in the SOW and procedures to be used must be specified by the bidder in their bid. It is extremely helpful to provide the sub with utility maps, with the caveat that all utilities are not necessarily depicted.

- The survey subcontractor shall employ the same geophysical techniques used to identify the buried utilities, to survey the proposed path of subsurface investigation/construction work to confirm no buried utilities are present.

- Obtain utility clearances for subsurface work on both public and private property.

- Clearances provided by both the "Miss Utility" service and the Jacobs-subcontracted service are to be in writing, signed by the party conducting the clearance. The Miss Utility service will have standard notification forms/letters which typically simply state that they have been to the site and have done their work. The Jacobs subcontractor shall be required to fill out the form provided in Attachment 4 (this can be modified for a particular project) indicating that each dig/drill location has been addressed. This documentation requirement (with a copy of the form) needs to be provided in the subcontractor SOW.

- Marking shall be done using the color coding presented in Attachment 5 defined by the American Public Works Association (APWA). The type of material used for marking must be approved by the Activity prior to marking. Some base commanders have particular issues with persistent spray paint on their sidewalks and streets. Any particular marking requirements need to be provided in the subcontractor SOW.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 087,LOCATING AND CLEARING UNDERGROUND UTILITIES

- Protect and preserve the markings of approximate locations of facilities until the markings are no longer required for safe and proper excavations. If the markings of utility locations are destroyed or removed before excavation commences or is completed, the Project Manager must notify the utility company or utility protection service to inform them that the markings have been destroyed.

- Perform a field check prior to drilling/digging (preferably while the utility location sub is still at the site) to see if field utility markings coincide with locations on utility maps. Look for fire hydrants, valves, manholes, light poles, lighted signs, etc to see if they coincide with utilities identified by the subcontractor.

- Underground utility locations must be physically verified (or dig locations must be physically cleared) by hand digging using wood or fiberglass-handled tools, air knifing, or by some other acceptable means approved by Jacobs when the dig location (e.g. mechanical drilling, excavating) is expected to be within 3 feet of a marked underground system. Hand clearance shall be done to a depth of four feet unless a utility cross-section is available that indicates the utility is at a greater depth. In that event, the hand clearance shall proceed until the documented depth of the utility is reached.

- Conduct a site briefing for employees at the start of the intrusive work regarding the hazards associated with working near the utilities and the means by which the operation will maintain a safe working environment. Detail the method used to isolate the utility and the hazards presented by breaching the isolation.

- Monitor for signs of utilities during advancement of intrusive work (e.g., sudden change in advancement of auger or split spoon during drilling or change in color, texture or density during excavation that could indicate the ground has been previously disturbed).

## V. Attachments

1. Example SOW for Utility Location Subcontractor Procurement
2. Services Available for Identifying and Marking Underground Utilities
3. Equipment Used for Identifying Underground Utilities
4. Utility Clearance Documentation Form
5. Utility Marking Color Codes

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 087, LOCATING AND CLEARING UNDERGROUND UTILITIES

# Attachment 1, Example SOW for Subcontracting Underground Utilities Locating Services

- CTO-XXX
- Scope of Work
- Subsurface Utility Locating
- Site XX
- Navy Activity
- City, State

A licensed and insured utility locator will be subcontracted to identify and mark out subsurface utilities for an environmental investigation/remediation project at Site XX of <<insert name of base, city, and state>>. The subcontractor will need to be available beginning at <<insert time>> on <<insert date>>. It is estimated that the work can be completed within XX days.

## Proposed Scope of Work

The subcontractor will identify and mark all subsurface utilities (CHOOSE 1) that lie within a radius of 20 feet of each of XX sampling locations at Site XX shown on the attached Figure 1; (OR) that lie within the bounds of Site XX as delineated on the attached Figure 1. (If multiple sites are to be cleared, provide maps of each site with sample locations or clearance boundaries clearly delineated and a scale provided.)

Utilities will be identified using all reasonably available as-built drawings, electronic locating devices, and any other means necessary to maintain the safety of drilling and sampling personnel and the protection of the base infrastructure. The location of utilities identified from as-built drawings or other maps must be verified in the field prior to marking.

Base utility drawings for the Site(s) (CHOOSE 1) can be found at <<insert specific department and address or phone number on the base>> and should be reviewed by the subcontractor and referenced as part of the utility locating. (OR), will be provided to the subcontractor by Jacobs upon the award of the subcontract. (OR), are not available. Utility drawings shall not be considered definitive and must be field verified.

Field verification will include detection using nonintrusive subsurface detection equipment (magnetometers, GPR, etc) as well as opening manhole covers to verify pipe directions. As part of the bid, the Subcontractor shall provide a list of the various subsurface investigation tools they propose to have available and use at the site and what the limitations are of each tool.

A Jacobs representative shall be present to coordinate utility clearance activities and identify points and features to be cleared.

## Field Marking and Documentation

All utilities located within (CHOOSE 1) a 20-ft radius of the XX proposed soil boring locations (OR) within the boundary of the site(s) as identified on the attached figure(s) will be marked using paint (some Bases such as the WNY may have restrictions on the use of permanent paint) and/or pin flags color coded to indicate electricity, gas, water, steam, telephone, TV cable, fiber optic, sewer, etc. The color coding shall

6

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 087,LOCATING AND CLEARING UNDERGROUND UTILITIES
ATTACHMENT 1, EXAMPLE SOW FOR SUBCONTRACTING UNDERGROUND UTILITIES LOCATING SERVICES

match the industry standard as described on the attached form. In addition, the Buried Utility Location Tracking Form (attached) will be completed by the Subcontractor based upon what is identified in the field during the utility locating and submitted back to Jacobs (field staff or project manager) within 24 hours of completing the utility locating activities.

(OPTIONAL) The subcontractor shall also provide a map (or hand sketch) of the identified utilities to the Engineer within XX days of field demobilization. The map shall include coordinates or ties from fixed surface features to each identified subsurface utility.

## Bid Sheet/Payment Units

The subcontractor will bid on a time and materials basis for time spent on site and researching utility maps. Mobilization (including daily travel to the site) should be bid as a lump sum, as well as the preparation of the AHA and any required mapping. The per diem line item should be used if the field crew will require overnight accommodations at the project site.

## Health and Safety Requirements

The utility locating subcontractor is to provide and assume responsibility for an adequate corporate Health and Safety Plan for onsite personnel. Standard personal safety equipment including: hard hat, safety glasses, steel-toed boots, gloves are recommended for all project activities. Specific health and safety requirements will be established by the Subcontractor for each project. The health and safety requirements will be subject to the review of Jacobs.

The subcontractor shall also prepare and provide to the Engineer, at least 48 hours prior to mobilization, an acceptable Activity Hazard Analysis (AHA) using the attached AHA form or similar.

It is also required that all subcontractor personnel who will be on site attend the daily 15-minute health and safety tailgate meeting at the start of each day in the field.

Subcontractor personnel showing indications of being under the influence of alcohol or illegal drugs will be sent off the job site and their employers will be notified. Subcontractor personnel under the influence of prescription or over-the-counter medication that may impair their ability to operate equipment will not be permitted to do so. It is expected that the subcontractor will assign them other work and provide a capable replacement (if necessary) to operate the equipment to continue work.

## Security

The work will be performed on US Navy property. Jacobs will identify the Subcontractor personnel who will perform the work to the appropriate Navy facility point-of-contact, and will identify the Navy point-of-contact to the Subcontractor crew. The Subcontractor bears final responsibility for coordinating access of his personnel onto Navy property to perform required work. This responsibility includes arranging logistics and providing to Jacobs, in advance or at time of entry as specified, any required identification information for the Subcontractor personnel. Specifically, the following information should be submitted with the bid package for all personnel that will perform the work in question (this information is required to obtain a base pass):

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 087, LOCATING AND CLEARING UNDERGROUND UTILITIES
ATTACHMENT 1, EXAMPLE SOW FOR SUBCONTRACTING UNDERGROUND UTILITIES LOCATING SERVICES

- Name
- Birth Place
- Birth Date
- Social Security Number
- Drivers License State and Number
- Citizenship

Please be advised that no weapons, alcohol, or drugs will be permitted on the Navy facility at any time. If any such items are found, they will be confiscated, and the Subcontractor will be dismissed.

## Quality Assurance

The Subcontractor will be licensed and insured to operate in the State of <<state>> and will comply with all applicable federal, state, county and local laws and regulations. The subcontractor will maintain, calibrate, and operate all electronic locating instruments in accordance with the manufacturer's recommendations. Additionally, the Subcontractor shall make all reasonable efforts to review as-built engineering drawings maintained by Base personnel, and shall notify the Jacobs Project Manager in writing (email is acceptable) whenever such documentation was not available or could not be reviewed.

## Subcontractor Standby Time

At certain periods during the utility locating activities, the Subcontractor's personnel may be asked to stop work and standby when work may normally occur. During such times, the Subcontractor will cease activities until directed by the Jacobs representative to resume operations. Subcontractor standby time also will include potential delays caused by the Jacobs representative not arriving at the site by the agreed-upon meeting time for start of the work day. Standby will be paid to the Subcontractor at the hourly rate specified in the Subcontractor's Bid Form attached to these specifications.

Cumulative Subcontractor standby will be accrued in increments no shorter than 15 minutes (i.e., an individual standby episode of less than 15 minutes is not chargeable).

During periods for which standby time is paid, the surveying equipment will not be demobilized and the team will remain at the site. At the conclusion of each day, the daily logs for the Subcontractor and Jacobs representative will indicate the amount of standby time incurred by the Subcontractor, if any. Payment will be made only for standby time recorded on Jacobs's daily logs.

## Down Time

Should equipment furnished by the Subcontractor malfunction, preventing the effective and efficient prosecution of the work, or inclement weather conditions prevent safe and effective work from occurring, down time will be indicated in the Subcontractor's and Jacobs representative's daily logs. No payment will be made for down time.

## Schedule

It is anticipated that the subsurface utility locating activities will occur on <<insert date>>. It is estimated that the above scope will be completed within XXX days.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 087, LOCATING AND CLEARING UNDERGROUND UTILITIES

# Attachment 2, Services Available for Identifying and Marking Underground Utilities

The services that are available to us for identifying and marking underground utilities are:

- The Activity's PWC (or similar organization)
- The local public/private utility -run service such as Miss Utility or 811
- Utility location subcontractors (hired by Jacobs)
- Non-contact excavation (vacuum excavation) subcontractor

Each are discussed below.

## Navy Public Works Department

A Public Works Department (PWD) is usually present at each Activity. The PWD is responsible for maintaining the public works at the base including management of utilities. In many cases, the PWD has a written permit process in place to identify and mark-out the locations of Navy-owned utilities [Note: The PWD is usually NOT responsible for the locations/mark-outs of non-Navy owned, public utilities (e.g., Washington Gas, Virginia Power, municipal water and sewer). Therefore, it is likely that we will have to contact other organizations besides the PWD to identify non-Navy owned, public utilities].

At some Activities, there may not be a PWD, the PWD may not have a written permit process in place, or the PWD may not take responsibility for utility locating and mark-outs. In these cases, the PWD should still be contacted since it is likely that they will have the best understanding of the utility locations at the Activity (i.e., engineering drawings, institutional knowledge, etc.). Subsequently, the PWD should be brought into a cooperative arrangement (if possible) with the other services employed in utility locating and mark-out in order to have the most comprehensive assessment performed.

At all Activities we should have a contact (name and phone number), and preferably an established relationship, with PWD, either directly or through the NAVFAC Atlantic, Mid-Atlantic, or Washington NTR or Activity Environmental Office that we can work with and contact in the event of problems.

## Miss Utility or "811 One Call" Services for Public Utility Mark-outs

Miss Utility or "811 One Call" service centers are information exchange centers for excavators, contractors and property owners planning any kind of excavation or digging. The "811 One Call" center notifies participating public utilities of the upcoming excavation work so they can locate and mark their underground utilities in advance to prevent possible damage to underground utility lines, injury, property damage and service outages. In some instances, such with southeastern Virginia bases, the Navy has entered into agreement with Miss (?) Utilities and is part of the response process for Miss Utilities. Generally, a minimum of 48 hours is required for the public utility mark-outs to be performed. The "811 One Call" services are free to the public. Note that the "811 One Call" centers only coordinate with participating public utilities. There may be some public utilities that do NOT participate in the "One Call" center which may need to be contacted separately. For example, in Washington, DC, the Miss Utility "811 One Call" center does not locate and mark public sewer and water lines. Therefore, the municipal water and sewer authority must be contacted separately to have the sewer and water lines

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 087, LOCATING AND CLEARING UNDERGROUND UTILITIES
ATTACHMENT 2, SERVICES AVAILABLE FOR IDENTIFYING AND MARKING UNDERGROUND UTILITIES

marked out. The AM should contact the appropriate one-call center to determine their scope of services.

For the Mid-Atlantic region, the following "One Call" service centers are available.

| Name | Phone | Website | Comments |
|---|---|---|---|
| Miss Utility of DELMARVA | 800-257-7777 | www.missutility.net | Public utility mark-outs in Delaware, Maryland, Washington, DC, and Northern Virginia |
| Miss Utility of Southern Virginia (One Call) | 800-552-7001 | not available | Public utility mark-outs in Southern Virginia |
| Miss Utility of Virginia | 800-257-7777 800-552-7007 | www.missutilityofvirginia.com | General information on public utility mark-outs in Virginia, with links to Miss Utility of DELMARVA and Miss Utility of Southern Virginia (One Call) |
| Miss Utility of West Virginia, Inc | 800-245-4848 | none | Call to determine what utilities they work with in West Virginia |
| North Carolina One Call Center | 800-632-4949 | www.ncocc.org/ncocc/default.htm | Public Utility Markouts in North Carolina |

# Private Subcontractors

Utility-locating support is required at some level for most all Jacobs field projects in "clearing" proposed subsurface boring locations on the project site. Utility location and sample clearance can include a comprehensive effort of GIS map interpretation, professional land surveying, field locating, and geophysical surveying. Since we can usually provide our own GIS-related services for projects and our professional land surveying services are normally procured separately, utility-locating subcontractors will normally only be required for some level of geophysical surveying support in the field. This level of geophysical surveying support can range widely from a simple electromagnetic (EM) survey over a known utility line, to a blind geophysical effort, including a ground-penetrating radar (GPR) survey and/or a comprehensive EM survey to delineate and characterize all unknown subsurface anomalies.

The level of service required from the subcontractor will vary depending on the nature of the site. At sites where utility locations are well defined on the maps and recent construction is limited, Jacobs may be confident with a limited effort from a traditional utility-locating subcontractor providing a simple EM survey. At sites where utility locations are not well defined, where recent constructions may have altered utility locations, or the nature of the site makes utility location difficult, Jacobs will require the services of a comprehensive geophysical surveying subcontractor, with a wide range of GPR and EM services available for use on an "as-needed" basis. Typical costs for geophysical surveying subcontractors will range from approximately $200 per day for a simple EM effort (usually one crew member and one instrument) to approximately $1,500 per day for a comprehensive geophysical

10

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 087,LOCATING AND CLEARING UNDERGROUND UTILITIES
ATTACHMENT 2, SERVICES AVAILABLE FOR IDENTIFYING AND MARKING UNDERGROUND UTILITIES

surveying effort (usually a two-person crew and multiple instruments). Comprehensive geophysical surveying efforts may also include field data interpretation (and subsequent report preparation) and non-destructive excavation to field-verify utility depths and locations.

The following table provides a list of recommended geophysical surveying support subcontractors that can be used for utility-locating services:

| Company Name and Address | Contact Name and Phone Number | Equipment[b] | | | | | Other Services[c] | | |
|---|---|---|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 | A | B | C |
| US Radar, Inc.[a] PO Box 319 Matawan, NJ 07747 | Ron LaBarca 732-566-2035 | | | √ | | | | | |
| Utilities Search, Inc. [a] | Jim Davis 703-369-5758 | √ | | | | √ | √ | √ | √ |
| So Deep, Inc. [a] 8397 Euclid Avenue Manassas Park, VA 20111 | 703-361-6005 | √ | | | | | √ | √ | √ |
| Accurate Locating, Inc. 1327 Ashton Rd., Suite 101 Hanover, MD 21076 | Ken Shipley 410-850-0280 | √ | √ | | | | | | |
| NAEVA Geophysics, Inc. P.O. Box 7325 Charlottesville, VA 22906 | Alan Mazurowski 434-978-3187 | √ | √ | √ | √ | √ | √ | √ | √ |
| Earth Resources Technology. Inc. 8106 Stayton Rd. Jessup, MD 20794 | Peter Li 240-554-0161 | √ | √ | √ | √ | √ | √ | √ | |
| Geophex, Ltd. 605 Mercury Street Raleigh, NC 27603 | I. J. Won 919-839-8515 | √ | √ | √ | √ | √ | √ | √ | √ |

[a] Companies denoted with an asterisk have demonstrated reluctance to assume responsibility for damage to underground utilities or an inability to accommodate the insurance requirements that Jacobs requests for this type of work at many Navy sites.

[b] Equipment types are:

- Simple electromagnetic instruments, usually hand-held
- Other, more innovative, electromagnetic instruments, including larger instruments for more area coverage
- Ground-penetrating radar systems of all kinds
- Audio-frequency detectors of all kinds
- Radio-frequency detectors of all kinds

[c] Other services include:

- Data interpretation and/or report preparation to provide a permanent record of the geophysical survey results and a professional interpretation of the findings, including expected accuracy and precision.
- Non-destructive excavation to field-verify the depths, locations, and types of subsurface utilities.
- Concrete/asphalt coring and pavement/surface restoration.

# Non-Contact Excavation Subcontractors

In certain circumstances it may be necessary for utility location to be carried out by non-contact excavation (also known as vacuum excavation). Please refer to the reference list of non-contact excavation subcontractors.

# Attachment 3, Equipment Used for Identifying Underground Utilities

This attachment provides a summary of the various types of equipment used for subsurface utility location. It describes the capabilities and limitations of each to help the AM and PM determine if the equipment being proposed by a subcontractor or Navy is adequate. A list of in-house experts that can be used to answer questions you may have is provided below.

## Jacobs In-house Utility Location Experts

- Steve Saville/KNV
  Home Office Phone – 720-261-5367

- Nick Jones/DEN
  Home Office Phone- 303-478-0655

## Electromagnetic Induction (EMI) Methods

EMI instruments, in general, induce an electromagnetic field into the ground (the primary field) and then record the response (the secondary field), if any. Lateral changes in subsurface conductivity, such as caused by the presence of buried metal or by significant soil variations, cause changes in the secondary field recorded by the instrument and thus enable detection and mapping of the subsurface features. It should be noted that EMI only works for electrically conductive materials--plastic or PVC pipes are generally not detected with EMI. Water and gas lines are commonly plastic, although most new lines include a copper "locator" strip on the top of the PVC to allow for detection with EMI.

EMI technology encompasses a wide range of instruments, each with inherent strengths and weaknesses for applications. One major division of EMI is between "time-domain" and "frequency-domain" instruments that differ in the aspect of the secondary field they detect. Another difference in EMI instruments is the operating frequency they use to transmit the primary field. Audio- and radio-frequencies are often used for utility detection, although other frequencies are also used. Consideration of the type of utility expected, surface features that could interfere with detection, and the "congestion" of utilities in an area, should be made when choosing a particular EMI instrument for a particular site.

One common EMI tool used for utility location is a handheld unit that can be used to quickly scan an area for utilities and allows for marking locations in "real time". This method is most used by "dig-safe" contractors marking out known utilities prior to excavation. It should be noted that this method works best when a signal (the primary field) can be placed directly onto the line (i.e., by clamping or otherwise connecting to the end of the line visible at the surface, or for larger utilities such as sewers, by running a transmitter through the utility). These types of tools also have a limited capability to scan an area for unknown utilities. Usually this requires having enough area to separate a handheld transmitter at least a hundred feet from the receiver. Whether hunting for unknown, or confirming known, utilities, this method will only detect continuous lengths of metallic conductors.

In addition to the handheld EMI units, larger, more powerful EMI tools are available that provide more comprehensive detection and mapping of subsurface features. Generally, data with these methods are collected on a regular grid in the investigation area, and are then analyzed to locate linear anomalies

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

that can be interpreted as utilities. These methods will usually detect all subsurface metal (above a minimum size), including pieces of abandoned utilities. In addition, in some situations, backfill can be detected against native soils giving information on trenching and possible utility location. Drawbacks to these methods are that the secondary signals from utilities are often swamped (i.e., undetectable) close to buildings and other cultural features, and that the subsurface at heavily built-up sites may be too complicated to confidently interpret completely.

Hand-held metal detectors (treasure-finders) are usually based on EMI technology. They can be used to locate shallow buried metal associated with utilities (e.g., junctions, utility access holes [e.g., manholes], metallic locators). Advantages of these tools is the ease of use and real-time marking of anomalies. Drawbacks include limited depths of investigations and no data storage capacity.

## Ground Penetrating Radar (GPR)

GPR systems transmit radio and microwave frequency (e.g., 80 megahertz to 1,000 megahertz) waves into the ground and then record reflections of those waves coming back to the surface. Reflections of the radar waves typically occur at lithologic changes, subsurface discontinuities, and subsurface structures. Plastic and PVC pipes can sometimes be detected in GPR data, especially if they are shallow, large, and full of a contrasting material such as air in a wet soil, or water in a dry soil. GPR data are usually collected in regular patterns over an area and then analyzed for linear anomalies that can be interpreted as utilities. GPR is usually very accurate in x-y location of utilities, and can be calibrated at a site to give very accurate depth information as well. A significant drawback to GPR is that depth of investigation is highly dependent on background soil conductivity, and it will not work on all sites. It is not uncommon to get only 1 to 2 feet of penetration with the signal in damp, clayey environments. Another drawback to GPR is that sites containing significant fill material (e.g., concrete rubble, scrap metal, garbage) will result in complicated anomalies that are difficult or impossible to interpret.

## Magnetic Field Methods

Magnetic field methods rely on detecting changes to the earth's magnetic field caused by ferrous metal objects. This method is usually more sensitive to magnetic metal (i.e., deeper detection) than EMI methods. A drawback to this method is it is more susceptible to being swamped by surface features such as fences and cars. In addition, procedures must usually be implemented that account for natural variations in the earth's background field as it changes throughout the day. One common use of the method is to measure and analyze the gradient of the magnetic field, which eliminates most of the drawbacks to the method. It should be noted this method only detects ferrous metal, primarily iron and steel for utility location applications. Some utility detectors combine magnetic and EMI methods into a single hand-held unit.

## Optical Methods

Down the hole cameras may be useful in visually reviewing a pipe for empty conduits and/or vaults.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 087, LOCATING AND CLEARING UNDERGROUND UTILITIES
ATTACHMENT 3, EQUIPMENT USED FOR IDENTIFYING UNDERGROUND UTILITIES

## Buried Utility Location Tracking Form

(Submit to Jacobs PM within 24 hrs of location activities)

**Project Location:**
**Jacobs Project No.:**
**Jacobs Project Manager:**     Name/Phone:
                                Fax:
                                Email:
**Jacobs Field Team Leader:**   Name/Phone:

**Jacobs Purchase Order:**

**Utility Location Subcontractor:**
**Subcontractor POC:**

**Dates of location activities:**

Check each box using an "X" if a buried utility is present within 5 feet of a marked Station ID. If color of the flag or paint differs from listed color, note change in color on the form.

| Station ID | Gas (Yellow) | Electric (Red) | Fiber optic (Orange) | Cable (Orange) | Water (Blue) | San. Sewer (Green) | Storm Sewer (Green) | Steam (Yellow) | Petroleum (Yellow) | Compressed air (Yellow) | Other ___ | Other ___ | Other ___ | Other ___ | Date completed | Technician initials | Notes (methods/tools used) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |

The findings of the buried utility location activities summarized herein were conducted in strict accordance with the Jacobs scope of work.

_____     _____
Subcontractor's                Date
Signature

14

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 087, LOCATING AND CLEARING UNDERGROUND UTILITIES

# Attachment 5, Utility Marking Color Codes

The following is the standard color code used by industry to mark various types of utilities and other features at a construction site.

- White – Proposed excavations and borings
- Pink – Temporary survey markings
- Red – Electrical power lines, cables, conduits and lighting cables
- Yellow – Gas, oil, steam, petroleum or gaseous materials
- Orange – Communication, alarm or signal lines, cables, or conduits
- Blue – Potable water
- Purple – Reclaimed water, irrigation and slurry lines
- Green – Sewer and storm drain lines

STANDARD OPERATING PROCEDURE 087, LOCATING AND CLEARING UNDERGROUND UTILITIES
ATTACHMENT 5, UTILITY MARKING COLOR CODES

This page intentionally left blank.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 090
NAVY CLEAN PROGRAM



# Groundwater Sampling for Per- and Polyfluoroalkyl Substances (PFAS)

## I.     Purpose and Scope

This SOP provides guidelines for groundwater sample collection for samples that will be analyzed for per- and polyfluoroalklyl substances (PFAS) via LC/MS/MS Compliant with the most recent version of the Quality Systems Manual (QSM) for which the lab is certified. This SOP should be used in conjunction with approved region-specific groundwater sampling SOPs which provide methods for general and low-flow groundwater sampling. In cases in which information in this SOP conflicts with region-specific groundwater sampling SOPs, this SOP will supersede the information in the general SOPs.

Standard techniques for collecting representative samples are summarized. These procedures are specific to the Navy Comprehensive Long-term Environmental Action Navy (CLEAN) Program. Materials, equipment, and procedures may vary; refer to the Sampling and Analysis Plan and operator's manuals for specific details.

## II.     Equipment and Materials

### A.     Equipment and Materials Required

- If installing wells, ensure driller does not use polytetrafluoroethylene (PFTE)-containing drill lube or other drilling lubes containing PFAS. Biolube has been determined to be an acceptable drilling lube for installing wells where PFAS may be of concern. Additionally, Waterra surge blocks have been confirmed to not contain PFAS and may be used for development.

- Groundwater sampling equipment
    - PFAS-free tubing (avoid Teflon, Viton, PTFE and other fluorinated compounds)
        - High density polyethylene (HDPE) tubing (unlined)
        - If Masterflex tubing is needed for peristaltic pumps, Cole Parmer C-Flex (06424 series) and Tygon E-3603 (06509 series) are suitable options
    - PFAS-free Bailer (if using a bailer[1])

---

[1] Geotech and Waterra offer PFAS free bailer options

STANDARD OPERATING PROCEDURE 090, GROUNDWATER SAMPLING FOR PER- AND POLYFLUOROALKYL SUBSTANCES (PFAS)

- – PFAS-free Pump such as:
  - Geotech PFAS-free Portable Bladder Pump (note, most bladder pumps include a Teflon-lined bladder, but Geotech currently has one model which is Teflon-free).
  - Panacea P120 or P125. The P200 Stainless Steel Pump may also be used, but the standard model contains Teflon at the tube connection. If you are using this Panacea model, you must request one with the "PTFE-free thread sealant option."
  - Waterra stainless foot-valve
  - QED Sample Pro
  - Monsoon or Mega Monsoon submersible pump
  - Grundfos Rediflo2 (this pump contains small Teflon components, but has not been shown to leach, it is less preferable than the other options)
  - Peristaltic pump (may be suitable for shallow locations)
- Groundwater sample containers (HDPE bottle with HDPE screwcap), sample bottles should not be glass as glass may sorb PFAS. Sample bottle caps should not contain Teflon. Notify your project manager (PM) if bottles provided by the lab are glass or contain Teflon parts.
- Laboratory prepared deionized, certified PFAS-free water for field blank collection
- PFAS-free shipping supplies (labels [if available][2], coolers, and ice)
- Loose leaf paper without waterproof coating or a spiralbound notebook (not waterproof) or tablet (see tablet use notes below)
- Metal clip board (if using loose-leaf paper)
- Pen (not Sharpie)
- Nitrile or latex gloves

## B.     Equipment and Materials to Avoid During Sampling

Equipment and materials used to collect groundwater samples should not contain any fluorinated compounds, Teflon, or synthetic rubber with fluoropolymer elastomers (e.g., Viton).

Specifically, the following material should be avoided during sampling:

- Gore-Tex brand or similar high-performance outdoor clothing, clothing treated with ScotchGuard brand or similar water repellent, fluoropolymer-coated Tyvek, wrinkle-resistant fabrics, and fire-resistant clothing with fluorochemical treatment or anything advertised as water repellant.
- Weather-proof log books with fluorochemical coatings.
- New clothing that has been washed fewer than six times.

The sample collection area should be clear of the following items:

- Pre-packaged food wrappers (e.g., fast food sandwich wrappers, pizza boxes, etc.)
- Microwave popcorn bags

---

[2] Efforts will be made to obtain PFAS-free labels; however, information on labels is scarce and labels are frequently mounted on PFAS-coated paper to allow for easy removal.

QC AND REVIEWED 03/2023

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

- Blue ice containers
- Non-Stick aluminum foil
- Kim-Wipes
- Sunscreen, insect repellant and other personal hygiene products that may contain PFAS

Research which has not yet been published has allowed us to generate a list of sunscreens and insect repellents which do not contain fluorine. Check with Bill Diguiseppi or Laura Cook on recommendations (because the research is not ours, it cannot be released externally at this time).

The use of electronics (e.g., cell phones and tablets) should be avoided without the implementation of precautionary measures outlined below:

- All devices should be used with clean, ungloved hands and an approved stylus (if desired).

Following the use of a device, hands must be washed with soap and water and clean gloves should be used prior to contact with sampling equipment (bottleware, tubing, etc.).

# III.      Procedures and Guidelines

Wash hands with dish detergent before sampling and don nitrile gloves. Do not use Kleen Guard powder free nitrile gloves which were shown in research to contain fluorine

Follow Navy CLEAN SOPs for low-flow or conventional groundwater sample collection, depending on site requirements.

## A.      Sample Collection

Once water quality parameters have stabilized for low-flow purging, samples can be collected. For conventional purging, if water quality parameters do not stabilize, a minimum of 3 well volumes must be purged prior to sample collection.

The steps to be followed for sample collection are as follows:

1.  Ensure that the end of the tubing does not touch the ground or equipment. Remove the cap from the sample bottle. Position the sample bottle under the end of the tubing.

    -   If the end of the tubing accidentally comes into contact with any surface, cut off 2" – 3" of tubing from the effluent end with deconned tubing cutters or scissors.

2.  Fill the bottle. Do not fill the bottle past the middle of the bottle shoulder. Samples do not need to be collected headspace free.

3.  Affix labels after bottles have been closed; collect only one sample at a time to avoid mislabeling. Place the samples in a Ziploc bag and pack the sample on ice immediately for shipment to the offsite laboratory. 3M Red packing tape and crystal clear gorilla tape is suitable for packing and fluorine free. Prior to utilizing additional materials please reach out to your PFAS SME.

## B.      Equipment Decontamination

Whenever possible, use disposable equipment when collecting groundwater samples. If reusable equipment must be used, the equipment must be cleaned/decontaminated between uses. Alconox and Liquinox soap are acceptable for cleaning/decontaminating reusable equipment at PFAS sites. Any water used for cleaning/decontamination must be certified PFAS-free by a laboratory. Consider triple-rinsing.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 090, GROUNDWATER SAMPLING FOR PER- AND POLYFLUOROALKYL SUBSTANCES (PFAS)

Once decontaminated, wrap equipment in plastic bags (such as Ziploc) or un-coated aluminum foil, and store away from potential PFAS sources.

## Use of Water Quality Equipment and Water Level Indicators

Water quality meters typically do not contain PFAS. However, consistent with general sampling SOPs, disconnect the water quality meter prior to sampling. Some water level indicators do contain small polyvinylidene fluoride (a PFAS constituent for which we do not currently monitor) or less frequently, Teflon, components, but we have not noted cross contamination from water level indicators at any sites. The Durham Geoslope Water Level Indicators and the Solinst Model 101 with the P2 meter have been shown to be fluorine free.

# IV.    References

United States Environmental Protection Agency (USEPA), 2009. *Determination of Selected Perfluorinated Alkyl Acids in Drinking Water by Solid Phase Extraction and Liquid Chromatography/ Tandem Mass Spectrometry (LC/MS/MS).* September.

United States Navy, 2020. *Interim Per- and Polyfluoroalkyl Substances (PFAS) Site Guidance for NAVFAC Remedial Project Managers (RPMs)/November 2020 Update*. November.

United States Navy, 2015. *Navy Drinking Water Sampling Policy for Perfluorochemicals: Perfluorooctane Sulfonate and Perfluorooctanoic Acid.* September.

QC AND REVIEWED 03/2023

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 093
NAVY CLEAN PROGRAM



# Sediment Sampling for Per- and Polyfluoroalkyl Substances

## I.      Purpose and Scope

This SOP provides guidelines for sediment sample collection and handling for samples that will be analyzed for per- and polyfluoroalklyl substances (PFAS) via LC/MS/MS Compliant with the most recent version of the Quality Systems Manual (QSM) for which the lab is certified at the time of analysis. Standard techniques for collecting representative samples are summarized. These procedures are specific to the Navy Comprehensive Long-term Environmental Action Navy (CLEAN) Program. Materials, equipment, and procedures may vary; refer to the Sampling and Analysis Plan and operator's manuals for specific details.

## II.      Equipment and Materials

### A.      Equipment and Materials Required

- Sample collection device (hand corer, scoop, dredge, grab sampler, or other suitable device). Check with your PFAS subject matter expert (SME) during field preparation to ensure all equipment is free of fluorine-containing components.

- Stainless steel spoon or spatula or fluorine-free plastic disposable scoop for media transfer

- Measuring tape

- GPS Unit

- PFAS-free labels (if available[1]) shipping materials

- Loose leaf paper or a wire-bound notebook without waterproof coating

- Metal clipboard (if using loose-leaf paper)

- Pen (not Sharpie)

- Personal protection equipment (rubber or latex gloves, boots, hip waders, etc.). Check with your SME prior to selecting PPE to ensure there are no fluorine-containing components.

- Materials for classifying soils, particularly the percentage of fines

- Sample jars (high density polyethylene [HDPE] with HDPE screw cap [no Teflon caps])

- Laboratory prepared deionized, certified PFAS-free water for field blank collection

---

[1] Efforts will be made to obtain PFAS-free labels; however, information on labels is scarce and labels are frequently mounted on PFAS-coated paper to allow for easy removal.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 093, SEDIMENT SAMPLING FOR PER- AND POLYFLUOROALKYL SUBSTANCES

## B.    Equipment and Materials to Avoid During Sampling

Equipment and materials used to collect soil samples should not contain any fluorinated compounds including Teflon or synthetic rubber with fluoropolymer elastomers (e.g. Viton).

Specifically, the following material should be avoided during sampling:

- Gore-Tex brand or similar high-performance outdoor clothing, clothing treated with ScotchGuard brand or similar water repellent, fluoropolymer-coated Tyvek, wrinkle-resistant fabrics, and fire-resistant clothing with fluorochemical treatment or anything advertised as water repellant.

- Weather-proof log books with fluorochemical coatings.

- New clothing that has been washed fewer than six times.

The sample collection area should be clear of the following items:

- Pre-packaged food wrappers (e.g., fast food sandwich wrappers, pizza boxes, etc.)
- Microwave popcorn bags
- Blue ice containers
- Non-Stick aluminum foil
- Kim-Wipes
- Sunscreen, insect repellant and other personal hygiene products that may contain PFAS

Contact your PFAS SME for an approved list of sunscreens and insect repellants.

The use of electronics (e.g., cell phones and tablets) should be avoided without the implementation of precautionary measures outlined below:

- All devices should be used with clean, ungloved hands and an approved stylus (if desired).

Following the use of a device, hands must be washed with soap and water and clean gloves should be used prior to contact with sampling equipment (bottleware, tubing, etc.).

## III.    Procedures and Guidelines

Wash hands with dish detergent before sampling and don nitrile gloves. Do not use Kleen Guard powder free nitrile gloves which were shown in research to contain fluorine.

Once the area has been determined to be free of materials potentially containing PFAS, these steps can be followed to collect the sediment samples:

1. Field personnel will start downstream and work upstream to prevent contamination of unsampled areas. In surface water bodies that are tidally influenced, sampling will be performed at low tide and under low flow conditions to minimize the dilution of possible contaminants. Sediment sampling activities will not occur immediately after periods of heavy rainfall.

2. Make a sketch of the sample area that shows important nearby river features and permanent structures that can be used to locate the sample points on a map. Whenever possible, include measured distances from such identifying features. Also include depth and width of waterway, rate of flow, type and consistency of sediment, and point and depth of sample removal (along shore, mid-channel, etc.).

3. Note in the field book any possible outside sources of contamination; for example, the outlet to a drainage culvert in the water body near your sampling location.

2                                                              QC AND REVIEWED 03/2023

4. Transfer sample into appropriate sample jars with a stainless-steel utensil or plastic disposable scoop confirmed to be fluorine-free. Be especially careful to avoid the loss of the very fine clay/silt particles when collecting the sample. The fine particles have a higher adsorption capacity than larger particles. Minimize the amount of water that is collected within the sample matrix. Decant the water off the sample slowly and carefully to maximize retention of the very fine particles. The sampler's fingers should never touch the sediment. Classify the soil type of the sample using the Unified Soil Classification System, noting particularly the percentage of silt and clay.

5. Rocks and other debris should be removed before placement in jars. Remove debris with decontaminated stainless-steel utensils or plastic disposable scoops.

6. For channel sampling, be on the alert for submerged hazards (rocks, tree roots, drop-offs, loess silt and muck) which can make wading difficult.

7. Affix the sample label to the container after the container has been closed; collect only one sample at a time to avoid mislabeling. Place the sample in Ziploc bags and immediately upon collection, all samples are to be placed in a closed container on ice. Although unusual and uncommon, there may be instances where it is not possible to have containers with ice at the sample location. In these instances, the samples should be placed on ice as soon as practical and during the time between collection and placing the samples on ice, the samples should be kept as cool as possible.

8. Equipment Decontamination

   - Whenever possible, use disposable equipment when collecting sediment samples. If reusable equipment must be used, the equipment must be cleaned/decontaminated between uses. Alconox and Liquinox soap are acceptable for cleaning/decontaminating reusable equipment at PFAS sites. Any water used for cleaning/decontamination must be certified PFAS-free by a laboratory. Consider triple-rinsing. Once decontaminated, wrap equipment in plastic bags (such as Ziploc) or un-coated aluminum foil, and store away from potential PFAS sources.

# IV.     References

United States Environmental Protection Agency (USEPA), 2009. *Determination of Selected Perfluorinated Alkyl Acids in Drinking Water by Solid Phase Extraction and Liquid Chromatography/Tandem Mass Spectrometry (LC/MS/MS).* September.

United States Navy, 2015. *Navy Drinking Water Sampling Policy for Perfluorochemicals: Perfluorooctane Sulfonate and Perfluorooctanoic Acid.* September.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 094
NAVY CLEAN PROGRAM



# Soil Sampling for Per- and Polyfluoroalkyl Substances

## I.      Purpose

This SOP provides guidelines for soil sample collection and handling for samples that will be analyzed for per- and polyfluoroalkyl substances (PFAS) via LC/MS/MS Compliant with the most recent version of the Quality Systems Manual (QSM) for which the lab is certified at the time of analysis. Standard techniques for collecting representative samples are summarized. These procedures are specific to the Navy Comprehensive Long-term Environmental Action Navy (CLEAN) Program. Materials, equipment, and procedures may vary; refer to the Sampling and Analysis Plan and operator's manuals for specific details.

## II.      Equipment and Materials

### A.      Equipment and Materials Required

A hand auger or other device that can be used to remove the soil from the ground. Stainless steel tools, carbon steel tools, or steel DPT tooling with acetate sleeves are preferred for PFAS sampling. Avoid any sampling materials containing PFAS (such as Teflon, Viton, PTFE, or other fluorinated compounds). Any plastic sampling materials should be evaluated thoroughly before selection to ensure they are fluorine-free.

A stainless steel spatula or fluorine-free disposable plastic scoop should be used to remove material from the sampling device.

Unpainted wooden stakes or pin flags

Fiberglass measuring tape (at least 200 feet in length)

GPS Unit

- PFAS-free labels (if available[1]) shipping materials

- Loose leaf paper or a wire-bound notebook without waterproof coating or tablet (see notes on tablet use below)

- Metal clipboard (if using loose-leaf paper)

- Pen (not Sharpie)

Personal protection equipment (rubber or latex gloves, boots, etc.). Check with your subject matter expert (SME) prior to selecting PPE to ensure there are no fluorine-containing components.

---

[1] Efforts will be made to obtain PFAS-free labels; however, information on labels is scarce and labels are frequently mounted on PFAS-coated paper to allow for easy removal.

STANDARD OPERATING PROCEDURE 094, SOIL SAMPLING FOR PER- AND POLYFLUOROALKYL SUBSTANCES

Sample jars (sample jars should be made of high density polyethylene (HDPE) as glass jars may sorb PFAS, please notify the project manager [PM] if glass jars are provided by the lab). Sample containers should not contain Teflon lids.

Laboratory-prepared deionized, certified PFAS-free water for field blank collection

## B.      Equipment and Materials to Avoid During Sampling

Equipment and materials used to collect soil samples should not contain any fluorinated compounds including Teflon or synthetic rubber with fluoropolymer elastomers (e.g. Viton).

If a driller is supporting collection of soil samples in split spoons or acetate DPT sleeves, ensure the driller has not used and will not use drilling lube containing polytetrafluoroethylene (PTFE) or any other fluorine-containing substance. Biolube has been determined to be an acceptable substitute.

Specifically, the following material should be avoided during sampling:

- Gore-Tex brand or similar high-performance outdoor clothing, clothing treated with ScotchGuard brand or similar water repellent, fluoropolymer-coated Tyvek, wrinkle-resistant fabrics, and fire-resistant clothing with fluorochemical treatment or anything advertised as water repellant.

- Weather-proof log books with fluorochemical coatings.

- New clothing that has been washed fewer than six times.

The sample collection area should be clear of the following items:

- Pre-packaged food wrappers (e.g., fast food sandwich wrappers, pizza boxes, etc.)
- Microwave popcorn bags
- Blue ice containers
- Non-stick aluminum foil
- Kim-Wipes
- Sunscreen, insect repellant and other personal hygiene products that may contain PFAS

Contact your PFAS SME for an approved list of sunscreens and insect repellants.

The use of electronics (e.g., cell phones and tablets) should be avoided without the implementation of precautionary measures outlined below:

- All devices should be used with clean, ungloved hands and an approved stylus (if desired).

Following the use of a device, hands must be washed with soap and water and clean gloves should be used prior to contact with sampling equipment (bottleware, tubing, etc.).

## III.      Procedures and Guidelines

Once the area has been determined to be free of materials potentially containing PFAS, these steps can be followed to collect the soil samples:

Wear protective gear, as specified in the Health and Safety Plan.

To locate samples, identify the correct location using the pin flags or stakes. Proceed to collect a sample from the undisturbed soil adjacent to the marker following steps C and D. If markers are not present, the following procedures will be used.

2                                                                            QC AND REVIEWED 03/2023

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## A.    Samples On A Grid

1. Use measuring tape to locate each sampling point on the first grid line as prescribed in the sampling plan. As each point is located, drive a numbered stake in the ground and record its location on the site map and in the field notebook/clipboard.

2. Proceed to sample the points on the grid line.

3. Measure to location where next grid line is to start and stake first sample. For subsequent samples on the line take two orthogonal measurements: one to the previous grid line, and one to the previous sample on the same grid line.

4. Proceed to sample the points on the grid line as described in Section C below.

5. Make sure to stake location after sample collection in case professional surveying is to be completed.

6. Repeat A-3 and A-4 above until all samples are collected from the area.

7. Or, a GPS unit can be used to identify each location based on map coordinates, if available.

## B.    Non-Grid Samples

1. Use measuring tape to position sampling point at location described in the sampling plan by taking two measurements from fixed landmarks (e.g., corner of house and fence post).

2. Note measurements, landmarks, and sampling point on a sketch in the field notebook, and on a site location map.

3. Proceed to sample as described in Section C below.

4. Make sure to stake location after sample collection in case professional surveying is to be completed.

5. Repeat B-1 through B-4 above until all samples are collected from the area.

6. Or, a GPS unit can be used to identify each location based on map coordinated, if available.

To the extent possible, differentiate between fill and natural soil. If both are encountered at a boring location, sample both as prescribed in the field sampling plan. Do not locate samples in debris, tree roots, or standing water. In residential areas, do not sample in areas where residents' activities may impact the sample (e.g., barbecue areas, beneath eaves of roofs, driveways, garbage areas). If an obstacle prevents sampling at a measured grid point, move as close as possible, but up to a distance of one half the grid spacing in any direction to locate an appropriate sample. If an appropriate location cannot be found, consult with the Field Team Leader (FTL). If the FTL concurs, the sampling point may be deleted from the program. The FTL will contact the Jacobs (CH2M) PM immediately. The PM and Navy Technical Representative (NTR) will discuss whether the point should be deleted from the program. If it is deleted, the PM will follow-up with the NTR in writing.

## C.    Collecting Samples Using Hand Tools

1. Use a decontaminated stainless steel scoop/trowel or disposable plastic scoop to scrape away surficial organic material (grass, leaves, etc.) adjacent to the stake. New disposable scoops or trowels may also be used to reduce the need for equipment blanks if the disposable scoops have been confirmed by your project PFAS SME to be PFAS free.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

2. If sampling:

- Surface soil: Obtain soil sample by scooping soil using the augering scoop/trowel, starting from the surface and digging down to a depth of about 6 inches, or the depth specified in the workplan.

- Subsurface soil: Obtain the subsurface soil sample using an auger down to the depths prescribed in the field sampling plan.

3. Record lithologic description and any pertinent observations (such as discoloration) in the field notebook/clipboard.

4. Empty the contents of the scoop/trowel into a decontaminated stainless steel pan or dedicated sealable bag.

5. Repeat this procedure until sufficient soil is collected to meet volume requirements.

6. Homogenize cuttings in the pan using a decontaminated stainless steel utensil or inside the dedicated sealable bag.

7. Transfer sample for analysis into appropriate containers with a decontaminated utensil. Affix labels after bottles have been closed; collect only one sample at a time to avoid mislabeling.

8. Immediately upon collection, all samples for chemical analysis are to be placed in a closed container on ice unless it is not possible to do so. Although unusual and uncommon, there may be instances where it is not possible to have containers with ice at the sample location. In these instances, the samples should be placed on ice as soon as practical and during the time between collection and placing the samples on ice, the samples should be kept as cool as possible.

9. Backfill the hole with soil removed from the borehole. To the extent possible, replace topsoil and grass and attempt to return appearance of sampling area to its pre-sampled condition. For samples in non-residential, unmowed areas, mark the sample number on the stake and leave stake in place. In mowed areas, remove stake.

## To Collect Samples Using DPT Methods

1. Decontaminate sampling tubes and other non-dedicated downhole equipment in accordance with SOP *Decontamination of Personnel and Equipment*. Ensure that decontamination water used is PFAS free (do not use water from fire hydrants on-base for steam cleaning unless the water has been demonstrated to be free of PFAS). Additionally, ensure that all decontaminated tools are wrapped in un-coated aluminum foil as needed.

2. Drive sampling tube to the desired sampling depth using the truck-mounted hydraulic percussion hammer. If soil above the desired depth is not to be sampled, first drive the lead rod, without a sampling tube, to the top of the desired depth.

3. Remove the rods and sampling tube from the borehole and remove the sampling tube from the lead rod.

4. Cut open the acetate liner using a specific knife designed to slice the acetate liners (see below).

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

 

5.  Fill all sample containers, using a decontaminated or dedicated sampling implement. Label the containers, place in Ziploc bags, and immediately place samples on ice for shipment to the laboratory.

6.  Decontaminate all non-dedicated downhole equipment (rods, sampling tubes, etc.) in accordance with SOP Decontamination of Personnel and Equipment and ensure decontamination water is from a PFAS-free water source and if equipment is wrapped in aluminum foil that un-coated aluminum foil is used.

7.  Backfill borehole at each sampling location with grout or bentonite and repair the surface with like material (bentonite, asphalt patch, concrete, etc.), as required.

## D.    Equipment Decontamination

Whenever possible, use disposable equipment when collecting soil samples. If reusable equipment must be used, the equipment must be cleaned/decontaminated between uses. Alconox and Liquinox soap are acceptable for cleaning/decontaminating reusable equipment at PFAS sites. Any water used for cleaning/decontamination must be certified PFAS-free by a laboratory. Consider triple-rinsing. Once decontaminated, wrap equipment in plastic bags (such as Ziploc) or un-coated aluminum foil, and store away from potential PFAS sources.

## IV.    References

United States Environmental Protection Agency (USEPA), 2009. *Determination of Selected Perfluorinated Alkyl Acids in Drinking Water by Solid Phase Extraction and Liquid Chromatography/Tandem Mass Spectrometry (LC/MS/MS).* September.

United States Navy, 2020. *Interim Per- and Polyfluoroalkyl Substances (PFAS) Site Guidance for NAVFAC Remedial Project Managers (RPMs)/November 2020 Update.* November.

United States Navy, 2015. *Navy Drinking Water Sampling Policy for Perfluorochemicals: Perfluorooctane Sulfonate and Perfluorooctanoic Acid.* September

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 095
NAVY CLEAN PROGRAM



# Surface Water Sampling for Per- and Polyfluoroalkyl Substances

## I.    Purpose and Scope

This SOP provides guidelines for surface water sample collection for samples that will be analyzed for per- and polyfluoroalklyl substances (PFAS) via LC/MS/MS Compliant with the most recent version of the Quality Systems Manual (QSM) for which the lab is certified at the time of analysis. Standard techniques for collecting representative samples are summarized. These procedures are specific to the Navy Comprehensive Long-term Environmental Action Navy (CLEAN) Program. Materials, equipment, and procedures may vary; refer to the Sampling and Analysis Plan and operator's manuals for specific details.

## II.    Materials and Equipment

### A.    Equipment and Materials Required

- Open tube sampler

- Dip sampler

- Weighted bottle sampler (no glass)

- Hand pump without Teflon components

- Van Dorn sampler (Kemmerer cannot be used as it has Teflon caps)

- Depth-integrating sampler

- Peristaltic pump and PFAS-free tubing

- High density polyethylene tubing (unlined)

- Masterflex tubing such as Cole Parmer C-Flex (06424 series) and Tygon E-3603 (06509 series) are suitable options

- Sample containers (high density polyethylene [HDPE] with HDPE screw cap [no Teflon caps])

- PFAS-free labels (if available[1]) and shipping materials

- Loose leaf paper or a wire-bound notebook without waterproof coating or tablet (see notes about tablet use below)

- Metal clipboard (if using loose leaf paper)

---

[1] Efforts will be made to obtain PFAS-free labels; however, information on labels is scarce and labels are frequently mounted on PFAS-coated paper to allow for easy removal.

- Pen (not Sharpie)

- Nitrile or Latex gloves (Do not use Kleen Guard powder free nitrile gloves which were shown in research to contain fluorine)

- Meters for specific conductance, temperature, pH, and dissolved oxygen

Equipment and materials used to collect surface water samples should not contain any fluorinated compounds including Teflon or synthetic rubber with fluoropolymer elastomers (e.g. Viton). Neoprene and rubber waders should not be an issue, however, check with your PFAS subject matter expert (SME) during field preparation to ensure all equipment is free of fluorine-containing components.

## B.     Equipment and Materials to Avoid During Sampling

Equipment and materials used to collect groundwater samples should not contain any fluorinated compounds, Teflon, or synthetic rubber with fluoropolymer elastomers (e.g., Viton).

Specifically, the following material should be avoided during sampling:

- Gore-Tex brand or similar high-performance outdoor clothing, clothing treated with ScotchGuard brand or similar water repellent, fluoropolymer-coated Tyvek, wrinkle-resistant fabrics, and fire-resistant clothing with fluorochemical treatment or anything advertised as water repellant.

- Weather-proof log books with fluorochemical coatings.

- New clothing that has been washed fewer than six times.

The sample collection area should be clear of the following items:

- Pre-packaged food wrappers (e.g., fast food sandwich wrappers, pizza boxes, etc.)
- Microwave popcorn bags
- Blue ice containers
- Non-stick aluminum foil
- Kim-Wipes
- Sunscreen, insect repellant and other personal hygiene products that may contain PFAS

Contact your PFAS SME for an approved list of sunscreens and insect repellants.

The use of electronics (e.g., cell phones and tablets) should be avoided without the implementation of precautionary measures outlined below:

- All devices should be used with clean, ungloved hands and an approved stylus (if desired).

Following the use of a device, hands must be washed with soap and water and clean gloves should be used prior to contact with sampling equipment (bottleware, tubing, etc.).

## III.     Procedures and Guidelines

Wash hands with dish detergent before sampling and don nitrile gloves. Do not use Kleen Guard powder free nitrile gloves which were shown in research to contain fluorine.

Before surface water samples are taken, all sampler assemblies and sample containers are cleaned and decontaminated as described in SOP *Decontamination of Personnel and Equipment* as well as this SOP (see below). Surface water samples collected from water bodies tidally influenced should be collected at low tide and under low flow conditions to minimize the dilution of potential contaminants. Once the

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

area has been determined to be free of materials potentially containing PFAS, follow the methods for surface water sample collection described below.

Surface water samples are collected manually by submerging a clean stainless steel or polypropylene container into the water body. Samples may be collected at depth with a covered bottle that can be removed with a tripline provided the bottle or bottle cap does not contain Teflon. The most common sampler types are sealable bottles, pond samplers, peristaltic pumps, and weighted bottle samplers. Pond samplers have a fixed or telescoping pole attached to the sample container. Weighted bottle samplers are lowered below water surface, where the attached bottle is opened, allowed to fill, and pulled out of the water. When retrieved, the bottle is tightly capped and removed from the sampler assembly. A specific type of weighted bottle sampler is the Van Dorn and is acceptable in most instances. The Kemmerer weighted bottle sampler cannot be used for PFAS sampling due to the Teflon caps.

A sample is taken with the following specific steps:

1. The location and desired depth for water sampling are selected.

2. The sample site is approached from downstream in a manner that avoids disturbance of bottom sediments as much as possible. The sample bottle is gently submerged with the mouth pointed upstream and the bottle tilted slightly downstream. Bubbles and floating materials should be prevented from entering the bottle. If using a Peristaltic pump, lower the tubing into the water to the desired depth. Purge the tubing of its entire water volume before collecting a sample to ensure that you are collecting water from the correct sample depth.

3. For weighted bottle samplers, the assembly is slowly lowered to the desired depth. The bottle stopper is unseated with a sharp tug and the bottle is allowed to fill until bubbles stop rising to the surface.

4. When the bottle is full, it is gently removed from the water. If sample transfer is required, it should be performed at this time. Fill all sample containers to the middle of the bottle shoulder. Do not fill bottles completely. Affix labels after sample containers are closed; collect only one sample at a time to avoid mislabeling.

5. Place the samples into a Ziploc bag, and place on ice immediately.

6. Measure dissolved oxygen, specific conductance, temperature, and pH at the sampling location.

## A.     Equipment Decontamination

Whenever possible, use disposable equipment when collecting surface water samples. If reusable equipment must be used, the equipment must be cleaned/decontaminated between uses. Alconox and Liquinox soap are acceptable for cleaning/decontaminating reusable equipment at PFAS sites. Any water used for cleaning/decontamination must be certified PFAS-free by a laboratory. Consider triple-rinsing. Once decontaminated, wrap equipment in plastic bags (such as Ziploc) or un-coated aluminum foil, and store away from potential PFAS sources.

### Use of Water Quality Equipment

Water quality meters typically do not contain PFAS. However, consistent with general sampling SOPs, disconnect the water quality meter prior to sampling.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 095, SURFACE WATER SAMPLING FOR PER- AND POLYFLUOROALKYL SUBSTANCES

# IV.    References

United States Environmental Protection Agency (USEPA), 2009. *Determination of Selected Perfluorinated Alkyl Acids in Drinking Water by Solid Phase Extraction and Liquid Chromatography/Tandem Mass Spectrometry (LC/MS/MS).* September.

United States Navy, 2015. *Navy Drinking Water Sampling Policy for Perfluorochemicals: Perfluorooctane Sulfonate and Perfluorooctanoic Acid.* September.

QC AND REVIEWED 03/2023

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

# Appendix C
## Laboratory DoD ELAP Accreditation Letters



ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

<u>SCOPE OF ACCREDITATION TO ISO/IEC 17025:2017</u>

**EUROFINS LANCASTER LABORATORIES ENVIRONMENT TESTING LLC**
2425 New Holland Pike
Lancaster, PA  17601
Kenneth Boley        Phone:  717-556-9413

ENVIRONMENTAL

Valid To:  November 30, 2024                                          Certificate Number:  0001.01

In recognition of the successful completion of the A2LA evaluation process (including an assessment of the laboratory's compliance with the 2009 TNI Environmental Testing Laboratory Standard, and the requirements of the DoD Environmental Laboratory Accreditation Program (DoD ELAP) as detailed in version 5.4 of the DoD/DOE Quality Systems Manual for Environmental Laboratories, accreditation is granted to this laboratory to perform recognized EPA methods using the following testing technologies and in the analyte categories identified below:

<u>Testing Technologies</u>

Atomic Absorption/ICP-AES Spectrometry, ICP-MS Spectrometry, Gas Chromatography, Gas Chromatography/Mass Spectrometry, Gravimetry, High Performance Liquid Chromatography, Ion Chromatography, Misc.-Electronic Probes (pH, $F^-$, $O_2$), Oxygen Demand, Spectrophotometry (Visible), Spectrophotometry (Automated), Titrimetry, TCLP, Total Organic Carbon, Turbidity, Liquid Chromatography/Mass Spectrometry/Mass Spectrometry, High Resolution Gas Chromatography/Mass Spectrometry

| Parameter/Analyte | Drinking Water | Non-Potable Water | Solid Hazardous Waste | |
|---|---|---|---|---|
| | | | **Aqueous** | **Solid** |
| **Demands** | | | | |
| COD | ---------------- | EPA 410.4 | EPA 410.4 | ---------------- |
| Total Organic Carbon | ---------------- | EPA 9060A<br>SM 5310C-2014 | EPA 9060A<br>SM 5310C-2014 | EPA 9060A<br>SM 5310C-2014<br>Lloyd Kahn |
| **Anions** | | | | |
| Ammonia | ---------------- | EPA 350.1 | EPA 350.1 | SM 4500-NH3 B/C-2011 |
| Fluoride | ---------------- | EPA 300.0<br>EPA 9056A | EPA 300.0<br>EPA 9056A | EPA 300.0<br>EPA 9056A |
| Nitrate (as N) | ---------------- | EPA 300.0<br>EPA 353.2<br>EPA 9056A | EPA 300.0<br>EPA 353.2<br>EPA 9056A | EPA 300.0<br>EPA 353.2<br>EPA 9056A |
| Nitrite (as N) | ---------------- | EPA 300.0<br>EPA 353.2<br>EPA 9056A | EPA 300.0<br>EPA 353.2<br>EPA 9056A | EPA 300.0<br>EPA 353.2<br>EPA 9056A |

(A2LA Cert No. 0001.01) 11/21/2022                                          Page 1 of 24

| Parameter/Analyte | Drinking Water | Non-Potable Water | Solid Hazardous Waste | |
| --- | --- | --- | --- | --- |
| | | | Aqueous | Solid |
| Nitrate Nitrite Total | ---------------- | EPA 300.0 EPA 9056A | EPA 300.0 EPA 9056A | EPA 300.0 EPA 9056A |
| Bromide | ------------------ | EPA 300.0 EPA 9056A | EPA 300.0 EPA 9056A | ------------------ |
| Chloride | ------------------ | EPA 300.0 EPA 9056A | EPA 300.0 EPA 9056A | EPA 300.0 EPA 9056A |
| Sulfate | ------------------ | EPA 300.0 EPA 9056A | EPA 300.0 EPA 9056A | EPA 300.0 EPA 9056A |
| **Wet Chemistry** | | | | |
| Alkalinity | ------------------ | SM 2320B-2011 | SM 2320B-2011 | --------------- |
| Corrosivity | ------------------ | --------------- | SW-846 Chapter 7 | SW-846 Chapter 7 |
| Conductivity | | SM 2510B-2011 | SM 2510B-2011 | --------------- |
| Cyanide | ------------------ | EPA 9012B | EPA 9012B | EPA 9012B |
| Filterable Residue (TDS) | ------------------ | SM 2540C-2015 | SM 2540C-2015 | --------------- |
| Flashpoint | ------------------ | EPA 1010A/B | EPA 1010A/B | EPA 1010A/B |
| Grain Size | ------------------ | --------------- | --------------- | ASTM D422 MOD |
| Hardness | ------------------ | EPA 130.2 SM 2340B-2011 SM 2340C-2011 | EPA 130.2 SM 2340B-2011 SM 2340C-2011 | ------------------ |
| Hexavalent Chromium Digestion | ------------------ | --------------- | --------------- | EPA 3060A |
| Hexavalent Chromium | ------------------ | EPA 218.6 EPA 7196A EPA 7199 | EPA 7196A EPA 7199 | EPA 7196A EPA 7199 |
| Ignitability | ------------------ | --------------- | 40 CFR 261.21 | 40 CFR 261.21 |
| Non-filterable Residue (TSS) | ------------------ | SM 2540D-2015 | SM 2540D-2015 | --------------- |
| Paint Filter | ---------------- | ----------------- | ----------------- | EPA 9095B |
| pH | ------------------ | SM 4500 H+B-2011 EPA 9040B/C | EPA 9040B/C | EPA 9045C/D |
| Phenol | ------------------ | EPA 9066 | EPA 9066 | --------------- |
| Reactivity Prep | ------------------ | --------------- | SW-846 Chapter 7.3 | SW-846 Chapter 7.3 |
| Reactive Cyanide | ---------------- | --------------- | EPA 9012B | EPA 9012B |
| Reactive Sulfide | ---------------- | --------------- | EPA 9034 | EPA 9034 |
| Sulfide | ------------------ | EPA 376.1 EPA 376.2 SM 4500 S2D-2011 SM 4500 S2F-2011 | EPA 376.1 EPA 376.2 SM 4500 S2D-2011 SM 4500 S2F-2011 | --------------- |
| Total Kjeldahl Nitrogen (TKN) | ------------------ | EPA 351.2 | EPA 351.2 | EPA 351.2 |
| Total Residue | ------------------ | SM 2540B-2015 | SM 2540B-2015 | SM 2540G-2015 |
| **Metals** | | | | |
| Metals Digestion | ------------------ | EPA 3005A | EPA 3005A | EPA 3050B |
| Aluminum | EPA 200.8 | EPA 200.7 EPA 200.8 EPA 6010C/D EPA 6020B | EPA 6010C/D EPA 6020B | EPA 6010C/D EPA 6020B |

(A2LA Cert No. 0001.01) 11/21/2022

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2103844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| Parameter/Analyte | Drinking Water | Non-Potable Water | Solid Hazardous Waste | |
| --- | --- | --- | --- | --- |
| | | | Aqueous | Solid |
| Antimony | EPA 200.8 | EPA 200.7<br>EPA 200.8<br>EPA 6010C/D<br>EPA 6020B | EPA 6010C/D<br>EPA 6020B | EPA 6010C/D<br>EPA 6020B |
| Arsenic | EPA 200.8 | EPA 200.7<br>EPA 200.8<br>EPA 6010C/D<br>EPA 6020B | EPA 6010C/D<br>EPA 6020B | EPA 6010C/D<br>EPA 6020B |
| Barium | EPA 200.7<br>EPA 200.8 | EPA 200.7<br>EPA 200.8<br>EPA 6010C/D<br>EPA 6020B | EPA 6010C/D<br>EPA 6020B | EPA 6010C/D<br>EPA 6020B |
| Beryllium | EPA 200.8 | EPA 200.7<br>EPA 200.8<br>EPA 6010C/D<br>EPA 6020B | EPA 6010C/D<br>EPA 6020B | EPA 6010C/D<br>EPA 6020B |
| Boron | ------------------ | EPA 200.7<br>EPA 6010C/D | EPA 6010C/D | EPA 6010C/D |
| Cadmium | EPA 200.8 | EPA 200.7<br>EPA 200.8<br>EPA 6010C/D<br>EPA 6020B | EPA 6010C/D<br>EPA 6020B | EPA 6010C/D<br>EPA 6020B |
| Calcium | EPA 200.7<br>EPA 200.8 | EPA 200.7<br>EPA 200.8<br>EPA 6010C/D<br>EPA 6020B | EPA 6010C/D<br>EPA 6020B | EPA 6010C/D<br>EPA 6020B |
| Chromium | EPA 200.7<br>EPA 200.8 | EPA 200.7<br>EPA 200.8<br>EPA 6010C/D<br>EPA 6020B | EPA 6010C/D<br>EPA 6020B | EPA 6010C/D<br>EPA 6020B |
| Cobalt | EPA 200.7 | EPA 200.7<br>EPA 200.8<br>EPA 6010C/D<br>EPA 6020B | EPA 6010C/D<br>EPA 6020B | EPA 6010C/D<br>EPA 6020B |
| Copper | EPA 200.7<br>EPA 200.8 | EPA 200.7<br>EPA 200.8<br>EPA 6010C/D<br>EPA 6020B | EPA 6010C/D<br>EPA 6020B | EPA 6010C/D<br>EPA 6020B |
| Iron | EPA 200.7<br>EPA 200.8 | EPA 200.7<br>EPA 200.8<br>EPA 6010C/D<br>EPA 6020B | EPA 6010C/D<br>EPA 6020B | EPA 6010C/D<br>EPA 6020B |
| Lead | EPA 200.8 | EPA 200.7<br>EPA 200.8<br>EPA 6010C/D<br>EPA 6020B | EPA 6010C/D<br>EPA 6020B | EPA 6010C/D<br>EPA 6020B |

(A2LA Cert No. 0001.01) 11/21/2022

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| Parameter/Analyte | Drinking Water | Non-Potable Water | Solid Hazardous Waste | |
| --- | --- | --- | --- | --- |
| | | | **Aqueous** | **Solid** |
| Lithium | EPA 200.7 | EPA 200.7 EPA 6010C/D | EPA 6010C/D | EPA 6010C/D |
| Molybdenum | ------------------- | EPA 200.7 EPA 200.8 EPA 6010C/D EPA 6020B | EPA 6010C/D EPA 6020B | EPA 6010C/D EPA 6020B |
| Magnesium | EPA 200.7 EPA 200.8 | EPA 200.7 EPA 200.8 EPA 6010C/D EPA 6020B | EPA 6010C/D EPA 6020B | EPA 6010C/D EPA 6020B |
| Manganese | EPA 200.7 EPA 200.8 | EPA 200.7 EPA 200.8 EPA 6010C/D EPA 6020B | EPA 6010C/D EPA 6020B | EPA 6010C/D EPA 6020B |
| Mercury | EPA 245.1 | EPA 245.1 EPA 7470A | EPA 245.1 EPA 7470A | EPA 7471A EPA 7471B |
| Nickel | EPA 200.7 EPA 200.8 | EPA 200.7 EPA 200.8 EPA 6010C/D EPA 6020B | EPA 6010C/D EPA 6020B | EPA 6010C/D EPA 6020B |
| Potassium | EPA 200.7 EPA 200.8 | EPA 200.7 EPA 200.8 EPA 6010C/D EPA 6020B | EPA 6010C/D EPA 6020B | EPA 6010C/D EPA 6020B |
| Selenium | EPA 200.8 | EPA 200.7 EPA 200.8 EPA 6010C/D EPA 6020B | EPA 6010C/D EPA 6020B | EPA 6010C/D EPA 6020B |
| Silicon | ------------------- | EPA 200.7 EPA 6010C/D | EPA 6010C/D | EPA 6010C/D |
| Silver | EPA 200.7 EPA 200.8 | EPA 200.7 EPA 200.8 EPA 6010C/D EPA 6020B | EPA 6010C/D EPA 6020B | EPA 6010C/D EPA 6020B |
| Sodium | EPA 200.7 EPA 200.8 | EPA 200.7 EPA 200.8 EPA 6010C/D EPA 6020B | EPA 6010C/D EPA 6020B | EPA 6010C/D EPA 6020B |
| Strontium | EPA 200.7 EPA 200.8 | EPA 200.7 EPA 200.8 EPA 6010C/D EPA 6020B | EPA 6010C/D EPA 6020B | EPA 6010C/D EPA 6020B |
| Sulfur | EPA 200.7 | EPA 200.7 EPA 6010C/D | EPA 6010C/D | EPA 6010C/D |
| Thallium | EPA 200.8 | EPA 200.7 EPA 200.8 EPA 6010C/D EPA 6020B | EPA 6010C/D EPA 6020B | EPA 6010C/D EPA 6020B |

(A2LA Cert No. 0001.01) 11/21/2022

Page 4 of 24

| Parameter/Analyte | Drinking Water | Non-Potable Water | Solid Hazardous Waste | |
| --- | --- | --- | --- | --- |
| | | | **Aqueous** | **Solid** |
| Thorium | ------------------ | EPA 6010C/D | EPA 6010C/D | EPA 6010C/D |
| Tin | EPA 200.7 | EPA 200.7 EPA 6010C/D | EPA 6010C/D | EPA 6010C/D |
| Titanium | ------------------ | EPA 200.7 EPA 200.8 EPA 6010C/D | EPA 6010C/D | EPA 6010C/D |
| Tungsten | ------------------ | EPA 6010C/D | EPA 6010C/D | EPA 6010C/D |
| Uranium | ------------------ | EPA 200.8 EPA 6020B | EPA 6020B | EPA 6020B |
| Vanadium | EPA 200.7 | EPA 200.7 EPA 200.8 EPA 6010C/D EPA 6020B | EPA 6010C/D EPA 6020B | EPA 6010C/D EPA 6020B |
| Zinc | EPA 200.7 EPA 200.8 | EPA 200.7 EPA 200.8 EPA 6010C/D EPA 6020B | EPA 6010C/D EPA 6020B | EPA 6010C/D EPA 6020B |
| Zirconium | ------------------ | EPA 6010C/D | EPA 6010C/D | EPA 6010C/D |
| **Purgeable Organics (Volatiles)** | | | | |
| Volatile Preparation | ------------------ | EPA 5030C | EPA 5030C | EPA 5035A |
| Acetone | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| Acetonitrile | ------------------ | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| Acrolein | ------------------ | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| Acrylonitrile | ------------------ | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| Allyl chloride | ------------------ | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| tert-Amyl Alcohol | ------------------ | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| tert-Amyl Methyl Ether | ------------------ | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| tert-Butyl Alcohol | ------------------ | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| tert-Butyl Formate | ------------------ | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| Benzene | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| Bromobenzene | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| Bromochloromethane | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| Bromodichloromethane | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| Bromoform | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| Bromomethane | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| 2-Butanone | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| n-Butylbenzene | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| sec-Butylbenzene | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| tert-Butylbenzene | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| Carbon disulfide | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| Carbon tetrachloride | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| 2-Chloro-1,3-butadiene | ------------------ | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| Parameter/Analyte | Drinking Water | Non-Potable Water | Solid Hazardous Waste | |
|---|---|---|---|---|
| | | | Aqueous | Solid |
| Chloroacetonitrile | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| Chlorobenzene | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| 1-Chlorobutane | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| Chlorodifluoromethane | ------------------- | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| Chloroethane | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| 2-Chloroethyl Vinyl Ether | ------------------- | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| Chloroform | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| 1-Chlorohexane | ------------------- | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| Chloromethane | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| 2-Chlorotoluene | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| 4-Chlorotoluene | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| Cyclohexane | ------------------- | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| Cyclohexanone | ------------------- | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| Di-Isopropyl ether | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| Dibromochloromethane | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| 1,2-Dibromo-3-chloropropane | EPA 524.2 | EPA 8260C/D EPA 8011 | EPA 8260C/D EPA 8011 | EPA 8260C/D |
| Dibromomethane | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| 1,2-Dibromoethane (EDB) | ------------------- | EPA 8260C/D EPA 8011 | EPA 8260C/D EPA 8011 | EPA 8260C/D |
| 1,2-Dichlorobenzene | ------------------- | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| 1,3-Dichlorobenzene | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| 1,4-Dichlorobenzene | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| trans-1,4-dichloro-2-butene | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| Dichlorodi-fluoromethane | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| 1,1-Dichloroethane | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| 1,2-Dichloroethane | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| 1,1-Dichloroethene | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| cis-1,2-Dichloroethene | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| trans-1,2-Dichloroethene | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| Dichlorofluoromethane | EPA 524.2 | --------------- | --------------- | --------------- |
| 1,2-Dichloropropane | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| 1,3-Dichloropropane | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| 2,2-Dichloropropane | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| 1,1-Dichloropropene | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| cis-1,3-Dichloropropene | ------------------- | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| trans-1,3-Dichloropropene | ------------------- | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| 1,4-Dioxane | ------------------- | EPA 8260C/D EPA 8260C/D SIM | EPA 8260C/D EPA 8260C/D SIM | EPA 8260C/D EPA 8260C/D SIM |
| Ethanol | ------------------- | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| Ethylbenzene | ------------------- | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| Ethyl ether | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |

| Parameter/Analyte | Drinking Water | Non-Potable Water | Solid Hazardous Waste | |
| --- | --- | --- | --- | --- |
| | | | **Aqueous** | **Solid** |
| Ethyl Methacrylate | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| Ethyl Tert-Butyl Ether | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| Freon-113 | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| Gasoline Range Organics (GRO) [Volatile Petroleum Hydrocarbons (VPH)] | ------------------- | EPA 8015C EPA 8015D EPA 8260C/D NW TPH-Gx MA VPH AK101 | EPA 8015C EPA 8015D EPA 8260C/D NW TPH-Gx MA VPH AK101 | EPA 8015C EPA 8015D EPA 8260C/D NW TPH-Gx MA VPH AK101 |
| Heptane | ------------------- | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| Hexane | ------------------- | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| 2-Hexanone | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| Hexachlorobutadiene | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| Hexachloroethane | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| Isopropyl Alcohol | ------------------- | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| Isopropylbenzene | ------------------- | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| 1,4-Isopropyltoluene | ------------------- | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| Methylacrylonitrile | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| Methyl Acetate | ------------------- | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| Methyl Acrylate | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| Methyl Iodide | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| Methylene Chloride | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| Methyl Methacrylate | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| Methyl Tert-Butyl Ether | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| 4-Methyl-2-pentanone | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| Methylcyclohexane | ------------------- | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| 2-Nitropropane | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| Naphthalene | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| Pentachloroethane | ------------------- | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| Propionitrile | ------------------- | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| n-Propylbenzene | ------------------- | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| Styrene | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| Tert-Amyl Ethyl Ether | ------------------- | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| 1,1,1,2-Tetrachloroethane | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| 1,1,2,2-Tetrachloroethane | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| Tetrachloroethene | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| Tetrahydrofuran | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| Toluene | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| 1,2,3-Trichlorobenzene | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| 1,2,4-Trichlorobenzene | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| 1,1,1-Trichloroethane | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| 1,1,2-Trichloroethane | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| Parameter/Analyte | Drinking Water | Non-Potable Water | Solid Hazardous Waste | |
| --- | --- | --- | --- | --- |
| | | | **Aqueous** | **Solid** |
| Trichloroethene | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| Trichlorofluoromethane | ------------------ | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| 1,2,3-Trichloropropane | ------------------ | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| 1,2,4-Trimethylbenzene | ------------------ | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| 1,3,5-Trimethylbenzene | ------------------ | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| 130BVinyl Acetate | ------------------ | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| Vinyl Chloride | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| Xylenes, Total | ------------------ | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| 1,2-Xylene (o-Xylene) | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| 1,3+1,4-Xylene (m+p Xylene) | EPA 524.2 | EPA 8260C/D | EPA 8260C/D | EPA 8260C/D |
| **Extractable Organics (Semivolatiles)** | | | | |
| Acenaphthene | ------------------ | EPA 8270D/E EPA 8270D/E SIM | EPA 8270D/E EPA 8270D/E SIM | EPA 8270D/E EPA 8270D/E SIM |
| Acenaphthylene | ------------------ | EPA 8270D/E EPA 8270D/E SIM | EPA 8270D/E EPA 8270D/E SIM | EPA 8270D/E EPA 8270D/E SIM |
| Acetophenone | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| 2-Acetylaminofluorene | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| Alkylated PAHs | ------------------ | EPA 8270D/E SIM | EPA 8270D/E SIM | EPA 8270D/E SIM |
| 4-Aminobiphenyl | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| 2-Amino-4,6-dinitrotoluene | ------------------ | EPA 8330B | EPA 8330B | ------------------ |
| 4-Amino-2,6-dinitrotoluene | ------------------ | EPA 8330B | EPA 8330B | ------------------ |
| Aniline | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| Anthracene | ------------------ | EPA 8270D/E EPA 8270D/E SIM | EPA 8270D/E EPA 8270D/E SIM | EPA 8270D/E EPA 8270D/E SIM |
| Atrazine | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| Benzaldehyde | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| Benzidine | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| Benzoic acid | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| Benzo (a) anthracene | ------------------ | EPA 8270D/E EPA 8270D/E SIM | EPA 8270D/E EPA 8270D/E SIM | EPA 8270D/E EPA 8270D/E SIM |
| Benzo (b) fluoranthene | ------------------ | EPA 8270D/E EPA 8270D/E SIM | EPA 8270D/E EPA 8270D/E SIM | EPA 8270D/E EPA 8270D/E SIM |
| Benzo (k) fluoranthene | ------------------ | EPA 8270D/E EPA 8270D/E SIM | EPA 8270D/E EPA 8270D/E SIM | EPA 8270D/E EPA 8270D/E SIM |
| Benzo (ghi) perylene | ------------------ | EPA 8270D/E EPA 8270D/E SIM | EPA 8270D/E EPA 8270D/E SIM | EPA 8270D/E EPA 8270D/E SIM |
| Benzo (a) pyrene | ------------------ | EPA 8270D/E EPA 8270D/E SIM | EPA 8270D/E EPA 8270D/E SIM | EPA 8270D/E EPA 8270D/E SIM |
| Benzo (e) pyrene | ------------------ | EPA 8270D/E SIM | EPA 8270D/E SIM | EPA 8270D/E SIM |
| Benzyl Alcohol | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| Biphenyl | ----------------- | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |

(A2LA Cert No. 0001.01) 11/21/2022

Page 8 of 24

| Parameter/Analyte | Drinking Water | Non-Potable Water | Solid Hazardous Waste | |
|---|---|---|---|---|
| | | | **Aqueous** | **Solid** |
| bis (2-Chloroethoxy) Methane | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| bis (2-Chloroethyl) Ether | ------------------ | EPA 8270D/E EPA 8270D/E SIM | EPA 8270D/E EPA 8270D/E SIM | EPA 8270D/E EPA 8270D/E SIM |
| bis (2-Ethylhexyl) Phthalate | ------------------ | EPA 8270D/E EPA 8270D/E SIM | EPA 8270D/E EPA 8270D/E SIM | EPA 8270D/E EPA 8270D/E SIM |
| 4-Bromophenylphenyl Ether | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| Butyl benzyl Phthalate | ------------------ | EPA 8270D/E EPA 8270D/E SIM | EPA 8270D/E EPA 8270D/E SIM | EPA 8270D/E EPA 8270D/E SIM |
| Caprolactam | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| Carbazole | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| Carbon Range Organics C8-C44 (including subsets of this range i.e. HRO, MRO, ORO, RRO) | ------------------ | EPA 8015C EPA 8015D | EPA 8015C EPA 8015D | EPA 8015C EPA 8015D |
| 4-Chloroaniline | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| 4-Chloro-3-methylphenol | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| Chlorobenzilate | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| 1-Chloronaphthalene | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| 2-Chloronaphthalene | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| 2-Chlorophenol | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| 4-Chlorophenyl phenyl ether | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| Chrysene | ------------------ | EPA 8270D/E EPA 8270D/E SIM | EPA 8270D/E EPA 8270D/E SIM | EPA 8270D/E EPA 8270D/E SIM |
| Cresols (Methyl phenols) | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| cis-/trans-Diallate | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| 2,4-Diamino-6-nitrotoluene | ------------------ | EPA 8330B | EPA 8330B | ---------------- |
| 2,6-Diamino-4-nitrotoluene | ------------------ | EPA 8330B | EPA 8330B | ---------------- |
| Dibenzo (a,h) acridine | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| Dibenzo (a,h) anthracene | ------------------ | EPA 8270D/E EPA 8270D/E SIM | EPA 8270D/E EPA 8270D/E SIM | EPA 8270D/E EPA 8270D/E SIM |
| Dibenzofuran | ------------------ | EPA 8270D/E EPA 8270D/E SIM | EPA 8270D/E EPA 8270D/E SIM | EPA 8270D/E EPA 8270D/E SIM |
| 1,2-Dichlorobenzene | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| 1,3-Dichlorobenzene | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| 1,4-Dichlorobenzene | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| 3,3-Dichlorobenzidine | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| Diesel Range Organics (DRO) [Extractable Petroleum Hydrocarbons (EPH)] | ------------------ | EPA 8015C EPA 8015D NWTPH DX MA EPH TX1005 AK102/103 AK102/103-SV | EPA 8015C EPA 8015D NWTPH DX MA EPH TX1005 AK102/103 AK102/103-SV | EPA 8015C EPA 8015D NWTPH DX MA EPH TX1005 AK102/103 |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| Parameter/Analyte | Drinking Water | Non-Potable Water | Solid Hazardous Waste | |
| --- | --- | --- | --- | --- |
| | | | **Aqueous** | **Solid** |
| 2,4-Dichlorophenol | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| 2,6-Dichlorophenol | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| Diethyl Phthalate | ------------------ | EPA 8270D/E<br>EPA 8270D/E SIM | EPA 8270D/E<br>EPA 8270D/E SIM | EPA 8270D/E<br>EPA 8270D/E SIM |
| Dimethoate | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| p-Dimethylaminoazobenze | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| 7,12-Dimethylbenz (a) anthracene | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| 2,4-Dimethylphenol | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| Dimethyl Phthalate | ------------------ | EPA 8270D/E<br>EPA 8270D/E SIM | EPA 8270D/E<br>EPA 8270D/E SIM | EPA 8270D/E<br>EPA 8270D/E SIM |
| 3,3'-Dimethylbenzidine | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| Di-n-butyl Phthalate | ------------------ | EPA 8270D/E<br>EPA 8270D/E SIM | EPA 8270D/E<br>EPA 8270D/E SIM | EPA 8270D/E<br>EPA 8270D/E SIM |
| Di-n-octyl phthalate | ------------------ | EPA 8270D/E<br>EPA 8270D/E SIM | EPA 8270D/E<br>EPA 8270D/E SIM | EPA 8270D/E<br>EPA 8270D/E SIM |
| 3,5-Dinitroaniline | ------------------ | EPA 8330B | EPA 8330B | ----------------- |
| 1,3-Dinitrobenzene | ------------------ | EPA 8270D/E<br>EPA 8330B | EPA 8270D/E<br>EPA 8330B | EPA 8270D/E |
| 1,4-Dinitrobenzene | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| 2,4-Dinitrophenol | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| 2,4-Dinitrotoluene | ------------------ | EPA 8270D/E<br>EPA 8330B | EPA 8270D/E<br>EPA 8330B | EPA 8270D/E |
| 2,6-Dinitrotoluene | ------------------ | EPA 8270D/E<br>EPA 8330B | EPA 8270D/E<br>EPA 8330B | EPA 8270D/E |
| 1,4-Dioxane | ------------------ | EPA 8270D/E<br>EPA 8270D/E SIM | EPA 8270D/E<br>EPA 8270D/E SIM | EPA 8270D/E<br>EPA 8270D/E SIM |
| Diphenylamine | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| Diphenyl ether | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| 1,2-Diphenylhydrazine | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| Ethyl Methanesulfonate | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| Fluoranthene | ------------------ | EPA 8270D/E<br>EPA 8270D/E SIM | EPA 8270D/E<br>EPA 8270D/E SIM | EPA 8270D/E<br>EPA 8270D/E SIM |
| Fluorene | ------------------ | EPA 8270D/E<br>EPA 8270D/E SIM | EPA 8270D/E<br>EPA 8270D/E SIM | EPA 8270D/E<br>EPA 8270D/E SIM |
| Hexachlorobenzene | ------------------ | EPA 8270D/E<br>EPA 8270D/E SIM | EPA 8270D/E<br>EPA 8270D/E SIM | EPA 8270D/E<br>EPA 8270D/E SIM |
| Hexachlorobutadiene | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| Hexachlorocyclo-pentadiene | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| Hexachloroethane | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| Hexachloropropene | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| Hexahydro-1,3,5-trinitro-1,3,5-triazine (RDX) | ------------------ | EPA 8330B | EPA 8330B | ------------------ |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| Parameter/Analyte | Drinking Water | Non-Potable Water | Solid Hazardous Waste | |
|---|---|---|---|---|
| | | | **Aqueous** | **Solid** |
| Indeno (1,2,3-cd) Pyrene | ------------------ | EPA 8270D/E EPA 8270D/E SIM | EPA 8270D/E EPA 8270D/E SIM | EPA 8270D/E EPA 8270D/E SIM |
| Isodrin | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| Isophorone | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| Isosafrole | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| 3-Methycholanthrene | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| 2-Methyl-4,6-dinitrophenol | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| Methyl methane sulfonate | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| 1-Methylnaphthalene | ------------------ | EPA 8270D/E EPA 8270D/E SIM | EPA 8270D/E EPA 8270D/E SIM | EPA 8270D/E EPA 8270D/E SIM |
| 2-Methylnaphthalene | ------------------ | EPA 8270D/E EPA 8270D/E SIM | EPA 8270D/E EPA 8270D/E SIM | EPA 8270D/E EPA 8270D/E SIM |
| 2-Methylphenol | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| 4-Methylphenol | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| Naphthalene | ------------------ | EPA 8270D/E EPA 8270D/E SIM | EPA 8270D/E EPA 8270D/E SIM | EPA 8270D/E EPA 8270D/E SIM |
| 1,4-Naphthoquinone | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| 1-Naphthylamine | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| 2-Naphthylamine | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| 4-Nitroquinoline-1-oxide | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| 2-Nitroaniline | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| 3-Nitroaniline | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| 4-Nitroaniline | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| Nitrobenzene | ------------------ | EPA 8270D/E EPA 8330B | EPA 8270D/E EPA 8330B | EPA 8270D/E |
| Nitroglycerin | ------------------ | EPA 8330B | EPA 8330B | ------------------ |
| 2-Nitrophenol | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| 4-Nitrophenol | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| 2-Nitrotoluene | ------------------ | EPA 8330B | EPA 8330B | --------------- |
| 3-Nitrotoluene | ------------------ | EPA 8330B | EPA 8330B | --------------- |
| 4-Nitrotoluene | ------------------ | EPA 8330B | EPA 8330B | ------------------ |
| 5-Nitro-o-toluidine | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| n-Nitroso-di-n-butylamine | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| n-Nitrosodiethylamine | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| n-Nitrosodimethylamine | ------------------ | EPA 8270D/E EPA 8270D/E SIM | EPA 8270D/E EPA 8270D/E SIM | EPA 8270D/E EPA 8270D/E SIM |
| n-Nitrosomethylethylamine | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| n-Nitrosomorpholine | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| n-Nitrosodi-n-propylamine | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| n-Nitrosodiphenylamine | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| n-Nitrosopiperidine | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| n-Nitrosopyrrolidine | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| Parameter/Analyte | Drinking Water | Non-Potable Water | Solid Hazardous Waste | |
|---|---|---|---|---|
| | | | **Aqueous** | **Solid** |
| Octahydro-1,3,5,7-tetranitro-1,3,5,7-tetrazocine (HMX) | ------------------ | EPA 8330B | EPA 8330B | EPA 8330B MOD |
| 2,2-Oxybis (1-chloropropane) | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| Pentachlorobenzene | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| Pentachloronitrobenzene | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| Pentachlorophenol | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| Pentaerythritol Tetranitrate (PETN) | ------------------ | EPA 8330B | EPA 8330B | ------------------ |
| Perylene | ------------------ | EPA 8270D/E SIM | EPA 8270D/E SIM | EPA 8270D/E SIM |
| Phenacetin | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| Phenanthrene | ------------------ | EPA 8270D/E EPA 8270D/E SIM | EPA 8270D/E EPA 8270D/E SIM | EPA 8270D/E EPA 8270D/E SIM |
| Phenol | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| 2-Picoline | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| Pronamide | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| Pyrene | ------------------ | EPA 8270D/E EPA 8270D/E SIM | EPA 8270D/E EPA 8270D/E SIM | EPA 8270D/E EPA 8270D/E SIM |
| Pyridine | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| Safrole | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| 1,2,4,5- Tetrachlorobenzene | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| 2,3,4,6-Tetrachlorophenol | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| Tetraethyl dithiopyrophosphate | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| Tetraethy lead | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| Tetryl | ------------------ | EPA 8330B | EPA 8330B | ------------------ |
| Thionazin | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| o-Toluidine | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| 1,2,4-Trichlorobenzene | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| 1,3,5-Trinitrobenzene | ------------------ | EPA 8330B | EPA 8330B | ------------------ |
| 2,4,5-Trichlorophenol | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| 2,4,6-Trichlorophenol | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| O,O,O-Tri-ethylphosphorothioate | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| 2,4,6-Trinitrotoluene | ------------------ | EPA 8330B | EPA 8330B | ------------------ |
| **Organochlorine Pesticides** | | | | |
| Aldrin | ------------------ | EPA 8081B | EPA 8081B | EPA 8081B |
| alpha-BHC | ------------------ | EPA 8081B | EPA 8081B | EPA 8081B |
| beta-BHC | ------------------ | EPA 8081B | EPA 8081B | EPA 8081B |
| delta-BHC | ------------------ | EPA 8081B | EPA 8081B | EPA 8081B |
| gamma-BHC (Lindane) | ------------------ | EPA 8081B | EPA 8081B | EPA 8081B |
| alpha-Chlordane | ------------------ | EPA 8081B | EPA 8081B | EPA 8081B |
| Chlordane (Technical) | ------------------ | EPA 8081B | EPA 8081B | EPA 8081B |
| 2,4'-DDD | ------------------ | EPA 8081B | EPA 8081B | EPA 8081B |
| 2,4'-DDE | ------------------ | EPA 8081B | EPA 8081B | EPA 8081B |
| 2,4'-DDT | ------------------ | EPA 8081B | EPA 8081B | EPA 8081B |
| 4,4'-DDD | ------------------ | EPA 8081B | EPA 8081B | EPA 8081B |

(A2LA Cert No. 0001.01) 11/21/2022

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| Parameter/Analyte | Drinking Water | Non-Potable Water | Solid Hazardous Waste | |
|---|---|---|---|---|
| | | | Aqueous | Solid |
| 4,4'-DDE | ------------------ | EPA 8081B | EPA 8081B | EPA 8081B |
| 4,4'-DDT | ------------------ | EPA 8081B | EPA 8081B | EPA 8081B |
| Dieldrin | ------------------ | EPA 8081B | EPA 8081B | EPA 8081B |
| Dinoseb | ------------------ | EPA 8270D/E | EPA 8270D/E | EPA 8270D/E |
| Endosulfan I (alpha) | ------------------ | EPA 8081B | EPA 8081B | EPA 8081B |
| Endosulfan II (beta) | ------------------ | EPA 8081B | EPA 8081B | EPA 8081B |
| Endosulfan Sulfate | ------------------ | EPA 8081B | EPA 8081B | EPA 8081B |
| Endrin | ------------------ | EPA 8081B | EPA 8081B | EPA 8081B |
| Endrin Aldehyde | ------------------ | EPA 8081B | EPA 8081B | EPA 8081B |
| Endrin Ketone | ------------------ | EPA 8081B | EPA 8081B | EPA 8081B |
| gamma-Chlordane | ------------------ | EPA 8081B | EPA 8081B | EPA 8081B |
| Heptachlor | ------------------ | EPA 8081B | EPA 8081B | EPA 8081B |
| Heptachlor Epoxide | ------------------ | EPA 8081B | EPA 8081B | EPA 8081B |
| Hexachlorobenzene | ------------------ | EPA 8081B | EPA 8081B | EPA 8081B |
| Hexachlorocyclopentadiene | ------------------ | EPA 8081B | EPA 8081B | EPA 8081B |
| Methoxychlor | ------------------ | EPA 8081B | EPA 8081B | EPA 8081B |
| Mirex | ------------------ | EPA 8081B | EPA 8081B | EPA 8081B |
| Toxaphene | ------------------ | EPA 8081B | EPA 8081B | EPA 8081B |
| **PCBs (Aroclors)** | | | | |
| PCB-1016 (Arochlor) | ------------------ | EPA 8082A | EPA 8082A | EPA 8082A |
| PCB-1221 | ------------------ | EPA 8082A | EPA 8082A | EPA 8082A |
| PCB-1232 | ------------------ | EPA 8082A | EPA 8082A | EPA 8082A |
| PCB-1242 | ------------------ | EPA 8082A | EPA 8082A | EPA 8082A |
| PCB-1248 | ------------------ | EPA 8082A | EPA 8082A | EPA 8082A |
| PCB-1254 | ------------------ | EPA 8082A | EPA 8082A | EPA 8082A |
| PCB-1260 | ------------------ | EPA 8082A | EPA 8082A | EPA 8082A |
| PCB-1262 | ------------------ | EPA 8082A | EPA 8082A | EPA 8082A |
| PCB-1268 | ------------------ | EPA 8082A | EPA 8082A | EPA 8082A |
| PCB congeners (209) | ------------------ | EPA 1668A EPA 1668C | EPA 1668A EPA 1668C | EPA 1668A EPA 1668C |
| **Herbicides** | | | | |
| 2,4,5-T | ------------------ | EPA 8151A | EPA 8151A | EPA 8151A |
| 2,4,5-TP (Silvex) | ------------------ | EPA 8151A | EPA 8151A | EPA 8151A |
| 2,4-D | ------------------ | EPA 8151A | EPA 8151A | EPA 8151A |
| 2,4-DB | ------------------ | EPA 8151A | EPA 8151A | EPA 8151A |
| Dalapon | ------------------ | EPA 8151A | EPA 8151A | EPA 8151A |
| Dicamba | ------------------ | EPA 8151A | EPA 8151A | EPA 8151A |
| Dichlorprop | ------------------ | EPA 8151A | EPA 8151A | EPA 8151A |
| Dinoseb | ------------------ | EPA 8151A | EPA 8151A | EPA 8151A |
| MCPA | ------------------ | EPA 8151A | EPA 8151A | EPA 8151A |
| MCPP | ------------------ | EPA 8151A | EPA 8151A | EPA 8151A |
| Pentachlorophenol | ------------------ | EPA 8151A | EPA 8151A | EPA 8151A |
| **PCB Homologues** | | | | |
| Monochlorobiphenyls | ------------------ | EPA 680 | EPA 680 | EPA 680 |
| Dichlorobiphenyls | ------------------ | EPA 680 | EPA 680 | EPA 680 |
| Trichlorobiphenyls | ------------------ | EPA 680 | EPA 680 | EPA 680 |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| Parameter/Analyte | Drinking Water | Non-Potable Water | Solid Hazardous Waste | |
|---|---|---|---|---|
| | | | Aqueous | Solid |
| Tetrachlorobiphenyls | ------------------ | EPA 680 | EPA 680 | EPA 680 |
| Pentachlorobiphenyls | ------------------ | EPA 680 | EPA 680 | EPA 680 |
| Hexachlorobiphenyls | ------------------ | EPA 680 | EPA 680 | EPA 680 |
| Heptachlorobiphenyls | ------------------ | EPA 680 | EPA 680 | EPA 680 |
| Octachlorobiphenyls | ------------------ | EPA 680 | EPA 680 | EPA 680 |
| Nonachlorobiphenyls | ------------------ | EPA 680 | EPA 680 | EPA 680 |
| Decachlorobiphenyls | ------------------ | EPA 680 | EPA 680 | EPA 680 |
| **Dioxins/Furans** | | | | |
| 2,3,7,8-TCDD | EPA 1613B | EPA 8290A | EPA 8290A | EPA 8290A |
| 2,3,7,8-TCDF | ------------------ | EPA 8290A | EPA 8290A | EPA 8290A |
| 1,2,3,7,8-PeCDF | ------------------ | EPA 8290A | EPA 8290A | EPA 8290A |
| 2,3,4,7,8-PeCDF | ------------------ | EPA 8290A | EPA 8290A | EPA 8290A |
| 1,2,3,7,8-PeCDD | ------------------ | EPA 8290A | EPA 8290A | EPA 8290A |
| 1,2,3,4,7,8-HxCDF | ------------------ | EPA 8290A | EPA 8290A | EPA 8290A |
| 1,2,3,6,7,8-HxCDF | ------------------ | EPA 8290A | EPA 8290A | EPA 8290A |
| 2,3,4,6,7,8-HxCDF | ------------------ | EPA 8290A | EPA 8290A | EPA 8290A |
| 1,2,3,7,8,9-HxCDF | ------------------ | EPA 8290A | EPA 8290A | EPA 8290A |
| 1,2,3,4,7,8,-HxCDD | ------------------ | EPA 8290A | EPA 8290A | EPA 8290A |
| 1,2,3,6,7,8-HxCDD | ------------------ | EPA 8290A | EPA 8290A | EPA 8290A |
| 1,2,3,7,8,9-HxCDD | ------------------ | EPA 8290A | EPA 8290A | EPA 8290A |
| 1,2,3,4,6,7,8-HpCDF | ------------------ | EPA 8290A | EPA 8290A | EPA 8290A |
| 1,2,3,4,7,8,9-HpCDF | ------------------ | EPA 8290A | EPA 8290A | EPA 8290A |
| 1,2,3,4,6,7,8-HpCDD | ------------------ | EPA 8290A | EPA 8290A | EPA 8290A |
| OCDF | ------------------ | EPA 8290A | EPA 8290A | EPA 8290A |
| OCDD | ------------------ | EPA 8290A | EPA 8290A | EPA 8290A |
| Total HpCDD | ------------------ | EPA 8290A | EPA 8290A | EPA 8290A |
| Total HpCDF | ------------------ | EPA 8290A | EPA 8290A | EPA 8290A |
| Total HxCDD | ------------------ | EPA 8290A | EPA 8290A | EPA 8290A |
| Total HxCDF | ------------------ | EPA 8290A | EPA 8290A | EPA 8290A |
| Total PeCDD | ------------------ | EPA 8290A | EPA 8290A | EPA 8290A |
| Total PeCDF | ------------------ | EPA 8290A | EPA 8290A | EPA 8290A |
| Total TCDD | ------------------ | EPA 8290A | EPA 8290A | EPA 8290A |
| Total TCDF | ------------------ | EPA 8290A | EPA 8290A | EPA 8290A |
| **Misc. Headspace Analysis** | | | | |
| Carbon dioxide | ------------------ | RSK-175 | RSK-175 | ------------------ |
| Ethane | ------------------ | RSK-175 | RSK-175 | ------------------ |
| Ethene | ------------------ | RSK-175 | RSK-175 | ------------------ |
| Methane | ------------------ | RSK-175 | RSK-175 | ------------------ |
| Acetylene | ------------------ | RSK-175 | RSK-175 | ------------------ |
| Propane | ------------------ | RSK-175 | RSK-175 | ------------------ |
| **Hazardous Waste Characteristics** | | | | |
| 342BToxicity Characteristic Leaching Procedure | ------------------ | ------------------ | EPA 1311 | EPA 1311 |
| 343BSynthetic Precipitation Leaching Procedure | ------------------ | ------------------ | EPA 1312 | EPA 1312 |

(A2LA Cert No. 0001.01) 11/21/2022    Page 14 of 24

| Parameter/Analyte | Drinking Water | Non-Potable Water | Solid Hazardous Waste | |
|---|---|---|---|---|
| | | | **Aqueous** | **Solid** |
| 344BASTM Leaching Procedure | ------------------ | ------------------ | ASTM D3987-85 | ASTM D3987-85 |
| **Other** | | | | |
| Perchlorate | ------------------ | EPA 6850 | EPA 6850 | EPA 6850 |
| Hydrazine | ------------------ | EPA 8315A MOD | EPA 8315A MOD | EPA 8315A MOD |
| Formaldehyde | ------------------ | ------------------ | EPA 8315A | EPA 8315A |
| Methylhydrazine | ------------------ | EPA 8315A MOD | EPA 8315A MOD | EPA 8315A MOD |
| 1,1-Dimethylhydrazine | ------------------ | EPA 8315A MOD | EPA 8315A MOD | EPA 8315A MOD |
| Acetic Acid | ------------------ | EPA 8015D | EPA 8015D | ------------------ |
| Butryic acid | ------------------ | EPA 8015D | EPA 8015D | ------------------ |
| Lactic Acid | ------------------ | EPA 8015D | EPA 8015D | ------------------ |
| Propionic Acid | ------------------ | EPA 8015D | EPA 8015D | ------------------ |
| Pyruvic Acid | ------------------ | EPA 8015D | EPA 8015D | ------------------ |
| Citric Acid | ------------------ | EPA 8015D | EPA 8015D | ------------------ |
| Formic Acid | ------------------ | EPA 8015D | EPA 8015D | ------------------ |
| Oxalic Acid | ------------------ | EPA 8015D | EPA 8015D | ------------------ |
| Quinic Acid | ------------------ | EPA 8015D | EPA 8015D | ------------------ |
| Succinic Acid | ------------------ | EPA 8015D | EPA 8015D | ------------------ |
| Tartaric Acid | ------------------ | EPA 8015D | EPA 8015D | ------------------ |
| Volatile Preparation | ------------------ | EPA 5030C | EPA 5030C | EPA 5035 EPA 5035A |
| 352BOrganic Extraction/Cleanup | ------------------ | EPA 3510C EPA 3511 EPA 3660B, 3620C, 3665A | EPA 3510C EPA 3511 EPA 3660B, 3620C, 3665A | EPA 3546 EPA 3550C EPA 3660B, 3620C, 3665A, 3640A |

| Parameter/Analyte | Drinking Water | Nonpotable Water | Solid Haz.Waste |
|---|---|---|---|
| **Per and Polyfluoroalkyl Substances (PFAS)** | | | |
| N-ethyl Perfluorooctanesulfonamidoacetic Acid (NEtFOSAA) | EPA 537 EPA 537.1 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15<br><br>EPA Draft Method 1633 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15<br><br>EPA Draft Method 1633 |
| N-methyl perfluoroctanesulfonamidoacetic Acid (NMeFOSAA) | EPA 537 EPA 537.1 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15<br><br>EPA Draft Method 1633 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15<br><br>EPA Draft Method 1633 |
| Perfluorobutanesulfonic Acid (PFBS) | EPA 537 EPA 537.1 EPA 533 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15<br><br>EPA Draft Method 1633 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15<br><br>EPA Draft Method 1633 |
| Perfluorodecanoic Acid (PFDA) | EPA 537 EPA 537.1 EPA 533 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15 |

(A2LA Cert No. 0001.01) 11/21/2022

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| Parameter/Analyte | Drinking Water | Nonpotable Water | Solid Haz.Waste |
|---|---|---|---|
| | | EPA Draft Method 1633 | EPA Draft Method 1633 |
| Perfluorododecanoic Acid (PFDoA) | EPA 537<br>EPA 537.1<br>EPA 533 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15<br><br>EPA Draft Method 1633 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15<br><br>EPA Draft Method 1633 |
| Perfluoroheptanoic Acid (PFHpA) | EPA 537<br>EPA 537.1<br>EPA 533 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15<br><br>EPA Draft Method 1633 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15<br><br>EPA Draft Method 1633 |
| Perfluorohexanesulfonic Acid (PFHxS) | EPA 537<br>EPA 537.1<br>EPA 533 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15<br><br>EPA Draft Method 1633 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15<br><br>EPA Draft Method 1633 |
| Perfluorohexanoic Acid (PFHxA) | EPA 537<br>EPA 537.1<br>EPA 533 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15<br><br>EPA Draft Method 1633 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15<br><br>EPA Draft Method 1633 |
| Perfluorononanoic Acid (PFNA) | EPA 537<br>EPA 537.1<br>EPA 533 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15<br><br>EPA Draft Method 1633 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15<br><br>EPA Draft Method 1633 |
| Perfluorooctanesulfonic Acid (PFOS) | EPA 537<br>EPA 537.1<br>EPA 533 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15<br><br>EPA Draft Method 1633 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15<br><br>EPA Draft Method 1633 |
| Perfluorooctanoic Acid (PFOA) | EPA 537<br>EPA 537.1<br>EPA 533 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15<br><br>EPA Draft Method 1633 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15<br><br>EPA Draft Method 1633 |
| Perfluorotetradecanoic Acid (PFTeDA) | EPA 537<br>EPA 537.1 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15<br><br>EPA Draft Method 1633 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15<br><br>EPA Draft Method 1633 |
| Perfluorotridecanoic Acid (PFTrDA) | EPA 537<br>EPA 537.1 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15<br><br>EPA Draft Method 1633 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15<br><br>EPA Draft Method 1633 |
| Perfluoroundecanoic Acid (PFUnA) | EPA 537<br>EPA 537.1<br>EPA 533 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15 |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

(A2LA Cert No. 0001.01) 11/21/2022

Page 16 of 24

| Parameter/Analyte | Drinking Water | Nonpotable Water | Solid Haz.Waste |
|---|---|---|---|
| | | EPA Draft Method 1633 | EPA Draft Method 1633 |
| Hexafluoropropylene oxide dimer acid (HF-PODA) | EPA 537.1 EPA 533 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15  EPA Draft Method 1633 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15  EPA Draft Method 1633 |
| 4,8-Dioxa-3*H*-perfluorononanoic acid (ADONA) | EPA 537.1 EPA 533 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15  EPA Draft Method 1633 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15  EPA Draft Method 1633 |
| 9-Chlorohexadecafluoro-3-oxanonane-1-sulfonic acid  (9Cl-PF3ONS) | EPA 537.1 EPA 533 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15  EPA Draft Method 1633 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15  EPA Draft Method 1633 |
| 11-Chloroeicosafluoro-3-oxaundecane-1-sulfonic acid  (11Cl-PF3OUdS) | EPA 537.1 EPA 533 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15  EPA Draft Method 1633 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15  EPA Draft Method 1633 |
| Perfluorobutanoic Acid (PFBA) | EPA 533 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15  EPA Draft Method 1633 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15  EPA Draft Method 1633 |
| Perfluoropentanoic Acid (PFPeA) | EPA 533 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15  EPA Draft Method 1633 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15  EPA Draft Method 1633 |
| 1H,1H, 2H, 2H-Perfluorohexane sulfonic acid (4:2FTS) | EPA 533 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15  EPA Draft Method 1633 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15  EPA Draft Method 1633 |
| 1H,1H, 2H, 2H-Perfluorodecane sulfonic acid (8:2-FTS) | EPA 533 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15  EPA Draft Method 1633 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15  EPA Draft Method 1633 |
| Perfluoropentanesulfonic Acid (PFPeS) | EPA 533 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15  EPA Draft Method 1633 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15  EPA Draft Method 1633 |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102814

| Parameter/Analyte | Drinking Water | Nonpotable Water | Solid Haz.Waste |
|---|---|---|---|
| 1H,1H, 2H, 2H-Perfluorooctane sulfonic acid (6:2-FTS) | EPA 533 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15<br><br>EPA Draft Method 1633 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15<br><br>EPA Draft Method 1633 |
| Perfluoroheptanesulfonic Acid (PFHpS) | EPA 533 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15<br><br>EPA Draft Method 1633 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15<br><br>EPA Draft Method 1633 |
| Perfluorononanesulfonic Acid (PFNS) | ------------- | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15<br><br>EPA Draft Method 1633 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15<br><br>EPA Draft Method 1633 |
| 374BPerfluorodecanesulfonic Acid (PFDS) | ------------- | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15<br><br>EPA Draft Method 1633 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15<br><br>EPA Draft Method 1633 |
| 10:2 Fluorotelomersulfonic Acid (10:2-FTS) | ------------- | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15 |
| Perfluorododecanesulfonic Acid (PFDoS) | ------------- | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15<br><br>EPA Draft Method 1633 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15<br><br>EPA Draft Method 1633 |
| Perfluorohexadecanoic Acid (PFHxDA) | ------------- | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15 |
| Perfluorooctadecanoic Acid (PFODA) | ------------- | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15 |
| Perfluorooctanesulfonamide (PFOSA) | ------------- | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15<br><br>EPA Draft Method 1633 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15<br><br>EPA Draft Method 1633 |
| N-methyl perfluorooctanesulfonamidoethanol (NMeFOSE) | ------------- | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15<br><br>EPA Draft Method 1633 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15<br><br>EPA Draft Method 1633 |
| N-methyl perfluorooctanesulfonamide (NMeFOSA) | ------------- | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15 |

| Parameter/Analyte | Drinking Water | Nonpotable Water | Solid Haz.Waste |
|---|---|---|---|
| | | EPA Draft Method 1633 | EPA Draft Method 1633 |
| N-ethyl perfluorooctanesulfonamidoethanol (NEtFOSE) | ------------- | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15<br><br>EPA Draft Method 1633 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15<br><br>EPA Draft Method 1633 |
| N-ethylperfluorooctanesulfonamide (NEtFOSA) | ------------ | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15<br><br>EPA Draft Method 1633 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15<br><br>EPA Draft Method 1633 |
| Nonafluoro-3,6-dioxaheptanoic acid (NFDHA) | EPA 533 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15<br><br>EPA Draft Method 1633 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15<br><br>EPA Draft Method 1633 |
| Perfluoro-3-methoxypropanoic acid (PFMPA) | EPA 533 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15<br><br>EPA Draft Method 1633 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15<br><br>EPA Draft Method 1633 |
| Perfluoro-4-methoxybutanoic acid (PFMBA) | EPA 533 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15<br><br>EPA Draft Method 1633 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15<br><br>EPA Draft Method 1633 |
| Perfluoro(2-ethoxyethane)sulfonic acid (PFEESA) | EPA 533 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15<br><br>EPA Draft Method 1633 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15<br><br>EPA Draft Method 1633 |
| 3-Perfluoropropylpropanoic acid (3:3 FTCA) | --- | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15<br><br>EPA Draft Method 1633 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15<br><br>EPA Draft Method 1633 |
| 2$H$,2$H$,3$H$,3$H$-Perfluorooctanoic acid (5:3 FTCA) | --- | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15<br><br>EPA Draft Method 1633 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15<br><br>EPA Draft Method 1633 |
| 3-Perfluoroheptylpropanoic acid (7:3 FTCA) | --- | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15<br><br>EPA Draft Method 1633 | PFAS by LCMSMS Compliant with QSM 5.3/5.4 Table B-15<br><br>EPA Draft Method 1633 |

**End of DoD ELAP section of scope**

In addition, in recognition of the successful completion of the A2LA evaluation process (including an assessment of the

(A2LA Cert No. 0001.01) 11/21/2022

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

laboratory's compliance with ISO IEC 17025:2017, the 2009 TNI Environmental Testing Laboratory Standard, and for the test methods applicable to Kentucky Statute KRS 224.60-130(2)(a), and for the test methods applicable to the Wyoming Storage Tank Remediation Laboratory Accreditation Program), accreditation is granted to this laboratory to perform recognized EPA methods using the following testing technologies and in the analyte categories identified below:

Testing Technologies

Atomic Absorption/ICP-AES Spectrometry, ICP-MS Spectrometry, Gas Chromatography, Gas Chromatography/Mass Spectrometry, Gravimetry, High Performance Liquid Chromatography, Ion Chromatography, Misc.-Electronic Probes (pH, F⁻, O₂), Oxygen Demand, Spectrophotometry (Visible), Spectrophotometry (Automated), Titrimetry, TCLP, Total Organic Carbon, Turbidity, Liquid Chromatography/Mass Spectrometry/Mass Spectrometry, High Resolution Gas Chromatography/Mass Spectrometry

| Parameter/Analyte | Tissue | Nonpotable Water | Solid Hazardous Waste | |
| --- | --- | --- | --- | --- |
| | | | Aqueous | Solid |
| **Other** | | | | |
| Perchlorate | Food & Food Products EPA 6850 | EPA 6850 | EPA 6850 | EPA 6850 |
| Hydrazine | -------------- | EPA 8315A MOD | EPA 8315A MOD | EPA 8315A MOD |
| Methylhydrazine | -------------- | EPA 8315A MOD | EPA 8315A MOD | EPA 8315A MOD |
| 1,1-Dimethylhydrazine | -------------- | EPA 8315A MOD | EPA 8315A MOD | EPA 8315A MOD |
| Volatile Preparation | -------------- | EPA 5030A EPA 5030C | EPA 5030A EPA 5030C | EPA 5035 EPA 5035A |
| Organic Extraction/ Cleanup | EPA 3546 EPA 3550C EPA 3660B EPA 3620C EPA 3665A EPA 3640A | EPA 3510C EPA 3511 EPA 3660B EPA 3620C EPA 3665A | EPA 3510C EPA 3511 EPA 3660B EPA 3620C EPA 3665A | EPA 3546 EPA 3550C EPA 3660B EPA 3620C EPA 3665A EPA 3640A |

| Parameter/Analyte | Tissue | Nonpotable Water | Solid Hazardous Waste | |
| --- | --- | --- | --- | --- |
| | | | Aqueous | Solid |
| **Kentucky UST Program** | | | | |
| **Metals** | | | | |
| Arsenic | -------------- | ------------------ | EPA 6010B | EPA 6010B |
| Barium | -------------- | ------------------ | EPA 6010B | EPA 6010B |
| Cadmium | -------------- | ------------------ | EPA 6010B | EPA 6010B |
| Chromium | -------------- | ------------------ | EPA 6010B | EPA 6010B |
| Lead | -------------- | ------------------ | EPA 6010B | EPA 6010B |
| Mercury | -------------- | ------------------ | EPA 7470A | EPA 7471A |
| Selenium | -------------- | ------------------ | EPA 6010B | EPA 6010B |
| Silver | -------------- | ------------------ | EPA 6010B | EPA 6010B |
| **Purgeable Organics (Volatiles)** | | | | |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| Parameter/Analyte | Tissue | Nonpotable Water | Solid Hazardous Waste | |
| --- | --- | --- | --- | --- |
| | | | Aqueous | Solid |
| Diesel Range Organics (DRO) | -------------- | EPA 8015C EPA 8015D | EPA 8015C EPA 8015D | EPA 8015C EPA 8015D |
| Gasoline Range Organics (GRO) | -------------- | EPA 8015C EPA 8015D | EPA 8015C EPA 8015D | EPA 8015C EPA 8015D |
| **Wyoming Storage Tank Program** | | | | |
| **Metals** | | | | |
| Cadmium | -------------- | ------------------ | EPA 6010C | EPA 6010C |
| Chromium | -------------- | ------------------ | EPA 6010C | EPA 6010C |
| Chromium (Total, hexavalent) | -------------- | ------------------ | EPA 7196A | EPA 7196A |
| Lead | -------------- | ------------------ | EPA 6010C | EPA 6010C |
| **Purgeable Organics (Volatiles)** | | | | |
| Volatile Preparation | -------------- | ------------------ | EPA 5030C EPA 5030C | EPA 5035 EPA 5035A |
| Benzene | -------------- | ------------------ | EPA 5030C EPA 8260D | EPA 8260D |
| 1,2-Dichloroethane | -------------- | ------------------ | EPA 8260D | EPA 8260D |
| 1,2-Dibromoethane | -------------- | ------------------ | EPA 8011 | EPA 8011 |
| Diisopropyl Ether | -------------- | ------------------ | EPA 5030C EPA 8260D | EPA 8260D |
| Ethyl Benzene | -------------- | ------------------ | EPA 5030C EPA 8260D | EPA 8260D |
| Ethyl tert-butyl Ether | -------------- | ------------------ | EPA 8260D | EPA 8260D |
| Methyl tert-butyl Ether | -------------- | ------------------ | EPA 5030C EPA 8260D | EPA 8260D |
| Naphthalene | -------------- | ------------------ | EPA 5030C EPA 8260D | EPA 8260D |
| Toluene | -------------- | ------------------ | EPA 5030C EPA 8260D | EPA 8260D |
| Tert-amyl Methyl Ether | -------------- | ------------------ | EPA 5030C EPA 8260D | EPA 8260D |
| Tert-butyl Alcohol | -------------- | ------------------ | EPA 5030C EPA 8260D | EPA 8260D |
| Xylenes, total | -------------- | ------------------ | EPA 5030C EPA 8260D | EPA 8260D |
| Gasoline Range Organics (GRO C6-C10) | -------------- | ------------------ | EPA 5030C EPA 8260D | EPA 8260D |
| **Extractable Organics (Semivolatiles)** | | | | |
| Diesel Range Organics (DRO C10-C32) | -------------- | ------------------ | EPA 8015C w/ EPA 3630 cleanup | EPA 8015C w/ EPA 3630 cleanup |

**End of KY, WY, and ISO 17025 section of scope**

In recognition of the successful completion of the A2LA evaluation process, including an assessment of the laboratory's compliance with ISO/IEC 17025:2017 accreditation is granted to this laboratory to perform recognized EPA methods using the following testing technologies and, in the analyte, categories identified below:

| Food and Feed (WHO 29) | Food/Feed |
|---|---|
| 2,3,7,8-TCDD | EPA 1613B |
| 2,3,7,8-TCDF | EPA 1613B |
| 1,2,3,7,8-PeCDF | EPA 1613B |
| 2,3,4,7,8-PeCDF | EPA 1613B |
| 1,2,3,7,8-PeCDD | EPA 1613B |
| 1,2,3,4,7,8-HxCDF | EPA 1613B |
| 1,2,3,6,7,8-HxCDF | EPA 1613B |
| 2,3,4,6,7,8-HxCDF | EPA 1613B |
| 1,2,3,7,8,9-HxCDF | EPA 1613B |
| 1,2,3,4,7,8-HxCDD | EPA 1613B |
| 1,2,3,6,7,8-HxCDD | EPA 1613B |
| 1,2,3,7,8,9-HxCDD | EPA 1613B |
| 1,2,3,4,6,7,8-HpCDF | EPA 1613B |
| 1,2,3,4,7,8,9-HpCDF | EPA 1613B |
| 1,2,3,4,6,7,8-HpCDD | EPA 1613B |
| OCDF | EPA 1613B |
| OCDD | EPA 1613B |
| | |
| **Food and Feed  (WHO 29)** | **Food/Feed** |
| 6 marker PCBs (PCB28, PCB52, PCB101, PCB138, PCB153, and PCB180) | EPA 1668C |
| (PCB77, PCB81, PCB105, PCB114, PCB118, PCB123, PCB126, PCB156, PCB157, PCB167, PCB169, and PCB189) | EPA 1668C |

| Parameter/Analyte | Tissue | Nonpotable Water | Solid Hazardous Waste | |
|---|---|---|---|---|
| | | | **Aqueous** | **Solid** |
| 12 Dioxin-like PCBs (dl-PCBs)/coplanar PCBs (PCB77, PCB81, PCB105, PCB114, PCB118, PCB123, PCB126, PCB156, PCB157, PCB167, PCB169, & PCB189) | EPA 1668C | ------------------ | --------------- | --------------- |

(A2LA Cert No. 0001.01) 11/21/2022

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| Parameter/Analyte | Drinking Water | Nonpotable Water | Solid Haz.Waste |
|---|---|---|---|
| **441BPer and Polyfluoroalkyl Substances (PFAS)** | | | |
| 442BN-ethyl perfluorooctane-sulfonamidoacetic acid (NetFOSAA) | EPA 537 Ver. 1.1 EPA 537.1 | EPA 537 Ver.1.1 Mod | EPA 537 Ver.1.1 Mod |
| 443BN-methyl perfluoroctane-sulfonamidoacetic acid (NMeFOSAA) | EPA 537 Ver. 1.1 EPA 537.1 | EPA 537 Ver.1.1 Mod | EPA 537 Ver.1.1 Mod |
| 444BPerfluorobutanesulfonic acid (PFBS) | EPA 537 Ver. 1.1 EPA 537.1 | EPA 537 Ver.1.1 Mod | EPA 537 Ver.1.1 Mod |
| 445BPerfluorodecanoic acid (PFDA) | EPA 537 Ver. 1.1 EPA 537.1 | EPA 537 Ver.1.1 Mod | EPA 537 Ver.1.1 Mod |
| 446BPerfluorododecanoic acid (PFDoDA) | EPA 537 Ver. 1.1 EPA 537.1 | EPA 537 Ver.1.1 Mod | EPA 537 Ver.1.1 Mod |
| 447BPerfluoroheptanoic acid (PFHpA) | EPA 537 Ver. 1.1 EPA 537.1 | EPA 537 Ver.1.1 Mod | EPA 537 Ver.1.1 Mod |
| 448BPerfluorohexanesulfonic acid (PFHxS) | EPA 537 Ver. 1.1 EPA 537.1 | EPA 537 Ver.1.1 Mod | EPA 537 Ver.1.1 Mod |
| 449BPerfluorohexanoic acid (PFHxA) | EPA 537 Ver. 1.1 EPA 537.1 | EPA 537 Ver.1.1 Mod | EPA 537 Ver.1.1 Mod |
| 450BPerfluorononanoic acid (PFNA) | EPA 537 Ver. 1.1 EPA 537.1 | EPA 537 Ver.1.1 Mod | EPA 537 Ver.1.1 Mod |
| 451BPerfluorooctanesulfonic acid (PFOS) | EPA 537 Ver. 1.1 EPA 537.1 | EPA 537 Ver.1.1 Mod | EPA 537 Ver.1.1 Mod |
| 452BPerfluorooctanoic acid (PFOA) | EPA 537 Ver. 1.1 EPA 537.1 | EPA 537 Ver.1.1 Mod | EPA 537 Ver.1.1 Mod |
| 453BPerfluorotetradecanoic acid (PFTeDA) | EPA 537 Ver. 1.1 EPA 537.1 | EPA 537 Ver.1.1 Mod | EPA 537 Ver.1.1 Mod |
| 454BPerfluorotridecanoic acid (PFTrDA) | EPA 537 Ver. 1.1 EPA 537.1 | EPA 537 Ver.1.1 Mod | EPA 537 Ver.1.1 Mod |
| 455BPerfluoroundecanoic acid (PFUnDA) | EPA 537 Ver. 1.1 EPA 537.1 | EPA 537 Ver.1.1 Mod | EPA 537 Ver.1.1 Mod |
| 2,3,3,3-Tetrafluoro-2-(1,1,2,2,3,3,3-heptafluoropropoxy)-propanoic acid (HFPODA) | EPA 537.1 | EPA 537 Ver.1.1 Mod | EPA 537 Ver.1.1 Mod |
| 4,8-Dioxa-3H-perfluorononanoic acid (DONA) | EPA 537.1 | EPA 537 Ver.1.1 Mod | EPA 537 Ver.1.1 Mod |
| 9-Chlorohexadecafluoro-3-oxanonane-1-sulfonic acid (9Cl-PF3ONS) | EPA 537.1 | EPA 537 Ver.1.1 Mod | EPA 537 Ver.1.1 Mod |
| 11-Chloroeicosafluoro-3-oxaundecane-1-sulfonic acid (11Cl-PF3OUdS) | EPA 537.1 | EPA 537 Ver.1.1 Mod | EPA 537 Ver.1.1 Mod |
| 456BPerfluoro-n-butanoic acid (PFBA) | --------------------- | EPA 537 Ver.1.1 Mod | EPA 537 Ver.1.1 Mod |
| 457BPerfluoro-n-pentanoic acid (PFPeA) | --------------------- | EPA 537 Ver.1.1 Mod | EPA 537 Ver.1.1 Mod |

| Parameter/Analyte | Drinking Water | Nonpotable Water | Solid Haz.Waste |
|---|---|---|---|
| 458B8:2 Fluorotelomersulfonic acid (8:2FTS) | --------------------- | EPA 537 Ver.1.1 Mod | EPA 537 Ver.1.1 Mod |
| 459B4:2 Fluorotelomersulfonic acid (4:2-FTS) | --------------------- | EPA 537 Ver.1.1 Mod | EPA 537 Ver.1.1 Mod |
| 460BPerfluoropentanesulfonic acid (PFPeS) | --------------------- | EPA 537 Ver.1.1 Mod | EPA 537 Ver.1.1 Mod |
| 461B6:2 Fluorotelomersulfonic acid (6:2-FTS) | --------------------- | EPA 537 Ver.1.1 Mod | EPA 537 Ver.1.1 Mod |
| Perfluoroheptanesulfonic acid (PFHpS) | --------------------- | EPA 537 Ver.1.1 Mod | EPA 537 Ver.1.1 Mod |
| 462BPerfluorononanesulfonic acid (PFNS) | --------------------- | EPA 537 Ver.1.1 Mod | EPA 537 Ver.1.1 Mod |
| 463BPerfluorodecanesulfonic acid (PFDS) | --------------------- | EPA 537 Ver.1.1 Mod | EPA 537 Ver.1.1 Mod |
| 464B10:2 Fluorotelomersulfonic acid (10:2-FTS) | --------------------- | EPA 537 Ver.1.1 Mod | EPA 537 Ver.1.1 Mod |
| 465BPerfluorododecanesulfonic acid (PFDoDS) | --------------------- | EPA 537 Ver.1.1 Mod | EPA 537 Ver.1.1 Mod |
| 466BPerfluorohexadecanoic acid (PFHxDA) | --------------------- | EPA 537 Ver.1.1 Mod | EPA 537 Ver.1.1 Mod |
| 467BPerfluorooctadecanoic acid (PFODA) | --------------------- | EPA 537 Ver.1.1 Mod | EPA 537 Ver.1.1 Mod |
| 468BPerfluorooctanesulfonamide (PFOSA) | --------------------- | EPA 537 Ver.1.1 Mod | EPA 537 Ver.1.1 Mod |
| 469B2-(N-methylperfluoro-1-octanesulfonamido)-ethanol (NMePFOSAE) | --------------------- | EPA 537 Ver.1.1 Mod | EPA 537 Ver.1.1 Mod |
| 470BN-methylperfluoro-1-octanesulfonamide (NMePFOSA) | --------------------- | EPA 537 Ver.1.1 Mod | EPA 537 Ver.1.1 Mod |
| 471B2-(N-ethylperfluoro-1-octanesulfonamido)-ethanol (NEtPFOSAE) | --------------------- | EPA 537 Ver.1.1 Mod | EPA 537 Ver.1.1 Mod |
| 472BN-ethylperfluoro-1-octanesulfonamide (NEtPFOSA) | --------------------- | EPA 537 Ver.1.1 Mod | EPA 537 Ver.1.1 Mod |

(A2LA Cert No. 0001.01) 11/21/2022

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844



# *Accredited Laboratory*

A2LA has accredited

# EUROFINS LANCASTER LABORATORIES ENVIRONMENTAL, LLC

*Lancaster, PA*

for technical competence in the field of

## Environmental Testing

In recognition of the successful completion of the A2LA evaluation process that includes an assessment of the laboratory's compliance with ISO/IEC 17025:2017, the 2009 TNI Environmental Testing Laboratory Standard, and the requirements of the Department of Defense Environmental Laboratory Accreditation Program (DoD ELAP) as detailed in version 5.4 of the DoD/DOE Quality System Manual for Environmental Laboratories (QSM), accreditation is granted to this laboratory to perform recognized EPA methods as defined on the associated A2LA Environmental Scope of Accreditation. This accreditation demonstrates technical competence for this defined scope and the operation of a laboratory quality management system (refer to joint ISO-ILAC-IAF Communiqué dated *April 2017*).



Presented this 21st day of November 2022.

Mr. Trace McInturff, Vice President, Accreditation Services
For the Accreditation Council
Certificate Number 1.01
Valid to November 30, 2024

*For the tests to which this accreditation applies, please refer to the laboratory's Environmental Scope of Accreditation.*



# CERTIFICATE OF ACCREDITATION

## The ANSI National Accreditation Board

Hereby attests that

## Eurofins Sacramento

### 880 Riverside Parkway
### West Sacramento, CA 95605

Fulfills the requirements of

## ISO/IEC 17025:2017

and

## U.S. Department of Defense (DoD) Quality Systems Manual for Environmental Laboratories (DoD QSM V5.4)

In the field of

## TESTING

This certificate is valid only when accompanied by a current scope of accreditation document.
The current scope of accreditation can be verified at [www.anab.org](http://www.anab.org).

Jason Stine, Vice President
Expiry Date: 20 January 2024
Certificate Number: L2468






This laboratory is accredited in accordance with the recognized International Standard ISO/IEC 17025:2017.
This accreditation demonstrates technical competence for a defined scope and the operation of a laboratory
quality management system (refer to joint ISO-ILAC-IAF Communiqué dated April 2017).

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844



**ANAB**
*ANSI National Accreditation Board*

# SCOPE OF ACCREDITATION TO ISO/IEC 17025:2017

## and

## U.S. Department of Defense (DoD) Quality Systems Manual for Environmental Laboratories (DoD QSM V5.4)

### Eurofins Sacramento

880 Riverside Parkway
West Sacramento, CA 95605
Robert Hrabak
916-374-4433

### TESTING

Valid to: **January 20, 2024**          Certificate Number: **L2468**

**Environmental**

| Non-Potable Water | | |
|---|---|---|
| **Technology** | **Method** | **Analyte** |
| LC/MS/MS | EPA 6850 | Perchlorate |
| GC/HRMS | EPA 8290/8290A/1613B | 2,3,7,8-TeCDD |
| GC/HRMS | EPA 8290/8290A/1613B | 1,2,3,7,8-PeCDD |
| GC/HRMS | EPA 8290/8290A/1613B | 1,2,3,4,7,8-HxCDD |
| GC/HRMS | EPA 8290/8290A/1613B | 1,2,3,6,7,8-HxCDD |
| GC/HRMS | EPA 8290/8290A/1613B | 1,2,3,7,8,9-HxCDD |
| GC/HRMS | EPA 8290/8290A/1613B | 1,2,3,4,6,7,8-HpCDD |
| GC/HRMS | EPA 8290/8290A/1613B | OCDD |
| GC/HRMS | EPA 8290/8290A/1613B | 2,3,7,8-TeCDF |
| GC/HRMS | EPA 8290/8290A/1613B | 1,2,3,7,8-PeCDF |
| GC/HRMS | EPA 8290/8290A/1613B | 2,3,4,7,8-PeCDF |
| GC/HRMS | EPA 8290/8290A/1613B | 1,2,3,4,7,8-HxCDF |
| GC/HRMS | EPA 8290/8290A/1613B | 1,2,3,6,7,8-HxCDF |
| GC/HRMS | EPA 8290/8290A/1613B | 1,2,3,7,8,9-HxCDF |
| GC/HRMS | EPA 8290/8290A/1613B | 2,3,4,6,7,8-HxCDF |
| GC/HRMS | EPA 8290/8290A/1613B | 1,2,3,4,6,7,8-HpCDF |

Version 017   Issued: July 12, 2023          [www.anab.org](http://www.anab.org)





**ANAB**

**ANSI** *National Accreditation Board*

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| Non-Potable Water | | |
|---|---|---|
| **Technology** | **Method** | **Analyte** |
| GC/HRMS | EPA 8290/8290A/1613B | 1,2,3,4,7,8,9-HpCDF |
| GC/HRMS | EPA 8290/8290A/1613B | OCDF |
| GC/HRMS | EPA 8290/8290A/1613B | Total TCDD |
| GC/HRMS | EPA 8290/8290A/1613B | Total PeCDD |
| GC/HRMS | EPA 8290/8290A/1613B | Total HxCDD |
| GC/HRMS | EPA 8290/8290A/1613B | Total HpCDD |
| GC/HRMS | EPA 8290/8290A/1613B | Total TCDF |
| GC/HRMS | EPA 8290/8290A/1613B | Total PeCDF |
| GC/HRMS | EPA 8290/8290A/1613B | Total HxCDF |
| GC/HRMS | EPA 8290/8290A/1613B | Total HpCDF |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | 6:2 Fluorotelomer sulfonic acid (1H,1H,2H,2H-perfluorooctane sulfonic acid) (6:2 FTS) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | 8:2 Fluorotelomer sulfonic acid (1H,1H,2H,2H-perfluorodecane sulfonic acid) (8:2 FTS) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | N-Ethyl perfluorooctanesulfon amidoacetic acid (NEtFOSAA, EtFOSAA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | N-Methyl perfluorooctanesulfon amidoacetic acid (NMeFOSAA, MeFOSAA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluorooctanoic acid (PFOA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluorooctanesulfonic acid (PFOS) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluorobutanoic acid (PFBA) |

 



ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| Non-Potable Water | | |
|---|---|---|
| **Technology** | **Method** | **Analyte** |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluoropentanoic acid (PFPA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluorohexanoic acid (PFHxA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluoroheptanoic acid (PFHpA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluorononanoic acid (PFNA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluorodecanoic acid (PFDA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluoroundecanoic acid(PFUnA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluorododecanoic acid (PFDoA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluorotridecanoic acid(PFTrDA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluorotetradecanoic acid (PFTeDA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluorobutanesulfonic acid (PFBS) |






**ANAB**
**ANSI** National Accreditation Board

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| Non-Potable Water | | |
|---|---|---|
| **Technology** | **Method** | **Analyte** |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluorohexanesulfonic acid (PFHxS) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluoroheptanesulfonic acid (PFHpS) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluorodecanesulfonic acid (PFDS) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluorooctanesulfonamide (PFOSA, FOSA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | 4:2 Fluorotelomer sulfonic acid (1H, 1H,2H,2H-perfluorohexane sulfonic acid) (4:2 FTS) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | 10:2 Fluorotelomer sulfonic acid (1H, 1H,2H,2H-perfluorododecane sulfonic acid) (10:2 FTS) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluorohexadecanoic acid (PFHxDA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluoropentanesulfonic acid (PFPeS) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluorononanesulfonic acid (PFNS) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | 4,8-Dioxa-3H-perfluorononanoic acid (ADONA) |






**ANAB**
**ANSI** National Accreditation Board

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| Non-Potable Water | | |
|---|---|---|
| **Technology** | **Method** | **Analyte** |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Hexafluoropropylene oxide dimer acid (HFPO-DA, GenX) (Perfluoro-2-propoxypropionic acid) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | 9-Chlorohexadecafluoro-3-oxanonane-1-sulfonic acid (9Cl-PF3ONS) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | 11-Chloroeicosafluoro-3-oxaundecane-1-sulfonic acid (11C1-PF3OUdS) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluorododecanesulfonic acid (PFDoS) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluorooctadecanoic acid (PFODA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluoro-4-ethylcyclohexanesulfonic acid (PFecHS) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluoro-1-propanesulfonic acid (PFPrS) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | N-Ethylperfluorooctane sulfonamide (NEtFOSA, EtFOSA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | N-Methylperfluorooctane sulfonamide (NMeFOSA, MeFOSA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | N-Ethylperfluorooctane sulfonamido ethanol (NEtFOSE, EtFOSE) |

Version 017   Issued: July 12, 2023          www.anab.org

 



**ANAB**
*ANSI National Accreditation Board*

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| **Non-Potable Water** | | |
|---|---|---|
| **Technology** | **Method** | **Analyte** |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | N-Methylperfluorooctane sulfonamido ethanol (NMeFOSe, MeFOSE) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | 4,4,5,5,6,6,6-Heptafluorohexanoic acid (3-Perfluoropropyl propanoic acid) (3:3 FTCA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | 2H,2H,3H,3H-Perfluorooctanoic acid (5:3 FTCA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | 2H,2H,3H,3H-Perfluorodecanoic acid (3-Perfluoroheptyl propanoic acid) (7:3 FTCA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | 2-Perfluorohexylethanoic acid (6:2 FTCA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | 2-Perfluorooctylethanoic acid (8:2 FTCA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | 2-Perfluorodecylethanoic acid (10:2 FTCA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluoropropionic acid (PPF Acid, PFPrA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluoro-3-methoxypropanoic acid (PFMPA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluoro-4-methoxybutanoic acid (PFMBA) |






**ANAB**

*ANSI National Accreditation Board*

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| **Non-Potable Water** | | |
|---|---|---|
| **Technology** | **Method** | **Analyte** |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Nonafluoro-3,6-dioxaheptanoic acid (NFDHA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluoro(2-ethoxyethane) sulfonic acid (PFEESA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Difluoro(perfluoromethoxy)acetic acid (PFMOAA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluoro-4-isopropoxybutanoic acid (PFECA G, PFPE-1) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluoro-3,5,7,9-butaoxadecanoic acid (PFO4DA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluoro-3,5,7-trioxaoctanoic acid   (PFO3OA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluoro-3,5-dioxahexanoic acid  (PFO2HXA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluoro-2-{[perfluoro-3-(perfluoroethoxy)-2-propanyl]oxy}ethanesulfonic acid (Hydro-PS Acid) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluoro-3,5,7,9,11-pentaoxadodecanoic acid (PFO5DoA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluoro-2-(perfluoromethoxy)propanoic acid (PMPA) |






**ANAB**
*ANSI National Accreditation Board*

| Non-Potable Water | | |
|---|---|---|
| **Technology** | **Method** | **Analyte** |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | 2,3,3,3-Tetrafluoro-2-(pentafluoroethoxy)propanoic acid (PEPA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | 4-(2-carboxy-1,1,2,2-tetrafluoroethoxy)-2,2,3,3,4,5,5,5-octafluoro-pentanoic acid (R-EVE) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | 1,1,2,2-Tetrafluoro-2-(1,2,2,2-tetrafluoroethoxy)ethane-1-sulfonic acid (NVHOS) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | 2,2,3,3-Tetrafluoro-3-{[1,1,1,2,3,3-hexafluoro-3-(1,2,2,2-tetrafluoroethoxy)propan-2-yl]oxy}propanoic acid (Hydro-EVE Acid) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | 1,1,2,2-tetrafluoro-2-[1,2,2,3,3-pentafluoro-1-(trifluoromethyl)propoxy]ethanesulfonic acid (R-PSDCA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | 1$H$,1$H$, 2$H$, 2$H$-Perfluorooctane sulfonic acid (6:2FTS) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | 1$H$,1$H$, 2$H$, 2$H$-Perfluorodecane sulfonic acid (8:2FTS) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | N-ethyl perfluorooctanesulfonamidoacetic acid (NEtFOSAA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | N-methyl perfluorooctanesulfonamidoacetic acid (NMeFOSAA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluorooctanoic acid (PFOA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluorooctanesulfonic acid (PFOS) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluorobutanoic acid (PFBA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluoropentanoic acid (PFPeA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluorohexanoic acid (PFHxA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluoroheptanoic acid (PFHpA) |

 

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844



ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| Non-Potable Water | | |
|---|---|---|
| **Technology** | **Method** | **Analyte** |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluorononanoic acid (PFNA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluorodecanoic acid (PFDA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluoroundecanoic acid (PFUnA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluorododecanoic acid (PFDoA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluorotridecanoic acid (PFTrDA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluorotetradecanoic acid (PFTeDA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluorobutanesulfonic acid (PFBS) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluorohexanesulfonic acid (PFHxS) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluoroheptanesulfonic acid (PFHpS) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluorodecanesulfonic acid (PFDS) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluorooctanesulfonamide (PFOSA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | $1H,1H, 2H, 2H$-Perfluorohexane sulfonic acid (4:2FTS) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluoropentanesulfonic acid (PFPeS) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluorononanesulfonic acid (PFNS) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | 4,8-Dioxa-3$H$-perfluorononanoic acid (ADONA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Hexafluoropropylene oxide dimer acid (HFPO-DA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | 9-Chlorohexadecafluoro-3-oxanonane-1-sulfonic acid (9Cl-PF3ONS) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | 11-Chloroeicosafluoro-3-oxaundecane-1-sulfonic acid (11C1-PF3OUdS) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluorododecanesulfonic acid (PFDoS) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | N-ethyl perfluorooctanesulfonamide (NEtFOSA) |

 



**ANAB**
*ANSI National Accreditation Board*

| Non-Potable Water | | |
|---|---|---|
| **Technology** | **Method** | **Analyte** |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | N-methyl perfluorooctanesulfonamide (NMeFOSA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | N-ethyl perfluorooctanesulfonamidoethanol (NEtFOSE) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | N-methyl perfluorooctanesulfonamidoethanol (NMeFOSE) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | 3-Perfluoropropyl propanoic acid (3:3FTCA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | $2H,2H,3H,3H$-Perfluorooctanoic acid (5:3FTCA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | 3-Perfluoroheptyl propanoic acid (7:3FTCA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluoro-3-methoxypropanoic acid (PFMPA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluoro-4-methoxybutanoic acid (PFMBA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Nonafluoro-3,6-dioxaheptanoic acid (NFDHA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluoro(2-ethoxyethane)sulfonic acid (PFEESA) |
| GC/HRMS | EPA 1668A/1668C | PCB 1 |
| GC/HRMS | EPA 1668A/1668C | PCB 2 |
| GC/HRMS | EPA 1668A/1668C | PCB 3 |
| GC/HRMS | EPA 1668A/1668C | PCB 4 |
| GC/HRMS | EPA 1668A/1668C | PCB 5 |
| GC/HRMS | EPA 1668A/1668C | PCB 6 |
| GC/HRMS | EPA 1668A/1668C | PCB 7 |
| GC/HRMS | EPA 1668A/1668C | PCB 8 |
| GC/HRMS | EPA 1668A/1668C | PCB 9 |
| GC/HRMS | EPA 1668A/1668C | PCB 10 |
| GC/HRMS | EPA 1668A/1668C | PCB 11 |
| GC/HRMS | EPA 1668A/1668C | PCB 12 |
| GC/HRMS | EPA 1668A/1668C | PCB 13 |
| GC/HRMS | EPA 1668A/1668C | PCB 14 |
| GC/HRMS | EPA 1668A/1668C | PCB 15 |
| GC/HRMS | EPA 1668A/1668C | PCB 16 |
| GC/HRMS | EPA 1668A/1668C | PCB 17 |
| GC/HRMS | EPA 1668A/1668C | PCB 18 |




ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| Non-Potable Water | | |
|---|---|---|
| **Technology** | **Method** | **Analyte** |
| GC/HRMS | EPA 1668A/1668C | PCB 19 |
| GC/HRMS | EPA 1668A/1668C | PCB 20 |
| GC/HRMS | EPA 1668A/1668C | PCB 21 |
| GC/HRMS | EPA 1668A/1668C | PCB 22 |
| GC/HRMS | EPA 1668A/1668C | PCB 23 |
| GC/HRMS | EPA 1668A/1668C | PCB 24 |
| GC/HRMS | EPA 1668A/1668C | PCB 25 |
| GC/HRMS | EPA 1668A/1668C | PCB 26 |
| GC/HRMS | EPA 1668A/1668C | PCB 27 |
| GC/HRMS | EPA 1668A/1668C | PCB 28 |
| GC/HRMS | EPA 1668A/1668C | PCB 29 |
| GC/HRMS | EPA 1668A/1668C | PCB 30 |
| GC/HRMS | EPA 1668A/1668C | PCB 32 |
| GC/HRMS | EPA 1668A/1668C | PCB 31 |
| GC/HRMS | EPA 1668A/1668C | PCB 33 |
| GC/HRMS | EPA 1668A/1668C | PCB 34 |
| GC/HRMS | EPA 1668A/1668C | PCB 35 |
| GC/HRMS | EPA 1668A/1668C | PCB 36 |
| GC/HRMS | EPA 1668A/1668C | PCB 37 |
| GC/HRMS | EPA 1668A/1668C | PCB 38 |
| GC/HRMS | EPA 1668A/1668C | PCB 39 |
| GC/HRMS | EPA 1668A/1668C | PCB 40 |
| GC/HRMS | EPA 1668A/1668C | PCB 41 |
| GC/HRMS | EPA 1668A/1668C | PCB 42 |
| GC/HRMS | EPA 1668A/1668C | PCB 43 |
| GC/HRMS | EPA 1668A/1668C | PCB 44 |
| GC/HRMS | EPA 1668A/1668C | PCB 45 |
| GC/HRMS | EPA 1668A/1668C | PCB 46 |
| GC/HRMS | EPA 1668A/1668C | PCB 47 |
| GC/HRMS | EPA 1668A/1668C | PCB 48 |
| GC/HRMS | EPA 1668A/1668C | PCB 49 |
| GC/HRMS | EPA 1668A/1668C | PCB 50 |
| GC/HRMS | EPA 1668A/1668C | PCB 51 |
| GC/HRMS | EPA 1668A/1668C | PCB 52 |
| GC/HRMS | EPA 1668A/1668C | PCB 53 |






**ANAB**
*ANSI National Accreditation Board*

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| Non-Potable Water | | |
|---|---|---|
| **Technology** | **Method** | **Analyte** |
| GC/HRMS | EPA 1668A/1668C | PCB 54 |
| GC/HRMS | EPA 1668A/1668C | PCB 55 |
| GC/HRMS | EPA 1668A/1668C | PCB 56 |
| GC/HRMS | EPA 1668A/1668C | PCB 57 |
| GC/HRMS | EPA 1668A/1668C | PCB 58 |
| GC/HRMS | EPA 1668A/1668C | PCB 59 |
| GC/HRMS | EPA 1668A/1668C | PCB 60 |
| GC/HRMS | EPA 1668A/1668C | PCB 61 |
| GC/HRMS | EPA 1668A/1668C | PCB 62 |
| GC/HRMS | EPA 1668A/1668C | PCB 63 |
| GC/HRMS | EPA 1668A/1668C | PCB 64 |
| GC/HRMS | EPA 1668A/1668C | PCB 65 |
| GC/HRMS | EPA 1668A/1668C | PCB 66 |
| GC/HRMS | EPA 1668A/1668C | PCB 67 |
| GC/HRMS | EPA 1668A/1668C | PCB 68 |
| GC/HRMS | EPA 1668A/1668C | PCB 69 |
| GC/HRMS | EPA 1668A/1668C | PCB 70 |
| GC/HRMS | EPA 1668A/1668C | PCB 71 |
| GC/HRMS | EPA 1668A/1668C | PCB 72 |
| GC/HRMS | EPA 1668A/1668C | PCB 73 |
| GC/HRMS | EPA 1668A/1668C | PCB 74 |
| GC/HRMS | EPA 1668A/1668C | PCB 75 |
| GC/HRMS | EPA 1668A/1668C | PCB 76 |
| GC/HRMS | EPA 1668A/1668C | PCB 77 |
| GC/HRMS | EPA 1668A/1668C | PCB 78 |
| GC/HRMS | EPA 1668A/1668C | PCB 79 |
| GC/HRMS | EPA 1668A/1668C | PCB 80 |
| GC/HRMS | EPA 1668A/1668C | PCB 81 |
| GC/HRMS | EPA 1668A/1668C | PCB 82 |
| GC/HRMS | EPA 1668A/1668C | PCB 83 |
| GC/HRMS | EPA 1668A/1668C | PCB 84 |
| GC/HRMS | EPA 1668A/1668C | PCB 85 |
| GC/HRMS | EPA 1668A/1668C | PCB 86 |
| GC/HRMS | EPA 1668A/1668C | PCB 87 |
| GC/HRMS | EPA 1668A/1668C | PCB 88 |






ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| Non-Potable Water | | |
|---|---|---|
| **Technology** | **Method** | **Analyte** |
| GC/HRMS | EPA 1668A/1668C | PCB 89 |
| GC/HRMS | EPA 1668A/1668C | PCB 90 |
| GC/HRMS | EPA 1668A/1668C | PCB 91 |
| GC/HRMS | EPA 1668A/1668C | PCB 92 |
| GC/HRMS | EPA 1668A/1668C | PCB 93 |
| GC/HRMS | EPA 1668A/1668C | PCB 94 |
| GC/HRMS | EPA 1668A/1668C | PCB 95 |
| GC/HRMS | EPA 1668A/1668C | PCB 96 |
| GC/HRMS | EPA 1668A/1668C | PCB 97 |
| GC/HRMS | EPA 1668A/1668C | PCB 98 |
| GC/HRMS | EPA 1668A/1668C | PCB 99 |
| GC/HRMS | EPA 1668A/1668C | PCB 100 |
| GC/HRMS | EPA 1668A/1668C | PCB 101 |
| GC/HRMS | EPA 1668A/1668C | PCB 102 |
| GC/HRMS | EPA 1668A/1668C | PCB 103 |
| GC/HRMS | EPA 1668A/1668C | PCB 104 |
| GC/HRMS | EPA 1668A/1668C | PCB 105 |
| GC/HRMS | EPA 1668A/1668C | PCB 106 |
| GC/HRMS | EPA 1668A/1668C | PCB 107 |
| GC/HRMS | EPA 1668A/1668C | PCB 108 |
| GC/HRMS | EPA 1668A/1668C | PCB 109 |
| GC/HRMS | EPA 1668A/1668C | PCB 110 |
| GC/HRMS | EPA 1668A/1668C | PCB 111 |
| GC/HRMS | EPA 1668A/1668C | PCB 112 |
| GC/HRMS | EPA 1668A/1668C | PCB 113 |
| GC/HRMS | EPA 1668A/1668C | PCB 114 |
| GC/HRMS | EPA 1668A/1668C | PCB 115 |
| GC/HRMS | EPA 1668A/1668C | PCB 116 |
| GC/HRMS | EPA 1668A/1668C | PCB 117 |
| GC/HRMS | EPA 1668A/1668C | PCB 118 |
| GC/HRMS | EPA 1668A/1668C | PCB 119 |
| GC/HRMS | EPA 1668A/1668C | PCB 120 |
| GC/HRMS | EPA 1668A/1668C | PCB 121 |
| GC/HRMS | EPA 1668A/1668C | PCB 122 |
| GC/HRMS | EPA 1668A/1668C | PCB 123 |

 



ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| Non-Potable Water | | |
| --- | --- | --- |
| **Technology** | **Method** | **Analyte** |
| GC/HRMS | EPA 1668A/1668C | PCB 124 |
| GC/HRMS | EPA 1668A/1668C | PCB 125 |
| GC/HRMS | EPA 1668A/1668C | PCB 126 |
| GC/HRMS | EPA 1668A/1668C | PCB 127 |
| GC/HRMS | EPA 1668A/1668C | PCB 128 |
| GC/HRMS | EPA 1668A/1668C | PCB 129 |
| GC/HRMS | EPA 1668A/1668C | PCB 130 |
| GC/HRMS | EPA 1668A/1668C | PCB 131 |
| GC/HRMS | EPA 1668A/1668C | PCB 132 |
| GC/HRMS | EPA 1668A/1668C | PCB 133 |
| GC/HRMS | EPA 1668A/1668C | PCB 134 |
| GC/HRMS | EPA 1668A/1668C | PCB 135 |
| GC/HRMS | EPA 1668A/1668C | PCB 136 |
| GC/HRMS | EPA 1668A/1668C | PCB 137 |
| GC/HRMS | EPA 1668A/1668C | PCB 138 |
| GC/HRMS | EPA 1668A/1668C | PCB 139 |
| GC/HRMS | EPA 1668A/1668C | PCB 140 |
| GC/HRMS | EPA 1668A/1668C | PCB 141 |
| GC/HRMS | EPA 1668A/1668C | PCB 142 |
| GC/HRMS | EPA 1668A/1668C | PCB 143 |
| GC/HRMS | EPA 1668A/1668C | PCB 144 |
| GC/HRMS | EPA 1668A/1668C | PCB 145 |
| GC/HRMS | EPA 1668A/1668C | PCB 146 |
| GC/HRMS | EPA 1668A/1668C | PCB 147 |
| GC/HRMS | EPA 1668A/1668C | PCB 148 |
| GC/HRMS | EPA 1668A/1668C | PCB 149 |
| GC/HRMS | EPA 1668A/1668C | PCB 150 |
| GC/HRMS | EPA 1668A/1668C | PCB 151 |
| GC/HRMS | EPA 1668A/1668C | PCB 152 |
| GC/HRMS | EPA 1668A/1668C | PCB 153 |
| GC/HRMS | EPA 1668A/1668C | PCB 154 |
| GC/HRMS | EPA 1668A/1668C | PCB 155 |
| GC/HRMS | EPA 1668A/1668C | PCB 156 |
| GC/HRMS | EPA 1668A/1668C | PCB 157 |
| GC/HRMS | EPA 1668A/1668C | PCB 158 |






ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| Non-Potable Water | | |
|---|---|---|
| **Technology** | **Method** | **Analyte** |
| GC/HRMS | EPA 1668A/1668C | PCB 159 |
| GC/HRMS | EPA 1668A/1668C | PCB 160 |
| GC/HRMS | EPA 1668A/1668C | PCB 161 |
| GC/HRMS | EPA 1668A/1668C | PCB 162 |
| GC/HRMS | EPA 1668A/1668C | PCB 163 |
| GC/HRMS | EPA 1668A/1668C | PCB 164 |
| GC/HRMS | EPA 1668A/1668C | PCB 165 |
| GC/HRMS | EPA 1668A/1668C | PCB 166 |
| GC/HRMS | EPA 1668A/1668C | PCB 167 |
| GC/HRMS | EPA 1668A/1668C | PCB 168 |
| GC/HRMS | EPA 1668A/1668C | PCB 169 |
| GC/HRMS | EPA 1668A/1668C | PCB 170 |
| GC/HRMS | EPA 1668A/1668C | PCB 171 |
| GC/HRMS | EPA 1668A/1668C | PCB 172 |
| GC/HRMS | EPA 1668A/1668C | PCB 173 |
| GC/HRMS | EPA 1668A/1668C | PCB 174 |
| GC/HRMS | EPA 1668A/1668C | PCB 175 |
| GC/HRMS | EPA 1668A/1668C | PCB 176 |
| GC/HRMS | EPA 1668A/1668C | PCB 177 |
| GC/HRMS | EPA 1668A/1668C | PCB 178 |
| GC/HRMS | EPA 1668A/1668C | PCB 179 |
| GC/HRMS | EPA 1668A/1668C | PCB 180 |
| GC/HRMS | EPA 1668A/1668C | PCB 181 |
| GC/HRMS | EPA 1668A/1668C | PCB 182 |
| GC/HRMS | EPA 1668A/1668C | PCB 183 |
| GC/HRMS | EPA 1668A/1668C | PCB 184 |
| GC/HRMS | EPA 1668A/1668C | PCB 185 |
| GC/HRMS | EPA 1668A/1668C | PCB 186 |
| GC/HRMS | EPA 1668A/1668C | PCB 187 |
| GC/HRMS | EPA 1668A/1668C | PCB 188 |
| GC/HRMS | EPA 1668A/1668C | PCB 189 |
| GC/HRMS | EPA 1668A/1668C | PCB 190 |
| GC/HRMS | EPA 1668A/1668C | PCB 191 |
| GC/HRMS | EPA 1668A/1668C | PCB 192 |

Version 017   Issued: July 12, 2023          www.anab.org

 



**ANAB**
*ANSI National Accreditation Board*

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

### Non-Potable Water

| Technology | Method | Analyte |
|---|---|---|
| GC/HRMS | EPA 1668A/1668C | PCB 193 |
| GC/HRMS | EPA 1668A/1668C | PCB 194 |
| GC/HRMS | EPA 1668A/1668C | PCB 195 |
| GC/HRMS | EPA 1668A/1668C | PCB 196 |
| GC/HRMS | EPA 1668A/1668C | PCB 197 |
| GC/HRMS | EPA 1668A/1668C | PCB 198 |
| GC/HRMS | EPA 1668A/1668C | PCB 199 |
| GC/HRMS | EPA 1668A/1668C | PCB 200 |
| GC/HRMS | EPA 1668A/1668C | PCB 201 |
| GC/HRMS | EPA 1668A/1668C | PCB 202 |
| GC/HRMS | EPA 1668A/1668C | PCB 203 |
| GC/HRMS | EPA 1668A/1668C | PCB 204 |
| GC/HRMS | EPA 1668A/1668C | PCB 205 |
| GC/HRMS | EPA 1668A/1668C | PCB 206 |
| GC/HRMS | EPA 1668A/1668C | PCB 207 |
| GC/HRMS | EPA 1668A/1668C | PCB 208 |
| GC/HRMS | EPA 1668A/1668C | PCB 209 |
| **Preparation** | **Method** | **Type** |
| Separatory Funnel Liquid-Liquid Extraction | EPA 3510C | Semivolatile and Non-Volatile Organics |
| Solid Phase Extraction | EPA 3535A | Semivolatile and Non-Volatile Organics |

### Drinking Water

| Technology | Method | Analyte |
|---|---|---|
| LC/MS/MS | EPA 537 | Perfluorobutanesulfonic acid (PFBS) |
| LC/MS/MS | EPA 537 | Perfluorohexanesulfonic acid (PFHxS) |
| LC/MS/MS | EPA 537 | Perfluorohexane Sulfonic Acid (PFHxS) |
| LC/MS/MS | EPA 537 | Perfluorononanoic acid (PFNA) |
| LC/MS/MS | EPA 537 | Perfluorooctanoic acid (PFOA) |
| LC/MS/MS | EPA 537 | Perfluorooctanesulfonic acid (PFOS) |
| LC/MS/MS | EPA 537 | Perfluorodecanoic acid (PFDA) |
| LC/MS/MS | EPA 537 | Perfluorododecanoic acid (PFDoA) |
| LC/MS/MS | EPA 537 | Perfluorohexanoic acid (PFHxA) |





**ANSI** National Accreditation Board

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| Drinking Water | | |
|---|---|---|
| **Technology** | **Method** | **Analyte** |
| LC/MS/MS | EPA 537 | Perfluorotetradecanoic acid (PFTeDA) |
| LC/MS/MS | EPA 537 | Perfluorotridecanoic acid (PFTrDA) |
| LC/MS/MS | EPA 537 | Perfluoroundecanoic acid (PFUnA) |
| LC/MS/MS | EPA 537 | N-Ethyl perfluorooctanesulfon amidoacetic acid (NEtFOSAA, EtFOSAA) |
| LC/MS/MS | EPA 537 | N-Methyl perfluorooctanesulfon amidoacetic acid (NMeFOSAA, MeFOSAA) |
| LC/MS/MS | EPA 537.1 | Perfluorodecanoic acid (PFDA) |
| LC/MS/MS | EPA 537.1 | Perfluorododecanoic acid (PFDoA) |
| LC/MS/MS | EPA 537.1 | Perfluorohexanoic acid (PFHxA) |
| LC/MS/MS | EPA 537.1 | Perfluorotetradecanoic acid (PFTeDA) |
| LC/MS/MS | EPA 537.1 | Perfluorotridecanoic acid (PFTrDA) |
| LC/MS/MS | EPA 537.1 | Perfluoroundecanoic acid (PFUnA) |
| LC/MS/MS | EPA 537.1 | N-Ethyl perfluorooctanesulfon amidoacetic acid (NEtFOSAA, EtFOSAA) |
| LC/MS/MS | EPA 537.1 | N-Methyl perfluorooctanesulfon amidoacetic acid (NMeFOSAA, MeFOSAA) |
| LC/MS/MS | EPA 537.1 | Perfluoroheptanoic acid (PFHpA) |
| LC/MS/MS | EPA 537.1 | Perfluorooctanoic acid (PFOA) |
| LC/MS/MS | EPA 537.1 | Perfluorononanoic acid (PFNA) |
| LC/MS/MS | EPA 537.1 | Perfluorobutanesulfonic acid (PFBS) |
| LC/MS/MS | EPA 537.1 | Perfluorohexanesulfonic acid (PFHxS) |
| LC/MS/MS | EPA 537.1 | Perfluorooctanesulfonic acid (PFOS) |
| LC/MS/MS | EPA 537.1 | Hexafluoropropylene Oxide Dimer Acid (HFPO-DA) |
| LC/MS/MS | EPA 537.1 | 9-Chlorohexadecafluoro-3-oxanonane-1-sulfonic acid (9Cl-PF3ONS) |
| LC/MS/MS | EPA 537.1 | 11-Chloroeicosafluoro-3-oxaundecane-1-sulfonic acid (11C1-PF3OUdS) |
| LC/MS/MS | EPA 537.1 | 4,8-Dioxa-3H-perfluoronanoic Acid (ADONA) |
| LC/MS/MS | EPA 533 | 11-Chloroeicosafluoro-3-oxaundecane-1-sulfonic acid (11C1-PF3OUdS) |
| LC/MS/MS | EPA 533 | 8:2 Fluorotelomer sulfonic acid (1H,1H,2H,2H-perfluorodecane sulfonic acid) (8:2 FTS) |






ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| Drinking Water | | |
|---|---|---|
| **Technology** | **Method** | **Analyte** |
| LC/MS/MS | EPA 533 | 4:2 Fluorotelomer sulfonic acid (1H, 1H,2H,2H-perfluorohexane sulfonic acid) (4:2 FTS) |
| LC/MS/MS | EPA 533 | 6:2 Fluorotelomer sulfonic acid (1H,1H,2H,2H-perfluorooctane sulfonic acid) (6:2 FTS) |
| LC/MS/MS | EPA 533 | 4,8-Dioxa-3H-perfluorononanoic acid (DONA) |
| LC/MS/MS | EPA 533 | 9-Chlorohexadecafluoro-3-oxanonane-1-sulfonic acid (9Cl-PF3ONS) |
| LC/MS/MS | EPA 533 | Hexafluoropropylene oxide dimer acid (HFPO-DA, GenX) (Perfluoro-2-propoxypropionic acid) |
| LC/MS/MS | EPA 533 | Nonafluoro-3,6-dioxaheptanoic acid (NFDHA) |
| LC/MS/MS | EPA 533 | Perfluoro (2-ethoxyethane) sulfonic acid (PFEESA) |
| LC/MS/MS | EPA 533 | Perfluoro-3-methoxypropanoic acid (PFMPA) |
| LC/MS/MS | EPA 533 | Perfluoro-4-methoxybutanoic acid  (PFMBA) |
| LC/MS/MS | EPA 533 | Perfluorobutanesulfonic acid (PFBS) |
| LC/MS/MS | EPA 533 | Perfluorobutanoic acid (PFBA) |
| LC/MS/MS | EPA 533 | Perfluorodecanoic acid (PFDA) |
| LC/MS/MS | EPA 533 | Perfluorododecanoic acid (PFDoA) |
| LC/MS/MS | EPA 533 | Perfluoroheptanesulfonic acid (PFHpS) |
| LC/MS/MS | EPA 533 | Perfluoroheptanoic acid (PFHpA) |
| LC/MS/MS | EPA 533 | Perfluorohexanesulfonic acid (PFHxS) |
| LC/MS/MS | EPA 533 | Perfluorohexanoic acid (PFHxA) |
| LC/MS/MS | EPA 533 | Perfluorononanoic acid (PFNA) |
| LC/MS/MS | EPA 533 | Perfluorooctanesulfonic acid  (PFOS) |
| LC/MS/MS | EPA 533 | Perfluorooctanoic acid (PFOA) |
| LC/MS/MS | EPA 533 | Perfluoropentanesulfonic acid (PFPeS) |
| LC/MS/MS | EPA 533 | Perfluoropentanoic acid (PFPeA) |
| LC/MS/MS | EPA 533 | Perfluoroundecanoic acid (PFUnA) |
| **Preparation** | **Method** | **Type** |
| Solid Phase Extraction | EPA 537/537.1/533 | Perfluoro compounds in Drinking Water |





**ANSI** National Accreditation Board

| Solid and Chemical Materials | | |
|---|---|---|
| **Technology** | **Method** | **Analyte** |
| LC/MS/MS | EPA 6850 | Perchlorate |
| Gravimetric | ASTM D2216 | %Moisture |
| GC/HRMS | EPA 8290/ 8290A/1613B | 2,3,7,8-TeCDD |
| GC/HRMS | EPA 8290/ 8290A/1613B | 1,2,3,7,8-PeCDD |
| GC/HRMS | EPA 8290/ 8290A/1613B | 1,2,3,4,7,8-HxCDD |
| GC/HRMS | EPA 8290/ 8290A/1613B | 1,2,3,6,7,8-HxCDD |
| GC/HRMS | EPA 8290/ 8290A/1613B | 1,2,3,7,8,9-HxCDD |
| GC/HRMS | EPA 8290/ 8290A/1613B | 1,2,3,4,6,7,8-HpCDD |
| GC/HRMS | EPA 8290/ 8290A/1613B | OCDD |
| GC/HRMS | EPA 8290/ 8290A/1613B | 2,3,7,8-TeCDF |
| GC/HRMS | EPA 8290/ 8290A/1613B | 1,2,3,7,8-PeCDF |
| GC/HRMS | EPA 8290/ 8290A/1613B | 2,3,4,7,8-PeCDF |
| GC/HRMS | EPA 8290/ 8290A/1613B | 1,2,3,4,7,8-HxCDF |
| GC/HRMS | EPA 8290/ 8290A/1613B | 1,2,3,6,7,8-HxCDF |
| GC/HRMS | EPA 8290/ 8290A/1613B | 1,2,3,7,8,9-HxCDF |
| GC/HRMS | EPA 8290/ 8290A/1613B | 2,3,4,6,7,8-HxCDF |
| GC/HRMS | EPA 8290/ 8290A/1613B | 1,2,3,4,6,7,8-HpCDF |
| GC/HRMS | EPA 8290/ 8290A/1613B | 1,2,3,4,7,8,9-HpCDF |
| GC/HRMS | EPA 8290/ 8290A/1613B | OCDF |
| GC/HRMS | EPA 8290/ 8290A/1613B | Total TCDD |
| GC/HRMS | EPA 8290/ 8290A/1613B | Total PeCDD |
| GC/HRMS | EPA 8290/ 8290A/1613B | Total HxCDD |
| GC/HRMS | EPA 8290/ 8290A/1613B | Total HpCDD |
| GC/HRMS | EPA 8290/ 8290A/1613B | Total TCDF |
| GC/HRMS | EPA 8290/ 8290A/1613B | Total PeCDF |
| GC/HRMS | EPA 8290/ 8290A/1613B | Total HxCDF |
| GC/HRMS | EPA 8290/ 8290A/1613B | Total HpCDF |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | 6:2 Fluorotelomer sulfonic acid (1H,1H,2H,2H-perfluorooctane sulfonic acid) (6:2 FTS) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | 8:2 Fluorotelomer sulfonic acid (1H,1H,2H,2H-perfluorodecane sulfonic acid) (8:2 FTS) |

 

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844



**ANAB**
*ANSI National Accreditation Board*

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| Solid and Chemical Materials | | |
|---|---|---|
| **Technology** | **Method** | **Analyte** |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | N-Ethyl perfluorooctanesulfon amidoacetic acid (NEtFOSAA, EtFOSAA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | N-Methyl perfluorooctanesulfon amidoacetic acid (NMeFOSAA, MeFOSAA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluorooctanoic acid (PFOA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluorooctanesulfonic acid (PFOS) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluorobutanoic acid (PFBA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluoropentanoic acid (PFPA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluorohexanoic acid (PFHxA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluoroheptanoic acid (PFHpA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluorononanoic acid (PFNA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluorodecanoic acid (PFDA) |






ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| Solid and Chemical Materials | | |
|---|---|---|
| **Technology** | **Method** | **Analyte** |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluoroundecanoic acid (PFUnA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluorododecanoic acid (PFDoA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluorotridecanoic acid (PFTrDA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluorotetradecanoic acid (PFTeDA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluorobutanesulfonic acid (PFBS) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluorohexanesulfonic acid (PFHxS) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluoroheptanesulfonic acid (PFHpS) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluorodecanesulfonic acid (PFDS) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluorooctanesulfonamide (PFOSA, FOSA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | 4:2 Fluorotelomer sulfonic acid (1H, 1H,2H,2H-perfluorohexane sulfonic acid) (4:2 FTS) |

 



**ANAB**
*ANSI National Accreditation Board*

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| Solid and Chemical Materials | | |
|---|---|---|
| **Technology** | **Method** | **Analyte** |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | 10:2 Fluorotelomer sulfonic acid (1H, 1H,2H,2H-perfluorododecane sulfonic acid) (10:2 FTS) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluorohexadecanoic acid (PFHxDA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluoropentanesulfonic acid (PFPeS) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluorononanesulfonic acid (PFNS) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | 4,8-Dioxa-3H-perfluorononanoic acid (ADONA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Hexafluoropropylene oxide dimer acid (HFPO-DA, GenX) (Perfluoro-2-propoxypropionic acid) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | 9-Chlorohexadecafluoro-3-oxanonane-1-sulfonic acid (9Cl-PF3ONS) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | 11-Chloroeicosafluoro-3-oxaundecane-1-sulfonic acid (11C1-PF3OUdS) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluorododecanesulfonic acid (PFDoS) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluorooctadecanoic acid (PFODA) |






**ANAB**
*ANSI National Accreditation Board*

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| Solid and Chemical Materials | | |
|---|---|---|
| **Technology** | **Method** | **Analyte** |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluoro-4-ethylcyclohexanesulfonic acid (PFecHS) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluoro-1-propanesulfonic acid (PFPrS) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | N-Ethylperfluorooctane sulfonamide (NEtFOSA ,EtFOSA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | N-Methylperfluorooctane sulfonamide (NMeFOSA, MeFOSA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | N-Ethylperfluorooctane sulfonamido ethanol (NEtFOSE EtFOSE) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | N-Methylperfluorooctane sulfonamido ethanol (NMeFOSe, MeFOSE) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | 4,4,5,5,6,6,6-Heptafluorohexanoic acid (3-Perfluoropropyl propanoic acid ) (3:3 FTCA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | 2H,2H,3H,3H-Perfluorooctanoic acid (5:3 FTCA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | 2H,2H,3H,3H-Perfluorodecanoic acid (3-Perfluoroheptyl propanoic acid) (7:3 FTCA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | 2-Perfluorohexylethanoic acid (6:2 FTCA) |

Version 017   Issued: July 12, 2023          www.anab.org

 



**ANAB**
**ANSI** National Accreditation Board

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| Solid and Chemical Materials | | |
|---|---|---|
| **Technology** | **Method** | **Analyte** |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | 2-Perfluorooctylethanoic acid (8:2 FTCA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | 2-Perfluorodecylethanoic acid (10:2 FTCA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluoropropionic acid (PPF Acid, PFPrA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluoro-3-methoxypropanoic acid (PFMPA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluoro-4-methoxybutanoic acid (PFMBA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Nonafluoro-3,6-dioxaheptanoic acid (NFDHA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluoro(2-ethoxyethane) sulfonic acid (PFEESA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Difluoro(perfluoromethoxy)acetic acid (PFMOAA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluoro-4-isopropoxybutanoic acid (PFECA G, PFPE-1) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluoro-3,5,7,9-butaoxadecanoic acid (PFO4DA) |






ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| Solid and Chemical Materials | | |
|---|---|---|
| **Technology** | **Method** | **Analyte** |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluoro-3,5,7-trioxaoctanoic acid   (PFO3OA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluoro-3,5-dioxahexanoic acid  (PFO2HXA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluoro-2-{[perfluoro-3-(perfluoroethoxy)-2-propanyl]oxy}ethanesulfonic acid (Hydro-PS Acid) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluoro-3,5,7,9,11-pentaoxadodecanoic acid (PFO5DoA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluoro-2-(perfluoromethoxy)propanoic acid (PMPA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | 2,3,3,3-Tetrafluoro-2-(pentafluoroethoxy)propanoic acid (PEPA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | 4-(2-carboxy-1,1,2,2-tetrafluoroethoxy)-2,2,3,3,4,5,5,5-octafluoro-pentanoic acid (R-EVE) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | 1,1,2,2-Tetrafluoro-2-(1,2,2,2-tetrafluoroethoxy)ethane-1-sulfonic acid (NVHOS) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | 2,2,3,3-Tetrafluoro-3-{[1,1,1,2,3,3-hexafluoro-3-(1,2,2,2-tetrafluoroethoxy)propan-2-yl]oxy}propanoic acid (Hydro-EVE Acid) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | 1,1,2,2-tetrafluoro-2-[1,2,2,3,3-pentafluoro-1-(trifluoromethyl)propoxy]ethanesulfonic acid (R-PSDCA) |

Version 017   Issued: July 12, 2023

 



**ANAB**
*ANSI National Accreditation Board*

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| Solid and Chemical Materials | | |
| --- | --- | --- |
| **Technology** | **Method** | **Analyte** |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | 1$H$,1$H$, 2$H$, 2$H$-Perfluorooctane sulfonic acid (6:2FTS) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | 1$H$,1$H$, 2$H$, 2$H$-Perfluorodecane sulfonic acid (8:2FTS) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | N-ethyl perfluorooctanesulfonamidoacetic acid (NEtFOSAA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | N-methyl perfluorooctanesulfonamidoacetic acid (NMeFOSAA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluorooctanoic acid (PFOA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluorooctanesulfonic acid (PFOS) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluorobutanoic acid (PFBA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluoropentanoic acid (PFPeA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluorohexanoic acid (PFHxA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluoroheptanoic acid (PFHpA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluorononanoic acid (PFNA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluorodecanoic acid (PFDA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluoroundecanoic acid (PFUnA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluorododecanoic acid (PFDoA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluorotridecanoic acid (PFTrDA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluorotetradecanoic acid (PFTeDA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluorobutanesulfonic acid (PFBS) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluorohexanesulfonic acid (PFHxS) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluoroheptanesulfonic acid (PFHpS) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluorodecanesulfonic acid (PFDS) |





**ANAB**
**ANSI** National Accreditation Board

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| Solid and Chemical Materials | | |
|---|---|---|
| **Technology** | **Method** | **Analyte** |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluorooctanesulfonamide (PFOSA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | 1$H$,1$H$, 2$H$, 2$H$-Perfluorohexane sulfonic acid (4:2FTS) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluoropentanesulfonic acid (PFPeS) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluorononanesulfonic acid (PFNS) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | 4,8-Dioxa-3$H$-perfluorononanoic acid (ADONA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Hexafluoropropylene oxide dimer acid (HFPO-DA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | 9-Chlorohexadecafluoro-3-oxanonane-1-sulfonic acid (9Cl-PF3ONS) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | 11-Chloroeicosafluoro-3-oxaundecane-1-sulfonic acid (11Cl-PF3OUdS) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluorododecanesulfonic acid (PFDoS) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | N-ethyl perfluorooctanesulfonamide (NEtFOSA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | N-methyl perfluorooctanesulfonamide (NMeFOSA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | N-ethyl perfluorooctanesulfonamidoethanol (NEtFOSE) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | N-methyl perfluorooctanesulfonamidoethanol (NMeFOSE) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | 3-Perfluoropropyl propanoic acid (3:3FTCA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | 2$H$,2$H$,3$H$,3$H$-Perfluorooctanoic acid (5:3FTCA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | 3-Perfluoroheptyl propanoic acid (7:3FTCA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluoro-3-methoxypropanoic acid (PFMPA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluoro-4-methoxybutanoic acid (PFMBA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Nonafluoro-3,6-dioxaheptanoic acid (NFDHA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluoro(2-ethoxyethane)sulfonic acid (PFEESA) |
| GC/HRMS | EPA 1668A/1668C | PCB 1 |

 



**ANAB**
*ANSI National Accreditation Board*

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| Solid and Chemical Materials | | |
|---|---|---|
| **Technology** | **Method** | **Analyte** |
| GC/HRMS | EPA 1668A/1668C | PCB 2 |
| GC/HRMS | EPA 1668A/1668C | PCB 3 |
| GC/HRMS | EPA 1668A/1668C | PCB 4 |
| GC/HRMS | EPA 1668A/1668C | PCB 5 |
| GC/HRMS | EPA 1668A/1668C | PCB 6 |
| GC/HRMS | EPA 1668A/1668C | PCB 7 |
| GC/HRMS | EPA 1668A/1668C | PCB 8 |
| GC/HRMS | EPA 1668A/1668C | PCB 9 |
| GC/HRMS | EPA 1668A/1668C | PCB 10 |
| GC/HRMS | EPA 1668A/1668C | PCB 11 |
| GC/HRMS | EPA 1668A/1668C | PCB 12 |
| GC/HRMS | EPA 1668A/1668C | PCB 13 |
| GC/HRMS | EPA 1668A/1668C | PCB 14 |
| GC/HRMS | EPA 1668A/1668C | PCB 15 |
| GC/HRMS | EPA 1668A/1668C | PCB 16 |
| GC/HRMS | EPA 1668A/1668C | PCB 17 |
| GC/HRMS | EPA 1668A/1668C | PCB 18 |
| GC/HRMS | EPA 1668A/1668C | PCB 19 |
| GC/HRMS | EPA 1668A/1668C | PCB 20 |
| GC/HRMS | EPA 1668A/1668C | PCB 21 |
| GC/HRMS | EPA 1668A/1668C | PCB 22 |
| GC/HRMS | EPA 1668A/1668C | PCB 23 |
| GC/HRMS | EPA 1668A/1668C | PCB 24 |
| GC/HRMS | EPA 1668A/1668C | PCB 25 |
| GC/HRMS | EPA 1668A/1668C | PCB 26 |
| GC/HRMS | EPA 1668A/1668C | PCB 27 |
| GC/HRMS | EPA 1668A/1668C | PCB 28 |
| GC/HRMS | EPA 1668A/1668C | PCB 29 |
| GC/HRMS | EPA 1668A/1668C | PCB 30 |
| GC/HRMS | EPA 1668A/1668C | PCB 32 |
| GC/HRMS | EPA 1668A/1668C | PCB 31 |
| GC/HRMS | EPA 1668A/1668C | PCB 33 |
| GC/HRMS | EPA 1668A/1668C | PCB 34 |
| GC/HRMS | EPA 1668A/1668C | PCB 35 |
| GC/HRMS | EPA 1668A/1668C | PCB 36 |

Version 017   Issued: July 12, 2023          www.anab.org

 



**ANAB**
*ANSI National Accreditation Board*

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| Solid and Chemical Materials | | |
| --- | --- | --- |
| **Technology** | **Method** | **Analyte** |
| GC/HRMS | EPA 1668A/1668C | PCB 37 |
| GC/HRMS | EPA 1668A/1668C | PCB 38 |
| GC/HRMS | EPA 1668A/1668C | PCB 39 |
| GC/HRMS | EPA 1668A/1668C | PCB 40 |
| GC/HRMS | EPA 1668A/1668C | PCB 41 |
| GC/HRMS | EPA 1668A/1668C | PCB 42 |
| GC/HRMS | EPA 1668A/1668C | PCB 43 |
| GC/HRMS | EPA 1668A/1668C | PCB 44 |
| GC/HRMS | EPA 1668A/1668C | PCB 45 |
| GC/HRMS | EPA 1668A/1668C | PCB 46 |
| GC/HRMS | EPA 1668A/1668C | PCB 47 |
| GC/HRMS | EPA 1668A/1668C | PCB 48 |
| GC/HRMS | EPA 1668A/1668C | PCB 49 |
| GC/HRMS | EPA 1668A/1668C | PCB 50 |
| GC/HRMS | EPA 1668A/1668C | PCB 51 |
| GC/HRMS | EPA 1668A/1668C | PCB 52 |
| GC/HRMS | EPA 1668A/1668C | PCB 53 |
| GC/HRMS | EPA 1668A/1668C | PCB 54 |
| GC/HRMS | EPA 1668A/1668C | PCB 55 |
| GC/HRMS | EPA 1668A/1668C | PCB 56 |
| GC/HRMS | EPA 1668A/1668C | PCB 57 |
| GC/HRMS | EPA 1668A/1668C | PCB 58 |
| GC/HRMS | EPA 1668A/1668C | PCB 59 |
| GC/HRMS | EPA 1668A/1668C | PCB 60 |
| GC/HRMS | EPA 1668A/1668C | PCB 61 |
| GC/HRMS | EPA 1668A/1668C | PCB 62 |
| GC/HRMS | EPA 1668A/1668C | PCB 63 |
| GC/HRMS | EPA 1668A/1668C | PCB 64 |
| GC/HRMS | EPA 1668A/1668C | PCB 65 |
| GC/HRMS | EPA 1668A/1668C | PCB 66 |
| GC/HRMS | EPA 1668A/1668C | PCB 67 |
| GC/HRMS | EPA 1668A/1668C | PCB 68 |
| GC/HRMS | EPA 1668A/1668C | PCB 69 |
| GC/HRMS | EPA 1668A/1668C | PCB 70 |
| GC/HRMS | EPA 1668A/1668C | PCB 71 |






**ANAB**
**ANSI** *National Accreditation Board*

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| Solid and Chemical Materials | | |
|---|---|---|
| **Technology** | **Method** | **Analyte** |
| GC/HRMS | EPA 1668A/1668C | PCB 72 |
| GC/HRMS | EPA 1668A/1668C | PCB 73 |
| GC/HRMS | EPA 1668A/1668C | PCB 74 |
| GC/HRMS | EPA 1668A/1668C | PCB 75 |
| GC/HRMS | EPA 1668A/1668C | PCB 76 |
| GC/HRMS | EPA 1668A/1668C | PCB 77 |
| GC/HRMS | EPA 1668A/1668C | PCB 78 |
| GC/HRMS | EPA 1668A/1668C | PCB 79 |
| GC/HRMS | EPA 1668A/1668C | PCB 80 |
| GC/HRMS | EPA 1668A/1668C | PCB 81 |
| GC/HRMS | EPA 1668A/1668C | PCB 82 |
| GC/HRMS | EPA 1668A/1668C | PCB 83 |
| GC/HRMS | EPA 1668A/1668C | PCB 84 |
| GC/HRMS | EPA 1668A/1668C | PCB 85 |
| GC/HRMS | EPA 1668A/1668C | PCB 86 |
| GC/HRMS | EPA 1668A/1668C | PCB 87 |
| GC/HRMS | EPA 1668A/1668C | PCB 88 |
| GC/HRMS | EPA 1668A/1668C | PCB 89 |
| GC/HRMS | EPA 1668A/1668C | PCB 90 |
| GC/HRMS | EPA 1668A/1668C | PCB 91 |
| GC/HRMS | EPA 1668A/1668C | PCB 92 |
| GC/HRMS | EPA 1668A/1668C | PCB 93 |
| GC/HRMS | EPA 1668A/1668C | PCB 94 |
| GC/HRMS | EPA 1668A/1668C | PCB 95 |
| GC/HRMS | EPA 1668A/1668C | PCB 96 |
| GC/HRMS | EPA 1668A/1668C | PCB 97 |
| GC/HRMS | EPA 1668A/1668C | PCB 98 |
| GC/HRMS | EPA 1668A/1668C | PCB 99 |
| GC/HRMS | EPA 1668A/1668C | PCB 100 |
| GC/HRMS | EPA 1668A/1668C | PCB 101 |
| GC/HRMS | EPA 1668A/1668C | PCB 102 |
| GC/HRMS | EPA 1668A/1668C | PCB 103 |
| GC/HRMS | EPA 1668A/1668C | PCB 104 |
| GC/HRMS | EPA 1668A/1668C | PCB 105 |
| GC/HRMS | EPA 1668A/1668C | PCB 106 |






ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| Solid and Chemical Materials | | |
| --- | --- | --- |
| **Technology** | **Method** | **Analyte** |
| GC/HRMS | EPA 1668A/1668C | PCB 107 |
| GC/HRMS | EPA 1668A/1668C | PCB 108 |
| GC/HRMS | EPA 1668A/1668C | PCB 109 |
| GC/HRMS | EPA 1668A/1668C | PCB 110 |
| GC/HRMS | EPA 1668A/1668C | PCB 111 |
| GC/HRMS | EPA 1668A/1668C | PCB 112 |
| GC/HRMS | EPA 1668A/1668C | PCB 113 |
| GC/HRMS | EPA 1668A/1668C | PCB 114 |
| GC/HRMS | EPA 1668A/1668C | PCB 115 |
| GC/HRMS | EPA 1668A/1668C | PCB 116 |
| GC/HRMS | EPA 1668A/1668C | PCB 117 |
| GC/HRMS | EPA 1668A/1668C | PCB 118 |
| GC/HRMS | EPA 1668A/1668C | PCB 119 |
| GC/HRMS | EPA 1668A/1668C | PCB 120 |
| GC/HRMS | EPA 1668A/1668C | PCB 121 |
| GC/HRMS | EPA 1668A/1668C | PCB 122 |
| GC/HRMS | EPA 1668A/1668C | PCB 123 |
| GC/HRMS | EPA 1668A/1668C | PCB 124 |
| GC/HRMS | EPA 1668A/1668C | PCB 125 |
| GC/HRMS | EPA 1668A/1668C | PCB 126 |
| GC/HRMS | EPA 1668A/1668C | PCB 127 |
| GC/HRMS | EPA 1668A/1668C | PCB 128 |
| GC/HRMS | EPA 1668A/1668C | PCB 129 |
| GC/HRMS | EPA 1668A/1668C | PCB 130 |
| GC/HRMS | EPA 1668A/1668C | PCB 131 |
| GC/HRMS | EPA 1668A/1668C | PCB 132 |
| GC/HRMS | EPA 1668A/1668C | PCB 133 |
| GC/HRMS | EPA 1668A/1668C | PCB 134 |
| GC/HRMS | EPA 1668A/1668C | PCB 135 |
| GC/HRMS | EPA 1668A/1668C | PCB 136 |
| GC/HRMS | EPA 1668A/1668C | PCB 137 |
| GC/HRMS | EPA 1668A/1668C | PCB 138 |
| GC/HRMS | EPA 1668A/1668C | PCB 139 |
| GC/HRMS | EPA 1668A/1668C | PCB 140 |
| GC/HRMS | EPA 1668A/1668C | PCB 141 |

 



ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| Solid and Chemical Materials | | |
|---|---|---|
| **Technology** | **Method** | **Analyte** |
| GC/HRMS | EPA 1668A/1668C | PCB 142 |
| GC/HRMS | EPA 1668A/1668C | PCB 143 |
| GC/HRMS | EPA 1668A/1668C | PCB 144 |
| GC/HRMS | EPA 1668A/1668C | PCB 145 |
| GC/HRMS | EPA 1668A/1668C | PCB 146 |
| GC/HRMS | EPA 1668A/1668C | PCB 147 |
| GC/HRMS | EPA 1668A/1668C | PCB 148 |
| GC/HRMS | EPA 1668A/1668C | PCB 149 |
| GC/HRMS | EPA 1668A/1668C | PCB 150 |
| GC/HRMS | EPA 1668A/1668C | PCB 151 |
| GC/HRMS | EPA 1668A/1668C | PCB 152 |
| GC/HRMS | EPA 1668A/1668C | PCB 153 |
| GC/HRMS | EPA 1668A/1668C | PCB 154 |
| GC/HRMS | EPA 1668A/1668C | PCB 155 |
| GC/HRMS | EPA 1668A/1668C | PCB 156 |
| GC/HRMS | EPA 1668A/1668C | PCB 157 |
| GC/HRMS | EPA 1668A/1668C | PCB 158 |
| GC/HRMS | EPA 1668A/1668C | PCB 159 |
| GC/HRMS | EPA 1668A/1668C | PCB 160 |
| GC/HRMS | EPA 1668A/1668C | PCB 161 |
| GC/HRMS | EPA 1668A/1668C | PCB 162 |
| GC/HRMS | EPA 1668A/1668C | PCB 163 |
| GC/HRMS | EPA 1668A/1668C | PCB 164 |
| GC/HRMS | EPA 1668A/1668C | PCB 165 |
| GC/HRMS | EPA 1668A/1668C | PCB 166 |
| GC/HRMS | EPA 1668A/1668C | PCB 167 |
| GC/HRMS | EPA 1668A/1668C | PCB 168 |
| GC/HRMS | EPA 1668A/1668C | PCB 169 |
| GC/HRMS | EPA 1668A/1668C | PCB 170 |
| GC/HRMS | EPA 1668A/1668C | PCB 171 |
| GC/HRMS | EPA 1668A/1668C | PCB 172 |
| GC/HRMS | EPA 1668A/1668C | PCB 173 |
| GC/HRMS | EPA 1668A/1668C | PCB 174 |
| GC/HRMS | EPA 1668A/1668C | PCB 175 |
| GC/HRMS | EPA 1668A/1668C | PCB 176 |






ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| Solid and Chemical Materials | | |
|---|---|---|
| **Technology** | **Method** | **Analyte** |
| GC/HRMS | EPA 1668A/1668C | PCB 177 |
| GC/HRMS | EPA 1668A/1668C | PCB 178 |
| GC/HRMS | EPA 1668A/1668C | PCB 179 |
| GC/HRMS | EPA 1668A/1668C | PCB 180 |
| GC/HRMS | EPA 1668A/1668C | PCB 181 |
| GC/HRMS | EPA 1668A/1668C | PCB 182 |
| GC/HRMS | EPA 1668A/1668C | PCB 183 |
| GC/HRMS | EPA 1668A/1668C | PCB 184 |
| GC/HRMS | EPA 1668A/1668C | PCB 185 |
| GC/HRMS | EPA 1668A/1668C | PCB 186 |
| GC/HRMS | EPA 1668A/1668C | PCB 187 |
| GC/HRMS | EPA 1668A/1668C | PCB 188 |
| GC/HRMS | EPA 1668A/1668C | PCB 189 |
| GC/HRMS | EPA 1668A/1668C | PCB 190 |
| GC/HRMS | EPA 1668A/1668C | PCB 191 |
| GC/HRMS | EPA 1668A/1668C | PCB 192 |
| GC/HRMS | EPA 1668A/1668C | PCB 193 |
| GC/HRMS | EPA 1668A/1668C | PCB 194 |
| GC/HRMS | EPA 1668A/1668C | PCB 195 |
| GC/HRMS | EPA 1668A/1668C | PCB 196 |
| GC/HRMS | EPA 1668A/1668C | PCB 197 |
| GC/HRMS | EPA 1668A/1668C | PCB 198 |
| GC/HRMS | EPA 1668A/1668C | PCB 199 |
| GC/HRMS | EPA 1668A/1668C | PCB 200 |
| GC/HRMS | EPA 1668A/1668C | PCB 201 |
| GC/HRMS | EPA 1668A/1668C | PCB 202 |
| GC/HRMS | EPA 1668A/1668C | PCB 203 |
| GC/HRMS | EPA 1668A/1668C | PCB 204 |
| GC/HRMS | EPA 1668A/1668C | PCB 205 |
| GC/HRMS | EPA 1668A/1668C | PCB 206 |
| GC/HRMS | EPA 1668A/1668C | PCB 207 |
| GC/HRMS | EPA 1668A/1668C | PCB 208 |
| GC/HRMS | EPA 1668A/1668C | PCB 209 |
| **Preparation** | **Method** | **Type** |

 



ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| Solid and Chemical Materials | | |
|---|---|---|
| **Technology** | **Method** | **Analyte** |
| Separatory Funnel Liquid-Liquid Extraction | EPA 3510C | Semivolatile and Non-Volatile Organics |
| Solvent Dilution | EPA 3580A | Semivolatile and Non-Volatile Organics |
| TCLP Extraction | EPA 1311 | Toxicity Characteristic Leaching Procedure |
| SPLP Extraction | EPA 1312 | Synthetic Precipitation Leaching Procedure |
| STLC Extraction | CA-WET | California Waste Extraction Test |

| Biological Tissue | | |
|---|---|---|
| **Technology** | **Method** | **Analyte** |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | 6:2 Fluorotelomer sulfonic acid (1H,1H,2H,2H-perfluorooctane sulfonic acid) (6:2 FTS) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | 8:2 Fluorotelomer sulfonic acid (1H,1H,2H,2H-perfluorodecane sulfonic acid) (8:2 FTS) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | N-Ethyl perfluorooctanesulfon amidoacetic acid (NEtFOSAA, EtFOSAA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | N-Methyl perfluorooctanesulfon amidoacetic acid (NMeFOSAA, MeFOSAA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluorooctanoic acid (PFOA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluorooctanesulfonic acid (PFOS) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluorobutanoic acid (PFBA) |





ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| Biological Tissue | | |
|---|---|---|
| **Technology** | **Method** | **Analyte** |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluoropentanoic acid (PFPA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluorohexanoic acid (PFHxA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluoroheptanoic acid (PFHpA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluorononanoic acid (PFNA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluorodecanoic acid (PFDA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluoroundecanoic acid (PFUnA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluorododecanoic acid (PFDoA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluorotridecanoic acid (PFTrDA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluorotetradecanoic acid (PFTeDA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.34 Table B-15 WS-LC-0025 | Perfluorobutanesulfonic acid (PFBS) |





ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| Biological Tissue | | |
|---|---|---|
| **Technology** | **Method** | **Analyte** |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.34 Table B-15 WS-LC-0025 | Perfluorohexanesulfonic acid  (PFHxS) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluorooctanesulfonamide (PFOSA, FOSA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | 4:2 Fluorotelomer sulfonic acid (1H, 1H,2H,2H-perfluorohexane sulfonic acid) (4:2 FTS) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | 10:2 Fluorotelomer sulfonic acid (1H, 1H,2H,2H-perfluorododecane sulfonic acid) (10:2 FTS) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluorohexadecanoic acid (PFHxDA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluoropentanesulfonic acid (PFPeS) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluorononanesulfonic acid (PFNS) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | 4,8-Dioxa-3H-perfluorononanoic acid (ADONA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Hexafluoropropylene oxide dimer acid (HFPO-DA, GenX) (Perfluoro-2-propoxypropionic acid) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | 9-Chlorohexadecafluoro-3-oxanonane-1-sulfonic acid (9Cl-PF3ONS) |

 



**ANAB**

*ANSI National Accreditation Board*

| Biological Tissue | | |
|---|---|---|
| **Technology** | **Method** | **Analyte** |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | 11-Chloroeicosafluoro-3-oxaundecane-1-sulfonic acid (11C1-PF3OUdS) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluorododecanesulfonic acid (PFDoS) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluorooctadecanoic acid (PFODA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | N-Ethylperfluorooctane sulfonamide (NEtFOSA, EtFOSA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | N-Methylperfluorooctane sulfonamide (NMeFOSA, MeFOSA) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | N-Ethylperfluorooctane sulfonamido ethanol (NEtFOSE, EtFOSE) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | N-Methylperfluorooctane sulfonamido ethanol (NMeFOSe, MeFOSE) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluoroheptanesulfonic acid (PFHpS) |
| LC/MS/MS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Perfluorodecanesulfonic acid (PFDS) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | $1H,1H, 2H, 2H$-Perfluorooctane sulfonic acid (6:2FTS) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | $1H,1H, 2H, 2H$-Perfluorodecane sulfonic acid (8:2FTS) |

Version 017   Issued: July 12, 2023




ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844



**ANAB**
*ANSI National Accreditation Board*

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| Biological Tissue | | |
|---|---|---|
| **Technology** | **Method** | **Analyte** |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | N-ethyl perfluorooctanesulfonamidoacetic acid (NEtFOSAA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | N-methyl perfluorooctanesulfonamidoacetic acid (NMeFOSAA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluorooctanoic acid (PFOA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluorooctanesulfonic acid (PFOS) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluorobutanoic acid (PFBA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluoropentanoic acid (PFPeA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluorohexanoic acid (PFHxA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluoroheptanoic acid (PFHpA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluorononanoic acid (PFNA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluorodecanoic acid (PFDA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluoroundecanoic acid (PFUnA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluorododecanoic acid (PFDoA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluorotridecanoic acid (PFTrDA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluorotetradecanoic acid (PFTeDA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluorobutanesulfonic acid (PFBS) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluorohexanesulfonic acid (PFHxS) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluoroheptanesulfonic acid (PFHpS) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluorodecanesulfonic acid (PFDS) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluorooctanesulfonamide (PFOSA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | 1$H$,1$H$, 2$H$, 2$H$-Perfluorohexane sulfonic acid (4:2FTS) |

 



**ANSI** *National Accreditation Board*

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

| Biological Tissue | | |
|---|---|---|
| **Technology** | **Method** | **Analyte** |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluoropentanesulfonic acid (PFPeS) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluorononanesulfonic acid (PFNS) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | 4,8-Dioxa-3$H$-perfluorononanoic acid (ADONA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Hexafluoropropylene oxide dimer acid (HFPO-DA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | 9-Chlorohexadecafluoro-3-oxanonane-1-sulfonic acid (9Cl-PF3ONS) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | 11-Chloroeicosafluoro-3-oxaundecane-1-sulfonic acid (11Cl-PF3OUdS) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluorododecanesulfonic acid (PFDoS) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | N-ethyl perfluorooctanesulfonamide (NEtFOSA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | N-methyl perfluorooctanesulfonamide (NMeFOSA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | N-ethyl perfluorooctanesulfonamidoethanol (NEtFOSE) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | N-methyl perfluorooctanesulfonamidoethanol (NMeFOSE) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | 3-Perfluoropropyl propanoic acid (3:3FTCA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | 2$H$,2$H$,3$H$,3$H$-Perfluorooctanoic acid (5:3FTCA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | 3-Perfluoroheptyl propanoic acid (7:3FTCA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluoro-3-methoxypropanoic acid (PFMPA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluoro-4-methoxybutanoic acid (PFMBA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Nonafluoro-3,6-dioxaheptanoic acid (NFDHA) |
| LC/MS/MS | Draft EPA Method 1633 Rev 2 | Perfluoro(2-ethoxyethane)sulfonic acid (PFEESA) |
| **Preparation** | **Method** | **Type** |
| Tissue Extraction for PFAS | PFAS by LCMSMS Compliant with QSM 5.4 Table B-15 WS-LC-0025 | Sonication/Solvent Shake with SPE cleanup |

 



Note:

1.  This scope is formatted as part of a single document including Certificate of Accreditation No. L2468.



Jason Stine, Vice President



Version 017   Issued: July 12, 2023                    www.anab.org





ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 147

## SAP Worksheet #32-1–Laboratory Corrective Action Form

Person initiating CA: _____     Date: _____

Description of problem and when identified:

_____

_____

_____

_____

_____

Cause of problem, if known or suspected:

_____

_____

_____

_____

_____

Sequence of CA: (including date implemented, action planned, and personnel/data affected)

_____

_____

_____

_____

_____

CA implemented by: _____     Date: _____

CA initially approved by: _____     Date: _____

Follow-up date: _____

Final CA approved by: _____     Date: _____

Information copies to:

_____

_____

_____

_____

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 148

This page intentionally left blank.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 149

## SAP Worksheet #32-2–Field Performance Audit Checklist

**Project Responsibilities**

Project No.: _____     Date: _____

Project Location: _____     Signature: _____

**Team Members**

Yes     No     1)   Is the approved work plan being followed?

Comments _____

_____

Yes     No     2)   Was a briefing held for project participants?

Comments _____

_____

Yes     No     3)   Were additional instructions given to project participants?

Comments _____

_____

**Sample Collection**

Yes     No     1)   Is there a written list of sampling locations and descriptions?

Comments _____

_____

Yes     No     2)   Are samples collected as stated in the Master SOPs?

Comments _____

_____

Yes     No     3)   Are samples collected in the type of containers specified in the work plan?

Comments _____

_____

Yes     No     4)   Are samples preserved as specified in the work plan?

Comments _____

_____

Yes     No     5)   Are the number, frequency, and type of samples collected as specified in the work plan?

Comments _____

_____

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 150

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## SAP Worksheet #32-2–Field Performance Audit Checklist (Continued)

Yes     No     6)  Are QA checks performed as specified in the work plan??

Comments _____

_____

Yes     No     7)  Are photographs taken and documented?

Comments _____

_____

**Document Control**

Yes     No     1)  Have any accountable documents been lost?

Comments _____

_____

Yes     No     2)  Have any accountable documents been voided?

Comments _____

_____

Yes     No     3)  Have any accountable documents been disposed of?

Comments _____

_____

Yes     No     4)  Are the samples identified with sample tags?

Comments _____

_____

Yes     No     5)  Are blank and duplicate samples properly identified?

Comments _____

_____

Yes     No     6)  Are samples listed on a chain-of-custody record?

Comments _____

_____

Yes     No     7)  Is chain of custody documented and maintained?

Comments _____

_____

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 151

## SAP Worksheet #32-3–Safety Observation Report Form

| ☐ Federal or ☐ Commercial Sector (check one) | | ☐ Construction or ☐ Consulting (check one) | |
|---|---|---|---|
| Project Number: | | Client/Program: | |
| Project Name: | | Observer: | Date: |
| Position/Title of worker observed: | | Background Information/ comments: | |
| Task/Observation Observed: | | | |

❖ Identify and reinforce safe work practices/behaviors
❖ Identify and improve on at-risk practices/acts
❖ Identify and improve on practices, conditions, controls, and compliance that eliminate or reduce hazards
❖ Proactive PM support facilitates eliminating/reducing hazards (do you have what you need?)
❖ Positive, corrective, cooperative, collaborative feedback/recommendations

| Actions & Behaviors | Safe | At-Risk | Observations/Comments |
|---|---|---|---|
| Current and accurate Pre-Task Planning/Briefing (for example, Project Safety Plan, Safety Training and Consulting, Activity Hazard Analysis, Pre-task Safety Plan, tailgate briefing, as needed) | | | **Positive Observations/Safe Work Practices:** |
| Properly trained/ qualified/ experienced | | | |
| Tools/equipment available and adequate | | | |
| Proper use of tools | | | **Questionable Activity/Unsafe Condition Observed:** |
| Barricades/work zone control | | | |
| Housekeeping | | | |
| Communication | | | |
| Work Approach/Habits | | | |
| Attitude | | | |
| Focus/attentiveness | | | **Observer's CAs/Comments:** |
| Pace | | | |
| Uncomfortable/unsafe position | | | |
| Inconvenient/unsafe location | | | |
| Position/Line of fire | | | |
| Apparel (hair, loose clothing, jewelry) | | | |
| Repetitive motion | | | **Observed Worker's CAs/Comments:** |
| Other… | | | |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 152

This page intentionally left blank.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 153

## SAP Worksheet #33–QA Management Reports Table

| Type of Report | Frequency (daily, weekly monthly, quarterly, annually, and so forth) | Projected Delivery Date(s) | Person(s) Responsible for Report Preparation (title and organizational affiliation) | Report Recipient(s) (title and organizational affiliation) |
|---|---|---|---|---|
| Field Audit Report | One annually | 1 month after completion of field work | PM CH2M | Included in project files. |
| Remedial Investigation Report | At completion of field work and data analyses | August 2025 | CH2M | MCB Camp Lejeune Partnering Team |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 154

This page intentionally left blank.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 155

## SAP Worksheets #34-36—Data Verification and Validation (Steps I and IIa/IIb) Process Table

| Verification Input[a] | Description | Internal/ External[b] | Steps I/IIa/IIb[a] | Responsible for Verification (name, organization)[c] |
|---|---|---|---|---|
| Field Notebooks | Field notebooks will be reviewed internally and placed into the project file for archival at project closeout. | Internal | Step I | FTL: TBD/CH2M |
| Chains-of-Custody and Shipping Forms | Chain-of-custody forms and shipping documentation will be reviewed internally upon their completion and verified against the packed sample coolers they represent. The shipper's signature on the chain-of-custody will be initialed by the reviewer, a copy of the chain-of-custody retained in the site file, and the original and remaining copies taped inside the cooler for shipment. | Internal / External | Step I | FTL: TBD/CH2M<br>Project Chemist: Sonya Gordon/CH2M |
| Sample Condition upon Receipt | Any discrepancies, missing, or broken containers will be communicated to the Project Chemist in the form of laboratory logins. | External | Step I | Project Chemist: Sonya Gordon/CH2M |
| Documentation of Laboratory Method Deviations | Laboratory method deviations not included in the laboratory SOP and therefore not included in the DoD ELAP accreditation letter are not allowed for this project. All laboratory deviations must be approved by the DoD ELAP accrediting body and be incorporated into the DoD accreditation letter. | Internal / External | Step I | Project Chemist: Sonya Gordon/CH2M |
| EDDs | EDDs will be compared against hardcopy laboratory results (10% check). If errors are found, the laboratory must correct the errors and resubmit the EDD. The Project Chemist will check to make sure the errors have been addressed and a 10% check will be performed. The process will be repeated if additional errors are found. | External | Step I | Project Chemist: Sonya Gordon/CH2M |
| Case Narrative | Case narratives will be reviewed by the data validator during the data validation process. This is verification that they were generated and are applicable to the data packages. | External | Step I | Data Validator: Doug Weaver/EDS |
| Laboratory Data | All laboratory data packages will be verified internally by the laboratory performing the work for completeness and technical accuracy prior to submittal. | Internal | Step I | Laboratory QAO: ELLE, ETAB, EXH |
| Laboratory Data | The data will be verified for completeness by the Project Chemist. In order to ensure completeness, EDDs will be compared to the SAP. This is a verification that all samples were included in the laboratory data and that correct analyte lists were reported. | External | Step I | Project Chemist: Sonya Gordon/CH2M |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 156

## SAP Worksheets #34-36—Data Verification and Validation (Steps I and IIa/IIb) Process Table (continued)

| Verification Input[a] | Description | Internal/ External[b] | Steps I/IIa/IIb[a] | Responsible for Verification (name, organization)[c] |
|---|---|---|---|---|
| Audit Reports | Upon report completion, a copy of all audit reports will be placed in the site file. If CAs are required, a copy of the documented CA taken will be attached to the appropriate audit report in the QA site file. Periodically, and at the completion of site work, site file audit reports and CA forms will be reviewed internally to ensure that all appropriate CAs have been taken and that CA reports are attached. If CAs have not been taken, the site manager will be notified to ensure action is taken. | Internal | Step I | PM: Daniel Hockett/ CH2M |
| | | | | Project Chemist: Sonya Gordon/CH2M |
| CA Reports | CA reports will be reviewed by the Project Chemist or PM and placed into the project file for archival at project closeout. | External | Step I | PM: Daniel Hockett/ CH2M |
| | | | | Project Chemist: Sonya Gordon/CH2M |
| Laboratory Methods | Ensure the laboratory analyzed samples using the correct methods. | External | Step IIa | Project Chemist: Sonya Gordon/CH2M |
| Target Compound List and Target Analyte List | Ensure the laboratory reported all analytes from each analysis group as described in **Worksheet #15**. | External | Step IIa | Project Chemist: Sonya Gordon/CH2M |
| Reporting Limits | Ensure the laboratory met the project-designated reporting limits as described in **Worksheet #15**. If reporting limits were not met, the reason will be identified and documented. Often times the reason for discrepancy is due to the quarterly update of the laboratory LOD. | External | Step IIa | Project Chemist: Sonya Gordon/CH2M |
| Laboratory SOPs | Ensure that approved analytical laboratory SOPs were followed. | External | Step IIa | Data Validator: Doug Weaver/EDS |
| Sample Chronology | Holding times from collection to extraction or analysis and from extraction to analysis will be considered by the data validator during the DV process. | External | Step IIb | Data Validator: Doug Weaver/EDS |
| Raw Data | 10% of the analytical data will undergo a Stage 4 validation which includes a review of raw data to confirm laboratory calculations and the remaining 90% of data will undergo a Step 2b validation. | External | Step IIb | Data Validator: Doug Weaver/EDS |
| Onsite Screening | All non-analytical field data will be reviewed against Quality Assurance Project Plan (QAPP) requirements for completeness and accuracy based on the field calibration records. | Internal | Step IIb | FTL: TBD/CH2M |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 157

### SAP Worksheets #34-36—Data Verification and Validation (Steps I and IIa/IIb) Process Table (continued)

| Verification Input[a] | Description | Internal/ External[b] | Steps I/IIa/IIb[a] | Responsible for Verification (name, organization)[c] |
|---|---|---|---|---|
| Documentation of Method QC Results | Establish that all required QC samples were run and met limits. | External | Step IIb | Data Validator: Doug Weaver/EDS |
| Documentation of field QC Sample Results | Establish that all required QAPP QC samples were run and met limits. | Internal | Step IIb | Project Chemist: Sonya Gordon/CH2M |
| | | | | Data Validator: Doug Weaver/EDS |
| PFAS[d] | QA/QC criteria presented in this SAP will be used to ensure compliance with DoD QSM. QA/QC criteria for field QC samples are presented on **Worksheet #12**. LOQs, LODs, and DLs are presented on **Worksheet #15**. QA/QC criteria for calibrations are presented in laboratory SOPs (referenced on **Worksheet #23**). Analytical instrument calibration criteria are presented on **Worksheet #24**. QA/QC criteria for laboratory QC samples are presented on **Worksheet #28**. Data may be qualified if QA/QC exceedances have occurred. Guidance and qualifiers from DoD *General Data Validation Guidelines* (DoD, 2019b) and 3rd Draft EPA Method 1633 [Compliant with DoD QSM v.5.4 Table B-24 (DoD/DOE, 2021)] (EPA, 2022) will be applied. In addition, the Data Validator may adapt the guidance from *Data Validation Guidelines Module 3: Data Validation Procedure for Per- and Polyfluoroalkyl Substances Analysis by QSM Table B-15* (DoD, 2020); *Data Validation Guidelines Modules 1, 2, 3, and 4 Revised Table for Sample Qualification in the Presence of Blank Contamination* (DoD, 2022c); EPA *National Functional Guidelines for Superfund Organic Methods Data Review* (EPA, 2017); and the EPA Technical Brief *Per- and Polyfluoroalkyl Substances (PFAS):: Reviewing Analytical Methods Data for Environmental Samples* (EPA, 2019). Should additional DoD DV Guidance specific to QSM v.5.4 Table B-24 become available for use prior to validation, this DoD guidance will be used and documented in a SAP Addendum or FTMR/FCR.<br><br>Although there are no samples being analyzed by EPA Method 537.1, the Data Validator may reference *EPA Data Review and Validation Guidelines for Perfluoroalkyl Substances (PFASs) Analyzed Using EPA Method 537* (EPA, 2018) as needed.<br><br>The data validation report will indicate QC parameters evaluated, the acceptance criteria used to evaluate each QC parameter, a list of QC exceedances as well as the extent of the exceedance, the samples associated with each exceedance, and the qualifiers applied. | External | Step IIb | Data Validator: Doug Weaver/EDS |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 158

### SAP Worksheets #34-36—Data Verification and Validation (Steps I and IIa/IIb) Process Table (continued)

| Verification Input[a] | Description | Internal/ External[b] | Steps I/IIa/IIb[a] | Responsible for Verification (name, organization)[c] |
|---|---|---|---|---|
| Fate and Transport (TOC, Grain Size, Moisture, Bulk Density, Porosity, AEC, CEC) | Fate and transport are subject to the verification and validation procedures specified in **Worksheets #34** and **#35**. The case narratives will be read, any issues will be investigated, and the impact (if any) on data quality or data usability will be discussed with the project team. | External | Step IIb | Project Chemist: Sonya Gordon/CH2M |

[a] Verification (Step 1) is a completeness check that is performed before the data review process continues to determine whether the required information (complete data package) is available for further review. Validation (Step 2a) is a review that the data generated is in compliance with analytical methods, procedures, and contracts. Validation (Step 2b) is a comparison of generated data against MPC in the SAP (sampling and analytical).

[b] Internal or external is in relation to the data generator.

[c] Should CH2M find discrepancies during the verification or validation procedures above, an email documenting the issue will be circulated to the internal project team, and a Corrections to File Memorandum will be prepared identifying the issues and the CA needed. This memorandum will be sent to the laboratory, or applicable party, and maintained in the project file.

[d] Manual validation is planned, and qualifiers are then applied to the EDDs. Validation will be 90% Step 2b and 10% Stage 4. There is currently no guidance for DV for 3rd Draft EPA Method 1633 (Compliant with DoD QSM v. 5.4 Table B-24 [DoD/DOE, 2021]). If new guidance is published prior to the DV, the data validators will use the latest documents.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 159

## SAP Worksheet #37—Usability Assessment

**Summarize the usability assessment process and all procedures, including interim steps and any statistics, equations, and computer algorithms that will be used:**

- Nondetected analytes will be evaluated to ensure that reporting limits (DLs, LODs, or LOQs) in **Worksheet #15** were achieved. If project reporting limits were achieved and the verification and validation steps yielded acceptable data, then the data are considered usable.

- During verification and validation steps, data may be qualified as estimated with the following qualifiers: J, J+, J-, or UJ. These qualifiers represent minor QC deficiencies that will not affect the usability of the data. When major QC deficiencies are encountered, data will be qualified with an X qualifier as recommended for rejection. The project team will review the PQOs and DV narrative and will decide whether to replace the X qualifier with the R qualifier or other appropriate qualifier. R-qualified data are not considered usable for project decision-making purposes.

  - J = Analyte present. Reported value may or may not be accurate or precise.
  - J+ = Analyte present. Reported value is estimated and may be biased high.
  - J- = Analyte present. Reported value is estimated and may be biased low.
  - UJ = Analyte not detected. Associated nondetect value may be inaccurate or imprecise.
  - X = Result recommended for rejection by the data validator. Result not reliable.
  - R = Rejected result, team decision. Result not reliable.

- If statistical comparisons are necessary, nondetect values will be represented by a concentration equal to the sample DL and evaluations will be performed using EPA's ProUCL software. For duplicate sample results, the most conservative value will be used for project decisions.

- Additional qualifiers that may be given by the DV are:

  - N = Tentative ID. Consider Present. Special methods may be needed to confirm its presence or absence in future sampling efforts.

  - NJ = Qualitative ID questionable due to poor resolution. Presumptively present at approximate quantity.

  - U = Not Detected.

- Analytical data will be checked to ensure the values and any qualifiers are appropriately transferred to the electronic database. The checks include comparison of hardcopy data and qualifiers to the EDDs. Once the data have been uploaded into the electronic database, another check will be performed to ensure all results were loaded accurately.

- Field and laboratory precision will be compared as RPD between the two results.

- Deviations from the SAP will be reviewed to assess whether CA is warranted and to assess impacts to achieving project objectives.

### Data Quality Indicators

Quantifiable criteria, known as MPC, are presented in **Worksheet #12**. The Precision, Accuracy, Representativeness, Comparability, Completeness, and Sensitivity (PARCCS) criteria will be the qualitative and quantitative indicators of data quality. The PARCCS criteria are discussed as follows.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 160

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

## SAP Worksheet #37—Usability Assessment (continued)

### Precision

Precision is a measure of mutual agreement among individual measurements of the same property, usually under prescribed similar conditions. Precision will be measured by using laboratory duplicates and MS/MSD samples. It will be expressed in terms of the RPD as follows:

$$RPD = \frac{|C_1 - C_2|}{(C_1 + C_2)/2} \times 100$$

where:

$RPD$ = relative percent difference
$C_1$ = concentration of sample or MS
$C_2$ = concentration of duplicate or MSD

### Accuracy

Accuracy is the degree of agreement of an observed measurement (or an average of the same measurement type) with an accepted reference or true value. Accuracy of analytical determinations will be measured using laboratory QC analyses such as LCSs and surrogate spikes. Accuracy will be measured by evaluating the actual result against the known concentration added to a spiked sample and will be expressed as %R as shown below:

$$\%R = \frac{S - U}{C_{sa}} \times 100$$

where:

$\%R$ = Percent Recovery
$S$ = Measured concentration of spiked aliquot
$U$ = Measured concentration of unspiked aliquot
$C_{sa}$ = Concentration of spike added

### Representativeness

Representativeness is the reliability with which a measurement or measurement system reflects the true conditions under investigation. Representativeness is influenced by the number and location of the sampling points, sampling timing and frequency of monitoring efforts, and the field and laboratory procedures. The representativeness of data will be maintained by the use of established field and laboratory procedures and their consistent application.

### Comparability

Comparability expresses the confidence with which one dataset can be compared to another based on using EPA-defined procedures, where available. If EPA procedures are not available, the procedures have been defined or referenced in this SAP.

The comparability of data will be established through well-documented methods and procedures, standard reference materials, QC samples, performance-evaluation study results, and by reporting each data type in consistent units.

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 161

## SAP Worksheet #37—Usability Assessment (continued)

### Completeness

Completeness is a measure of the amount of valid data obtained from a measurement system compared to the amount that was expected to be obtained under correct normal conditions. Analytical DV and a data quality assessment will determine which data will be valid and which data will be rejected. Percent completeness will be defined as follows:

$$Percent\ Completeness = \frac{V}{T} \times 100$$

where:

$V$ = Number of valid (not rejected) measurements over a given time

$T$ = Total number of planned measurements

The completeness goal for this project will be 95 percent for valid, usable data. If the completeness goal of the project is not achieved, a discussion on the limitations on the use of the project data will be included in the Usability Assessment section of the final reports.

If significant biases are detected with laboratory QA/QC samples, they will be evaluated to assess impacts on decision-making. Low biases will be described in detail because they represent a possible inability to detect compounds that may be present at the site.

If significant deviations are noted between laboratory and field precision, the cause will be further evaluated to assess impact on decision-making.

### Sensitivity

Sensitivity is the ability of an analytical method or instrument to discriminate between measurement responses representing different concentrations. This capability is established during the planning phase to meet project-specific objectives. It is important to be able to detect the target analytes at the levels of interest. Sensitivity requirements include the establishment of various limits such as calibration requirements, instrument LODs, and LOQs. The project QA/QC on method requirements has been established to be compliant with DoD QSM v5.4 (DoD/DOE, 2021).

### Describe the documentation that will be generated during the usability assessment and how usability assessment results will be presented so that they identify trends, relationships (correlations), and anomalies:

- Data tables will be produced to reflect detected and nondetected analytes. Data qualifiers will be reflected in the tables and discussed in the data quality evaluation.

- A data quality evaluation will be provided as part of the RI Report.

- The RI Report will identify any data usability limitations and make recommendations for CA, if necessary.

### Identify the personnel responsible for performing the usability assessment.

The CH2M Team, including the PM and Project Chemist, will review the data and present the data to the Navy and Base for review and approval of usability.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 162

This page intentionally left blank.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

2:25-cv-11725-RMG     Date Filed 08/29/25     Entry Number 1-2     Page 617 of 700

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 163

# References

Assistant Secretary of Defense (ASD). 2021. *Memorandum: Investigating Per- and Polyfluoroalkyl Substances within the Department of Defense Cleanup Program.* Updated September 15.

Baker Environmental, Inc (Baker). 1996. *Remedial Investigation Report, Operable Unit No. 10, Marine Corps Base Camp Lejeune, North Carolina*. August.

Baker. 1998. Basewide Remediation Assessment Groundwater Study (BRAGS), Marine Corps Base Camp Lejeune, North Carolina. April.

Brusseau, Mark and Guo, Bo. *Revising the EPA dilution-attenuation soil screening model for PFAS.* Journal of Hazardous Materials Letters. 4 (2023), 100077.

CH2M HILL, Inc. (CH2M). 2019*. Preliminary Assessment for Per- and Polyfluoroalkyl Substances, Marine Corps Base Camp Lejeune and Marine Corps Air Station New River, North Carolina.* December.

CH2M. 2020. *Sampling and Analysis Plan, Basewide Per- and Polyfluoroalkyl Substances (PFAS) Site Inspection, Marine Corps Base Camp Lejeune and Marine Corps Air Station New River, North Carolina.* Final. May.

CH2M. 2022a. *Basewide Per- and Polyfluoroalkyl Substances Site Inspection, Marine Corps Base Camp Lejeune and Marine Corps Air Station New River, North Carolina*. January.

CH2M. 2022b. Long-Term Monitoring Report, Installation Restoration Program Site 35, Fiscal Year 2021, Marine *Corps Base Camp Lejeune and Marine Corps Air Station New River, North Carolina*. July.

CH2M. 2023. *Investigation and Remediation Waste Management Plan, Marine Corps Base Camp Lejeune and Marine Corps Air Station, New River, North Carolina*. Updated March.

Department of Defense (DoD). 2019a. *Memorandum: Investigating Per- and Polyfluoroalkyl Substances within the Department of Defense Cleanup Program.* July 6.

DoD. 2019b. *General Data Validation Guidelines.* November.

DoD. 2020. *Data Validation Guidelines Module 3: Data Validation Procedure for Per- and Polyfluoroalkyl Substances Analysis by QSM Table B-15.* May.

DoD. 2022a. *Memorandum: Investigating Per-and Polyfluoroalkyl Substances within the Department of Defense Cleanup Program.* September.

DoD. 2022b. Memorandum for Investigating *Per-and Polyfluoroalkyl Substances within the Department of Defense Cleanup Program*. July 6*.*

DoD. 2022c. *Data Validation Guidelines Modules 1, 2, 3, and 4 Revised Table for Sample Qualification in the Presence of Blank Contamination.* February.

DoD. 2023. *Memorandum: Interim Guidance on Destruction or Disposal of Materials Containing Per-and Polyfluoroalkyl Substances in the United States*. July 11.

Department of Defense and Department of Energy (DoD/DOE). 2021. *Department of Defense (DoD) Department of Energy (DOE) Consolidated Quality Systems Manual (QSM) for Environmental Laboratories.* DoD Quality Systems Manual Version 5.4.

Department of the Navy (Navy). 2020. *Interim Per-and Polyfluoroalkyl Substances (PFAS) Site Guidance for Naval Facilities Engineering Systems Command (NAVFAC) Remedial Project Managers (RPMs)/November 2020 Update.*

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

SAMPLING AND ANALYSIS PLAN, REMEDIAL INVESTIGATION, PER- AND POLYFLUOROALKYL SUBSTANCES
SITE 113, BUILDING TC701 CAMP GEIGER FIRE STATION (STATION #6)
MARINE CORPS BASE CAMP LEJEUNE, NORTH CAROLINA
REVISION NUMBER 0
DECEMBER 2023
PAGE 164

United States Environmental Protection Agency (EPA). 2002. *Guidance for Quality Assurance Project Plans.* EPAQA/G-5*.* EPA/240/R-02/009. December.

EPA. 2005. *Uniform Federal Policy for Quality Assurance Project Plans: Evaluating, Assessing, and Documenting Environmental Data Collection and Use Programs - Part 1: UFP-QAPP Manual.* Intergovernmental Data Quality Task Force. EPA-505-B-04-900A. Final Version 1. March.

EPA. 2006. *Guidance on Systematic Planning Using the Data Quality Objectives Process.* EPA QA/G-4. EPA/240/B-06/001. February.

EPA. 2017. *National Functional Guidelines for Superfund Organic Methods Data Review*. EPA-540-R-2017-002. January.

EPA. 2018. *EPA Data Review and Validation Guidelines for Perfluoroalkyl Substances (PFAS) Analyzed Used EPA Method 537*. EPA 910-R-18-001. November.

EPA. 2019. *Per- and Polyfluoroalkyl Substances (PFAS): Reviewing Analytical Methods Data for Environmental Samples.* EPA/600/F-19/056. April.

EPA/EPA. 2022. *3rd Draft of Method 1633 - Analysis of Per- and Polyfluoroalkyl Substances (PFAS) in Aqueous, Solid, Biosolids, and Tissue Samples by LC-MS/MS*. December.

EPA. 2023. *Regional Screening Levels (RSLs) for Chemical Contaminants at Superfund Sites*. May. http://www.epa.gov/risk/regional-screening-levels-rsls-generic-tables.

Interstate Technology Regulatory Council (ITRC). 2022. *Per- and Polyfluoroalkyl Substances Technical and Regulatory Guidance*. June.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

Tables

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

Table 10-2. PFAS SI Anayltical Results in Soil

*Sampling and Analysis Plan, Remedial Investigation, Per- and Polyfluoroalkyl Substances for Site 113*

*MCB Camp Lejeune and MCAS New River*

*North Carolina*

| Station ID | Residential Soil RSL (HQ=0.1) | BW-TC701-MW01 | | | BW-TC701-MW02 | |
|---|---|---|---|---|---|---|
| Sample ID | | BW-TC701-SB01-11-12-20C | BW-TC701-SS01-20C | BW-TC701-SS01D-20C | BW-TC701-SB02-09-10-20C | BW-TC701-SS02-20C |
| Sample Date | | 07/28/20 | 07/28/20 | 07/28/20 | 07/28/20 | 07/28/20 |
| **Chemical Name** | | | | | | |
| | | | | | | |
| **Per- and Polyfluorinated Alkyl Substances (ng/g)** | | | | | | |
| Perfluorooctanoic acid (PFOA) | 19 | 2.2 U | 2.17 U | 2.41 U | 2.25 U | 2.02 U |
| Perfluorooctane sulfonic acid (PFOS) | 13 | 2.2 U | 11.4 U | 10.3 U | 2.25 U | 8.91 U |
| Perfluorobutanoic acid (PFBA) | 7,800 | NA | NA | NA | NA | NA |
| Perfluorobutanesulfonic acid (PFBS) | 1,900 | 1.1 U | 1.09 U | 1.2 U | 1.12 U | 1.01 U |
| Perfluorohexanoic Acid (PFHxA) | 3,200 | 2.89 U | 2.17 U | 2.41 U | 2.25 U | 2.02 U |
| Perfluorohexanesulfonic acid (PFHxS) | 130 | 2.2 U | 2.17 U | 2.41 U | 2.25 U | 2.02 U |
| Perfluorononanoic acid (PFNA) | 19 | 1.1 U | 2.82 J | 2.53 J | 1.12 U | 1.08 J |
| Hexafluoropropylene oxide dimer acid (HFPO-DA) | 23 | 2.2 U | 2.17 U | 2.41 U | 2.25 U | 2.02 U |

Notes:

Grey shading indicates exceedance of Residential Soil RSLs, HQ = 0.1 (May 2023)

J - Analyte present, value may or may not be accurate or precise

U - The material was analyzed for, but not detected

ng/g - Nanograms per gram

Perfluorobutanoic acid (PFBA) was not analyzed in groundwater or soil samples as part of the Basewide SI.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

1 of 1

Table 10-3. PFAS SI Anayltical Results in Groundwater

*Sampling and Analysis Plan, Remedial Investigation, Per- and Polyfluoroalkyl Substances for Site 113*

*MCB Camp Lejeune and MCAS New River*

*North Carolina*

| Station ID | Tapwater RSL (HQ=0.1) | BW-TC701-MW01 | | BW-TC701-MW02 | BW-TC701-MW03 |
|---|---|---|---|---|---|
| Sample ID | | BW-TC701-GW01-20C | BW-TC701-GW01D-20C | BW-TC701-GW02-20C | BW-TC701-GW03-20C |
| Sample Date | | 09/02/20 | 09/02/20 | 09/03/20 | 09/03/20 |
| **Chemical Name** | | | | | |
| **Per- and Polyfluorinated Alkyl Substances (ng/l)** | | | | | |
| Perfluorooctanoic acid (PFOA) | 6 | 1,455 | 1,558 | 2,116 | 419 |
| Perfluorooctane sulfonic acid (PFOS) | 4 | 394 | 389 | 4,594 | 2,592 |
| Perfluorobutanoic acid (PFBA) | 1,800 | NA | NA | NA | NA |
| Perfluorobutanesulfonic acid (PFBS) | 600 | 26.2 | 26.3 | 143 | 445 |
| Perfluorohexanoic Acid (PFHxA) | 990 | 2,541 | 2,518 | 497 | 1,030 |
| Perfluorohexanesulfonic acid (PFHxS) | 39 | 1,737 | 1,934 | 3,860 | 2,488 |
| Perfluorononanoic acid (PFNA) | 5.9 | 6.08 | 5.66 | 526 | 5.19 |
| Hexafluoropropylene oxide dimer acid (HFPO-DA) | 6 | 0.56 J | 0.55 J | 0.46 UJ | 0.45 U |

Notes:

Grey shading indicates exceedance of Tapwater RSLs, HQ = 0.1 (May 2023)

J - Analyte present, value may or may not be accurate or precise

U - The material was analyzed for, but not detected

UJ - Analyte not detected, quantitation limit may be inaccurate

ng/l - Nanograms per liter

Perfluorobutanoic acid (PFBA) was not analyzed in groundwater or soil samples as part of the Basewide SI.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

Figures



Figure 1
Base Location Map
Site 113 - Building TC701 Camp Geiger Fire Station (Station #6) PFAS RI SAP
MCB Camp Lejeune and MCAS New River
North Carolina

1 inch = 15,000 feet

\\DC1VS01\GISNAVYCLEAN\MIDLANT\MCBCAMPLEJEUNE\MAPFILES\BASEWIDE\PFAS\0007NVI5_RI_UFPSAP\SITE113_BUILDINGTC701CAMPGEIGERFIRESTATION\FIGURE_2_BUILDINGTC701_RESULTS.MXD AM038876 8/9/2023 5:00:48 PM

ELECTRONICALLY FILED - 2025 Aug 13 16:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

**BW-TC701-MW01**

|  | SS* 0-1' | SB 11-12' | GW* 12-22' |
|---|---|---|---|
| PFOA | 2.41 U | 2.2 U | 1,558.31 |
| PFOS | 11.4 U | 2.2 U | 394.30 |
| PFBA | NA | NA | NA |
| PFBS | 1.2 U | 1.1 U | 26.34 |
| PFHxA | 2.41 U | 2.89 U | 2,540.93 |
| PFHxS | 2.41 U | 2.2 U | 1,934.26 |
| PFNA | 2.82 J | 1.1 U | 6.08 |
| HFPO-DA | 2.41 U | 2.2 U | 0.56 J |

**BW-TC701-MW03**

|  | GW 15-25' |
|---|---|
| PFOA | 418.63 |
| PFOS | 2,592.08 |
| PFBA | NA |
| PFBS | 444.86 |
| PFHxA | 1,029.98 |
| PFHxS | 2,487.91 |
| PFNA | 5.19 |
| HFPO-DA | 0.45 U |

**BW-TC701-MW02**

|  | SS 0-1' | SB 9-10' | GW 15-25' |
|---|---|---|---|
| PFOA | 2.02 U | 2.25 U | 2,116.03 |
| PFOS | 8.91 U | 2.25 U | 4,594.20 |
| PFBA | NA | NA | NA |
| PFBS | 1.01 U | 1.12 U | 143.29 |
| PFHxA | 2.02 U | 2.25 U | 496.76 |
| PFHxS | 2.02 U | 2.25 U | 3,859.88 |
| PFNA | 1.08 J | 1.12 U | 526.01 |
| HFPO-DA | 2.02 U | 2.25 U | 0.46 UJ |

| Analyte | Soil SLs (ng/g) | Groundwater SLs (ng/L) |
|---|---|---|
| PFOA | 19 | 6 |
| PFOS | 13 | 4 |
| PFBA | 7,800 | 1,800 |
| PFBS | 1,900 | 600 |
| PFHxA | 3,200 | 990 |
| PFHxS | 130 | 39 |
| PFNA | 19 | 5.9 |
| HFPO-DA | 23 | 6 |

Building TC701 Camp Geiger Fire Station (Station #6)

G700A

**Notes:**
SS - surface soil
SB - subsurface soil
GW - groundwater
SL - screening level
0-1' - soil sample depth interval (in feet) or monitoring well screen interval
U - undetected
J - analyte present, value may or may not be accurate or precise
UJ - analyte not detected, quantitation limit may be inaccurate
NA – not analyzed
ng/g -nanogram per gram (for soil results)
ng/L - nanogram per liter (for groundwater results)
Shading is an exceedance of RSLs (May 2023)
* - field duplicate collected
Water levels measured 11/30/2020
PFBA was not analyzed in groundwater or soil samples as part of the Basewide SI.

**Legend**

| Symbol | Description |
|---|---|
| | Surficial Aquifer Monitoring Well Location and Soil Sampling Location |
| | Surficial Aquifer Monitoring Well Location |
| | PFAS Release Area |
| | Surficial Aquifer Potentiometric Surface Contour |
| | Surficial Aquifer Groundwater Flow Direction |
| | Inferred Groundwater Flow Direction in Castle Hayne Aquifer |
| **16.36** | Groundwater Elevation |
| ● | Stormwater Inlet |
| | Stormwater Utility Line |
| | Drainage Feature |
| | Drainage Feature Flow Direction |
| | Wetlands |





0    35    70 Feet

1 inch = 70 feet

N

Figure 2

Building TC701 Camp Geiger Fire Station (Station #6) SI Results
Site 113 - Building TC701 Camp Geiger Fire Station (Station #6) PFAS RI SAP
MCB Camp Lejeune and MCAS New River
North Carolina

ch2m



Figure 3
Proposed Sample Locations
Site 113 - Building TC701 Camp Geiger Fire Station (Station #6) PFAS RI SAP
MCB Camp Lejeune and MCAS New River
North Carolina

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

# Appendix A
# Ecological Screening Values

Table A-1. Ecological Screening Values for PFAS in Surface Water, Sediment, and Soil

| Chemical | Surface Water (Marine) | | Sediment | | Soil | |
|---|---|---|---|---|---|---|
| | ESV (ng/L) a | ESV Reference | ESV (µg/kg) a | ESV Reference | ESV (µg/kg) a | ESV Reference |
| Perfluorooctanoic acid (PFOA) | 6,120 | Secondary Chronic Value from Argonne 2021 | 6 | NOAEL-based value from Divine et al. 2020, based on food web model for little brown bat. | 3,840 | Terrestrial mammal value from Argonne 2021 |
| Perfluorooctane Sulfonate (PFOS) | 117 | Mammal wildlife value from Argonne 2021 | 1.4 | NOAEL-based value from Divine et al. 2020, based on food web model for little brown bat. | 8.7 | Terrestrial mammal value from Argonne 2021 |
| Perfluorobutanesulfonic acid (PFBA) | 11,000 | Quality Standard (saltwater pelagic community) Valsecchi et al. 2017 | 1,600 | NOAEL-based value from Divine et al. 2020, based on food web model for little brown bat. | 2,980 | Terrestrial mammal value from Argonne 2021 |
| Perfluorobutanesulfonic acid (PFBS) | 37,000 | Quality Standard (saltwater pelagic community) Valsecchi et al. 2017 | 730 | NOAEL-based value from Divine et al. 2020, based on food web model for tree swallow | 817 | Terrestrial mammal value from Argonne 2021 |
| Perfluorononanoic acid (PFNA) | 2,080 | Mammal wildlife value from Argonne 2021 | 10 | NOAEL-based value from Divine et al. 2020, based on food web model for little brown bat. | 24.2 | Terrestrial mammal value from Argonne 2021 |
| Perfluorohexanoic acid (PFHxA) | 28,800 | Tier 2 Chronic Value from Argonne 2021 | 1,800 | NOAEL-based value from Divine et al. 2020, based on food web model for little brown bat. | 6,200 | Terrestrial mammal value from Argonne 2021 |
| Perfluorodecanoic acid (PFDA) | 660 | Mammal wildlife value from Argonne 2021 | NA | NA | 67.7 | Terrestrial mammal value from Argonne 2021 |
| Perfluoroheptanoic acid (PFHpA) | NA | NA | NA | NA | 1,000 | NOEC from Karnjanapiboonwong et al. 2018, adjusted with UF of 10 as recommended by Divine et al. 2020 |
| Perfluorohexane sulfonate (PFHxS) | 5,500 | Mammal wildlife value from Argonne 2021 | NA | NA | 2.8 | Terrestrial mammal value from Argonne 2021 |
| Perfluoropentanoic acid (PFPeA) | 3,200 | Quality Standard (saltwater pelagic community) Valsecchi et al. 2017 | NA | NA | NA | NA |

Notes

[a] At the current time, EPA has not issued consensus-based ecological screening values for PFAS in any environmental medium. Initial ecological screening values, based on available documents in the literature are presented here to ensure that data collected during the RI are suitable to meet the needs to complete a future ecological risk assessment; however, the final ecological screening values utilized for the initiation of a screening level ecological risk assessment completed during the overall RI will be reviewed and updated based on the state of the science at the time of the evaluation and presented to regulatory partners.

µg/kg = microgram(s) per kilogram
ng/L = nanogram(s) per liter
ESV = ecolgoical screening value
References:
Argonne National Laboratory (Argonne). 2021. Final Derivation of PFAS Ecological Screening Values. Environmental Science Division, Argonne National Laboratory. Completed under interagency agreement between the U.S. Department of Energy (DOE), Argonne National Laboratory
(Argonne), and the Air Force Civil Engineer Center (AFCEC). September.
Karnjanapiboonwong, A., S.K. Deb, S. Subbiah, D. Wang, and T.A. Anderson. 2018. "Perfluoroalkylsulfonic and Carboxylic Acids in Earthworms (Eisenia fetida): Accumulation and Effects Results from
Divine, C., J. Zodrow, M. Frenchmeyer, K. Dally, E. Osborn, and P. Anderson. 2020. Approach for Assessing PFAS Risk to Threatened and Endangered Species. Strategic Environmental Research and Development Program (SERDP). Project ER18-1653.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

1 of 1

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

# Appendix B
# Field Standard Operating Procedures – CH2M/Jacobs

*Note: CH2M is a wholly-owned subsidiary of Jacobs and SOPs may refer to either CH2M or Jacobs but are all applicable for work being conducted under this SAP.*

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 001

# Preparing Field Logbooks

## I.   Purpose

This SOP provides general guidelines for entering field data into logbooks (hard copy and electronic) during site investigation and remediation activities.

## II.   Scope

This is a general description of data requirements and format for field logbooks.  Logbooks are needed to properly document all field activities in support of data evaluation and possible legal activities. Field notes may be recorded in field logbooks or electronically on computer tablets.

## III.   Equipment and Materials

- Logbook

- Indelible pen

- Jacobs supplied electronic tablet or laptop with notebook software

## IV.   Procedures and Guidelines

Properly completed field logbooks are a requirement for all of the work we perform under the Navy CLEAN contract. Logbooks are legal documents and, as such, must be prepared following specific procedures and must contain required information to ensure their integrity and legitimacy. This SOP describes the basic requirements for field logbook entries.

### A.   Procedures for Completing Field Logbooks

1.   Field notes commonly are kept in bound, hard-cover logbooks used by surveyors and produced, for example, by Peninsular Publishing Company and Sesco, Inc. Pages should be water resistant and notes should be taken only with water-proof, non-erasable permanent ink, such as that provided in Rite in the Rain or Sanford Sharpie permanent markers. Note: for sites where PFC is being analyzed for, Rite-in-the-Rain, Sanford Sharpie, or anything water-resistant or with Teflon cannot be used in the field.  All field book materials must be "fluorine free".  Acceptable substitutes would be a sewn notebook without a plastic cover, or loose-leaf notebook paper.

2.   Alternatively, field notes may be recorded electronically in Jacobs provided field tablets or laptop computers. Notes are recorded in appropriate note collection software; e.g., Microsoft One Note. At the end of each day, the electronic notes must be digitally signed by the author and downloaded for electronic file storage. The notes may be converted to an Adobe pdf file prior to storage. It is important that the field notes be downloaded daily to ensure the electronic time stamp of the notes is the same as the day the notes were recorded.

1

QC AND REVIEWED 3/2023

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 001, PREPARING FIELD LOGBOOKS

3. On the inside cover of the logbook the following information should be included:

– Company name and address

– Log-holders name if logbook was assigned specifically to that person

– Activity or location

– Project name

– Project manager's name

– Phone numbers of the company, supervisors, emergency response, etc.

4. All lines of all pages should be used to prevent later additions of text, which could later be questioned. Any line not used should be marked through with a line and initialed and dated. Any pages not used should be marked through with a line, the author's initials, the date, and the note "Intentionally Left Blank."

5. If field notes are recorded electronically, the author will not have any spaces between entries.

6. If errors are made in the logbook, cross a single line through the error and enter the correct information. All corrections shall be initialed and dated by the personnel performing the correction. If possible, all corrections should be made by the individual who made the error.

7. Daily entries will be made chronologically.

8. Information will be recorded directly in the field logbook during the work activity. Information will not be written on a separate sheet and then later transcribed into the logbook.

9. Each page of the logbook will have the date of the work and the note takers initials.

10. The final page of each day's notes will include the note-takers signature as well as the date.

11. Only information relevant to the subject project will be added to the logbook.

12. The field notes will be copied and the copies sent to the Project Manager or designee in a timely manner (at least by the end of each week of work being performed).

## B.   Information to be Included in Field Logbooks

1. Entries into the logbook should be as detailed and descriptive as possible so that a particular situation can be recalled without reliance on the collector's memory.  Entries must be legible and complete.

2. General project information will be recorded at the beginning of each field project.  This will include the project title, the project number, and project staff.

3. Scope: Describe the general scope of work to be performed each day.

4. Weather: Record the weather conditions and any significant changes in the weather during the day.

5. Tail Gate Safety Meetings: Record time and location of meeting, who was present, topics discussed, issues/problems/concerns identified, and corrective actions or adjustments made to address concerns/ problems, and other pertinent information.

6. Standard Health and Safety Procedures: Record level of personal protection being used (e.g., level D PPE), record air monitoring data on a regular basis and note where data were recording (e.g., reading in borehole, reading in breathing zone, etc). Also record other required health and safety procedures as specified in the project specific health and safety plan.

7. Instrument Calibration; Record calibration information for each piece of health and safety and field equipment.

8. Personnel: Record names of all personnel present during field activities and list their roles and their affiliation. Record when personnel and visitors enter and leave a project site and their level of personal protection.

9. Communications: Record communications with project manager, subcontractors, regulators, facility personnel, and others that impact performance of the project.

10. Time: Keep a running time log explaining field activities as they occur chronologically throughout the day.

11. Deviations from the Work Plan: Record any deviations from the work plan and document why these were required and any communications authorizing these deviations.

12. Health and Safety Incidents: Record any health and safety incidents and immediately report any incidents to the Project Manager.

13. Subcontractor Information: Record name of company, record names and roles of subcontractor personnel, list type of equipment being used and general scope of work.  List times of starting and stopping work and quantities of consumable equipment used if it is to be billed to the project.

14. Problems and Corrective Actions: Clearly describe any problems encountered during the field work and the corrective actions taken to address these problems.

15. Technical and Project Information: Describe the details of the work being performed. The technical information recorded will vary significantly between projects. The project work plan will describe the specific activities to be performed and may also list requirements for note taking. Discuss note-taking expectations with the Project Manager prior to beginning the field work.

16. Any conditions that might adversely affect the work or any data obtained (e.g., nearby construction that might have introduced excessive amounts of dust into the air).

17. Sampling Information: Specific information that will be relevant to most sampling jobs includes the following:

   – Description of the general sampling area – site name, buildings and streets in the area, etc.

   – Station/Location identifier

3

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 001, PREPARING FIELD LOGBOOKS

- Description of the sample location – estimate location in comparison to two fixed points – draw a diagram in the field logbook indicating sample location relative to these fixed points – include distances in feet.

- Sample matrix and type

- Sample date and time

- Sample identifier

- Draw a box around the sample ID so that it stands out in the field notes

- Information on how the sample was collected – distinguish between "grab," "composite," and "discrete" samples

- Number and type of sample containers collected

- Record of any field measurements taken (i.e., pH, turbidity, dissolved oxygen, and temperature, and conductivity)

- Parameters to be analyzed for, if appropriate

- Descriptions of soil samples and drilling cuttings can be entered in depth sequence, along with PID readings and other observations. Include any unusual appearances of the samples.

## C.     Suggested Format for Recording Field Data

1. Use the left side border to record times and the remainder of the page to record information (see attached example).

2. Use tables to record sampling information and field data from multiple samples.

3. Sketch sampling locations and other pertinent information.

4. Sketch well construction diagrams.

# V.    Attachments

- Example field notes.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

(47)   MAY 12, 2003   (EXAMPLE)

| Time | Entry |
|---|---|
| 0715 | ARRIVE ON SITE AT XYZ SITE. |
| | CH2M HILL STAFF: |
| | John Smith : FIELD TEAM LEADER |
| | Bob Builder: SITE SAFETY COORD. |
| | WEATHER: OVERCAST + COOL, 45°F |
| | CHANCE OF LATE SHOWERS |
| | SCOPE :• COLLECT GROUNDWATER |
| | SAMPLES for LTM work at SITE 14 |
| | • SUPERVISE SURVEY CREW |
| | AT SITE 17 |
| 0725 | BB and JS Calibrates |
| | PID: 101 ppm / 100 ppm OK |
| | PID Model #, SERIAL # |
| 0730 | BB CALIBRATES HORIBA METER |
| | Model #, Serial # |
| | → List calibration RESULTS |
| 0738 | SURVEY CREW ARRIVES on SITE |
| | → LIST NAMES |
| 0745 | BB Holds H+S Talk on Slips, |
| | Trips, FAlls, Ticks + AIR Monitoring |
| | JS + SURVEY CREW ATTEND |
| | No H+S ISSUES IDENTIFIED as |
| | concERNS. All work is in "Level D." |
| 0755 | JS conducts SITE-WIDE AIR Monitoring |
| | All readings = 0.0 ppm in |

JS
5-12-03

(48)   MAY 12, 2003   (EXAMPLE)

| Time | Entry |
|---|---|
| | SITE 14  LTM |
| | BREATHING ZONE (BZ) |
| 0805 | Mobilize to well MW-22 to |
| | SAMPLE, surveyors setting up |
| | At SITE 17 |
| 0815 | PM (PAUL PAPER PUSHER) CAlls AND |
| | INForms JS to collect GW SAMPLE |
| | At well MW-44 today for 24 hour |
| | TAT ANALYSIS OF VOCIS |
| 0820 | Purging MW-22 |
| | → RECORD WATER QUALITY DATA  JS 5-12-03 |
| 0843 | Collect SAMPLE At MW-22 for |
| | total TAl Metals and VOCIS. No |
| | Dissolved metals collected per FSP |
| 0905 | JS + BB Mobilize to SITE 17 to |
| | show surveyors wells to survey |
| 0942 | Mobilize to well MW-22 to |
| | Collect SAMPLE |
| 0950 | CAN not Access well MW-22 |
| | due to BASE OPERATIONS; Contact |
| | PAUL PAPER PUSHER AND he stated |
| | he will check on GAINING Access |
| | with BASE contAct |
| 0955 | Mobilize to well MW- 19 |

JS
5-12-03

5

STANDARD OPERATING PROCEDURE 001, PREPARING FIELD LOGBOOKS

This page intentionally left blank.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 002

# General Considerations for PFAS Investigations

## I. Purpose and Scope

This SOP describes the techniques to be used in conjunction with other approved standard operating procedures (SOPs) to conduct PFAS investigation.

## II. Materials and Equipment

- Loose leaf paper without waterproof coating or a spiralbound notebook (not waterproof) or tablet (see tablet use notes below)

- Metal clip board (if using loose-leaf paper)

- Pen (not Sharpie)

- Personal Protective Equipment (PPE) to be PFAS free – confirm with PFAS SME to confirm which products are suitable if using non-standard PPE (i.e, personal floatation device (PFD) and waders)

- PFAS-free tubing (avoid Teflon, Viton, PTFE and other fluorinated compounds)

  - High density polyethylene (HDPE) tubing (unlined)

  - If Masterflex tubing is needed for peristaltic pumps, Cole Parmer C-Flex (06424 series) and Tygon E-3603 (06509 series) are suitable options

- Sample containers (HDPE bottle with HDPE screwcap unless conducting drinking water sampling), sample bottles should not be glass as glass may sorb PFAS. Sample bottle caps should not contain Teflon. Notify your project manager (PM) if bottles provided by the lab are glass or contain Teflon parts.

- Laboratory prepared deionized, certified PFAS-free water for field blank collection

- PFAS-free shipping supplies (labels [if available][1], coolers, and ice)

- Nitrile or latex gloves (powder-free gloves only)

- Durham Geoslope Water Level Indicators and the Solinst Model 101 with the P2 meter have been shown to be fluorine free.

---

[1] Efforts will be made to obtain PFAS-free labels; however, information on labels is scarce and labels are frequently mounted on PFAS-coated paper to allow for easy removal.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

- PFAS-free Pump such as:
  - Geotech PFAS-free Portable Bladder Pump (note, most bladder pumps include a Teflon-lined bladder, but Geotech currently has one model which is Teflon-free).
  - Panacea P120 or P125. The P200 Stainless Steel Pump may also be used, but the standard model contains Teflon at the tube connection. If you are using this Panacea model, you must request one with the "PTFE-free thread sealant option."
  - Waterra stainless foot-valve
  - QED Sample Pro
  - Monsoon or Mega Monsoon submersible pump
  - Grundfos Rediflo2 (this pump contains small Teflon components, but has not been shown to leach, it is less preferable than the other options)
  - Peristaltic pump (may be suitable for some sample locations)
- Specifically, the following material should be avoided by the field team during sampling:
  - Gore-Tex brand or similar high-performance outdoor clothing, clothing treated with ScotchGuard® brand or similar water repellent, fluoropolymer-coated Tyvek®, wrinkle-resistant fabrics, and fire-resistant clothing with fluorochemical treatment or anything advertised as water repellant.
  - New clothing that has been washed fewer than six times.
  - Weather-proof log books with fluorochemical coatings.
  - Teflon or PTFE tape
  - Fluorinate pipe dope
  - Dry erase markers

# III.   Sampling Guidelines and Considerations

The sample collection area should be clear of the following items:

- Pre-packaged food wrappers (e.g., fast food sandwich wrappers, pizza boxes, etc.)
- Microwave popcorn bags
- Blue ice containers
- Non-stick aluminum foil
- Kim-Wipes
- Sunscreen, insect repellant and other personal hygiene products that may contain PFAS (contact your PFAS SME for an approved list of sunscreens and insect repellants)

The use of electronics (e.g., cell phones and tablets) should be avoided without the implementation of precautionary measures outlined below:
- All devices should be used with clean, ungloved hands and an approved stylus (if desired).

QC'D AND REVIEWED 04/2023                                                                                                    2

- Following the use of a device, hands must be washed with soap and water and clean gloves should be used prior to contact with sampling equipment (bottleware, tubing, etc.).

- Wash hands before sampling with dish detergent and don nitrile gloves.

- Affix labels immediately after samples have been collected and bottles have been closed, collect one sample at a time to ensure sample bottles are not mixed up.

- Place samples into Ziploc bags and then into a cooler immediately following sampling,

## IV.    Equipment Decontamination

Whenever possible, use disposable equipment when collecting samples. The use of any non-standard equipment must be approved by the SME to confirm the equipment does not contain any PFAS parts. If reusable equipment must be used, the equipment must be cleaned/decontaminated between uses. Alconox and Liquinox soap are acceptable for cleaning/decontaminating reusable equipment at PFAS sites. Any water used for cleaning/decontamination must be certified PFAS-free by a laboratory (or otherwise approved by the SME). Consider triple-rinsing. Once decontaminated, wrap equipment in plastic bags (such as Ziploc) or un-coated aluminum foil, and store away from potential PFAS sources.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 003

# Decontamination of Personnel and Equipment

## I.   Purpose

To provide general guidelines for the decontamination of personnel, sampling equipment, and monitoring equipment used in potentially contaminated environments.

## II.   Scope

This is a general description of decontamination procedures.

## III.   Equipment and Materials

- Demonstrated analyte-free, deionized ("DI") water (specifically, ASTM Type II water or lab-grade DI water)

- Potable water; must be from a municipal water supplier, otherwise an analysis must be run for appropriate volatile and semivolatile organic compounds and inorganic chemicals (e.g., Target Compound List and Target Analyte List chemicals)

- 2.5% (W/W) Liquinox and water solution

- Pesticide-grade (90%) isopropanol in squeeze bottle

- Large plastic pails or tubs for Liquinox and water, scrub brushes, squirt bottles for Liquinox solution, and water, plastic bags and sheets

- DOT approved 55-gallon drum for disposal of waste

- Personal Protective Equipment as specified by the Health and Safety Plan

- Decontamination pad and steam cleaner/high pressure cleaner for large equipment

## IV.   Procedures and Guidelines

### A.   Personnel Decontamination

To be performed after completion of tasks whenever potential for contamination exists, and upon leaving the exclusion zone.

1. Wash boots in Liquinox solution, then rinse with water. If disposable latex booties are worn over boots in the work area, rinse with Liquinox solution, remove, and discard into DOT-approved 55-gallon drum.

2. Wash outer gloves in Liquinox solution, rinse, remove, and discard into DOT-approved 55-gallon drum.

3. Remove disposable coveralls ("Tyvek") and discard into DOT-approved 55-gallon drum.

STANDARD OPERATING PROCEDURE 003, DECONTAMINATION OF PERSONNEL AND EQUIPMENT

4. Remove respirator (if worn).

5. Remove inner gloves and discard.

6. At the end of the workday, shower entire body, including hair, either at the work site or at home.

7. Sanitize respirator if worn.

## B.   Sampling Equipment Decontamination—Groundwater Sampling Pumps

Sampling pumps are decontaminated after each use as follows.

1. Don phthalate-free gloves.

2. Spread plastic on the ground to keep equipment from touching the ground

3. Turn off pump after sampling. Remove pump from well and remove and dispose of tubing. Place pump in decontamination tube.

4. Turn pump back on and recirculate 1 gallon of Liquinox solution through the sampling pump for a minute. Turn off the pump and containerize the used solution.

5. Turn pump back on and recirculate 1 gallon of tap water for a minute (deionized water may be substituted for tap water) Turn off the pump and containerize the used solution.

6. If pump was exposed to non-aqueous phase liquids remove pump from the tube and rinse lightly (a few cc's of solvent is sufficient) with isopropanol, over and through the pump, and allow to air dry. Note that isopropanol is highly flammable and should be used very sparingly and away from potential sources of ignition.

7. *Turn pump back on and recirculate 1 gallon of tap water for a minute (deionized water may be substituted for tap water) Turn off the pump and containerize the used solution.*

8. Keep decontaminated pump in decontamination tube or remove and wrap in aluminum foil or clean plastic sheeting.

9. Collect all rinsate and dispose of in a DOT-approved 55-gallon drum.

10. Decontamination materials (e.g., plastic sheeting, tubing, etc.) that have come in contact with used decontamination fluids or sampling equipment will be disposed of in either DOT-approved 55-gallon drums or with solid waste in garbage bags, dependent on Facility/project requirements.

## C.   Sampling Equipment Decontamination—Other Equipment

Reusable sampling equipment is decontaminated after each use as follows.

1. Don phthalate-free gloves.

2. Before entering the potentially contaminated zone, wrap soil contact points in aluminum foil (shiny side out).

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

3.    Rinse and scrub with potable water.

4.    Wash all equipment surfaces that contacted the potentially contaminated soil/water with Liquinox solution.

5.    Rinse with potable water.

6.    If equipment was exposed to non-aqueous phase liquids rinse lightly with isopropanol and allow to air dry.

7.    Rinse with deionized water.

8.    Completely air dry and wrap exposed areas with aluminum foil (shiny side out) for transport and handling if equipment will not be used immediately.

9.    Collect all rinsate and dispose of in a DOT-approved 55-gallon drum.

10.  Decontamination materials (e.g., plastic sheeting, tubing, etc.) that have come in contact with used decontamination fluids or sampling equipment will be disposed of in DOT-approved 55-gallon drums or with solid waste in garbage bags, dependent on Facility/project requirements.

## D.    Health And Safety Monitoring Equipment Decontamination

1.    Before use, wrap soil contact points in plastic to reduce need for subsequent cleaning.

2.    Wipe all surfaces that had possible contact with contaminated materials with a paper towel wet with Liquinox solution, and finally three times with a towel wet with distilled water. Solvents should not be used to clean plastic instruments as they could cause damage. Dispose of all used paper towels in a DOT-approved 55-gallon drum or with solid waste in garbage bags, dependent on Facility/project requirements.

## E.    Sample Container Decontamination

The outsides of sample bottles or containers filled in the field may need to be decontaminated before being packed for shipment or handled by personnel without hand protection. The procedure is:

1.    Wipe container with a paper towel dampened with Liquinox solution or immerse in the solution AFTER THE CONTAINERS HAVE BEEN SEALED. Repeat the above steps using potable water.

2.    Dispose of all used paper towels in a DOT-approved 55-gallon drum or with solid waste in garbage bags, dependent on Facility/project requirements.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 003, DECONTAMINATION OF PERSONNEL AND EQUIPMENT

### F.    Heavy Equipment and Tools

Heavy equipment such as drilling rigs, drilling rods/tools, and the backhoe will be decontaminated upon arrival at the site and between locations as follows:

1.    Set up a decontamination pad in area designated by the Facility

2.    Steam clean heavy equipment until no visible signs of dirt are observed. This may require wire or stiff brushes to dislodge dirt from some areas.

# V.    Attachments

None.

# VI.    Key Checks and Items

- Clean with solutions of Liquinox and distilled water.

- Use isopropanol only if heavy organic contamination is present, and then sparingly. Isopropanol should be allowed to evaporate rather than contained as it may render liquid investigation derived waste ignitable.

- Drum all contaminated rinsate and materials.

- Decontaminate filled sample bottles before relinquishing them to anyone.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 004

# Decontamination of Drilling Rigs and Equipment

## I.  Purpose and Scope

The purpose of this guideline is to provide methods for the decontamination of drilling rigs, downhole drilling tools, and water-level measurement equipment. Personnel decontamination procedures are not addressed in this SOP; refer to the site safety plan and SOP *Decontamination of Personnel and Equipment*. Sample bottles will not be field decontaminated; instead, they will be purchased with certification of laboratory sterilization.

## II.  Equipment and Materials

- Portable steam cleaner and related equipment

- Potable water

- 2.5% (W/W) Liquinox and water solution

- Buckets

- Brushes

- Isopropanol, pesticide grade

- Personal Protective Equipment as specified by the Health and Safety Plan

- ASTM–Type II grade water or Laboratory Grade Deionized Water

- Aluminum foil

## III.  Procedures and Guidelines

### A.  Drilling Rigs and Monitoring Well Materials

Before the onset of drilling, after each borehole, before drilling through permanent isolation casing, and before leaving the site, heavy equipment and machinery will be decontaminated by steam cleaning at a designated area. The steam-cleaning area will be designed to contain decontamination wastes and waste waters and can be an HDPE-lined, bermed pad. A pumping system will be used to convey decontaminated water from the pad to drums.

Surface casings may be steam cleaned in the field if they are exposed to contamination at the site prior to use.

### B.  Downhole Drilling Tools

Downhole tools will be steam cleaned before the onset of drilling, prior to drilling through permanent isolation casing, between boreholes, and prior to leaving the site. This will include, but is not limited to, rods, split spoons or similar samplers, coring equipment, augers, and casing.

QC AND REVIEWED 2/2023                                    1

STANDARD OPERATING PROCEDURE 004, DECONTAMINATION OF DRILLING RIGS AND EQUIPMENT

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

Before the use of a sampling device such as a split-spoon sampler for the collection of a soil sample for physical characterization, the sampler shall be cleaned by scrubbing with a detergent solution followed by a potable water rinse.

Before the use of a sampling device such as a split-spoon sampler for the collection of a soil sample for chemical analysis, the sampler shall be decontaminated following the procedures outlined in the following subsection.

## C.    Field Analytical Equipment

1.    Water Level Indicators

Water level indicators that consist of a probe that comes into contact with the groundwater must be decontaminated using the following steps:

– Rinse with Liquinox and water solution

– Rinse with de-ionized water

– Solvent rinse with isopropanol (optional)

– Rinse with deionized water

2.    Probes

Probes, for example, pH or specific ion electrodes, geophysical probes, or thermometers that would come in direct contact with the sample, will be decontaminated using the procedures specified above unless manufacturer's instructions indicate otherwise. For probes that make no direct contact, for example, PID equipment, the probe will be wiped with clean paper-towels or cloth wetted with isopropanol.

# IV.  Attachments

None.

# V.  Key Checks and Preventative Maintenance

The effectiveness of field cleaning procedures may be monitored by rinsing decontaminated equipment with organic-free water and submitting the rinse water in standard sample containers for analysis.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 005

# Disposal of Waste Fluids and Solids

## I.     Purpose and Scope

This SOP describes the procedures used to dispose of hazardous fluid and solid materials generated as a result of the site operations. This SOP does not provide guidance on the details of Department of Transportation regulations pertaining to the transport of hazardous wastes; the appropriate Code of Federal Regulations (49 CFR 171 through 177) should be referenced. Also, the site investigation-derived waste management plan should be consulted for additional information and should take precedence over this SOP.

## II.     Equipment and Materials

### A.     Fluids

- DOT-approved 55-gallon steel drums or frac tanks
- Tools for securing drum lids
- Funnel for transferring liquid into drum
- Labels
- Paint Pens
- Marking pen for appropriate labels
- Seals for 55-gallon steel drums

### B.     Solids

- DOT-approved 55-gallon steel drums or rolloffs
- Tools for securing drum lids
- Paint Pens
- Plastic sheets
- Labels
- Marking pen for appropriate labels

## III.     Procedures and Guidelines

### A.     Methodology

Clean, empty drums or roll-offs or frac tanks will be brought to the site by the drilling subcontractor for soil and groundwater collection and storage. The empty drums will be located

QC AND REVIEWED 2/2023                    1

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

at the field staging area and moved to drilling locations as required. The drums will be filled with the drilling and well installation wastes (fill drum ¾, not to top), capped, sealed, and moved to the onsite drum storage area by the drilling subcontractor. The full drums will separate types of wastes by media. The drums will be labeled as they are filled in the field and labels indicating that the contents are pending analysis affixed.

The drum contents will be sampled to determine the disposal requirements of the drilling wastes. Check with the Environmental Manager (EM) assigned to the project prior to sample collection for frequency and analysis. Unless otherwise specified by the EM, the drum sampling will be accomplished through the collection and submittal of composite samples, one sample per 10 drums (check with disposal facility to determine sample frequency) containing the same media. Similar compositing will be performed in each rolloff to obtain a representative sample. The compositing of the sample will be accomplished by collecting a specific volume of the material in each drum into a large sample container. When samples from each of the drums being sampled in a single compositing are collected, the sample will be submitted for TCLP, ignitability, corrosivity, and reactivity analysis. Additional analysis may be required by your EM.

If rolloffs are used, compositing and sampling of soil will comply with applicable state and federal regulations.

## B.    Labels

Drums and other containers used for storing wastes from drilling operations will be labeled when accumulation in the container begins. Analysis pending labels should be used initially. Labels will include the following minimum information:

- Container number
- Container contents
- Origin (source area including individuals wells, piezometers, and soil borings)
- Date that accumulation began
- Date that accumulation ended
- Generator Contact Information
- When laboratory results are received, drum labels will be completed or revised to indicate the hazardous waste constituents in compliance with Title 40 of the Code of Federal Regulations, Part 262, Subpart C if the results indicate hazardous waste or labeled as non-hazardous if applicable.

## C.    Fluids

Drilling fluids generated during soil boring and groundwater discharged during development and purging of the monitoring wells will be collected in 55-gallon, closed-top drums. When a drum is filled, the bung will be secured tightly. Fluids may also be transferred to frac tanks after being temporarily contained in drums to minimize the amount of drums used.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

When development and purging is completed, the water will be tested for appropriate hazardous waste constituents as per instruction from the project EM. Compositing and sampling of fluids will comply with applicable state and federal regulations.

## D.  Solids

The soil cuttings from well and boring drilling will constitute a large portion of the solids to be disposed of.

The solid waste stream also will include plastic sheeting used for decontamination pads, Tyveks, disposable sampling materials, and any other disposable material used during the field operations that appears to be contaminated. These materials will be placed in designated drums.

## E.  Storage and Disposal

The wastes generated at the site at individual locations will be transported to the drum storage area by the drilling services subcontractor. Drums should be stored on plastic sheeting with a short berm wall (hay bales or 2 x 4 planks or equivalent) to capture small spills. The drums should be staged such that the labels are all visible and there should be enough room to walk between rows of drums if applicable.

Waste solid materials that contain hazardous constituents will be disposed of at an offsite location in a manner consistent with applicable solid waste, hazardous waste, and water quality regulations. Transport and disposal will be performed by a commercial firm under subcontract.

The liquid wastes meeting acceptable levels of discharge contamination may be disposed of through the sanitary sewer system at the site. However, prior to disposal to the sanitary sewer system, approval and contract arrangements will be made with the appropriate authorities. Wastes exceeding acceptable levels for disposal through the sanitary sewer system will be disposed of through contract with a commercial transport and disposal firm.

# IV.  Attachments

None.

# V.  Key Checks and Preventative Maintenance

- Contact the project Environmental Manager prior to containerizing waste to determine containerization method and sampling frequency and analysis.

- Check that representative samples of the containerized materials are obtained.

- Be sure that all state and federal regulations are considered when classifying waste for disposal.

STANDARD OPERATING PROCEDURE 005, DISPOSAL OF WASTE FLUIDS AND SOLIDS

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

This page intentionally left blank.

4

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 017

# Field Measurement of pH, Specific Conductance, Turbidity, Dissolved Oxygen, ORP, and Temperature Using a Water Quality Meter with Flow-Through Cell

## I.    Purpose and Scope

The purpose of this procedure is to provide a general guideline for using a water quality meter for field measurements of pH, specific conductance, turbidity, dissolved oxygen, oxidation-reduction potential (ORP), and temperature of aqueous samples. The operator's manual should be consulted for detailed operating procedures.

## II.    Equipment and Materials

- Water Quality Monitoring System with flow-through cell (Horiba, YSI, In-Situ, Ion Science, etc.)
- Calibration Standard Solution(s) (provided by rental company)
- Deionized water in spray bottle

## III.    Procedures and Guidelines

### A.    General Parameters and Specifications:

Note: the general parameters listed below may not be available for every type of meter used. Please refer to the specific meter's manual to determine meter's range of measurement and accuracy.

| Parameter | Range of measurement | Accuracy |
|---|---|---|
| pH | 0 to 14 pH units | +/- 0.1 pH units |
| Specific conductance | 0 to 9.99 S/m | +/- 3 % full scale |
| Turbidity | 0 to 800 NTU | +/- 5 % full scale |
| Dissolved oxygen | 0 to 19.99 mg/l | +/- 0.2 mg/l |
| Temperature | 0 to 55 °C | +/- 1.0 °C |
| ORP | -999 to +999 mV | +/- 15 mV |
| Salinity | 0 to 4 % | +/- 0.3 % |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 017, FIELD MEASUREMENT OF PH, SPECIFIC CONDUCTANCE, TURBIDITY, DISSOLVED OXYGEN, ORP, AND TEMPERATURE USING A WATER QUALITY METER WITH FLOW-THROUGH CELL

### B.     Calibration:

Prior to each day's use, clean the probe and flow-through cell using deionized water and calibrate using the Standard Solution. Refer to the specific instrumentation manual for the proper calibration methods.

### C.     Sample Measurement:

The water quality probes are inserted into a flow-through cell, and the purged groundwater is directed through the cell by connecting the pump discharge tubing to the bottom port on the flow through cell, allowing measurements to be collected before the water contacts the atmosphere. The flow-through cell should be positioned out of direct sunlight to reduce solar heating, and wrapped in aluminum foil to minimize heat loss or gain.

As water passes through the flow-through the flow cell, press MEAS to obtain readings or the readings are displayed on the meter for each parameter (dependent on the type of meter used). Record the water quality parameter data in a field notebook.

Once the parameters have stabilized (see *Low-Flow Groundwater Sampling from Monitoring Wells – EPA Region I and III* or *Low-Flow Groundwater Sampling from Monitoring Wells – EPA Region IV* depending on project site location), remove the tubing from the bottom port of the flow-through cell.

Never collect a groundwater sample for laboratory analysis from the flow-through cell. Rinse the flow-through cell between wells to remove any sediment buildup within the cell.

## IV.   Key Checks and Preventive Maintenance

- Calibrate meter

- Clean probe with deionized water when done

- Refer to operations manual for recommended maintenance and troubleshooting

- Check batteries, and have a replacement set on hand

- Due to the importance of obtaining these parameters, the field team should have a spare unit readily available in case of an equipment malfunction

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 026

# Low-Flow Groundwater Sampling from Monitoring Wells – EPA Region IV

## I.     Purpose and Scope

This SOP presents general guidelines for the collection of groundwater samples from monitoring wells using low-flow purging and sampling procedures.

## II.     Equipment and Materials

- Adjustable-rate positive-displacement pump, electric submersible pump, or peristaltic pump[1]

- Multi parameter water quality meter and flow through cell to monitor pH, specific conductance, turbidity, dissolved oxygen, oxidation-reduction potential (ORP), and temperature

- Air monitoring equipment

- Personal protective equipment

- Generator or alternate power source depending on pump type

- Hand tools (9/16-inch socket, screwdrivers, tubing cutter, scissors)

- Water-level indicator

- New, clean, ¼-inch outer diameter Teflon, Teflon-lined polyethylene tubing or polyethylene tubing

- New, clean, ¼-inch inner diameter silicone tubing

- Plastic sheeting

- Well-construction information

- Calibrated container and stopwatch to measure flow rate

- Purged water containers

- Sample containers

- Waste container labels

- In-line disposable 0.45µm filters (QED®  FF8100 or equivalent)

- Shipping supplies (labels, coolers, and ice)

- Aluminum foil

- Field book

---

[1] Reference Section III C for specific guidance when using peristaltic pumps

QC AND REVIEWED 2/2023                                         1

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 026, LOW-FLOW GROUNDWATER SAMPLING FROM MONITORING WELLS – EPA REGION IV

# III.   Procedures and Guidelines

## A.   Setup and Purging

1.  Obtain information on well location, diameter(s), depth, and screen interval(s), and the method for disposal of purged water.

2.  Calibrate instruments according to manufacturer's instructions.

3.  Record well number, site, date, and condition in the field logbook.

4.  Place plastic sheeting on the ground surrounding well head.  All decontaminated equipment to be used in sampling will be placed only on the plastic sheeting until after the sampling has been completed. Do not let any downhole equipment touch the ground.

5.  Open the well and begin screening breathing zone with the air monitoring device until sampling is complete, in accordance with the HASP.

6.  All sampling equipment and any other equipment to be placed in the well is cleaned and decontaminated before sampling in accordance with SOP *Decontamination of Personnel and Equipment*.

7.  Water level measurements are collected in accordance with the *Water Level Measurements* SOP.  **Do not measure the depth to the bottom of the well at this time**; this reduces the possibility that any accumulated sediment in the well will be disturbed.  Obtain depth to bottom information from well construction log.

8.  Attach and secure the tubing to the pump. Lower the pump slowly into the well and set it at approximately the middle of the screen, or wetted screen interval, and at least two feet above the bottom of the well to avoid disturbance of sediment. Submersible pumps should be lowered by the suspension cable rather than the discharge tubing.

9.  Insert the water quality measurement probes into the flow-through cell and place in a shaded area. The purged groundwater must enter the flow through the cell by the lower port and exit via the upper port. Wrap exposed tubing and the flow through cell in aluminum foil to minimize heat loss/gain due to environmental conditions.

10. Generators and fuel, if used, must be located at least 30 feet downwind from the well to avoid exhaust fumes contaminating the samples.

11. Begin purging the well at 0.2 to 0.5 liters per minute.   Avoid surging.  Purging rates for more transmissive formations could be started at 0.5-liter to 1 liter per minute. The initial field parameters of pH, specific conductance, dissolved oxygen, ORP, turbidity, and temperature of water are measured and recorded in the field logbook.

12. Contain purged water for placement in labeled 55-gallon drum or tank, as appropriate.

13. The water level should be monitored frequently during purging, and, ideally, the purge rate should equal the well recharge rate so that there is little or no drawdown in the well (i.e., less than 0.3-foot).  The water level should stabilize for the specific purge rate.  Record adjustments in the purge rate and changes in depth to water in the logbook.  Purge rates should, if needed, be decreased to the minimum capabilities of the pump (0.1- to 0.2-liter

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 026, LOW-FLOW GROUNDWATER SAMPLING FROM MONITORING WELLS – EPA REGION IV

per minute) to avoid excessive water level drawdown. <u>If the water level is drawn down by more than 1 foot, or 5% of the static water column, purging should be conducted using the 'well volume' method in accordance with SOP <em>Groundwater Sampling from Monitoring Wells</em></u>.

14. During purging, the field parameters are measured frequently (every 5 minutes) until the parameters have stabilized.  Field parameters are considered stable when three consecutive measurements meet the following criteria:

- pH: within 0.1 Standard Unit

- Specific conductance: within 5 percent

## B.     Sample Collection

1. Once purging is complete the well is ready to sample. The pump should be allowed to operate at the same rate as the purge cycle until sampling begins, whereupon the discharge should be reduced to 0.1 L/m.

2. Volatile organic compound (VOC) samples are normally collected first and directly into pre-preserved sample containers (see Special Conditions for Sampling with Peristaltic Pumps).

3. The steps to be followed for sample collection are as follows:

- The cap is removed from the sample bottle, and the bottle is tilted slightly.

- The sample is slowly poured so that it runs down the inside of the sample bottle with a minimum of splashing. The pumping rate should be reduced to approximately 100 ml per minute when sampling VOCs.

- Inorganics, including metals, may be collected and preserved in the filtered form as well as the unfiltered form.  Disposable in-line filters (0.45-micron filter), connected to the end of the sample tubing, are typically used for field filtration.  Samples are field filtered as the water is being placed into the sample container.

- Adequate space is left in the bottle to allow for expansion, except for VOC vials, which are filled to the top with a positive meniscus. VOC vials should be capped slowly to prevent introduction of air bubbles in the sample. Once capped, the VOC vial should be inverted and tapped to detect the presence of air bubbles.

- Immediately upon collection, all samples for chemical analysis are to be labeled and placed on ice.

- Re-usable equipment is cleaned and decontaminated in accordance with the <em>Decontamination of Personnel and Equipment</em> SOP.

4. The following information, at a minimum, will be recorded in the log book:

- Sample identification (site name, location, and project number; sample name/number and location; sample type and matrix; time and date; sampler's identity)

- Sample source and description

3

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 026, LOW-FLOW GROUNDWATER SAMPLING FROM MONITORING WELLS – EPA REGION IV

5.    Field observations and measurements (appearance, volatile screening, field chemistry, sampling method), volume of water purged prior to sampling, and field parameter measurements

6.    Sample disposition (preservative; laboratory name, date and time sent; laboratory sample number, chain-of-custody number, sample bottle lot number)

## C.    Special Conditions for Sampling with Peristaltic Pumps

The EPA Region 4 Groundwater Sampling SOP states, "Samples for organic analyses cannot be exposed to the flexible peristaltic pump-head tubing due to the risk that the tubing would sorb contaminants and the propensity of this tubing to contribute organic compounds to the sample." Consequently, when collecting samples for organic compound analyses using a peristaltic pump it is necessary to use a vacuum container ("Vacuum Jug Method"), placed between the pump and the well for semi-volatile organic compounds (SVOC) sample collection or the "Soda-straw" method for VOC samples, as described below.

When sampling by peristaltic pump, samples should be collected in order of turbidity sensitivity, as follows:

- Metals and wet chemistry – directly from the pump discharge
- SVOCs, pesticides, herbicides, PCBs, dioxins, furans – by "vacuum jug" method
- VOCs – by "soda-straw" method

## D.    Vacuum Jug Method

The following step-by-step procedures describe the process of sampling with a peristaltic pump and vacuum jug:

- Disconnect the purge tubing from the pump. Make sure the tubing is securely attached to the protective casing or other secure object.

- Insert the tubing into one of the ferrule nut fittings of a Teflon® vacuum container transfer cap assembly.

- Place a suitable length of Teflon® tubing between the remaining transfer cap assembly ferrule nut fitting and the vacuum side of the flexible tubing in the peristaltic pump head. Securely hand-tighten both fittings.

- Turn the pump on. Water should begin to collect in the transfer container (typically a 1-liter "Boston round" glass sample container) within a few minutes. If water does not begin to flow into the container within several minutes, check the transfer cap fittings and make sure the assembly is tightly attached to the container. It may be necessary to tighten the ferrule nuts with a wrench or pliers to achieve a vacuum in the system, particularly when approaching the maximum head difference between the pump and water table (limit of suction).

- When the transfer container is nearly full, turn off the pump, remove the transfer cap assembly, and pour the sample into the appropriate containers.

4

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 026, LOW-FLOW GROUNDWATER SAMPLING FROM MONITORING WELLS – EPA REGION IV

1. If additional sample volume is needed, replace the transfer cap assembly, turn the pump on, and collect additional volume.

## E.    Soda-Straw Method

The "soda straw" method involves allowing the tubing to fill, by either lowering it into the water column (A) or by filling it via suction applied by the pump head (B). To avoid having to reinsert the tubing into the well to collect additional sample volume samplers should cut the tubing several feet longer than the well depth requires thereby increasing the storage capacity.

- If method (A) is used, the tubing is removed from the well after filling and the captured sample is allowed to drain into the sample vials.

- If method (B) is used, after running the pump and filling the tubing with sample, the pump speed is reduced, and the direction reversed to push the sample out of the tubing into the vials.

- Avoid completely emptying the tubing when filling the sample vials when using method (B) to prevent introducing water that was in contact with the flexible pump head tubing.

- Either method is repeated, as necessary, until all vials are filled, taking care to prevent the tubing from contacting any surface.

Samples for some constituents, primarily inorganic analytes such as metals and cyanide, may be collected directly from the peristaltic pump head tubing. This method is acceptable under the following conditions:

- The pump head tubing must be changed between sampling locations;

- An equipment rinsate blank must be collected by pumping de-ionized water through a piece of the tubing.

## F.    Additional remarks

1. If the well goes dry during purging, wait until it recovers sufficiently to remove the required volumes to sample all parameters.  It may be necessary to return periodically to the well but a particular sample (e.g., large amber bottles for semivolatile analysis) should be filled at one time rather than over the course of two or more visits to the well.

2. Disposable tubing is disposed of with PPE and other site trash.

# IV.  Attachments

- White paper on reasons and rationale for low-flow sampling.

# V.   Key Checks and Preventative Maintenance

- The drawdown in the well should be minimized as much as possible (preferably no more than 0.5-foot to 1 foot) so that natural groundwater-flow conditions are maintained as closely as possible.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 026, LOW-FLOW GROUNDWATER SAMPLING FROM MONITORING WELLS – EPA REGION IV

- The highest purging rate should not exceed 1 liter per minute. This is to keep the drawdown minimized.

- Stirring up of sediment in the well should be avoided so that turbidity containing adsorbed chemicals is not suspended in the well and taken in by the pump.

- Overheating of electric submersible pumps should be avoided to minimize the potential for losing VOCs through volatilization. Submersible pumps used in large diameter wells should be equipped with a shroud to force water flow across the pump motor to dissipate heat build-up.

- Keep the working space clean with plastic sheeting and good housekeeping.

- Maintain field equipment in accordance with the manufacturer's recommendations.  This will include, but is not limited to:

  – Inspect sampling pump regularly and replace as warranted

  – Inspect quick-connects regularly and replace as warranted

  – Verify battery charge, calibration, and proper working order of field measurement equipment prior to initial mobilization and daily during field efforts

STANDARD OPERATING PROCEDURE 026, LOW-FLOW GROUNDWATER SAMPLING FROM MONITORING WELLS – EPA REGION IV

ATTACHMENT 1

# Reasons and Rationale For Low-Flow Sampling

EPA recommends low-flow sampling as a means of collecting groundwater samples in a way that minimizes the disturbance to the natural groundwater flow system and minimizes the introduction of contamination into the samples from extraneous sources. The following are details about these issues.

When a pump removes groundwater from the well at the same rate that groundwater enters the well through the screen, the natural groundwater-flow system around the well experiences a minimum of disturbance. Some disturbance is bound to occur because you are causing groundwater to flow to the well in a radial fashion that otherwise would have flowed past it. However, the resulting low-flow sample provides the most-representative indication we can get of groundwater quality in the immediate vicinity of the well.

Normally, when a well is pumped at an excessive rate that drops the water level in the well below the water level in the aquifer, the water cascades down the inside of the well screen when it enters the well. The turbulence from this cascading causes gases such as oxygen and carbon dioxide to mix with the water in concentrations that are not representative of the native groundwater and are higher than expected. This causes geochemical changes in the nature of the water that can change the concentrations of some analytes, particularly metals, in the groundwater sample, not mention it's effect on the dissolved oxygen levels that then will be measured in the flow-through cell. Such turbulence also may cause lower-than-expected concentrations of volatile organic compounds due to volatilization.

For wells in which the water level is above the top of the screen, the water up in the riser is out of the natural circulation of the groundwater and, therefore, can become stagnant. This stagnant water is no longer representative of natural groundwater quality because its pH, dissolved-oxygen content, and other geochemical characteristics change as it contacts the air in the riser. If we minimize the drawdown in the well when we pump, then we minimize the amount of this stagnant water that is brought down into the well screen and potentially into the pump. As a result, a more-representative sample is obtained.

Typically, wells contain some sediment in the bottom of the well, either as a residue from development that has settled out of the water column or that has sifted through the sand pack and screen since the well was installed. This sediment commonly has adsorbed on it such analytes as metals, SVOCs, and dioxins that normally would not be dissolved in the groundwater. If these sediments are picked up in the groundwater when the well is disturbed by excessive pumping, they can:

- Make filtering the samples for metals analysis more difficult

- Add unreasonably to the measured concentration of SVOCs and other organic compounds

The SOP for low-flow sampling has been modified recently and should be consulted for additional information about low-flow sampling and ways of dealing with wells in which the water level cannot be maintained at a constant level.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 026, LOW-FLOW GROUNDWATER SAMPLING FROM MONITORING WELLS – EPA REGION IV
ATTACHMENT 1 – REASONS AND RATIONALE FOR LOW-FLOW SAMPLING

This page intentionally left blank.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 028

# Groundwater Sampling from Monitoring Wells – EPA Region IV

## I.     Purpose and Scope

This procedure presents general guidelines for collecting groundwater samples from monitoring wells using the well-volume approach.  The procedure **does not** address purging and sampling using "low-flow" techniques (see SOP *Low-Flow Groundwater Sampling from Monitoring Wells – EPA Region IV).* Operations manuals should be consulted for specific calibration and operating procedures.

## II.    Equipment and Materials

- Adjustable-rate positive-displacement pump, electric submersible pump, or peristaltic pump[1]

- Weighted, single check valve bailers (polyethylene or Teflon) and nylon cord, if applicable

- Multi parameter water quality meter and flow through cell to monitor pH, specific conductance, turbidity, dissolved oxygen, oxidation-reduction potential (ORP), and temperature Air monitoring equipment

- Personal protective equipment

- Generator or alternate power source depending on pump type

- Water-level indicator

- New, clean, Teflon, Teflon-lined polyethylene tubing or polyethylene tubing (sized to suite the pump)

- New, clean silicone tubing (for use with peristaltic pumps)

- Plastic sheeting

- Well-construction information

- Calibrated container and stopwatch to determine flow rate

- Purged water containers

- Sample containers

- Waste container labels

- In-line disposable 0.45μm filters (QED® FF8100 or equivalent)

- Shipping supplies (labels, coolers, and ice)

- Aluminum foil

---

[1] Reference Section IV for specific guidance using peristaltic pumps

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 028, GROUNDWATER SAMPLING FROM MONITORING WELLS - EPA REGION IV

- Field book

- Hand tools

*Note: bailers and peristaltic pumps should only be used when site access or other limitations prevent the use of sampling pumps*

# III.  Procedures and Guidelines

## A.  Setup and Purging

1.  Obtain information on well location, diameter(s), depth, and screened interval(s), and the method for disposal of purged water.

2.  A pump will be used for well purging if the well yield is adequate; otherwise, a bailer may be used depending on project requirements.

3.  Sampling equipment is cleaned and decontaminated prior to sampling in accordance with SOP *Decontamination of Personnel and Equipment*.

4.  Instruments are calibrated according to manufacturer's instructions.

5.  The well number, site, date, and condition are recorded in the field logbook.

6.  Plastic sheeting is placed on the ground, and the well is unlocked and opened.

7.  Open the well and begin screening breathing zone with air monitoring device until sampling is complete, in accordance with the HASP.

8.  Water level measurements are collected in accordance with the *Water Level Measurement* SOP. **Do not measure the depth to the bottom of the well at this time**; this reduces the possibility that any accumulated sediment in the well will be disturbed.  Obtain depth to bottom information from well construction log.

9.  Calculate the volume (V) of water in a well casing as follows:

$$V = 0.041\ d^2h$$

where:     V = volume of water in well (gallons)
d = diameter of well in <u>inches</u>
h = height of water column in <u>feet</u>

10.  The volume of water in common well casing diameters may be calculated as follows:

2-inch diameter well:
0.163 gal/ft x ____ (linear feet of water) = gallons
4-inch diameter well:
0.653 gal/ft x ____ (linear feet of water) = gallons
6-inch diameter well:
1.469 gal/ft x ____ (linear feet of water) = gallons

11.  Attach tubing, support cable or rope, and air line (if applicable) to the pump. The support cable should bear the weight of the pump. Set the pump intake near the top of the water column. This is done so that the pump will "pull" water from the formation into the screened

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 028, GROUNDWATER SAMPLING FROM MONITORING WELLS - EPA REGION IV

area of the well and up through the casing so that the entire static volume can be removed. It is recommended that the pump not be lowered more than 3 to 5 feet into the water column. If the recovery rate of the well is faster than the pump rate and no observable draw down occurs, the pump should be raised until the intake is within 1 foot of the top of the water column. If the pump rate exceeds the recovery rate of the well, the pump will have to be lowered, as needed, to accommodate the drawdown.

12. If an electric submersible pump is to be used in a large diameter well (greater than 4 inches), a pump shroud should be used to direct the flow of water across the pump motor. Failure to use a shroud in this situation can lead to overheating of the motor and loss of volatiles from the pump discharge.

13. Generators and fuel, if used, must be located at least 30 feet downwind from the well to avoid exhaust fumes contaminating the samples.

14. If a bailer is being used, it should be removed from its protective covering and attached to a cord compatible with the site contaminants. The bailer should be lowered into the top of the water column, allowed to fill, and removed. It is critical that bailers be slowly and gently immersed into the top of the water column, particularly during final stages of purging, to minimize turbidity and disturbance of volatile organic constituents. The use of bailers for purging and sampling is discouraged because the correct technique is highly operator dependent and improper use may result in an unrepresentative sample.

15. Insert the water quality measurement probes into the flow-through cell and place in a shaded area. The purged groundwater must enter the flow through the cell by the lower port and exit via the upper port. Wrap exposed tubing and the flow through cell in aluminum foil to minimize heat loss/gain due to environmental conditions. Field parameters including pH, ORP, turbidity, dissolved oxygen, specific conductance, and temperature are measured and recorded in the field logbook.

16. A minimum of three well volumes must be purged (up to 5 well volumes may be purged if water quality parameters do not stabilize) prior to sampling. In low-yielding wells, if the well is purged dry it is <u>not necessary to remove a minimum of three well volumes</u>; however, the well should be allowed to recover sufficiently to allow collection of all samples at one time.

17. During purging, the field parameters are measured frequently (every 5 to 10 minutes) until the parameters have stabilized. Field parameters are considered stable when three consecutive measurements meet the following criteria:

- pH: within 0.1 Standard Units
- Specific conductance: within 5 percent

## B.   Sample Collection

1. Once purging is complete the well is ready to sample. The pump should be allowed to operate at the same rate as the purge cycle until sampling begins, whereupon the discharge should be reduced to 0.1 L/m.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 028, GROUNDWATER SAMPLING FROM MONITORING WELLS - EPA REGION IV

2.  Samples will be placed in sample containers that have been cleaned to laboratory standards and are preserved in accordance with the analytical method. The containers are typically pre-preserved, if required.

3.  The steps to be followed for sample collection are as follows:

- The cap is removed from the sample bottle, and the bottle is tilted slightly.

- The sample is slowly poured from the bailer or discharged from the pump so that it runs down the inside of the sample bottle with a minimum of disturbance. The pumping rate should be reduced to approximately 100 ml per minute when sampling VOCs.

- Inorganics, including metals, may be collected and preserved in the filtered form as well as the unfiltered form. Disposable in-line filters (0.45 micron filter), connected to the end of the sample tubing, are typically used for field filtration. Samples are field filtered as the water is being placed into the sample container. If a bailer is used, filtration may be driven by a peristaltic pump.

- Adequate space is left in the bottle to allow for expansion, except for VOC vials, which are filled to the top with a positive meniscus. VOC vials should be capped slowly to prevent introduction of air bubbles in the sample. Once capped, the VOC vial should be inverted and tapped to detect the presence of air bubbles.

- The bottle is capped and clearly labeled.

- Immediately upon collection, all samples for chemical analysis are to be placed in a closed container on ice.

- If the sample tubing or bailer is dedicated, it is returned to the well and the well is capped and locked. Nondedicated equipment is cleaned and decontaminated in accordance with the *Decontamination of Personnel and Equipment* SOP.

4.  The following information, at a minimum, will be recorded in the log book:

- Sample identification (site name, location, and project number; sample name/number and location; sample type and matrix; time and date; sampler's identity)

- Sample source and description

- Field observations and measurements (appearance, volatile screening, field chemistry, sampling method), volume of water purged prior to sampling, number of well volumes purged, and field parameter measurements

- Sample disposition (preservative; laboratory name, date and time sent; laboratory sample number, chain-of-custody number, sample bottle lot number)

# IV.  Additional remarks

**Special Conditions for Sampling with Peristaltic Pumps**

The EPA Region 4 Groundwater Sampling SOP states, *"Samples for organic analyses cannot be exposed to the flexible peristaltic pump-head tubing due to the risk that the tubing would sorb contaminants and the propensity of this tubing to contribute organic compounds to the sample."* Consequently, when collecting

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 028, GROUNDWATER SAMPLING FROM MONITORING WELLS - EPA REGION IV

samples for organic compound analyses using a peristaltic pump it is necessary to use a vacuum container ("Vacuum Jug Method"), placed between the pump and the well for semi-volatile organic compounds (SVOC) sample collection or the "Soda-Straw" method for VOC samples, as described below.

When sampling by peristaltic pump, samples should be collected in order of turbidity sensitivity, as follows:

- Metals and wet chemistry – directly from the pump discharge
- SVOCs, pesticides, herbicides, PCBs, dioxins, furans – by "vacuum jug" method
- VOCs – by "soda-straw" method

**Vacuum Jug Method**

The following step-by-step procedures describe the process of sampling with a peristaltic pump and vacuum jug:

- Disconnect the purge tubing from the pump. Make sure the tubing is securely attached to the protective casing or other secure object.

- Insert the tubing into one of the ferrule nut fittings of a Teflon® vacuum container transfer cap assembly.

- Place a suitable length of Teflon® tubing between the remaining transfer cap assembly ferrule nut fitting and the vacuum side of the flexible tubing in the peristaltic pump head. Securely hand-tighten both fittings.

- Turn the pump on. Water should begin to collect in the transfer container (typically a 1-liter "Boston round" glass sample container) within a few minutes. If water does not begin to flow into the container within several minutes, check the transfer cap fittings and make sure the assembly is tightly attached to the container. It may be necessary to tighten the ferrule nuts with a wrench or pliers to achieve a vacuum in the system, particularly when approaching the maximum head difference between the pump and water table (limit of suction).

- When the transfer container is nearly full, turn off the pump, remove the transfer cap assembly, and pour the sample into the appropriate containers.

- If additional sample volume is needed, replace the transfer cap assembly, turn the pump on, and collect additional volume.

**Soda-Straw Method**

The "soda straw" method involves allowing the tubing to fill, by either lowering it into the water column (A) or by filling it via suction applied by the pump head (B). To avoid having to reinsert the tubing into the well to collect additional sample volume samplers should cut the tubing several feet longer than the well depth requires thereby increasing the storage capacity.

- If method (A) is used, the tubing is removed from the well after filling and the captured sample is allowed to drain into the sample vials.

- If method (B) is used, after running the pump and filling the tubing with sample, the pump speed is reduced and the direction reversed to push the sample out of the tubing into the vials.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 028, GROUNDWATER SAMPLING FROM MONITORING WELLS - EPA REGION IV

- Avoid completely emptying the tubing when filling the sample vials when using method (B) to prevent introducing water that was in contact with the flexible pump head tubing.

- Either method is repeated, as necessary, until all vials are filled, taking care to prevent the tubing from contacting any surface.

Samples for some constituents, primarily inorganic analytes such as metals and cyanide, may be collected directly from the peristaltic pump head tubing. This method is acceptable under the following conditions:

- The pump head tubing must be changed between sampling locations;

- An equipment rinsate blank must be collected by pumping de-ionized water through a piece of the tubing.

# V.  Attachments

None.

# VI.  Key Checks and Preventative Maintenance

- Use of peristaltic pumps and bailers should be avoided, if possible.

- Allow the field parameters to stabilize within the specified criteria as much as possible.

- Fill bottles for VOC samples first.

- Be sure the sample identification is properly specified.

- Maintain field equipment in accordance with the manufacturer's recommendations.  This may include, but is not limited to:

  – Inspect sampling pump regularly and replace as warranted

  – Bring supplies for replacing the bladder and "O" rings if using a positive-displacement bladder pump

  – Inspect tubing regularly and replace as warranted

  – Inspect air/sample line quick-connects regularly and replace as warranted

  – Verify battery charge, calibration, and proper working order of field measurement equipment prior to initial mobilization and daily during field efforts

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 040

# Multi RAE Photoionization Detector (PID)

## I. Purpose

The purpose of this SOP is to provide general reference information for using the Multi RAE PID in the field. Calibration and operation, along with field maintenance, will be included in this SOP.

## II. Scope

This procedure provides information on the field operation and general maintenance of the Multi RAE PID. Review of the information contained herein will ensure that this type of field monitoring equipment will be properly utilized. Review of the owner's instruction manuals is a necessity for more detailed descriptions.

## III. Definitions

Carbon Monoxide Sensor (CO) - Carbon Monoxide concentration in ppm.

Volatile Organic Compound (VOC) – VOC concentration in ppm

Lower Explosive Limit (LEL) - Combustible gas is expressed as a percent of the lower explosive limit.

Hydrogen Sulfide Sensor ($H_2S$) - Hydrogen Sulfide concentration in ppm.

Oxygen Sensor (OXY) - Oxygen concentration as a percentage.

ppm - parts per million: parts of vapor or gas per million parts of air by volume.

## IV. Procedures

The PID operates on the principle that most organic compounds and some inorganic compounds are ionized when they are bombarded by high-energy ultraviolet light. The air sample is drawn across a UV lamp using a pump or a fan. The energy of the lamp determines whether a particular chemical will be ionized. Each chemical compound has a unique photoionization potential (PIP). When the UV light energy is greater than the ionization potential of the chemical, ionization will occur. All PID readings are relative to the calibration gas, usually isobutylene.

It is important to calibrate the PID in the same temperature and elevation that the equipment will be used, and to determine the background concentrations in the field before taking measurements. For environments where background readings are high, factory zero calibration gas should be used.

Note:  For volatile and semi-volatile compounds, knowing the PIP is critical in determining the appropriate instrument to use when organic vapor screening. Consult the QAPP and manufacturer's manual to determine that the proper instrument has been selected for the contaminate vapors of interest. If an expected compound at a site has a PIP less than 11.7 eV, it is possible to use a PID. If the ionization potential is greater than 11.7eV, a flame-ionization detector is required.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 040, MULTI RAE PHOTOIONIZATION DETECTOR (PID)

The following subsections will discuss Mini RAE calibration, operation, and maintenance. These sections, however, do not take the place of the instruction manual.

## A.    Calibration

For Multi RAE configured with $O_2$, LEL, $H_2S$, CO, sensors and a 10.6 eV PID Lamp.

1. Start up Instrument

- Press Mode button

- A RAE Systems logo (or a company name) should appear first. This is followed by a progression of screens that tell you the MultiRAE's current settings:

    – Product name and model number, air flow type, and serial number

    – Application firmware version, build date, and build time

    – Sensor firmware, build date, build time

    – Installed sensors (including serial number/production/expiration/calibration date and alarm limit settings)

    – Current date, time, temperature, and relative humidity

    – User mode and operation mode

    – Battery type, voltage, shutoff voltage

    – Alarm mode and alarm settings

    – Datalog period (if it is activated) and interval

    – Policy Enforcement settings (whether calibration and/or bump testing are enforced)

- Then the MultiRAE's main reading screen appears. It may take a few minutes for sensors to show a reading, so if any have not warmed up by the time the main screen is shown, you will see "- - -" instead of a numerical value until the sensor provides data (typically less than 2 minutes). Then it displays instantaneous readings similar to the following screen (depending on the sensors installed) and is ready for use.



ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 040, MULTI RAE PHOTOIONIZATION DETECTOR (PID)

2.  Calibration Check and Adjustment

- Zero Calibration

- At the Calibration Menu, select "Fresh Air." Press [Y/+] once to enter the fresh air calibration sub-menu.



- Press **[Y/+]** to start fresh air calibration

- A countdown screen appears. You can abort the calibration at any time during the countdown by pressing [N/-].



- Note: Dotted line indicates automatic progression

- If the calibration is not aborted, the display shows the sensor names and tells you whether the fresh air calibration passed or failed, followed by the sensors' fresh air readings

3.  Multi Sensor Span Calibration

- Depending on the configuration of your MultiRAE and span gas you have, you can perform a span calibration simultaneously on multiple sensors. You can define which sensors are calibrated together using the Multi Cal Select menu described in section 8.3.2.9.

3

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 040, MULTI RAE PHOTOIONIZATION DETECTOR (PID)

- In case all sensors in the instrument cannot be calibrated with the same gas, the MultiRAE will intelligently split the span calibration process into several steps and will provide menu prompts accordingly.

- At the Calibration Menu, select "Multi Sensor Span."

- Install the calibration adapter and connect it to a source of calibration gas.

- Start the flow of calibration gas.

- Press **[Y/+]** to start calibrating or wait for calibration to start automatically.

- A countdown screen is shown. You can abort the calibration at any time during the countdown by pressing **[N/-]**.



- Note: Dotted line indicates automatic progression

- If the calibration is not aborted, the display shows the sensor names and tells you whether the calibration passed or failed, followed by the sensor readings.

4. Single Sensor Span Calibration

- Instead of performing a span calibration on multiple sensors simultaneously, you can select a single sensor and perform a span calibration.

- To perform span calibration of an individual sensor, follow these steps:

- At the Calibration Menu, select "Single Sensor Span."

- Select a sensor to calibrate from the list.

- Install the calibration adapter and connect it to a source of calibration gas.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 040, MULTI RAE PHOTOIONIZATION DETECTOR (PID)

- Verify that the displayed calibration value meets the concentration specified on the gas cylinder.
- Start the flow of calibration gas.



- Press [Y/+] to start calibrating or wait for calibration to start automatically.
- A countdown screen appears. You can abort the calibration at any time during the countdown by pressing [N/-].



- Note: Dotted line indicates automatic progression
- Select the done button when calibration is complete.
- **CALIBRATION IS COMPLETE!**

5

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 040, MULTI RAE PHOTOIONIZATION DETECTOR (PID)

5. Operation

- Due to the Multi RAE having many functions in terms of operation, it is recommended that you follow the operational procedures as outlined in the instruction manual.

6. Site Maintenance

- After each use, the meter should be recharged and the outside of the instruments should be wiped clean with a soft cloth.

7. Scheduled Maintenance

| Function | Frequency |
|---|---|
| Check alarm and settings | Monthly/before each use |
| Clean screens and gaskets around sensors | Monthly |
| Replace sensors | Biannually or when calibration is unsuccessful |

# V.   Quality Assurance Records

Quality assurance records will be maintained for each air monitoring event.  The following information shall be recorded in the field logbook.

- Identification - Site name, date, location, CTO number, activity monitored, (surface water sampling, soil sampling, etc.), serial number, time, resulting concentration, comments and identity of air monitoring personnel.

- Field observations - Appearance of sampled media (if definable).

- Additional remarks (e.g., Multi RAE had wide range fluctuations during air monitoring activities.)

# VI.   References

Multi RAE User's Guide, RAE Systems, Revision C, May 2013.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 051

# Installation of Monitoring Wells by Sonic Drilling

## I.     Purpose and Scope

The purpose of this guideline is to describe methods for drilling and installation of groundwater monitoring wells and piezometers in unconsolidated or poorly consolidated materials using sonic drilling techniques. Sonic drilling technology potentially eliminates telescoping monitoring wells, allowing the installation of aquifer penetrating, single-cased wells.

## II.     Equipment and Materials

### A.     Drilling

1.    Sonic drilling rig without per- and polyfluoroalklyl substances (PFAS)-containing components (Avoid Teflon, Viton, PTFE and all other fluorinated compounds). This includes drilling and well development equipment.

2.    Override casings and core barrel

3.    Ensure the driller has not used and will not use drilling lube containing polytetrafluoroethylene (PFTE) or any other fluorine-containing substance. Biolube has been determined to be an acceptable substitute.

4.    Do not use water from the facility (e.g., fire hydrants) for decontamination of equipment or preparation of grout mix if there is a possibility that the water available is contaminated with PFAS.

### B.     Well Riser/Screen

1.    Polyvinyl chloride (PVC), Schedule 40, minimum 2-inch ID, flush-threaded riser; alternatively, stainless steel riser

2.    PVC, Schedule 40, minimum 2-inch ID, flush-threaded, factory slotted screen; alternatively, stainless-steel screen.

### C.     Bottom Cap

1.    PVC, threaded to match the well screen; alternatively, stainless-steel

2.    Centering guides (if used)

### D.     Well Cap

1.    Above-grade well completion:  PVC, threaded or push-on type, vented

2.    Flush-mount well completion: PVC, locking, leak-proof seal

3.    Stainless-steel to be used as appropriate

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 051, INSTALLATION OF MONITORING WELLS BY SONIC DRILLING

### E.    Sand

1.   Clean silica sand, provided in factory-sealed bags, well-rounded, containing no organic material, anhydrite, gypsum, mica, or calcareous material; primary (coarse – e.g., Morie #1) filter pack, and secondary (fine sand seal) filter pack.  Grain size determined based on sediments observed during drilling.

### F.    Bentonite

1.   PFAS-free Pure, additive-free bentonite pellets

2.   PFAS-free Pure, additive-free powdered bentonite

3.   PFAS-free Coated bentonite pellets; coating must biodegrade within 7 days

4.   Cement-Bentonite Grout: proportion of 6 to 8 gallons of water per 94-pound bag of Portland cement; 3 pounds of bentonite added per bag of cement to reduce shrinkage

### G.    Protective Casing

1.   Above-grade well completion:  6-inch minimum ID black iron steel pipe with locking cover, diameter at least 2 inches greater than the well casing, painted with epoxy paint for rust protection; heavy duty lock; protective posts if appropriate

2.   Flush-mount well completion:  8-inch or 12-inch dia. manhole cover, or equivalent; rubber seal to prevent leakage

### H.    Well Development

1.   Surge block

2.   Well-development pump and associated equipment

3.   Calibrated meters to measure pH, temperature, specific conductance, and turbidity of development water

4.   Containers (e.g., 55-gallon drums) for water produced from well.

## III.    Procedures and Guidelines

### A.    Drilling Method

1.   Drill rods and core barrel with a minimum 6-inch inside diameter (ID) will be used to drill monitoring well boreholes. Continuous core soil samples (4-inches outside diameter) will be collected for lithologic classification and intervals may be selected for chemical analysis. Soil sampling procedures are detailed in SOP *Shallow Soil Sampling.*

2.   The use of water and additives to assist in sonic drilling for monitoring well installation will be minimized, unless required for such conditions as running sands or drilling bedrock formations.

3. Override casings, core barrels, and other downhole drilling tools will be decontaminated prior to the initiation of drilling activities and between each borehole location. Core barrels and other downhole soil sampling equipment will also be decontaminated before and after each use. SOP *Decontamination of Drilling Rigs and Equipment* details proper decontamination procedures.

4. Drill cuttings and decontamination fluids generated during well drilling activities will be contained according to the procedures detailed in the Sampling and Analysis Plan.

## B.   Monitoring Well Installation

1. Sonic drilling technology eliminates the necessity to install double or triple cased wells since the borehole will be fully cased during drilling activities. Monitoring wells will be constructed inside the override casing(s), once the borehole has been advanced to the desired depth. Following setting the well screen, riser, filter pack, and bentonite seal, the well will be grouted as the temporary casing is withdrawn, preventing cross contamination. If the borehole has been drilled to a depth greater than that at which the well is to be set, the borehole will be backfilled with bentonite pellets or a bentonite-cement slurry to a depth approximately 2 feet below the intended well depth. Approximately 2 feet of clean sand will be placed on top of the bentonite to return the borehole to the proper depth for well installation.

2. The appropriate lengths of well screen, nominally 10 feet (with bottom cap), and casing will be joined watertight and lowered inside the temporary casing to the bottom of the borehole. Centering guides, if used, will be placed at the bottom of the screen and above the interval in which the bentonite seal is placed.

3. A primary sand pack consisting of clean Morie No. 00 (or DSI No.1) silica sand for 0.010-inch slotted screen and Morie No. 01 (or DSI No.2) silica sand for 0.020-inch slotted screen will be placed around the well screen. The sand will be placed into the borehole at a uniform rate, in a manner that will allow even placement of the sand pack. The inner-most override casing will be raised gradually during sand pack installation to avoid caving of the borehole wall; at no time will the innermost override casing be raised higher than the top of the sand pack during installation. During placement of the sand, the position of the top of the sand will be continuously sounded. The primary sand pack will extend from the bottom of the borehole to a minimum of 2 feet above the top of the well screen. A secondary, finer-grained sand pack may be installed for a minimum of 1 foot above the coarse sand pack. Heights of the coarse and fine sand packs and bentonite seal may be modified in the field to account for a shallow water table and small saturated thickness of the surficial aquifer.

4. A bentonite seal at least 2 feet thick will be placed above the sand pack. The seal will be placed into the borehole in a manner that will prevent bridging. The position of the top of the bentonite seal will be verified using a weighted tape measure. If all or a portion of the bentonite seal is above the water table, clean water will be added to hydrate the bentonite. A hydration period of at least 30 minutes will be required following installation of the bentonite seal.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 051, INSTALLATION OF MONITORING WELLS BY SONIC DRILLING

5.  Above the bentonite seal, an annular seal of cement-bentonite grout will be placed.  The cement-bentonite grout will be installed continuously in one operation from the bottom of the space to be grouted to the ground surface through a tremie pipe. The tremie pipe must be plugged at the bottom and have small openings along the sides of the bottom 1-foot length of pipe. This will allow the grout to discharge laterally into the borehole and not disturb the bentonite pellet seal.

6.  Well Completion

7.  For monitoring wells that will be completed above-grade, a locking steel protective casing set in a concrete pad will be installed. The steel protective casing will extend at least 2 feet into the ground and 3 feet above ground but should not penetrate the bentonite seal. The concrete pad will be square, approximately 2 feet per side (unless otherwise specified in the project plans) and poured into wooden forms.  The concrete will be sloped away from the protective casing.

8.  Guard posts may be installed in high-traffic areas for additional protection.  Four steel guard posts will be installed around the protective casing, within the edges of the concrete pad. Guard posts will be concrete-filled, at least 2 inches in diameter, and will extend at least 2 feet into the ground and 3 feet above the ground. The protective casing and guard posts will be painted with an epoxy paint to prevent rust.

9.  For monitoring wells with flush-mount completions, Morrison 9-inch or 12-inch 519 manhole cover or equivalent, with a rubber gasket and drain will be installed. The top of the manhole cover will be positioned approximately 1 inch above grade. A square concrete pad, approximately 2 feet per side (unless otherwise specified in the project plans), will be installed as a concrete collar surrounding the road box cover, and will slope uniformly downward to the adjacent grade. The road box and installation thereof will be of sufficient strength to withstand normal vehicular traffic.

10. Concrete pads installed at all wells will be a minimum of 6 inches below grade. The concrete pad will be 12-inches thick at the center and taper to 6-inch thick at the edge. The surface of the pad should slope away from the protective casing to prevent water from pooling around the casing. Protective casing, guard posts, and flush mounts will be installed into this concrete.

11. Each well will be properly labeled on the exterior of the locking cap or protective casing with a metal stamp indicating the permanent well number.

## C.   Well Development

1.  Well development will be accomplished using a combination of surging throughout the well screen and pumping, until the physical and chemical parameters of the discharge water that are measured in the field have stabilized and the turbidity of the discharge water is substantially reduced. Fine-grained materials in the surficial aquifer at the site may not allow low turbidity results to be achieved.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 051, INSTALLATION OF MONITORING WELLS BY SONIC DRILLING

2.  The surging apparatus will include a tight-fitting surge block. Well development will begin by surging the well screen, starting at the bottom of the screen and proceeding upwards, throughout the screened zone.  Following surging, the well will be pumped to remove the fine materials that have been drawn into the well.  During pumping, measurements of pH, temperature, turbidity and specific conductance will be recorded.

3.  Development will continue by alternately surging and pumping until the discharge water is free from sand and silt, the turbidity is substantially reduced, and the pH, temperature, and specific conductance have stabilized at regional background levels, based on historical data. Development will continue for a minimum of one hour until the water removed from the well is as clear of turbidity as practicable.

4.  Well development equipment will be decontaminated prior to initial use and after the development of each well. Decontamination procedures are detailed in SOP *Decontamination of Personnel and Equipment*. Water generated during well development will be contained and managed as detailed in the SOP *Disposal of Waste Fluids and Solids* and the Investigation Derived Waste Management Plan.

## IV.  Attachments

- Schematic diagram of shallow monitoring well construction (MWSingleDiag.xls)



| PROJECT NUMBER | WELL NUMBER | |
|---|---|---|
| | | SHEET 1    OF 1 |

# WELL COMPLETION DIAGRAM

PROJECT :                                              LOCATION :

DRILLING CONTRACTOR :

DRILLING METHOD AND EQUIPMENT USED :

WATER LEVELS :                    START :                    END :              LOGGER :

1- Ground elevation at well    _____

2- Top of casing elevation    _____
   a) vent hole?    _____

3- Wellhead protection cover type    _____
   a) weep hole?    _____
   b) concrete pad dimensions    _____

4- Dia./type of well casing    _____
   _____

5- Type/slot size of screen    _____
   _____

6- Type screen filter    _____
   a) Quantity used    _____

7- Type of seal    _____
   a) Quantity used    _____

8- Grout
   a) Grout mix used    _____
   b) Method of placement    _____
   c) Vol. of well casing grout    _____

Development method    _____

Development time    _____

Estimated purge volume    _____

Comments    _____
_____
_____
_____
_____
_____

051_MWSingleDiag.xls                              6                              xxxxxx.xx.xx

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 056

# Water-Level Measurements

## I.    Purpose and Scope

The purpose of this procedure is to provide a guideline for the measurement of the depth to groundwater in piezometers and monitoring wells, even where a second phase of floating liquid (e.g., gasoline) is encountered, and on staff gauges in surface-water bodies. This SOP includes guidelines for discrete measurements of static water levels and does not cover the use of continuously recording loggers (see SOP *Use of Data Loggers and Pressure Transducers)*.

## II.    Equipment and Materials

- Electronic water-level meter (Solinst® or equivalent) with a minimum 100-foot tape; the tape should have graduations in increments of 0.01 feet or less

- Interface probe (Solinst® Model 122 Interface Meter or equivalent)

## III.    Procedures and Guidelines

Verify that the unit is turned on and functioning properly. Slowly lower the probe on its cable into the piezometer or well until the probe just contacts the water surface; the unit will respond with a solid tone or light signal. Note the depth from a reference point indicated on the piezometer or well riser. Typically, this is the top of the PVC casing. If no reference is clearly visible, measure the depth to water from the northern edge of the PVC casing. If access to the top of the PVC casing is difficult, sight across the top of the locking casing adjacent to the measuring point, recording the position of the cable when the probe is at the water surface.

Measure the distance from this point to the closest interval marker on the tape and record the water level reading in the logbook. Water levels will be measured to the nearest 0.01-foot. Also, when specified in the project plans, measure and record the depth of the piezometer or well. The depth of the piezometer or well may be measured using the water-level probe with the instrument turned off.

Free product light or dense nonaqueous phase liquid may be present in the piezometer or well. If the presence of free product is suspected, the thickness of the product should be determined using appropriate equipment (e.g., Solinst® Model 122 Interface Meter). The depth to water also is determined with this equipment and the water-level meter should not be used in the piezometer or well as long as product is present. Typically, a constant sound is emitted from the device when free product is encountered and an alternating on/off beep sound is emitted when water is encountered.

The apparent elevation of the water level in the well or piezometer is determined by measuring both the apparent depth to water and the thickness of free product. The corrected water-level elevation is calculated by the following equation:

$WL_c = Wl_a + (\text{Free-product thickness} \times 0.80)$

Where  $WL_c$ = Corrected water-level elevation

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 056, WATER-LEVEL MEASUREMENTS

$Wl_a$ = Apparent water-level elevation

0.80 = Typical value for the density of petroleum hydrocarbon products.

If free product is detected on the surface of the water in the piezometer or well, the value of sampling should be reconsidered because of the potential for contaminating the sampling equipment.

Staff gauges may be installed in some surface-water bodies. These facilities typically are constructed by attaching a calibrated, marked staff gage to a wood or metal post, driving the post into the bottom of the surface-water body, and surveying the elevation of the top of the post to a resolution or 0.01-foot. The elevation of the water in the surface-water body then can be determined by reading off the distance the water level is from the top of the post. A shield or other protection may be needed to calm the fluctuations in water level if the gauge is installed at a location exposed to wind or wave.

# IV.   Attachments

None.

# V.   Key Checks

- Before each use, verify that the battery is charged by pressing the test button on the water-level meter.

- Verify that the unit is operating correctly by testing the probe in distilled or de-ionized water.  Leave the unit turned off when not in use.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 059

# Civil Surveying

## I.  Purpose and Scope

The SOP describes survey procedures to be used on CLEAN projects. Modified third-order survey procedures will be used for most surveying. Geographic Positioning System techniques will be used for measurement of some horizontal coordinates. These procedures are general guidelines only and are in no way intended to replace the specifications in the surveyor's subcontract.

### A.  Records and Definitions

All field notes should be kept in bound books. Each book should have an index. Each page of field notes should be numbered and dated and should show the initials of all crew members. The person taking field notes will be identified in the log. Information on weather (wind speed/wind direction, cloud cover, etc.) and on other site conditions should also be entered in the notes. Notes should also include instrument field identification number and environmental settings. Graphite pencils or waterproof ballpoint pens should be used. Erasing is not acceptable; use a single-strike-through and initial it. The notekeeping format should conform to the Handbook of Survey Notekeeping by William Pafford. A survey work drawing with grid lines and at the scale of the topographic map should be prepared for all survey field work. Field notebooks will be available on site.

The following terms are defined to clarify discussion in this SOP:

- North American Datum (NAD) -The standard geodetic datum on the North American continent.

- National Geodetic Vertical Datum (NGVD) - The vertical-control datum used (1929 or later) by the National Geodetic Survey for vertical control.

- Horizontal Control - Horizontal location of an object from surveyed corners or other features on permanent land monuments in the immediate site area. Will be based on North American Datum (NAD) 1983 and state plane grid systems.

- Vertical Control - Vertical location of an object compared to the adjacent ground surface.

- Bench Mark - Precisely determined elevation above or below sea level. May also have horizontal control (northing, easting) determined for location.

## II.  Surveying

### A.  Horizontal Survey

Horizontal angular measurements shall be made with a 20-second or better theodolite or transit. When using a 20-second instrument the horizontal angles shall be turned four times (two each direct and inverted) with the mean of the fourth angle being within 5 seconds of the mean of the

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 059, CIVIL SURVEYING

second angle. When using a 10-second or better instrument the angles shall be doubled (once each direct and inverted), with the mean of the second angle within 5 seconds of the first angle. The minimum length of any traverse courses shall be 300 feet.

Distance measurements shall be made with a calibrated steel tape corrected for temperature and tension or a calibrated electronic distance meter (EDM). When using an EDM the parts per million (PPM), curvature and refraction corrections shall be made. Vertical angle measurements used for distance slope corrections shall be recorded to the nearest 20 seconds of arc deviation from the horizontal plane. Horizontal locations will be surveyed to within 0.05-foot of the true location.

Horizontal traverse stations shall be established and referenced for future use. All stations shall be described in the field notes with sufficient detail to facilitate their recovery at a later date. The station shall consist of a permanent mark scribed on facilities such as sidewalks, curbs, concrete slabs, or iron rod and cap.

The horizontal location will be referenced to NAD83 and the appropriate state plane grid system.

Some horizontal coordinates will be measured using Geographic Positioning System (GPS) equipment. This approach will be used in particular for determining the coordinates of surface-water and sediment sampling locations, and may be used also for determining the locations of piezometers and monitoring wells. The GPS survey will be performed by staff trained in the use of the equipment and will conform to guidance provided by the manufacturer.

## B.    Vertical Survey

When practical, vertical control will be referenced to the National Geodetic Vertical Datum (NGVD) of 1929, obtained from a permanent benchmark. If practical, level circuits should close on a known benchmark other than the starting benchmark. The following criteria shall be met in conducting the survey:

- Instruments shall be pegged weekly or after any time it is dropped or severely jolted.

- Foresight and backsight distances shall be reasonably balanced and shall not be greater than 250 feet in length.

- No side shot shall be used as a beginning or ending point in another level loop.

- Rod readings shall be made to 0.01-foot and estimated to 0.005-foot.

- Elevations shall be adjusted and recorded to 0.01-foot.

Temporary benchmarks (TBMs) shall be established and referenced for future use. All TBMs shall be described in the field notes with sufficient detail to facilitate their recovery at a later date. The TBMs shall consist of a permanent mark scribed on facilities such as sidewalks, curbs, concrete slabs, etc. or spikes set in the base of trees (not power poles), or tops of anchor bolts for transmission line towers, etc. (Horizontal traverse stations will not be considered as a TBM but may be used as a permanent turning point.)

1.    Traverse Computations and Adjustments

Traverses will be closed and adjusted in the following manner:

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 059, CIVIL SURVEYING

– Step One—Coordinate closures will be computed using unadjusted bearings and unadjusted field distances.

– Step Two—Coordinate positions will be adjusted (if the traverse closes within the specified limits) using the compass rule.

– Step Three—Final adjusted coordinates will be labeled as "adjusted coordinates." Field coordinates should be specifically identified as such.

– Step Four—The direction and length of the unadjusted error of closure, the ratio of error, and the method of adjustment shall be printed with the final adjusted coordinates.

2. Level Circuit Computations and Adjustments

Level circuits will be closed and adjusted in the following manner:

– For a single circuit, elevations will be adjusted proportionally, provided the raw closure is within the prescribed limits for the circuit.

– In a level net where the elevation of a point is established by more than one circuit, the method of adjustment should consider the length of each circuit, the closure of each circuit, and the combined effect of all the separate circuit closures on the total net adjustments.

## C.   Piezometer and Monitoring-Well Surveys

Piezometer and monitoring-well locations will be surveyed only after the installation of the protective casing, which is set in concrete. The horizontal plane survey accuracy is +0.05-foot and is measured to any point on the protective-casing cover. The vertical plane survey must be accurate to +0.01-foot. The following two elevations will be measured at piezometers and monitoring wells:

• Top of the piezometer or well riser (not on the protective casing), preferably on the north side

• Ground surface, preferably on the north side of the well

If no notch or mark exists, the point at which the elevation was measured on the inner casing shall be described so that water-level measurements may be taken from the same location.

## D.   Grid Surveys

Selected soil boring locations may be located by the survey crew after the soil borings are complete. The selected borings will be staked in the field by the field team leader. The stake will be marked with the boring number for reference. The horizontal plane survey accuracy is + 1 foot and is measured to any point on the ground surface immediately adjacent to the stake.

STANDARD OPERATING PROCEDURE 059, CIVIL SURVEYING

Exhibit A. Standards for Modified Third-order Plane Surveys

| Traverse | |
|---|---|
| Max Number of bearing course between azimuth checks | 30 |
| Astronomical bearings: standard error of results | 6" |
| Azimuth closure at azimuth checkpoint not to exceed | $20" \sqrt{N}$ |
| Standard error of the mean for length measurements | 1 in 50,000 |
| Position closure per loop in feet before azimuth adjustment | 1:10,000 |

| Leveling | |
|---|---|
| Levels error of closure per loop in feet | $0.05 \sqrt{M}$ |

N = the number of stations for carrying bearing

M = the distance in miles

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 060

# Sampling Contents of Tanks and Drums

## I.    Scope and Application

This procedure provides an overview approach and guidelines for the routine sampling of drums and tanks. Its purpose is to describe standard procedures and precautions which are applied in sampling drums and tanks. Procedures for opening drums with the individual instruments are included in **Attachment D**.

The samples obtained may be used to obtain physical chemical or radiological data. The resulting data may be qualitative or quantitative in nature and are appropriate for use in preliminary surveys as well as confirmatory sampling.

## II.    Summary of Methods

Drums are generally sampled by means of sampling tubes such as glass sample tubes or COLIWASA samplers. In either case, the sampling tube is manually inserted into the waste material. A sample of the drum contents is withdrawn by the sampling device. Should a drum contain bottom sludge, a glass tube will be used to retrieve a sample of this as well.

Storage tank and tank trailers, because of their greater depths, require sampling devices that can be lowered from the top, filled at a particular depth, and then withdrawn. Such devices are a COLIWASA, a Kemmerer depth sampler, or a Bacon Bomb. Where samples of bottom sludge are desired, a gravity corer can be utilized. This heavy tube with a tapered nose piece will penetrate the sludge as it free falls through the tank.

## III.    Comments

The sampling of tanks, containers, and drums present unique problems not associated with environmental samples. Containers of this sort are generally closed except for small access ports, manways, or hatches on the larger vessels, or taps and bungs on smaller drums. The physical size, shape, construction material, and location of access limit the types of equipment and methods of collection that can be used.

When liquids are contained in sealed vessels, gas vapor pressure can build up, sludges can settle out, and density layerings (stratification) can develop. Bulging drums may be under pressure and extreme caution should be exercised. The potential exists for explosive reactions or the release of noxious gases when containers are opened. All vessels should be opened with extreme caution. Check the HSP for the level of personnel protection to be worn. A preliminary sampling of any headspace gases is warranted. As a minimum, a preliminary check with a MultiRAE or equivalent may be of aid in selecting a sampling method.

In most cases it is impossible to observe the contents of these sealed or partially sealed vessels. Since some layering or stratification is likely in any solution left undisturbed over time, a sample must be taken that represents the entire depth of the vessel.

QC AND REVIEWED 3/2023                                    1

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 060, SAMPLING CONTENTS OF TANKS AND DRUMS

## IV.  Required Equipment and Apparatus

1.  **Health and safety equipment/materials:** As listed in the site safety plan.

2.  **Sampling equipment:** COLIWASA, glass sample tubes, Kemmerer depth sampler, Bacon Bomb, gravity corer.

3.  **Tools:** Rubber mallet, bung wrench, speed wrench with socket, etc., (all non-sparking), paint marker.

4.  **Heavy equipment:** Backhoe equipped with explosion shield, drum grappler, and 3-foot copper-beryllium (non-sparking) spike with 6-inch collar (to puncture top of drums for sampling, if necessary).

5.  **Sample Containers:** As specified in the field sampling plan.

## V.  Procedures

### A.  Drums

NOTE: DO NOT open more than one drum at a time. Each drum must be handled and sampled as a separate entity to reduce vapors in the sampling area.

1.  Drums will be sampled on an area-by-area basis. Drums will be sampled after they have been placed in overpack drums but before they are transferred from the excavation to the onsite storage area.

2.  Record, in logbook, all pertinent information from visual inspection of drum (e.g., physical condition, leaks, bulges, and labels). Label each drum with a unique identifying number.

3.  If possible, stage drums for easy access.

4.  If necessary, attach ground strap to drums and grounding point.

5.  Remove any standing material (water, etc.) from container top.

6.  Using non-sparking tools, carefully remove the bung or lid while monitoring air quality with appropriate instruments. If necessary (and as a last resort), the non-sparking spike affixed to the backhoe can also be used to puncture the drum for sampling. See Attachment D for method of drum opening. Record air-quality monitoring results.

7.  When sampling a previously sealed vessel, a check should be made for the presence of bottom sludge. This is accomplished by measuring the depth to apparent bottom, then comparing it to the known interior depth.

8.  Agitation to disrupt the layers and rehomogenize the sample is physically difficult and almost always undesirable. If the vessel is greater than 3 feet in depth (say, a 55-gallon drum), the appropriate sampling method is to slowly lower the sampling device (i.e., suction line of peristaltic pump, glass tube) in known increments of length. Discrete samples can be collected from various depths, then combined or analyzed separately. If the depth of the vessel is greater than the lift capacity of the pump, an at-depth water sampler, such as the Kemmerer or Bacon Bomb type, may be required.

2

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 060, SAMPLING CONTENTS OF TANKS AND DRUMS

9. Extract a representative sample from the drum using a glass rod, COLIWASA, Bacon Bomb, Kemmerer bottle, or gravity corer (See Attachments). Ensure that the entire depth of material is penetrated. Depending on the size of the opening of the drum, three to four takes should be collected from random locations across the drum surface, to ensure a representative sample. Any observed stratification must be recorded in logbook, including number and thickness of the layers and a conceptualized sketch.

10. Record a visual description of the sample (e.g., liquid, solid, color, viscosity, and percent layers).

11. When possible, sampling equipment (like glass tubes) should be expendable and be left inside the drum for disposal with drum contents, once sampling is completed.

12. Place lid, bung, cap, etc., back in place on drum. Tighten hand tight. If necessary, the sampling port can be sealed using a cork.

13. Wipe up spilled material with lab wipes. Wipe off sample containers.

14. Mark the drum with a unique sample identification number and date using a paint marker.

15. Samples will be handled as high hazard samples. Samples will be placed in containers defined according to the analytical needs, wiped clean, and then packed in paint cans for shipping. Packaging, labeling, and preparation for shipment procedures will follow procedures as specified in the field sampling plan.

## B.      Underground Storage Tanks

1. A sampling team of at least two people is required for sampling—one will collect samples, the other will relay required equipment and implements.

2. Sampling team will locate a sampling port on the tank. Personnel should be wearing appropriate protective clothing at this time and carrying sampling gear.

3. Do not attempt to climb down into tank. Sampling MUST BE accomplished from the top.

4. Collect a sample from the upper, middle, and lower section of the tank contents with one of the recommended sampling devices.

5. If compositing is necessary, ship samples to laboratory in separate containers for laboratory compositing.

6. Samples will be handled as hazardous. Samples will be placed in appropriate containers and packed with ice in a cooler. Packaging, labeling, and preparation for shipment will follow procedures specified in the field sampling plan.

## C.      Tank Trailers or Above-Ground Storage Tanks

1. A sampling team of two is required. One will collect samples, the other will relay required equipment and implements.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 060, SAMPLING CONTENTS OF TANKS AND DRUMS

2.    Samples will be collected through the manhole (hatch) on top of the tanker or the fill port. Do not open valves at the bottom. Before opening the hatch, check for a pressure gauge or release valve. Open the release valve slowly to bring the tank to atmospheric pressure.

3.    If tank pressure is too great, or venting releases large amounts of toxic gas, discontinue venting and sampling immediately. Measure vented gas with organic vapor analyzer and explosimeter.

4.    If no release valve exists, slowly loosen hatch cover bolts to relieve pressure in the tank. (Again, stop if pressure is too great.)

5.    Once pressure in tank has been relieved, open the hatch and withdraw sample using one of the recommended sampling devices.

6.    Sample each trailer compartment.

7.    If compositing is necessary, ship samples to laboratory in separate containers for laboratory compositing.

8.    Samples will be handled as hazardous. Samples will be placed in appropriate containers and packed with ice in a cooler. Packaging, labeling, and preparation for shipment will follow procedures specified in the field sampling plan.

## D.    Refer to Attachment B for procedures for sampling with appropriate devices as follows:

1.    Drum

Glass tube              Procedure 1

COLIWASA               Procedure 2

2.    Storage Tank and Tank Trailer

COLIWASA               Procedure 2

Bacon Bomb             Procedure 3

Gravity Corer          Procedure 4

(for bottom sludge)

## E.    Contamination Control

Sampling tools, instruments, and equipment will be protected from sources of contamination prior to use and decontaminated after use as specified in SOP *Decontamination of Personnel and Equipment*. Liquids and materials from decontamination operations will be handled in accordance with the waste management plan. Sample containers will be protected from sources of contamination. Sampling personnel shall wear chemical resistant gloves when handling any samples. Gloves will be decontaminated or disposed of between samples.

## F.    Attachments

1.    Collection of Liquid-Containerized Wastes Using Glass Tubes

2.    Sampling Containerized Wastes Using the Composite Liquid Waste Sample (COLIWASA)

3.    Sampling Containerized Wastes Using the Bacon Bomb Sampler

4.    Gravity Corer for sampling Sludges in Large Containers

5.    Construction of a Typical COLIWASA

6.    Drum Opening Techniques and Equipment

## G.    References

*A Compendium of Superfund Field Operations Methods*, EPA/540/P-87/001, U.S. Environmental Protection Agency, Washington, D.C., 1987.

*Data Quality Objectives for Remedial Activities - Development Process*, EPA/540/G-87/003, U.S. Environmental Protection Agency, Washington, D.C., 1987.

Annual Book of ASTM Standards, *Standard Recommended Practices for Sampling Industrial Chemicals*, ASTM-E-300, 1986.

*Test Method for Evaluating Solid Waste*, SW-846, Volume II, Field Methods, Second Edition, U.S. Environmental Protection Agency, Washington, D.C., 1982.

U.S. Environmental Protection Agency, *Characterization of Hazardous Waste Sites — A Method Manual: Volume II, Available Sampling Methods*, USEPA Environmental Monitoring Systems Laboratory, Las Vegas, EPA-600/4-84-076, December, 1984.

*Environmental Surveillance Procedures*, Quality Control Program, Martin Marietta Energy Systems, ESH/Sub/87-21706/1, Oak Ridge, TN, September 1988.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 060, SAMPLING CONTENTS OF TANKS AND DRUMS

# VI.  Field Checklist

| | |
|---|---|
| _____ Sampling Instruments | _____ Labels |
| _____ Tools | _____ Sampling and Analysis Plan |
| _____ Rubber Mallet | _____ Health and Safety Plan |
| _____ Logbook | _____ Decontamination Equipment |
| _____ Safety Glasses or Monogoggles | _____ Lab Wipes |
| _____ Safety Shoes | _____ Lab Spatulas or Stainless Steel Spoons |
| _____ Ice/Cooler, as required | _____ Chemical Preservatives, as required |
| _____ Custody Seals, as required | _____ Appropriate Containers for Waste and Equipment |
| _____ Chain-of-Custody Forms | _____ Duct Tape |
| _____ Drum Labels, as required | _____ Plastic Sheeting |
| _____ Paint Marker, if drum sampling | |
| _____ Black Indelible Pen | |
| _____ Monitoring Instruments | |

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 060, SAMPLING CONTENTS OF TANKS AND DRUMS

ATTACHMENT A

# Collection of Liquid-Containerized Wastes Using Glass Tubes

## I.      Discussion

Liquid samples from opened containers (i.e., 55-gallon drums) are collected using lengths of glass tubing. The glass tubes are normally 122 centimeters long and 6 to 16 millimeters inside diameter. Larger diameter tubes may be used for more viscous fluids if sampling with the small diameter tube is not adequate. The tubing is broken and discarded in the container after the sample has been collected, eliminating difficult cleanup and disposal problems. This method should not be attempted with less than a two-person sampling team.

### A.      Uses

This method provides for a quick, relatively inexpensive means of collecting concentrated containerized wastes. The major disadvantage is from potential sample loss that is especially prevalent when sampling low-viscosity fluids. Splashing can also be a problem and proper protective clothing should always be worn.

Note:    A flexible tube with an aspirator attached is an alternative method to the glass tube and allows various levels to be sampled discretely.

### B.      Procedures for Use

1.      Remove cover from sample container.

2.      Insert glass tubing almost to the bottom of the container. Tubing should be of sufficient length so that at least 30 centimeters extend above the top of the container.

3.      Allow the waste in the drum to reach its natural level in the tube.

4.      Cap the top of the tube with a safety-gloved thumb or a stopper.

5.      Carefully remove the capped tube from the drum. If the tube has passed through more than one layer, the boundary should be apparent in the glass tube.

6.      Insert the bottom, uncapped end into the sample container.

7.      Partially release the thumb or stopper on the top of the tube and allow the sample to slowly flow into the sample container. If separation of phases is desired, cap off tube before the bottom phase has completely emptied. It may be advisable to have an extra container for "waste," so that the fluid on either side of the phase boundary can be directed into a separate container, allowing collection of pure phase liquids in the sample containers. The liquid remaining after the boundary fluid is removed is collected in yet a third container. NOTE: It is not necessary to put phases in separate containers if analysis of separate phases is not desired.

7

STANDARD OPERATING PROCEDURE 060, SAMPLING CONTENTS OF TANKS AND DRUMS
ATTACHMENT A - COLLECTION OF LIQUID-CONTAINERIZED WASTES USING GLASS TUBES

8.      Repeat steps 2 through 6 if more volume is needed to fill the sample container.

9.      Remove the tube from the sample container and replace the tube in the drum, breaking it, if necessary, in order to dispose of it in the drum.

Optional Method (if sample of bottom sludge is desired)

1.      Remove the cover from the container opening.

2.      Insert glass tubing slowly almost to the bottom of the container. Tubing should be of sufficient length so that at least 30 cm extends above the top of the container.

3.      Allow the waste in the drum to reach its natural level in the tube.

4.      Gently push the tube towards the bottom of the drum into the sludge layer. Do not force it.

5.      Cap the top of the tube with a safety-gloved thumb or stopper.

6.      Carefully remove the capped tube from the drum and insert the uncapped end into the sample container.

7.      Release the thumb or stopper on the top of the tube and allow the sample container to fill to approximately 90 percent of its capacity. If necessary, the sludge plug in the bottom of the tube can be dislodged with the aid of the stainless-steel laboratory spatula.

8.      Repeat if more volume is needed to fill sample container and recap the tube.

Note:

1.      If a reaction is observed when the glass tube is inserted (violent agitation, smoke, light, etc.), the investigators should leave the area immediately.

2.      If the glass tube becomes cloudy or smoky after insertion into the drum, the presence of hydrofluoric acid maybe indicated, and a comparable length of rigid plastic tubing should be used to collect the sample.

3.      When a solid is encountered in a drum (either layer or bottom sludge) the optional method described above may be used to collect a core of the material, or the material may be collected with a disposable scoop attached to a length of wooden or plastic rod.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ATTACHMENT B

# Sampling Containerized Wastes using the Composite Liquid Waste Sampler (COLIWASA)

## I.   Discussion

The COLIWASA is a much-cited sampler designed to permit representative sampling of multiphase wastes from drums and other containerized wastes. The sampler is commercially available or can be easily fabricated from a variety of materials, including PVC, glass, or Teflon. In its usual configuration it consists of a 152 cm by 4 cm (inside diameter) section of tubing with a neoprene stopper at one end attached by a rod running the length of the tube to a locking mechanism at the other end. Manipulation of the locking mechanism opens and closes the sampler by raising and lowering the neoprene stopper. See Attachment E: Construction of a COLIWASA.

## II.   Uses

The COLIWASA is primarily used to sample containerized liquids. The PVC COLIWASA is reported to be able to sample most containerized liquid wastes except for those containing ketones, nitrobenzene, dimethylforamide, mesityloxide, and tetrahydrofuran. A glass COLIWASA is able to handle all wastes unable to be sampled with the plastic unit except strong alkali and hydrofluoric acid solutions. Due to the unknown nature of many containerized wastes, it would therefore be advisable to eliminate the use of PVC materials and use samplers composed of glass or Teflon.

The major drawback associated with using a COLIWASA is concern for decontamination and costs. The sampler is difficult, if not impossible, to decontaminate in the field, and its high cost in relation to alternative procedures (glass tubes) makes it an impractical throwaway item. It still has applications, however, especially in instances where a true representation of a multiphase waste is absolutely necessary.

## III.   Procedures for Use

1.   Check to make sure the sampler is functioning properly. Adjust the locking mechanism, if present, to make sure the neoprene rubber stopper provides a tight closure.

2.   Put the sampler in the open position by placing the stopper rod handle in the T-position and pushing the rod down until the handle sits against the sampler's locking block.

3.   Slowly lower the sampler into the liquid waste. Lower the sampler at a rate that permits the levels of the liquid inside and outside the sampler tube to be about the same. If the level of the liquid in the sample tube is lower than that outside the sampler, the sampling rate is too fast and will result in a non-representative sample.

4.   When the sampler stopper hits the bottom of the waste container, push the sampler tube downward against the stopper to close the sampler. Lock the sampler in the closed position by turning the T-handle until it is upright and one end rests tightly on the locking block.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 060, SAMPLING CONTENTS OF TANKS AND DRUMS
ATTACHMENT B - SAMPLING CONTAINERIZED WASTES USING THE COMPOSITE LIQUID WASTE SAMPLER (COLIWASA)

5.    Slowly withdraw the sampler from the waste container with one hand while wiping the sampler tube with a laboratory wipe with the other hand. A phase boundary, if present, can be observed through the tube.

6.    Carefully discharge the sample into a suitable sample container by slowly pulling the lower end of the T-handle away from the locking block while the lower end of the sampler is positioned in a sample container.

7.    Unscrew the T-handle of the sampler and disengage the locking block.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 060, SAMPLING CONTENTS OF TANKS AND DRUMS

ATTACHMENT C

# Sampling Containerized Wastes using the Bacon Bomb Sampler

## I.   Discussion

The Bacon Bomb is designed for the withdrawal of samples from various levels within a storage tank. It consists of a cylindrical body with an internal tapered plunger that acts as a valve to admit the sample. A line attached to the top of the plunger is used to open and close the valve. A removable cover provides a point of attachment for the sample line and has a locking mechanism to keep the plunger closed after sampling. The Bacon Bomb is usually constructed of chrome-plated brass and bronze with a rubber O-ring acting as the plunger-sealing surface. Stainless steel versions are also available. The volumetric capacity is 8, 16, or 32 oz (237, 473, or 946 ml).

## II.   Uses

The Bacon Bomb is a heavy sampler suited best for viscous materials held in large storage tanks or in lagoons. If a more non-reactive sampler is needed, the stainless steel version would be used, or any of the samplers could be coated with Teflon.

## III.   Procedures for Use

1.   Attach the sample line and the plunger line to the sampler.

2.   Measure and then mark the sampling line at the desired depth.

3.   Gradually lower the sampler by the sample line until the desired level is reached.

4.   When the desired level is reached, pull up on the plunger line and allow the sampler to fill for a sufficient length of time before releasing the plunger line to seal off the sampler.

5.   Retrieve the sampler by the sample line, being careful not to pull up on the plunger line, thereby accidentally opening the bottom valve.

6.   Wipe off the exterior of the sampler body.

7.   Position the sampler over the sample container and release its contents by pulling up on the plunger line.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 060, SAMPLING CONTENTS OF TANKS AND DRUMS

ATTACHMENT D

# Gravity Corer for Sampling Sludges in Large Containers

## I.     Discussion

A gravity corer is a metal tube with a replaceable tapered nosepiece on the bottom and a ball or other type of check valve on the top. The check valve allows water to pass through the corer on descent but prevents a washout during recovery. The tapered nosepiece facilitates cutting and reduces core disturbance during penetration. Most corers are constructed of brass or steel and many can accept plastic liners and additional weights.

## II.     Uses

Corers are capable of collecting samples of most sludges and sediments. They collect essentially undisturbed samples that represent the strata profile that may develop in sediments and sludges during variations in the deposition process. Depending on the density of the substrate and the weight of the corer, penetration to depths of 75 cm (30 in.) can be attained. Exercise care when using gravity corers in vessels or lagoons that have liners because penetration depths could exceed those of the substrate; this could result in damage to the liner material.

## III.     Procedures for Use

1.     Attach a precleaned corer to the required length of sample line. Solid braided 5-mm (3/16-in.) nylon line is sufficient; however, 20-mm (3/4-in.) nylon is easier to grasp during hand hoisting. An additional weight can be attached to the outside of the corer if necessary.

2.     Secure the free end of the line to a fixed support to prevent accidental loss of the corer.

3.     Allow corer to free fall through the liquid to the bottom.

4.     Retrieve corer with a smooth, continuous, up-lifting motion. Do not bump corer because this may result in some sample loss.

5.     Remove nosepiece from corer and slide sample out of corer into stainless steel or Teflon pan (preferred).

6.     Transfer sample into appropriate sample bottle with a stainless steel lab spoon or laboratory spatula.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 060, SAMPLING CONTENTS OF TANKS AND DRUMS

ATTACHMENT E

# Construction of a Typical COLIWASA

The sampling tube consists of a 1.52-m (5-ft) by 4.13-cm (1-5/8 in) I.D. translucent plastic pipe, usually polyvinyl chloride (PVC) or borosilicate glass plumbing tube. The closure-locking mechanism consists of a short-length, channeled aluminum bar attached to the sampler's stopper rod by an adjustable swivel. The aluminum bar serves both as a T-handle and lock for the samplers' closure system. When the sampler is in the open position, the handle is placed in the T-position and pushed down against the locking block. This manipulation pushes out the neoprene stopper and opens at the sampling tube. In the closed position, the handle is rotated until one leg of the T is squarely perpendicular against the locking block. This tightly seats the neoprene stopper against the bottom opening of he sampling tube and positively locks the sampler in the closed position. The closure tension can be adjusted by shortening or lengthening the stopper rod by screwing it in or out of the T-handle swivel. The closure system of the sampler consists of a sharply tapered neoprene stopper attached to a 0.95-cm (3/8-in) O.D. rod, usually PVC. The upper end of the stopper rod is connected to the swivel of the aluminum T-handle. The sharply tapered neoprene stopper can be fabricated according to specifications by plastic-products manufacturers at an extremely high price, or it can be made in-house by grinding down the inexpensive stopper with a shop grinder.

COLIWASA samplers are typically made out of plastic or glass. The plastic type consists of translucent plastic (usually PVC) sampling tube. The glass COLIWASA uses borosilicate glass plumbing pipe as the sampling tube and a Teflon plastic stopper rod. For purpose of multiphase sampling, clear plastic or glass is desirable in order to observe the profile of the multiphase liquid.

The sampler is assembled as follows:

- Attach the swivel to the T-handle with the 3.18-cm (1-1/4 in) long bolt and secure with the 0.48-cm (3/16-in) National Coarse (NC) washer and lock nut.

- Attach the PFTE stopper to one end of the stopper rod and secure with the 0.95-cm (3/8-in) washer and lock nut.

- Install the stopper and stopper rod assembly in the sampling tube.

- Secure the locking block sleeve on the block with glue or screw. This block can also be fashioned by shaping a solid plastic rod on a lathe to the required dimension.

- Position the locking block on top of the sampling tube such that the sleeveless portion of the block fits inside the tube, the sleeve sits against the top end of the tube, and the upper end of the stopper rod slips though the center hole of the block.

- Attach the upper end of the stopper rod to the swivel of the T-handle.

- Place the sampler in the close position and adjust the tension on the stopper by screwing the T-handle in or out.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 060, SAMPLING CONTENTS OF TANKS AND DRUMS

ATTACHMENT F

# Drum Opening Techniques and Equipment [1]

## I.     Introduction

The opening of closed drums prior to sampling entails considerable risk if not done with the proper techniques, tools, and safety equipment. The potential for vapor exposure, skin exposure due to splash or spraying, or even explosion resulting from sparks produced by friction of the tools against the drum, necessitate caution when opening any closed container. Both manual drum opening and remote drum opening will be discussed in the following paragraphs. When drums are opened manually risks are greater than when opened remotely; for this reason, the remote opening of drums is advised whenever possible.

Prior to sampling, the drums should be staged to allow easy access. Also, any standing water or other material should be removed from the container top so that the representative nature of the sample is not compromised when the container is opened. There is also the possibility of encountering a water-reactive substance.

## II.     Manual Drum Opening

### A.     Bung Wrench

A common method for opening drums manually is using a universal bung wrench. These wrenches have fittings made to remove nearly all commonly encountered bungs. They are usually constructed of cast iron, brass, or a bronze-beryllium (a non-sparking alloy formulated to reduce the likelihood of sparks). The use of bung wrenches marked "NON SPARKING" is encouraged. However, the use of a "NON SPARKING" wrench does not completely eliminate the possibility of spark being produced. Such a wrench only prevents a spark caused by wrench-to-bung friction, but it cannot prevent sparking between the threads on the drum and the bung.

A simple tool to use, the fitting on the bung wrench matching the bung to be removed is inserted into the bung and the tool is turned counterclockwise to remove the bung. Since the contents of some drums may be under pressure (especially, when the ambient temperature is high), the bung should be turned very slowly. If any hissing is heard, the person opening the drum should back off and wait for the hissing to stop. Since drums under pressure can spray out liquids when opened, the wearing of appropriate eye and skin protection in addition to respiratory protection is critical.

### B.     Drum Deheader

One means by which a drum can be opened manually when a bung is not removable with a bung wrench is by using a drum deheader. This tool is constructed of forged steel with an alloy steel blade and is designed to cut the lid of a drum off or part way off by means of a scissors-like cutting action. A limitation of this device is that it can be attached only to closed head drums (i.e.,

---

1 Taken from EPA Training Course: "Sampling for Hazardous Materials," U.S. Environmental Protection Agency, Office of Emergency and Remedial Response Support Division, March 24, 1987.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

DOT Specification 17E and 17F drums); drums with removable heads must be opened by other means.

Drums are opened with a drum deheader by first positioning the cutting edge just inside the top chime and then tightening the adjustment screw so that the deheader is held against the side of the drum. Moving the handle of the deheader up and down while sliding the deheader along the chime will enable the entire top to be rapidly cut off if so desired. If the top chime of a drum has been damaged or badly dented it may not be possible to cut the entire top off. Since there is always the possibility that a drum may be under pressure, the initial cut should be made very slowly to allow for the gradual release of any built-up pressure. A safer technique would be to employ a remote pressure release method prior to using the deheader.

## C.   Hand Pick or Spike

When a drum must be opened and neither a bung wrench nor a drum deheader is suitable, then it can be opened for sampling by using a hand pick, pickaxe, or spike. These tools are usually constructed of brass or a non-sparking alloy with a sharpened point that can penetrate the drum lid or head when the tool is swung. The hand picks or pickaxes that are most commonly used are commercially available, whereas the spikes are generally uniquely fabricated 4-ft long poles with a pointed end. Often the drum lid or head must be hit with a great deal of force in order to penetrate it. Because of this, the potential for splash or spraying is greater than with other opening methods and therefore this method of drum opening is not recommended, particularly when opening drums containing liquids. Some spikes used for drum opening have been modified by the addition of a circular splash plate near the penetrating end. This plate acts as a shield and reduces the amount of splash in the direction of the person using the spike. Even with this shield, good splash gear is essential.

Since drums, some of which may be under pressure, cannot be opened slowly with these tools, "sprayers" may result and appropriate safety measures must be taken. The pick or spike should be decontaminated after each drum is opened to avoid cross contamination and/or adverse chemical reaction from incompatible materials.

# III.   Remote Opening

## A.   Backhoe Spike

The most common means used to open drums remotely for sampling is the use of a metal spike attached or welded to a backhoe bucket. In addition to being very efficient, this method can greatly reduce the likelihood of personnel exposure.

Drums should be "staged," or placed in rows with adequate aisle space to allow ease in backhoe maneuvering. Once staged, the drums can be quickly opened by punching a hole in the drum head or lid with the spike.

The spike should be decontaminated after each drum is opened to prevent cross contamination. Even though some splash or spray may occur when this method is used, the operator of the backhoe can be protected by mounting a large shatter-resistant shield in front of the operator's cage. This, combined with the normal sampling safety gear, should be sufficient to protect the

STANDARD OPERATING PROCEDURE 060, SAMPLING CONTENTS OF TANKS AND DRUMS
ATTACHMENT F - DRUM OPENING TECHNIQUES AND EQUIPMENT

operator. Additional respiratory protection can be afforded by providing the operator with an on-board airline system. The hole in the drum can be sealed with a cork.

## B.     Hydraulic Devices

Recently, remotely operated hydraulic devices have been fabricated to open drums remotely. One such device is discussed here. This device uses hydraulic pressure to pierce through the wall of a drum. It consists of a manually operated pump that pressurizes oil through a length of hydraulic line. A piercing device with a metal point is attached to the end of this line and is pushed into the drum by the hydraulic pressure. The piercing device can be attached so that a hole for sampling can be made in either the side or the head/lid of the drum. Some of the metal piercers are hollow or tube-like so that they can be left in place, if desired, and serve as a permanent tap or sampling port. The piercer is designed to establish a tight seal after penetrating the container.

## C.     Pneumatic Devices

Pneumatically-operated devices utilizing compressed air have been designed to remove drum bungs remotely. A pneumatic bung remover consists of a compressed air supply (usually SCBA cylinders) that is controlled by a heavy-duty, 2-stage regulator. A high pressure air line of desired length delivers compressed air to a pneumatic drill that is adapted to turn a bung fitting (preferably, a bronze-beryllium alloy) selected to fit the bung to be removed. An adjustable bracketing system has been designed to position and align the pneumatic drill over the bung. This bracketing system must be attached to the drum before the drill can be operated. Once the bung has been loosened, the bracketing system must be removed before the drum can be sampled. This attachment and removal procedure is time- consuming and is the major drawback of this device. This remote bung opener does not permit the slow venting of the container, and therefore appropriate precautions must be taken. It also requires the container to be upright and relatively level. Bungs that are rusted shut cannot be removed with this device.

# IV.   Summary

The opening of closed containers is one of the most hazardous site activities. Maximum efforts would be made to ensure the safety of the sampling team. Proper protective equipment and a general wariness of the possible dangers will minimize the risk inherent to sampling operations. Employing proper drum opening techniques and equipment will also safeguard personnel. The use of remote sampling equipment whenever feasible is highly recommended.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 061

# Global Positioning System

## I.    Purpose

The procedure describes the calibration, operation, and functions associated with a Trimble® GeoExplorer® 6000 series. The GeoExplorer 6000 series includes the GeoXH™ and GeoXT™ handhelds. These handhelds combine a Trimble GNSS receiver with a field computer powered by Microsoft Windows Mobile version 6.5 operating system. If using a different instrument, the operation manual supplied by the manufacturer should be consulted for instructions.

## II.   Scope

This procedure provides information regarding the field operation and general maintenance of a Trimble® GeoExplorer® 6000 series. The information contained herein presents the operation procedures for this equipment. Review of the equipment's instruction manual is a necessity for more detailed descriptions pertaining to the operation and maintenance of the equipment.

## III.  Definitions

GPS: Global Positioning System - A system of satellites developed and operated by the US DOD. Continuous 3D coordinate information is broadcast free of charge on a worldwide basis enabling precise positional location. The GeoExplorer 6000 series handheld includes an integrated GNSS receiver that enables the collection of GPS and GLONASS data for incorporating into a GIS or for managing assets.

GPS (Global Positioning System) and GLONASS (GLObal NAvigation Satellite System) are Global Navigation Satellite Systems (GNSS). Each system consists of a constellation of satellites that orbit the earth. GNSS provides worldwide, all-weather, 24-hour time and position information.

## IV.   Procedures and Guidelines

The procedure for calibration, operation, and maintenance of the GPS unit is outlined below. Daily calibration and battery recharging is typical operating procedure; frequencies other than daily shall be noted in the logbook and reason for increased frequency recorded. If using a different instrument, the operation manual supplied by the manufacturer should be consulted for instructions.

The procedures described below include additional features pre-programmed into the GPS datalogger to aid the data collection process.

ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 061, GLOBAL POSITIONING SYSTEM

## A.     GeoExplorer 6000 Unit

## Parts of the GeoExplorer 6000 series handheld

The following diagrams show the main parts of the handheld.



## Keypad buttons

The GeoExplorer 6000 series handheld has a keypad for fast, easy access to common actions. LEDs provide visual notifications of system events.



ELECTRONICALLY FILED - 2025 Mar 12 6:09 PM - FLORENCE - COMMON PLEAS - CASE#2024CP2102844

STANDARD OPERATING PROCEDURE 061, GLOBAL POSITIONING SYSTEM

## B.    Operations for Surveying Coordinates of a Location

The TerraSync software consists of five sections as described below:

| Use this section … | to … |
| --- | --- |
| Map | view features, background files, and the GPS trail graphically |
| Data | work with data files:<br>• create a new data file or open an existing data file<br>• log base station data to file or broadcast real-time corrections<br>• collect new features or maintain existing features<br>• move, copy, delete, or rename data and background files |
| Navigation | navigate to features using the *Direction Dial* and *Close-up* screens, or the graphical lightbar |
| Status | view information about:<br>• the satellites the TerraSync software is tracking, their relative positions in the sky, and your current position<br>• the predicted satellite constellation and position quality over the next 12 hours<br>• communication ports that the TerraSync software is using<br>• your GPS receiver and real-time correction source<br>• the current UTC time<br>• the TerraSync software version and trademark information |
| Setup | configure the TerraSync software |

1.    Configure coordinate settings: To open the **Coordinate System** form, tap Coordinate System in the Setup screen. Use this form to specify the coordinate system you want the TerraSync software to display foreground and background files.